_____

IN RE AUTOMOTIVE WIRE
HARNESS SYSTEMS ANTITRUST
LITIGATION

_____

THIS DOCUMENT RELATES TO:

All Direct Purchaser Actions

_____

: Master File No. 12-md-02311
:
:
:
:
:
:
:
:
:
:
:

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## SUMMARY OF THE CASE

1.     Plaintiffs, individually and on behalf of the Class described below, bring this class action against Defendants for damages and injunctive relief under the antitrust laws of the United States on behalf of direct purchasers who, during the Class Period, purchased Wire Harness Products, as defined below, in the United States from one or more of the Defendants.  Defendants are manufacturers or sellers of Wire Harness Products that are manufactured or sold in the United States.

2.     Plaintiffs allege that Defendants conspired to rig bids for, and to raise fix, maintain, or stabilize the prices of, Wire Harness Products sold in the United States from at least as early as January 1, 2000 until at least February 28, 2010 in violation of Section 1 of the Sherman Act.  Plaintiffs further allege that Defendants fraudulently concealed their conspiracy.

3.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class paid higher prices for Wire Harness Products than they would have paid in a competitive market.

## JURISDICTION AND VENUE

4.     Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit and reasonable attorneys' fees, as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.     The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and one or more of the Defendants reside in this District.

6.     This Court has personal jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Wire Harness Products throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was

directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

7.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

8.    Alternatively, there is jurisdiction over foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## DEFINITIONS

9.    The "Class Period" is from January 1, 2000 through the present.

10.    The term "Wire Harness Products", as used in this Complaint, refers to wire harnesses and the following related products: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, high voltage wiring, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors used in motor vehicles.

11.    Wire harnesses are electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in motor vehicles.

12.     "Defendant" or "Defendants" as used herein, includes all of the named Defendants' predecessors during the Class Period.

## TRADE AND COMMERCE

13.     During the Class Period each Defendant sold Wire Harness Products in the United States, in a continuous and uninterrupted flow of interstate commerce.

14.     During the Class Period, Defendants collectively controlled a majority of the market for Wire Harness Products, both globally and in the United States.

15.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## THE PARTIES

### Plaintiffs

16.     Plaintiff Mexican Industries in Michigan, Inc. by and through Timothy Miller, its Trustee in Bankruptcy ("Mexican Industries") is a Michigan corporation with its principal place of business in Detroit, Michigan.  Plaintiff Mexican Industries purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

17.     Plaintiff Paesano Connecting Systems, Inc. ("Paesano") is a Pennsylvania corporation with its principal place of business in Ridgway, Pennsylvania.  Plaintiff Paesano purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

18.     Plaintiff Craft-Co Enterprises, Inc. ("Craft-Co") is a Mississippi corporation with its principal place of business in Brandon, Mississippi.  Plaintiff Craft-Co purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

19.     Plaintiff Findlay Industries, Inc. ("Findlay") is an Ohio corporation with its principal place of business in Findlay, Ohio.  Plaintiff Findlay purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

20.     Plaintiff Cesar-Scott, Inc. ("Cesar-Scott") is a Texas corporation with its principal place of business in El Paso, Texas.  Plaintiff Cesar-Scott purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

21.     Plaintiff Martinez Manufacturing, Inc. ("Martinez") is an Illinois corporation with its principal place of business in Cary, Illinois.  Plaintiff Martinez purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

22.     Plaintiff South Star Corporation ("South Star") is a Virginia corporation with its principal place of business in Elliston, Virginia.  Plaintiff South Star purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

## The Delphi Defendants

23. Defendant Delphi Automotive LLP is a partnership organized under the laws of England and Wales. It was formed in 2009 to buy assets of Troy, Michigan-based Delphi Corporation, which filed for bankruptcy protection in 2005. Defendant Delphi Automotive LLP – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

24. Defendant Delphi Automotive Systems, LLC is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of and wholly owned or controlled by its parent, Delphi Automotive LLP. Officers from Defendant Delphi Automotive LLP work out of the Michigan offices of Defendant Delphi Automotive Systems, LLC. Defendant Delphi Automotive Systems, LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

25. Defendant DPH Holdings Corporation (f/k/a Delphi Corporation) is a Delaware corporation with its principal place of business in Warren, Ohio. It is a subsidiary of and wholly owned or controlled by its parent, Delphi Automotive LLP. Defendant DPH Holdings Corporation manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

26. Defendant Delphi Furukawa Wiring Systems LLC is a limited liability company created in 2004 as a joint venture between Delphi Corporation and Furukawa Electric Co., Ltd. with its principal place of business in Ann Arbor, Michigan. Delphi Furukawa Wiring Systems LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

27. Defendants Delphi Automotive LLP, Delphi Automotive Systems, LLC, DPH Holdings Corporation and Delphi Furukawa Wiring Systems LLC shall collectively be referred to herein as the "Delphi Defendants" or "Delphi."

**The Denso Defendants**

28. Defendant Denso Corporation is a Japanese corporation. Defendant Denso Corporation – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

29. Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned or controlled by its parent, Denso Corporation. Defendant Denso International America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Denso Corporation.

30. Defendant Asmo Co. Ltd. ("Asmo") is a Japanese corporation with its principal place of business in Japan. Asmo is a wholly-owned and controlled subsidiary of Defendant Denso Corporation. Defendant Asmo manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Denso Corporation.

31. Defendants Denso Corporation, Denso International America, Inc. and Asmo Co., Ltd. shall collectively be referred to herein as the "Denso Defendants" or "Denso."

**The Fujikura Defendants**

32. Defendant Fujikura Ltd. is a Japanese corporation. Defendant Fujikura Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

33. Defendant Fujikura America, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia. It is a subsidiary of and wholly owned or controlled by its parent, Fujikura Ltd. Defendant Fujikura America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

During the Class Period, its activities in the United States were under the control and direction of Fujikura Ltd.

34.	Defendants Fujikura Ltd. and Fujikura America, Inc. shall collectively be referred to herein as the "Fujikura Defendants" or "Fujikura."

**The Furukawa Defendants**

35.	Defendant Furukawa Electric Co., Ltd. is a Japanese corporation. Defendant Furukawa Electric Co., Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

36.	Defendant American Furukawa, Inc. is a Delaware corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned or controlled by its parent, Furukawa Electric Co. Ltd.  Defendant American Furukawa, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Furukawa Electric Co., Ltd.

37.	Defendant Furukawa Wiring Systems America, Inc. f/k/a Furukawa Lear Corporation and Lear Furukawa Corporation is a Delaware corporation with its principal place of business in El Paso, Texas.  Defendant Furukawa Wiring Systems America, Inc. is 60% owned by Furukawa Electric Co., Ltd. and 40% owned by American Furukawa, Inc.  During the Class Period, Furukawa Wiring Systems

America, Inc. operated as a joint venture between Lear Corporation and Furukawa Electric Co., Ltd. that manufactured, distributed or sold Wire Harness Products that were purchased throughout United States, including in this District.  In June 2010, Furukawa Electric Co., Ltd. purchased all of Lear's Corporation's remaining interest.

38.     Defendants Furukawa Electric Co., Ltd. American Furukawa, Inc. and Furukawa Wiring Systems America, Inc. shall collectively be referred to herein as the "Furukawa Defendants" or "Furukawa."

## The Lear Defendants

39.     Defendant Lear Corporation is a Delaware corporation with its principal place of business in Southfield, Michigan.  Defendant Lear Corporation – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

40.     Defendant Kyungshin-Lear Sales and Engineering, LLC is a Delaware corporation with its principal place of business in Selma, Alabama.  It is a joint venture between Defendant Lear Corporation and Kyungshin Corporation of South Korea.  Defendant Kyungshin-Lear Sales and Engineering, LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

41.    Defendants Lear Corporation and Kyungshin-Lear Sales and Engineering, LLC shall collectively be referred to herein as the "Lear Defendants" or "Lear."

42.    Lear filed for Chapter 11 bankruptcy protection on July 7, 2009.  After its emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Wire Harness Products pursuant to and as part of its participation in furtherance of the conspiracy.  From and after November 2009, Lear had significant Wire Harness Products sales in the United States at supra-competitive prices.  In 2010 alone, Lear had $2.56 billion in total sales in its electric power and management systems, which includes significant sales of Wire Harness Products in the United States pursuant to the conspiracy.

## The Leoni Defendants

43.    Defendant Leoni AG is a German corporation.  Defendant Leoni AG – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

44.    Defendant Leoni Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned or controlled by its parent, Leoni AG.  Defendant Leoni Wiring Systems Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

During the Class Period, its activities in the United States were under the control and direction of Leoni AG.

45.    Defendant Leonische Holding, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned or controlled by its parent, Leoni AG.  Defendant Leonische Holding, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Leoni AG.

46.    Defendant Leoni Kabel GmbH is a German corporation.  Defendant Leoni Kabel GmbH manufactured, marketed  or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

47.    Defendant Leoni Wire Inc. is a Massachusetts corporation with its principal place of business in Chicopee, Massachusetts.  Leoni Wire Inc. is a wholly-owned and controlled subsidiary of Defendant Leoni AG.  Defendant Leoni Wire Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Leoni AG.

48.     Defendants Leoni AG, Leoni Wiring Systems, Inc., Leonische Holding, Inc., Leoni Kabel GmbH and Leoni Wire Inc. shall collectively be referred to herein as the "Leoni Defendants" or "Leoni."

## The Sumitomo Defendants

49.     Defendant Sumitomo Electric Industries, Ltd. is a Japanese corporation.  Defendant Sumitomo Electric Industries, Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

50.     Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation. Defendant Sumitomo Wiring Systems, Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

51.     Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Electric Wiring Systems, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control

and direction of Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.

52. Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee. It is a subsidiary of and wholly owned or controlled by its parent, Sumitomo Electric Industries, Ltd. Defendant K&S Wiring Systems, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd.

53. Defendant Sumitomo Wiring Systems (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.

54. Defendant Sumitomo Electric Wintec America, Inc. is a Kentucky corporation with its principal place of business in Edmonton, Kentucky. Sumitomo Electric Wintec America, Inc. is a wholly-owned and controlled subsidiary of

Defendant Sumitomo Electric Industries, Ltd. Defendant Sumitomo Electric Wintec America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd.

55.     Defendants Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc., Sumitomo Wiring Systems (U.S.A.) Inc., and Sumitomo Electric Wintec America, Inc. shall collectively be referred to herein as the "Sumitomo Defendants" or "Sumitomo."

## The Yazaki Defendants

56.     Defendant Yazaki Corporation is a Japanese corporation. Defendant Yazaki Corporation – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

57.     Defendant Yazaki North America, Inc. is an Illinois corporation with its principal place of business in Canton Township, Michigan. It is a subsidiary of and wholly owned or controlled by its parent, Yazaki Corporation. Defendant Yazaki North America Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District,

during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Yazaki Corporation.

58.     Defendant S-Y Systems Technologies Europe GmbH is a German corporation. S-Y Systems Technologies Europe GmbH was formed as a joint venture between Siemens and Yazaki Corporation. Defendant S-Y Systems Europe GmbH – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

59.     Defendant S-Y Systems Technologies America, LLC is a Delaware corporation with its principal place of business in Dearborn, Michigan. It is currently a wholly owned subsidiary of or controlled by its parent Defendant Yazaki Corporation, but was formerly a joint venture between Siemens VDO Automotive AG and Yazaki Corporation. Defendant S-Y Systems Technologies America, LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Siemens and Yazaki Corporation, or its current Japanese parent, Yazaki Corporation.

60.     Yazaki Corporation, Yazaki North America, Inc., S-Y Systems Technologies Europe GmbH, and S-Y Systems Technologies America, LLC are herein referred to as shall collectively be referred to herein as the "Yazaki Defendants" or "Yazaki."

## The Tokai Rika Defendants

61.     Defendant Tokai Rika Co., Ltd. is a Japanese corporation.  Defendant Tokai Rika Co., Ltd. manufactured, marked or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

62.     Defendant TRAM, Inc. ("TRAM") is a Michigan corporation with its principal place of business in Plymouth, Michigan.  TRAM is a wholly-owned and controlled subsidiary of Defendant Tokai Rika Co., Ltd. Defendant TRAM manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Tokai Rika Co., Ltd.

63.     Defendants Tokai Rika Co., Ltd. and TRAM, Inc. are collectively referred to herein as "Tokai Rika."

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

64.     Various persons or firms not named as Defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

65. Each Defendant acted as the agent or joint venturer of or for other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiffs.

## CLASS ACTION ALLEGATIONS

66. Plaintiffs bring this action both on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3). The Class is defined as follows:

> All individuals and entities that purchased Wire Harness Products in the United States directly from one or more Defendants or co-conspirators from January 1, 2000 through the present.

67. Plaintiffs do not know the exact number of Class members, such information being in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

68. There are questions of law or fact common to the class:

    a. Whether Defendants engaged in a contract, combination, or conspiracy to rig bids for, or to raise, fix, maintain, or stabilize prices of Wire Harness Products sold in the United States;

    b. Whether Defendants agreed to allocate the supply of Wire Harness Products sold to certain direct purchasers in the United States on a model-by-model basis;

c.      Whether Defendants' conduct caused Wire Harness Products to be sold in the United States at artificially high prices;

d.      Whether Plaintiffs and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

e.      Whether Plaintiffs and other members of the Class are entitled to injunctive relief and, if so, the nature and extent of such relief.

69.     These questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

70.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly purchased Wire Harness Products from one or more of the Defendants, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiffs is common to the Class.

71.     Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of Wire Harness Products and have no conflict with any other members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

72.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

73.    A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

74.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

75.    The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

**INDUSTRY BACKGROUND**

76.    Wire harnesses are systems of electrical and electronic cables, wires and connectors used to transmit informational signals or operating currents to electronic control units, wiring, circuit boards, and other components in motor vehicles.

77.    Wire harness assemblies consist of raw, coiled wire, which is cut to length and terminated.  Individual circuits are assembled together on a jig or table, inserted into connectors and wrapped or taped to form wire harness assemblies.

78.    Wire harnesses have color coded wires that are designed to support specific electrical and electronic motor vehicle features.  Most, if not all, electrical and electronic devices in a vehicle rely on a wire harness to provide electric current and data transmission for operation.

79.    Motor vehicles contain masses of wires that can amount to several kilometers in length.  A motor vehicle's wiring system is organized into multiple

wire harnesses. Wire harnesses provide organized connection points for multiple wiring configurations. The harness feature binds wires and cables into a bundle, which provides protection against deterioration or damage from vibration, abrasions, and moisture.

80. Wire Harness Products are installed by manufacturers in new vehicles as part of the manufacturing process. Also, Wire Harness Products are installed in vehicles to replace worn out, defective or damaged parts.

81. Automotive electrical wiring is the wiring that runs throughout the vehicle.

82. High voltage wiring is integral to vehicles equipped with hybrid, fuel-cell or electric-powered powertrains.

83. Lead wire assemblies connect a wire carrying electrical current from the power source to an electrode holder or a group clamp.

84. Cable bonds are the electrical connection between the armor or sheath of one cable and that of an adjacent cable or across a wire in the armor.

85. Automotive wiring connectors connect various types of wires in a motor vehicle.

86. Automotive wiring terminals are the ends of a wire that provide a point of connection to external circuits.

87. Electronic control units ("ECUs") are embedded modules or systems that control one or more of the electrical systems or subsystems in a motor vehicle.

Motor vehicles are equipped with a large number of ECUs that operate various motor vehicle functions and exchange large volumes of data with one another.

88.     Fuse boxes are modules that hold the fuses for the various electrical circuits, all of which are routed through the fuse box.  The primary purpose of an electrical fuse is to help protect components on a circuit from damage in the event of a short circuit or a current spike or overload.

89.     Relay boxes are modules that hold the electrical switches that transmit impulses from one component to another, and can be used to connect or break the flow of the current in a circuit.  Once a relay is activated it connects an electrical or other data supply to a particular component or accessory.

90.     Junction blocks are used as electrical connection points for the distribution power or distribution of a ground.

91.     Power distributors serve to distribute power at varying levels to various electrical components.

<u>Requests For Quotation</u>

92.     Motor vehicle Original Equipment Manufacturers ("OEMs") require multiple sources for motor vehicle parts.  As part of their supply chain and procurement process, OEMs issue Requests for Quotation ("RFQs") to parts suppliers on a model-by-model basis for model specific Wire Harness Products.

93.     RFQs are a standard business practice that allow parts suppliers to submit price quotations or bids on specific products or services.

94.     Foreign OEMs participate in RFQs to procure parts for U.S.-manufactured vehicles both abroad and in the United States.

95.     Generally, OEMs issue Wire Harness Products RFQs to begin the bidding process approximately three years prior to production of a motor vehicle.

96.     OEMs' RFQs typically include specifications and other relevant information for each motor vehicle product.  In response to RFQs, parts suppliers submit price quotations, or bids, to OEMs to be considered for an award.

97.     After receiving responses to RFQs from each respective bidder, OEMs then award the business to the selected parts suppliers generally for the life of the vehicle model and further confirmed with annual purchase orders.

98.     Suppliers to OEMs have been required to directly purchase Wire Harness Products from Defendants at prices established by the OEMs and Defendants in the bidding process.

## The Wire Harness Products Industry

99.     It was important to the success of the cartel alleged herein that its members control and manipulate the prices paid by OEMs in order to control the prices paid by all other direct purchasers of Wire Harness Products.

100.    The Wire Harness Products industry is heavily concentrated.  Wire Harness Products manufacturers are all capable of producing Wire Harness Products for use in any motor vehicle.

101.     During the Class Period the top four automotive Wire Harness

Products manufacturers controlled 76.95% of the global market, and the top seven,

all of which are Defendants, controlled 87.95% of the global market.  See Figure 1.

**Market Shares of World's Major Manufacturers of Automotive Wiring Harness, 2009**

| | |
|---|---|
| Yazaki | 29.81% |
| Sumitomo | 24.38% |
| Delphi | 16.71% |
| Leoni | 6.05% |
| Lear | 4.70% |
| Furukawa | 3.61% |
| Fujikura | 2.69% |

Figure 1.

102.     According to *Research in China*, an international market research and

market data firm, the global automotive wiring harness market reached U.S. $25.3

billion in 2009, and grew by 6.6% to $26.9 billion in 2010.  By 2013, the global

automotive wiring harness market is projected to increase to almost U.S. $33

billion.  See Figure 2.



**Global Automotive Wiring Harness Market Scale, 2007-2013**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Market Scale (US$ million) | 29,302 | 24,980 | 25,317 | 26,982 | 29,380 | 30,010 | 32,980 |
| Growth Rate | 16.9% | -14.7% | 1.3% | 6.6% | 9.3% | 9.0% | 3% |

Figure 2.

    103.    There are high barriers to entry in the Wire Harness Products market due to high capital investment in plant and machinery and technical expertise. It is critically important for parts suppliers to maintain minimum viable scale in order to efficiently produce parts within the price and quantity parameters established by the OEMs. As such, loss of one's position as a supplier of choice could have severe consequences to the business models of Defendants and their co-conspirators.

104.    In a competitive market, economies of scale and decreasing costs would lead to lower prices because manufacturers typically will reduce pricing rather than lose market share.  In a market subject to a conspiracy to fix prices, however, competitors do not have the same incentive to lower prices despite steady or decreasing input costs because, based on a conspiratorial agreement, there is a smaller risk of losing sales to lower-priced competitors.

105.    During the Class Period, the prices of Wire Harness Products increased, while the primary manufacturing input costs remained steady.  In fact, the Yazaki, Sumitomo, Leoni, Furukawa, Delphi, Lear and Fujikura Defendants have extensive experience in wiring production and are able to control associated input costs.

## Opportunities To Conspire

106.    Defendants and their co-conspirators attended industry events that provided the opportunity to meet, disguise their improper discussions, and perform acts in furtherance of the conspiracy.  For example, Defendants and their co-conspirators have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan and the Automotive Aftermarket Products Expo in Las Vegas, Nevada.

## The Conspiracy

107.    During the Class Period, Defendants and their co-conspirators formed an international cartel to suppress and eliminate competition for Wire Harness

Products by agreeing to rig bids for, and to raise, fix, stabilize, or maintain the prices of, Wire Harness Products.

108. Defendants and their co-conspirators participated in meetings, conversations, and communications in the United States and abroad to discuss bids and price quotations for Wire Harness Products to be submitted to automobile manufacturers in the United States.

109. Defendants and their co-conspirators agreed during those meetings, conversations, and communications to allocate the supply of Wire Harness Products sold to automobile manufacturers in the United States on a model-by-model basis.

110. Defendants and their co-conspirators also agreed during meetings, conversations, and communications to coordinate price adjustments requested by automobile manufacturers in the United States.

111. Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States in accordance with their conspiratorial agreements.

112. Defendants' pricing actions regarding their sales of Wire Harness Products to automobile manufacturers had an impact on prices for Wire Harness Products for all direct purchasers of Wire Harness Products throughout the United States.

113. Defendants and their co-conspirators held meetings and conversations in the United States to monitor and police the agreed-upon bid-rigging and price-fixing conspiracy.

114.     Defendants and their co-conspirators undertook measures to maintain the secretive nature of their unlawful conduct, including but not limited to, using code names and meeting at private residences or remote locations.

Government Investigations

115.     Various U.S. and international governmental authorities, including the U.S. Department of Justice ("DOJ") via its Antitrust Division, are currently investigating anticompetitive conduct in connection with the Wire Harness Products industry.

116.     On February 23, 2010, the Federal Bureau of Investigation's ("FBI") Detroit division and the DOJ raided the U.S. offices of Denso, Yazaki, and TRAM. DOJ spokeswoman Gina Talamona said that "[t]he antitrust division is investigating the possibility of anticompetitive cartel conduct. . . . We are coordinating with the European Commission and other foreign competition authorities."

117.     On February 24, 2010, officials from the Competition Directorate of the EC raided the offices of Wire Harness Products manufacturers and a February 25, 2010 EC press release disclosed that the "Commission confirms investigation into suspected cartel in the sector of automotive electrical and electronic components suppliers. . . . The Commission has reason to believe that the companies concerned may have violated EU antitrust rules that prohibit cartels and restrictive business practices." Reports indicated that the EU's investigation included Leoni AG, Leoni Kabel GmbH, Lear Automotive France, Delphi, Yazaki and S-Y Systems.

118.   Also on February 24, 2010, it was reported that the Japanese Fair Trade Commission ("JFTC") raided three Japanese wire harness manufacturers suspected of participating in a price-fixing cartel: Yazaki Corporation, Sumitomo Electric Industries, Ltd., and Furukawa Electric Co., Ltd.  The three manufacturers have a combined 90% share of the Japanese wire harness market.

119.   On June 30, 2011, Defendant Fujikura Ltd. announced that it received an advance notice of disciplinary action against the company from the JFTC for violating antitrust laws regarding the trading of wiring harnesses.  Fujikura Ltd. was ordered to pay 1.2 billion yen (U.S. $14.8 million).

120.   On July 20, 2011, the JFTC raided seven Japanese auto parts makers, including Defendants Denso Corporation and its wholly-owned subsidiary Asmo. The *Japan Times* reported that the JFTC "suspects the parts manufacturers had meetings from 2002 or earlier to set parts prices and decided which companies would win contracts before bidding for orders from automakers."

121.   On July 27, 2011, Defendant Delphi announced in its consolidated second quarter 2011 financial statements that it "received a request from antitrust authorities at the European Commission seeking information about conduct by Delphi in connection with an investigation in the European Union related to the electrical and electronic components market" and is cooperating with European authorities.

122.   On September 29, 2011, the DOJ charged Defendant Furukawa Electric Co., Ltd. and three of its executives with participating in a "combination

and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses and related products" in violation of the Sherman Antitrust Act.

123. Also on September 29, 2011, Defendant Furukawa Electric Co., Ltd. and its three executives agreed to plead guilty for their involvement in a criminal price-fixing and bid-rigging conspiracy in connection with the sale of Wire Harness Products. Furukawa Electric Co., Ltd. agreed to pay a $200 million fine while three of its executives agreed to serve prison time in the United States ranging from a year and a day to eighteen months.

124. The DOJ described these as the "first charges as a result of its ongoing international cartel investigation of price fixing and bid rigging in the auto parts industry."

125. In a September 29, 2011 DOJ press release, Sharis A. Pozen, Acting Assistant Attorney General of the DOJ's Antitrust Division stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

126. FBI Special Agent in Charge Andrew G. Arena also said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system." "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

127.   According to the DOJ, Defendant Furukawa Electric Co., Ltd. and its co-conspirators manufactured automotive Wire Harness Products (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

128.   The DOJ alleges that Furukawa Electric Co., Ltd. and its co-conspirators: (a) had meetings and communications in the United States and Japan to discuss bids and price quotations to be submitted to automobile manufacturers in the United States, (b) agreed on bids and price quotations to be submitted  to automobile manufacturers in the United States, (c) agreed to allocate the supply of automotive wire harnesses and related products sold in the United States on a model-by-model basis, (d) agreed to coordinate price adjustments requested by automobile manufacturers in the United States, (e) submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States in accordance with the agreements reached, (f) sold Wire Harness Products to automobile manufacturers in the United States at collusive and noncompetitive prices, and (g) participated in meetings and communications to monitor the conspiracy and conceal their unlawful conduct, including but not limited to using code names and meeting at private residences or remote locations.

129.   On October 24, 2011, Hirotsugu Nagata pleaded guilty to a conspiracy to restrain trade in the market for Wire Harness Products in violation of the

Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan. Nagata was employed at Furukawa America in Plymouth, Michigan as General Manager of Sales from January 2004 to November 2007, Chief Financial Officer from January 2004 until March 2009, and Marketing Manager for a related joint venture from January 2004 until June 2009. Nagata admitted in his guilty plea that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.

130.    On October 24, 2011, Junichi Funo pleaded guilty to a conspiracy to restrain trade in the market for Wire Harness Products in violation of the Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan. Funo worked at Furukawa Electric Co., Ltd. in Japan as a Honda Sales Division representative from April 2003 to August 2003, then as Assistant General Manager for Honda Sales at Furukawa America from August 2003 to March 2009, and also as Manager of the Honda Sales Division in Japan from March 2009 until at least July 2009. Funo admitted in his guilty plea that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile

manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.

131. On November 10, 2011, Tetsuya Ukai pleaded guilty to a conspiracy to restrain trade in the market for Wire Harness Products in violation of the Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan. Ukai worked at Furukawa Electric Co., Ltd. in Japan as a Manager in the Honda Sales Division from April 2003 to July 2005, Unit Chief in the Honda Sales Division from July 2005 to April 2007, and then General Manager of the Honda Sales Division from April 2007 until at least July 2009. Ukai admitted in his guilty plea that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.

132. On November 14, 2011, Defendant Furukawa Electric Co., Ltd. pleaded guilty for its involvement in a criminal price-fixing and bid-rigging conspiracy in connection with the sale of Wire Harness Products. Furukawa Electric Co., Ltd. admitted in its guilty plea that during the relevant period, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig

bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States. Furukawa Electric Co., Ltd. agreed to pay a $200 million fine.

133. On January 19, 2012, the JFTC issued cease and desist orders to Defendants Yazaki Corporation and Fujikura Ltd. The JFTC also fined Yazaki Corporation, Sumitomo Electric Industries Ltd. and Fujikura Ltd. The JFTC's cease and desist orders and fines against these Defendants were based on their involvement in a price-fixing and bid-rigging conspiracy in connection with the sale of Wire Harness Products in violation of Article 3 of the Japanese Antimonopoly Act. According to a JFTC press release, Yazaki Corporation, Sumitomo Electric Industries Ltd., Fujikura Ltd., and Furukawa Electric Co., Ltd. "substantially restrained competition . . . [by] appointing the designated successful bidder and managing to have the designated successful bidder win the bidding." The JFTC fined Yazaki Corporation approximately $125.8 million, Sumitomo Electric Industries Ltd. $27.5 million, and Fujikura Ltd. $14.4 million. Furukawa Electric Co., Ltd. admitted to its participation in a price-fixing and bid-rigging conspiracy, but was not fined because it provided information to the JFTC that led to the investigation.

134. On January 30, 2012, the DOJ announced that Defendant Yazaki Corporation had agreed to pay a $470 million fine and to plead guilty to a three-count criminal information charging Yazaki Corporation with, among other things,

participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Wire Harnesses Products sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act. On March 1, 2012, Defendant Yazaki Corporation pleaded guilty to this charge.

135. In addition to Yazaki Corporation, four Yazaki executives, Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa, and Hisamitsu Takada, agreed to plead guilty to antitrust violations arising from their participation in a conspiracy to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Wire Harness Products sold to certain automobile manufacturers in the United States and elsewhere. The four executives of Yazaki Corporation will serve prison time ranging from 15 months to two years. The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act violation.

136. On January 30, 2012, the DOJ also announced that Defendant Denso Corporation agreed to plead guilty and pay a total of $78 million in criminal fines to a two-count criminal information charging Denso Corporation with, among other things, participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain ECUs sold to an automobile manufacturer in the

United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act. ECUs are Wire Harness Products as alleged in this Complaint and are "essential to the wiring, circuit boards, gauges and fuel tanks of automobiles." On March 5, 2012, Denso Corporation pleaded guilty to this charge.

137. On April 23, 2012, the DOJ announced that Defendant Fujikura Ltd. had agreed to plead guilty to a one-count criminal information charging it with participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Wire Harnesses Products sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2006 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act. Fujikura Ltd. also agreed to pay a $20 million fine for its role in the conspiracy.

## FRAUDULENT CONCEALMENT

138. Defendants affirmatively and wrongfully concealed their anti-competitive conduct from Plaintiffs and the Class from at least January 1, 2000 through at least February 2010, when the antitrust investigations of the Wire Harness Products manufacturers became public. During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to their claims, despite due diligence. Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least February 2010.

139.    Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral. In making those false representations, Defendants misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer allocation, and price-fixing activities.

140.    Defendants' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

141.    In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

142.    During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

143.    Defendants likewise agreed to allocate the supply of Wire Harness Products sold to customers in the United States and elsewhere.

144.    Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

145.    In accordance with the agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

146.    As a result of such coordinated actions, and unbeknownst to Plaintiffs, Defendants sold Wire Harness Products to purchasers in the United States at collusive and noncompetitive prices.

147.    To keep the sale of Wire Harness Products at collusive and noncompetitive prices a secret, Defendants employed certain measures, including but not limited to, using code names and meeting at private residences or remote locations.

148.    Moreover, Defendants' successful contract, combination, or conspiracy was by its nature inherently self-concealing.

149.    Despite due diligence, Plaintiffs had no knowledge of Defendants' unlawful contract, combination, or conspiracy.

150.    In the course of purchasing Wire Harness Products, Plaintiffs studied prices of the specific products involved.

151.    Plaintiffs received from one or more Defendants various pricing information.  Plaintiffs had no way to know that Defendants' prices were higher than they should have been due to the conspiracy alleged herein.

152.    Plaintiffs did not and could not have discovered Defendants' unlawful contract, combination, or conspiracy at any earlier date, despite due diligence. Defendants undertook affirmative acts of concealment of their contract, combination, or conspiracy, including their attendance at secret meetings, making misrepresentations to Plaintiffs and the Class of the reasons for the prices charged,

and engaging in secret conversations concerning the allocation of customers, bid-rigging, and price-fixing of Wire Harness Products.

## ANTITRUST INJURY

153. Defendants' conspiracy caused injury to Plaintiffs and members of the Class by suppressing price competition among Wire Harness Products manufacturers, thereby depriving purchasers of Wire Harness Products of the benefits of a competitive market and setting prices of Wire Harness Products at artificially high levels.

154. As a direct result of Defendants' conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for Wire Harness Products than otherwise would have been the case in a competitive market.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 – Horizontal Price-Fixing Against All Defendants)

155. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

156. During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Wire Harness Products sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

157. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants and their co-

conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices for Wire Harness Products sold in the United States. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

158. Defendants succeeded in rigging bids, fixing, raising, maintaining and stabilizing the prices of Wire Harness Products sold in the United States during the Class Period.

159. For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they conspired to do, including:

    a.    Participating in meetings and conversations in the United States and elsewhere to discuss the bids and price quotations of Wire Harness Products to be submitted to direct purchasers in the United States;

    b.    Agreeing on bids and price quotations to be submitted to direct purchasers in the United States;

    c.    Agreeing to manipulate prices and allocate supply of Wire Harness Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.    Agreeing to coordinate price adjustments in the United States;

e.    Submitting bids, price quotations, and price adjustments to direct purchasers of Wire Harness Products in accordance with the agreements reached;

f.    Selling Wire Harness Products to direct purchasers in the United States at noncompetitive prices; and

g.    Employing measures to conceal the true nature of their unlawful conduct from Plaintiffs and other members of the Class in furtherance of the conspiracy.

160.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses or property in that they have paid more for Wire Harness Products than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully request the following relief:

A.    That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act;

C.      That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest; and

G.      That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: May 14, 2012

/s/ David H. Fink

David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Road; Ste. 111
Bloomfield Hills, MI 48304
(248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Direct Purchaser Interim Liaison Counsel

Gregory P. Hansel
Randall B. Weill
Joshua R. Carver
PRETI, FLAHERTY, BELIVEAU
  & PACHIOS LLP
One City Center, P.O. Box 9546
Portland, ME  04112-9546
Telephone:  (207) 791-3000
ghansel@preti.com
rweill@preti.com
jcarver@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
Telephone:  (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Michael J. Freed
Steven A. Kanner
William H. London
Michael L. Silverman
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone:  (224) 632-4500
mfreed@fklmlaw.com
skanner@fklmlaw.com
blondon@fklmlaw.com
msilverman@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
  & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone:  (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Direct Purchaser Interim Lead Counsel

W. Joseph Bruckner
LOCKRIDGE GRINDAL
    NAUEN P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: (612) 339-6900
wjbruckner@locklaw.com

Robert Bonsignore
Richard Kirchner
Brian Hagen
Paula Flannery
Lisa Sleboda
BONSIGNORE & BREWER
193 Plummer Hill Road
Belmont, NH 03220
Telephone: (781) 856-7650
rbonsignore@class-actions.us
rkirchner@class-actions.us
bhagen@class-actions.us
pflannery@class-actions.us
lsleboda@class-actions.us

Brian Murray
Lee Albert
MURRAY FRANK LLP
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: (212) 682-1818
bmurray@murrayfrank.com
lalbert@murrayfrank.com

Garret Blanchfield
REINHARDT, WENDORF
    & BLANCHFIELD
E-1250 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
Telephone: (651) 287-2100
g.blanchfield@rwblawfirm.com

Solomon B. Cera
GOLD BENNETT CERA
  & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
scera@gbcslaw.com

James F.B. Daniels
MCDOWELL, RICE, SMITH
  & BUCHANAN, P.C.
605 West 47th Street, Suite 350
Kansas City, MO 64112-1005
Telephone: (816) 753-5400
jdaniels@mcdowellrice.com

Manuel John Dominguez
COHEN MILSTEIN SELLERS & TOLL
  PLLC
3507 Kyoto Gardens Drive
Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 578-6850
jdominguez@cohenmilstein.com

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
vesades@heinsmills.com

Karlos F. Finley
BOTELER, FINLEY & WOLFE, P.C.
1252 Dauphin Street
Mobile, AL 36604
Telephone: (251)433-7766
karlos@bfw-lawyers.com

Joseph M. Fischer
CARSON FISCHER, P.L.C.
4111 Andover Road West - Second Floor
Bloomfield Hills, MI 48302-1924
Telephone: (248) 644-4840
jfischer@carsonfischer.com

Bruce E. Gerstein
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036
Telephone: (212) 398-0055
bgerstein@garwingerstein.com

Lewis Goldfarb
MCELROY, DEUTSCH, MULVANEY
  & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
Telephone: (973) 425-8689
lgoldfarb@mdmc-law.com

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, LPA
35 East Seventh Street, Suite 600
Cincinnati, OH 45202
Telephone: (513) 345-8291
jgoldenberg@gs-legal.com

Steve Greenfogel
LITE DEPALMA GREENBERG, LLC
1521 Locust Street
Philadelphia, PA 19102
Telephone: (215) 564-5182
sgreenfogel@litedepalma.com

Steven D. Irwin
LEECH TISHMAN FUSCALDO
  & LAMPL, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219
Telephone: (412) 261-1600
sirwin@leechtishman.com

Irwin B. Levin
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 687-6611
dmogin@moginlaw.com

D. Michael Noonan
SHAHEEN & GORDON, P.A.
P.O. Box 977
140 Washington Street, 2nd floor
Dover, NH 03821
Telephone: (603) 749-5000
mnoonan@shaheengordon.com

Linda P. Nussbaum
Robert G. Eisler
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
lnussbaum@gelaw.com

Dustin M. Roach
VAN GILDER & TRZYNKA, P.C.
436 E. Wayne Street
Fort Wayne, IN 46802
Telephone: (260) 424-8132
droach@vgtlaw.com


Wesley Steury
BURT BLEE DIXON SUTTON &
BLOOM, LLP
200 East Main Street, Suite 1000
1st Source Banking Center
Fort Wayne, IN 46802
Telephone: (260) 426-1300
Wsteury@burtblee.com

Stephen M. Smith
JOSEPH SMITH, LTD.
2100 Kecoughtan Road
Hampton, VA 23661
Telephone: (757) 244-7000 Ext. 123
ssmith@braininjurylawcenter.com

Robert Peurach
DAKMAK PEURACH, P.C.
615 Griswold Street, Suite 600
Detroit, MI 48226
Telephone: (866) 732-9522
rpeurach@gdakmak.com

R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
rick@saveri.com
cadio@saveri.com


Michael T. Smith
LAW OFFICES OF
MICHAEL T. SMITH
440 West Irving Park Road
Roselle, IL 60172
Telephone: (847) 380-5899
lawoffice0724@sbcglobal.net

Jason J. Thompson
Lance A. Young
SOMMERS SCHWARTZ PC
2000 Town Center, Suite 900
Southfield, MI 48075
Telephone: (248) 355-0300
jthompson@sommerspc.com
lyoung@sommerspc.com