```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3                        —   —   —

 4
       IN RE:  AUTOMOTIVE PARTS
 5     ANTITRUST LITIGATION              Case No. 12-md-02311

 6            MDL NO. 2311               Hon. Marianne O. Battani

 7

 8     _____/

 9                    STATUS CONFERENCE

10          BEFORE THE HONORABLE MARIANNE O. BATTANI
                 United States District Judge
11          Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
12                    Detroit, Michigan
                    Friday, June 15, 2012
13

14     APPEARANCES:

15     For the              WILLIAM G. CALDES
       Direct Purchaser     SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
16     Plaintiffs:          1818 Market Street, Suite 2500
                            Philadelphia, PA  19103
17                          (215) 496-0300

18                          DAVID H. FINK
                            FINK + ASSOCIATES LAW
19                          100 West Long Lake Road, Suite 111
                            Bloomfield Hills, MI  48304
20                          (248) 971-2500

21                          GREGORY P. HANSEL
                            PRETI, FLAHERTY, BELIVEAU &
22                          PACHIOS, L.L.P.
                            One City Center
23                          Portland, ME  04112
                            (207) 791-3000

24

25
```

```
 1    APPEARANCES:

 2    For the              STEVEN A. KANNER
      Direct Purchaser     FREED, KANNER, LONDON & MILLEN, L.L.C.
 3    Plaintiffs:          2201 Waukegan Road, Suite 130
                           Bannockburn, IL  60015
 4                         (224) 632-4502

 5                         JOSEPH C. KOHN
                           KOHN, SWIFT & GRAF, P.C.
 6                         One South Broad Street, Suite 2100
                           Philadelphia, PA  19107
 7                         (215) 238-1700

 8                         MICHAEL MOSKOVITZ
                           FREED, KANNER, LONDON & MILLEN, L.L.C.
 9                         2201 Waukegan Road, Suite 130
                           Bannockburn, IL  60015
10                         (224) 632-4502

11                         EUGENE A. SPECTOR
                           SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
12                         1818 Market Street, Suite 2500
                           Philadelphia, PA  19103
13                         (215) 496-0300

14                         JASON J. THOMPSON
                           SOMMERS SCHWARTZ, P.C.
15                         2000 Town Center, Suite 900
                           Southfield, MI  48075
16                         (248) 355-0300

17    For the              STEVEN A. ASHER
      End-Payor            WEINSTEIN, KITCHENOFF & ASHER, L.L.C.
18    Plaintiffs:          1845 Walnut Street, Suite 1100
                           Philadelphia, PA  19103
19                         (215) 545-7200

20                         DANIEL E. BECNEL, JR.
                           BECNEL LAW FIRM, L.L.C.
21                         106 W. Seventh Street
                           Reserve, LA  70084
22                         (985) 536-1186

23                         KEITH BUTLER
                           STRANGE & CARPENTER
24                         12100 Wilshire Boulevard, 19th Floor
                           Las Angeles, CA  90025
25                         (310) 207-5055
```

```
 1   APPEARANCES:

 2   For the              PATRICK E. CAFFERTY
     End-Payor            CAFFERTY FAUCHER, L.L.P.
 3   Plaintiffs:          101 North Main Street, Suite 450
                          Ann Arbor, MI  48104
 4                        (734) 769-2144

 5                        FRANK C. DAMRELL
                          COTCHETT, PITRE & McCARTHY, L.L.P.
 6                        840 Malcolm Road
                          Burlingame, CA  94010
 7                        (650) 697-6000

 8                        ELIZABETH FEGAN
                          HAGENS BERMAN
 9                        1144 W. Lake Street, Suite 400
                          Oak Park, IL  60301
10                        (708) 628-4960

11                        E. POWELL MILLER
                          THE MILLER LAW FIRM, P.C.
12                        950 W. University Drive, Suite 300
                          Rochester, MI  48307
13                        (248) 841-2200

14                        JOHN F. NEVARES
                          JOHN F. NEVARES & ASSOCIATES
15                        P.O. Box 13667
                          San Juan, PR  00908
16                        (787) 722-9333

17                        ALYSON OLIVER
                          KRESCH OLIVER, P.L.L.C.
18                        21400 Southfield Road, Suite 305
                          Southfield, MI  48075
19                        (248) 327-6556

20                        TERRELL W. OXFORD
                          SUSMAN GODFREY, L.L.P.
21                        901 Main Street, Suite 5100
                          Dallas, TX  75202
22                        (214) 754-1902

23                        BERNARD PERSKY
                          LABATON SUCHAROW
24                        140 Broadway Avenue
                          New York, NY  10005
25                        (212) 907-0700
```

```
 1    APPEARANCES:

 2    For the              HOLLIS L. SALZMAN
      End-Payor            LABATON SUCHAROW
 3    Plaintiffs:          140 Broadway Avenue
                           New York, NY  10005
 4                         (212) 907-0700

 5                         ADAM T. SCHNATZ
                           THE MILLER LAW FIRM, P.C.
 6                         950 West University Drive, Suite 300
                           Rochester, MI  48307
 7                         (248) 841-2200

 8                         STEVEN N. WILLIAMS
                           COTCHETT, PITRE & McCARTHY, L.L.P.
 9                         840 Malcolm Road
                           Burlingame, CA  94010
10                         (650) 697-6000

11    For the              JOHN W. DON BARRETT
      Dealership           BARRETT LAW OFFICES
12    Plaintiffs:          P.O. Drawer 987
                           Lexington, MS  39095
13                         (601) 834-2376

14                         JONATHAN W. CUNEO
                           CUNEO, GILBERT & LaDUCA, L.L.P.
15                         507 C Street NE
                           Washington, D.C.  20002
16                         (202) 789-3960

17                         GERARD V. MANTESE
                           MANTESE, HONIGMAN, ROSSMAN &
18                         WILLIAMSON, P.C.
                           1361 E. Big Beaver Road
19                         Troy, MI  48083
                           (248) 457-9200
20
                           VICTORIA ROMANENKO
21                         CUNEO, GILBERT & LaDUCA, L.L.P.
                           507 C Street NE
22                         Washington, D.C.  20002
                           (202) 789-3960
23

24

25
```

```
 1    APPEARANCES:

 2    For the                IRWIN M. ALTERMAN
      Defendants:            KEMP KLEIN LAW FIRM
 3                           201 W. Big Beaver Road, Suite 600
                             Troy, MI  48084
 4                           (248) 528-1111
                               on behalf of Furukawa Electric Company
 5
                             STEVEN F. CHERRY
 6                           WILMER HALE
                             1875 Pennsylvania Avenue NW
 7                           Washington, D.C.  20006
                             (202) 663-6321
 8                             on behalf of Denso International
                               America
 9
                             JAMES W. COOPER
10                           ARNOLD & PORTER, L.L.P.
                             555 Twelfth Street NW
11                           Washington, D.C.  20004
                             (202) 942-5000
12                             on behalf of Fujikura America,
                               Incorporated
13
                             KENNETH R. DAVIS, II
14                           LANE POWELL, P.C.
                             601 SW Second Avenue, Suite 2100
15                           Portland, OR  97204
                             (503) 778-2100
16                             on behalf of Furukawa Electric Company

17                           GEORGE B. DONNINI
                             BUTZEL LONG, P.C.
18                           150 W. Jefferson Ave., Suite 100
                             Detroit, MI  48226
19                           (313) 228-7042
                               on behalf of Tokai Rika America (TRAM)
20
                             MICHAEL J. FANELLI
21                           COVINGTON & BURLING, L.L.P.
                             1201 Pennsylvania Avenue NW
22                           Washington, D.C.  20004
                             (202) 662-5383
23                             on behalf of S-Y Systems Technologies,
                               GmbH
24

25
```

```
 1   APPEARANCES:

 2   For the                  MICHELLE K. FISCHER
     Defendants:              JONES DAY
 3                            51 Louisiana Avenue NW
                              Washington, D.C.  20001
 4                            (202) 879-4645
                                on behalf of Yazaki North America,
 5                                Incorporated

 6                            LARRY S. GANGNES
                              LANE POWELL, P.C.
 7                            1420 Fifth Avenue, Suite 4100
                              Seattle, Washington  98101
 8                            (206) 223-7000
                                on behalf of Furukawa Electric Company
 9
                              JEFFREY G. HEUER
10                            JAFFE, RAITT, HEUER & WEISS, P.C.
                              27777 Franklin Road, Suite 2500
11                            Southfield, MI  48034
                              (248) 351-3000
12                              on behalf of Kyungshin-Lear Sales and
                                Engineering
13
                              HOWARD B. IWREY
14                            DYKEMA GOSSETT, P.L.L.C.
                              39577 Woodward Avenue, Suite 300
15                            Bloomfield Hills, MI  48304
                              (248) 203-0526
16                              on behalf of Lear Corporation

17                            SHELDON H. KLEIN
                              BUTZEL LONG, P.C.
18                            41000 Woodward Avenue
                              Bloomfield Hills, MI  48304
19                            (248) 258-1414
                                on behalf of Tokai Rika America (TRAM)
20
                              ANDREW S. MAROVITZ
21                            MAYER BROWN, L.L.P.
                              71 South Wacker Drive
22                            Chicago, IL  60606
                              (312) 701-7116
23                              on behalf of Lear Corporation

24

25
```

```
 1   APPEARANCES:

 2   For the              JOSEPH E. PAPELIAN
     Defendants:          DELPHI CORPORATION
 3                        5725 Delphi Drive
                          Troy, MI  48098
 4                        (248) 813-2535
                            on behalf of Delphi Automotive, L.L.P.
 5
                          MATTHEW L. POWELL
 6                        KERR, RUSSELL & WEBER, P.L.C.
                          500 Woodward Avenue, Suite 2500
 7                        Detroit, MI  48226
                          (313) 961-0200
 8                          on behalf of Fujikura America,
                            Incorporated
 9
                          WILLIAM A. SANKBEIL
10                        KERR, RUSSELL & WEBER, P.L.C.
                          500 Woodward Avenue, Suite 2500
11                        Detroit, MI  48226
                          (313) 961-0200
12                          on behalf of Fujikura America,
                            Incorporated
13
                          MARGUERITE M. SULLIVAN
14                        LATHAM & WATKINS, L.L.P.
                          555 Eleventh Street NW, Suite 1000
15                        Washington, D.C.  20004
                          (202) 637-2200
16                          on behalf of Sumitomo Electric
                            Industries, Limited
17
                          MICHAEL F. TUBACK
18                        O'MELVENY & MYERS, L.L.P.
                          Two Embarcadero Center, 28th Floor
19                        San Francisco, CA  94111
                          (415) 984-8700
20                          on behalf of Leoni Wire, Inc.

21

22   Also present:        Mark Werling
                          Chrysler Group, L.L.C.
23

24
          To obtain a copy of this official transcript, contact:
25            Robert L. Smith, Official Court Reporter
              (313) 964-3303 • rob_smith@mied.uscourts.gov
```

1                              TABLE OF CONTENTS

2                                               Page

3  **JPML JUNE 12, 2012 TRANSFER ORDER**

Discussion by the Court............................ 10

4  Remarks by Mr. Fink................................ 12

Remarks by Mr. Tuback.............................. 19

5  Remarks by Mr. Damrell............................ 21

Remarks by Mr. Becnel............................. 25

6

7  **RELATIONSHIP WITH OTHER AUTOMOTIVE PARTS
PRICE-FIXING CASES**

Discussion by the Court............................ 27

8  Remarks by Mr. Kanner.............................. 27

Remarks by Mr. Damrell............................ 31

9  Remarks by Mr. Persky............................. 33

Remarks by Mr. Cuneo.............................. 34

10  Remarks by Mr. Iwrey.............................. 35

11  **SERVICE ISSUES**

Remarks by Mr. Kohn............................... 37

12

13  **DISCUSSION REGARDING MOTIONS TO DISMISS**

Remarks by Ms. Fischer............................ 39

Remarks by Mr. Hansel............................. 42

14  Remarks by Mr. Marovitz........................... 43

Remarks by Mr. Persky............................. 44

15  Remarks by Mr. Marovitz........................... 45

Ruling by the Court............................... 46

16

17  **DISCUSSION RELATING TO GRAND JURY PROCEEDINGS**

Remarks by Mr. Spector............................ 47

Remarks by Ms. Fischer............................ 40

18  Remarks by Mr. Spector............................ 54

Remarks by Ms. Fischer............................ 55

19  Remarks by Mr. Persky............................. 56

Remarks by Mr. Cherry............................. 56

20  Remarks by Mr. Spector............................ 57

Remarks by Ms. Fischer............................ 58

21  Ruling by the Court............................... 58

22  **DISCUSSION REGARDING DOCUMENT PRESERVATION**

Remarks by Mr. Hansel............................. 59

23  Remarks by Mr. Tuback............................. 62

Remarks by Mr. Hansel............................. 66

24  Remarks by Mr. Tuback............................. 68

Remarks by Mr. Kanner............................. 70

25

```
 1                  TABLE OF CONTENTS (Continued)

 2                                                          Page

 3   DISCUSSION REGARDING PROTECTIVE ORDER
         Remarks by Mr. Kohn............................... 71
 4       Remarks by Mr. Marovitz........................... 76
         Remarks by Mr. Kohn............................... 82
 5       Remarks by Mr. Marovitz........................... 85
         Remarks by Mr. Kohn............................... 86
 6       Ruling by the Court............................... 87

 7   THIRD STATUS CONFERENCE DATE
         Discussion by the Court........................... 88
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   Detroit, Michigan

2   Friday, June 15, 2012

3   at about 10:00 a.m.

4                           -   -   -

5           (Court and Counsel present.)

6           THE CASE MANAGER:  All rise.

7           The United States District Court for the Eastern

8   District of Michigan is now in session, the Honorable

9   Marianne O. Battani presiding.

10          All those having business before this Honorable

11  Court, please draw near and you shall be heard.  God save

12  these United States and this Honorable Court.

13          You may be seated.

14          Court calls Automotive Parts Antitrust Litigation.

15          THE COURT:  Good morning.

16          ATTORNEYS PRESENT:  (Collectively) Good morning,

17  Your Honor.

18          THE COURT:  Gee, there are a lot of you here.  I

19  didn't realize that so many of you would come.  Okay.

20          All right.  I'm very anxious for this meeting

21  because I want to find out what is going on, and, of course,

22  we just had a recent transfer order which you may have heard

23  about from the MDL, and actually that's the first thing on

24  the agenda.

25          I would like to follow the same protocol that we

1    did last time; if you are going to speak if you would please

2    approach the podium and give your name, so nobody say

3    anything without identifying themselves.  All right.

4         First of all, the transfer order, that came kind of

5    as a surprise to me when Judge Heyburn called and said there

6    wouldn't be other MDLs and how did I feel about that.  To be

7    honest, I had never considered that they would be

8    consolidated without being the separate MDLs, but he told me

9    would I do that, that's what they had determined, and I said

10   okay, fine, and so here we are.

11        And I think we need to talk about how we are

12   including these new parts into our MDL, how we are going to

13   organize the docket, the file, to reflect these parts.  What

14   happens with the complaint, how do we -- do we need another

15   amended complaint, do we have a separate complaint, do we

16   somehow consolidate them?  I mean, they are all issues that I

17   don't have answers to, and I was very anxious for you, and I

18   am so happy that they came down with this order before this

19   meeting because, you know, as I said, I wouldn't have

20   imagined that it would be such a big part of this but, of

21   course, it is now.

22        I do want to say one other thing while we are

23   having -- before we get into this general discussion, there

24   is -- there are three other cases that were just filed that I

25   have -- two of them that I have accepted, one was before

1    Judge Roberts -- Eric, was that the seat belt -- well, and

2    Judge Steeh.  One was seat belts and I don't remember what

3    the other one was.  And then -- and they had some of the same

4    defendants, and so I am going to accept those and put them

5    into the MDL as tagalongs.

6          There is one case that -- there is one case, the --

7    let me see, that Judge Zatkoff has, and I think that's the

8    wheel bearing case.  I talked to Judge Zatkoff about that and

9    came to the understanding that he felt and therefore I

10   agreed, but I will tell you why, that there were different

11   defendants in that case totally from the case MDL 2311, but

12   it is an auto part and as I read the order from the transfer

13   order it almost sounds like all of our auto parts, and

14   believe me, I have no clue -- oh, I do have a clue as to how

15   many auto parts because I had another case totally unrelated

16   to this, it was on a purchase order, and had to do with an

17   auto part, and so I asked them just as an aside, and the

18   attorneys, of course, did not know why I was asking, I said

19   how many auto parts are there?  He said oh, 12,000 to 15,000.

20   With all due respect to the defendants, I don't anticipate

21   that too many more are involved, I don't know.

22         But anyway, as to the wheel bearing case that

23   Judge Steeh has -- excuse me, Judge Zatkoff has, he is

24   keeping that.  Now, I am doing nothing about that.  If

25   anybody wants to change it or have it as a tagalong then

Status Conference • June 15, 2012

1    there are processes that you could take to do that.  I mean,

2    the more I think about this and I guess as you come up and

3    comment I would like your comment, and please understand that

4    I am just talking because I want to find out more information

5    about this but I'm always looking to the end for the

6    settlement, I mean, I know we have a long way to go and I'm

7    not saying that you are all going to settle so please don't

8    think that I am saying that you need to, but in the end when

9    we get there I want to know -- I mean, the plaintiffs have to

10   be the same basically, the classes, so if you purchase a car,

11   I mean, aren't we going to resolve this with one, you know,

12   each purchaser is going to get something or are they going to

13   get something for a car harness, something for a safety seat,

14   something for a fuel sender?  I mean, it becomes somewhat

15   overwhelming so ultimately -- and, you know, I did discuss

16   this with Judge Zatkoff that ultimately I think the cases are

17   going to come together one way or another, so I just want you

18   to know that is the status right now.  If anybody in the

19   wheel bearing case wants to change any status then you are

20   going to have to go through the panel.

21          Just with those comments, can I have some comments?

22   Mr. Fink?

23          MR. FINK:  Your Honor, David Fink.

24          To speak to the initial question that the Court is

25   asking really about organization, there have been a lot of

1    discussions among the counsel for the parties.  We have a

2    general consensus, there may be dissent which we'll hear but

3    I don't think so, we have a general consensus that the

4    logical way to go forward is essentially as follows:  One, of

5    course, it is determined that this is a single MDL and that

6    it is master file 2311, but within that MDL it makes sense to

7    break this down into subparts by product so that, for

8    example, you might have a 2311-WH for wire harness, IPC for

9    instrument panel clusters, et cetera.

10           THE COURT:  Can I just stop you there because there

11   is another thing I want you to talk about?  We amongst

12   ourselves here in court had thought before -- well, actually,

13   as naive as we were we were starting out with 2311 as being

14   the umbrella and then having all the separate MDLs under it,

15   but that's all scratched.  Then we were talking about doing

16   exactly what you were saying, adding a letter or two to the

17   case number so that we can identify the part, but I want you

18   to think about this, is it the part we need to identify and,

19   if so, do we also need to identify within the part anything

20   chronologically?

21           You are going to wonder what am I talking about.

22   In other words, we have -- if we do it by part that may

23   resolve it because, you know, we have these new parts that

24   have just come in now and some of you have already been

25   served and you've got your dates and everything and your

1      conference, so I want to know how do we keep track of the

2      schedule, do we do it by group, do we do it by part, do we do

3      it by all of those filed this month, I mean, how do we group

4      them?

5              I think what you are saying is you would like to

6      group them by part and that might take care of this whole

7      issue of dates because wire harnesses basically are all

8      pretty well filed, is that --

9              MR. FINK:  Yes, Your Honor.  By separating them by

10     part you essentially have a group of -- well, saying it was

11     under an umbrella wasn't really inaccurate because you really

12     have a group of MDLs that are under one umbrella but that

13     umbrella -- and if you think of it in terms of ECF filing it

14     becomes a little clearer both what we need to do and what the

15     problems arise if we don't, and that is there is -- there

16     will be defendants who are in one, two or three of the auto

17     parts cases and not in others, they don't need to or want to

18     get all of the pleadings, filings and court notices related

19     to the part they are not involved in.  So by breaking them up

20     this way through the ECF system everybody that's involved in

21     any one of the individual auto parts gets all of their

22     notices, gets all the information related to that, but they

23     don't have the overlap of the other information which would

24     be overwhelming both for the Court and for the parties.

25              Now, the Court could use the 2311 number and send a

1    notice of some kind, I suppose, but my best guess is it is

2    easier for the Court to just send out -- instead of setting

3    the ECF up that way it is probably still easier just to send

4    notices to each of the -- identical notices if necessary to

5    each of the subcategories, whether it is the WH, IPC.

6          Now, there is one complication but this is with ECF

7    folks, and that currently the way that the docket -- that the

8    codes are structured, the letters that come after the numbers

9    represent the judges so if, for example, we had an auto part

10   that was MOB that would be pretty complicated since right now

11   that's the Judge's initials that follow the 2311, but that's

12   obviously something that can be dealt with.

13         So, Your Honor, to start with, as I started to say,

14   we break it up by part, and the next issue though is, as

15   applies in all of these cases, you also want to have a

16   subcategory that breaks it up by the plaintiff category.  So

17   in this case, for example, you've got the direct -- all the

18   direct purchaser plaintiffs, the end-payor actions and the

19   auto dealer actions, and literally as the way if the Court

20   wanted to picture a caption the way the caption would read is

21   it would be In Re:  Automobile Parts Antitrust Litigation,

22   and then below that this document relates to, and under that

23   you would first identify the auto part that it applies to,

24   and then under that you would indicate the track that it

25   applies to; all direct purchaser actions, all end-payor

1    actions or perhaps all matters.  And that would be pretty

2    consistent with the way that these cases are handled with the

3    oddity that they are all under this 2311 number.

4         Now the Court had asked a question about multiple

5    complaints and things like that, and then that's really not

6    an issue anymore because each one follows -- will follow its

7    scheduling track also.

8         THE COURT:  Well, let me give you this example.

9    The new auto part, say the instrument cluster -- the panel,

10   that's not in your consolidated complaint obviously, or the

11   fuel sender or, you know, whatever, so how is that to be

12   handled?  How would you suggest in terms of another amended

13   complaint, another complaint?  I don't know.

14        MR. FINK:  There would be a separate case

15   management order presumably, we haven't discussed this among

16   ourselves, yeah, but there would be separate complaints, but

17   the answer to the broader question that I thought the Court

18   was asking was managing that and other issues, and presumably

19   there will be a separate case management order that sets

20   things like the filing of a consolidated amended complaint

21   and then the complaint that's filed in wire harness really is

22   not involved in any way in the complaint that is filed in --

23   I mean, the consolidated amended complaint that ends up being

24   filed with the IPC case.

25        Now, Your Honor, there is --

```
 1           THE COURT:  Okay.  We'll have to work this out
 2   because we have one case number, we have the 2311, and we are
 3   going to have multiple complaints under 2311.  It's not
 4   impossible.  I'm thinking of CM/ECF and how we manage it
 5   without throwing the system totally crazy.  I will tell you
 6   that we have a meeting next week with a person who has the
 7   most expertise working on the Dow case in here, the clerk who
 8   did all of that computer stuff, so we will see what we can
 9   do, but the multiple complaints are going to be interesting.
10           MR. FINK:  If the Court would like the
11   participation of representatives of each of the groups I'm
12   certain that we would be happy to participate in that meeting
13   if that would be appropriate or helpful.  Perhaps it is
14   unnecessary.
15           There are other attorneys here who may want to
16   speak to this, and in particular --
17           THE COURT:  I will give them an opportunity, yeah,
18   no problem.  And I don't know yet, I'm going to meet with her
19   with my staff, and if we find we should get a couple of you,
20   you know, or just liaison, again, I don't want to get all of
21   you in here, this is just a technology issue and so it may be
22   that we will be coming to you for some assistance before we
23   do the final decision as to how it is handled now that we
24   know what the format -- now that we know what the MDL is
25   doing.
```

1          MR. FINK:  Well, Your Honor --

2          THE COURT:  Because it is important to do that now

3     because otherwise we are going to be messed up for the next

4     how many years.

5          MR. FINK:  Absolutely, Your Honor, and I do want to

6     say that with the questions that the Court posed, while it

7     may start as a technology issue it could create a lot of

8     problems and complications in the pleadings, et cetera.

9          THE COURT:  Okay.

10          MR. FINK:  Now, I know that the indirect -- I'm

11    sorry, the end-payor purchase plaintiffs currently have among

12    the counsel who are representing them someone who may be able

13    to offer some additional perspective, it is Judge

14    Frank Damrell, who is -- he's not here as a judge, of course,

15    but he's recently retired from the Federal bench, and I think

16    he may want to speak to this.  I don't mean to go out of

17    turn, I just wanted to be sure that the Court was aware --

18          THE COURT:  Well, we will but let's take this

19    gentleman here first, and then we will get to you, sir.

20          MR. TUBACK:  Good morning, Your Honor.

21    Michael Tuback on behalf of Leoni, speaking at least for this

22    issue on behalf of the defendants.

23          We feel very strongly, Your Honor, that this case,

24    the wiring harness case, needs to be treated as a separate

25    case for purposes of the complaint and how it is going to

```
 1   function than these other cases.  There are a number of us in
 2   this case, Leoni, my client is one of them, who have nothing
 3   to do with fuel senders, they have nothing to do with seat
 4   belts, they have nothing to do with anything else, and so
 5   we -- and there should not be a new consolidated complaint.
 6   The complaints that are currently on file here are the ones
 7   that will be tested in the motions to dismiss, and whatever
 8   else happens in those other cases shouldn't effect the
 9   complaints that are currently on file.
10           Now, the MDL panel --
11           THE COURT:  Well, the complaints currently on file
12   some of them have other car parts in them.
13           MR. TUBACK:  The consolidated amended complaints
14   that are filed in these three actions --
15           THE COURT:  Just the wire harness?
16           MR. TUBACK:  Yeah, just the wiring harnesses, and
17   we would not want to see them case weighed or lag or somehow
18   be pulled in with all of these other car parts, and I think
19   that's why the MDL panel, when it sent in its transfer order,
20   and this is a common language the court uses, the MDL court
21   uses, is that the cases are transferred for coordination or
22   consolidation.  In this case we think coordination is the
23   much better way to go.  Consolidation is going to result in
24   an unholy mess, if we were to have one complaint it would
25   certainly be unworkable, and so I think we are going to want
```

1    to treat them --

2              THE COURT:  I think you're right.

3              MR. TUBACK:  -- separately.

4              MR. BECNEL:  May it please the Court, I would like

5    to speak after --

6              THE COURT:  Yes.

7              MR. DAMRELL:  Your Honor, my name is Frank Damrell.

8    I haven't addressed a court on this side of the bench in

9    about 17 years, so I'm very happy there are so many brilliant

10   counsel here behind me because I so need their help, I have

11   always needed that whether before and after I became a judge.

12             I also have had the privilege of serving on the MDL

13   panel, and I would comment about the order.  I mean, the

14   first item on the agenda here is the MDL order, and this is a

15   very detailed order that you seldom see on a transfer such as

16   this but this is a complicated case but I think

17   Judge Heyburn's words kind of lay out the road map that I

18   think that, Your Honor, you have already indicated in some

19   respects how you want to proceed with respect to separate

20   tracks perhaps, and obviously that's enhanced by the fact

21   that you have now several cases that will have separate

22   tracks in addition to the wire harness.

23             I don't want to echo the comments that were just

24   made with respect to the wire harness case.  It is my

25   understanding there has been a number of agreements reached

 1    with respect to the discovery plan, motion schedule and such

 2    in the -- as I understand how these cases oftentimes work,

 3    you do have a case such as this where you have the wire

 4    harness case that was filed first and has moved down the

 5    track some ways, and it becomes a template oftentimes for the

 6    following cases.  You have here the same attorneys, the same

 7    parties in many of these cases, and they have already reached

 8    agreement, and those agreements could be applicable obviously

 9    to other cases that follow, which is a big benefit to the

10    Court and clearly streamlines some of the proceedings that

11    otherwise would have to start from scratch.

12            So I would underscore the notion that in particular

13    the order itself from the panel, the words from Judge Heyburn

14    were similar conspiracies are alleged involving overlapping

15    defendants and stemming from the same Government

16    investigation, and the parties and counsel already overlap

17    to such a large extent, we find the creation of a single MDL

18    presents less of a concern that they raised earlier.  So that

19    even though we have a single number you have multiple tracks

20    that follow on different other products, and with respect to

21    those products I think it is important that I wasn't clear

22    about the Court's comment but I understand that there is

23    another judge that may be keeping another automotive product

24    case.  It seems to me, Your Honor, just --

25            THE COURT:  Excuse me, Counsel.  Are you on the

1    wheel bearing case?  You kind of shook your head.  Counsel

2    here at the end.

3            MR. IWREY:  No, Your Honor, I have it but --

4            THE COURT:  Oh, you have the complaint.  Okay.  All

5    right.  I was just wondering if we had some inside

6    information here.

7            MR. DAMRELL:  It is so incurious because we do have

8    an order from the panel that refers to the same

9    investigation, the same Grand Jury investigation, and I think

10   that historically those cases that arise from the same

11   investigation generally are maintained in the same -- before

12   the same transferee judge for obvious reasons.  Now, I'm not

13   suggesting that you can't do otherwise, it is up to you.  The

14   nice part about this is you have complete freedom to do

15   exactly how you want to handle this, and that's important.

16           THE COURT:  That's the difference from this side of

17   the bench and that side of the bench.

18           MR. DAMRELL:  Exactly, and I'm struggling with

19   that, believe me.

20           But I think if this bearing case is part of the

21   same investigation, given the discovery issues involved it

22   would probably make sense to have the same judge -- the

23   transferee judge handle that case, and I think that's what's

24   contemplated in Judge Heyburn's order.

25           THE COURT:  I agree with you.  Once I got this

1   order it was relatively clear to me, and maybe as a former

2   member of the panel you are telling me that if it went to the

3   panel it would become part of this case?

4        MR. DAMRELL:  Correct.  As I say, this order is --

5   I would say of the many orders I have seen this is very

6   detailed, and obviously the panel places great confidence in

7   you and they place great confidence in your ability to put

8   this together, which is going to be -- it is not going to be

9   easy but it is not reinventing the wheel either, and I think

10  that the notion of tracks separate and apart, and I am not

11  going to get into the details, but separate and apart and

12  having the harness case -- the wire harness case probably

13  provides a template for you to proceed, as prior counsel has

14  indicated, that goes along its own track, as it were, but

15  provides a template and a way for you to deal with other

16  cases because those same lawyers are going to be appearing

17  before you in those other cases and it is makes sense that

18  those agreements if they should be applied should obviously

19  be applied to the other cases and products.

20       THE COURT:  All right.  So from what I'm hearing so

21  far there is some agreement that every part be like a track,

22  have its own -- I'm not going to say case number, I don't

23  know how that is going to work technically but we will

24  have -- each part will have its own case basically but we

25  have the same attorneys on each part?

1          MR. DAMRELL:  Right.

2          THE COURT:  Okay.  Thank you.

3          MR. DAMRELL:  Nothing further.  Thank you, Your

4   Honor.

5          THE COURT:  Thank you.  Yes, sir?

6          MR. BECNEL:  May it please the Court,

7   Daniel Becnel.

8          Bernie, with Labaton, and I appeared before the

9   panel to argue this case, and as you recall the last time we

10  were here when you were appointing lead counsel we said

11  there's some more things in the pipeline, we don't know

12  whether they are going to give them to you or they are going

13  to want to split them off, but when we appeared before the

14  panel the first thing they said we don't want you to argue

15  where this case is going to go, argue if you have anything to

16  say why Judge Battani shouldn't have these cases, and we both

17  agreed they should come here.

18         And the only issue you have to deal with now is --

19  and there are going to be some more in the pipeline.  You

20  have the general number, and how you separate them is up to

21  you.

22         There's only two or three big cases that I can

23  recall where you've had this kind of complicated problem

24  where if they were all the same manufacturers or they were

25  all in the same associations, such as pedicle screws where

1    you had many manufacturers of pedicle screws, or breast

2    implants where you had many manufacturers but they were all

3    different, you know, it was Bristol Myers, it had Dow, it was

4    this one and that one.

5         The Chinese drywall is the most incredible one of

6    all, which I was in yesterday, we have a thousand defendants.

7    So what the judge did then is said look, each of you appoint

8    who you want and I will give an impromptu to who you appoint

9    to be lead counsel for the home builders or lead counsel for

10   the distributors or lead counsel for the manufacturers,

11   et cetera, because a lot of them had claims and cross claims

12   against each other, it is not me, it is the man behind the

13   tree that is responsible.

14        So I think we are in total agreement the leadership

15   you have appointed is fine.  We don't know whether the

16   defendants are in total agreement, whether let's say a

17   Swedish company wants to be in the same boat with the

18   Japanese company.  That's what you have to determine based

19   upon their recommendations to you and then you make the call

20   for balls and strikes.  The only issue with the other cases

21   is this leadership is fine, we are all working together, I

22   don't think we have a problem, the issue is who do you want

23   to be responsible for the two new cases?  Should you say you

24   guys get together and make this guy responsible or that lady

25   responsible or this person responsible, or do I have to

1    appoint somebody so I have somebody to look to to answer the

2    questions that I'm going to want answered in that particular

3    component?

4            THE COURT:  Okay.

5            MR. BECNEL:  But I think you are going to have some

6    more coming to you also so this is probably not the caboose

7    yet.  Thank you, Your Honor.

8            THE COURT:  But not 14,000, right?

9            MR. BECNEL:  I hope not.

10            THE COURT:  Okay.  Well, when we first met and we

11   appointed lead counsel -- interim lead counsel, liaison,

12   et cetera, of course we didn't know these wouldn't be

13   separate -- the future ones would not be separate MDLs, but

14   right now, and I guess I would like some lead counsel to

15   approach the podium because I really don't intend to have

16   more counsel, I mean, this is just going to be too much.  I

17   want to know can lead counsel handle other car parts?

18   Somebody want to speak?

19            MR. KANNER:  Good morning, Your Honor.

20   Steve Kanner on behalf of direct plaintiffs.

21            On March 15th we appeared before Your Honor for the

22   first time.  At that time in connection with our groups, the

23   organizational efforts with respect to the wire harness case

24   and incidentally our petition for lead counsel, we made a

25   pledge at that time.  I think we have upheld that pledge.

1    That pledge was to work cooperatively with the direct

2    purchasers, the dealer classes and the indirect purchaser or

3    the end-payor classes to coordinate our efforts with

4    defendants and to promote the efficient prosecution of the

5    case.  I think we have done that so far with wire harness.  I

6    think the comments that were made earlier about using this

7    case, its organizational efforts as a template, are well

8    taken.

9         To directly answer your question, I would like to

10   provide some examples why I believe we can continue to

11   efficiently run these additional cases.  To date plaintiffs

12   and defendants, as you well know, have had a number of meet

13   and confers both in person and telephonically which resulted

14   in I'm counting about six separate items.

15        Number one, we have completed a formal ESI

16   stipulation.  Number two, we have completed a stipulation on

17   expert materials.  Number three, we have coordinated

18   successfully a briefing schedule for defendants' motions to

19   dismiss, which, I believe, the first are to be filed in mid

20   July and those, of course, relate to the defendants who have

21   been served.  Number four, we established a schedule for the

22   production of Grand Jury materials by those defendants who

23   have entered guilty pleas.  I believe that production begins

24   sooner than might be in other cases, that would be

25   August 1st.  It is scheduled to complete -- to be completed

1    by October.  Fifth, we have agreed in principle to the

2    production by defendants of their transactional data,

3    critical, of course.  Sixth, we have agreed on all but two

4    items, which are later on down the laundry list for today on

5    the discovery.

6              THE COURT:  I have read them.

7              MR. KANNER:  But I have to tell you, from my

8    experience in a number of these cases that's remarkable

9    progress.  We have done so with a high degree of civility,

10   collegiality and cooperativeness both with the plaintiffs'

11   classes, and I have been in many cases where the subclasses

12   of plaintiffs or the various groups don't have a good working

13   relationship, and certainly I think it stands as a testimony

14   to our collective experience in the bar that we have been

15   working well, all those zealously with different sides, with

16   our colleagues on the defense bar who have demonstrated a

17   high degree of cooperativeness with us, so that's a positive.

18             THE COURT:  Let me ask, what is your -- as lead

19   counsel now, your relationship with counsel who filed say a

20   wire harness case but is not lead counsel?  How does that

21   stand?  I just don't know.  I have no idea how these counsel

22   who file a case and yet now they are not counsel on the case.

23             MR. KANNER:  Well, when I first spoke to Your Honor

24   back in March I talked about how we had already created very

25   distinct assignment groups.

```
 1           THE COURT:  Right.
 2           MR. KANNER:  Those assignments have been given to
 3   various attorneys in the plaintiffs' counsel group, which is
 4   over 20 firms at this point.  We are not duplicating our
 5   work.
 6           THE COURT:  So they are assisting, they are doing
 7   their work separate?
 8           MR. KANNER:  Absolutely.
 9           THE COURT:  As I told you in the beginning, I'm
10   concerned about fees and I know the fees are going to be
11   enormous, but I want to make sure there isn't a duplication
12   yet I want the other attorneys involved.
13           MR. KANNER:  There isn't, Your Honor.  In fact, we
14   have made it quite clear with correspondence to all of the
15   plaintiffs' firms working in the case that no efforts in this
16   case, no work that anyone does in this case should be done --
17   no time will be accepted on that unless it is through a
18   specific assignment by lead counsel.
19           We have established a time reporting mechanism.  By
20   the end of every month all counsel must submit their time
21   broken down in detail with backup to one of the firms in
22   which to maintain on an Excel spreadsheet, and firms can't go
23   back two months to add time.  We have been through this
24   before and we understand that certain mechanisms have to be
25   in place to ensure accuracy of time and to ensure that work
```

 1    is done per assignment and not on a willy-nilly basis.

 2            THE COURT:  And I trust that.  I think you should

 3    all know, both in having these meetings and in working this

 4    out, you know, I may have the final decision but I'm looking

 5    to you with the experience to direct me in how to make that

 6    decision.

 7            MR. KANNER:  Your Honor, we always keep in mind the

 8    fact that you do have the final authority on that issue.

 9            THE COURT:  But I want you to keep in mind that I

10    want you all, because I think it is important, and you have

11    so far worked together so well because of your expertise and

12    that's why you were appointed as you were.  So I just want to

13    be sure you're saying to me there is no problem with the

14    additional car parts coming under your group as interim lead

15    counsel?

16            MR. KANNER:  That is exactly what we are saying,

17    Your Honor.

18            THE COURT:  Okay.  Very good.  Thank you.

19            MR. KANNER:  Thank you.

20            THE COURT:  Anybody else?

21            MR. DAMRELL:  Can I just make one comment?

22            THE COURT:  See, you're deferring to him because he

23    was a judge, that's not fair.

24            MR. DAMRELL:  Your Honor, the question arose

25    regarding leadership, and I think that kind of goes to the

1    notion of this template that has been referred to.  As

2    counsel just indicated, there have been a number of things

3    that have occurred that really have streamlined the

4    procedures, and it seems to me that if you look at the MDL

5    order again itself I think it contemplates that the wire

6    harness case has taken the lead, as it were, and in the sense

7    that you're going to have tracks but you're going to have one

8    number, different products are going to be obviously in

9    separate tracks, but the notion that counsel for the three

10   classes have reached agreement with the defendants, all the

11   defendants in this case, on such key matters, it makes sense

12   that going forward that that same counsel maintain that role

13   because it obviously is going to be something that you are

14   going to be interested in in terms of what is accomplished

15   going forward in the wire harness case and some of the same

16   counsel are going to be representing the plaintiffs in the

17   other classes in the other cases.

18          Having -- if we were to -- if we were to change

19   that and have different roles for different attorneys and

20   different plaintiffs it seems to me that the efficiencies

21   that are gained by this order is --

22          THE COURT:  I'm not going to change it.  You don't

23   have to go on, there is no question about that.

24          MR. DAMRELL:  Okay.

25          THE COURT:  No, no, there's no question.  I just

 1   wonder, you know, you're sitting there and all of a sudden

 2   your case becomes a little different than what you started

 3   with, and I want to make sure everybody is comfortable with

 4   that, that's all.  I think it is very efficient to have the

 5   same attorneys handle everything.  I'm just -- I'm just

 6   concerned, and maybe I can ask you this about that case that

 7   Judge Zatkoff has because I can't take that from him, you

 8   understand that, internally.  I can't do it but -- I don't

 9   know who the attorneys are on that.

10         Eric, you told me one was --

11         MR. PERSKY:  My name is Bernard Persky of the

12   Labaton Sucharow firm.  We are co-lead counsel for the

13   end-payor plaintiffs.

14         We filed the first auto bearing case, we filed it

15   in the Eastern District as a related matter.  It arises from

16   the same exact Government investigation by the FBI out of the

17   Detroit office.  And, yes, there are not overlapping

18   defendants but it is the same kind of conspiracy under the

19   same investigation by the Government.  In our view it in

20   essence fits within what would normally be called a tagalong

21   case in the view of the MDL's transfer order.  The Multi

22   District Litigation Panel, I believe, had in mind that auto

23   parts come your way.  We don't expect -- we don't know what

24   beyond the auto bearing cases there are.  We know that the

25   safety systems case, which Your Honor has now accepted, has

1    an overlapping defendant so that's common with defendants in

2    the other cases that you have.  As to auto bearings it is our

3    view that the appropriate thing to do is to apply to the

4    Multi District Litigation Panel, not to the judge who

5    currently has it in the Eastern District of Michigan, and

6    persuade the panel that it is a tagalong case that should be

7    before Your Honor, and it will have its own track, its own

8    scheduling, but the same plaintiffs' counsel would be running

9    it on behalf of the various plaintiffs' classes.

10            So with all due respect, Your Honor, we think it

11    should be here, and we along with whoever else wants to join

12    us will take the steps that are appropriate and necessary to

13    ask the panel to send it to Your Honor.

14            THE COURT:  Good.

15            MR. PERSKY:  Thank you.

16            THE COURT:  Thank you.  That settles that issue.

17    All right.  Now --

18            MR. CUNEO:  Your Honor --

19            THE COURT:  Oh, I'm sorry.

20            MR. CUNEO:  Jonathan Cuneo, and we are here with

21    some of my colleagues for the auto dealers.

22            We wanted to identify with the remarks that

23    Mr. Kanner made about his group.  Our group is in the process

24    of establishing the same internal controls, and we have been

25    working very well with both the direct purchasers and the end

 1    users.  And a measure of that is just this morning a group of

 2    them persuaded me and I believe my colleagues that the

 3    approach that Mr. Fink outlined to the Court early this

 4    morning was acceptable to us.  And in that regard we are at

 5    least at the current time, as I stand before you, have been

 6    conceptualizing this in a different way, which was by

 7    defendants as opposed to by part, at least as far as the

 8    subsequent filings to wire harness, but we are prepared to

 9    retrofit our thinking, file amended complaints, and do it in

10    the way that the Court prefers, and we have no problem with

11    the program that Mr. Fink suggested.

12             THE COURT:  Good, very good.  Thank you.

13             MR. CUNEO:  So that is evidence of cooperation

14    right here in your courtroom.

15             THE COURT:  That certainly is.  I do want to say to

16    any defendants, I hope you don't mind sitting in the jury

17    box, you know.

18             MR. FINK:  Your Honor, we just want it to be clear,

19    that this is a temp -- they are not going to be in the jury

20    box at the end.

21             THE COURT:  We will see.  We will see.  Does any

22    defendant have any other statement they want to make about

23    this?

24             MR. IWREY:  Your Honor, Howard Iwrey from Dykema.

25             THE COURT:  Could you come to the podium, please?

 1           MR. IWREY:  I'm sorry.  Good morning.  Howard Iwrey

 2     from Dykema on behalf of Lear.

 3           I just wanted to say that Mr. Fink and I had talked

 4     about the ECF protocol, and you had mentioned that you're

 5     meeting next week.  I just wanted to volunteer along with

 6     David and other local people to work and coordinate that for

 7     the Court if that's what the Court desires.

 8           THE COURT:  Okay.  You know, I'm not asking to put

 9     more work on you, I just want input so we get it right,

10     that's all.

11           MR. IWREY:  We are lined up in terms of the

12     separate identifications of the parts and the separate

13     tracks.

14           THE COURT:  Okay.  Let me ask you this, if I -- if

15     I want to have your input, I guess I'm thinking about liaison

16     counsel because you're here, and it seems liaison should do

17     something.

18           MR. IWREY:  No comment.

19           THE COURT:  Would it be all right, like you have so

20     many defendants, I don't need all the defendants to come in

21     on this technology, I really don't want you all, but if you

22     want to volunteer for defendants or, you know, some other

23     defendant thinks they need to be there, I mean, we obviously

24     are not talking at all about the substance of the case, we

25     are only talking about how to do the administrative -- the

1    technology part to effectuate what we have just talked about,

2    the parts.  So if you all agree and I decide, and I don't

3    know yet because I want to meet first to see what they have,

4    I would have liaison counsel for each of the groups and you,

5    sir, for the defendants, and if some other defendant wants to

6    come too really I don't care, but I want this as a small

7    discussion group, that's all.

8              MR. IWREY:  Looking over at the jury box it appears

9    that I have been volunteered for that.

10             THE COURT:  Okay.  All right.  Very good.

11             MR. IWREY:  Thank you, Your Honor.

12             THE COURT:  I will notify you.  I am going to meet

13   next week, and maybe in a week or so have another meeting and

14   then have you come in.  I won't finalize anything until I

15   discuss it with all of you so that if there are some other

16   ideas or something we missed, as I said, I want your input.

17   Okay.  Very good.

18             Are there any service issues?  I haven't heard

19   anything else that is not taken care of but -- no?

20             MR. KOHN:  May it please the Court, Joseph Kohn,

21   Kohn, Swift & Graf, for the direct purchaser plaintiffs.

22             With respect to wire harness, we can confirm that

23   all of the 31 entities named, and they do fall under the

24   different defendant groups, have either accepted service,

25   been served, except for two that are in Japan where the

 1    service is underway as part of that process and it has been

 2    catching up as we speak.  And one of the quirks of that is

 3    the defendants' counsel will frequently tell us before the

 4    service reports back to us that they have completed the

 5    service, they will say, yes, we have now been served in

 6    Japan.  So we have no reason to believe that won't be

 7    completed in the normal course as this briefing proceeds.

 8              THE COURT:  Okay.  Very good.

 9              There was another item -- well, I guess number 3 on

10    page 2 which had to do with service issues too, so while we

11    are on it, I would like to know the status of the defendants

12    who have been served and when they were served in like one

13    easy table.  This is just a simple thing because I want to

14    keep track of these dates.  Could you provide me with that?

15              MR. KOHN:  Certainly, Your Honor.

16              THE COURT:  Thank you.  Okay.  And we all know that

17    we have a new name, it has been referred here to as the

18    Automotive Parts Antitrust Litigation, and I think that also

19    shows the intent of the panel, do you not?  I wish I had had

20    this order before I talked to Judge Zatkoff because I think

21    we could have avoided all of this but I didn't so -- all

22    right.  As to the second item on the agenda we have taken

23    care of that.

24              Motions to dismiss.  We aren't arguing them today.

25              MS. FISCHER:  No, Your Honor.

 1          THE COURT:  July something they will be filed?

 2          MS. FISCHER:  July 13th, Your Honor, they will be

 3   filed.

 4          Your Honor, we just wanted to discuss sort of

 5   logistical issues today on the motions to dismiss.  We are

 6   obviously trying to limit the amount of paper before the

 7   Court so we are attempting to basically draft collective

 8   briefs on collective issues, and have made a proposal to

 9   plaintiffs' counsel that for collective briefs, opening

10   briefs be 40 pages.

11          THE COURT:  I'm sorry.  Could you give your name?

12          MS. FISCHER:  Yes.  It is Michelle Fisher on behalf

13   of the Yazaki.

14          So 40 pages for opening briefs, 40 pages for

15   opposition, and then 15 for replies for collective issues,

16   and then there will be individual defendants who will be

17   briefing their own -- some of their own issues.  We made the

18   proposal, we haven't heard back from plaintiffs yet so I

19   don't know if there is dissent on that or not but that's the

20   proposal on the table.

21          THE COURT:  You need 40 pages?

22          MS. FISCHER:  For the collective issues.  So, in

23   other words, you won't get from every defendant a Twombly

24   brief or briefs on why the consumer protection claims under

25   Alabama law are deficient or something like that.

1          In addition, we would propose to handle on the
2    state law claims just not argument but using an index at the
3    back to list the state and then the authority that supports
4    the point made in the brief.
5          THE COURT:  Okay.  Let me start from the back of
6    this with the defendants all filing their briefs and they are
7    going to have exhibits, I'm assuming, to the brief.  Are
8    there going to -- I don't know how common your exhibits,
9    maybe by having this initial large brief you will have just
10   one group of exhibits.
11         MS. FISCHER:  Well, the indexes or appendixes we
12   are thinking about are really just a list of authority by
13   state.
14         THE COURT:  The authority, okay.
15         MS. FISCHER:  Right, the authority, since they are
16   motions to dismiss --
17         THE COURT:  You won't have anything else?
18         MS. FISCHER:  At least 12(b)(6) motions would not
19   have anything else, jurisdiction issues may be different.
20         THE COURT:  Right.  And what are, without -- I
21   don't want to give away any of your strategy, but could you
22   tell me kind of in general what these claims are based on,
23   your motions to dismiss?
24         MS. FISCHER:  Possible subjects would include
25   Twombly, jurisdictional issues, FTAIA is a possibility, state

1    specific arguments, consumer protection, state antitrust law

2    and unjust enrichment arguments, standing.  There is even

3    some specific arguments that some defendants have filed for

4    bankruptcy so they will have bankruptcy --

5         THE COURT:  Well, bankruptcy is another issue, I'm

6    glad, so the individual defendants will bring up the

7    bankruptcy issue, okay, because we have a couple at least who

8    have that issue.  Okay.

9         What else do you need?  Now, you are going to be

10   filing them by July 13th?

11        MS. FISCHER:  Correct.

12        THE COURT:  And that would be your group one plus

13   all the individual defendants, so we know we have that.

14        MS. FISCHER:  And just for the sake of clarity,

15   there are three group of plaintiffs so three separate

16   complaints, so we would be talking about collective briefs

17   relating to the different groups.

18        THE COURT:  Okay.  And then, as I recall the

19   schedule, there is what, 60 days?

20        MS. FISCHER:  60 days.  I think the oppositions

21   would be due September 11th, if I'm doing my math right, and

22   then the replies would be due October 26th, I believe.

23        THE COURT:  Okay.  And then I always have argument

24   on my dispositive motions, I have never dealt with all of

25   this many people though, but I still think I would like to

1    have argument on the motions, so we will have to come up with

2    a date.  I don't know yet because I need time to look for a

3    clerk and myself because I always read them to go through all

4    of the motions first before I have you come in for argument,

5    so I am really not sure if we are talking about the middle of

6    October.

7            MS. FISCHER:  Well, the replies would be filed late

8    October.

9            THE COURT:  Late October.  I don't know if we would

10   have argument in December maybe or possibly even early

11   January.  Okay.

12           Anything else on the motions?

13           MR. HANSEL:  May it please the Court, Your Honor,

14   Greg Hansel for the direct purchaser plaintiffs.

15           We have had discussions with Ms. Fischer attempting

16   to reach agreement on the page limits that the defendants

17   have requested, and we agree that it makes sense for the

18   defendants who have a common -- who have common issues to

19   combine those into a single brief to make it more streamlined

20   for the Court and promote judicial economy, fewer opposition

21   briefs, fewer reply briefs, that all makes sense.  The

22   40-page limit the defendants have requested seems reasonable

23   for a consolidated motion to dismiss brief and for the

24   plaintiffs' responses.

25           However, we believe that the separate individual

 1    supplemental motions to dismiss should be shorter --

 2         THE COURT:  I agree.

 3         MR. HANSEL:  -- than the 20 pages, which is the

 4    default page limit, simply because if you didn't do that you

 5    wouldn't actually be achieving efficiencies, you would have

 6    the maximum page limit for every defendant plus 40 pages, so

 7    if we are actually trying to streamline this then those ought

 8    to be somewhat shorter.

 9         The plaintiffs would respectfully suggest 10 pages

10    for the initial separate briefs, 10 pages for responses and 5

11    pages for replies.  Thank you, Your Honor.

12         MR. MAROVITZ:  Good morning, Your Honor.

13    Andy Marovitz on behalf of Lear.

14         We are one of the defendants that will be filing a

15    separate brief, and for us it is not a supplemental brief.

16    Lear is one of the defendants that filed for bankruptcy.

17    Lear is one of the defendants who is not involved in any one

18    of the other cases and we have our own issues.

19         In addition, the rules are not necessarily one size

20    fits all for all cases.  There are some cases like this one

21    that present a myriad of issues where parties may need more

22    than the usual number of briefs, so respectfully we agree

23    with all the other defendants that we are going to do our

24    very best and all the other defendants are going to do their

25    very best not to give you more paper than you need.  That's

1    not in anybody interest, it is certainly not in ours.  But in

2    order to provide you with a full picture of what, at least

3    for Lear we intend to show why we should be dismissed from

4    this case, and also from any of the other defendants too who

5    are filing more than simple me-too briefs, we really do need

6    20 pages for our opening brief, we would allow 20 pages for

7    the plaintiffs, and we need 15 pages in reply.  This is a big

8    case and to --

9            THE COURT:  I'm getting scared, everybody says it

10   is a big case, it is making me nervous.

11           MR. MAROVITZ:  But to limit us to 10 pages and then

12   5 will effectively eliminate our ability to apprise the Court

13   of why we should be dismissed.

14           THE COURT:  All right.  Here is what I'm going to

15   do --

16           MR. PERSKY:  May I comment on that, Your Honor?

17           THE COURT:  We'll take one more comment but that's

18   it because I already know what I'm going to do, so go ahead.

19           MR. PERSKY:  This is Bernard Persky of the Labaton

20   Sucharow firm for the end payors.

21           I just wanted to bring the Court up to date about

22   the Lear bankruptcy situation.  Lear had moved before the

23   bankruptcy court to enjoin all antitrust actions against it

24   by reason of purported discharge that they got in bankruptcy.

25   The matter was briefed and argued before bankruptcy Judge

1   Gropper.  To the extent the motion related to --

2           THE COURT:  What district?

3           MR. PERSKY:  Southern District of New York, a

4   bankruptcy judge.  To the extent that the alleged unlawful

5   conduct resulted in antitrust violations post discharge the

6   Court allowed that matter to go forward and left it to the

7   antitrust court to determine whether there has been

8   sufficient pleading of an antitrust claim, and if it turns

9   out that the antitrust claim is established what the scope of

10  that liability is.  Lear took an appeal to the District Court

11  in the Southern District of New York.  That has been fully

12  briefed.  So the issues under the bankruptcy laws as to

13  whether or not we can move forward is sub judice.

14          So in my view to the extent that there are

15  antitrust issues before Your Honor I would just think they

16  would be common to the other defendants and any bankruptcy

17  issues are currently before the District Court judge in the

18  Southern District of New York who is hearing their appeal.

19          But, I mean, I don't want to make too much of a big

20  deal over page limits, I thought Your Honor should be aware

21  that the bankruptcy issues are currently sub judice.

22          THE COURT:  Thank you.

23          MR. MAROVITZ:  Your Honor, Andy Marovitz for Lear.

24          It is -- the complicated nature of the fact that

25  there are issues being addressed in two separate courts shows

 1   precisely why we need the page limits that we need and that

 2   we have asked for.  It is not the case that all bankruptcy

 3   issues are simply going to the Southern District of New York

 4   and only antitrust issues will be here.  Part of our motion

 5   to dismiss will be based upon bankruptcy issues that are not

 6   presented to the Southern District of New York either through

 7   Judge Gropper or through Judge Forest who now has the appeal.

 8   So I certainly don't want to argue with Mr. Persky on the

 9   merits of our position, that will be saved for the motion to

10   dismiss, but in the end, of course, we are going to be the

11   ones who present the arguments and I just want to put

12   everyone on notice they will include the reasons under the

13   bankruptcy laws that were not part of what has been presented

14   to the Southern District of New York as to why this case

15   should not and cannot go forward against Lear.

16           THE COURT:  All right.  The Court is going to allow

17   for the common issues against each class -- I should say

18   proposed class of plaintiffs, 40 pages with 15 pages for the

19   reply.  For all other individual defendant issues the Court

20   is going to allow 20 pages with 10 pages for the reply.

21           And on the 40 pages I read 20 pages really well but

22   when I get to 21, you know, so put your important stuff in

23   the beginning, okay?

24           Then I think we are getting to the discovery plan

25   issue.  Does anybody have anything else before we get to the

1    discovery plan?  Okay.  Who is going to argue?

2            MR. SPECTOR:  Good morning, Your Honor.  Eugene

3    Spector for the direct purchase plaintiffs.  I'm going to be

4    dealing on behalf of our group with the document question,

5    the Grand Jury documents.

6            THE COURT:  Okay.

7            MR. SPECTOR:  We have managed to reach an agreement

8    with the defendants to produce the documents that were

9    produced to the Department of Justice in connection with the

10   Grand Jury investigation, the subpoenas, search warrants.

11   That's great progress.

12           We have been advised that of those millions of

13   documents most of them are in Japanese, which is a difficult

14   issue, especially me who doesn't speak Japanese or read it,

15   but for all the plaintiffs' lawyers in this case.  And so we

16   wanted some kind of guidance or road map or descriptions of

17   what is there so we would understand what is being produced

18   to us, who the custodians were, where the documents came

19   from, a description of what kind of documents they are, the

20   subject matters maybe, and e-mails, correspondence, so we

21   would at least have some kind of understanding and be able to

22   try to organize this a little more efficiently and make it

23   move more quickly and be less costly ultimately for us.

24           THE COURT:  You are going to get the source and the

25   custodian information, according to the document I have.

1    MR. SPECTOR:  Yes, but most of that, Your Honor, is

2 going to be in the metadata that is on the documents which

3 will be in Japanese, some of it will be in English but most

4 of it in coming out will be in Japanese.

5    THE COURT:  I'm not understanding.  Are you saying

6 because this is Japanese you need more information, or are

7 you saying you need a translation?

8    MR. SPECTOR:  No -- well, a little bit different.

9 What we are saying is that we would like some guidance as to

10 what is there so that when we start looking at it we know

11 what we are getting.  Actually we are not asking for a lot

12 more than what the Justice Department asks for when it

13 requires the submissions to be made.

14    THE COURT:  But you're not the Justice Department,

15 and that's exactly the issue here.

16    MR. SPECTOR:  I understand that, but they have

17 already done this, Your Honor, and that's why we thought it

18 made sense that if they already have got it done why can't we

19 have it?  And what they do is when they submit their data in

20 their database there is a letter that is submitted with each

21 submission who says who the custodians are that are included,

22 the total number of records, the number of records for each

23 custodian, and then the Bates range numbers for those

24 custodians.  That kind of information would be helpful to us

25 as well, and I think we should be able to get that without

```
 1    having to run the metadata on each of the data sources that
 2    were provided, just as the Justice Department gets it.
 3                THE COURT:  So you are saying custodians, total
 4    number of records?
 5                MR. SPECTOR:  Number of records per custodian and
 6    the Bates range number -- or the Bates number ranges, I'm
 7    sorry, of that.  And we thought some sort of a description
 8    that tells us what is there, e-mail, correspondence, memos,
 9    that kind of thing.
10                There is one other issue that has arisen in
11    connection with this, Your Honor, and that is we have come to
12    understand that there are a number of translations that have
13    been provided to the Justice Department, English
14    translations, both certified translations and uncertified
15    translations, and we believe that that should be part of what
16    is produced to us as well.
17                THE COURT:  That would make it a lot easier,
18    wouldn't it?
19                MR. SPECTOR:  Well, it would make things more
20    efficient.
21                THE COURT:  Yeah.
22                MR. SPECTOR:  And it is already done, and the
23    department -- we have been in touch with the department, Your
24    Honor, as I have reported to you the last time, we try to
25    stay in touch with the department so we don't interfere with
```

1    them and we want to make sure they don't think we are doing

2    something that is going to interfere with them.  We have

3    asked them about these English translations, and they told us

4    they have no objection to those being produced to us, it will

5    not in any way interfere with the investigation being

6    conducted by the department.

7         THE COURT:  Okay.  Can I hear a response on this?

8         MS. FISCHER:  Thank you, Your Honor.  Again,

9    Michelle Fisher.

10        First, it may just be a misunderstanding, I cannot

11   say that I know for a fact that most of the documents are in

12   Japanese.  It is a fair characterization to say that a number

13   are Japanese perhaps, certainly many, I don't even know if I

14   can say most for all defendants, but they are getting -- the

15   plaintiffs are, indeed, getting most of the information that

16   they asked for.  They asked us to provide them with a letter

17   identifying the fields that they would be getting.  They are

18   in load files.  They are getting, for example, from Yazaki

19   the custodian, the beginning Bates number, the ending Bates

20   number.

21        THE COURT:  Okay.  Are they getting a list of

22   custodians or do they have to look in metadata?

23        MS. FISCHER:  It is in the fields that's provided,

24   so it has a load file and it will tell you by document Bates

25   range who the custodian of that document was and the company

1    from which it came, so they are getting the information.  It

2    seems to me what they are asking you for, Your Honor, is to

3    provide that same information in multiple forms because it

4    will save them time, on that issue that's what they are

5    asking for.  If the concern, Your Honor, is that some of the

6    names might show up in the metadata as Japanese or some other

7    language, we are certainly willing to provide them with a

8    translation of this means Mr. Smith or Mr. Suzuki or whatever

9    the case may be, we are certainly willing to do that.

10            THE COURT:  What about the English translations?

11            MS. FISCHER:  Your Honor, that first came up today,

12   this morning, and if the Court wants to give that serious

13   consideration we would certainly request a chance to brief

14   about it but I'm prepared to talk about it.

15            THE COURT:  Do you have English translations?  The

16   Department of Justice does.

17            MS. FISCHER:  We have some English translations,

18   yes.  Basically we do not translate all documents, they are

19   not certified, and to the extent they are provided to the

20   Department of Justice they reflect sometimes quick responses,

21   quick translations to respond to specific correspondence or

22   specific requests with the Department of Justice which

23   relates very directly to the Grand Jury proceedings, the

24   nature, scope and direction of what they are looking at.

25            In essence, the plaintiffs have dropped their

1    request for the subpoenas, the search warrants and the

2    correspondence acknowledging that they are not entitled

3    without a showing of compelling necessity to documents that

4    reflect the nature, scope and direction of the Grand Jury.

5    This is just a backdoor attempt to get exactly that.  If we

6    describe what is in the documents it is a summary of what the

7    DOJ was looking for.  They want to know if it was e-mails, it

8    is in the property field for Yazaki, it tells you if it is an

9    e-mail or a memo or things of that sort.

10          THE COURT:  Do you have any other document that

11   says -- that you have already prepared that says, you know,

12   these are e-mails, these are whatever?

13          MS. FISCHER:  I don't believe so.  I will check on

14   that, Your Honor, but I don't -- I don't know that we have

15   some sort of index.  I think you just produce it with a load

16   file which has the fields I'm referring to.

17          So I do think that intrudes on privilege and

18   work-product issues to the extent that these translations are

19   frankly reflecting value judgments made by the lawyers about

20   what should and shouldn't be --

21          THE COURT:  I'm not understanding that.  To me a

22   translation is what is in a document.  What are you talking

23   about?

24          MS. FISCHER:  But they are not all translated.

25          THE COURT:  Well, you don't have to translate what

 1   is not translated but if you have translations --

 2            MS. FISCHER:  The translations would show those

 3   documents that we selected in response to discussions with

 4   the DOJ and the subpoena itself.

 5            THE COURT:  Okay.

 6            MS. FISCHER:  They are not all the documents.

 7            THE COURT:  Okay.  Let me -- this is not difficult.

 8   You will give them the translations that you have.  I'm not

 9   talking about some other third description like this like

10   you're trying to give some extra detail or explain what was

11   meant in this document, I'm not talking about that, but

12   translations of any documents you are to turn over.

13            MS. FISCHER:  I have a question, Your Honor.

14            THE COURT:  Okay.

15            MS. FISCHER:  There are two sets -- there are two

16   types of translations, translations that we made for our own

17   benefit and translations of documents produced to the DOJ.

18   With respect to the documents produced to the DOJ, that

19   clearly invades Grand Jury proceedings.

20            THE COURT:  No, no, they get the translations,

21   that's it.  They get the translations.  That's not invading

22   the Grand Jury.  They don't know what questions were asked to

23   get those documents.

24            MS. FISCHER:  To the extent that those translations

25   were provided to the DOJ it shows exactly what the DOJ is

 1   looking for and pursuing because we were making selective --

 2   selections of which documents to translate, that's the point.

 3   I would only ask, Your Honor, since this just came up, this

 4   is a very important issue raising a lot of critical points,

 5   privilege and 6(e), and if the Court is inclined, as you seem

 6   to be, to seek -- to order us to do this, we would ask for an

 7   opportunity to brief this.  This just came up this morning.

 8   We had reached an agreement to provide documents which they

 9   knew were produced to the DOJ pursuant to subpoena, not

10   translations which are cooperation documents, not subpoena

11   documents.  This came out of the blue.

12            THE COURT:  Mr. Spector?

13            MR. SPECTOR:  Your Honor, we asked for all the

14   documents that they produced to the Department of Justice.

15   We learned that some of those documents -- and we learned

16   recently that some of those documents were translations.

17   Ms. Fischer is correct, I raised that issue with her this

18   morning because I learned of it yesterday in our

19   communications with the department, and I don't understand

20   why anything produced to the department based upon the

21   agreement that I thought we had wouldn't be produced to us

22   including translations?  And I don't see how that in any way

23   invades the Grand Jury secrecy, it is a translation of a

24   document we are getting.

25            THE COURT:  Okay.

1           MS. FISCHER:  May I make one more point?

2           THE COURT:  You may.

3           MS. FISCHER:  I can't speak for all defendants but

4    in the case of Yazaki, translations were provided separate

5    and apart from our actual productions.  They do not bear

6    Bates numbers in the same way that the production pursuant to

7    the subpoena did.  They are distinct categories of documents

8    reflecting value judgments and specific communications with

9    the DOJ.  In essence they are asking for correspondence

10   between us and the DOJ on issues that we discussed, and they

11   are a unique set of documents very different from what we had

12   agreed to produce.  Thank you, Your Honor.

13          MR. PERSKY:  May I just make one comment?

14          THE COURT:  You may.

15          MR. PERSKY:  My name is Bernard Persky.  If the

16   Department of Justice thought it interfered with Grand Jury

17   secrecy they wouldn't have consented to its production in

18   this case.

19          MS. FISCHER:  Your Honor, I didn't have the phone

20   call but our groups' view -- Steve --

21          MR. CHERRY:  Your Honor, I think we should --

22          THE COURT:  Could I have your name, please.

23          MR. CHERRY:  I'm Steve Cherry.  Would you like me

24   to come to the podium?

25          THE COURT:  Yes.

```
 1          MR. CHERRY:  Your Honor, I don't think any of us
 2   should speak for the Department of Justice today, they are
 3   not here.  I have had conversations with them, I don't know
 4   that it is the most recent one, but I have fairly recently
 5   where they did express concerns about translations including
 6   the accuracy given the roughness, the uncertified nature that
 7   these things will be produced and then they start being
 8   important documents in a litigation where that is not the
 9   purpose they were created for.  And I think if we are
10   going --
11          THE COURT:  But I am not understanding this, these
12   are the same documents, we are not talking about separate
13   documents, the same documents, but you have translated them
14   and given them to the Government?
15          MR. CHERRY:  Well, first of all, they are not
16   certified, they are not -- they are rough translations often
17   of portions of documents that you want to discuss with the
18   DOJ at their request and you go in and you may talk about
19   that portion of the document, you may find out in that
20   discussion it is erroneously translated and --
21          THE COURT:  Well, certainly plaintiff would take
22   these translations at their peril, you know, and I'm assuming
23   defendants did not deliberately miss -- and I don't think you
24   are saying that, so they are taking it at their peril.  No, I
25   think these documents should be turned over.  So the English
```

1    translations may be turned over.  The Bates number ranges,

2    any objection to turning over Bates number?

3            MS. FISCHER:  Are you saying separate from the

4    metadata, is that what you are saying?

5            THE COURT:  Yeah, I'm not sure what that means.

6            MS. FISCHER:  In other words, are you asking us to

7    generate a specific report of the information they are

8    already getting in the fields?

9            THE COURT:  Mr. Spector?

10           MR. SPECTOR:  If I might, Your Honor, it is our

11   understanding that when you submit a disk of data of

12   information to the Department you do it with a cover letter,

13   the cover letter says on this disk are documents from

14   Sam Smith, Bates range number X, Y, Z, and Sam Smith was an

15   employee at such and such place, information along that line,

16   just identifying as a locater and a custodian and a Bates

17   range.  That's the information we asked for as a separate

18   idea so we would know what was on those data sources that we

19   would be getting.

20           THE COURT:  Let me ask, Ms. Fischer, if you would

21   come to the podium.

22           MS. FISCHER:  Yes.

23           THE COURT:  Do you have such documents, are there

24   letters that simply say this is what is on these disks?

25           MS. FISCHER:  I'm not certain, I didn't handle

```
 1    that.  I think I can make a more general point, which is the
 2    case law says that -- and the Sixth Circuit and I believe --
 3    the Sixth Circuit has said that even if you are producing
 4    Grand Jury documents themself you do not -- you do not have
 5    to produce an index to those documents because it would,
 6    quote, violate the concept of Grand Jury secrecies by
 7    allowing civil litigants to peer into the Grand Jury process.
 8          In Re: Caremark, which is a Northern District of
 9    Illinois case, the same result, the court said the documents
10    themself need be produced but they barred disclosure of the
11    Grand Jury subpoenas and document indexes because they said
12    they should not be compiled for the plaintiffs in the same
13    manner that they were produced to the DOJ because that would
14    disclose the working of the Grand Jury.  It was exactly your
15    point to Mr. Spector, they are not the DOJ, and so they are
16    getting this information --
17          THE COURT:  Okay.  All right.
18          MR. SPECTOR:  Just to be clear, Your Honor, we are
19    not asking for an index, we are asking for a list of whose
20    documents they are, Bates ranges, that kind of thing.
21          THE COURT:  No, I don't think that's necessary.  I
22    think that you can get that from the information that you
23    have, you can create your own, so I'm not going to order that
24    turned over.
25          MR. SPECTOR:  Thank you, Your Honor.
```

1          THE COURT:  All right.  The next issue, either the

2    date range or the notification.

3          MR. HANSEL:  Greg Hansel, again, Your Honor, for

4    the direct purchaser plaintiffs.  I would like to address the

5    issue of document preservation.

6          We have had discussions with the defendants and we

7    have tried to reach an agreement, we have been unable to

8    reach an agreement as late as 9:45 this morning as those

9    discussions have continued.

10          THE COURT:  But if I have this right they are

11    willing to give you until September, I forget now, the end of

12    September to come up with -- to review records before you

13    determine date preservation, and you want until the end of

14    December?

15          MR. HANSEL:  December 1, Your Honor, so we do

16    expect under the agreement that the defendants who pled

17    guilty be producing Grand Jury documents beginning on

18    August 1st, primarily in Japanese, now, we are happy to have

19    some translations of selected documents, and continuing to

20    October 1, I believe, so we won't even have all of them until

21    October.  We will need some time, there are millions of pages

22    of documents so that's why the plaintiffs are requesting

23    until December 1 to agree -- to attempt to agree on

24    preservation dates.

25          I would like to say a few words about the

```
 1    importance of the preservation dates themself, if I may.  As
 2    the Court is aware, in each of the three types of plaintiffs'
 3    consolidated amended complaint there is a class period.  In
 4    the wire harness case the class period runs from 2000 to
 5    2010.  However, it is important for the plaintiffs to obtain
 6    documents from both before and after the class period because
 7    of important issues of liability and damages.  The cartel may
 8    have started earlier, in fact, than the begin date according
 9    to the plea agreements between certain criminal defendants
10    and the DOJ.  Those plea agreements were subject to
11    negotiation, the Department may have chosen to agree to
12    certain dates in the interest of reaching a plea agreement.
13    Those dates are not necessarily binding on the plaintiffs if
14    we can demonstrate the cartel started earlier as we believe
15    or if the effects lasted longer.  Our investigation has
16    suggested that some of these cartels may have begun in the
17    1980s in some parts of the world, and we don't want to bind
18    ourselves to the DOJ's bracket dates.
19         So plaintiffs intend to show that there is
20    liability for the full period of the cartel, whatever that
21    is, but even outside of what we eventually determine to be
22    the full cartel period, for purposes of damages we need to
23    understand the state of affairs in the industry, the pricing
24    in the industry before the cartel started and after the
25    cartel ended.
```

```
 1            Here is the reason:  That for the plaintiffs to
 2   carry their burden to prove damages in this case we have
 3   retained a Ph.D. economist who will have to create a model of
 4   what a competitive market price would have been in this
 5   industry, in the wire harness industry, during the class
 6   period but for the cartel.  So if there had not been a cartel
 7   what would the competitive price have been if bids weren't
 8   rigged and prices weren't fixed and the defendants were
 9   competing properly, would it -- by what measure would it have
10   driven prices down to a competitive level?  We call that the
11   but-for world.
12            Many economists will say that the best evidence of
13   the but-for world is prices before the cartel started or
14   after the cartel ended.  So we do need to go back before the
15   cartel started, and we don't even know when it started yet.
16   We also need to go look at data from after the cartel ended.
17   Now, we all assume perhaps that the cartel conduct would have
18   ended when the FBI raided companies and the Japanese Fair
19   Trade Commission and European Commission raided these
20   companies in dawn raids beginning in February of 2010.
21   However, as all of the complaints plead, these contracts that
22   were bid rigged were oftentimes five-year contracts so we
23   know there may have been continuing effects.  If a bid was
24   rigged and a contract given to a supplier just before the
25   raids that model car might not even have come into
```

```
 1    manufacturing yet because as we know the requests for
 2    quotation, RFQ process, often began three years before the
 3    new model car started being manufactured.  So for that reason
 4    we need documents after and data afterwards.
 5             So I think I have gone on long enough about the
 6    importance of the issue and some of the nuances for purposes
 7    of liability and damages.  I just want to say one last point
 8    about costs.  The defendants assert that it will be
 9    expensive, even debilitating, for them to maintain old
10    records.  My understanding is that most of these records
11    would be on digital backup tapes from the year 2000, 1999
12    era.  And with the pace of change of technology the
13    plaintiffs seriously doubt whether those tapes are even
14    reusable now some 13 years later, and we frankly don't
15    understand why it would cost the defendants anything to leave
16    those backup tapes on the shelf.
17             THE COURT:  Okay.
18             MR. HANSEL:  Thank you, Your Honor.
19             THE COURT:  Defense?
20             MR. TUBACK:  Good morning, again, Your Honor.
21    Michael Tuback for Leoni.
22             I think we need to separate out two things here.
23    One is when we need to reach agreement on when the
24    preservation date begins, what the beginning date is for
25    preservation and what the end date is for preservation.  I
```

1    think it is a fair point to say that the plaintiffs need time

2    to figure out what the beginning point is of preservation.

3    Of course, putting aside the issue of preservation is very

4    different than production, but just to preserve the

5    documents.  We are not making the argument that it is

6    burdensome or costly to preserve the old, whatever there may

7    be out there, preserving documents from the 1990s or the

8    early 2000s.  Our argument is that for the end date there is

9    no reason to pick anything other than the date shortly after

10   the Grand Jury subpoenas were issued, there were public

11   search warrants and dawn raids in Europe.  And on that point

12   the only thing that plaintiffs have said is there may be

13   continuing effects of conduct prior to those raids that would

14   be reflected in the prices.

15        We have already agreed to preserve the

16   transactional data that we would be required to do anyway as

17   businesses that are growing concerns, we have already agreed

18   to preserve the transactional data that postdates the Grand

19   Jury subpoenas and the search warrants.  What we don't want

20   to have to do and what we should not be required to do is

21   re-image computers that we have already imaged, undergo a

22   whole new preservation process that we have already done.

23   Let me explain what I mean by that.

24        THE COURT:  Wait a minute.  We are talking end

25   dates here now from 2010, so you are talking 2011, 2012 so

1   far that you --

2           MR. TUBACK:  Right, and our proposal, Your Honor,

3   is that we would end our preservation obligations as of June

4   2010 is what we should do.  We have, in negotiations with the

5   plaintiffs, have taken different positions to try to reach

6   compromises but the right result here is we end our

7   preservation obligations in June of 2010 with the exception

8   of transactional documents, documents -- data, transactional

9   data that will tell them what the prices were for products

10  past that time.  They have given us no reason why we should

11  do anything after we did our initial preservation that came

12  as a result of the Grand Jury subpoenas.  Let me explain what

13  I mean by that.

14          THE COURT:  Wait a minute.  Are you saying because

15  the Grand Jury subpoena was issued on this date everybody

16  would have stopped whatever corrupt action they would have

17  been involved in, if any?

18          MR. TUBACK:  That exact --

19          THE COURT:  Because they wouldn't be stupid enough

20  to continue after the Grand Jury has -- they got the

21  subpoena, is that what you are saying?

22          MR. TUBACK:  I might phrase it differently but

23  that's certainly one way to phrase it, but beyond that, Your

24  Honor --

25          THE COURT:  I think I have done a lot more criminal

1    law than you have.

2            MR. TUBACK:  I was an assistant U.S. attorney for a

3    number of years.

4            THE COURT:  Judge, do you ever see people go on?

5    Sure.

6            MR. TUBACK:  I don't want to get into the relative

7    stupidity of anyone here, but what I do want to say is in our

8    experience, and I have done a fair number of these, and I

9    will say I was an assistant U.S. attorney for a number of

10   years, the preservation obligations -- let me just explain

11   how these cases work.  When a company gets a Grand Jury

12   subpoena one of the first things we do is go out and preserve

13   documents.  So one thing that will include, for instance, is

14   going to the custodians that we think may have responsive

15   documents and imaging those computers or making copies of

16   everything they have.  And you do that shortly after the

17   Grand jury subpoena is issued.  Why, because you want to make

18   sure you're preserving the documents that need to be

19   preserved for the Grand Jury subpoena.  That's a very

20   expensive, time-consuming process, and there is no reason to

21   make us -- unless they can proffer some reason, there is no

22   reason to make us go back to those same custodians, image the

23   same computers all over again so that they can capture not

24   transactional data, because they will get that already, but

25   to capture e-mails that are several weeks or so after the

 1     Grand Jury subpoenas are issued, and today that's a very

 2     expensive process.

 3              THE COURT:  So what are you -- what have you done

 4     to capture this data from the Grand Jury date to today's

 5     date?  You still have that, those images?

 6              MR. TUBACK:  You are talking about transaction --

 7     yeah, of course.

 8              THE COURT:  Not transactional.

 9              MR. TUBACK:  Of course we have kept the images,

10     yes, absolutely.  We have document holds in place that have

11     been put in place since the Grand Jury subpoenas were issued.

12     The question is do we need to go back now and make a second

13     effort to redo basically everything we did when we got the

14     Grand Jury subpoenas?

15              THE COURT:  Okay.  Thank you.

16              MR. TUBACK:  Thank you.

17              THE COURT:  You know, I can't even imagine how you

18     do all of this but anyway --

19              MR. TUBACK:  Believe me, it is a lot.

20              THE COURT:  -- assuming you do it.

21              Go ahead.

22              MR. HANSEL:  Thank you, Your Honor.  Briefly in

23     reply, the reason we need liability documents, not just

24     transactional data, at the end of the cartel is twofold.

25     Number one, if a defendant changes its conduct after they are

1    busted and now they are acting in a different way, a

2    competitive way, that in itself is important evidence of how

3    they were acting in a cartel beforehand, that changed, that

4    new conduct.  So suddenly they actually have to compete how

5    do they go about deciding their prices internally that they

6    are going to charge or the responses that they are going to

7    make to an RFQ?  They will have a whole new analysis perhaps

8    because they are not meeting with their competitors anymore

9    to fix the prices and rig the bids.  That new analysis, the

10   fact that they go through it at all, how they do it, is

11   evidence that they were competing -- they were engaging in a

12   cartel beforehand.

13           THE COURT:  So you are assuming the other, they are

14   not continuing with their, quote/unquote, corrupt behavior,

15   they are in fact doing it right and now you want to say here

16   you have done it right and so --

17           MR. HANSEL:  This is what it looks like and you can

18   contrast that with what they were doing before just meeting

19   with the competition.  Now, in some cases the second --

20           THE COURT:  It is like they are damned if they do

21   and they are damned if they don't, isn't it?

22           MR. HANSEL:  In some cases there have been cases

23   where the defendants did continue the conspiratorial conduct,

24   and one example of that was a case called Graphite

25   Electrodes, and in that case there was evidence that the

1    defendants even after the investigation began they continued

2    to secretly fix prices.

3           THE COURT:  Let me ask you this, what are you

4    looking for to determine how long they should have to keep

5    this data, in your opinion?

6           MR. HANSEL:  Well, we think as a practical matter

7    the plaintiffs' ability to review the Grand Jury documents

8    that the defendants have already agreed to produce starting

9    in August, our ability to review those quickly will enable us

10   to negotiate a reasonable set of bracket dates, beginning and

11   end, by December 1st.

12          THE COURT:  Okay.

13          MR. HANSEL:  Thank you.

14          MR. TUBACK:  I'm sorry, Your Honor.  These Grand

15   Jury subpoenas were issued in February of -- starting in

16   February of 2010, and what I have just heard the plaintiffs

17   say is that they want until December 2012 to decide when we

18   can cut off our preservation obligations.  That's just not

19   reasonable.  It is not surprising to me that plaintiffs'

20   counsel have set up a syllogism whereby if we continue to

21   conspire they get the documents and if we didn't continue to

22   conspire they get the documents.  This is a burden issue, and

23   the question is is there any good reason to make us go back

24   and do what we have already done and spent a lot of money and

25   time doing because they want to rummage around to see if they

1   can come up with some other argument.  It is not the way --

2   the fact that they can come up with one example where it may

3   have happened in the past, that may or may not be the case

4   but what I can tell the Court in the absence of any evidence

5   that it has happened we shouldn't be required to go back and

6   redo all of our work again.  It is really expensive.

7         THE COURT:  Okay.  Well, you have agreed to wait

8   until September 1st.

9         MR. TUBACK:  September 1st, Your Honor, what I said

10  in the beginning is we wanted to wait until September 1st for

11  the beginning date.  I can see the argument on the beginning

12  date, to pick the date beyond which we don't have to keep

13  documents or before which we don't have to keep documents.  I

14  might pick an earlier date, but if they wanted until then I

15  can live with that.  What I think we should get is an earlier

16  date for when the preservation obligations end so that we

17  know we can go back to our clients and say okay, we have done

18  what we need to do to preserve the documents that are

19  relevant to this case potentially, and we don't have to keep

20  going on and on and on to preserve these documents.

21        THE COURT:  Okay.  It would seem to me that

22  plaintiff should have some time to review these documents

23  that they are getting that were submitted to the DOJ before

24  we make this determination.  I don't think you need until

25  December 1st but let me give you until mid October, say

1    October 15th, to make a determination of what the dates will

2    actually be.

3            MR. HANSEL:  Thank you, Your Honor.

4            MR. KANNER:  Your Honor, if I may, Steve Kanner.

5            The tail end of the document production for the

6    defendants of the Grand Jury materials, it begins in August

7    but it doesn't end until the 16th of October, and as these

8    things happen it is oftentimes that you get a pile of

9    hundreds of thousands or perhaps more documents on

10   October 12th, so we may not have had a chance --

11           THE COURT:  All right, October 30th, and you will

12   have to work really hard.

13           MR. KANNER:  We will work fast.  Thank you, Your

14   Honor.

15           MR. TUBACK:  Your Honor, the October 30th date,

16   just to be clear, is a date where we are supposed to meet and

17   confer and try to reach resolution?

18           THE COURT:  Correct.

19           MR. TUBACK:  The plaintiffs aren't dictating to us

20   what our preservation obligations are?

21           THE COURT:  Absolutely not.

22           MR. TUBACK:  And if we have a disagreement we will

23   come back to the Court?

24           THE COURT:  You will be here.

25           MR. TUBACK:  Thank you.

Status Conference • June 15, 2012

```
 1          THE COURT:  I think if you have a disagreement you
 2   could file a motion and the Court will hear it forthwith
 3   because I don't think this is going to be complicated but who
 4   knows, it could be, I don't think so.
 5          Now, we have an issue of depositions and
 6   confidential documents.
 7          MR. KOHN:  Thank you, Your Honor.  Again,
 8   Joseph Kohn for direct purchasers and all plaintiffs with
 9   respect to the protective order issues.
10          Your Honor, there is one disputed issue, which is
11   the use of so-called highly-confidential documents at a
12   deposition.  The plaintiffs' position is there need not be a
13   prior seven-day notice of a document that would be presented
14   at such a deposition.  Now, we have compromised on many
15   issues on the discovery program, we compromised on a lot of
16   issues in the confidentiality order, we compromised on a lot
17   of issues revolving around the depositions under the
18   confidentiality order.  Why can't we compromise on this?  I
19   think there is really two groups of reasons, one you would
20   call principle and the others are practicality.
21          By the time we get to the depositions of these
22   witnesses after all of these motions, after the review and
23   translations of documents, I mean, this is really the core of
24   the trial preparation in the case.  I mean, very few cases
25   like this with foreign defendants or defendants spread around
```

1   the country result in testimony from live witnesses at trial.

2   It is really the deposition testimony that becomes the trial

3   testimony by videotape, by reading, et cetera.

4           THE COURT:  Boring.

5           MR. KOHN:  It can be, which our task is to try to

6   keep that interesting for a jury.

7           These witnesses are being deposed as on

8   cross-examination.  We are calling a defense witness as on

9   cross, yes, there is discovery issues, we may not know who

10  wrote a handwritten document and we are asking questions

11  about that sort of thing, we may want some background, but it

12  really is the crux.  On the principle item there are two

13  problems, one is giving your opponents advance notice of your

14  planned cross-examination right down to the specific exhibits

15  you are going to use.  It just is not proper trial under our

16  system.  The second, and to me really the more important one,

17  is if there is a failure for some reason to predesignate a

18  particular document that at the deposition you want to use

19  the result is you are barred from presenting that piece of

20  evidence to a witness.  In other words, you may have an

21  otherwise admissible piece of evidence, a memorandum from a

22  defendant that is an admission, or it is a business record or

23  it is a co-conspirator statement, and a witness may be saying

24  something that you either did or didn't anticipate, and now

25  you can't present that document at that point in the trial,

1    you can't have it displayed to the jury that this witness

2    claims no knowledge of some meeting that, you know, you think

3    he or she may have attended.  There are credibility issues

4    that come up, large and small, where some document may in the

5    flow of our cross-examination and our trial presentation we

6    would want to be able to show those documents.

7            Now, yes, we prepare ahead of time but you prepare

8    your questions ahead of time but unfortunately you don't know

9    what the answers are going to be.  And it, again, might be a

10   document that in a trial with a live witness you would want

11   to pull out and say, Mr. Witness, you just said something,

12   haven't you seen Exhibits Number 2, 3 and 4 which are

13   evidence in this case, and don't they cause you to either

14   reconsider your testimony, or doesn't that refresh your

15   recollection about this or that?

16           So, you know, we have seen other orders, I know we

17   did cite the order in the matter before Judge Borman in

18   Packaged Ice as how it was a negotiated, agreed-upon order,

19   it was not -- it didn't involve a ruling by Judge Borman, but

20   in that case there were -- there was no pre-notice about

21   deposition -- showing highly-confidential documents to

22   deposition witnesses.

23           There are, as I say, some restrictions on the use.

24   I mean, we are proceeding in good faith and we do agree to

25   certain restrictions on the use of highly-confidential

1   documents at depositions.  We just don't agree with the

2   pre-notice.  If I had my druthers it would simply say we can

3   show any confidential and any highly-confidential document to

4   any witness at a deposition for any reason we choose, but we

5   didn't have that, we do have some stricters on it with

6   respect to impeachment, et cetera.

7         Now, on the practical side what we have found in

8   cases, despite the notion of highly-confidential documents,

9   many, many pieces of paper come with that legend on them

10   after they are produced.  We are not talking about the seven

11   pieces of paper that have some sort of secret formula, so

12   that leads to a couple of things if we have one of these

13   procedures of having to prenotify people about depositions.

14   Sometimes there may simply be an oversight of a document; you

15   provided the list and, oh, shucks, we forgot to put these ten

16   documents which we may want to use and now we are barred, or

17   you have over designation so the week before the deposition

18   make sure you list every single highly-confidential document

19   that we might conceivably want to use so you have to make

20   sure you're complying with your notice provision.

21         I mean, the other practical issue is what happens

22   once there is dispute?  Let's say we do predesignate some

23   documents, the defense says oh, no, I don't want you to show

24   that document to the witness.  Are we going to be running to

25   the Court or to the magistrate on I want to show a specific

 1   document to a specific witness in a deposition?  These are

 2   documents that have already been produced, they are the

 3   defendants' documents.  Sometimes we have been in cases where

 4   the depositions are proceeding along on track and our

 5   colleagues, Mr. Persky is taking a deposition, and three days

 6   later I have a deposition, and we get a notice there is a

 7   really interesting document we hadn't focused on it before

 8   but so-and-so just testified about this document, so you

 9   ought to ask the witness you are taking in three days about

10   it.  Too late, it wasn't on my list that I had to submit.

11   Now, I mean, that may be an absurd example but those are the

12   kinds of practicalities that do come out.

13         So the order as drafted, other than this witness

14   provision, has all sorts of protections which we think should

15   stay in place.  We are not saying that highly-confidential

16   documents should no longer be confidential.  Paragraph one

17   says all the information is used solely for the litigation.

18   Paragraph 8-A, in no event may information be used for any

19   business or competitive purpose.  The witnesses must be told

20   of the confidentiality order, shown the confidentiality

21   order, requested to sign an attachment to keep it

22   confidential.  If they don't agree it is read into the

23   record.  The deposition itself, the transcript, is

24   confidential, for 30 days the entire transcript is kept under

25   wraps.  The witnesses don't walk out of the room with these

1    documents.

2         And I think the concerns here really this is not a

3    case where the plaintiffs are Pepsi and the defendants are

4    Coke and we are trying to get in and see their secrets.  This

5    is a case where -- the irony of sort of the confidentiality

6    issue where -- the contention is there were improper

7    communications and disclosure of confidential information

8    between and among the defendants, and it would be the defense

9    witnesses, one defendant having an issue with another

10   defendant's witnesses about this disclosure, so I think

11   within the strictures of the confidentiality order they can

12   police that and police their own witnesses and bring home the

13   importance of the confidentiality agreement and it shouldn't

14   hinder the plaintiffs' preparation of our trial.

15        THE COURT:  Okay.  Let's see what defense has to

16   say about that.

17        MR. KOHN:  Thank you, Your Honor.

18        MR. MAROVITZ:  Good morning, Your Honor.

19   Andy Marovitz, again, for Lear.

20        There are actually three, not just one, but three

21   narrow but very important disputes between the plaintiffs and

22   the defendants about the handling of the parties most

23   competitive, competitively-sensitive, highly-confidential

24   documents that are at issue.  I agree with Mr. Kohn that we

25   made tremendous progress with everything else.

 1          The key difference here that I want to focus my

 2   remarks on that plaintiffs do not focus on is we are not

 3   talking about all highly-confidential documents, we are

 4   talking about highly-confidential documents that would be

 5   shown in depositions to people who have never before seen

 6   those documents.  That's why we need to have certain

 7   protections in place.  That's why frankly with respect to

 8   each of these three fundamental differences the defendants

 9   approach is faithful to the protective order which does not

10   presume, despite what Mr. Kohn remarked as the irony of the

11   situation, that defendants are guilty of any crime.

12          First -- the first of the three points is can a

13   lawyer show a highly-confidential document to, again,

14   consider the recipient, a competitor, a customer or direct

15   seller who has never before seen the document without first

16   notifying the producing party so that it can at least

17   evaluate whether it should take some precautionary steps to

18   protect its commercial secrets?  That's one, and I'm going to

19   talk about that in a minute.

20          Second, in addition to all the people who have

21   previously seen the document who are covered by other parts

22   of the protective order, can the plaintiffs show

23   highly-confidential documents, again, to people who have

24   never before seen its contents and who aren't even familiar

25   with its contents if the witness is a former employee, if the

1    document is used for refreshment purposes or if the document

2    is being used to impeach, again, when the witness has never

3    before seen the document and is not knowledgeable about its

4    contents?

5           And third, can the plaintiffs show

6    highly-confidential information to a person who did not

7    author it or receive it if the lawyer doesn't even have

8    reason to believe that the person is knowledgeable about the

9    specific events referenced in the document instead of some

10   industry fact that is more general in nature?

11          Those are the three disputes, and they are all put

12   forth in our brief.  Before I go one, two, three on those I

13   want to remark about one important point that is not

14   contained in the plaintiffs' brief but was given some

15   prominence today, and that's the what happens if we miss one,

16   are we barred from using it at the deposition?  I assure you

17   for Lear and probably for the other defendants as well that

18   we are going to exhibit the same degree of professionalism

19   that we have, that everyone's conceded that everyone has

20   exhibited throughout the proceedings thus far if that occurs.

21   So we will take a fair look and we will try to figure out

22   whether it is appropriate or inappropriate, so there won't be

23   some automatic bar, it is just that they would have to show

24   it to us at the deposition if they want to show it to a

25   witness who has never before seen it.

1          So let me talk about each of those three points

2     because they are really important.  First, again, it is the

3     recipient that matters.  This is not some parade of horribles

4     where all highly-confidential documents are subject to this.

5     Why would a lawyer show a company's internal,

6     highly-confidential documents in litigation to a competitor,

7     a customer or a direct seller who has never before seen it?

8     The answer must be if the attorney believes that that person

9     has knowledge of its contents despite the fact he hasn't seen

10    it before.  That's possible under certain circumstances, no

11    doubt, but there is a huge and certain risk to the parties of

12    transmitting highly-confidential information from that

13    witness who wrote the document in the first instance to the

14    witness who is seeing the document now in the second.

15         And the fact is that even when you have a

16    protective order the most well-meaning witness who signs the

17    protective order can't somehow forget what he's seen, he has

18    seen it, and if he continues to have some role in the

19    industry he's knowledgeable, and that would be frightening to

20    us and to my client if, in fact, he is shown something that

21    is commercially sensitive.  Imagine, for instance, if

22    plaintiffs want to show highly-confidential technological or

23    cost information to a competitor who has never seen it

24    before.

25         Defendants' paragraph 10-C balances these issues by

1    on the one hand giving notice and opportunity, it doesn't bar

2    the plaintiffs from doing this, but it gives notice and

3    opportunity for the document to be seen and for the lawyer to

4    evaluate whether the risks are too high, and then if we can't

5    reach agreement to bring it to Your Honor.  I am sure that

6    all parties are going to make judicious use of that

7    procedure.  Nobody wants to bug the Court unless it is really

8    necessary, but this fact is even more important now that we

9    may have these other cases coming in and the notion that

10   other people may at some point in the future be part of this.

11   So that's point one.

12           Point two is, again, in addition to people who have

13   previously seen the document, the plaintiffs' version of

14   their protective order, which was not commented on in oral

15   argument but is part of their version that was submitted to

16   you, allows highly-confidential documents to be shown to

17   witnesses who have never before seen it and who are not

18   thought to reasonably know the contents for purposes of

19   refreshment or impeachment or if the witness was a former

20   employee of the party that saw -- that produced the document.

21   This is what we on the defense side call the except that

22   swallows the complete rule because if the plaintiffs, or

23   anybody frankly, can make use of that provision, it is Katy,

24   bar the door, there is no protection at all.

25           We asked the plaintiffs in the meet and confer to

1   identify a situation where you would impeach a witness with a

2   document that they haven't received, that they haven't

3   authored and they are not thought to know its contents, and

4   they could offer us no example and there is none in their

5   brief, so this is one that is really again important frankly

6   to us and it ought to be important to everybody.

7            The third and final point that I raised before is

8   can plaintiff show highly-confidential documents to a person

9   who didn't author it and didn't receive it if the lawyer

10  doesn't have some reason to believe that that witness is

11  knowledgeable about the specific things that are mentioned in

12  the document?  Our draft says it has to be specific, the

13  plaintiffs' draft says it doesn't have to be specific, and we

14  are very concerned about that because we are very concerned

15  about whether or not some generalized industry fact could be

16  used as a hoist in order to show people documents, again,

17  they have then seen before and that are highly confidential

18  under the terms of the protective order.

19           To conclude, Judge, discovery in litigation is --

20  it is remarkable in some sense, it permits lawyers and

21  sometimes witnesses to see a party's most

22  competitively-sensitive documents, and here we have a

23  reasonable, negotiated -- everybody negotiated in good

24  faith -- protective order to protect against misuse, but

25  there are limits to what a protective order can do, and the

1    plaintiffs' positions on all of this would seriously

2    jeopardize the value of confidential, proprietary information

3    to each of these parties as they try to continue to earn

4    business in the marketplace.

5            The final thing that I would say on this is it was

6    told to me that one of the first things that Judge Borman

7    asked when entering the Ice stipulated protective order is

8    why do you need a protective order in the first place, are

9    you trying to protect the secret formula for ice?  This case

10   is not about ice, this case is about highly-sensitive

11   information that needs protection.

12           THE COURT:  Okay.

13           MR. KOHN:  If I may very briefly, we were counsel

14   for plaintiffs in Ice, and despite Judge Borman's admonition

15   there were a lot of highly-confidential documents in that

16   case, so the principle --

17           THE COURT:  Not on how to make ice?

18           MR. KOHN:  -- the principle, does it relate to your

19   customer list, doesn't relate to your internal costs, that

20   concept of highly confidential applies despite the different

21   process.

22           Very briefly just to respond to the notions of --

23   the examples that counsel has cited.  The defendants'

24   proposal, it is in their paragraph 10-C, is that any employee

25   of a competitor who is not either the author or recipient of

```
 1    the document must receive advance notice.  The problem we
 2    have with that are a few quick examples.  Company A has a
 3    document, it is the notes or memos of a conspiratorial
 4    meeting, it was not given to the witness at company B, he was
 5    not a recipient, he was not the author.  Company B witness
 6    doesn't remember or categorically denies such a meeting.
 7    That piece of evidence we believe can properly be shown to
 8    that witness without advance notice.
 9         Company A writes a memo to their boss, I reached
10    agreement with witness X at company B to rig the bids to the
11    manufacturers.  He's not an author or a recipient.  That
12    document would require the advance notice.
13         There might simply be the bid that was submitted by
14    a particular company, that's confidential.  Company B's
15    witness didn't author it, didn't receive it, but we want to
16    show that company B's bid was deliberately askew from the
17    company A bid and we want to match the two of them up, we
18    would have to give them that ahead of time.
19         The whole notion that a witness has, quote, never
20    seen the document before, why would you ask them that?  Well,
21    first of all, how do we know they have never seen the
22    document before until we ask them?  These are now the
23    depositions.  So they sort of have that rabbit in the hat
24    with the whole notion of what we have to give them advance
25    notice of it.
```

1    We know if they are listed as an author or

2    recipient, but we don't know that they passed out documents

3    at a meeting and then took them back after a bid rigging

4    meeting.  We have seen that in cases.  The documents, you

5    know, it is not like a memorandum from the company boss to

6    the field offices, these are by definition the conspiratorial

7    documents.

8    As to the technical cost information, Your Honor,

9    frequently what you see is a lot of this is from ancient

10   history.  We are in 2012, these depositions may begin in

11   2013, 2014, about conduct that occurred in 2005, 2006, 2007.

12   I mean, despite these concerns about confidential cost

13   information, confidential technical information, there is

14   really very little of it when you get to the end of day, it

15   is ancient history by that time.  The costs and the bids were

16   communicated to the third parties, to the victims of the

17   conspiracy.

18   The automobile can be reverse engineered and broken

19   apart and looked at, the other folks can see what the wire

20   harness of -- you know, Sumitomo can see what Yazaki's wire

21   harness looks like, they know it.  So I think, again, we are

22   not dealing with the Coca-Cola secret formula or maybe

23   dealing with a little more than the Ice secret formula, but

24   we think given all the other protections in the order, given

25   the additional good faith that we said we are not going to

 1   show any document to any witness willy-nilly, it will have to

 2   be for impeachment or for refreshment or that they are

 3   referenced in some way as a subject matter that refers to a

 4   meeting or that sort of thing, we think that is more than

 5   adequate protection and we do believe the advance notice is

 6   just an unworkable and an improper restriction on the

 7   preparation of the case.  Thank you.

 8              THE COURT:  Briefly.

 9              MR. MAROVITZ:  Yes, Your Honor.  Three very brief

10   points, Your Honor.

11              First, third parties, non-parties to this

12   litigation, including our customers, have an interest in the

13   way that certain of our internal documents are being used,

14   and if there is no notice given to them or given to us and we

15   have the ability to give it to them they will not be heard

16   before their information is used.

17              Second, I would urge the Court to look carefully at

18   the different versions that were given by the plaintiffs and

19   the defendants.  These are certainly by definition, the oral

20   argument we are having is more thematic, but if the Court

21   looks carefully at those two different versions it will see

22   that the defendants' version is far more careful.  What I

23   mean by that is, for instance, the critical point to remember

24   in all of this is what we are asking for is not a bar, we are

25   simply asking for notice if in the event if the witness is a

 1    competitor, a customer or a direct seller, and that is the

 2    key point that really distinguishes the plaintiffs from the

 3    defendants here.  These are not documents going to people

 4    that have seen them before or who know what is in there.  It

 5    is not only people who haven't seen them before or don't know

 6    what is in there, but it is people who could affirmatively

 7    use competitive information to the disadvantage of the

 8    company that produced it and is keeping it secret.

 9          What I would say, Judge, is finally once the bell

10    is rung it can't be unrung.

11          MR. KOHN:  Your Honor, if I may briefly, and to

12    show it is brief I will stay at counsel table if that's

13    appropriate?

14          THE COURT:  That's fine.

15          MR. KOHN:  The first point as to a concern about a

16    customer's document or some third-party's document that they

17    may have I don't quite understand.  I think what they are

18    saying is there's some document marked highly confidential

19    that they then want to tell some third party who is not even

20    subject to the confidentiality order about to sort of just

21    pre-discuss, you know, the use of the document in a

22    confidential deposition.

23          Finally, Your Honor, the pre-notice as where we

24    begin in trial preparation, there is a spontaneity about

25    asking a witness on cross-examination about a document, and

1    we just don't think it is appropriate to have an opportunity

2    to rehearse even as to a document that you didn't see before,

3    now you do get a chance to see it a week before your

4    deposition and have your answers prepared for it.  We just

5    don't think that's proper in cross-examination.

6          THE COURT:  I agree.  I don't think the documents

7    should be shown before the deposition.  I think if they are

8    marked highly confidential all attorneys will respect that.

9    Yes, once the bell is rung it has been rung, but I guess

10   that's always a danger in litigation.  It seems to me that

11   you have enough built in to secure the confidentiality of the

12   documents.  It is not of a nature of the Coca-Cola trade

13   secret where somebody can look at it and get a recipe.  We

14   are not talking about trade secrets here.  I agree that much

15   of the highly confidential would probably be ancient history

16   but not necessarily all of it, and I can certainly understand

17   plaintiffs' concern about some of this information coming

18   out, but I think there are too many -- there are more risks

19   with having the seven-day notice than not, and I think that

20   the spontaneity of the witness's response is perhaps the

21   critical point.

22          Certainly counsel at deposition can see the

23   document before the witness is shown the document, so we will

24   put that in that counsel will see it first, and then if

25   counsel has some objection I guess you make your objection at

1    that point and it will be preserved for the Court's ruling.

2        Okay.  I think that takes care of all of the issues

3    in the plan and protective order, so we have covered all of

4    these items.  I'm going to ask counsel, plaintiffs and

5    defendants, to get together to submit orders that are

6    consistent with what we did here today.

7        I know from your papers that you were talking about

8    another conference after the motions are resolved.  I don't

9    want to wait quite that long.  I think we need to just see to

10   it administratively that things are moving along and that we

11   don't have any great delay.  So my suggestion would be this,

12   I know defendants don't have designated counsel except for

13   what we did today about the IT, but you may want to -- you

14   are certainly all welcome to come, but you may want to get

15   together and have a few of you come.  I just want to have a

16   status conference, I'm thinking, and I will send out notice

17   of this, I'm thinking of November because then everything

18   would have been filed though not heard or ruled on or

19   anything else, but we would have all of the briefing in just

20   to see that we are all on the same page.

21       I'm only requiring liaison counsel to come so that

22   you don't all have to come from wherever.  Obviously I will

23   send out notice and whoever wants to come can, but what I'm

24   trying to tell you is you don't all have to show up.  This is

25   just so we can make sure -- I can feel confident that the

 1    case is moving along as scheduled.  So we will submit

 2    probably sometime in October the date for the November

 3    meeting.

 4              MR. ALTERMAN:  Your Honor, would it be possible

 5    for --

 6              THE COURT:  Could you give your name?

 7              MR. ALTERMAN:  Irwin Alterman.  Would it be

 8    possible for some people to participate by telephone or is

 9    that too cumbersome?

10              THE COURT:  Well, ordinarily I do a lot by

11    telephone but with the number of people here I think we would

12    be getting everybody wanting to participate by telephone and

13    I'm not going to go there at this point.

14              MR. TUBACK:  Just one quick question, the Court

15    indicated it was going to set a hearing date for November in

16    October, if the Court can do so --

17              THE COURT:  Oh, no, no, a hearing date?

18              MR. TUBACK:  The next status conference date.

19              THE COURT:  Right.

20              MR. TUBACK:  If the Court could set the November

21    date as early as possible so we can block off our calendar

22    that would be very useful?

23              THE COURT:  Okay.  I mean, I have nothing scheduled

24    for November -- I do have trials, I do have some big trials,

25    but we will do it as soon as possible.  Thank you.

1        Before we close is there anything else?  I want to

2   say I'm really impressed with how you are cooperating and how

3   organized and obviously your experience comes through so

4   well.  I appreciate it.  It is really a good opportunity for

5   me to deal with excellent counsel in a very fascinating case,

6   so I thank you.  Good luck.  All right.

7        THE CASE MANAGER:  All rise.  Court is adjourned.

8        (Proceedings concluded at 11:59 a.m.)

9                  -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          *CERTIFICATION*

2

3                I, Robert L. Smith, Official Court Reporter of

4       the United States District Court, Eastern District of

5       Michigan, appointed pursuant to the provisions of Title 28,

6       United States Code, Section 753, do hereby certify that the

7       foregoing pages comprise a full, true and correct transcript

8       taken in the matter of In Re:  Automotive Parts Antitrust

9       Litigation, Case No.  12-MDL-2311, on Friday, June 15, 2012.

10

11

12                              *s/Robert L. Smith*
                                Robert L. Smith, RPR, CSR 5098
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15

16

17      Date:  07/10/2012

18      Detroit, Michigan

19

20

21

22

23

24

25