UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
                                            :
IN RE: AUTOMOTIVE PARTS ANTITRUST           :        Master File No. 12-MD-02311
LITIGATION                                  :        Honorable Marianne O. Battani
_____:
                                            :
PRODUCT(S):                                 :
WIRE HARNESS SYSTEMS                        :
_____:
                                            :
THIS DOCUMENT RELATES TO:                   :        Lead Case No. W:12-cv-00101
Direct Purchaser Actions                    :
_____:

## DIRECT PURCHASER PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT LEAR CORPORATION'S RULE 12(b)(6) MOTION TO DISMISS

Joseph C. Kohn                          David H. Fink (P28235)
William E. Hoese                        Darryl Bressack (P67820)
Douglas A. Abrahams                     FINK + ASSOCIATES LAW
KOHN, SWIFT & GRAF, P.C.                100 West Long Lake Road, Suite 111
One South Broad Street, Suite 2100      Bloomfield Hills, MI 48304
Philadelphia, PA 19107                  (248) 971-2500
(215) 238-1700
                                        Interim Liaison Counsel for the Direct Purchaser
Steven A. Kanner                        Plaintiffs
William H. London
Michael E. Moskovitz                    Gregory P. Hansel
Michael L. Silverman                    Randall B. Weill
FREED KANNER LONDON                     Joshua R. Carver
  & MILLEN LLC                          PRETI, FLAHERTY, BELIVEAU & PACHIOS LLP
2201 Waukegan Road, Suite 130           One City Center, P.O. Box 9546
Bannockburn, IL 60015                   Portland, ME 04112-9546
(224) 632-4500                          (207) 791-3000

                                        Eugene A. Spector
                                        William G. Caldes
                                        Jonathan M. Jagher
                                        Jeffrey L. Spector
                                        SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
                                        1818 Market Street, Suite 2500
                                        Philadelphia, PA 19103
                                        (215) 496-0300

                                        Interim Lead Counsel for the Direct Purchaser Plaintiffs

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES PRESENTED............................................................................ ii

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ................................................ iii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ........................................................................................................................... 1

I.   DP PLAINTIFFS' ALLEGATIONS AGAINST LEAR MEET
THE REQUIREMENTS OF *TWOMBLY* ........................................................ 1

II.   LEAR'S 2009 DISCHARGE IN BANKRUPTCY DOES NOT DEFEAT DP
PLAINTIFFS' CLAIMS .................................................................................. 6

   A.   Lear Continued to Participate in the Conspiracy After Its 2009 Discharge ............... 6

   B.   Lear Is Also Liable for All Unlawful Acts Committed over the Duration of the
Conspiracy Because of Its Post-Discharge Participation in the Conspiracy............. 11

CONCLUSION...................................................................................................... 17

## STATEMENT OF THE ISSUES PRESENTED

1.      Whether the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (the "CAC") alleges "sufficient facts to meet the requirements … for pleading a claim based on an antitrust conspiracy" as to Defendant Lear Corporation ("Lear") satisfying Fed.R.Civ.P. 8 and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007), where the CAC alleges:

- guilty pleas by multiple Defendants—including Lear's joint venture partner Furukawa Electric Co., Ltd.—and key company executives to antitrust violations involving wire harnesses and related products;

- cease and desist orders and fines against multiple Defendants issued by the Japanese Fair Trade Commission;

- wire harness products investigations of Defendants – including Lear's subsidiary Lear Automotive France – by U.S., Japanese and/or European law enforcement entities;

- a market structure conducive to collusion; and,

- opportunities to collude.

2.      Whether Lear's discharge in bankruptcy in 2009 prevents the CAC from stating a plausible claim against Lear where Lear continued to participate in the conspiracy after its 2009 discharge, which participation renders Lear liable for all unlawful acts committed by Defendants over the duration of the conspiracy.

**CONTROLLING OR MOST APPROPRIATE AUTHORITIES**

*American Society of Mech. Engrs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 566 and 573 n.12 (1982)

*Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2215-2216 (U.S. 2010)

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Azar v. Conley*, 480 A.2d 220, 222 (6th Cir. 1973)

*Barnosky Oils, Inc. v., Union Oil Co. of Cal.*, 665 F.2d 74, 81 (6th Cir. 1981)

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)

*Dextone Co. v. Bldg. Trades Council of Westchester Cnty.*, 60 F.2d 47 (2d Cir. 1932)

*Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980)

*In re Bulk Popcorn Antitrust Litigation*, 783 F. Supp. 1194, 1199 (D. Minn. 1991)(same)

*In re Lower Lake Erie Iron Ore Antitrust Litig.,* 710 F. Supp. 152 (E.D. Pa. 1989)

*In re Aftermarket Filters Antitrust Litig.*, 08 C 4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009)

*In re American Continental Corp./Lincoln Savings and Loan Securities Litigation*, 794 F. Supp. 1424 (D. Ariz. 1992)

*In re Polyurethane Foam Antitrust Litigation*, 799 F. Supp. 2d 777, 800 (N.D. Ohio 2011)

*John Doe I v. Unocal Corp.*, 395 F. 3d 932, 970 (9th Cir. 2002)

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)

*McNulty v. Reddy Ice Holdings, Inc.*, 2009 WL 1508381, at *5 (E.D. Mich. May 29, 2009), *rev'd on reconsideration on other grounds*, 2009 WL 2168231 (E.D. Mich. July 17, 2009)

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999)

*Schutze v. Springmeyer*, 989 F. Supp. 833, 837 (S.D. Tex. 1998)

*Texas Indust. v. Racliff Materials, Inc.,* 451 U.S. 630 (1981)

*United States v. Robinson*, 390 F.3d 853, 882 (6th Cir. 2004)(quoting *United States v. Gravier*, 706 F.2d 174, 177–78 (6th Cir. 1983)

*United States v. Bogart*, 576 F.3d 565, 576 (6th Cir. 2009)

*United States v. Gravier*, 706 F.2d 174, 177-78 (6th Cir. 1983)

*United States v. Benson*, 79 Fed. Appx. 813, 822 (6th Cir. 2003)

*Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 338 (1971)

## INDEX OF AUTHORITIES

**Cases**

*Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201 (U.S. 2010) .................................................... 4

*American Society of Mech. Engrs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556 (1982) ...................... 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 3

*Azar v. Conley*, 480 A.2d 220 (6th Cir. 1973) ............................................................. 3

*Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74 (6th Cir. 1981) ............................... 7, 8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................... 1, 3, 4

*Campbell v. A.H. Robins Co., Inc.*, 615 F. Supp. 495 (W. D. Wis. 1985) .................................... 14

*City of El Paso v. Darbyshire Steel Co., Inc.*, 575 A.2d 521 (5th Cir. 1978) .............................. 10

*Dextone Co. v. Bldg. Trades Council of Westchester Cnty.*, 60 F.2d 47 (2d Cir. 1932) ............. 12

*Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, (6th Cir. 1999) ........................................... 9

*Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir. 1980) ........................................... 12

*In re Aftermarket Filters Antitrust Litig.*, 08 C 4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) 3

*In re American Continental Corp./Lincoln Savings and Loan Securities Litig.*, 794 F. Supp. 1424

   (D. Ariz. 1992) ...................................................................................... 13

*In re Bulk Popcorn Antitrust Litigation*, 783 F. Supp. 1194 (D. Minn. 1991) ............................ 12

*In re Lower Lake Erie Iron Ore Antitrust Litig.,* 710 F. Supp. 152 (E.D. Pa. 1989) .............. 12, 13

*In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777 (N.D. Ohio 2011) ...................... 15

*In re Travel Agent Commission Antitrust Litigation* ("*Tam Travel*"),

   583 F.3d 896 (6th Cir. 2009) .................................................................. 8, 9, 15, 16

*John Doe I v. Unocal Corp.*, 395 F. 3d 932 (9th Cir. 2002) ........................................................... 4

*Kaiser Aluminum & Chemical Sales, Inc*., 677 A.2d 1045 (5th Cir. 1982)................................. 10

*Kidron v. Movie Acquisition Corp*., 40 Cal. App. 4th 1571 (Cal. App. 1995) ............................ 14

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ........................................................ 7, 10, 11, 16

*McNulty v. Reddy Ice Holdings, Inc.*, 2009 WL 1508381 (E.D. Mich. May 29, 2009), *rev'd on reconsideration on other grounds*, 2009 WL 2168231 (E.D. Mich. July 17, 2009) ................. 3

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir. 1999)............................ 7

*Schutze v. Springmeyer*, 989 F. Supp. 833 (S.D. Tex. 1998)........................................................ 4

*Texas Indust. v. Racliff Materials, Inc.,* 451 U.S. 630 (1981) ..................................................... 12

*United States v. Benson*, 79 Fed. Appx. 813, 822 (6th Cir. 2003)................................................ 15

*United States v. Gravier*, 706 F.2d 174 (6th Cir. 1983) ........................................................ 12, 15

*United States v. Robinson*, 390 F.3d 853 (6th Cir. 2004) ............................................................ 12

*Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321 (1971)...................................... 8, 10

## Rules

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................... 3

Federal Rule of Civil Procedure 8(a)(2) ....................................................................................... 3

## PRELIMINARY STATEMENT

Lear argues that the complaints against it do not pass muster under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), because (according to Lear) they do not plausibly suggest that Lear was a participant in the conspiracy to fix prices and rig bids in the market for Wire Harness Products.  A review of the Direct Purchasers Consolidated Amended Class Action Complaint ("CAC"), however, reveals that Lear's argument has no merit, as the CAC squarely and plausibly alleges the existence of a conspiracy to fix the prices of Wire Harness Products as well as Lear's active participation in that conspiracy.

## ARGUMENT

Direct Purchaser Plaintiffs' ("DP Plaintiffs") allegations[1], including those against Lear, meet the requirements of *Twombly,* and Lear's liability for the impact of that conspiracy is not defeated by Lear's 2009 emergence from bankruptcy.

## I.    DP PLAINTIFFS' ALLEGATIONS AGAINST LEAR MEET THE REQUIREMENTS OF *TWOMBLY*

The CAC first specifies that Lear's liability stems from its participation in the conspiracy after November 2009, when it left the protection of the Bankruptcy Court:

> After its emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Wire Harness Products pursuant to and as part of its participation in furtherance of the conspiracy.  From and after November 2009, Lear had significant Wire Harness Products sales in the United States at supra-competitive prices.  In 2010 alone, Lear had $2.56 billion in total sales in its electric power and management systems, which includes significant sales of Wire Harness Products in the United States pursuant to the conspiracy.

CAC ¶42.  The CAC thus squarely alleges that Lear participated in the conspiracy after its November 2009 discharge in bankruptcy by selling Wire Harness Products at supra-competitive

---

[1] *See* Direct Purchaser Plaintiffs' Response in Opposition to Defendants' Collective Motion to Dismiss the Direct Purchaser Actions for a factual description of the nature and extent of the conspiracy to fix prices for Wire Harness Products, the standards against which Defendants and Lear Corporation's motions to dismiss are to be judged, and the reasons why the CAC *in toto* satisfies the pleading requirements of *Twombly*.

prices (the conspiracy's objective), and that it derived substantial financial benefit from its post-discharge participation.

The CAC also explains that Lear was a joint venture partner with Defendant Furukawa Electric Co., Ltd ("Furukawa Electric").  "During the Class Period, Furukawa Wiring Systems America, Inc. ("Furukawa Wiring") operated as a joint venture between Lear Corporation and Furukawa Electric Co., Ltd. that manufactured, distributed or sold Wire Harness Products that were purchased throughout [the] United States . . . ." CAC ¶ 37.  The joint venture is also a named Defendant. *Id.*  Lear and Furukawa Electric remained joint venture partners in Furukawa Wiring until June 2010, half a year *after* Lear's discharge in bankruptcy. *Id.*

In February 2010 the Competition Directorate of the European Commission raided the offices of Wire Harness Products manufacturers and announced an "investigation into suspected cartel in the sector of automotive electrical and electronic components suppliers'" who were suspected of having "'violated EU antitrust rules that prohibit cartels and restrictive business practices.'" CAC ¶117 (quoting EC press release).  A Lear subsidiary, Lear Automotive France, was included in this investigation. *Id.*

Then, in September 2011, the United States Department of Justice ("DOJ") charged Furukawa Electric and three of its executives with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses and related products in violation of the Sherman Antitrust Act." CAC ¶122 (internal quotation marks omitted); *see also id*. ¶128 (detailing the specific allegations DOJ made against Furukawa Electric).  In November 2011, Furukawa Electric pleaded guilty to having participated in

criminal price-fixing and bid-rigging in connection with sale of Wire Harness Products and agreed to pay a $200 million fine. *Id.* ¶132.

This summary demonstrates that DP Plaintiffs have done more than enough to meet the requirement (identified by Lear) that "'[e]ach defendant is entitled to know whether he is alleged to be liable as part of the conspiracy . . . and whose rights he is alleged to have infringed.'" Lear Motion to Dismiss at 4 (quoting *Azar v. Conley*, 480 A.2d 220, 222 (6th Cir. 1973)). Neither *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), nor *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), changed the pleading standard for a civil antitrust complaint. Indeed, *Twombly* confirmed that the notice pleading standard of Rule 8 applies to such actions, and that "[Rule] 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" 550 U.S. at 555. Moreover, a complaint need not contain "detailed factual allegations" to survive a motion to dismiss under Rule 12(b)(6). *Id.* After an opportunity for meaningful discovery, a plaintiff will need to specifically "identify the people who acted on behalf of the various defendants" pursuant to the conspiracy, but a plaintiff "*cannot* be expected to know or allege such details at this early stage on the case; [and] neither *Twombly* nor any case decided under that holding suggests otherwise." *In re Aftermarket Filters Antitrust Litig.*, 08 C 4883, 2009 WL 3754041, * 20 (N.D. Ill. Nov. 5, 2009). This basic tenet has been adopted in this District. *See McNulty v. Reddy Ice Holdings, Inc.*, 2009 WL 1508381, at *5 (E.D. Mich. May 29, 2009), *rev'd on reconsideration on other grounds*, 2009 WL 2168231 (E.D. Mich. July 17, 2009).

In summarizing what is necessary at the pleading stage for a claim under Section 1 of the Sherman Act, the Supreme Court held:

> [S]tating such a claim requires a complaint with enough factual matter (taken as true) to **suggest** that an agreement was made [among defendants].  Asking for plausible grounds to infer an agreement, [however], does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a **reasonable expectation that discovery will reveal evidence of illegal agreement**.

*Twombly,* 550 U.S. at 556 (emphasis added).

First, the fact that Lear's joint venture partner has pleaded guilty to engaging in a price-fixing and bid-rigging conspiracy with respect to the very same products that were manufactured, distributed, and sold by the Lear-Furukawa joint venture makes Lear's participation in the same conspiracy highly plausible.  Second, "[i]t is well-established as a federal common law principle that a member of a joint venture is liable for the acts of it co-venturers." *John Doe I v. Unocal Corp.*, 395 F. 3d 932, 970 (9th Cir. 2002).  As the Supreme Court has held, under the antitrust laws, "[a] corporation is responsible for the wrongs committed by its agents in the course of its business, and the principle is enforced against the contention that torts are *ultra vires* of the corporation." *American Society of Mech. Engrs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 566 and 573 n.12 (1982).  More specifically, the Supreme Court has held that "competitors cannot simply get around antitrust liability by acting through a third-party intermediary or joint venture." *Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2215-2216 (U.S. 2010)(internal quotation marks omitted); *see also Schutze v. Springmeyer*, 989 F. Supp. 833, 837 (S.D. Tex. 1998)("In a joint venture, the negligence or fraud of one venturer, while acting within the scope of the enterprise, may be imputed to co-venturers so as to render the latter liable for the injuries sustained by third persons as a result of the negligence or fraud.")(internal quotation marks omitted).

In sum, the Furukawa Electric guilty plea is significant both because the guilty plea by Lear's joint venturer bolsters the plausibility of the allegations against Lear, and because Lear itself is liable, not just for its own participation in the conspiracy, but also for the participation of

its joint venturer Furukawa Electric and the joint venture Furukawa Wiring.  As Lear, its joint venture partner Furukawa Electric, and their joint venture Furukawa Wiring Systems America, Inc. were all involved in the manufacture, marketing and/or sale of Wire Harness Products in the United States during the Class Period, Lear is simply wrong to assert that "the *only* reason why Lear is named in the Complaints is that it **happens to be in the same industry** as other Defendants that have entered guilty pleas." Lear Motion to Dismiss at 8 (italics in original)(bold added).  The conspiracy that DP Plaintiffs allege Lear participated in is the very same conspiracy that Furukawa Electric and three of its executives have already pled guilty to having participated in.  Contrary to Lear's assertion, these concrete and well-supported factual allegations consist of far more than "vague generalities about the existence of a conspiracy and opportunities to conspire." *Id.* at 4.  Taken as true, as they must be at the pleading stage, DP Plaintiffs' allegations are sufficient to state a cause of action against Lear, because they are non-conclusory, specific, and constitute a plausible basis for concluding that Lear was part of the conspiracy.

Lear's suggestion that the various complaints are somehow "inconsistent" with Lear's participation in the conspiracy because Lear has not been publicly identified as a target of a DOJ investigation (Lear Motion to Dismiss at 7-8) rests on a legal proposition for which Lear offers no support: the notion that where a DOJ investigation of a price-fixing conspiracy has commenced, only those industry participants who have been publicly identified as its targets may plausibly be alleged to have participated in the conspiracy.  In addition to being unsupported by any legal authority, this proposition is illogical, as Lear fails to explain why private plaintiffs should be barred from pursuing antitrust claims against industry participants who have a tangible link to proven price fixing simply because there has been no public indication that DOJ is pursuing them.  The absence of a publicized DOJ investigation of a party could in fact be entirely

consistent with its participation in the conspiracy—for example, if the party were cooperating with a DOJ investigation as a leniency applicant. Lear also ignores the fact that its European subsidiary is the subject of a European Union investigation. *See* CAC ¶ 117. While the fact that the DOJ may have investigated a specific Defendant supports the plausibility of conspiracy allegations against that Defendant, it does not follow that *only* Defendants who have been named as DOJ targets may plausibly be alleged to have participated in the conspiracy.

## II. LEAR'S 2009 DISCHARGE IN BANKRUPTCY DOES NOT DEFEAT DP PLAINTIFFS' CLAIMS

### A. Lear Continued to Participate in the Conspiracy After Its 2009 Discharge

Lear argues that DP Plaintiffs have not alleged any post-discharge conduct that violates the antitrust laws:

> The only post-discharge conduct alleged in the Complaints is that Lear "continued to sell Automotive Wire Harness Systems . . . in furtherance of the conspiracy" at "supra-competitive prices" (*id.* ¶ 101). But such sales, by definition, would have been made pursuant to bids that were submitted and accepted *well before November 9, 2009*.

Lear Motion to Dismiss at 12 (emphasis in original)(footnote omitted). According to Lear, because its post-discharge sales were made at prices that had been unlawfully fixed via bids submitted before the date of the discharge, they do not constitute overt acts in furtherance of the conspiracy. Lear is simply incorrect; the CAC alleges:

> after November 2009, Lear had significant Wire Harness Products sales in the United States at supra-competitive prices. In 2010 alone, Lear had $2.56 billion in total sales in its electric power and management systems, which includes significant sales of Wire Harness Products in the United States pursuant to the conspiracy.

CAC ¶42. In other words, DP Plaintiffs alleged that Lear continued, post-discharge, to charge conspiratorially fixed prices, and to enjoy the benefit they produced. In selling Wire Harness Products on or after its November 2009 discharge, Lear was charging and receiving unlawfully

inflated prices pursuant to the conspiracy.  The consummation of these sales amounted to a series

of overt acts performed by Lear in furtherance of the conspiracy's aims.

It is well established that in a continuing antitrust conspiracy, each sale at an unlawfully

fixed price (or pursuant to an unlawful market allocation or bid-rigging conspiracy) constitutes a

violation of the antitrust laws for which each co-conspirator is liable.    As the Supreme Court

has explained (in the context of when a cause of action accrues):

> Antitrust law provides that, in the case of a continuing violation, say, a price–
> fixing conspiracy that brings about a series of unlawfully high priced sales over a
> period of years, each overt act that is part of the violation and that injures the
> plaintiff, *e.g.*, *each sale to the plaintiff, starts the statutory period running again*,
> regardless of the plaintiff's knowledge of the alleged illegality at much earlier
> times.

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)(emphasis added) (internal quotation marks

omitted); *see also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir.

1999) ("[W]hen sellers conspire to fix the price of a product, each time a customer purchases that

product at the artificially inflated price, an antitrust violation occurs").  Lear's participation in

substantial post-discharge sales of Wire Harness Products at unlawfully inflated prices entailed a

series of post-discharge violations of the antitrust laws for which DP Plaintiffs may hold Lear

liable, as each sale constitutes an injurious overt act that gives rise to a claim against Lear.

Lear seeks to evade responsibility for its post-discharge conduct by citing cases that

distinguish between "a defendant's overt acts" and "the effects of those acts."  Lear Motion to

Dismiss at 11 (internal quotation marks omitted).  According to Lear, "accrual depends on the

commission of an 'injurious act' rather than 'the abatable but unabated inertial consequences' of

that act." *Id*. (quoting *Barnosky Oils, Inc. v. Union Oil Co. of Cal*., 665 F.2d 74, 81 (6th Cir.

1981)).  As just explained, however, the CAC alleges that Lear *did* commit overt injurious acts

after November 2009—it sold Wire Harness Products at unlawfully inflated prices.  Even if it

7

were assumed that these prices were arrived at unlawfully prior to its discharge, Lear continued to participate in the conspiracy after its discharge when it proceeded to sell Wire Harness Products at fixed prices. *See Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 338 (1971) (when continuous antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants).

The case Lear cites in support of its "injurious act" argument, *Barnosky Oils*, does not advance Lear's cause. The injurious act at issue there was the defendant oil company's offer to reward the independent wholesaler plaintiff if the plaintiff stopped selling defendant's gasoline to one of the plaintiff's customers—which happened in 1971, more than four years before the lawsuit was filed. 665 F.2d at 80-81. The Court noted that "[a]lthough [the independent wholesaler plaintiff] asserts that [the oil company defendant] continually enforced the 1971 agreement, it is undisputed that [the plaintiff] never requested permission to sell gasoline to [its former customer] during the limitations period." *Id.* at 81. It was in this context—an alleged unlawful act that was taken in 1971 and entailed *no further action* by the defendant going forward—that the *Barnosky Oils* court commented that the mere "inertial consequences" of a completed act (which in *Barnosky* amounted to mere *inaction*) did not themselves constitute new overt acts. Here, however, DP Plaintiffs have alleged more than inertial consequences of pre-discharge bid-rigging; they have alleged a continuing series of overt acts in the form of sales made at unlawfully fixed prices.

Lear's reliance on *In re Travel Agent Commission Antitrust Litigation* ("*Tam Travel*"), 583 F.3d 896 (6th Cir. 2009), is equally misplaced. In *Tam Travel*, plaintiff travel agencies alleged that defendant airlines illegally conspired to eliminate base commissions in violation of the Sherman Act. *See id.* at 900. After each defendant had eliminated base commissions in

2002, defendant United filed for bankruptcy. *See id.* at 900-01. DP Plaintiffs alleged that United later rejoined the conspiracy by maintaining a 0% base commission policy upon emerging from bankruptcy in 2006. The district court granted United's motion to dismiss on the ground that "United's post-reorganization 0% commission policy did not create a new § 1 claim because its decision was merely a reaffirmation of a previous act [the decision to eliminate commissions in 2002]." *Id.* at 902 (internal quotation marks omitted). In affirming the decision of the district court, the Sixth Circuit noted that an antitrust cause of action accrues each time a defendant commits an act that injures plaintiff's business and that the focus is on the timing of the causes of injury," i.e., the defendant's overt acts, as opposed to the *effects* of the overt acts." *Id.* (emphasis in original).

The crucial difference between *Tam Travel* and this case is not hard to spot: while the *Tam Travel* court sensibly rejected the plaintiff's attempt to characterize "United's decision to maintain its 0% commission policy"—that is, its *nonpayment* of commissions—as an "overt act" *Id.* at 902 (in other words it was the effect of an overt act occurring prior to the limitations period), the DP Plaintiffs here allege that Defendants committed post-discharge *overt* acts by making actual sales, and accepting payment therefor, at unlawfully fixed prices. The Sixth Circuit in *Tam Travel* concluded that the illegal decision by the defendants to eliminate commissions had only a "rippling effect into the future" (*id.* at 902) because the nonpayment of commissions by United in the post-discharge period—an *inaction*, in clear contrast to concrete actions taken by Lear in selling Wire Harness Products at fixed prices—entailed no overt act. *See id.* at 902 ("[W]e reject plaintiffs' attempt to characterize United's decision to maintain its 0% commission policy as an overt act."); *see also Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999)(cited by Lear)("failure to obtain . . . work" as a consequence of earlier

9

conspiratorial acts does not constitute a new overt act). Lear's strained use of language in seeking to liken its post-discharge sales of price-fixed goods to "United's payment of its existing commission rate" (Lear Motion To Dismiss at 13) simply underscores why *Tam Travel* is inapposite here. One does not "pay" a zero percent commission. Instead, no commission is paid—that is, there is no overt act.

Lear's reliance on *Zenith* is equally inapposite. Lear cites *Zenith* for the unremarkable proposition that "[i]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." 410 U.S. at 339 (cited in Lear Motion To Dismiss at 11). While Lear would have the Court read *Zenith* to somehow bar DP Plaintiffs from asserting claims based on post-discharge sales, the Supreme Court in the more recent *Klehr* decision removed any possible doubt that, under antitrust law, "each sale to the plaintiff[]" is an "overt act that is part of the violation and that injures the plaintiff . . . ." 521 U.S. at 189 (internal quotation marks omitted). DP Plaintiffs had price-fixing claims against Lear based on acts committed before its November 2009 discharge, and they have price-fixing claims based on acts committed post-discharge as well.

In sum, the Supreme Court made clear in *Klehr* that "each sale to the plaintiff[]" is an "overt act that is part of the violation and that injures the plaintiff . . . ." *See id.* at 189.[2] Lear sold Wire Harness Products after November 2009, and each sale was, as alleged in the CAC, an overt act that inflicted a new harm. Consistent with *Klehr*, Lear engaged in a continuing conspiracy that caused a new Section 1 claim to accrue upon each sale of a price-fixed Wire

---

[2] To the extent that *City of El Paso v. Darbyshire Steel Co., Inc.*, 575 A.2d 521 (5th Cir. 1978) and *Kaiser Aluminum & Chemical Sales, Inc.*, 677 A.2d 1045 (5th Cir. 1982) are to the contrary, those cases: (1) are inconsistent with *Klehr*, (2) predate—and thus were overruled in pertinent part by—*Klehr* (decided by the Supreme Court in 1997), and (3) are not from this Circuit.

Harness Product.  *See Klehr*, 521 U.S. at 189.  Lear's contention that DP Plaintiffs have failed to state a claim against it with respect to its post-discharge sales of Wire Harness Products at prices that were fixed in violation of the antitrust laws is therefore without merit.

> ### B. Lear Is Also Liable for All Unlawful Acts Committed over the Duration of the Conspiracy Because of Its Post-Discharge Participation in the Conspiracy.

Lear next argues that, even if its post-discharge sales establish that it continued to participate in the conspiracy after its November 2009 emergence from bankruptcy, DP Plaintiffs cannot "hold Lear jointly liable for the entire course of the more than 10-year alleged conspiracy, under a theory of retroactive liability." Lear Motion to Dismiss at 15.  Lear would have the Court believe that "[t]he bankruptcy process would be rendered meaningless" if DP Plaintiffs were permitted to pursue claims against it based on a theory of retroactive liability for the pre-November 2009 conduct of its co-conspirators.  But as explained *infra*, Lear brought this liability upon itself by continuing to commit overt acts in furtherance of the conspiracy after its discharge.  If a debtor such as Lear wishes to enjoy the "fresh start" provided under the Bankruptcy Code, it is not unreasonable to require that the debtor refrain from participating in unlawful conspiracies after its debts have been discharged.  Because it participated in the conspiracy after its November 2009 discharge, Lear is jointly and severally liable as a co-conspirator for the entire conspiracy.

As a co-conspirator, Lear is liable for all damages caused over the course of the conspiracy, including damages caused by conduct undertaken before it joined, because Lear continued to participate in the conspiracy after it emerged from bankruptcy in November 2009.  Lear is thus jointly and severally liable with its co-conspirators for all of the damages caused by the conspiracy, before and after November 2009.  To be clear, Lear is alleged to have participated in the conspiracy from its inception, but its November 2009 discharge requires that

the situation be analyzed *as if* it had not joined the conspiracy until November 2009. "[I]t has long been established that a conspirator may join a conspiracy already in progress and be held responsible for actions done in furtherance of the conspiracy before he joined.'" *United States v. Robinson*, 390 F.3d 853, 882 (6th Cir. 2004)(quoting *United States v. Gravier*, 706 F.2d 174, 177–78 (6th Cir. 1983)). Indeed, it is "well recognized that a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators." *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980); *see also In re Bulk Popcorn Antitrust Litigation*, 783 F. Supp. 1194, 1199 (D. Minn. 1991)(same); *Dextone Co. v. Bldg. Trades Council of Westchester Cnty.*, 60 F.2d 47 (2d Cir. 1932)("[E]very person who participates in a conspiracy is liable for everything done during the period of its existence regardless of the exact time at which he becomes a member or the extent of his participation.").

This is true even in a bankruptcy context. In *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F. Supp. 152 (E.D. Pa. 1989), the court held that "[e]ach participant in an antitrust conspiracy is liable for the *entire amount of damages caused by the conspiracy* . . . ." *Id.* (citing *Texas Indust. v. Racliff Materials, Inc.*, 451 U.S. 630 (1981)) (emphasis added). The plaintiffs in *Lower Lake Erie* sought to hold defendant Conrail liable for damages caused by a conspiracy spanning over 20 years (1958 to 1980) to monopolize the transportation of iron ore, based on Conrail's conduct after it had assumed ownership in 1976 of certain bankrupt railroads alleged to have participated in the conspiracy. Conrail argued that holding it liable for the entire period of the conspiracy, including the pre-bankruptcy conduct of its predecessors-in-interest, would be contrary to the "clean slate" objective underpinning the Railroad Reorganization Act. *See id.*

The court rejected Conrail's argument, holding that it was potentially liable for the full duration of the conspiracy:

> Those who, with knowledge of the conspiracy, aid or assist in the carrying out of the purposes of the conspiracy, make themselves party thereto and are equally liable . . . with the original conspirators.

*Id.* The court acknowledged that the Railroad Reorganization Act—like the Bankruptcy Code—"does reflect a congressional intent to enable Conrail to start out, as of April 1, 1976, with a clean slate," but concluded: "*there is plainly no basis for suggesting that Congress wished to enable Conrail to engage in an antitrust conspiracy thereafter without incurring the same penalties as other antitrust violators.*" *Id.* (emphasis added). Thus, if plaintiffs' allegations concerning Conrail's participation in the conspiracy post-1976 proved true, "Conrail would thereby be rendered liable for all of the damages caused by the conspiracy . . . ." *Id.*

The same logic applies here: the Bankruptcy Code's objective of providing Lear with a "fresh start" does not mean Lear should be permitted to "engage in an antitrust conspiracy thereafter without incurring the same penalties as other antitrust violators"—that is, being held responsible for "all of the damages caused by the conspiracy" in which it engaged. *Id.* As with the Railroad Reorganization Act in *Lower Lake Erie*, Lear should not be permitted to use the Bankruptcy Code as a shield against bearing its fair apportionment of liability for having participated in an antitrust conspiracy.

Contrary to the impression Lear seeks to create, the cases it cites are not to the contrary. In *In re American Continental Corp./Lincoln Savings and Loan Securities Litig.*, 794 F. Supp. 1424 (D. Ariz. 1992), the court simply said "[a] conspirator may not be held liable for an offense committed before his or her agreement to join the conspiracy, *if that prior offense completed the ultimate objective of the conspiracy.*" *Id.* at 1437 (emphasis added). The court then made clear

13

what it had in mind by "complet[ing] the ultimate objective of the conspiracy," explaining that "[t]he distinction turns on whether the goal of the common design has been *achieved with finality, as the murder* in *People v. Marks, supra,* or is ongoing in nature, as the conversion in *De Vries v. Brumback . . . ." Id.* at 1437 (emphasis added). Common sense indicates that the common design of an ongoing price-fixing conspiracy cannot be said to have been "achieved with finality" while the conspiracy remains ongoing. Equally inapposite is *Kidron v. Movie Acquisition Corp*., 40 Cal. App. 4th 1571, 1593 (Cal. App. 1995)(cited by Lear)( another comparison of completed murder cited by Lear as an example of conspiracy where the objective had been achieved).

As for *Campbell v. A.H. Robins Co., Inc*., 615 F. Supp. 495 (W. D. Wis. 1985), Lear fails to acknowledge the significance of the words "already completed" in the sentence it quotes to the effect that "retrospective liability of co-conspirators does not operate to make the late-entering conspirator responsible for the *already completed* substantive offenses of his cohorts." *Id*. at 500 (emphasis added). Here, the conspiracy at issue continued after November 2009, and thus was not "already completed" at the time of Lear's discharge. Lear also ignores the sentence preceding the language it quotes from *Campbell*, where the court observed: "It is, of course, true that conspirators are responsible for the overt acts of co-conspirators, *even those that occurred before they entered the conspiracy*." *Id*. (emphasis added). The Court should reject Lear's invitation to view the objective of Defendants' price-fixing conspiracy as having been "completed" upon the successful rigging of bid processes (Lear Motion To Dismiss at 16), when the self-evident objective of the conspiracy was not simply to rig bids, but *to sell Wire Harness Products at inflated prices pursuant to those bids*, a process that was still very much underway after November 2009. *See also United States v. Bogart*, 576 F.3d 565, 576 (6th Cir. 2009) ("In

the context of a conspiracy, it is clear that a defendant is liable in restitution to all the victims of the reasonably foreseeable acts of his co-conspirators.  No court has ever held to the contrary."); *United States v. Benson*, 79 Fed. Appx. 813, 822 (6th Cir. 2003) ("A co-conspirator can generally be held liable for 'actions done in furtherance of a conspiracy before [the particular co-conspirator] joined.") (*quoting United States v. Gravier*, 706 F.2d 174, 177-78 (6th Cir. 1983) (alteration in original)); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 800 (N.D. Ohio 2011) ("a fundamental tenant of conspiracy law . . . holds one participating conspirator jointly liable for all his co- conspirators prior acts").

Nor does Lear gain any traction with the suggestion that retroactive conspiracy liability would be "patently inconsistent with the policy concerns express in *Tam Travel*" (Lear Motion to Dismiss at 17), as the passage Lear quotes does not even address the issue of retroactive liability, but rather the threshold issue (already addressed in § II(A) *supra*) of whether Lear committed an overt act in furtherance of the conspiracy after its November 2009.  *See* Lear Motion To Dismiss at 17 (citing the concern of the *Tam Travel* court that "an antitrust plaintiff could . . . salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct"—which goes to the overt act issue, not the retroactive liability issue). As explained in § II(A) *supra*, Lear *did* commit overt acts in furtherance of the conspiracy after its November 2009 discharge; DP Plaintiffs allege more than that they "continue[d] to lose revenue because of past alleged anticompetitive conduct."

*Tam Travel* has no bearing on the retroactive liability issue because the court there concluded that the plaintiffs had failed to allege an overt act by the defendants in the post-discharge period. Thus, there having been no post-discharge participation in the conspiracy to begin with, the issue of retroactive liability for pre-discharge conduct of co-conspirators was

never even raised.  *See Tam Travel*, 583 F.3d at 902 ("[P]laintiffs assert that United's final act to effectuate that conspiracy occurred in 2002, long before United emerged from bankruptcy."). Here, of course, in clear contrast to *Tam Travel*, DP Plaintiffs have *not* alleged that Lear's final violation occurred before it emerged from bankruptcy.  Lear's attempt to blur the line between the issues of post-discharge participation in the conspiracy, and retroactive liability for pre-discharge acts of co-conspirators based on that post-discharge conduct, should be rejected.

According to Lear, DP Plaintiffs have misread (in a filing in the Bankruptcy Court) the retroactivity holding of *Klehr*. Lear Motion to Dismiss at 18.  Lear bases its contention on the statement in *Klehr* that "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." 521 U.S. at 189.  The issue here, however, is not the statute of limitations—which does not bar any of DP Plaintiffs' claims due to fraudulent concealment (which prevented the starting of the limitations period in the first place)[3]—but whether Lear's commission of overt acts in furtherance of the conspiracy after its November 2009 discharge exposes it to liability for the pre-November 2009 conduct of its co-conspirators, even though Lear (due to its discharge) could not be held directly liable for its own pre-November 2009 conduct. *See Klehr*, 521 U.S. at 189 ("each sale to the plaintiff[]" is an "overt act that is part of the violation and that injures the plaintiff . . . .")(internal quotation marks omitted).  Because Lear continued to participate in the conspiracy to fix prices for Wire Harness Products after its discharge, it is responsible for all of the damages caused by the conspiracy, including damages caused by the pre-discharge conduct of its co-conspirators.

---

[3] *See* Direct Purchaser Plaintiffs Opposition to Defendants' Collective Motion to Dismiss.

16

**<u>CONCLUSION</u>**

DP Plaintiffs have alleged facts sufficient to plead a price-fixing conspiracy among all Defendants, including Defendant Lear Corporation. Several Defendants have already pled guilty to criminal price fixing of Wire Harness Products, paid substantial fines, and have employees serving jail time.  Defendant Lear sold Wire Harness Products.  It was a joint venture partner with Furukawa Electric, one of the Defendants that has pled guilty to fixing the prices of Wire Harness Products.  Employees of Furukawa Electric are now in jail for fixing the prices of Wire Harness Products.  The joint venture in which Lear was a partner, Furukawa Wiring, sold Wire Harness Products and is also a Defendant in this action.  A Lear subsidiary is under investigation in Europe for price fixing Wire Harness Products.  The CAC clearly satisfies the plausibility requirement of *Twombly*.  Lear's motion to dismiss should be denied.

Dated: September 11, 2012                    Respectfully Submitted,

                                    By: /s/ David H. Fink
                                    David H. Fink (P28235)
                                    Darryl Bressack (P67820)
                                    FINK + ASSOCIATES LAW
                                    100 West Long Lake Road, Suite 111
                                    Bloomfield Hills, MI 48304
                                    (248) 971-2500
                                    dfink@finkandassociateslaw.com

                                    *Interim Liaison Counsel for the DP Plaintiffs*

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700
jkohn@kohnswift.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
Michael L. Silverman
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500
skanner@fklmlaw.com

Gregory P. Hansel
Randall B. Weill
Joshua R. Carver
PRETI, FLAHERTY, BELIVEAU
  & PACHIOS LLP
One City Center, P.O., Box 9546
Portland, ME 04112-9546
(207) 791-3000
ghansel@preti.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
  & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300
espector@srkw-law.com

*Interim Lead Counsel for the Direct Purchaser
Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2012, I electronically filed the foregoing paper with the Clerk of the court using the ECF system which will send notification of such filing to all counsel of record registered for electronic filing.

FINK + ASSOCIATES LAW

By: /s/David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Interim Liaison Counsel for DP Plaintiffs
100 West Long Lake Road, Suite111
Bloomfield Hills, MI  48304
(248) 971-2500
dfink@finkandassociateslaw.com