```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                           —   —   —

 4
    IN RE:  AUTOMOTIVE WIRE HARNESS
 5  SYSTEMS ANTITRUST                   MDL NO. 12-2311

 6  _____/

 7
                         MOTION HEARING
 8
         BEFORE THE HONORABLE MARIANNE O. BATTANI
 9               United States District Judge
           Theodore Levin United States Courthouse
10               231 West Lafayette Boulevard
                      Detroit, Michigan
11               Thursday, December 6, 2012

12
    APPEARANCES:
13
    Direct Purchaser Plaintiffs:
14
                         DOUGLAS ABRAHAMS
15                       KOHN, SWIFT & GRAF, P.C.
                         One South Broad Street, Suite 2100
16                       Philadelphia, PA  19107
                         (215) 238-1700
17

18                       MATTHEW BARSENAS
                         OLIVER LAW GROUP
19                       950 West University Drive, Suite 200
                         Rochester, MI  48307
20                       (248) 436-3385

21
                         WILLIAM G. CALDES
22                       SPECTOR, ROSEMAN, KODROFF & WILLIS,
                         P.C.
23                       1818 Market Street, Suite 2500
                         Philadelphia, PA  19103
24                       (215) 496-0300

25
```

```
1    APPEARANCES:   (Continued)

2    Direct Purchaser Plaintiffs:

3                           SOLOMON B. CERA
                            GOLD, BENNET, CERA & SIDENER, L.L.P.
4                           595 Market Street, Suite 2300
                            San Francisco, CA  94105
5                           (415) 777-2230

6

7                           DAVID H. FINK
                            FINK & ASSOCIATES LAW
8                           100 West Long Lake Road, Suite 111
                            Bloomfield Hills, MI  48304
9                           (248) 971-2500

10                          GREGORY P. HANSEL
                            PRETI, FLAHERTY, BELIVEAU &
11                          PACHIOS, L.L.P.
                            One City Center
12                          Portland, ME  04112
                            (207) 791-3000

13

14                          WILLIAM E. HOESE
                            KOHN, SWIFT & GRAF, P.C.
15                          One South Broad Street, Suite 2100
                            Philadelphia, PA  19107
16                          (215) 238-1700

17

18                          BRENT W. JOHNSON
                            COHEN MILSTEIN
19                          1100 New York Avenue NW, Suite 500 West
                            Washington, D.C.  20005
20                          (202) 408-4600

21                          STEVEN A. KANNER
                            FREED, KANNER, LONDON & MILLEN, L.L.C.
22                          2201 Waukegan Road, Suite 130
                            Bannockburn, IL  60015
23                          (224) 632-4502

24

25
```

Motion Hearing • December 6, 2012

3

```
 1    APPEARANCES: (Continued)

 2    Direct Purchaser Plaintiffs:

 3                        JOSEPH C. KOHN
                          KOHN, SWIFT & GRAF, P.C.
 4                        One South Broad Street, Suite 2100
                          Philadelphia, PA  19107
 5                        (215) 238-1700

 6
                          WILLIAM H. LONDON
 7                        FREED, KANNER, LONDON & MILLEN, L.L.C.
                          2201 Waukegan Road, Suite 130
 8                        Bannockburn, IL  60015
                          (224) 632-4504
 9

10                        MELISSA H. MAXMAN
                          COZEN O'CONNOR
11                        1627 I Street, NW, Suite 1100
                          Washington, D.C.  20006
12                        (202) 912-4800

13
                          EUGENE A. SPECTOR
14                        SPECTOR, ROSEMAN, KODROFF & WILLIS,
                          P.C.
15                        1818 Market Street, Suite 2500
                          Philadelphia, PA  19103
16                        (215) 496-0300

17
                          JASON J. THOMPSON
18                        SOMMERS SCHWARTZ, P.C.
                          2000 Town Center, Suite 900
19                        Southfield, MI  48075
                          (248) 355-0300
20

21                        RANDALL B. WEILL
                          PRETI, FLAHERTY, BELIVEAU &
22                        PACHIOS, L.L.P.
                          One City Center
23                        Portland, ME  04112
                          (207) 791-3000
24

25
```

APPEARANCES: (Continued)

**End-Payor Plaintiffs:**

THOMAS E. AHLERING
**HAGENS, BERMAN, SOBOL, SHAPIRO, L.L.P.**
1144 West Lake Street, suite 400
Oak Park, IL  60301
(708) 628-4961

WARREN T. BURNS
**SUSMAN GODFREY, L.L.P.**
901 Main Street, Suite 5100
Dallas, TX  75202
(214) 754-1928

FRANK C. DAMRELL
**COTCHETT, PITRE & McCARTHY, L.L.P.**
840 Malcolm Road
Burlingame, CA  94010
(650) 697-6000

LAUREN CRUMMEL
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI  48307
(248) 841-2200

BERNARD PERSKY
**LABATON SUCHAROW**
140 Broadway Avenue
New York, NY  10005
(212) 907-0700

MARC M. SELTZER
**SUSMAN GODFREY, L.L.P**
190 Avenue of the Stars, Suite 950
Los Angeles, CA  90067
(310) 789-3102

```
1     APPEARANCES:   (Continued)

2     End-Payor Plaintiffs:

3
                      ELIZABETH T. TRAN
4                     COTCHETT, PITRE & McCARTHY, L.L.P.
                      840 Malcolm Road
5                     Burlingame, CA  94010
                      (650) 697-6000
6

7                     STEVEN N. WILLIAMS
                      COTCHETT, PITRE & McCARTHY, L.L.P.
8                     840 Malcolm Road
                      Burlingame, CA  94010
9                     (650) 697-6000

10
                      ADAM J. ZAPALA
11                    COTCHETT, PITRE & McCARTHY, L.L.P.
                      840 Malcolm Road
12                    Burlingame, CA  94010
                      (650) 697-6000
13
      Dealership Plaintiffs:
14
                      DON BARRETT
15                    BARRETT LAW OFFICES
                      P.O. Drawer 987
16                    Lexington, MS  39095
                      (601) 834-2376
17

18                    JONATHAN W. CUNEO
                      CUNEO, GILBERT & LaDUCA, L.L.P.
19                    507 C Street NE
                      Washington, D.C.  20002
20                    (202) 789-3960

21

22                    JOEL DAVIDOW
                      CUNEO, GILBERT & LaDUCA, L.L.P.
23                    507 C Street NE
                      Washington, D.C.  20002
                      (202) 789-3960
24

25
```

1   APPEARANCES:  (Continued)

2

3   **Dealership Plaintiffs:**

4                           BRENDAN FREY
                           **MANTESE, HONIGMAN, ROSSMAN &**
                           **WILLIAMSON, P.C.**
5                           1361 East Big Beaver Road
                           Troy, MI  48083
6                           (248) 457-9200

7

8                           GERARD V. MANTESE
                           **MANTESE, HONIGMAN, ROSSMAN &**
                           **WILLIAMSON, P.C.**
9                           1361 East Big Beaver Road
                           Troy, MI  48083
10                          (248) 457-9200

11

12                          SHAWN M. RAITER
                           **LARSON KING, L.L.P.**
                           30 East Seventh Street, Suite 2800
13                          Saint Paul, MN  55101
                           (651) 312-6500

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3              BRIAN M. AKKASHIAN
                PAESANO AKKASHIAN
 4              132 North Old Woodward Avenue
                Birmingham, MI  48009
 5              (248) 792-6886

 6
                CRAIG D. BACHMAN
 7              LANE POWELL, P.C.
                601 SW Second Avenue, Suite 2100
 8              Portland, OR  97204
                (503) 778-2100
 9

10              THOMAS E. BEJIN
                BEJIN, VANOPHEM BIENSMAN
11

12              PETER E. BOIVIN
                HONIGMAN, MILLER, SCHWARTZ AND COHN, L.L.P.
13              2290 First National Building
                660 Woodward Avenue
14              Detroit, MI  48226
                (313) 465-7396
15

16              STEVEN F. CHERRY
                WILMER HALE
17              1875 Pennsylvania Avenue NW
                Washington, D.C.  20006
18              (202) 663-6321

19
                JAMES W. COOPER
20              ARNOLD & PORTER, L.L.P.
                555 Twelfth Street NW
21              Washington, DC  20004
                (202) 942-5000
22

23              SAMUEL B. DAVIDOFF
                WILLIAMS & CONNOLLY, L.L.P.
24              725 Twelfth Street NW
                Washington, DC  2005
25              (202) 434-5648
```

```
1    APPEARANCES:   (Continued)

2    For the Defendants:

3                     KENNETH R. DAVIS, II
                      LANE POWELL, P.C.
4                     601 SW Second Avenue, Suite 2100
                      Portland, OR  97204
5                     (503) 778-2100

6
                      DEBRA H. DERMODY
7                     REED SMITH
                      225 Fifth Avenue
8                     Pittsburgh, PA 15222
                      (412) 288- 3131
9

10                    GEORGE B. DONNINI
                      BUTZEL LONG, P.C.
11                    150 West Jefferson Avenue
                      Detroit, MI  48226
12                    (313) 225-7000

13
                      DAVID P. DONOVAN
14                    WILMER, CUTLER, PICKERING, HALE and DORR,
                      L.L.P.
15                    1875 Pennsylvania Avenue, NW
                      Washington, D.C.  20006
16                    (202) 663-6868

17
                      MOLLY M. DONOVAN
18                    WINSTON & STRAWN, L.L.P.
                      200 Park Avenue
19                    New York, NY  10166
                      (212) 294-4692
20

21                    DAVID F. DuMOUCHEL
                      BUTZEL LONG, P.C.
22                    150 West Jefferson Avenue
                      Detroit, MI  48226
23                    (313) 225-7000

24

25
```

```
1    APPEARANCES:  (Continued)

2    For the Defendants:

3                     PETER M. FALKENSTEIN
                      JAFFE, RAITT, HEUER & WEISS, P.C.
4                     27777 Franklin Road, Suite 2500
                      Southfield, MI  48034
5                     (248) 351-3000

6

7                     JAMES P. FEENEY
                      DYKEMA GOSSETT, P.L.L.C.
                      39577 Woodward Avenue, Suite 300
8                     Bloomfield Hills, MI  48304
                      (248) 203-0841
9

10                    MICHELLE K. FISCHER
                      JONES DAY
11                    51 Louisiana Avenue NW
                      Washington, D.C.  20001
12                    (202) 879-4645

13

14                    LARRY S. GANGNES
                      LANE POWELL, P.C.
                      1420 Fifth Avenue, Suite 4100
15                    Seattle, Washington  98101
                      (206) 223-7000
16

17                    DANIEL W. GLAD
                      LATHAM & WATKINS, L.L.P.
18                    233 South Wacker Drive, Suite 5800
                      Chicago, IL 60606
19                    (312) 777-7110

20

21                    FRED K. HERRMANN
                      KERR, RUSSELL & WEBER, P.L.C.
                      500 Woodward Avenue, Suite 2500
22                    Detroit, MI  48226
                      (313) 961-0200
23

24                    HOWARD B. IWREY
                      DYKEMA GOSSETT, P.L.L.C.
                      39577 Woodward Avenue, Suite 300
25                    Bloomfield Hills, MI  48304
                      (248) 203-0526
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3                    BENJAMIN W. JEFFERS
                      DYKEMA GOSSETT, P.L.L.C.
 4                    400 Renaissance Center
                      Detroit, MI  48243
 5                    (313) 568-5340

 6
                      SHELDON H. KLEIN
 7                    BUTZEL LONG, P.C.
                      41000 Woodward Avenue
 8                    Bloomfield Hills, MI  48304
                      (248) 258-1414

 9

10                    PETER KONTIO
                      ALSTON & BIRD, L.L.P.
11                    1201 West Peachtree Street
                      Atlanta, GA  30309
12                    (404) 881-7000

13
                      ERIC MAHR
14                    WILMER, CUTLER, PICKERING, HALE and DORR,
                      L.L.P.
15                    1875 Pennsylvania Avenue, NW
                      Washington, D.C.  20006
16                    (202) 663-6099

17
                      ANDREW S. MAROVITZ
18                    MAYER BROWN, L.L.P.
                      71 South Wacker Drive
19                    Chicago, IL  60606
                      (312) 701-7116

20

21                    W. TOOD MILLER
                      BAKER & MILLER, P.L.L.C.
22                    2401 Pennsylvania Avenue NW, Suite 300
                      Washington, DC  20037
23                    (202) 663-7822

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3                    SONIA KUESTER PFAFFENROTH
                      ARNOLD & PORTER, L.L.P.
 4                    555 Twelfth Street NW
                      Washington, DC  20004
 5                    (202) 942-5094

 6
                      ANNA M. RATHBUN
 7                    LATHAM & WATKINS, L.L.P.
                      555 Eleventh Street NW, Suite 1000
 8                    Washington, D.C.  20004
                      (202) 637-2200
 9

10                    SALVATORE A. ROMANO
                      PORTER, WRIGHT, MORRIS & ARTHUR
11                    1919 Pennsylvania Ave., NW, Suite 500
                      Washington, D.C. 20006
12                    (202) 778-3054

13
                      WM. PARKER SANDERS
14                    SMITH, GAMBRELL & RUSSELL, L.L.P.
                      Promenade Two, Suite 3100
15                    1230 Peachtree Street NE
                      Atlanta, GA  30309
16                    (404) 815-3684

17
                      WILLIAM A. SANKBEIL
18                    KERR, RUSSELL & WEBER, P.L.C.
                      500 Woodward Avenue, Suite 2500
19                    Detroit, MI  48226
                      (313) 961-0200
20

21                    CONNOR B. SHIVELY
                      LANE POWELL, P.C.
22                    1420 Fifth Avenue, Suite 4100
                      Seattle, Washington  98101
23                    (206) 223-7000

24

25
```

1   APPEARANCES:   (Continued)

2   **For the Defendants:**

3                    ANITA STORK
                    **COVINGTON & BURLING, L.L.P.**
4                    One Front Street
                    San Francisco, CA  94111
5                    (415) 591-7050

6

7                    MARGUERITE M. SULLIVAN
                    **LATHAM & WATKINS, L.L.P.**
                    555 Eleventh Street NW, Suite 1000
8                    Washington, D.C.  20004
                    (202) 637-2200

9

10                   JOANNE GEHA SWANSON
                    **KERR, RUSSELL & WEBER, P.L.C.**
11                   500 Woodward Avenue, Suite 2500
                    Detroit, MI  48226
12                   (313) 961-0200

13

14                   MICHAEL F. TUBACH
                    **O'MELVENY & MYERS, L.L.P.**
                    Two Embarcadero Center, 28th Floor
15                   San Francisco, CA  94111
                    (415) 984-8700

16

17                   MICHAEL R. TURCO
                    **BROOKS, WILKINS, SHARKEY & TURCO, P.L.L.C.**
18                   401 South Old Woodward Avenue, Suite 400
                    Birmingham, MI  48009
19                   (248) 971-1713

20

21                   A. PAUL VICTOR
                    **WINSTON & STRAWN, L.L.P.**
                    200 Park Avenue
22                   New York, NY  10166
                    (212) 294-4655

23

24

25

Motion Hearing • December 6, 2012

13

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3                    ALISON WELCHER
                      SHEAVMAN & STERLING
 4                    801 Pennsylvania Avenue, NW, Suite 900
                      Washington, D.C. 20004
 5                    (202) 508-8122

 6

 7                    ROBERT WIERENGA
                      SCHIFF HARDIN, L.L.P.
                      350 South Main Street, Suite 210
 8                    Ann Arbor, MI  48104
                      (734) 222-1507

 9

10                    STEPHANIE K. WOOD
                      WILMER, CUTLER, PICKERING, HALE and DORR,
11                    L.L.P.
                      1875 Pennsylvania Avenue, NW
12                    Washington, D.C.  20006
                      (202) 663-6099

13

14                    MASA YAMAGUCHI
                      LANE POWELL, P.C.
15                    601 SW Second Avenue, Suite 2100
                      Portland, OR  97204
16                    (503) 778-2174

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

Page

PERSONAL JURISDICTION MOTION REGARDING LEONI
Motion by Mr. Tubach................................ 24
Response by Mr. Davidow............................ 35
Reply by Mr. Tubach................................ 41
SurRespone by Mr. Davidow......................... 45
SurReply by Mr. Tubach............................ 46

PERSONAL JURISDICTION REGARDING S-Y SYSTEMS
Motion by Ms. Stork................................ 47
Response by Mr. Burns.............................. 54
Reply by Ms. Stork................................ 60

MOTION TO DISMISS REGARDING END PAYORS & DEALERS
Motion by Ms. Sullivan............................ 61
Motion by Ms. Fischer............................. 82
Response by Mr. Cuneo............................. 97
Response by Mr. Williams..........................106
Reply by Ms. Sullivan............................126
Reply by Ms. Fischer.............................129

MOTION TO DISMISS REGARDING TRAM
Response by Mr. Seltzer..........................133
Reply by Mr. Klein...............................139
Reply by Mr. Williams............................144

MOTION TO DISMISS REGARDING DENSO
Motion by Mr. Cherry.............................146
Response by Mr. Damrell..........................147
Reply by Mr. Cherry..............................150
Sur Response by Mr. Damrell......................152
Sur Reply by Mr. Cherry..........................154

MOTION TO DISMISS REGARDING GS ELECTECH
Motion by Mr. Romano.............................157
Response by Mr. Davidow..........................168
Reply by Mr. Romano..............................176

 1   Detroit, Michigan

 2   Thursday, December 6, 2012

 3   at about 10:10 a.m.

 4                           —    —    —

 5          (Court and Counsel present.)

 6          THE CASE MANAGER:  All rise.

 7          The United States District Court for the Eastern

 8   District of Michigan is now in session, the Honorable

 9   Marianne O. Battani presiding.

10          You may be seated.

11          The Court calls automotive parts antitrust

12   litigation.

13          THE COURT:  Good morning.  I apologize again.  I

14   don't know what's going on, that's all I can tell you, but

15   I'm glad we are all here ready to go.

16          Before you begin I do have a couple of things that

17   I don't want to forget about.  One is I would like someone to

18   enter the orders regarding Fujikura dismissing FAI.

19          MR. PERSKY:  Right.  There should be orders entered

20   in which --

21          THE COURT:  You don't have to tell me what it is,

22   but if you have been dismissed for something please enter

23   your order so that we have the order.

24          Also, an order for the amended dates for the

25   consolidated complaints.

1    MR. WILLIAMS:  Your Honor, Steve Williams for the

2    end payors.

3        We will do that.  We all spoke, all the plaintiff

4    groups and the defendants this morning, and we would like to

5    propose one adjustment to the date, and then I think I

6    misspoke yesterday in terms of the order.  So the dates as we

7    agree will be the instrument panel complaint would be served

8    and filed on January 15th.

9        THE COURT:  January 15th.  Okay.

10       MR. WILLIAMS:  Heating control panel would be

11   February 28th and fuel senders would be April 15th.

12       THE COURT:  Okay.

13       MR. WILLIAMS:  The last two dates are the dates set

14   yesterday, the only adjustment is the first date and then the

15   order of complaint, which is consistent with what was

16   previously done.

17       THE COURT:  The only difference being January 15th,

18   which is fine.

19       MR. WILLIAMS:  Yes, Your Honor.  I think Mr. Persky

20   has a matter.

21       THE COURT:  Mr. Persky?

22       MR. PERSKY:  I just want to hand up to the Court

23   and hand out -- my name is Bernard Persky of the Labaton

24   Sucharow firm, co-lead counsel for the end payors.

25       Just finishing off something that was adverted to

1     yesterday.  I wanted to hand up to the Court a document we

2     filed with the Court with ECF yesterday, a request for

3     judicial notice which reflects Lear's and Furukawa's press

4     releases referring to their entity as a joint venture, public

5     statements by them.

6               THE COURT:  Okay.

7          MR. PERSKY:  Here is the request for judicial

8     notice, an extra copy for the defendants.  May I approach the

9     bench, Your Honor?

10               THE COURT:  Yes.

11          MR. MAROVITZ:  Your Honor, Andy Marovitz for Lear

12     Corporation.

13          We'll be formally responding to the request for

14     judicial notice certainly no later than Monday, we will try

15     to actually get it in tomorrow.  The judicial notice that is

16     being asked for here isn't really notice of anything at all.

17     There is no question that Lear Corporation and Furukawa at

18     points have described in public statements their -- the

19     Furukawa-Lear Corporation as a, quote/unquote, joint venture.

20     We said that in our opening brief and we said that in our

21     reply brief.  There is no news here.

22          What the plaintiffs' request for judicial notice

23     doesn't address anywhere is the fact that it is still a

24     separately incorporated Delaware corporation entitled to the

25     rights under Delaware law, and the shareholders therefore are

```
 1   entitled under Delaware law not to be held vicariously liable
 2   for the acts either of a shareholder or of the corporation
 3   itself.  In this case the Furukawa-Lear Corporation didn't
 4   even plead guilty so we are talking about things five times
 5   removed.
 6           THE COURT:  But you are going to submit something
 7   in writing?
 8           MR. MAROVITZ:  Within the next two business days.
 9           THE COURT:  Okay.
10           MR. PERSKY:  Just one word in response, and I
11   promise not to belabor the point.
12           THE COURT:  We are opening up arguments here?  Go
13   ahead.
14           MR. PERSKY:  Lear was listed today but we had
15   agreed we would finish everything yesterday but this issue is
16   still somewhat open.  In the direct purchasers' brief in
17   response to Lear's motion they cite numerous cases which talk
18   about the liability of joint ventures.  What we pleaded in
19   our complaint, in the end payors' complaint, is that this
20   entity was operated as a joint venture.  The request for
21   judicial notice indicates that they called themself and
22   regarded themselves as a joint venture so that the cases
23   cited in the direct purchasers' brief with respect to joint
24   venture liability are applicable to an entity that acted and
25   represented itself to the public as a joint venture.  That's
```

Motion Hearing • December 6, 2012

**19**

```
 1    all I'm saying.  Those cases are relevant.
 2              THE COURT:  All right.  You said that yesterday.  I
 3    will allow you to file a reply of a few pages to the
 4    defendant.
 5              MR. PERSKY:  I beg your pardon?
 6              THE COURT:  You just missed your opportunity.  I
 7    will allow you to file a reply.
 8              MR. PERSKY:  After he --
 9              THE COURT:  Within seven days, and you can have
10    seven days to file yours, I know you said you would have it
11    in two business days but --
12              MR. PERSKY:  So after they file theirs I can
13    respond?
14              THE COURT:  Right.
15              MR. PERSKY:  Thank you, Your Honor.
16              MR. MAROVITZ:  Thank you, Your Honor.
17              THE COURT:  We do have something to finish up from
18    yesterday though and that's the personal jurisdiction
19    arguments that we didn't get to, Leoni and S-Y Systems.
20              MR. TUBACH:  Good morning.  Did the Court want to
21    hear arguments about both the personal jurisdiction and the
22    Twombly sort of merits argument from Leoni all at once?
23              THE COURT:  I think you can do it all at once.
24              MR. TUBACH:  I certainly can.  I hope so.
25              THE COURT:  Okay.
```

1          MR. TUBACH:  They are intertwined.  Thank you, Your

2     Honor.  Michael Tubach on behalf of the Leoni defendants.

3          We were working hard to make the Court's job easier

4     here.  As the Court knows, the direct purchasers recently

5     dismissed all of the Leoni entities voluntarily from this

6     case entirely.

7          THE COURT:  Wait a minute.  What do we have -- are

8     you waiting --

9          MR. DAVIDOW:  I'm Joel Davidow.  I'm arguing for

10    the indirects in the motion we are talking about, and wanted

11    to say something about the order or how it would be carried

12    out.

13         THE COURT:  Okay.  Do you want to do that now

14    before he continues?

15         MR. DAVIDOW:  Yeah.  Well, basically --

16         THE COURT:  Let's get your appearance, please.

17         MR. DAVIDOW:  First name Joel, last name Davidow,

18    D-A-V-I-D-O-W.  I'm with the Cuneo Gilbert firm and I

19    represent for this purpose all indirect purchasers, both the

20    dealers and the end payors, in both the case involving Leoni

21    jurisdiction and Leoni merits.

22         And the Sixth Circuit has recognized in Carrier

23    that there is an interdependence in a case like this between

24    the merits and the jurisdiction and therefore my only thought

25    was that we hold the jurisdiction until the -- I'm sorry, the

```
 1    merits -- there be one 30-minute argument by the two of us
 2    either now or in two hours, preferably in two hours.
 3              THE COURT:  Okay.
 4              MR. TUBACH:  I'm ready to go now.
 5              MR. DAVIDOW:  Just move the jurisdiction back with
 6    the merits, and all the Leoni issues we argue between the two
 7    of us and --
 8              THE COURT:  To separate the Leoni issues?
 9              MR. TUBACH:  I prefer to do them all at once, Your
10    Honor.  We are ready to go.  There's no reason not to
11    argue --
12              MR. DAVIDOW:  We can --
13              MR. TUBACH:  Excuse me, sir.  There's no reason --
14              THE COURT:  Oops, oops, oops.  Wait a minute.
15    Okay.  Let's begin with your argument.  You may argue both of
16    them.
17              MR. TUBACH:  Thank you.
18              MR. DAVIDOW:  So 30 minutes apiece?
19              THE COURT:  Yes.  All right.  Go ahead.  Don't
20    worry about the time.  Go on.
21              MR. TUBACH:  I won't need 30 minutes, Your Honor.
22              THE COURT:  Okay.
23              MR. TUBACH:  As I said, the direct purchasers have
24    dismissed us from the case entirely.
25              THE COURT:  Right.
```

1      MR. TUBACH:  As to the indirect purchasers, in

2  other words, the auto dealers and the end payors, they

3  recently agreed to voluntarily dismiss two Leoni entities

4  from the case voluntarily also and completely, and those

5  dismissals have been filed, and so what we are down to now

6  are three Leoni entities only with respect to the auto

7  dealers and the end payors and those three entities are

8  Leoni AG, Leonische Holding and Leoni Wiring System, Inc.

9      I want to start with the Twombly argument, if I

10  could.  A lot has been said about Twombly already and I won't

11  repeat it all here.  I really only want to say two things.

12  One, that the Sixth Circuit has said a few times now that the

13  plaintiffs have to not just make generic allegations but they

14  have to make specific allegations about the who, what, where,

15  when, how or why of the conspiracy.  The plaintiffs say they

16  don't need to do that, but if the Court reads the

17  Sixth Circuit opinion in Carrier Corp. it's quite clear that

18  that's what they need to do.  They can't just make

19  generalized allegations of wrongdoing.

20      And the second thing they have to do, and this is

21  most important for Leoni, they have to specify how each

22  defendant was involved in the alleged conspiracy.  And the

23  Court -- the Sixth Circuit has said that now twice in

24  Carrier Corp. and in the Travel Agent case.  That's

25  critically important for Leoni because as we will talk about

 1    in a minute they literally have nothing to suggest that Leoni

 2    was involved in any conspiracy that they have alleged.  So

 3    what the plaintiffs cannot do is make a generalized

 4    allegation about defendants, defendants did this, defendants

 5    did that, and somehow have that count against Leoni

 6    specifically.  And as we cited in our brief, generic pleading

 7    alleging misconduct against defendants without specifics as

 8    to the role each played in the alleged conspiracy was

 9    specifically rejected under Twombly, and that's the Total

10    Benefits case.

11        So what do they have other than generic allegations

12    that specifically relate to Leoni?  They don't have any

13    allegations that we attended a single meeting, that we

14    participated in any phone calls, that we reached any

15    agreements to price fix at all.  For a while they had even

16    named two entities of Leoni that don't even make wire

17    harnesses, the ones that they eventually agreed to dismiss.

18        THE COURT:  And there were no pleas?

19        MR. TUBACH:  Leoni has not pleaded guilty.  There

20    have obviously been guilty pleas by other defendants but

21    those defendants have all been Japanese companies or Japanese

22    national individuals involving sales of product to Japanese

23    companies; Toyota, Subaru and Honda.

24        THE COURT:  Any raids?

25        MR. TUBACH:  Leoni was the subject of a raid in the

1  European Commission, and I will talk about that in a minute.

2  But as to the U.S. guilty pleas, there is no allegation in

3  the complaint that any of the Leoni entities even sell wiring

4  harnesses to Japanese manufacturers, so they literally have

5  nothing -- there wouldn't be enough anyway that someone else

6  has pleaded guilty to tie that to Leoni, but here they

7  particularly have nothing to suggest that those guilty pleas

8  in any way affect my clients.

9          So they have no allegations of actual wrongdoing.

10  What do they point to?  They point to two things; first, that

11  Leoni sells -- some Leoni entities sell wiring harnesses.

12  That obviously is not enough to survive Twombly, and the

13  plaintiffs presumably will not argue otherwise.  The fact

14  that Leoni is in the market for wiring harnesses is not a

15  basis to support a conspiracy claim.  They argue that, well,

16  Leoni has six percent market share worldwide.  That's simply

17  another way of saying we sell wiring harnesses, and there is

18  nothing about having a six-percent market share, which is a

19  pretty modest market share, to suggest that somehow we have

20  the ability as such a small participant in the market to

21  control or dominate or otherwise fix prices.

22          The second thing they point to is the European

23  Commission investigation, and Leoni was raided as part of

24  that, this was now several years ago, and the only thing we

25  know is that nothing has happened yet; there have been no

1    charges filed as that would happen in Europe.  And we don't

2    know if the investigation has any relevance to the U.S. at

3    all because we don't know anything about the investigation.

4    An investigation in the U.S. would be irrelevant unless

5    charges have been filed against my client, and the fact that

6    it is pending in Europe makes it even less relevant.  We

7    don't know whether the investigation will lead to anything,

8    we don't know whether it will lead to anything relating to my

9    client, and we don't know if it will lead to anything

10   relating to my client that even involves anything with the

11   U.S. market, there are plenty of cars sold in Europe that

12   never make their way over here.  So with all of those

13   contingencies, simply pointing to a pending investigation in

14   another jurisdiction is not enough to keep my client in this

15   case.

16            And that's --

17            THE COURT:  So as far as you know the European

18   Commission investigation is not resolved?

19            MR. TUBACH:  It is not resolved as far as I know.

20   We don't represent the Leoni entities in Europe, they are

21   represented by another law firm there.

22            THE COURT:  Uh-huh.

23            MR. TUBACH:  But as far as I -- as far as I read

24   the papers and know the investigation is not resolved either

25   way.

1            THE COURT:  Okay.  All right.

2            MR. TUBACH:  So we don't know exactly how it is

3     going to resolve.  And so with absolutely nothing to point

4     Leoni into this conspiracy we shouldn't be here, we just

5     shouldn't be here.  We have spent -- the client has spent a

6     significant sum of money already on this litigation and the

7     plaintiffs essentially propose to just keep us around as we

8     go through very expensive discovery and class certification

9     and summary judgment and then maybe trial so that maybe they

10    can discover some basis for keeping us in this lawsuit.  They

11    shouldn't be able to do that.  That's not what -- that's not

12    what Twombly allows, and it is not what this Court should

13    allow either.

14            THE COURT:  Okay.

15            MR. TUBACH:  Unless the Court has questions about

16    the Twombly aspect of it I will turn to the personal

17    jurisdiction?

18            THE COURT:  No.

19            MR. TUBACH:  The personal jurisdiction argument

20    relates only to one of the Leoni entities, that's Leoni AG.

21    There was another personal jurisdiction argument that we were

22    making with respect to a separate German entity but the

23    indirect purchasers have dismissed that entity from the

24    lawsuit and so that -- that's Leoni Kabel GmbH, and that's no

25    longer part of this case.

Motion Hearing • December 6, 2012

1    And as to Leoni AG the plaintiffs argue there is

2    both general jurisdiction and specific jurisdiction, and I

3    would like to talk first about the general jurisdiction.  The

4    plaintiffs do not argue that there is -- that we have any of

5    the traditional contacts that you would generally want to see

6    ini order to make a determination that an entity has

7    continuous and systematic contacts with the particular

8    jurisdiction.  Instead, they don't argue and they can't argue

9    that we have -- that we sell -- that Leoni AG sells wiring

10   harnesses here, Leoni AG has no phone number here, it has no

11   offices, it has no fax number, it has no agent for service of

12   process here, it doesn't conduct any business in the U.S.

13   Instead, what the plaintiffs argue, is that they

14   can use this theory of jurisdiction called alter ego

15   jurisdiction to basically say, well, there is a U.S.

16   subsidiary of Leoni in the U.S. and they should just be able

17   to basically assume that whatever the U.S. subsidiary was

18   doing is attributable to the German parent because of this

19   alter ego theory of jurisdiction.  That theory only applies

20   when the -- if Leoni AG exercises so much control over the

21   U.S. subsidiary that they're really one entity.

22   And courts like Alexander Associates and the

23   Thompson case from the Sixth Circuit both list a host of

24   factors, ten factors each, I think, that go to whether or not

25   there is this essential lack of keeping a corporate distinct

1    between the two entities, it is quite clear looking at those

2    two factors that Leoni AG and the U.S. entities are kept

3    separate.

4            For example --

5            THE COURT:  Okay.  I was just going to ask you.

6            MR. TUBACH:  Yeah, I can just run through them.  Do

7    they share principal officers -- this is from the Alexander

8    Associates case.  Do they share principal offices?  Do they

9    share board members?  Does all of the parent's revenue come

10   from the subsidiary?  Is all of the capital of the subsidiary

11   provided by the parent?  Does the subsidiary buy exclusively

12   from the parent?  Is the subsidiary seriously

13   undercapitalized?  Does the parent regularly provide

14   gratuitous services to the subsidiary?  Does the parent do

15   the payroll for the subsidiary?  Do they have -- do they

16   direct the policies and decisions of the subsidiary?  Does

17   the parent consider the subsidiary's product essentially to

18   be its own?  That's from the Alexander Associates case.

19           And the Thompson case has a similar list of ten

20   factors.  Do they basically adhere to corporate formalities?

21   Do they keep separate corporate records?  Is there financial

22   independence?  Do they share the same employees, business,

23   address, assets, jobs, records, tax returns, financial

24   statements?  Do they exert control over the daily affairs of

25   the company?

1    THE COURT:  And are any of those factors applicable
2  to --
3    MR. TUBACH:  No, we say no.  They are a separate
4  company -- they are separate companies and they operate
5  separately.  Of course what the plaintiffs point to is that
6  the Leoni group, which is a large company that has, you know,
7  maybe dozens of subsidiaries around the world has, for
8  instance, centralized its research and development facility
9  in one area, or that it has -- that it does marketing on
10  behalf of the Leoni group as opposed to separate marketing
11  for Leoni Wiring Systems, Inc. and Leoni Cable GmbH and Leoni
12  AG.
13    That is simply routine corporate efficiency.  It
14  can't be that because they do centralized research and
15  development that somehow every entity has now disregarded the
16  corporate form.  That's what an efficient business does, and
17  that's exactly what Leoni AG does.
18    And the only thing else they point to is that at
19  some point one officer of Leoni AG was the CEO of Leoni
20  Wiring Systems, Inc., but there is nothing wrong with one
21  person holding -- wearing two hats.  In any event, that ended
22  in 2008, and there has been no allegation that because of
23  that somehow Leoni Wiring Systems, Inc., the U.S. entity, was
24  not able to carry on its own business in its own way in
25  accordance with corporate formality.

1          They make a number of other allegations with

2    respect to Leoni Wiring Systems, Inc., and another German

3    entity that hasn't even been sued in this case, and we

4    suggest that simply is irrelevant.  There is nothing about

5    some relationship between whether there are board members who

6    sit here and there between the U.S. subsidiary and an

7    unrelated German entity that has anything to do with this

8    lawsuit.  That unrelated German entity is not part of this

9    lawsuit, they have never been part of this lawsuit, and so to

10   point to that doesn't really add to the Court's analysis at

11   all.

12          And so there is really no way that the Court should

13   be able to find that there is general jurisdiction here, that

14   there is such systematic and continuous contact by Leoni AG

15   through its subsidiary because they have simply disregarded

16   corporate form.

17          And so -- they also argue that in addition to

18   general jurisdiction there is specific jurisdiction.  As the

19   Court is surely aware, there is a familiar three-part test

20   from Southern Machine about whether or not the Court can

21   exercise specific jurisdiction over Leoni AG.  There has to

22   be purposeful availment in the jurisdiction, the claim has to

23   arise from that purposeful availment and the contacts have to

24   be sufficiently substantial that it is reasonable to exercise

25   jurisdiction over the entity.

Motion Hearing • December 6, 2012

1    And here we have really the worst kind of

2  bootstrapping.  The plaintiffs essentially make two

3  arguments.  First, they argue that under a stream of commerce

4  analysis if you sell a product and you specifically direct

5  your product at the forum -- at the forum in which you are

6  being sued that you have purposefully availed yourself of

7  that forum and can be sued there, so if I specifically target

8  Michigan as a place to sell my goods I can't then be

9  surprised if something goes wrong with one of my goods and I

10 get sued in Michigan.

11   When you look at their brief they don't even say

12 that we did that.  In three different places of their brief

13 they say if Leoni did this then the stream of commerce

14 analysis would apply, on pages 13, 16 and 17.  At first I

15 thought that must have been a mistake that they had done that

16 because surely their allegation is that we did do that, but,

17 in fact, repeatedly they say if Leoni did this there will be

18 jurisdiction.  And so their solution is, well, just give us a

19 bunch of discovery and we will figure out if they were part

20 of this conspiracy and if they were part of this conspiracy

21 then there was jurisdiction.  That's putting the cart before

22 the horse.  They can't simply say we have no idea whether

23 Leoni AG sells these products but we would like to spend a

24 lot of your money figuring it out and if it turns out they

25 don't sell it, well, then, sorry about that.  That's no way

1    to go about deciding personal jurisdiction.

2          We have submitted a declaration from Robert Steiner

3    as part of our motion to dismiss which says unequivocally

4    that Leoni AG sells no products.  It is a holding company.

5    It doesn't make products and it doesn't sell products.  And

6    to allow them to get in through the back door by saying well,

7    we don't really know they do this but we would sure like to

8    find out, that's no way about testing jurisdiction.

9          THE COURT:  They are asking for more discovery.

10          MR. TUBACH:  Well, they say well, look -- they have

11    not moved for more discovery.  They say in their opposition

12    to our motion to dismiss, look, if this effort isn't good

13    enough we would like an opportunity to take some discovery.

14    We don't think they should be allowed to do so.  When we

15    filed our motion if they wanted discovery and we filed

16    declarations with our motion, if they wanted to take

17    discovery of Leoni AG to determine whether or not our

18    declarations were accurate or if there was something else

19    that would justify jurisdiction here they could have done so.

20    They never asked us, they never sought any discovery, and to

21    say in the opposition to the motion, well, you know, if this

22    effort doesn't work out we would sort of like to have another

23    shot at it, that's just not reasonable.

24          Particularly, as this Court has held in Brown v.

25    Way, you should not get discovery on jurisdictional issues

1    unless you have made a prima facie showing of jurisdiction

2    and they just haven't done that here at all, and so they

3    should not be allowed to have discovery to try to discover a

4    basis for continuing to exert jurisdiction over Leoni AG.

5         I said the plaintiffs had two arguments as to why

6    there was specific jurisdiction, why there was that

7    purposeful availment.  The first was stream of commerce, and

8    the second is this doctrine called the Calder Effect Doctrine

9    from a Supreme Court case called Calder.  There it is

10   essentially another bootstrapping argument, which is if you

11   expressly aim your conduct at the forum, the tortious conduct

12   at the forum, and the brunt of the harm was felt there, then

13   you can say well, that's another basis to assert -- that

14   helps the court determine whether -- decide if there should

15   be jurisdiction over that entity.  But again, this is just

16   another bootstrapping exercise because they haven't asserted

17   any facts to show that we are involved in any conspiracy that

18   was any conspiracy at all, and certainly no conspiracy aimed

19   expressly at this jurisdiction where the brunt of the harm

20   was felt here, they simply haven't.  They have put it in

21   their brief but, again, as with all of their allegations

22   against us they haven't alleged any facts to support it.

23        Your Honor, we should not be here, and I ask the

24   Court to dismiss the remaining three Leoni entities from this

25   case entirely with prejudice.

1         THE COURT:  Thank you.

2         MR. TUBACH:  Thank you.

3         THE COURT:  All right.  Response?

4         MR. DAVIDOW:  Your Honor, one thing I should

5    mention is that in our reply brief we cited two recent

6    developments within the last week or two, those were an

7    upgrading of the European investigation from an ordinary

8    investigation to what they call a priority investigation -- a

9    priority hearing in the common market against Leoni, and

10   Leoni saying it would cooperate.

11        THE COURT:  Wait a second.  Tell me again what

12   happened.  There was a --

13        MR. DAVIDOW:  Well, I can hand up the piece of

14   paper if you would like to see it.  It is the one noted in

15   our brief.

16        THE COURT:  Okay.  Just --

17        MR. DAVIDOW:  Here is the piece of paper.

18        THE COURT:  Okay.

19        MR. DAVIDOW:  It is an official press release of

20   the European antitrust authority, and it says that they are

21   taking their wire harness investigation to a new level.  I

22   had the benefit when I was with the antitrust division to be

23   loaned to the common market for three months, so I'm familiar

24   generally with what they are doing.  Essentially this kind of

25   hearing was referred to by Mr. Marovitz yesterday.

1    Mr. Marovitz, on behalf of his client, said that there is now

2    what they call a statement of objections, that is this is a

3    formal hearing which begins with a state of objections, we

4    think you have done X, and that his client got a pass, in

5    other words, he said we don't want you any more, but Leoni

6    didn't get a pass, they said we still want you, you are still

7    in for the big show, so that it was exactly the opposite of

8    what happened to Mr. Marovitz's.

9         But to go backwards, the Detroit Automotive News,

10   the Free Press, the Justice Department, everybody else two

11   years ago when the raids came in Detroit said specifically

12   that they were raids coordinated with the E.U., so the

13   original dawn raid on Leoni, which was in the same week as

14   the dawn raids by the FBI in Detroit, were all part of the

15   same enforcement activity, so therefore Leoni two and-a-half

16   years later cannot say that any Government agency has lost

17   interest in them.

18        The question is why should we believe anything has

19   happened in Europe?  Well, if you look back at what else is

20   occurring at the moment, in that same press release and the

21   Bloomberg article that follows, they note that the raid and

22   the priority hearing is against Leoni, it is against S-Y and

23   it is against Yazaki.

24        Now, Yazaki is sort of the world's greatest price

25   fixer, they have been fined $470 million, the second highest

1    fine in the history of the antitrust laws, and it is Yazaki

2    that is being investigated with Leoni concerning whether the

3    two of them conspired on bids for wire harnesses in Europe,

4            Now, in the same period of time, not mentioned by

5    Leoni is that having had a whole series of Japanese

6    indictments the antitrust division indicted a Swedish

7    company, Autoliv, which makes seat belts, and Autoliv pleaded

8    guilty.  So this is a European company indicted for auto

9    parts violation and pleading guilty.  They followed that with

10   TRW Deutschland which makes other products, I think also

11   occupant safety, and TRW Deutschland also pleaded guilty.  So

12   we are now getting a spat of guilty pleas coming out of

13   Europe.

14           We know from the -- in the annual report, the 2011

15   annual report of Leoni, that they make the wire harnesses for

16   Volkswagen, for Nissan cars, for Land Rovers, for Jaguars,

17   for BMWs and for Mercedes.  These are all cars in which the

18   biggest or the second biggest market is going to be United

19   States and Detroit.

20           THE COURT:  And yet they only have about six

21   percent market share?

22           MR. DAVIDOW:  Well, they may have about 18 percent

23   in Europe, they have six percent worldwide but they are

24   primarily in Europe.  As far as we can see, they are one of

25   the three major players in Europe.  So if they sell wire

1    harnesses to all of these major Europeans and they are

2    selling against Yazaki, the question is either they are going

3    to be in bed with Yazaki or they are not.  And the answer is,

4    is this upgrading of the investigation from just looking at

5    the documents to a priority hearing a plus factor sufficient

6    to keep our Twombly motion alive?  And we say absolutely,

7    that we had coordinated U.S. and European investigations

8    resulting two and-a-half years later in a full hearing in

9    front of the commission, which is to start soon, in which

10   some companies like Mr. Marovitz's were given a free pass and

11   Leoni was saying don't go anywhere, you are still in.  So

12   that is where we are for now.

13        THE COURT:  So are you saying that it is basically

14   the fact that this investigation has been upgraded --

15        MR. DAVIDOW:  Yes.

16        THE COURT:  -- is the basis to keep your case alive

17   here?

18        MR. DAVIDOW:  Well, we start the other way around,

19   which is that if Leoni is in general a competitor of Yazaki

20   and Furukawa and if Yazaki and Furukawa plead guilty in

21   indictments which say they pleaded guilty to conspiring with

22   co-conspirators.  Remember there was a comment yesterday

23   about some bilaterals in which Justice said you did one

24   company or one -- with only one co-conspirator.  Both the

25   Furukawa and the Yazaki indictment say companies and

1    co-conspirators so the question is, well, who are the other

2    guys in the world market?  There are only four or five names

3    around.  And the more recent indictments, for instance,

4    TRW Deutschland, if it is fixing prices it is obviously going

5    to be fixing them to people in Deutschland.

6         And the other point we go back to is these cases

7    began when the Japanese started to make their cars here and

8    then the parts companies came here and apparently carried out

9    their traditional way of doing things, which is to whack up

10   the bids in one way or another, but shortly thereafter, and

11   we know it from this announcement, Yazaki, the head price

12   fixer, moved to Europe in two ways; it opened the London and

13   French office to make wire harnesses and bid for them because

14   it wanted European business, and Furukawa started bidding in

15   Europe, and they were bidding against obviously Leoni, so

16   they either had to make peace with Leoni or lose out on the

17   bids.  So we are saying it is an enormous plus factor that

18   out of three or four people in the market when you have

19   guilty pleas by the major people they are bidding against

20   that it is highly probable, and it doesn't have to be highly

21   probable, it has to be plausible.

22        Now, let me turn for a moment to the stream of

23   commerce jurisdiction point.  The Carrier case cites Rita and

24   Turner as saying in international antitrust 12(b)(2) and 12

25   (b)(6) become interdependent.  There is that point, which is

1    our contention, is that Leoni, Furukawa and Yazaki as being

2    investigated in Europe fixed bids on wire harnesses for cars

3    like Volkswagens and Mercedes which were then shipped

4    obviously to Detroit, America, whatever you want to say, and

5    that that creates what we used to call long-arm jurisdiction

6    in Michigan.  That is just as if they sent a motorcycle which

7    had a bad part and exploded on the street in Detroit, you

8    would have tort long-arm jurisdiction.  In this case if it is

9    a price-fixed component of the car which causes the car to

10   cost more to the people of Detroit, of the United States,

11   there is long-arm jurisdiction.

12          And that is not just my theory, Judge Ilston is a

13   very fine judge in California that had a case involving the

14   LCDs that go into computers, and defense motion was made to

15   say, well, leave us alone, we just are Japanese who sell to

16   Japan and somebody else takes it to America, you have no

17   jurisdiction.  And she said of course we do.  You aimed a

18   product, just like in the Asahi case with a bad motorcycle

19   part, we do have jurisdiction.

20          So the point then is if our theory of jurisdiction

21   over Leoni based on the priority investigation, the people

22   they bid against and so on and their guilty pleas, is the

23   selling of these cars which come here containing price-fixed

24   products, if we -- if you decide on the basis of what I have

25   said to find that we meet a plausibility standard and allow

1    us to go to discovery and that discovery shows that Leoni did

2    exactly what we say it did, namely conspired with Yazaki and

3    Furukawa, we will at the moment we establish our merits case

4    establish our long-arm jurisdiction case.

5           So the point of this is the most economical way for

6    you as a judge to handle this is to look first at Twombly.

7    If what I have handed you plus the guilty pleas of the other

8    people they bid against is viewed as enough of a plus and we

9    are allowed to go forward, then you won't know whether we

10   have a 12(b)(2) long-arm thing until you know whether they

11   are guilty.  So at the moment we establish substantive guilt

12   we also would have established long-arm jurisdiction.

13          Now, if we had to establish long-arm jurisdiction

14   starting now we have an obvious fact which is to start with a

15   very misleading statement.  Mr. Steiner puts in an affidavit

16   and said Leoni AG is just a holding company.  You say, wait a

17   minute, the whole wire harness business, the thing that

18   controls the sales, the strategy, who does what, who bids

19   what, is called the wire harness division.  Now, when I

20   learned corporate law if something is called a division it

21   means it is not separately incorporated.  So if wire harness

22   is a division of Leoni AG, it is Leoni.  We don't have to

23   talk about it as an alter ego, it is a division of AG which

24   claims not to be in business but all it is saying is, well --

25   and then we find out who is the head of Leoni, and it is a

1    man called Mr. Layman, and who is the head of wire harness

2    division, well, it happens to be the same guy.  So Leoni's

3    lawyer now says, well, yes, he wears two hats but since he

4    has -- one hat is kind of a general holding company,

5    accounting guy, and one hat to sell wire harnesses, you can't

6    say it is an alter ego because he's wearing a different hat.

7    Well, that's nonsense, simply nonsense.

8            So the immediate answer is Leoni is a unitarian

9    company in the wire harness business, the entire business is

10   run out of Mr. Layman and AG and therefore we would have

11   alter ego now even though we don't need it because we should

12   be -- we think we have easily met the plausibility standard

13   and we should go forward with the merits and the long-arm

14   jurisdiction should await the result -- if we lose the merits

15   we'll lose the long-arm jurisdiction.

16           Thank you very much.

17           THE COURT:  Thank you.

18           MR. TUBACH:  Thank you, Your Honor.  I will be

19   brief.

20           THE COURT:  All right.  Go ahead.

21           MR. TUBACH:  Opposing counsel spent quite a bit of

22   time reciting facts about various things.  We supposedly have

23   an 18 percent market share in Europe, we sell to Mercedes,

24   BMW and others.  None of those facts are anywhere in the

25   complaint.  He's simply standing up here and making it up.

1    It may be true, it may not be true, I'm not saying either

2    way, but you can't get to a hearing on a 12(b)(6) and start

3    adding facts to the record.  He's handing up press releases

4    talking about an upgrade to a European Commission

5    investigation.  Well, that very press release -- and we do

6    object to the introduction of additional evidence outside the

7    fact of the complaint, but it is nothing that is particularly

8    relevant anyway.  The opening as their own evidence suggests

9    here -- I'm quoting, the opening of proceedings means the

10   Commission will treat this case as a matter of priority --

11   whatever that means -- without prejudging the outcome of the

12   investigation.

13        So what exactly does this upgrade tell us?  It

14   tells us exactly nothing.  Even if the European Commission

15   goes forward and files charges against Leoni AG and Leoni AG

16   is found to have done something wrong and admits it did

17   something wrong, we have no idea whether it has anything to

18   do with the U.S. market, no idea, and Mr. Davidow certainly

19   has no basis for alleging that way.  So to claim that now

20   there has been some kind of upgrade recently that that alone

21   justifies keeping Leoni in this case is really not right.

22        He mentioned that Autoliv -- that somehow because

23   European companies have started to be charged that somehow

24   that has something to do with Leoni.  Autoliv is a Swedish

25   company, not a German company, a Swedish company, and they

1    make seat belts.  We don't make seat belts so I don't think

2    that allegation has really -- it is not an allegation, the

3    assertion by counsel gets them anywhere.

4         THE COURT:  What about the argument of the

5    division, you know, that Leoni AG somehow they do what, the

6    advertising and they seem to allege that they do more than

7    that for every Leoni group?

8         MR. TUBACH:  Well, I heard that here today.  I

9    don't think that's accurate, certainly not anything they have

10   put in the record.  Of course, there is a -- there is a

11   separate corporate forum in terms of one part of their

12   business and another part of their business, and one part of

13   their business is wire harnesses, but that doesn't mean that

14   Leoni AG runs everything for every subsidiary.  That's

15   just -- there is nothing in the record to support that and it

16   is not accurate.  The fact that they have centralized

17   research and development doesn't mean that the U.S. entity

18   isn't a separate entity, and he simply asserts without any

19   proof in the record that Leoni AG runs every business itself.

20   It's simply not true.

21        The only thing they have pointed to with respect to

22   Leoni AG that is a fact is that at some point prior to

23   2000 -- or until 2008 at some point one manager at Leoni AG

24   was also the CEO of Leoni Wiring Systems, Inc., that's it.

25   That's not a sufficient basis to say that these -- that all

1  of these different corporate entities have just disregarded

2  the corporate forum and should be treated as one for

3  jurisdictional purposes.  That can't be enough or you would

4  never have any efficiencies in a global enterprise.  A global

5  enterprise has to have consolidated research and development

6  facilities and has to coordinate its marketing efforts and

7  should have one website, not 75 websites, for customers to go

8  look at what it is that Leoni as a company is trying to do,

9  but that doesn't mean that for jurisdictional purposes you

10 get to throw away all of the corporate formality and treat

11 them all as one.  That simply doesn't make sense.  That's not

12 what the cases say, and there is no evidence in the record to

13 suggest that the kind of factors that the Thompson court and

14 that Alexander Associates look at to determine whether or not

15 you can assert alter ego jurisdiction, that any of those

16 factors are present here sufficiently to allow the Court to

17 say I don't care that Leoni AG is a separate entity in

18 Germany from Leoni Wiring Systems, Inc., I'm going to ignore

19 that and treat them all the same.

20          THE COURT:  All right.

21          MR. TUBACH:  Thank you very much.

22          THE COURT:  Thank you very much.  Okay.

23          MR. DAVIDOW:  May I have a moment of rebuttal?

24          THE COURT:  We are into surrebuttal again.  Yes, go

25 ahead, a moment.

1              MR. DAVIDOW:  Well, there were a couple statements

2    made there about what is in the record or not.  The -- there

3    were a number of Leoni briefs, one of them was put in by the

4    direct payors, it had as Exhibit A something one can get off

5    of Google or the Internet, which is the 2011 annual report of

6    Leoni.  I have it in my hand, this is the 2011 report.  First

7    of all, Leoni's lawyer has said that, well, how do you know

8    that they make all of these cars?  Well, I'm going to hand up

9    their annual report.  And secondly, they said, oh, this

10   Mr. Layman, well, four years ago he might have had this

11   position of being the head of Leoni AG and the head of Leoni

12   wire harnesses.  Well, there is a second tab right here and

13   it says in 2011 Mr. Leoni (sic) is both the management board

14   and head of the wire system.  I will hand this up if I can

15   hand it?

16              THE COURT:  We already have it, don't we?

17              MR. DAVIDOW:  It is Exhibit A, and I'm looking at

18   page 7 and page 29.  Page 7 is a chart of the cars they

19   service, the Mercedes and Volkswagen and so on.  Page 29 is

20   the list of who is on the management board and who is the

21   head of the wiring system in 2011.  The statement that he

22   stopped being that in 2008 is just wrong.  Thank you.

23              MR. TUBACH:  15 seconds, Your Honor?  My point

24   about what happened in 2008 had nothing to do with the wiring

25   systems division, it had to do with whether Mr. Layman was

 1    serving on the board of Leoni Wiring Systems, Inc., that's

 2    what the plaintiffs alleged was the basis -- these plaintiffs

 3    allege was the basis to keep -- to assert alter ego

 4    jurisdiction between Leoni AG and Leoni Wiring Systems, Inc.,

 5    that relationship came to an end in 2008.

 6              THE COURT:  All right.  Thank you.

 7              S-Y Systems jurisdiction issues?

 8              MS. STORK:  Yes.

 9              THE COURT:  May I have your appearance, please.

10              MS. STORK:  Good morning.  My name is Anita Stork,

11    I'm with Covington & Burling.  I represent Defendant S-Y

12    Systems Technology Europe GmbH, or hereinafter S-Y Europe for

13    the convenience of the Court.

14              We also have a 12(b)(2) motion to dismiss for lack

15    of personal jurisdiction, and although we did not bring a

16    separate 12(b)(6) motion to dismiss on Twombly grounds we

17    joined in the joint defense motion on those grounds.

18              THE COURT:  Yes.

19              MS. STORK:  Because so much of what the plaintiffs

20    have put in the record -- or tried to put in the record in

21    opposition to the personal jurisdiction motion is actually

22    attempts to try to claim that they have pleaded a viable

23    claim against S-Y Europe.  Some of what I'm talking about

24    will also go to the argument that they are trying to

25    bootstrap jurisdiction onto price-fixing claims which they

1    have utterly failed to make.

2         S-Y Europe has also been dismissed similar to a

3    couple of the Leoni entities by the direct purchasers, so the

4    motion now is addressed to the two indirect purchaser cases,

5    the end payor and automobile dealer cases.

6         Of course, the Court knows the standard for a

7    12(b)(2) motion, which is that the Court can consider sworn

8    facts outside of the face of the complaint, and with its

9    moving papers S-Y Europe submitted a declaration from one of

10   its employees in Europe, Mr. Giroux, and those facts are

11   uncontroverted by anything that the plaintiffs have put in

12   the record.

13        Now, what's in this declaration?  What are the

14   sworn facts that are in the record?  The sworn facts are that

15   S-Y Europe is headquartered in Germany, that S-Y Europe has

16   never, I repeat never, been licensed to do business in the

17   United States, has never been incorporated in the United

18   States and has never had officers in the United States.  They

19   have never had manufacturing or sales facilities either

20   directly or through subsidiaries in the U.S., and S-Y Europe

21   has never had any subsidiaries located in the U.S., and

22   lastly, but certainly not least, S-Y Europe has never, never

23   sold automotive wire harness systems for mass production for

24   automobiles in the United States.  So those are the sworn

25   facts in the record.

 1          Now, what do we have from the plaintiffs in their
 2    opposition?  The plaintiffs submitted an affidavit but it was
 3    an affidavit attaching outside documents, documents that are
 4    created -- that have been created by third parties, and there
 5    is nothing in the affidavit that authenticates the supposed
 6    facts considered within the documents.  So this Court
 7    certainly could be at liberty, we would argue, to consider
 8    everything that is in those -- in the exhibits to the
 9    plaintiffs' affidavit as hearsay.  But even if the Court
10    takes a look at what is there, it certainly doesn't lend any
11    weight to their argument that they have personal
12    jurisdiction, that the Court has personal jurisdiction over
13    S-Y Europe, or certainly that there has been any kind of
14    viable claim stated against S-Y Europe because if you read
15    the plaintiffs' brief, the arguments they make, it really is
16    a bootstrapping argument similar in some way to what
17    Mr. Tubach was talking about in the Leoni situation.  They
18    are trying to bootstrap a claim that they have sufficiently
19    stated a price-fixing claim against S-Y Europe and therefore
20    the Court should exercise jurisdiction, and it is just not
21    the case that they have stated the claim or that that should
22    be the analysis, that is putting the cart before the horse to
23    claim that they have stated a claim against S-Y Europe and
24    therefore there should be jurisdiction.
25          THE COURT:  Has S-Y Europe been involved in pleas

1    and/or raids of any kind?

2         MS. STORK:  Absolutely happy to run through that

3    for you, Your Honor.  S-Y Europe has not been the subject of

4    any pleas.  Plaintiffs have not alleged that they have been

5    the subject of any investigation in the United States.  They,

6    like some other entities, have been -- were the subject of a

7    raid in the E.U., but, again, an investigation does not lend

8    weight to pleading an antitrust claim, and it is particularly

9    more attenuated when the investigation is overseas in Europe.

10   We have the Graphic Processing case, we also have the

11   Elevator antitrust case which clearly states you've got to

12   show some linkage between an investigation in Europe and

13   anything that is going on in the U.S.  You can't simply say

14   because it happened there it happened here, it is not the

15   law.

16        The minimum contacts test, which was just run

17   through, which is the Southern Machine test.  In order for

18   plaintiffs to claim specific jurisdiction over S-Y Europe

19   they have to show, one, that S-Y Europe purposefully availed

20   itself of the privilege of acting in the United States, the

21   cause of action has to arise from the defendant's activities

22   in the forum, and the acts of the defendant or consequences

23   must have substantial enough connection with the forum to

24   make the exercise of jurisdiction reasonable.

25        So let's just take a quick look at what the

1    plaintiffs claim they have put forward that satisfies each

2    one of those elements -- independent elements that have to be

3    met.  As to purposeful availment, plaintiffs claim that and

4    they rely on a press release which is more than ten years old

5    that at the time, and this is ten years ago, that S-Y Europe,

6    which is a joint venture, was created.  There was another

7    joint venture create called S-Y America.  Plaintiffs claim

8    that according to the press release it was thought or perhaps

9    forecast that these two entities, S-Y Europe and S-Y America,

10   might work together on certain projects.  Plaintiffs have no

11   evidence in the record that these two ever communicated and

12   if they did what they talked about, that's simply

13   insufficient to claim that from this press release you can

14   infer that S-Y Europe had contacts with the United States,

15   and, by the way, S-Y America is no longer a defendant in this

16   action.

17        Plaintiffs also have a stream of commerce argument

18   which, again, I think the argument heading is very telling

19   because the plaintiffs claim the argument heading and their

20   argument is that S-Y Europe placed automotive wire harness

21   systems in the stream of commerce after having fixed prices.

22   So, again, they are jumping to the conclusion and just

23   assuming, oh, they fixed prices and, of course, then they

24   must have placed products in the stream of commerce that was

25   targeted at the United States.  It is simply again the wrong

 1    order of analysis.  It can't simply assume that they stated a

 2    claim against S-Y Europe and therefore --

 3              THE COURT:  What do they base their claim in their

 4    complaint on the fixed pricing, how do you fix prices?

 5              MS. STORK:  Well, there again we go back to have

 6    they put anything in the record about the who, what, when or

 7    why or the specifics of what S-Y Europe did or supposedly did

 8    or allegedly did.  What they have are some very generic

 9    non-specific allegations of defendants conspired to inflate

10    prices.  Well, that doesn't tell me if S-Y Europe went to

11    meetings, if they had telephone calls, who they talked to,

12    nothing, nothing in the record on that effect.  I mean, what

13    they are hanging their hats on is the fact of the E.U.

14    investigation and that's largely the sum and substance of it.

15              THE COURT:  Okay.

16              MS. STORK:  I guess I would also add as well too

17    that they have tried to put some things in the record about

18    S-Y Europe's relationship with BMW but, again, there is no

19    allegations -- nothing that has been put in the record to

20    suggest that S-Y Europe has any connection with the pleas

21    because those again were to Japanese car manufacturers, the

22    pleas reference sales to Japanese car manufacturers, and

23    S-Y Europe does not sell to Japanese car manufacturers.

24              I think just on the reasonableness prong, given all

25    of those things it is absolutely unreasonable to try to

1    exercise jurisdiction over S-Y Europe when the uncontroverted

2    facts again are that S-Y Europe doesn't have employees here,

3    it is headquartered in Europe, and has never sold automotive

4    wire harnesses for mass production in the United States.

5           Plaintiffs also try to use a conspiracy theory of

6    jurisdiction and, you know, we submit, Your Honor, that they

7    are far short of the minimum factual support which is needed

8    in order to make a conspiracy theory of jurisdiction fly.

9    And to that end we think that this factual situation is

10   completely on all fours with what the Court faced in

11   Weather Underground and where the Court found that the

12   minimal factual support had not been made in order to use a

13   conspiracy theory of jurisdiction.

14          My last point has to do with jurisdictional

15   discovery.  We are in the same situation, plaintiffs did --

16   as Leoni.  Plaintiffs did not raise any argument that they

17   needed jurisdictional discovery until they lobbed it in with

18   their brief.  At no time did they say during the briefing

19   period we want to depose Mr. Giroux or we need some discovery

20   in order to properly get the facts on the record for the

21   Court to have a factual record which might have included what

22   plaintiffs are now trying to get in through a lot of hearsay

23   exhibits.

24          We don't belong here, S-Y Europe doesn't belong

25   here, and as a foreign defendant and as a foreign-based

1  company under Asahi they really should not have to go through

2  the expensive, time-consuming, burdensome hassle of being a

3  defendant in a U.S. antitrust court.

4        THE COURT:  Let me ask, does S-Y sell wire

5  harnesses for autos that are sent into the United States?

6        MS. STORK:  For purposes of this I would just say

7  they don't sell harnesses into the United States for mass

8  production in the United States.

9        THE COURT:  Who do they sell to?

10        MS. STORK:  They sell to BMW.

11        THE COURT:  Just BMW, but there are a lot of BMWs

12  in the United States?

13        MS. STORK:  Yeah, there are a lot of BMWs, and it

14  may or may not be that some of their harnesses have come into

15  the United States.

16        THE COURT:  Okay.  Thank you.

17        MS. STORK:  Thank you, Your Honor.

18        THE COURT:  Response?

19        MR. BURNS:  Good morning, Your Honor.  Warren Burns

20  with Susman Godfrey.  Today I will be arguing for both the

21  end payors and the dealers.

22        Now, Your Honor, I'm from Dallas, Texas and I would

23  note --

24        THE COURT:  Welcome.

25        MR. BURNS:  -- I have boots, I didn't wear them

1   today because I didn't think it would be necessary and, in

2   fact --

3           THE COURT:  I bet you wish you had them and your

4   gloves when you were outside.

5           MR. BURNS:  I do, I do.  Your Honor, I think it

6   would be useful to ground us in the facts in this case and

7   also with the standards -- the legal standards applicable

8   here.

9           As you are more than aware, our burden in

10  demonstrating personal jurisdiction at this stage is very

11  slight, we have a burden to show a prima facie case in

12  support of jurisdiction, and I believe the well-pled facts as

13  well as the facts we placed forward in the affidavit and in

14  our opposition brief establish and meet that burden in this

15  case.

16          I would like to start briefly on this issue of

17  hearsay touched on by counsel and in their motion.  Counsel

18  would essentially have Your Honor ignore the affidavit placed

19  in our response papers.  Now, in fact, it is crystal clear in

20  the law that once the defendants have submitted an affidavit

21  of their own, we are entitled to submit an affidavit in

22  response.

23          The defendant relies on a case called Almond vs.

24  ABB Industrial Systems, which points out the error in their

25  argument.  In that case there had been jurisdictional

1    discovery which had not been availed of by the plaintiffs,

2    plaintiffs submitted an affidavit which contained hearsay

3    documents, and the court found that no hearsay exceptions

4    were applicable that would permit the documents to come in.

5           That's not the case here.  There has been no

6    jurisdictional discovery, and in this case the document --

7           THE COURT:  You didn't ask for any prior to this

8    personal jurisdiction motion.

9           MR. BURNS:  Yes, Your Honor.  If I may respond to

10   that?

11          Your Honor will recall that there were a series of

12   negotiations between the plaintiffs and the group of

13   defendants on matters touching on discovery that led to the

14   entry of the CMO.  At that time we understood the plaintiffs

15   were clearly opposed to discovery and perhaps we read too

16   much into it but we assumed that that included a position on

17   jurisdictional discovery and that was their position.

18          Now, in point of fact even without -- even without

19   jurisdictional discovery I think we have met our burden in

20   this case.  The documents we have submitted in our affidavit

21   are admissible under the hearsay exception including

22   Rule 807, which is the catchall provision, which requires in

23   part that the documents submitted are in essence the best we

24   can obtain at the time, and that's certainly true and --

25   that's certainly true without full jurisdictional discovery.

 1          Back to the essential facts in this case, Your

 2    Honor, as alleged and pleaded by the indirect purchasers.  As

 3    Your Honor is aware, S-Y Europe was a joint venture between

 4    Continental AG and Yazaki.  It was tasked with being the

 5    strategic lead for the BMW account.  It is undisputed that

 6    Yazaki, S-Y's parent, had pleaded guilty to engaging in a

 7    conspiracy to fix the price of wire harnesses.

 8          It is also undisputed that the June 10th, 2010

 9    European Union -- that on June 10th, 2010 European Union

10    antitrust authorities raided the offices of S-Y and Yazaki on

11    the belief that S-Y and its corporate parent may have

12    participated in a cartel.

13          Now, in our opposition papers we presented as well

14    a statement by Continental AG, S-Y's other corporate parent,

15    which acknowledges the raid and in the same paragraph

16    references internal investigations that may or may not have

17    referred to S-Y's participation in anticompetitive

18    activities.

19          The consolidated amended complaint specifically

20    alleged that S-Y conspired with Yazaki, its corporate parent,

21    and other co-conspirators in fixing the price of wire

22    harnesses.  And the response we hear from the defendants is

23    telling, I believe.  One, there is no express denial of the

24    conspiracy or anticompetitive conduct with respect to these

25    specific allegations, and there is no specific denial of the

```
 1    underlying facts in the affidavit we submitted in our
 2    opposition, particularly with respect and relevant here to
 3    the jurisdictional analysis.  The fact is that S-Y Europe
 4    provides wire harnesses to BMW and that BMW imports tens of
 5    thousands of vehicles into the United States every year.
 6          I will turn to our argument on personal
 7    jurisdiction and start with our argument with respect to
 8    specific personal jurisdiction.  I think the central issue
 9    here in dispute between the parties centers on this
10    purposeful availment prong of the three-part test that was
11    annunciated in Carrier and the numerous other cases.  Under
12    this purposeful availment prong, again, I think we have met
13    our burden.  The problem is satisfied in this case because
14    S-Y provided the wire harnesses to BMW with the knowledge and
15    with the intent that those wire harnesses would travel with
16    BMW's completed automobiles to the United States, would be
17    sold there, and in the context of a price-fixing conspiracy
18    would be sold at anticompetitive prices.
19          Now, here and as we have heard this morning there
20    is no denial of the simple fact that S-Y provides those wire
21    harnesses to BMW.  We saw that there was an affidavit from
22    Dr. Giroux sort of artfully dealing with this issue and
23    stating that there was no export of wire harnesses to the
24    U.S. for mass production here, but as Your Honor questioned
25    this morning and elicited the response, wire harnesses are
```

Motion Hearing • December 6, 2012

58

```
 1   provided to BMW and BMW cars travel to the United States.
 2          Now, we clearly think this satisfies the purposeful
 3   availment arm, and I think there is no credible argument to
 4   the contrary.  To suggest to the contrary that the actions
 5   that S-Y has taken in commerce that lead to the export of its
 6   wire harnesses to the United States does not satisfy the
 7   purposeful availment arm would essentially absolve all auto
 8   parts manufacturers of any liability here in the United
 9   States for participating in a cartel.
10          Now I will turn briefly, Your Honor, to our
11   conspiracy theory of jurisdiction.  I won't spend a lot of
12   time here because I think frankly we have met our burden with
13   respect to specific jurisdiction, but here I will say that
14   under the conspiracy theory we have met the basic elements
15   there.  We have established from a pleading standpoint S-Y's
16   participation in the conspiracy, the participation with its
17   corporate parent, the participation with other
18   co-conspirators as evidenced by the EU raids.
19          THE COURT:  But you don't allege who those other
20   co-conspirators are.
21          MR. BURNS:  Well, I think our complaints, Your
22   Honor, specifically reference Leoni, for example, they
23   reference various wire harness manufacturers, so in the
24   context of this overarching conspiracy that we have alleged I
25   think we have pleaded specifically numerous other
```

1    co-conspirators.  Now, is it possible there are other

2    non-named co-conspirators, that is possible, Your Honor.

3              So finally, Your Honor, I will close by saying that

4    should Your Honor not be satisfied with the showing we have

5    made thus far we would ask for limited jurisdictional

6    discovery going forward.

7              THE COURT:  What do you propose if you got

8    discovery, what would you be looking for?

9              MR. BURNS:  Well, Your Honor, I think we would

10   certainly focus on the facts establishing purposeful

11   availment, we would want to know more about S-Y's

12   relationship with BMW, the amount of commerce it flows into

13   the United States, S-Y's intentions with respect to that

14   commerce.  We would also want to know -- or we would also

15   want discovery relating to disputed facts about S-Y's

16   relationship with S-Y America, with Yazaki, all of those

17   facts have been thrown into contention here.

18             Obviously it is within your discretion, Your Honor,

19   but we feel that discretion is warranted here given the

20   disputed facts in this case.

21             THE COURT:  Okay.

22             MR. BURNS:  Thank you, Your Honor.

23             MS. STORK:  Short rebuttal?

24             THE COURT:  Yes.

25             MS. STORK:  First of all, as to counsel's statement

1    that they have alleged that S-Y Europe conspired with its

2    parent, which is Yazaki, there is absolutely nothing in the

3    complaint that supports any allegation that the corporate

4    forum has been ignored, and there is no specifics at all

5    about any types of meetings or agreements or exchange of

6    information between Yazaki and S-Y Europe, so there's simply

7    nothing in the complaint to support that corporate forum has

8    been ignored or that there is specifics of meetings between

9    Yazaki, there's certainly not specifics of meetings or

10   agreements or whatever with --

11            THE COURT:  That's what I was getting at before, we

12   have the overarching conspiracy theory but we don't have any

13   specifics?

14            MS. STORK:  Right.  Thank you, Your Honor.

15            THE COURT:  All right.  Thank you very much.  Thank

16   you.

17            All right.  Now we will go into the collective

18   motions for the end payors and automotive dealers.

19            MS. SULLIVAN:  Good morning.  My name is

20   Maggie Sullivan of Latham & Watkins representing the Sumitomo

21   defendants.

22            I will be arguing the Twombly standing and briefly

23   the injunctive relief portions of the collective motion to

24   dismiss the indirect purchasers' complaints, and then

25   Ms. Fischer from Jones Day will be arguing the state specific

 1    arguments.

 2            THE COURT:  Wait a minute, go back because you were

 3    going kind of fast.  Ms. Sullivan, you represent

 4    which --

 5            MS. SULLIVAN:  The Sumitomo defendants.

 6            THE COURT:  Sumitomo.

 7            MS. SULLIVAN:  But I'm speaking on behalf of all

 8    the defendants for this argument.

 9            THE COURT:  Okay.

10            MS. SULLIVAN:  Your Honor, I'm not going to stand

11    up here and tell you that none of these defendants did

12    anything wrong, clearly some did.  I'm also not going to tell

13    you that none of these defendants should ever have to defend

14    themselves in a civil case or make restitution to any parties

15    that it may have harmed, but not this case and not these

16    plaintiffs.

17            The indirect purchasers that have brought these

18    claims are not the proper party.  The very nature of a class

19    action is that it is a claim that a group of people were

20    suffered -- or suffered injury that was generalized in

21    nature, and that's what the plaintiffs assert here, that car

22    dealers all around America and every person who purchased a

23    car in 23 states over a ten-year period was injured by the

24    defendants' conduct, but there is a big difference between

25    targeted behavior and generalized behavior and there is a big

1   difference between a potential claim by an OEM that might

2   allege that its injury was direct and foreseeable because it

3   paid an artificially inflated price for a wire harness or a

4   connecter or an ECU and a claim that that injury translates

5   into millions of people downstream from that sale paying more

6   for entirely different products that contain thousands of

7   other components.

8          Targeted versus generalized behavior, direct

9   effects versus remote indirect effects.  The defendants are

10  entitled to have those essential differences be part of this

11  dialogue as we are discussing the scope and contours of this

12  case, and that's why we have brought this motion.  The

13  question that this Court must decide is whether these

14  plaintiffs have sufficiently and plausibly alleged that they

15  were injured because of any defendant's conduct, and the

16  answer is that they have not done so.

17         Now, we have made a number of different arguments

18  in our motion and some apply to different portions of the

19  indirect purchasers and different claims so I have handed up

20  a slide deck that looks like this, a blue cover.

21         THE COURT:  Okay.

22         MS. SULLIVAN:  The first slide there is a clarity

23  that just breaks out our claims -- our argument -- what the

24  argument is and then who it applies to and what the result

25  should be.  I'm going to be focusing on, as I said, the

1    Twombly argument and the standing arguments, and then briefly

2    the injunctive relief argument.

3          I will just touch on Twombly briefly because it was

4    covered a lot yesterday so I won't spend a ton of time on it.

5    The indirect purchasers' complaint fail for the same reasons

6    as the direct purchasers' complaint; they don't state facts

7    that support the broad industry-wide conspiracy that they

8    have alleged, but there are additional deficiencies with the

9    indirect purchasers' complaint because they are in a

10   different position than the directs.  Because they are

11   indirect purchasers to claim an injury they have to

12   establish plausibly -- they have to plausibly allege that any

13   overcharge that an OEM paid for a wire harness or a connecter

14   or an ECU was passed through the chain of distribution to

15   them.

16         Now, yesterday Your Honor asked what the term

17   plausible means, and I agree with Mr. Cherry and Mr. Cooper

18   who said that it is something more than speculative, it is

19   something more than possible, but the way I think about it is

20   does this make sense?  Does this all make sense?  When you

21   look at all of their allegations as a whole does it make

22   sense based on the facts that they have alleged that these

23   plaintiffs were injured by any defendant's conduct?  And to

24   answer that question there are two categories of information

25   that we would need to know.  We would need to know, first,

 1   what these indirect purchasers bought and from whom and

 2   because they have asserted state law claims from where, and

 3   then we would also need to know -- we would need to see facts

 4   that plausibly link the claim that they paid more for the

 5   product that they purchased because of the defendants'

 6   conduct, and none of that information is in either of these

 7   complaints.

 8        First, who bought what?  The auto dealers appear to

 9   allege that they bought both wire harnesses and related

10   products and also cars.  The end payors don't differentiate

11   really, they just say they bought wire harnesses and related

12   parts so they don't say whether they bought them as

13   stand-alone parts in the aftermarket or whether they just

14   bought just cars that had wire harnesses in them.

15        With respect to the replacement part allegation,

16   there is not a single factual allegation in either complaint

17   about the aftermarket for any of these parts, not a single

18   allegation.  There is nothing about conduct relating to the

19   aftermarket, there is nothing about how the RFQs specific

20   conduct that the pleas describe and that their complaint

21   describes relates at all to prices in the aftermarket or

22   anything about how pricing works in the aftermarket at all,

23   so they have not plausibly alleged that either any defendant

24   conspired with respect to any product in the aftermarket or

25   that these plaintiffs that they were harmed by any such

1    conduct, it is just not there.

2         So we will turn to the allegation about cars, the

3    purchases of cars.

4         THE COURT:  But would it be plausible that they

5    would in the aftermarket sell for less than what they -- the

6    price they charged the OEMs?

7         MS. SULLIVAN:  Well, Your Honor, I think there are

8    so many things that would go into how prices are charged in

9    the aftermarket that we can't conclude that one way or

10   another.  It is possible that they might charge prices that

11   are related to the prices that they charged the OEMs, but it

12   also might be possible that they would charge significantly

13   higher prices because remember how this works, what they

14   allege in their complaint is that wire harnesses are

15   especially designed for a particular car model, and once a

16   supplier -- or once an OEM chooses a supplier, that supplier

17   has the business for the entire life of the vehicle, so for a

18   four- to six-year contract for the vehicle.  So if there are

19   replacement parts that need to be made for that vehicle there

20   is a single OEM or a single wire harness manufacturer that

21   produces those replacement parts.  There is no competition at

22   that point, they are a sole supplier to the OEM for that

23   model, and so it is plausible or possible that the prices

24   that are charged in the aftermarket are higher for a

25   completely unrelated reason and not tied at all to the prices

1    charged to OEMs.

2         So turning to the claim that they've paid more for

3    their cars, they don't allege what make or models they bought

4    and that information here is really important because of the

5    guilty pleas that they rely so heavily on.  If you will just

6    go a couple of slides ahead, I'm jumping a little bit out of

7    order here, but we have a slide that is page 4 that is titled

8    guilty pleas do not support the broad conspiracy IPPs allege.

9    This is very similar to the slide that Mr. Cooper used

10   yesterday, but I have highlighted a couple of the pieces of

11   information from the pleas that are particularly relevant to

12   the indirect purchasers, and that's in -- if you look at the

13   target column you can see that several of the defendants pled

14   guilty to targeting an automotive manufacturer.  And then if

15   you look at the individuals who pled guilty you can see that

16   the sales departments that they worked in were Honda, Toyota

17   and Subaru.

18        So we don't know which cars the plaintiffs bought

19   here so it is not plausible that a person who bought let's

20   say a Chevy was necessarily impacted by any of the

21   defendants' behavior that they pled guilty to.  It may be

22   possible, again, but it is not plausible.  They haven't

23   alleged what they bought and from whom so it is impossible to

24   reasonably infer that they, in fact, were injured.

25        And then the second piece of information that I

1    mentioned that we would need to see in the complaints for

2    these injury claims to make sense are facts that link the

3    defendants' conduct to the prices that these plaintiffs paid,

4    and that brings me to standing.  Your Honor, any claimant can

5    conjure a damage claim for any possible injury that could

6    conceivably be traced to unlawful conduct however remote and

7    however speculative, but there are limits to who can actually

8    maintain these claims.  Both Article 3 and the antitrust laws

9    require a causal connection between the defendants' alleged

10   conduct and the injury, and there is zero connection here.

11   Again, as I noted, because these are indirect purchasers they

12   are a couple steps removed -- several steps removed depending

13   on who they purchased from and what they purchased from the

14   wire harness manufacturers and so they have to establish that

15   causal connection, it is particularly important for these

16   plaintiffs' claims.

17           So, again, I would like you to -- I would ask you

18   to look at the replacement part purchases first and then

19   we'll turn to the cars because the analysis is slightly

20   different but the result is the same.  In either case they

21   haven't plausibly alleged they were injured because of the

22   defendants' conduct.

23           Regarding replacement parts, as I noted, they

24   haven't alleged what they bought but even if they all bought

25   replacement parts they haven't alleged facts that plausibly

1    suggest that the injury is traceable to defendants' conduct.

2    They have to allege each of these elements of standing in the

3    same manner as any other matter on which the plaintiff bears

4    the burden of proof and with the manner and degree of

5    evidence required at the successive stages of the pleading.

6    That's the standard in Lujan.  And, of course, Twombly says

7    you have to allege enough facts to state a claim for relief

8    that is plausible on its face.  You have to read those two

9    opinions together, which is what the Sixth Circuit did in

10   Brown v. Matauszak, and Judge Borman just recently did in

11   Packaged Ice when he was analyzing whether plaintiffs had

12   established Article 3 standing, and he said there was simply

13   not enough factual matter asserted regarding injury that was

14   allegedly suffered, in that case it was limited to the

15   particular states, but he said to plausibly suggest a viable

16   claim.

17           And to the extent that the Court has any concern

18   that this is the proper standard to apply, the First Circuit,

19   the Eighth Circuit, the Ninth Circuit and district courts in

20   the Third, Fourth, Fifth and Sixth Circuits have all adopted

21   this standard, this higher pleading standard, to establish

22   the elements of article 2 since Twombly.

23           Now, as I noted, these plaintiffs complain about

24   price fixing at the initial RFQ stage when an OEM requests a

25   quote from a wire harness manufacturer and the wire harness

1    is designed for a particular car model.  Because there are no

2    allegations at all about how prices submitted to that OEM

3    then relate at all to the aftermarket they easily fail to

4    establish Article 3 standing for the aftermarket claims.

5          So, again, now turning back to the claim that they

6    paid more for cars, there are two sets of indirect purchasers

7    and they are situated somewhat differently and I will get to

8    the difference, but before I do that I want to talk about the

9    similarity, which is the allegation that they paid more for

10   cars because the defendants fixed prices on wire harnesses.

11   Neither complaint alleges any facts that enables this Court

12   to reasonably infer that there was a causal link between any

13   defendant's conduct on wire harnesses and the prices the

14   plaintiffs paid for cars, and that conclusion is not

15   plausible given the products that we are talking about here.

16         As Your Honor noted during one of our earlier

17   status conferences, a car contains ten more -- more than

18   10,000 components, I think you said maybe 13,000 components,

19   and plaintiffs don't address that at all, they don't address

20   the engine or the chassis or the transmission or how any of

21   those other components might relate to the cost of a car or

22   how a wire harness or an ECU or a connecter or any of the --

23         THE COURT:  We have no information as I have been

24   looking for from the beginning and there is nothing in the

25   complaint about the cost of wire harnesses or even the

1    percentage in relationship to other parts.  You know, it is

2    major?  Is it more than an engine?  I don't assume so but

3    whatever, there is nothing like that.

4         MS. SULLIVAN:  That's correct, Your Honor, and

5    that's critical, that's critical here because the auto

6    dealers know exactly how much these things cost, right, and

7    the individuals to the extent that the end payors actually

8    bought replacement parts they know how much these things

9    cost, but none of that is in the complaint.

10         THE COURT:  Well, the plaintiff wouldn't know how

11    much these things cost.

12         MS. SULLIVAN:  Well, he or she would know how much

13    he or she paid if the person bought a replacement part.

14         THE COURT:  Well, replacement part might be more,

15    they would know what they paid but they would only know what

16    they paid for that part as opposed to in relationship to

17    other parts in the car.

18         MS. SULLIVAN:  That's correct.

19         THE COURT:  An individual car purchaser doesn't

20    know how much the wire harness accounts for the cost of the

21    car.

22         MS. SULLIVAN:  That's correct but you would get

23    some sense of the relationship -- for example, if you learned

24    or if there was an allegation that a person bought an ECU and

25    an ECU cost $50 that gives you some indication of the

1    relationship between the cost of an ECU and the cost of a

2    car.  Now, of course, the specific manufacturing cost but you

3    get a general sense of what the relationship is, and here

4    there is zero, there is nothing about that and that's

5    important because the only allegation that they have that

6    ties the wire harness prices to the prices they paid arguably

7    is that the wire harness can be physically traced, the actual

8    product itself can be physically traced through the chain of

9    distribution, and they conclude from that that the cost of

10   the wire harness can also be physically traced but that's not

11   plausible.  There is -- without more, that is not plausible

12   without more.  The ability to trace a physical product is

13   entirely different from tracing an overcharge on the product.

14   It would only be plausible if, as Your Honor noted, there

15   were some allegations that indicated that the cost of the

16   component was a significant portion of the cost of the end

17   product, and actually that is the trend in these kind of

18   cases.

19          Your Honor, we have read every single indirect

20   purchaser case that exists and we have tried to synthesize

21   them and understand what is going on in these cases.  And if

22   you will turn to slide two in the little packet there is a

23   slide that has green and red, I call this the spectrum slide.

24   The title is no standing when component cost is small portion

25   of end product cost.  And what this slide shows is that as a

1    general matter, particularly over the past four years since

2    Twombly and Iqbal, courts find standing when a component is a

3    significant portion of the cost of the end product but not

4    when it is an insignificant portion of the cost or when there

5    are no allegations at all as we have in this case.

6         I won't go through every single one of these cases

7    but I did want to highlight a few of them.  On the standing

8    portion of it, Flash, the NAND Flash Memory case, LCD and GPU

9    are all very similar cases.  In all three the component was

10   alleged to be a substantial amount of the cost of the end

11   product.  And in Flash, in fact, the plaintiffs limited their

12   claims to products in which NAND Flash Memory was a

13   substantial component, for example, flash memory cards and

14   USB flash drives.  They didn't even include other products.

15        In GPU the court was swayed by the fact that when a

16   consumer is buying a computer it buys the computer in part

17   based on the specific characteristic of the GPU, whether it

18   is a fast GPU or a slow GPU or other types of performance

19   characteristics, and also a GPU is a separate line item on a

20   computer invoice and, of course, a significant cost component

21   in a computer's price.

22        If you go down to the other end of the spectrum, I

23   want to highlight a couple.  Magnesium is on there twice

24   because in the first decision there were no cost allegations

25   at all as we have in this case, and the court held that it

```
 1    couldn't determine whether there was a sufficient nexus
 2    between the defendant's alleged conduct and the plaintiff's
 3    alleged injury.  The court noted that trace amounts of an
 4    ingredient in an end product would not have a foreseeable
 5    effect on the price of the end product but a major ingredient
 6    might, and so the court allowed the plaintiffs to amend their
 7    complaint, and they did, and in their amended complaint they
 8    stated that they bought cattle feed and mineral pacts and
 9    that magnesium was four percent of those products.  The court
10    held in the second Magnesium decision that that wasn't
11    enough, that it wasn't foreseeable that purchasers of cattle
12    feed or mineral pacts that only contain four percent of
13    magnesium would be injured by a conspiracy to fix the price
14    of the Magnesium.
15            Another one to highlight on this slide is the
16    Insulation case, that's the Von Der Werth v. John Manville
17    case out of the Northern District of Georgia (sic).  In that
18    case Judge Carnes held that purchasers of homes did not have
19    standing to sue for price fixing on insulation.  She noted
20    that they did not participate in the insulation market, that
21    there were no allegations that insulation was an integral
22    component of a home or a selling point of a home, and that
23    houses contain lots of other components that all have an
24    impact on the price that a person pays for a home and so the
25    allegation was too indirect.  That's exactly what we have
```

Motion Hearing • December 6, 2012

1    here, Your Honor.

2         Now the plaintiffs I'm sure will come up and they

3    will refer to some cases in which courts did find standing

4    based on the types of conclusory boilerplate allegations that

5    they have here but all of those cases were before Twombly

6    with the exception of one, and that's the Intel case, but the

7    Intel case was decided after Twombly but before Iqbal, and

8    the court in the Intel case relied on or used the old Iqbal

9    standard so the court said we are going to use the Second

10   Circuit's flexible plausibility standard and not pay so much

11   attention to this new Twombly decision that has just come

12   out.  And so then the Supreme Court ruled in Iqbal that that

13   was not the proper standard to apply and that the Twombly

14   standard was what the court needed to apply in all civil

15   cases.

16        Because neither group of plaintiffs here allege

17   anything at all about the relationship between a wire harness

18   price or a component -- I'm sorry, a connecter or an ECU or a

19   junction box or a fuse box or any of the products that they

20   are basing their claims on, any relationship between those

21   products and the price they pay for their cars they have

22   failed to establish Article 3 and antitrust standing.

23        And then the end payors have two additional

24   fundamental problems with their claims.  First, they are at

25   the very bottom of the distribution chain here and they don't

1    allege that any party above them actually passed on any

2    overcharge or any portion of any overcharge that it may have

3    paid, and they can't do that because the auto dealers who are

4    above them in the chain of distribution claim that they

5    absorbed a significant portion of any overcharge that they

6    might have paid.  That's in paragraph 214 of the auto

7    dealers' complaint and 215 of their complaint.  They

8    expressly state they did not pass on all of the overcharges.

9         Now, of course, as I have explained, the dealers

10   themselves don't allege sufficient facts to support their

11   claim that they had to pay an overcharge but even if they had

12   they say that they didn't pass it all through.  Did they pass

13   any of it through?  The end payors don't say, they don't make

14   that allegation.

15        But even if an auto dealer did take some portion of

16   an overcharge into account when it set a sticker price for a

17   car, the second fundamental problem that the end payors have

18   with their claims is that the price that people, you and I

19   when we buy a car, it is negotiated, that price is

20   negotiated.  Two people who go into the same dealer on the

21   same day and buy the same car pay different prices, and those

22   negotiations are impacted by things like whether you have a

23   trade-in, if you have a trade-in what's the value of your

24   trade-in, are there rebates being offered or special

25   discounts, is there a rebate being offered across the street

1    that might be better that you use to bargain for a better

2    price?  Are there cash incentives or reduced financing rates

3    or free upgrades?  It just is not plausible based on the

4    facts that these plaintiffs have alleged that the prices the

5    end payors paid were affected in any way by the defendants'

6    conduct.

7              Now, it is important to understand that these

8    deficiencies, everything I have just been talking about, they

9    are fatal regardless of whether Associated General

10   Contractors applies to the standing claims here -- or to the

11   state law claims here.  There are four ways that courts

12   approach the antitrust standing analysis.  One, they apply

13   the AGC five-factor test.  Two, they use ACG as a guide and

14   they don't necessarily apply the factors stringently but they

15   use ACG as a guide.  Three, they apply a modified version of

16   AGC which might use three of the factors or four of the

17   factors.  And four, some courts don't apply AGC at all but

18   they look to common law concepts of foreseeability, proximate

19   cause, remoteness and the relationship between the injury and

20   the purpose of the antitrust laws.  All four of these

21   approaches take causation and the remoteness of the injury

22   into account.  These concepts are fundamental to antitrust

23   standing because the antitrust laws weren't designed to allow

24   anyone who could conceivably come up with a claim to pursue

25   it and then recover treble damages.  The antitrust injury

1    requirement imposes limits on who can bring claims under both

2    state and federal law.  So for all of these reasons,

3    whichever approach Your Honor decides to take here, the

4    component part purchases, the indirect purchasers who bought

5    cars, do not have standing.

6         I would like to shift gears a little bit now and

7    talk about standing to assert claims in states for which they

8    are not residents.

9         THE COURT:  All right.

10        MS. SULLIVAN:  Judge Borman's decision in Packaged

11   Ice and Judge Cox's recent decision in Refrigerant

12   Compressors are both thoughtful and well-reasoned opinions on

13   this issue and so I would encourage the Court to apply the

14   same reasoning here.  The states that are at issue for the

15   auto dealers are Hawaii, Maine, Montana, North Dakota,

16   South Carolina and Vermont; and for the end payors,

17   Washington, D.C.

18        South Carolina and Vermont require explicitly that

19   the residents of those states be affected by the alleged

20   conduct.  Vermont doesn't state that explicitly in its

21   statute but the Supreme Court of Vermont has held that the

22   legislative history of this statute makes clear that the

23   statute was enacted to protect Vermont's citizens but there

24   are no allegations at all that suggest that any residents of

25   any of those three states were affected here.

1          For the other states the point here is not really

2    that they don't have any residents who are named plaintiffs

3    but that they haven't alleged any facts at all that link

4    their alleged injuries to the state's cause of action.  All

5    of those states require that the effect be felt in the state.

6    As the plaintiffs point out, they provide a claim for any

7    person, that's true, but it is any person who was injured by

8    the conduct made unlawful by the statute, and the conduct

9    that each statute prohibits must have some connection to the

10   state.  Hawaii, Maine and Washington, D.C. all have the same

11   language; a contract, combination or conspiracy between two

12   or more persons in restraint of or to monopolize trade or

13   commerce, any part of which is in this state, is unlawful.

14          THE COURT:  So if they bought their car in that

15   state wouldn't they have the effect -- if what plaintiff says

16   is true the effect in that state?

17          MS. SULLIVAN:  They would but they haven't alleged

18   that.  They haven't alleged where they bought anything so we

19   have no idea.  The key is that they, as you pointed out, they

20   don't necessarily have to reside in the states but they do

21   have to allege some connection and they haven't.  They make

22   these conclusory allegations that the defendants' conduct was

23   directed at wire harnesses -- I'm sorry, at the wire harness

24   market in all states and had an effect throughout all of the

25   states, and those claims aren't enough.  Judge Borman

Motion Hearing • December 6, 2012

**79**

1   recently found in Packaged Ice that similar types of

2   conclusory allegations did not establish Article 3 standing

3   to sue under state law when you didn't have some real

4   connection, some factual allegations that drew a connection

5   to the state.

6         The end payors' claim regarding D.C., they allege

7   that price competition in Washington, D.C. was restrained and

8   that the prices for wire harnesses were raised in D.C., but

9   they actually don't allege that any named plaintiff purchased

10  wire harnesses or any product in D.C. at artificially high

11  prices.  So, again, the same reason they haven't alleged any

12  connection at all to Washington, D.C.

13        I anticipate that the plaintiffs will get up here

14  and they will say, Your Honor, you don't need to decide this

15  issue now because these are really class questions and so

16  just push it off until class certification.  There is a split

17  in the circuits on this question of whether you can push off

18  the question of Article 3 standing for these -- on these

19  state claims until after class certification.  The

20  Sixth Circuit has not ruled the way plaintiffs assert that

21  they have.

22        In the Sixth Circuit in the Fallick case the court

23  specifically stated that the threshold individual standing is

24  a prerequisite for all actions including cost actions, and

25  that a potential class representative must demonstrate

 1    individual standing vis-á-vis the defendant.  He cannot

 2    acquire such standing merely by virtue of bringing a class

 3    action.  That's at page 423 of that decision.

 4         In that case once the plaintiff had established

 5    that he had standing to bring each of his claims then the

 6    court said you don't need to look to see if he has standing

 7    then to assert claims on behalf of class members, but here

 8    the point is that these plaintiffs have not established that

 9    they have standing to assert the state law claims that they

10    are asserting.  They have to establish standing for every

11    single claim and they haven't done that.

12         Then finally just a brief note about injunctive

13    relief.  They haven't established standing to bring their

14    injunctive relief claim for two reasons.  First, really for

15    the same reasons that their damages claim fails, that they

16    haven't established antitrust injury, they can't get an

17    injunction against a threatened injury for which they

18    wouldn't be able to entity -- or they wouldn't be able to

19    recover compensation if the injury had actually occurred.

20    And then second, they don't allege any facts to plausibly

21    suggest that there is any future threat of injury here.  As

22    we have talked about for the past two days, the

23    investigations that generated all of this began in February

24    of 2010, and there are a number of guilty pleas and there is

25    just no allegation at all that plausibly suggest that in the

```
 1    face of Government investigations and with guilty pleas out
 2    there that any of these defendants are continuing to engage
 3    in any kind of unlawful conduct.
 4              THE COURT:  Okay.
 5              MS. SULLIVAN:  Thank you.
 6              THE COURT:  Thank you.
 7              MS. FISCHER:  Good morning, Your Honor.
 8    Michelle Fischer from Jones Day on behalf of the defendants
 9    for the remaining state law arguments.
10              THE COURT:  All right.
11              MS. FISCHER:  Plaintiffs have alleged --
12              THE COURT:  I have to say that this is the first
13    time I have dealt with all of these different state laws.
14    They are absolutely mind boggling.
15              MS. FISCHER:  Yes, they are.
16              THE COURT:  I thought they were going to be able to
17    be categorized in certain -- I was just --
18              MS. FISCHER:  My colleagues told me I drew the
19    short straw.
20              Plaintiffs have raised antitrust claims under the
21    laws of 25 states, consumer protection claims under the laws
22    of 14 states, and unjust enrichment claims in 32 states.
23    Each of these state laws has specific elements and pleading
24    requirements, and plaintiffs' complaints fall far short of
25    many of them for the reasons that we detailed in our briefs
```

1    and that we briefly summarize on page 5 of the handout that

2    you have in front of you from Ms. Sullivan.

3           Although the other brief discusses these numerous

4    deficiencies in great detail, in the limited time I have

5    today I would like to highlight a few of the deficiencies in

6    their complaint and in their claims to show you why those

7    claims fail and why they cannot be fixed.

8           I would like to turn first to the auto dealers'

9    lack of standing to bring consumer protection claims in three

10   states; Missouri, Montana and Massachusetts.  The consumer

11   protection laws in Missouri and Montana clearly permit only

12   persons or consumers who purchased or leased goods, quote,

13   primarily for personal, family or household purposes to bring

14   a claim.  Auto dealers expressly plead in paragraphs 50 to 51

15   and 68 to 69 that they bought wire harnesses and the other

16   products for, quote, their repair and service businesses.

17          They cite not a single Missouri or Montana case

18   even suggesting that businesses like them who made their

19   purchases for commercial purposes have a right to bring

20   claims under these statutes and, in fact, even the inapposite

21   cases that they cite construing Michigan law make clear

22   that -- make clear and they cite them through frankly

23   creative and truncated quotation that those -- they make

24   clear that there is a distinction between persons who buy

25   goods as true intermediaries or conduits who buy them purely

1   to pass them along for somebody else's personal use from

2   those who, like auto dealers buy the goods, quote,

3   principally so that they can themselves engage in their own

4   business or commercial enterprise. Auto dealers are

5   businesses, they have no standing, they cannot fix that on

6   amendment.

7         Now, the situation is similar in Massachusetts. As

8   businesses auto dealers must bring their claims under section

9   11 of the Massachusetts consumer protection law. Section 11

10   expressly states that it must be construed consistently with

11   Massachusetts Antitrust Act. That act denies indirect

12   purchasers a right of action. They don't dispute that they

13   can't bring a claim under the Massachusetts Antitrust Act and

14   significantly they do not allege, either end payors or auto

15   dealers, they do not allege a claim under the Massachusetts

16   Antitrust Act. And once again, even the case on which they

17   seek to rely, Ciardi vs. Hoffmann-LaRoche, makes clear that

18   claims under section 11 are to be guided by interpretation of

19   the Massachusetts Antitrust Act, quote, and by association

20   Illinois Brick. They are indirect purchasers, they have no

21   standing under section 11, they can't fix that on amendment.

22   Their claims should be dismissed.

23         Next I want to turn to their class action claims

24   again under three laws, under the Illinois Antitrust Act and

25   the consumer protection laws of Montana and South Carolina.

1    Auto dealers bring claims under all three.  End payors bring

2    claims only under Montana law.

3            As you can see from the left-hand column of page 6

4    of your handout --

5            THE COURT:  Wait a minute.

6            MS. FISCHER:  -- each of these states' laws contain

7    an express ban on class actions.

8            Now plaintiffs argue that the Supreme Court's

9    decision in Shady Grove somehow changes this.  It absolutely

10   does not.  Shady Grove is not a blanket ban on enforcing

11   class action bars in diversity actions.  Rather, Shady Grove

12   says that a state procedural rule as opposed to say a rule

13   that might be procedural in title but substantive in

14   application would be displaced by federal procedural rules in

15   diversity actions.  But where, however, a state procedural

16   rule is, quote, so intertwined with a state right or remedy

17   that it functions to define the scope of the state-created

18   right the state rule will continue to govern.  In other

19   words, as this court found in Packaged Ice and as many other

20   courts both within this circuit and in others have found,

21   statutory restrictions on class actions which appear in the

22   very statutes that define the substantive rights at issue

23   survive Shady Grove.

24           So as you can see from this slide, unlike the

25   New York statute at issue in Shady Grove, which is shown in

1    the right-hand column, that is exactly what the statutes at

2    issue here do, they define and limit the rights within the

3    very same statute.   In New York there was a separate

4    procedural statute and a substantive statute, and the

5    procedural bar, the class action bar, applied to many, many

6    different causes of action.   Here the class action bar

7    applies only to an antitrust cause of action or a consumer

8    protection cause of action.   For that reason courts faced

9    with this very issue on motions to dismiss have specifically

10   found that the Illinois antitrust class action bar and others

11   like it survive Shady Grove and have therefore dismissed

12   class action claims as being statutory barred.

13          In Re: Wellbutrin and In Re: Digital Music, both

14   specifically found that the Illinois act class action bar

15   survived, and this court in Packaged Ice, although dismissing

16   the Montana claim on other grounds, did say that after

17   Shady Grove class actions would likely continue to be -- to

18   be barred in federal court under the Montana Unfair Trade

19   Practices Act.

20          The South Carolina statute, as you can see, is of

21   exactly the same nature and the same exact argument applies

22   to South Carolina.   All of these claims are statutory barred

23   and they cannot be fixed on amendment.

24          Now I would like to turn globally to the

25   plaintiffs' unjust enrichment claims.   Plaintiffs conceded in

1    their opposition that their unjust enrichment claims are

2    based on the same facts as their underlying state antitrust

3    claim.  In so doing they clarified and conceded they are not

4    seeking to bring what are called autonomous or freestanding

5    unjust enrichment claims, those are claims that exist

6    independent of an underlying act.  Instead, plaintiffs have

7    brought here what are called parasitic unjust enrichment

8    claims.  These are claims that merely provide an alternative

9    form of remedy for the plaintiffs' underlying predicate act,

10   in this case either an antitrust claim or a consumer

11   protection claim or both in a given state.  That means that

12   their unjust enrichment claims rise or fall with the

13   underlying antitrust or consumer protection claims to which

14   they are tethered in the first instance.  That's the first

15   in Creek.

16          What that means as well though is that if this

17   Court finds that there is, for example, only an antitrust in

18   a given state and that that claim fails for the reasons that

19   either Ms. Sullivan or state-specific reasons discussed in

20   our briefs, you don't even have to get to an unjust

21   enrichment analysis because if the underlying claim fails so

22   too does the unjust enrichment claim because they are

23   parasitic.  But even assuming that a given state the

24   underlying claim or claims survive, the unjust enrichment

25   claim may well be deficient in its own right, and the vast

 1    majority of plaintiffs' unjust enrichment claims are.  They

 2    have made no effort whatsoever to tailor their claim to any

 3    specific state.  Instead they make this omnibus claim that

 4    the defendants' conduct has violated the unjust enrichment

 5    claims -- the unjust enrichment laws in 32 states.  That

 6    approach dooms their unjust enrichment claim in virtually

 7    every state, not every state but virtually every state in

 8    which they bring them, at least under a proper unjust

 9    enrichment claims analysis.

10           We've laid out the unjust enrichment analysis on

11    the next page of your handout.  This is the analysis that

12    defendants argue applied as opposed to the

13    mischaracterizations we feel of our arguments you will see in

14    the plaintiffs' opposition.

15           So I would like to go through what the proper

16    analysis really is.  Specifically, the analysis starts by

17    asking for each state under which plaintiffs assert an unjust

18    enrichment claim under what underlying state law or laws did

19    they assert the claim; antitrust only, consumer protection

20    only, or both?

21           So let's use Massachusetts as an example.  In

22    Massachusetts end payors have abandoned their Massachusetts

23    antitrust claims so now we are left with both end payors and

24    auto dealers have only a Massachusetts consumer protection

25    claim.  So at step two we ask, do they have standing to

1   assert their claims under that law?  As we just discussed,

2   because auto dealers are businesses they have to bring their

3   claims under section 11 of Massachusetts law, they lack

4   standing, so at level three of the flow chart their consumer

5   protection falls, unjust enrichment analysis ends for auto

6   dealers, they are done because their underlying claim fails.

7       But the end payors sue under section 9 and indirect

8   purchasers are allowed to proceed under section 9 of

9   Massachusetts consumer protection law.  So we then ask --

10  then we go to the next stage and we ask, does their consumer

11  protection claim fail for other reasons?  Well, as

12  Ms. Sullivan told you earlier today, we believe they fail

13  because they haven't alleged injury and fact, and that the

14  claim goes out for that reason.  If the Court accepts that

15  then there is no unjust enrichment analysis, their unjust

16  enrichment claim fails.  If the Court doesn't accept that,

17  then we go to the next step and we ask is the unjust

18  enrichment claim barred for other reasons.

19      Now, as we explained in our briefs, there are three

20  primary additional reasons why plaintiffs' unjust enrichment

21  claims could fail.  First, where the plaintiffs received the

22  benefit of the bargain they have no viable unjust enrichment

23  claim.  This applies to 24 states including Massachusetts.

24      Next, where the defendants have failed to confer a

25  benefit directly on the defendants.  They have no viable

1    unjust enrichment claim in seven states.  That is not the

2    rule in Massachusetts.

3           And third, where plaintiffs fail to meet special

4    pleading requirements that apply in seven states, not

5    including Massachusetts, they also have failed to allege a

6    viable unjust enrichment claim.

7           So to finish our Massachusetts example let's start

8    first with benefit of the bargain.  As you can see from

9    page 8 of your handout, plaintiffs have brought unjust

10   enrichment claims in 32 total states.  If you turn to the

11   very next page you can see that courts in 24 of these states,

12   including Massachusetts, have recognized that where the

13   plaintiff gets the exchange he expected -- what do I mean by

14   that?  The product he intended at the price he agreed to --

15   then there is, quote, no equitable reason for restitution.

16   For that reason, courts in these 24 states have routinely

17   rejected unjust enrichment claims in cases where, as here,

18   parties have voluntarily negotiated and entered into and

19   fully performed their bargain.  Plaintiffs do not allege that

20   they did not get the products that they expected.  They got

21   their cars and they paid for them at the prices they agreed

22   to.  Their claim is not that they didn't get what they wanted

23   but that they paid too much for it.  That is their claim.

24   And as our briefs make very clear, the cases are clear that

25   where they got what they wanted and merely paid too much,

1    that does not state a viable unjust enrichment claim.

2         I will refer as examples to the Prohias case and

3    the District 1199P cases.  In each of those cases the

4    plaintiffs were purchasers of drugs from pharmacies, and they

5    allege that the defendant drug manufacturers had engaged in a

6    scheme to basically mislabel through off-label marketing or

7    bad advertising to create artificial demand for their product

8    which ended up increasing the price of those products.  The

9    plaintiffs claim therefore that by purchasing the drugs for

10   which the prices had been artificially increased they had

11   unjustly enriched the defendants.

12        In each of those cases the court looked to the fact

13   that the plaintiffs got exactly what they bargained for, a

14   drug that worked for the condition for which it was purchased

15   at the price that they had agreed to pay, and held that the

16   drug manufacturers were not unjustly enriched by the higher

17   prices.

18        THE COURT:  Was that contract law or antitrust law?

19        MS. FISCHER:  They were marketing cases so I think

20   they were probably unfair competition type claims, but I can

21   get that for you, I don't have that off the top of my head.

22   It was not a contract.

23        THE COURT:  It just seems that you would agree to

24   pay X dollars if that was the going rate for the product, but

25   if the product should have been X minus Y you wouldn't have

1    paid more for it.

2            MS. FISCHER:  I guess what I would say, Your Honor,

3    is if there is an actual contract unjust enrichment doesn't

4    even apply, contract law would then govern in that particular

5    case.

6            THE COURT:  Right.

7            MS. FISCHER:  So what we are looking at here is

8    whether or not there was an unjust enrichment to the

9    defendant, and under circumstance where the plaintiffs

10   pleaded that their injury was that they paid too high of a

11   price that was not -- that was not deemed to be a viable

12   unjust enrichment claim.  But let's look at it from the

13   perspective that you just noted.  Let's say the plaintiff

14   argued that, in fact, it didn't get the benefit of its

15   bargain, okay, because it felt it should have gotten

16   something else perhaps at a lower price.  Well, even assuming

17   that's the case where the plaintiffs allege they didn't get

18   the benefit of the bargain, which I want to point out

19   plaintiffs do not make that allegation here, the courts do

20   not automatically conclude that there is a viable unjust

21   enrichment claim or that the defendant was unjustly enriched.

22   Instead, they will then look to assess the defendant's

23   bargain, they will look to see whether the defendant received

24   a benefit from someone and if so whether the defendant paid

25   someone for it.  And they have concluded that, this is a

```
 1   quote, the retention of a benefit is not unjust where
 2   defendants have paid for it.  If the defendant has given any
 3   consideration to any person for the benefit it would not be
 4   unjust for him to retain the benefit without paying the
 5   furnisher.  That comes from Ray Riley's Tire Mart, that's a
 6   Vermont case, quoting a Tennessee Supreme Court case called
 7   Paschalls v. Dozier.
 8        Another case that looks to whether or not the
 9   defendant has paid for -- paid consideration for what it
10   received from whoever provided the benefit directly to it is
11   American Safety.  Here the defendants gave consideration,
12   wire harnesses, connectors, fuse boxes, et cetera, to their
13   direct customers, and plaintiffs do not and cannot plead
14   otherwise, nor did they plead that they didn't get their
15   benefit of the bargain.  Their only real retort is to make
16   two claims.  First is to say that section 107 of the first
17   restatement of restitution, which is a source of this benefit
18   of the bargain rule, does not apply anymore.  Well, that's
19   readily rebutted by the fact that that section continues to
20   be cited and relied upon, and the rule is that issuances of
21   new restatements do not automatically supersede earlier
22   restatements.
23        And second, they claim that the benefit of the
24   bargain analysis only applies when the bargain at issue was
25   between the actual parties to the litigation before the
```

1    court.  They cite zero cases in support of that.  By contrast

2    you will find in defendants' papers at least nine cases where

3    the benefit of the bargain analysis was applied by the court

4    even though the bargain they were assessing was not between

5    the parties to the litigation.  These include the cases I

6    just referred to, Ray Riley's, Prohias, District 1199P and

7    American Safety, and at least five others which I'm happy to

8    list for you but in the interest of time I will move on.

9    They are all in our papers.

10        Basically bottom line, plaintiffs have offered

11   nothing that undermines the fact that these 24 jurisdictions

12   apply the benefit of the bargain analysis irrespective of

13   whether the bargain was between the parties before the court,

14   and will bar unjust enrichment claims where the plaintiffs

15   got what they expected at the price they negotiated, or if

16   they didn't where, in fact, the defendant has paid

17   consideration for the benefit it received.

18        Now that takes care of benefit of the bargain, but

19   if you turn to page 10 of your handout, you can see that

20   plaintiffs' unjust enrichment claims fail in seven states for

21   the additional reason that plaintiffs have failed to allege

22   that they directly conferred a benefit on the defendants, and

23   that's required in these seven states.  Here, again,

24   plaintiffs do not argue that they met this requirement but

25   instead they claim that we are wrongly insisting upon direct

1    contact or contractual privity in these states.

2          I want to be very clear, that is not the

3    defendants' argument, we are not insisting on either privity

4    or direct contact.  Instead, we are insisting that they show

5    that they, in fact, conferred a benefit directly on the

6    defendants.  Two ways to do this are, of course, through

7    direct contact or through contractual privity but they are

8    not the only ways as the case law shows.  One way, for

9    example, where a plaintiff can confer a direct benefit

10   without either privity or contact is where it provides

11   services, let's say such as medical services to a person to

12   whom the defendant owes a duty such as a duty of care.

13         Examples you will find in the case law include the

14   provision of medical services, let's say to a minor child to

15   whom a defendant parent or guardian owed a legal duty of

16   care, or medical services to county or city or state inmates

17   to whom the county or city owed a duty of care.  In each case

18   the medical services are provided, they are not paid, and the

19   provider goes after the defendant who had the legal duty.

20   That, of course, doesn't apply here.

21         Another example is where a plaintiff contractor

22   makes improvement to a defendant's property at the request of

23   a lessee.  When the lessee fails to pay but the landowner

24   retains the improvements and is then able to rent out its

25   property for a higher rate because of the improvements, the

Motion Hearing • December 6, 2012

95

1    landowner has been viewed as unjustly enriched even though

2    there was no privity and frankly no communication as between

3    the landowner and the contractor but the benefit was directly

4    conferred on the landowner's property.

5           In each case, as I just said, no direct contact, no

6    contractual privity, but there was a direct benefit.  That is

7    what we are asking plaintiffs to allege and they haven't done

8    so, and under the circumstances of this case we don't believe

9    there is any way any could do so.  Their unjust enrichment

10   claims fail in these seven states because they do not and

11   cannot allege a direct benefit.

12          Finally, if you look to the next page of your

13   handout, you will see that there are special pleading

14   requirements imposed under the unjust enrichment laws of

15   seven states.  They are basically summarized for you there.

16   I'm not going to go through all of them.  I wanted to use

17   just one example.  Let's take a look at Tennessee.  The

18   Tennessee Supreme Court has made it very clear that to state

19   a viable unjust enrichment claim under Tennessee law you must

20   allege that you have exhausted your remedies against your

21   direct seller or that effort would have been futile, but it

22   is not enough just to say that the effort would have been

23   futile.  The Tennessee Supreme Court has specifically said

24   that a bare allegation that any attempt to exhaust its

25   remedies against the direct seller would be futile without

1    providing a factual basis to support the allegation is not

2    sufficient.

3            Plaintiffs have not done so here.  They say by

4    citing to a bunch of federal cases that they don't have to do

5    so here, but the Tennessee Supreme Court would be the arbiter

6    of how its own laws are supposed to be constructed, they are

7    not free to be ignored.

8            So if you go to the last slide you will see that

9    even if we start with the assumption, the wrong assumption,

10   that all of the underlying predicate claims survived after

11   application of the unjust enrichment analysis I went through,

12   you will end up with, at most, unjust enrichment claims in

13   five states.

14           Your Honor, in bringing their state law claims

15   plaintiffs basically took a throw spaghetti at the wall and

16   see what sticks approach.  We submit the vast majority of

17   their claims do not stick and cannot stick even if you give

18   them another chance to take aim, and we would ask you to

19   dismiss them all.

20           THE COURT:  Thank you.

21           MS. FISCHER:  Thank you.

22           THE COURT:  Response?

23           MR. CUNEO:  Good afternoon, Your Honor.  Jonathan

24   Cuneo; Cuneo, Gilbert & LaDuca.  I'm appearing here on behalf

25   of the auto dealers.  I have agreed to split our time with

1   Mr. Steve Williams of the Cotchett firm who will be

2   representing our customers, the end payors.  I thought it

3   would be most helpful to the Court if I addressed some of the

4   gnarly antitrust questions that the defendants have raised.

5        Now, let's start with the question of standing.

6   That, of course, is a word that has many meanings but when we

7   talk about Article 3 standing then what that invokes is the

8   jurisdiction of the federal court.

9        Now, the Supreme Court has a recent and important

10  decision in that area, the Sprint case.  And in that case the

11  high court upheld a claim in which the plaintiff had agreed

12  to assign 100 percent of the proceeds of the plaintiff's

13  claim to other parties.  The plaintiff was effectively acting

14  as a collection agent and had no financial interest in the

15  outcome, and the court nonetheless upheld the claim.

16       But what is significant for this morning's

17  discussion is that the majority opinion stated that in

18  discussing the dissent that the agreement among the plaintiff

19  and his -- and its assignees could easily be jiggered to

20  provide a dollar or two of standing and that would be

21  sufficient.  And that court very clearly upheld standing in

22  the face of an allegation that the plaintiffs hadn't suffered

23  at all.  Subsequently, the 2011 Bond vs. United States case

24  differentiates between a situation in which the plaintiff

25  cannot state a claim of relief and one in which the court

1   lacks jurisdiction.

2         Now, our case is a case with respect to the auto

3   dealers where we have alleged monetary damage that we

4   absorbed time and time and time again in the complaint.  And

5   in fact, one of my distinguished colleagues who appeared

6   before me quoted sections 215 and 216 in which she said that

7   we alleged that we had absorbed a tremendous amount of the

8   overcharges that had been passed on by the OEMs.

9         Now, let me say this, we are plaintiffs who

10  purchase both the automobile wire harness itself as well as

11  the wire harness when it is incorporated in a manufactured

12  vehicle by the OEMs.  Now, the defendants -- and that is a

13  very important difference, and if you look at page 11 and

14  12 -- maybe it is 10 and 11, it is around in there, of their

15  opening brief, they seem to concede that we have standing and

16  meet the AGC factors, Associated General Contractors, which I

17  will turn to in a second, with respect to the purchase of

18  individual parts.

19        However, let me say this, we are directly in harm's

20  way.  We purchase from the OEMs, that is in our complaint,

21  that's common sense, everybody knows it, and the vast

22  majority of dealers in the United States purchase directly

23  from OEMs.  And if you listen to the defendants that this is

24  a conspiracy or a series of conspiracies to bid rig with

25  respect to OEM procurement needs, and when the OEMs purchase

1    that equipment from the defendants there is only one use that

2    they have for it and that is to put it in a car or else to

3    sell it to dealers.  It is not like people -- and that charge

4    is directly reflected in the price that the OEMs charge us.

5    So we are not people that install the soda machines at

6    dealerships or even at OEMs, we are people who are directly

7    in the line of distribution.

8           Now let's talk about the two-percent figure that

9    the defendants -- it is not in the record and the defendants

10   put the two-percent figure in their brief.  Now, two percent,

11   it is not a figure that we know or agree to or have had any

12   discovery about.  However, I would take the position it makes

13   our case and here is why:  A motor vehicle in the United

14   States costs over the class period on average between 24,000

15   and $30,000, something like that.  So what we are talking

16   about is an overcharge on an item that is between 500 and

17   $600.

18          Now, in the chart that the defendants prepared

19   notice that they put on percentages, they didn't put on

20   dollar figures.  That is a very large component and an

21   important component in the car.  It is not like we are

22   talking about an ashtray, it is not like we are talking about

23   something that is irrelevant, it is central to the nervous

24   system of the car, you can't operate without one, and so we

25   are directly and really approximately affected.

```
 1          To the extent that state legislatures around the
 2   country overruled Illinois Brick, we were the people that
 3   they had in mind.  Now, we allege clearly, I want to state
 4   this, in paragraph 12 that automobile dealers paid
 5   artificially inflated prices for vehicles containing
 6   automobile wire harness systems, and in paragraph 21 that
 7   defendants' conspiracy adversely affected persons in the
 8   United States who purchased automobile wire harness systems,
 9   and in paragraph 229 super competitive prices.
10          Now let's talk for a second about Associated
11   General Contractors, that is a federal case decided after
12   Illinois Brick.  And what that case involved was a lawsuit on
13   behalf of a union which was suing contractors saying that
14   they were trying to discourage union labor by agreements.
15   The case didn't involve higher prices or consumers or
16   anything like that.  And Justice Stevens, who was a
17   distinguished antitrust lawyer, strives mightily to take the
18   complaint and the prior opinions and construct an antitrust
19   allegation.  It was really constructed mostly in the Supreme
20   Court.  And he noted that the harm was that a conviction of
21   coercion may have diverted particular contracts to nonunion
22   firms and thereby cause certainly unionized subcontractors to
23   lose some business.  Well, that certainly doesn't sound
24   anything like our case.  And he says that in that case the
25   union was neither a consumer nor a competitor in the market
```

1  that was restrained.

2      Well, we are surely purchasers of these products.

3  Now, trying to graft Associated General Contractors and

4  harmonize it with the state repealer statute is a challenging

5  prospect because state legislatures have authorized just this

6  kind of lawsuit.  Under the defendants' construction of the

7  case no lawsuit like this of the law would ever be

8  authorized, and we say that even if AGC is applicable, it is

9  applicable in some states, maybe a few, others it is of

10  ambiguous applicability in an indirect purchaser case, and in

11  other cases it is not applicable at all.  But even if we are

12  in this context -- in the special context, applicable, we

13  easily meet the standard, the nature of the harm, an

14  overcharge, direct -- it is about as direct as you can get

15  without being an OEM.

16      Speculative measure, well, since that time that was

17  decided the economic science has advanced tremendously and

18  people who were a lot smarter than me can do studies and

19  determine exactly who paid what overcharge.  So complexity,

20  well, that is something that the courts -- that the

21  legislature has effectively passed to the courts.  And there

22  are lots and lots of cases at different circumstances in

23  complex litigation where damages are apportioned and

24  courts -- it is part of the bread and butter of complex

25  litigation.  I mean, for example, where there is a fund and

1    it is created and there's different sets of stockholders and

2    bondholders and 401(k) claimants to the same fund, courts

3    routinely in these circumstances deal with these problems,

4    and that, in my judgment, is a later problem; that has

5    nothing to do with whether this complaint as pled can be

6    upheld, but even if everything the defendants say is true,

7    which we don't agree, we think that the complaint should

8    easily be upheld.

9            Now, I would like to talk about a number of the

10   individual state issues and --

11           THE COURT:  Not too great a number.

12           MR. CUNEO:  I'm sorry?

13           THE COURT:  Not too great a number.

14           MR. CUNEO:  I'm going to limit it, okay, I'm going

15   to limit it very quickly.  Let me say this, let's talk for a

16   second about the so-called Shady Grove issue.  Okay.  This is

17   a case in which courts have in the past incorrectly sometimes

18   dismissed some cases because of an incorporated class action

19   ban.  Well, Mr. Cooper, who spoke yesterday, told this Court

20   that what the Court has now is a series of individual cases,

21   it is not yet certified as a class, and each dealer on behalf

22   of whom we have asserted a claim has a very valuable

23   individual claim well in excess of the statutory minimum as

24   well as a claim for injunctive relief, and so it would be

25   improper to dismiss a case on the ground that that dealer

1    couldn't maintain a class action.  That is a procedural

2    problem that I really do think the Court can scratch off of

3    its list right now.

4         Okay.  Let me quickly address the question of

5    component purchasers -- well, I already have addressed it a

6    little bit but the only two real cases that they cite, the

7    components were small, they had many uses, the vast majority

8    of weight is that purchasers of components can maintain a

9    suit under the Illinois Brick repealer acts.

10        Let me turn now to the Massachusetts example.

11   Section 11 of the Massachusetts law confers standing on

12   businesses to bring lawsuits such as this, but the provision

13   that the defendants rely on say that the courts shall be

14   guided in its interpretation of unfair methods of competition

15   by the principles of the Massachusetts antitrust law.  Well,

16   antitrust is kind of a living, breathing thing, and there are

17   practices that existed in the '70s that were thought to be

18   illegal, for example, maximum vertical price fixing, but now

19   the Supreme Court says, well, maybe not.  It is -- they use

20   to be per se, now it is rule of reason.  It is a flexible

21   body of law.

22        Here what the directive is is to be guided in its

23   interpretation of an unfair method of competition, that --

24   whether one can bring suit isn't an interpretation of what an

25   unfair method of competition is, that's a substantive

1     provision.

2            Finally, let me say this, I'm looking over this

3     list the defendants have put together, the interstate

4     commerce issue, in every case we represent a substantial

5     dealer and dealers do millions of dollars worth of business,

6     they buy cars, they order cars, they pay for cars, they fix

7     them up for sale, they deal with customers, they help make

8     financing arrangements, many cases they have special

9     arrangements with the DMV, they repair people's cars.  Any

10    suggestion that that isn't interstate commerce is not

11    correct, and that one I think is easy.

12           With respect to the consumer protection statutes of

13    Missouri and Montana, those statutes look at the nature of

14    the product, whether it is a consumer product or whether it

15    is not necessarily facts claimed for entities that are a lot

16    larger than us, meanwhile mainly major insurance companies

17    who are -- health insurers have been upheld under those

18    statutes.

19           Now, I think that that is the points that I wanted

20    to cover in my initial presentation, and I would, of course,

21    be prepared to answer any questions the Court might have.

22           THE COURT:  Okay.  Let's hear the rest of your

23    presentation of plaintiffs.  Is it --

24           MR. WILLIAMS:  The end payors.

25           THE COURT:  I would like to get this done before I

1     let you go so if you have to leave just feel free.  All

2     right.  For the end payors?

3             MR. WILLIAMS:  For the end payor, Steve Williams.

4     Thank you, Your Honor.  I want to thank the Court and its

5     staff for the time and attention to all of this.  There is a

6     lot of materials here, and we saved for the end the part that

7     is perhaps the most involved in terms of the number of laws

8     because Congress decided that all of the class actions ought

9     to go to federal judges, so federal judges now have the

10    pleasure of adjudicating what were state court claims.

11            But the important part of that is that in doing so

12    we need to look at what the state court law is.  The

13    fundamental point here is that the defendants are really

14    asking this Court to do something that no other court has

15    done, many of their points are not supported, most of their

16    points are against the authorities because when the Supreme

17    Court -- the U.S. Supreme Court in Illinois Brick made a

18    prudential determination that an indirect purchaser should

19    not get to assert a claim for damages under the Sherman Act

20    and the Clayton Act, they weren't saying that indirect

21    purchasers were not damaged under the Clayton Act and the

22    Sherman Act, they were saying that for various reasons we are

23    not going to permit that claim.

24            What they also said in Illinois Brick is direct

25    purchasers pass over charges to indirect customers who are

 1  the ones ultimately damaged.  They recognize that.  That's in

 2  the majority and in the dissent in Illinois Brick.

 3          And, you know, plausibility, I'm not sure what type

 4  of present the Supreme Court gave us there because we all

 5  debate what it means and counsel said it doesn't make sense.

 6  I don't accept that if the rationale is does it make sense

 7  for me to come in or in my brief throw in a lot of facts that

 8  are not in the complaint and ask the Court to accept them,

 9  and then to determine and adjudicate who is right and wrong.

10          I want to put in context one aspect of Twombly and

11  one aspect of what we are doing here that I think

12  demonstrates why that is the wrong approach.  We talked a lot

13  yesterday about the number of people who pled guilty -- I

14  should have said at the outset, I've got a bit of a cold so

15  I'm going to try to be coherent, and I apologize if I lose my

16  track on that, but there is a lot of chutzpah to the argument

17  the defendants are making here.

18          Now, I think there are ten defendant families I'm

19  going to say left in my case, five of them have pled guilty,

20  I think one of them just had a criminal information filed

21  against.  And one other thing we didn't talk about yesterday

22  but I think when we look at complaints and we use our wisdom

23  and reason to determine is what is set forth plausible or

24  Judge Breyer in the Northern District I think in my

25  Trans Pacific case said, look, my job is just to look at

1    everything they alleged and say is it possible that what they

2    said is true or does it strike me that, no, that's not good

3    enough to let you go forward to discovery.  It is not a high

4    test.  Even Twombly talked about nudging it across the line.

5           Congress passed the Antitrust Criminal Penalties

6    Enhancement Perform Act, and what that said is when you all

7    participate in the conspiracy the one of you that comes in

8    first and squeals on the others doesn't get charged.  So the

9    fair inference from that, Your Honor, is that in addition to

10   those five who have pled there is someone else in that box

11   who is the one who went to the Government and told the story

12   about the others.

13          So here we have these defendants, five of whom who

14   pled, one of whom who likely is what we call the amnesty

15   applicant and is thus cooperating with the Government in

16   exchange for not being charged, entering pleas in courts like

17   this one in front of a flag like that when they violated U.S.

18   law and the Sherman Act, and entering a plea that said, for

19   example, from the Furukawa one that we placed before the

20   court earlier this week, quote, in light of the availability

21   of civil causes of action which potentially provide a

22   recovery of multiple damages, the sentence does not include

23   restitution, meaning we are not paying back any victims here,

24   but then they come in and not withstanding the prefatory

25   comment here about we know we pled guilty and we are not

1  saying we are not responsible, they tell you that not one

2  single plaintiff in this courtroom can state a claim against

3  them.  And one way they tell you that is they say, well, my

4  group, the end payors, we didn't say which wire harness for

5  which car we bought.  They know.  They know but they don't

6  say.  It is not in their plea agreements.  They say we don't

7  say how much did it cost.  They know because they are the

8  ones who got together and fixed the prices for it.  It is not

9  in their plea agreements so they won't tell us.  And, in

10  fact, they think that information is so highly confidential

11  and they think their right to protect it is so powerful that

12  we shouldn't even be allowed to have access to it.  If you

13  will recall, we wanted it at that first status conference and

14  they said, no, you've got to overcome the motion to dismiss

15  first, so we didn't have it when we filed our complaints, but

16  now they are telling this Court we need to say which wire

17  harness was fixed and we need to say how much did it cost

18  before we can go forward.  They know that's impossible

19  because they are the only ones with that information, and

20  that is not the standard.

21         Five pled guilty, one is likely cooperating.  The

22  cost goes to the OEM, we know that, that's who they fixed the

23  prices to.  To suggest that the OEM doesn't pass on its cost

24  of goods sold to its customers, that's not plausible.  And we

25  alleged antitrust injury in our complaint, we alleged we paid

Motion Hearing • December 6, 2012

1    the increased cost in our complaint, that's sufficient.  And

2    there was this discussion -- and I feel I got a bit of a

3    moving target here because there was a discussion about this

4    standard of pleading that somehow Twombly isn't just about

5    plausibly pleading a conspiracy, which is what it is, which

6    is what the Supreme Court said, it is about is the conspiracy

7    properly pled to permit you to go forward and do discovery.

8    There is no doubt here.  They're quibbling about the metes

9    and bounds of it; was it this product or that product and did

10   I do it or what time period was it.  Like I said, no one

11   knows that but them, it is their choice to keep that secret.

12   But in terms of injury they tell the Court, all of these

13   cases I heard today, the First, Third, Eighth, I don't know

14   what, say you have to plead more of injury in fact.  I didn't

15   see those in their briefs, Your Honor.

16         What I saw in their briefs, I saw one case called

17   Taylor vs. Key Corp., Sixth Circuit case, that's in their

18   reply.  That's where they say plaintiffs are wrong,

19   plaintiffs say they don't have to prove it, Taylor v.

20   Key Corp.  Taylor v. Key Corp. is a case where a plaintiff

21   sued their employees' stock plan saying that someone engaged

22   in some form of securities fraud, and the plaintiff

23   affirmatively alleged that she profited from it because she

24   sold when the stock was artificially inflated.  So what the

25   Sixth Circuit said is you pled yourself out of it because you

1    pled you benefited, you never pled that you were damaged.

2    That's not our case.

3           In their opening brief they cited Brown vs.

4    Matauszak, that's a federal appendix case from I think this

5    circuit.  It is a prisoner case where a prisoner trying to

6    fill in the form on his complaint that he was deprived of his

7    right to file a claim in court had it dismissed because in

8    filling out the forms he never actually said what his claim

9    was, and the court said you have to do that because that's an

10   element of the claim.  That's not this case.

11          So this case involves the people who the Supreme

12   Court in Illinois Brick and all the state legislatures who

13   passed these repealer statutes said are the real victims

14   because we are at the end of the line.  We can't pass costs

15   on to anyone else.  Everyone above us -- and, Your Honor, I

16   handed to counsel and the Court just a few slides.  I would

17   like, if we could, it has got a cover, it says end payor

18   plaintiffs' illustrations.

19          THE COURT:  Okay.

20          MR. WILLIAMS:  I want to show from our complaint

21   that there is, like I said, this idea of does it make sense

22   and then this is how people buy cars and all of these

23   different things could happen.  None of that is in our

24   complaints.  Two percent is not in our complaint.  What's in

25   our complaint describes the supply chain in that first slide;

 1    it goes from an OEM -- I'm sorry.  It goes from a defendant

 2    to Toyota, to the dealer, to us.  That's four -- well, that's

 3    three really.

 4            Now, the Court may note I put the tier one with

 5    Toyota there, and I just want to explain why I did that.

 6    Yesterday one of the attorneys talked about this whole direct

 7    pricing issue.  That's where, for example, Toyota negotiates

 8    its price with a defendant or gets a price-fixed price from a

 9    defendant and then tells its supplier who maybe makes the

10    body part of a door go buy on my price, I negotiated the

11    price already, you are going to buy on my price and then give

12    me the finished product to stick in the car to sell to the

13    dealer.  It is the same level.  It is not another chain or

14    another link in the chain.

15            And if I can ask the Court to turn to the next

16    slide I did, this is the parts chain that we heard was so

17    complex and variable and will never figure this out.  The

18    term aftermarket was used, and I have to object to that

19    because that's a term of art in this business.  Aftermarket

20    means someone other than the OEMs' parts.  We are not talking

21    about people who bought some other wire harness for a Toyota

22    Camry.  I don't know if you can do that.  As counsel said,

23    when they negotiated these prices through these bid-rigged

24    auctions they won the business for years.  So if my Camry

25    owner was in an accident and had to replace his wire harness,

```
 1   he's going to go to the dealer and he's going to get the
 2   defendant's wire harness from that dealer at the shop or he's
 3   going to get it from a distributor to a repair shop.  So,
 4   again, it is a very short chain.  It is not difficult.
 5          The last slide, I won't take a lot of time on it,
 6   is this is the Intel case, and defendants and we cited to it,
 7   it was discussed during counsel's argument.  That's how many
 8   different paths of distribution were present in that case.
 9   The court there said there is no problem because all you need
10   to do is your complaint, you're pleading whether or not
11   someone violated the antitrust law and you should get to go
12   forward.  You are not proving it.
13          In fact, I cited Taylor and Brown.  If you look at
14   the brief they gave Your Honor when they filed their motion,
15   and they say plaintiffs have to prove, they have to prove how
16   much they paid, they have to prove the amount, they have to
17   prove.  They cited six class certification summary judgment
18   cases.  I will stipulate to that now, that those are cases
19   that govern standards of class certification and summary
20   judgment, but we are not there, and effectively what they are
21   asking you is give them summary judgment now.  Effectively
22   what they are asking you is the only ones who maybe can ever
23   file a claim against us are the OEMs, that's what they are
24   telling all of these different groups, and there is no basis
25   for that for you to throw these claims out at this point.
```

```
 1            And when these states passed these so-called
 2   repealer statutes and said we recognize the prudential
 3   limitation the Supreme Court has put in place, we disagree.
 4   What they said is we want the residents of our states, we
 5   want the victims of price-fixing conspiracies to have a right
 6   to recover their damages.  And I think it is worthwhile to
 7   look at how far back these laws go because most of these
 8   states had antitrust laws before the Federal Sherman Act was
 9   put in place.  That's how far back these cases go.  I'm just
10   going to allude to that for a moment because on this
11   interstate law issue uniformly the cases we cited to you that
12   have come down in these types of cases, someone who is price
13   fixing to an OEM and then it is put in the chain of
14   distribution and sold throughout the country, uniformly they
15   say if the effect is felt when the customer buys the product
16   with the inflated price you have satisfied your burden.
17            The ones that don't are, and there are few, almost
18   all from either the 1900 or 1910 because then there was a
19   theory that there was dual sovereignty, that the federal
20   government regulated the federal economic system and the
21   states regulated the state economic system, and those did not
22   mix, but that's been discarded.  The question now is, is the
23   effect of it felt because that's the reality of what the
24   economy is and it is the reality of what these legislatures
25   did when they said notwithstanding what the Supreme Court has
```

1    said for prudential reasons we choose to give our citizens

2    the right to seek damages against those who have fixed

3    prices.

4            And on this Associated General Contractors issue,

5    what the defendants I think really have advocated, and there

6    were little ships passing in the night on this one, they say

7    we are saying we don't ever have to prove standing and we

8    don't have to prove injury, we don't say that, I don't think

9    we said it anywhere, but they do seem to be suggesting that

10   that standard should apply to all of these claims.  Just

11   think about the fundamental inconsistency there.  AGC,

12   American General Contractors, construed the Federal Sherman

13   Act which had already been determined not to permit indirect

14   purchaser suits.  So the analysis of standing that it gave in

15   that case was by definition for those who had standing to

16   assert a claim under the Sherman Act by definition had

17   nothing to do with Illinois Brick repealer, states that said

18   notwithstanding that you can go forward and sue.

19           And we cited to the Court the ARC America case, and

20   that was a case that came after Illinois Brick.  The

21   importance of that case is that what it said was -- I think

22   what happened is a defendant came in and said this is not

23   fair because now I can get sued under the state law and I can

24   get sued under federal law.  I might have to pay twice.  No,

25   put aside the first answer, which was then don't violate the

Motion Hearing • December 6, 2012

1   Sherman Act in the state law.  Well, the court said that's

2   the choice of the states.  We in the federal Government, we

3   don't have the power to tell the states they can't provide

4   that remedy, and if they choose to provide that additional

5   remedy that is within their powers and there is nothing we

6   can do to disrupt that.  And that's why, for example, in the

7   GPU case that you have seen, two decisions in that case, the

8   court said it is not up to a federal court to sit here and

9   overrule the legislatures and courts of all of these

10  different states based on a federal case, I can't do that.

11  And the better approach has been if a state high court or the

12  legislature has said we want to apply these standards then

13  you do, not if a trial court in North Carolina in a case

14  involving a rubber additive decided to apply it, that's not

15  dispositive.

16          And the primary case that the defendants rely on on

17  this point is really the DRAM.  You see the DRAM case again

18  and again about this point.  Just a couple points on it.

19  First, the DRAM case was probably the first federal judge

20  that had to look at this on a CAFA case because of the

21  timing.  It was an early class action that involved indirect

22  purchasers, after the statute they all got filed in front of

23  Judge Hamilton.

24          And two important points on this.  The first is she

25  certified her order for 1292.  She -- the orders say what

 1   they say, and I'm going to come back to them in a second, but

 2   she then said there's substantial ground for difference of

 3   opinion about this, certified it for a 1292 appeal.  The

 4   Ninth Circuit took it.  That's on appeal right now.  And

 5   meanwhile, all of these cases are done and settled and those

 6   defendants have paid hundreds of millions of dollars in those

 7   cases, but that's not a final decision.  It was the first one

 8   out, and I think Judge Hamilton got it wrong because what she

 9   focused on there was not really the seven elements, assuming

10   all seven apply, she focused on the first.  She said well,

11   you bought a computer and in the computer is a -- DRAM is a

12   memory chip, dynamic random access memory chip.  The chip is

13   in there but you're not really in the market for chips, it is

14   not close enough, but, like I said, in her order she said

15   there is substantial ground for difference of opinion about

16   that.  And, in fact, that was the first in the line of these

17   so-called component part cases, DRAM, SRAM, LCD, TFT, CRT,

18   where most of the purchasers bought the product.  They are

19   not in the market for the component part.  Other than

20   replacement parts we are not in the market for wire

21   harnesses, we buy cars.  But what every court said after DRAM

22   said that's the same market, they are inextricably

23   intertwined because there is no purpose to a wire harness for

24   a Camry but to go in a Camry, and if you are buying a Camry

25   that's the appropriate market.

Motion Hearing • December 6, 2012

1     And in one of the ways I think that the arguments

2  are moving a little bit, I'm trying to wind up with them, is

3  the idea that in the briefing it seemed to me the argument

4  was you've got to plead the amount, the nature and the

5  mechanics of passthrough in your complaint, and there is no

6  case that says that.

7     In the slides today it seems to be you have to say

8  the percentage, that that is -- the essential element is the

9  percentage of the passthrough.  Well, as I said, because they

10  won't tell anyone there is no way we could do that.  And a

11  fundamental concept in antitrust law has been for years and

12  years that -- I could pull a number of cases out, this comes

13  from the new motor vehicle cases we all cited, quoting the

14  First Circuit, that we have long crossed the bridge of

15  precision of proof of causation and extent of damages in

16  antitrust cases.  We recognize antitrust suits covering as

17  many as it must, many imponderables, rigid standards of

18  precise proof would make a plaintiff's task practically

19  hopeless.  That generally applies now.

20     This is a price-fixing case involving specific

21  component parts that are the same thing when they leave the

22  defendant and they go to the OEM and they are put in the car

23  and they go to the dealer and they go to my client, it is

24  still that same part, and it has a value and it has a price

25  that was set that can be traced through.  And all of these

 1    component cases, that's what all of these courts let the

 2    plaintiff have an effort to try to prove, what was the

 3    inflation and how was the cost passed through.  But the idea

 4    that a defendant can withhold information and evidence about

 5    its own violation of the Sherman Act and then say throw them

 6    out of court because they don't have the details is offensive

 7    to that principle that you don't --

 8              THE COURT:  Could you get that information from the

 9    OEMs -- could you have gotten it from the OEMs?

10              MR. WILLIAMS:  The information on how much --

11              THE COURT:  The parts costs.

12              MR. WILLIAMS:  They cost for the courts?

13              THE COURT:  Yes.

14              MR. WILLIAMS:  What I would say is through this

15    Court's jurisdiction we can get that information.  As a

16    customer we could have gone if we were buying just the repair

17    part and gotten their sales costs, how much are they going to

18    sell it to us for.  I doubt in an arm's-length transaction we

19    could walk in and say tell me how much you paid for it.  The

20    routine manner of proof in these cases involves the bill of

21    materials, which is this term for all of the elements of cost

22    that a manufacturer puts into our product that then sells to

23    a consumer, and time and again that's the substance of what

24    we look at and our experts look at to determine overcharge

25    and to determine the mechanics of passthrough.

1        As to the entire car I think it would be even more

2   challenging to go and ask them, tell me how much you, Toyota,

3   paid Denso for the ECU.  I don't know that we can do that

4   without -- now, obviously with subpoenas we think we can, we

5   think that's the means by which we do that.

6        In terms of the AGC analysis, I don't want to

7   repeat what's in the papers, and they have their chart and we

8   have our Exhibit 3 to respond to our chart, but what I would

9   like to do is really refer the Court to the component part

10  cases that have followed since DRAM and we have cited to

11  them, which is the D.R. Ward case, the GPU case, the LCD

12  case, the Flash Memory case and the Aftermarket Filters

13  cases, as setting forth the appropriate standard which you

14  look for that clear direction from the high court and from

15  the legislature, and in the absence of it you don't choose to

16  put a limitation on that state's laws that that state's

17  legislature did not choose to make.

18        I want to step back for a moment because I didn't

19  cover this, I was lead counsel for the direct purchasers in

20  the SRAM.  The SRAM is a different type of memory chip, it is

21  a static random access memory chip.  You know, we are not

22  buying the two percent because we have no basis to.  We don't

23  think it is a basis for decision for this court.  I can

24  assure you that the static random access memory chip in those

25  computers there is substantially less than two percent of the

 1     cost of those computers.  Those complaints were upheld.

 2          And the idea that we have to plead and prove those

 3     mechanics and those numbers now has not been accepted by any

 4     of those courts, it was not required.  What was required is

 5     the allegation that I bought the product with the price-fixed

 6     part and I paid a super competitive price and an inflated

 7     price because of the price fixing.

 8          I wanted to comment just briefly, our class is

 9     purchasers of new cars.  There is this extended analogy in

10     the reply brief about used car buyers and there would be no

11     limits and how would we ever know -- I don't know what to

12     tell them about that because that's not our case.

13          THE COURT:  We don't have used cars in here.

14          MR. WILLIAMS:  We don't have used cars here so it

15     is the parade of horribles and I understand why you do it but

16     it is not this case.

17          I want to comment on the types of cases that they

18     showed you in that slide with the percentages, and I don't

19     think that's the analysis the courts did was to say you made

20     30 percent, you get to go forward, but the cases in which it

21     wasn't permitted, first of all, this Magnesium Oxide I think

22     it was, it is hard to say what happened in that case because

23     it looks like the plaintiffs didn't even know how much was in

24     the product because they said something like up to four

25     percent can be this, which I presume means it could be less,

1    it could be more.  It is the same for the Rubber Elements

2    case, is that the rubber that went in the tire, the North

3    Carolina case, because sometimes maybe it is .1 percent,

4    sometimes it is 1 percent, sometimes maybe it is 10 percent

5    but it is different all the time because unlike this

6    component product that is the same thing from the beginning

7    to the end, this is a part of a -- I don't know, it is an

8    ingredient in something that you can't even measure or define

9    or be precise about how much of it is in there.  That I think

10   was the dispositive issues in those cases, not the amount of

11   how much it was.

12          I think if you even look at Judge Alsup's opinion

13   in the Magnesium case that was given to you, he says

14   something about if the plaintiffs alleged it was inextricably

15   intertwined with what they bought that would be good.  I

16   can't give you the paragraph now but I think we have alleged

17   that in our complaint because it is, the wire harness is

18   inextricably intertwined with the car it goes into, it has no

19   purpose other than that.

20          I'm not to going to go on very long about the Shady

21   Grove case.  You know I think that the Optical Disk Drive

22   case we cited just rejected the same challenge.

23          I do want to cover a couple issues very briefly

24   that were not addressed in the argument that are in the

25   briefing, this concerns the retroactive application of the

1    Hawaii and Nebraska laws, the laws where they are saying
2    those states didn't repeal until relatively recently.  It
3    seems to me that if that's true then that defines how far
4    back your damage claim may go.  If it is true it has no
5    significance to discovery in this case because they are not
6    going to give us different discovery based upon the fact that
7    New Hampshire claims only go back to 2008.  You know, I can't
8    think of any difference that would make to them.
9         And I note as well that their argument as to Hawaii
10   was rejected in the SRAM case specifically.  Their argument
11   to Nebraska was rejected in the LCD case specifically, and
12   they said Judge Bilstein got that wrong in LCD because she
13   didn't read the legislative history.  Well, she read the
14   Supreme Court in Nebraska's opinion and that's where she got
15   her rationale from, so I think she got that one right.
16        In terms of the interstate commerce, we think our
17   allegations are there.  We think that this concept that they
18   have to have done something in the state has been discarded
19   when the concept of dual sovereignty was discarded, so we
20   think we are well past that.
21        And then a few -- I will try to go through these.
22   There is this issue about having to plead fraud in Florida.
23   That's not an element of the statute.  It is one type of
24   unfair practice.  I think they rely on Packaged Ice for that.
25   Packaged Ice didn't look at antitrust or price-fixing cases

1    when it reached that conclusion.  We would suggest Processed

2    Eggs and the Gastaldi case provide the better part of the

3    rule.

4              Similarly as to unconscionable conduct for

5    New Mexico, for the District of Columbia, for North Carolina,

6    we have given you authority by which all of those states deem

7    bid rigging and price fixing to be unconscionable conduct.

8              I'm going to go ahead to a couple of the cases they

9    cite where they are saying your interstate commerce

10   allegations were insufficient, and they cite, for example, a

11   Meridian project case from California to try to throw out

12   some of our claims there.  If you look at the case, it is a

13   case involving a Chicago misconduct and a Canadian plaintiff.

14   It had nothing to do with California, it didn't allege

15   someone was harmed there.  It is just not bearing on the

16   issues before the Court.

17             I think the remoteness issues under their consumer

18   protection claim are really covered by what we have

19   discussed, which is the conduct took place, it was intended

20   to raise the prices of the products, there is very few links

21   in this chain, they understood manufacturers were going to

22   pass the increased costs on.  It is not realistic or

23   plausible to think that they didn't know and expect that.

24             In terms of unjust enrichment there are a couple of

25   cases I think we may not have had in our brief, I told

1   counsel before, that we would cite that have upheld these

2   same claims.  The first is the Hanlon case, which is --

3           THE COURT:  Hanlon?

4           MR. WILLIAMS:  H-A-N-L-O-N, 150, F.3rd, 1011.  The

5   Abbott Labs case, which is 2007 West Law 1689899, the

6   Westways World Travel case, 218 F.R.D. 223.  The last one is

7   the SRAM case at 264 F.R.D.  All of those upheld unjust

8   enrichment claims over these types of arguments.  And,

9   frankly, I think in all fairness the arguments that were made

10  about unjust enrichment today are addressed in our brief, I

11  don't think they are very different from what we all put in

12  our papers, and I would submit to the Court on what we

13  briefed on unjust enrichment.

14          Then the last part is injunctive relief, and I

15  think we have established that we are the end payors, we are

16  the ones the cost gets passed on to and no one else can pay

17  it or we can't pass it on to anyone else, that the states

18  gave us the right to bring these claims, that they didn't

19  quantify it by it has to be -- you have to plead it is a

20  certain amount before you can go forward.

21          But on the argument that there is no reason to do

22  it, which I think is essentially saying one of us is

23  cooperating with the Government and the other five pled

24  guilty, but trust us, we won't do it again.  That's not been

25  the case in certainly the cases coming out of California in

1    the electronic industry where one conspiracy has led to

2    another has led to another.  We know these investigations are

3    still going on, and we have a pretty good reason to think

4    that there are other parts out there, and we just heard

5    yesterday about more parts are coming in.  So the idea that

6    that should go away because we can trust them now, I don't

7    think you are going to find any cases ever that said that.

8            THE COURT:  Okay.

9            MR. WILLIAMS:  And I think the point, and I would

10   emphasize, the directs made yesterday was it's an element of

11   relief in any event, it doesn't change what we are all doing

12   here, it is just an element of relief that we may be able to

13   have at the end of the case.

14           THE COURT:  All right.

15           MR. WILLIAMS:  Thank you, Your Honor.

16           THE COURT:  Ms. Sullivan?

17           MS. SULLIVAN:  Your Honor, I know it is getting

18   late and I'm sure you're hungry, and I will be very quick.

19           Just a few points I want to make in response to the

20   end payors' presentation.  First of all, we are not asking

21   for summary judgment now.  Lujan states that there are

22   elements that are required to establish standing to have a

23   claim, and those elements are injury and causation.

24   Antitrust standing is a concept that states that injury --

25   the injury that you allege has to flow from that which makes

 1    the conduct that you are alleging to have occurred unlawful.

 2    These are pleading requirements, and Twombly says that

 3    plaintiffs have to allege facts that establish each element

 4    with plausibility.

 5            A couple of cases that he just mentioned that are

 6    on the slide that I referred to earlier, and SRAM is one of

 7    them.  Just to clarify, Mr. Williams said that SRAM was less

 8    than one percent I think of the proportion of the end

 9    product, and actually the plaintiffs in that case allege in

10    their complaints, which is in the packet that we sent up

11    earlier, that the cost of SRAM to a direct purchaser OEM was

12    a significant cost component in the selling price of that

13    OEM's electronic products, and they allege that the

14    overcharge was passed on 100 percent through each level of

15    the distribution chain.  And, of course, these plaintiffs

16    have not alleged that and, in fact, the end payors can't

17    allege that because the auto dealers say that they did not

18    pass on a significant portion of it.

19            Magnesium, Mr. Williams noted or surmised that the

20    plaintiffs in that case didn't know what portion of the end

21    product magnesium made up, and that's actually not true.  The

22    decision states clearly that the plaintiffs actually alleged

23    that they bought the cattle feed specifically for the

24    magnesium, they knew exactly what percentage the magnesium

25    made up of the cattle feed, and the court held that four

```
 1   percent was still not enough.
 2          Finally, this suggestion that it is impossible for
 3   the plaintiffs to allege what they bought just doesn't make
 4   sense.  We are not saying that they have to allege this
 5   specific percentage, that's not what that slide was about.
 6   They have to allege something though that links the
 7   defendants' conduct to their claimed injury.  They claim that
 8   they were injured because they bought cars, and the conduct
 9   relates to wire harnesses.  There is no link between the two.
10   You have got two groups of indirect purchasers here, auto
11   dealers and end payors who bought from the auto dealers, and
12   even between the two of them they have no allegations about
13   any kind of passthrough or anything that links their injury
14   to any conduct.
15          Mr. Cuneo, very quickly, referred to an overcharge
16   of two percent that he suggested the defendants had put in
17   our briefing.  That's not at all what we indicated.  We
18   didn't represent that there was any overcharge of two
19   percent, that's footnote three of -- in our opening brief,
20   and all it says there is that the plaintiffs did not allege
21   what portion of the cost of an end product a wire harness is
22   and that we believe that all of these products together, all
23   13 of them together, make up at most two percent of a car,
24   but that was not suggested -- or not intended to suggest in
25   any way that there is a two-percent overcharge on anything.
```

1      He also noted that wire harnesses and related

2  components are a very large component.  That's not in the

3  complaint.  And he noted that a wire harness is the central

4  nervous system of the car, and that is in the complaint but

5  that relates solely to the functionality of a wire harness,

6  that doesn't relate at all to the cost issue that we have

7  been discussing.

8      And then finally, Mr. Cuneo said that the injury

9  that they have alleged is as direct as you can get without

10  being an OEM.  That's really what this is all about.  These

11  are not OEMs, neither group of them is an OEM, and they

12  allege nothing that suggests that a price for a wire harness

13  charged to an OEM then translates into a higher price for a

14  car several steps down the chain.

15      THE COURT:  Okay.

16      MS. SULLIVAN:  Thank you, Your Honor.

17      THE COURT:  Ms. Fischer?

18      MS. FISCHER:  I will be equally brief.  I just want

19  to hit a few points.

20      On Shady Grove, Mr. Cuneo did not say that the

21  class action bars don't survive, he said it was a timing

22  issue.  Mr. Williams said that they cited to ODD, Optical

23  Disk Drive, to show that the South Carolina class action bar

24  survives.  If you look at that case, that case simply says we

25  don't find defendant's argument persuasive, we have no idea

1    on what ground the court found it unpersuasive.  There have

2    been numerous cases from this district who have construed

3    statutes just like the South Carolina one to have class

4    action bars that survive.  So I invite you to read ODD but I

5    also invite you to read the other cases we cite because I

6    think that the trend is plainly in our favor and that there

7    is no support and no reasoning whatsoever given for the

8    South Carolina decision.

9        As for the timing issue, it is absolutely not

10   improper to dismiss these class action claims at this stage.

11   Wellbutrin did it, Digital Music did it, and this court in

12   Packaged Ice said it would have dismissed if it hadn't

13   already dismissed the Montana claim for other reasons.

14       It is absolutely appropriate to dismiss the class

15   claim even if the person can make a claim on their own, and

16   the Supreme Court actually said in Twombly when the

17   allegations in a complaint, however true, could not raise a

18   claim of entitlement to relief, this basic deficiency should

19   be exposed at the point of minimal expenditure of time and

20   money by the parties and the court.  That applies equally to

21   Mr. Williams' retroactivity point.  He said oh, this won't

22   really affect discovery, et cetera.  I disagree with that,

23   but in any event it is appropriate to get rid of it.

24       In terms of his points on retroactivity, the Hawaii

25   point is this, the case that they rely on from the Hawaii

1    Supreme Court does say that individuals had a private right

2    of action under the antitrust section of the Hawaii statute

3    but the class action right to bring private claims was not

4    provided until 2002 and the statute itself makes it explicit

5    that it is not effective until the date of the actual

6    enactment, which was June 28th, 2002.

7         In terms of Nebraska, the cases that they cite, one

8    didn't even construe the antitrust act, it was construing the

9    Consumer Protection Act under Nebraska law, and the other one

10   really did not even consider the legislative history.

11        Last issue I want to cover is on the intrastate

12   effect. He said -- I think Mr. Williams said that

13   essentially they think they have done enough here because

14   they have alleged that they have paid higher prices. Your

15   Honor, they don't allege a single state in which they

16   purchased a car, that is completely within their knowledge.

17   I don't think that given the nature of a car, which is a huge

18   big-ticket item that you buy once every X many years, that

19   they are necessarily entitled to an inference that they must

20   have bought the car in the state in which they reside. I

21   know -- I certainly know examples of people who will go to

22   the next state over to take advantage of a better deal or

23   even a better sales right. Completely within their

24   knowledge, they haven't pled it, and without pleading where

25   they bought it how can we infer affect much less injury

1    anywhere?  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          All right.  We have I think Fujikura, TRAM.  Does

4    anyone want to add -- anybody who has filed separately?

5          MR. COOPER:  For Fujikura, as we discussed

6    yesterday and then this morning, those will be dismissed and

7    we will provide orders.

8          THE COURT:  Okay.

9          MR. CUNEO:  Your Honor, we also have Yazaki which

10   essentially is --

11         THE COURT:  It just adopts it.

12         MS. FISCHER:  Correct, we just adopt it, we have no

13   further argument.

14         MR. KLEIN:  Your Honor, for TRAM we have nothing --

15         THE COURT:  Wait a minute.  Let's get this on the

16   record.  Let's go back to Yazaki.  As I have Yazaki, and as I

17   read it, it is only a couple pages, you just adopted the --

18         MR. CUNEO:  That's correct.  At the same time I was

19   going to use the argument to respond to something that was

20   just said, but I won't do that if it doesn't please the

21   Court.

22         THE COURT:  Does it please you?

23         MS. FISCHER:  No.

24         THE COURT:  I don't think it is necessary.

25         MR. CUNEO:  Thank you.

1    THE COURT:  I can't imagine what else you could

2  have.  Thank you.

3    MR. SELTZER:  Your Honor, I would like to be heard

4  briefly with respect to the end payors' opposition to the

5  Tokai Rika motion.

6    THE COURT:  The end payors' Tokai Rika which we did

7  earlier?

8    MR. SELTZER:  Yes, that was heard yesterday with

9  respect to the direct purchasers, and now I would like to be

10 heard with respect to the end payor.  This is Marc Seltzer of

11 Susman Godfrey.

12    There was an argument that has been made that the

13 allegations are insufficient to charge both defendants with

14 involvement in the wire harness conspiracy, in any event not

15 to charge the parent for the acts of the subsidiary.

16    I want to make a couple of brief points, Your

17 Honor.  First of all, it is a basic principle of law of

18 conspiracy that once a conspiracy is shown only slight

19 evidence is needed to link another defendant with that

20 conspiracy.  You will find that in case after case.  One case

21 that says that is Apex vs. DiMauro, it is a Second Circuit

22 case 822 F.2d 246, and that appears at page 258.  That's a

23 trial principle.  We are now at the pleading stage.  It is a

24 much lower standard now to establish once there is a credible

25 allegation or a plausible allegation that a conspiracy exists

1    to link up the defendant with that conspiracy.  I think it is
2    impossible to fairly say that there is not a plausible
3    allegation that there was a wire harness price-fixing
4    conspiracy given the fact that multiple defendants have plead
5    guilty to participating in that conspiracy.
6           The other point I would make, Your Honor, and this
7    relates to the request for judicial notice that was the
8    subject of yesterday's discussion, the defendant did not
9    object to having that be considered by the Court.  What is in
10   that request for judicial notice is highly significant.
11   Tokai Rika, the parent, has pled guilty -- or has agreed to
12   plead guilty to two crimes, one participating in a
13   price-fixing conspiracy regarding heating control panels and
14   one to obstruction of justice with respect to the
15   investigation being conducted by the Grand Jury in this very
16   district.
17          Now, in our complaint we allege that on
18   February 23, 2010 that there were three companies in this
19   district whose offices were raided by the FBI, one was Denso,
20   one was Yazaki and one was TRAM.  That was the same date that
21   there were raids being conducted simultaneously by European
22   and Japanese authorities, that appears at page 170 of the
23   complaint.
24          Here is what Tokai Rika said about that raid in its
25   reply brief, and that was filed on October 26th, 2012.

1     Quote, it does bear repeating that as to the FBI raid, an

2     allegation about an investigation that has not borne fruit

3     and the subject of which has not been specifically identified

4     is insufficient to establish that TRAM, much less that

5     TR, Limited, that's the parent, participated in the

6     conspiracy alleged.

7          What do we know about that raid?  We know about

8     that raid that Denso that was raided has agreed to plead

9     guilty for fixing the price of electronic control units and

10    heating control panels, and that Yazaki, the other company

11    that was raided, has agreed to plead guilty for fixing the

12    price of wire harnesses, instrument panel controls and fuel

13    senders.  These aren't unrelated conspiracies, it is all part

14    of one investigation and involving overlapping

15    co-conspirators.

16         Now, just four days after that reply brief was

17    filed with this Court the Justice Department announced on

18    October 30th that the parent company, Tokai Rika, had agreed

19    to plead guilty, as I just said, so that raid which was

20    characterized as not bearing fruit has produced three guilty

21    pleas, but it is also significant that there is a plea to

22    obstruction of justice, and what did the Department of

23    Justice say about that, and that's in the request for

24    judicial notice.  According to the Department of Justice on

25    February 2010, that's when the raid took place that we

1    alleged in our complaint, after the parent and its executives

2    and employees became aware that the FBI executed a search

3    warrant on Tokai Rika's U.S. subsidiary, that's TRAM, the

4    other defendant we sued, a company executive directed

5    employees to delete electronic data and destroy paper

6    documents likely to contain evidence of antitrust crimes in

7    the United States and elsewhere.  The Department said as a

8    result electronic data was deleted and paper documents were

9    destroyed and some of the deleted electronic data and

10   destroyed paper documents were non-recoverable.

11        So the parent who had said there is absolutely zero

12   evidence that it was involved in the price-fixing activities

13   and that we were seeking to hold it liable for the acts of

14   its subsidiary is the one that pleaded guilty to obstructing

15   justice involving the investigation that began to its

16   knowledge when that raid was conducted in February 2010 in

17   this district.

18        Now, the law is that a plea of guilty in a related

19   product industry can be considered by the Court in

20   determining whether or not a complaint raises a claim of

21   plausible price-fixing conspiracy in a related product.

22   There are multiple cases that say that.  For example, the

23   Seventh Circuit decision in High Fructose Corn Syrup, that

24   was a decision by Judge Posner when he dealt with the law

25   applicable to a claim of conspiracy involving high fructose

1  corn syrup where a Grand Jury had been impanelled but then

2  discharged without indicting as to that product but where

3  there had been indictments and convictions for related

4  product, citric acid and lysine, and he said it was proper to

5  consider those earlier guilty plea proceedings and

6  convictions in determining the plausibility of a claim

7  involving high fructose corn syrup.

8        Now, we also have alleged facts that make the

9  allegations of conspiracy plausible; they have to do with the

10  structure of the industry, the concentration of the industry,

11  the fact of the increasing prices when costs remain the same,

12  other facts as well to back up the allegations that the issue

13  here is whether or not the plaintiffs should be allowed to

14  proceed to take discovery against these defendants in the

15  face of which just happened where you not only have a plea of

16  guilty to price fixing but also a plea of guilty to

17  obstruction of justice where every kind of adverse inference

18  can be drawn against a party that engages in that kind of

19  conduct, and every kind of evidentiary sanction may

20  ultimately be employed against that party where they

21  destroyed documents related to the division's investigation

22  of price fixing in the auto parts industry.  I submit, Your

23  Honor, that it would be inappropriate to dismiss the case at

24  this time.

25        Now, the other point I would make, Your Honor, we

1   try to be responsible in naming defendants in these cases.

2   We haven't named everybody that we could possibly name.  We

3   try to name parties that we think at the end of the day we

4   are going to be successful in investing time and money and

5   going to trial and winning against the defendant at trial.

6   That's the decision-making process we go through in these

7   cases.  It may be that after we take discovery that the claim

8   against Tokai Rika we decide is not one that is -- is one

9   that should be pursued, but that's a decision not to be made

10  at this time, it is to be made only after we have had a

11  chance to take discovery.

12          Thank you very much, Your Honor.

13          THE COURT:  Thank you.

14          MR. ROMANO:  Your Honor, may I address the Court?

15  We are scheduled to argue last, and I hope we haven't been

16  skipped or forgotten.

17          THE COURT:  You will all get your opportunity.

18          MR. ROMANO:  My name is Sal Romano and I represent

19  GS Electech.  We are the last scheduled.

20          THE COURT:  Just a minute.

21          MR. KLEIN:  If I can respond on behalf of TRAM?

22          THE COURT:  I think we are going to break for lunch

23  and we will continue after.

24          MR. ROMANO:  I may have misunderstood what was

25  happening and I just didn't want to get overlooked.

```
 1              THE COURT:  No, you're not overlooked.  Let's -- it
 2   is 1:20, let's resume at 2:30.  Thank you.
 3              THE LAW CLERK:  All rise.
 4              (Court recessed at 1:23 p.m.)
 5                           —   —   —
 6              (Court reconvened at 2:38 p.m.; Court and Counsel
 7              present.)
 8              THE LAW CLERK:  All rise.  Court is now in session.
 9   You may be seated.
10              THE COURT:  I was looking for you over here and
11   here you are.  Okay.
12              MR. KLEIN:  Good afternoon, Your Honor.
13   Sheldon Klein on behalf of Tokai Rika.  I want to briefly
14   respond to some points raised by Mr. Seltzer before we took
15   our break.
16              THE COURT:  I thought you would.
17              MR. KLEIN:  I don't know what I was thinking when
18   first I said I didn't think we would have anything to say
19   this afternoon before Mr. Seltzer started speaking.
20              Your Honor, I can't help but noticing that there is
21   a consistent theme to plaintiffs' arguments regarding
22   Tokai Rika, which is you should lower the bar on the normal
23   pleading rules that's required to state an antitrust
24   conspiracy claim about Tokai Rika.  He says only slight
25   evidence is enough, you should lower the normal bar of having
```

1    to plead facts supporting Tokai Rika's participation in this
2    conspiracy.  Well, that is not the law.  It is not the law
3    that they can plead a claim against one defendant and then
4    keep on throwing more parties into the caption of the case.
5    The slight evidence standard is an old pre-Twombly standard,
6    it was articulated only in a small handful of civil cases.
7    But more -- but the pre-Twombly point is much more important.
8             Twombly is about what is required to plead a
9    conspiracy claim in an antitrust case, that is the precise
10   issue in the case.  And in light of Twombly there is
11   certainly no way that the law can be that, no, you don't need
12   to plead facts supporting a plausible inference of the claim
13   against that defendant, you need to be -- you need to plead
14   something against one defendant and then after that Twombly
15   goes out the door, and there are many cases since Twombly
16   that stand for that proposition I believe in their briefs, I
17   don't have the cites at hand since it was raised at the last
18   minute.
19            He says that we admit that we fixed heater control
20   panel prices so that's enough, you should lower the bar about
21   what is required to plead our participation in this
22   conspiracy.  And I thoroughly discussed yesterday, Your
23   Honor, and I won't repeat it, the case law regarding the if
24   there, then here logic that some courts have followed and why
25   those cases are off point, and that our plea in the heater

 1    control panel conspiracy simply isn't probative and certainly

 2    isn't sufficient when that's all that they have to hold

 3    Tokai Rika as a defendant in this conspiracy.

 4         Finally, Mr. Seltzer all but accused us of

 5    misleading the Court in a sentence in our reply brief

 6    discussing the status of the investigation of Tokai Rika.

 7    Now, we are here representing Tokai Rika in a case about wire

 8    harnesses, in a brief about wire harnesses, and the sentence

 9    in question from which Mr. Seltzer read a snippet is quite

10    specific and, in any case, in context can only be about this

11    case.  We talked about the conspiracy alleged, that's part of

12    the sentence.  Now, we would need to not only be unethical

13    but the dumbest attorneys on Earth to file a brief four days

14    before we knew that our plea in the heater control panel

15    case -- or I guess I should say the information in the heater

16    control panel case was going to become public to include in a

17    brief a statement that we thought could possibly mislead the

18    Court.  We didn't do it.  The fact is that we wanted to tell

19    the Court about the outcome of the investigation.  The

20    outcome was that there was no action taken with respect to

21    wire harnesses, that the only action was with respect to a

22    different case.  We couldn't because it wasn't public.  In

23    fact, we thought it would be public before we filed the reply

24    brief but because of scheduling issues it got deferred so we

25    couldn't discuss it in the brief, but you will recall

1    yesterday a central point of our argument is how we believe

2    that the outcome of the investigation requires the dismissal

3    of these claims against Tokai Rika, and it is not true and

4    there is no reason in the world that we would mislead the

5    Court about what was going on in anything, we didn't mislead

6    the Court, we were talking about this case and, you know, it

7    is more than a little concern to us that that suggestion was

8    raised.

9           We didn't mislead.  The bar shouldn't be lowered.

10   The claims against Tokai Rika should be dismissed under the

11   pertinent pleading standards.  If the Court has any

12   questions?

13          THE COURT:  Okay.  Are you saying -- I'm trying to

14   get this distinguished, the heater control panel from the

15   wire harness part of these cases.  Obviously you must be a

16   defendant in the heater control?

17          MR. KLEIN:  At the moment we aren't but if I'm a

18   betting man that's going to change.

19          THE COURT:  Basically what you are saying is your

20   plea and the obstruction of justice had to do with shredding

21   of documents regarding heater control panels or do we know

22   that?

23          MR. KLEIN:  The plea is not specific as to -- it

24   doesn't say in the heater control panel case.  I mean, the

25   fact is that the Justice Department was aware of the document

1    problem, brought charges on the document problem, didn't

2    bring any wire harness claims.  You know, there is nothing

3    that --

4         THE COURT:  So is it that we weren't involved in

5    wire harnesses, we were involved in heater controls, is that

6    what you are saying?

7         MR. KLEIN:  No -- well, I'm not sure I understand

8    the Court's question.

9         THE COURT:  I'm just trying to distinguish,

10   plaintiffs are saying that you were part of this conspiracy

11   in the wire harness case and you, of course, through your

12   argument are saying no, we weren't, but now it turns out that

13   you are, in fact, in the heater control case or you, as you

14   say, you probably will be.  The question is, can you use that

15   heater control panel plea, and I suppose I should ask this of

16   plaintiff, can you use that heater control panel plea to show

17   that you were involved in wire harnesses?

18        MR. KLEIN:  Your Honor, we think the answer is no.

19   You know, the notion that we are a bad person so you might

20   have done anything doesn't fly, and we talked yesterday about

21   what I've called the if there, then here cases where courts

22   have considered pleas usually in a different geographic area.

23   For example, the Packaged Ice case that was here, there was a

24   plea as to a conspiracy in Michigan and the court considered

25   it with respect to a civil case for a larger area conspiracy.

```
 1        There's a series of cases out in California
 2   involving different types of memory products, that's the
 3   flash memory, the SRAM, the DRAM, the cases that keep on
 4   coming up.  What's different about all of those cases is they
 5   quite explicitly recognize that a plea -- whatever weight a
 6   plea in a different case might have it alone isn't
 7   sufficient, they explicitly say that.  And it is simply --
 8   you know, if it is a fact that can be considered it is only
 9   together with specific facts with respect to that defendant's
10   role in the particular conspiracy.
11        And if you recall in one of the cases that I
12   discussed yesterday, and the name escapes me, the court
13   labeled the plea in the other cases contextual.  First, the
14   court discussed the facts about that defendant's role in the
15   conspiracy that was the subject of the case and there were
16   specific factual allegations linking them, and then he said
17   there is also contextual facts, and one of the contextual
18   facts was they had pled guilty in a different conspiracy.
19   So, you know, perhaps it is a pebble on the scale, there is
20   no case that has held that because you did something wrong
21   there that's enough and the fact is that is the only thing
22   either in the complaint or, now that the plea in heater
23   control panels is public, in the record that links us to
24   this.
25        THE COURT:  Okay.  Response, Mr. Williams?
```

1          MR. WILLIAMS:  Steve Williams, Your Honor, and I

2    will be brief on the last point.

3          No one is suggesting that because he pled in one

4    market that by itself with nothing else means you've

5    satisfied your obligation to plead a conspiracy in a

6    different market.  What the cases --

7          THE COURT:  Mr. Williams, wait a minute.  So this

8    plea to the wire harness --

9          MR. WILLIAMS:  The plea to heating control panels.

10         THE COURT:  I'm sorry.  To the heating control

11   panel does not come over to your wire harness case?

12         MR. WILLIAMS:  No, it does, and I will explain why.

13   So the point counsel made was no court has ever said that by

14   itself is enough, but we are not saying that by itself is

15   enough.  What the courts say is when you weigh the factors

16   towards plausibility that's a strong factor that you did, in

17   fact, conspire to violate the Sherman Act in one related

18   market makes it more plausible that you might have done it in

19   the other market, and then when you add the obstruction of

20   justice charge, which we just heard is undifferentiated, he

21   can't tell you it didn't involve wire harness, and everything

22   else we put in the complaint about who they all do business

23   is, the answer -- the correct answer we think from Fructose

24   and Flash and SRAM is it makes it more plausible, it is not a

25   factor by itself but it makes it all the more plausible.

1          THE COURT:  Okay.

2          MR. WILLIAMS:  Thank you.

3          THE COURT:  Very good.  Now, before I get to S-Y I

4    want to know if there is anybody else who wanted to add --

5    you wanted to add something, Counsel.  Do you still want to

6    add something?

7          MR. CUNEO:  I would add only this fact, if I didn't

8    say anything in response to something they said I assume that

9    I could rely and stand on my briefs?

10          THE COURT:  You may rely on your briefs.  Believe

11    me, they have been gone over quite extensively.

12          MR. CUNEO:  Very nice of you.  Thank you.

13          THE COURT:  I think we have GS Electech.  Did Denso

14    want to say anything else?

15          MR. CHERRY:  Your Honor, can I speak from here?

16          THE COURT:  Sure.

17          MR. CHERRY:  Steve Cherry for Denso.  You know, we

18    filed one motion against both complaints.

19          THE COURT:  Right.

20          MR. CHERRY:  So I feel we went through it all

21    yesterday and I don't see a reason to repeat it unless you

22    had any questions.

23          THE COURT:  Okay.

24          MR. DAMRELL:  I would like one response.

25          THE COURT:  You are going to file -- you say one

1     response, do you mean --

2              MR. DAMRELL:  Can I make a response to his

3     comments?

4              THE COURT:  Okay.  Go ahead.  Can we have your

5     appearance first, please?

6              MR. DAMRELL:  My name is Frank Damrell, Cotchett,

7     Pitre & McCarthy, for the end payors.

8              Your Honor, the only -- I will keep this very brief

9     because I'm about an hour and-a-half from a plane.  I have

10    been waiting 17 years to argue a motion in federal court and

11    now I have to catch a plane, but that happens in retirement.

12             Look at, the point that I would make is this, the

13    plea agreements in these cases follow a typical pattern for

14    conspiracies.  Conspiracies are cracked by cooperators, and

15    I'm sure in your experience you have seen many conspiracies

16    and the trials commence generally with a plea agreement or a

17    cooperation agreement.  That happened here.  As a result,

18    eventually a search warrant was issued after two plea

19    agreements, two cooperation agreements and the search of

20    Denso.

21             And the reasons why those agreements are effective,

22    I'm talking about the cooperation agreements, is because

23    there is an agreement to cooperate based upon the threat of

24    prosecution for other crimes which surely implies that other

25    crimes very well may be out there but are not being

 1    prosecuted.

 2            Denso entered into the same type of cooperation

 3    agreement, and the cooperation agreement provided that you

 4    cooperate or we are -- we may file further prosecution or

 5    further charges against you.

 6            The point I make is that the conspiracy concept

 7    flows from those three cases, then the next case follows with

 8    a guilty plea with a cooperation agreement, on and on and on,

 9    that's in the pattern of this case, I'm talking about the

10    larger case, I'm talking about the auto parts generally, but

11    they certainly apply to the wire harness situation.

12            As to market, the other situation that has been

13    raised by Denso is that, well, there is no

14    interchangeability, the ECU is not a wire harness, this is a

15    simple matter, we are disconnected from the wire harness

16    conspiracy by doing so.  I would ask the Court to take a look

17    at the Denso -- excuse me, the Yazaki and Furukawa plea

18    agreements and how the federal Government, how the DOJ,

19    computed the fines in each of those cases.  They incorporated

20    the sales of ECU and wire harnesses over the relevant period,

21    determined in Yazaki it was $2 billion, something like

22    $800 million with respect to Furukawa.  Once they had that

23    total number of both ECUs, related products, and the wire

24    harness, they took that total amount, found out what the

25    pecuniary gain was, went to the sentencing guidelines and

```
 1    found the chart and determined what the fine was.

 2         The point is that the DOJ clearly sees, as we do in

 3    our complaint, that the same market pertains to both wire

 4    harness and the related products.  That's the way the DOJ

 5    determined the fines, and that's the way both Furukawa and

 6    Yazaki agreed to, they agreed to that computation.  In other

 7    words, putting those products all in the same relevant time,

 8    determining the actual sales, both wire harness and ECU and

 9    the related products, that they have described in those

10    agreements.

11         THE COURT:  So wire harness and ECUs because that's

12    what we have now, but what happens when we get heater control

13    panels, do we add those in?

14         MR. DAMRELL:  Those are not related products, Your

15    Honor.

16         THE COURT:  Those aren't related products?  Who

17    says they are not related products just because the DOJ --

18         MR. DAMRELL:  Well, they are designated in the plea

19    agreements as they are in our complaint, and if I can just

20    find -- here.  Automotive wire harnesses are automotive

21    electrical distribution systems, systems used to direct and

22    control electronic components, wiring and circuit boards.

23    The following are defined as related products for the

24    purposes of this plea agreement, automotive electrical

25    wiring, lead wire, assemblies, cable bond, automotive wiring
```

1    connectors.

2         THE COURT:  I'm just -- I understand that but, you

3    know, not to be facetious but I'm just wondering if the DOJ

4    isn't going to come up and do what the MDL did and just

5    change this name to auto parts.  Is that something we can

6    foresee?

7         MR. DAMRELL:  Well, our complaint is fashioned upon

8    these plea agreements and how the Department of Justice

9    decided what they are going to include of components of the

10   wire harnesses.

11        THE COURT:  Okay.  Thank you.

12        MR. DAMRELL:  Thank you.

13        THE COURT:  Now, you have something to say?

14        MR. CHERRY:  A little bit.

15        THE COURT:  Okay, Mr. Cherry.

16        MR. CHERRY:  You know, it all comes down to, you

17   know, as we cite and the case law is very clear, that you

18   can't be accused of a conspiracy for a product that you don't

19   sell, that you're not a competitor for.  Their briefs refers

20   to the cases we cite and they don't dispute them, they say

21   they merely stand for the unremarkable proposition that a

22   horizontal conspiracy can only occur among competitors or

23   potential competitors in a given market.

24        And their argument -- Denso is not the one saying

25   it, it is their argument that 13 different products, 12 of

1    which we have never sold, are all the same market.  Those are

2    their words, their argument, it is the crux of their whole

3    complaint.  It falls apart without them proving that up.  The

4    cases are very clear that you can't just say that, you can't

5    make it up.  You have to allege facts to show it is the same

6    market.  You have to allege facts that show

7    interchangeability of use among the products, that they can

8    be used for the same thing.  You have to show pricing -- that

9    the prices have some relationship to each other.

10           In regard Elevator, in regard the Cement Concrete

11   case, their own case, the Chocolate case stands for that very

12   proposition.

13           THE COURT:  But they are not really saying it, they

14   are reading from the pleas, they are saying the DOJ said --

15           MR. CHERRY:  The DOJ never said that.  They did not

16   use the word market.  They have never referred to some wire

17   harness product market.  They don't make that determination.

18   They did not do that here.  Our plea doesn't have the words

19   wire harness are nowhere to be found in it.  We had nothing

20   to do with wire harnesses, it is not in our plea, we don't

21   make them, we don't sell them, that's not us.  You know, they

22   are just lumping us all together and calling it all one

23   market without any facts to support that.

24           THE COURT:  Okay.

25           MR. DAMRELL:  Can I say one more thing?

Motion Hearing • December 6, 2012

**151**

```
 1          MR. CHERRY:  The other thing -- can I just say one
 2   more thing?
 3          THE COURT:  Just a little, he has a plane to catch.
 4          MR. CHERRY:  Oh, okay, well, let me start over
 5   then, Your Honor.
 6          The Government, we don't know why they lump these
 7   things together for their own convenience and how they get to
 8   the VOC.  I mean, they certainly don't determine a market,
 9   they don't use the word market, they don't talk about a
10   market.  The fact that something is a related product clearly
11   doesn't mean it is the same thing, that it is fungible, that
12   it is the same market.  You know, I think we talked about a
13   hubcap may be related to a tire.  You can't use one for the
14   other.  The pricing may have nothing to do with each other.
15   It doesn't mean the same thing.
16          He made some reference to their determining the
17   pecuniary gain, they don't do that, there is a formula under
18   the federal sentencing guidelines, that's how they get to the
19   fine.
20          Thank you, Your Honor.
21          THE COURT:  All right.
22          MR. DAMRELL:  Your Honor, just quickly, the
23   discountus (phonetic) max of the defendant utilizing the plea
24   agreement and then saying, well, we only pled to the ECU
25   conspiracy, and then counsel makes the comment we don't make
```

1    wire harnesses.  Well, we don't know that, that's a factual

2    assertion.  They may well sell wire harnesses, they may well

3    sell other components.  The fact is that we pled that the ECU

4    was part of the wire harness system, that's our allegation.

5    Maybe discovery might develop that further, maybe it won't be

6    that effective once we get into discovery, but the fact

7    remains that's our claim.  And as Judge Borman said, plea

8    agreements don't define plaintiffs' claims, plea agreements

9    are decided by negotiation, by the DOJ deciding that they

10   want to do this or that, and Denso decided they felt that

11   this is where they ought to come out, that has nothing to do

12   with this.  The fact is we include ECUs in the system of wire

13   harnesses and the DOJ when it computed the fine, which it

14   did, which it did and factor in the -- again, it is all laid

15   out in the plea agreement.  Based upon both the sales of the

16   wire harness and the ECU in the case of Yazaki and the case

17   of Furukawa, and they agreed to that, they agreed to that, it

18   would seem that on that basis we should be able to pursue our

19   claims despite what the negotiations were between.

20          THE COURT:  So if they said that -- if they say

21   they don't make anything but the ECU --

22          MR. DAMRELL:  I don't think that's the case, Your

23   Honor.  I can offer some factual assertions because we have

24   evidence to the contrary that, in fact, they sell wire

25   harnesses.  I mean, if we are going to get into that kind of

1    discussion that's not proper here in my view, but that's the

2    evidence that we have.

3          THE COURT:  Okay.  You better go check your product

4    line.

5          MR. CHERRY:  Your Honor, we don't, and I think it

6    would be easy enough to find out.  I don't think now is the

7    time to be saying, you know, we don't know if they do or we

8    don't, we need discovery to figure out if they even make the

9    product we are suing for.  This is all on-line, our product

10   catalogue is on-line.  If they are obligated to do anything

11   it is to do some basic research to know what their client

12   bought and to know what we sell and to figure out if they are

13   the same thing, and, you know, to know the basics of their

14   claims.  We don't sell wire harnesses and we shouldn't be in

15   a case that is about a conspiracy to deal with wire

16   harnesses.

17         And, again, it is not just wire harnesses, it is 13

18   different products.  The whole crux of this overarching

19   conspiracy claim they are bringing is that they are all the

20   same thing, that it is all one market but they don't allege

21   any facts to show that.

22         Thank you.

23         THE COURT:  Is the ECU part of the electrical

24   system of a car?

25         MR. CHERRY:  It is an electronic control unit.  It

1    depends on what you mean by that.

2              THE COURT:  I wouldn't know what the DOJ meant

3    but --

4              MR. CHERRY:  Yeah, really, this idea too that these

5    13 different parts that it matters that the carmaker may plug

6    them in together in some way and make a system is irrelevant.

7    They are still different parts, they are sold by different

8    companies, different prices, they are in different markets.

9    They all go into a car.  To say they all go into the car

10   makes them the same thing, I mean, you might as well say

11   that.  They are still different parts, they are different

12   markets for each part, and it is just irrelevant that they

13   may go into some system by the person who is making the car.

14   We still don't make --

15             THE COURT:  How do you define market, what is a

16   different market?

17             MR. CHERRY:  Well, actually the law is very clear

18   on that.  I mean, there is a definition in all of the case

19   law that the market depends on the interchangeability of the

20   products, that at some point you can interchange, that at

21   some pricing point you will substitute one product for the

22   other, that that is possible and you will do that at some

23   point given the economics of the deal, and they don't allege

24   that.  You clearly can't use these products one for the

25   other, they are totally different things.  They have alleged

```
 1    that nothing --
 2           THE COURT:  Well, if that were true we would have
 3    12 different products, would we not?
 4           MR. CHERRY:  Just as we have a heater control
 5    product case and we have a --
 6           THE COURT:  I'm talking about the wire harness
 7    case, if that were true in the wire harness we would have 12
 8    parts to it?
 9           MR. CHERRY:  Certainly you would have a different
10    body ECU case, and as far as I know, I mean, we don't make
11    these other products, somebody who is in that market -- in
12    those particular products can speak to them but, yes, I think
13    you may end up with that situation where you have different
14    products, they are different things, one cannot in any way be
15    used for the other.  The price of one does not affect the
16    price of the other.  If you are selling one you run into
17    different competitors.  They are different markets.
18           THE COURT:  Okay.
19           MR. CHERRY:  Thank you, Your Honor.
20           THE COURT:  It seems like we keep coming up with
21    more questions rather than less.
22           MR. DAMRELL:  The fact remains that
23    interchangeability is a -- there's a lot of subtleties to
24    that; you have markets and submarkets.  You have cases in
25    this circuit that clearly indicate that you could have a wire
```

1    harness market and a submarket might include ECUs but that's

2    not our position.  The fact remains is that the Department of

3    Justice prosecuted these conspiracies on the basis that wire

4    harness system, which it is called in their definition a

5    system, and that the various related products which I was

6    describing are part of that system.  That's our allegation,

7    that's what we are suggesting.  We think that is the same

8    market, we think it is the conspiracy relating to the same

9    products that make up wire harness systems, and that's the

10   basis of our claims.

11              THE COURT:  Okay.  Thank you.  All right.

12              MR. ROMANO:  May I proceed, Your Honor?

13              THE COURT:  You may.  Do you have a plane to catch

14   too?

15              MR. ROMANO:  Good afternoon, Your Honor.  My name

16   is Sal Romano, and with me is my partner Don Barnes, and we

17   represent GS Electech and its affiliated companies.

18              Earlier I handed up what I hope is a document that

19   will facilitate your agreeing with our argument in this case.

20   To start off with, you have heard a lot about Twombly.  I

21   would like to focus the Court's attention on two principles

22   of Twombly that have peculiar application to our case.  One

23   obviously is the definition of plausibility, the definition

24   of plausibility being that the plaintiffs must assert

25   sufficient factual content to allow for the reasonable

1    inference of the existence of the conspiracy that is pled in

2    their case.

3            Now, the problem that the plaintiffs have is that

4    they have pled a single conspiracy and they pled a global,

5    massive, overarching conspiracy that affects a whole -- what

6    they define as the wire harness industry.  The problem that

7    they have is that the guilty pleas they have relied upon

8    primarily, particularly our guilty plea, don't support it.

9    In fact, what should be somewhat informative to the Court in

10   this case, and while I know the Government oftentimes does

11   not necessarily proceed on the basis of the investigation

12   that is being conducted, I can assure you if they thought

13   that this was an international cartel and that this

14   international cartel somehow fixed the prices on a global

15   basis and an overarching conspiracy for all of these

16   automotive parts, they would have charged somebody with it.

17   They might not have charged us because we are so small.  They

18   may have charged some of the bigger players in the case.

19   They would have done that, they would not have walked away

20   from such a case, and they conducted an extensive and what

21   the plaintiffs have called a global investigation of this

22   industry.

23           To get to the point about the standard, not only is

24   that an important plausibility standard which calls upon the

25   Court to use its common sense and experience, to look at the

 1   situation and then say yes, I believe that this could lead to

 2   a probable violation, but there is another important aspect

 3   of Twombly and that's the gatekeeper function.  The Supreme

 4   Court has decided that it needed the district courts to

 5   operate as a gatekeeper not only at the point of summary

 6   judgment, which it did with Matauszak, but at the earliest

 7   point of the pleading stage in order to preserve the

 8   integrity of the federal court system, which is being

 9   overburdened, and in our case to protect small companies from

10   being overburdened with the massive discovery that takes

11   place in a complex, protracted antitrust litigation.  This is

12   clearly going to be a massive, protracted antitrust case.  It

13   is going to become an unwieldy massive antitrust if what is

14   really going on here is not some single conspiracy but a

15   bunch of smaller disparate conspiracies.  It will be the type

16   of case that becomes so unwieldy it will become a morass and

17   maybe turn into a quagmire because it would be so disparate.

18   We don't want to be caught up in that, we don't want to get

19   caught up in something that we are not a part of.

20          But let's get to the point.  Now, the principles

21   that I just announced were recently reconfirmed by the

22   Sixth Circuit in the case -- and I haven't had a chance to

23   analyze the case or read the case.  I got a report of the

24   case, it is the case that involves the Ohio Police and Fire

25   vs. The Standard Employee and Financial Group, and it

 1    reconfirms the importance of the two points that I just made

 2    about the Twombly decision, and it made it in a context where

 3    it actually refused to allow the plaintiff in that case to

 4    amend the complaint and dismissed it with prejudice.

 5                But to get to the real point of the plaintiffs'

 6    case as it relates to GS Electech, they rely on two things.

 7    One is the actual guilty plea itself and, two, somehow they

 8    refer in a footnote to what went on at the hearings, and they

 9    also throw in a bunch of boilerplates about this is a

10    Government investigation, you have to look at the whole thing

11    as a whole, but when you boil it all down and get to the

12    nitty-gritty all that is involved with GS Electech is its

13    guilty plea.  The guilty plea of GS Electech, as I outlined

14    it to you before, does not support a participation in a

15    global conspiracy either by GS Electech or its affiliated

16    companies.  And, in fact, first of all, the plea describes

17    GS Electech as an assembler of speed sensor wire assemblies,

18    not a manufacturer.  So basically it is an assembler, it gets

19    the parts from somebody and it puts them together and it

20    assembles them.

21                The conspiracy involved only one other

22    co-conspirator, another company that was a co-conspirator,

23    not 5, not 6, not 7, not 10, not 15, just one other

24    co-conspirator.  Only one manufacturer was the target.  A

25    very small volume of commerce was involved.  The Government

1    said $11 million was the volume of commerce impacted by the

2    alleged conspiracy.

3            Now, what is ironic about that point, if you look

4    at the plaintiffs' complaints, and we are only responding to

5    the end payors and to the auto dealers because they are the

6    only complaints where any of us are mentioned, we are not

7    mentioned in the direct purchasers' complaint, but in the

8    complaints that I refer to they have a pie chart and they

9    also have a list of the companies and the amount of commerce

10   each company carries volume.  We are in the others, and the

11   others is such a small fraction and we are such an

12   infinitesimal part of that small fraction that if somebody

13   wanted to create an international cartel I can assure you,

14   Your Honor, nobody would invite us to the meeting.

15           We get to the next point, and this is a point that

16   I think everybody has been trying to get their arms around,

17   the product that we sell is a product that is probably

18   somewhere between $5 and $10 per car.  It is a very small,

19   low-end wire system, and it is just wires and a connecter,

20   that's all it is.  If you look at the list of products that

21   Maggie Sullivan had listed in her handout that she had given

22   to the Court, we don't make any of those more sophisticated

23   products.  Those sophisticated products all function

24   differently than how our product functions.  We don't compete

25   with those products.  We don't make fuel boxes, ECUs or

1    anything else.  It is extremely difficult to suggest that

2    somehow we conspired with them to fix a global market.

3           THE COURT:  Are you saying you are not part of the

4    wire harness system or that you are too insignificant?

5           MR. ROMANO:  I'm saying both.  There is no such

6    thing -- I mean, they cited a case for instance -- you can

7    call almost any industry generic, and they cited the case, it

8    is in In Re: Polypropylene Carpet Antitrust Litigation,

9    178 Federal Rules Decision 603.

10          THE COURT:  Okay.

11          MR. ROMANO:  Now, admitted, in that case the number

12   of products was large but the court made it clear that it

13   disagreed with the concept that polypropylene carpet industry

14   products and markets are fungible, and the reason they said

15   it is because they performed different functions, not only

16   did they perform different functions but they were made to

17   different specifications.

18          What I want to emphasize in this case, you take

19   even this $5 or $10 piece of equipment that we sell, it is a

20   negotiation.  A big company like maybe Toyota or Honda will

21   put out an RFQ, and the negotiation process starts but it is

22   not just a negotiation on price.  Their engineers are

23   involved.  They want to develop a better product for the next

24   generation of Camrys or whatever it is and so they have

25   engineers that say hey, we wanted to do X, we have engineers

1    that say we will work with you, and the engineers work back

2    and forth along with the negotiations, it is an extremely sui

3    generis process.  You can't compare that product even with

4    another product that is being made for another function where

5    the same process is going on.  The whole concept here is

6    automotive manufacturers want to make their cars as hi-tech

7    as they can make them so that consumers will buy them.

8    Someday they hope they are going to have cars on highways

9    where you press a button and say I want to go to Detroit and

10   you are in Washington, D.C. and it will take you to Detroit,

11   because it will be so much technology involved.  These

12   products have a lot of hi-tech to them because they make

13   other hi-tech products work better.  So that's one of the

14   reasons why the idea that they are competitive or homogeneous

15   or somehow fungible, that's not the case at all, and it will

16   be really unfortunate to find that out after six months of

17   discovery or five months of discovery.

18          It is incumbent upon the plaintiffs it to allege

19   factual information to supply the Court with the kind of

20   information so it can manage these cases, not only to state a

21   claim but state it in such a way where the Court can make a

22   determination whether this is one big conspiracy or not.

23          Now, the floor is not only the guilty plea, not

24   only does our guilty plea not support it, it undermines -- as

25   I described it, it undermines the concept of their theory of

 1    a single global conspiracy, but what's even better than that,

 2    Your Honor, and what makes this case extremely unique,

 3    extremely unique, is the plaintiffs cite in one of their

 4    footnotes to what happened at the hearing, and they cite to

 5    the fact that the Government stated that somehow or other a

 6    footnote -- on page -- well, I don't have it directly

 7    available, but in a footnote they cite to the Government

 8    saying at the transcript at the hearing that this case arose

 9    out of its investigation.  Well, what they did, Your Honor,

10    is they left out the good part, the part that helps us, they

11    left that out, but not only is it a good part it is an

12    extremely good part.

13            THE COURT:  Glad it wasn't a footnote.

14            MR. ROMANO:  They shouldn't have cited a footnote,

15    I don't think, but they did cite a footnote and they relied

16    on what the Government said in part, but what they left out

17    was what the Government judicially agreed to.  In that

18    transcript a statement was made and the Government said we

19    agree with that statement, and the statement is the available

20    evidence neither indicates nor suggests that GS Electech was

21    a party to any overarching wire harness conspiracy involving

22    the companies which have been previously charged or have pled

23    guilty in this court including Furukawa and Yazaki and

24    certain other major suppliers.  The plea agreement makes it

25    clear that GS Electech was involved with only one other

 1   co-conspirator, so it is a two-company conspiracy, and that's

 2   on pages 5 and 6 of the transcript, which is Exhibit B to our

 3   motion, which is page 7 of our handout, Your Honor.

 4          I think it is pretty clear from that statement by

 5   the Government that it would be virtually impossible to infer

 6   based on the allegations of the complaint, the guilty plea

 7   and this statement, Your Honor, that somehow or other you

 8   could draw an inference that we were participants or had

 9   anything to do with an overarching, global, massive

10   conspiracy that the plaintiffs assert without any foundation,

11   by the way, is a conspiracy in this case.

12          So now the other point I would like to make and --

13          THE COURT:  Who is the other company in the

14   two-company conspiracy?

15          MR. ROMANO:  Excuse me?

16          THE COURT:  Who is the other company in the

17   two-company conspiracy?

18          MR. ROMANO:  Who was the other company?

19          THE COURT:  Yes.

20          MR. ROMANO:  My best information, the Government

21   would never tell us, we had to guess, but through other

22   sources we believe it is Sumitomo.

23          THE COURT:  But you haven't been told that, you

24   haven't been officially told that by the Government or --

25          MR. ROMANO:  Well, I wouldn't say -- I don't know

 1   what the word officially means but we have been informed.  I

 2   would be less than honest if I said I wasn't informed of it

 3   from a reliable source.  I wouldn't call it official.

 4        THE COURT:  Well, assuming you pled guilty -- I

 5   guess I should say this, assuming you pled guilty to

 6   conspiracy you must have had somebody that you conspired

 7   with, right, so you would have known?

 8        MR. ROMANO:  Well, one of the problems that you can

 9   find in these situations, Your Honor, is you do your

10   investigation, the Government has done an incredible amount

11   of investigation, there is usually someone claiming leniency

12   in the case, so the Government has a certain leverage in

13   negotiating with you and you are trying to work it out so

14   that nobody goes to jail and the fine is as small as you can

15   make it, so you do the best you can under the circumstances.

16        But even if it -- it doesn't make any difference

17   whether we pled guilty with Sumitomo -- or we pled guilty and

18   Sumitomo was the other co-conspirator.  The fact of the

19   matter is the Government clearly said we weren't part of

20   anything else, that's the important point.  The important

21   point of the Government's concession is that they are saying

22   on the record, and they don't do it often, maybe almost --

23   I'm not familiar with it ever happening before but I'm sure,

24   you know, because I'm not familiar with it doesn't mean it

25   didn't happen, okay, but the point is that they don't go

 1   around on the record and say, hey, this is a very limited

 2   conspiracy, no one else is involved but one other conspirator

 3   and they are not involved in any other global alleged

 4   so-called or whatever conspiracy that is being asserted by

 5   somebody.  So I think that's a very telling point, it is not

 6   something -- I mean, I don't think that in and of itself is

 7   essential for our position but I think it is an imposition, I

 8   think it makes it impossible, Your Honor, to infer that we

 9   were part of a global conspiracy.

10        With all the evidence that the Government had

11   available to it and with the plaintiffs asserting ad nauseam

12   that the Government conducted this broad investigation and

13   then the upshot of it is that the Government concedes that we

14   weren't part of a global conspiracy, I think that's

15   compelling in terms of precluding the possibility of going

16   forward and being able to infer the existence of the

17   conspiracy.

18        Now, in the face of that we don't believe the Court

19   should ignore the important gatekeeper function that the

20   Supreme Court stated was part of the process.  We believe

21   that this calls for the Court to look carefully at the

22   situation and indicate that this company should not be

23   exposed to the massive discovery and the protracted

24   litigation that is going to cost them millions of dollars and

25   maybe even disrupt their ability to be competitive in the

1    marketplace when there is almost nothing to support the very

2    claim that the plaintiffs are making.

3            With respect to the affiliated companies, Your

4    Honor, there are both subs, they are alleged to be subs.

5    Clearly if I'm correct and the Government's concession is

6    conclusive, which I believe that it is, then they go as well,

7    but even if I'm not correct it is pretty obvious to me if you

8    read the plaintiffs' 31-page brief that they are concerned

9    with their allegations with respect to the subs because they

10   only allege we are subs, they only allege that GS Wiring and

11   GS Manufacturing were companies that are wholly owned, they

12   don't allege they did anything wrong, they went to any

13   meetings or anything like that; that we implemented the

14   conspiracy in some manner, shape or form, they don't allege

15   anything of that.  So it is fundamentally flawed as well as

16   with the subsidiary corporations.

17           If the Court has no questions I can make it as

18   short and sweet as you would like?

19           THE COURT:  No, I'm fine.  Very interesting point.

20   Okay.

21           MR. ROMANO:  Thank you for your time and your

22   consideration, Your Honor.

23           THE COURT:  Reply.

24           MR. DAVIDOW:  Yes.

25           THE COURT:  Let me ask first, you argued --

```
 1          MR. DAVIDOW:  I argued Leoni, Joel Davidow.

 2          THE COURT:  Wait a minute.  Mr. Barnes, you weren't

 3     adding anything to that argument, were you?

 4          MR. BARNES:  No, Your Honor.  The only thing I

 5     would add very briefly is that neither of the subsidiary

 6     companies of GS Electech, specifically GSW Manufacturing or

 7     GSW Wiring, neither of those companies pled guilty, they are

 8     simply alleged to be subsidiaries, as Mr. Romano pointed out,

 9     that clearly, clearly is insufficient under the standards

10     annunciated in Twombly and adopted by this Court.

11          THE COURT:  Okay.

12          MR. DAVIDOW:  Well, I will feel a little free on my

13     time because I think my opponent instead of 10 minutes went

14     about 25 but I will try to stay within 10.

15          THE COURT:  You don't have to match it.

16          MR. DAVIDOW:  And I have a plane to catch.

17          First, if I may interrupt for a moment, my team

18     would like to ask the Court to order that all slides be filed

19     so that people who aren't here could see what was on

20     everybody's slides.  You can ask that everybody here who

21     presented a slide give it to the clerk so that it is

22     obtainable under the docket, the records.

23          THE COURT:  Well, it will have to be filed as an

24     exhibit so I will have to ask my clerk about that

25     electronically, how it --
```

1          MR. DAVIDOW:  I was asked to make the statement.  I

2    have said --

3          THE COURT:  Nothing is simple nowadays.

4          MR. DAVIDOW:  I hope it is, it is just for fairness

5    of those who were here or not here to actually knowing what

6    occurred.

7          I think the case --

8          MR. MAROVITZ:  Pardon me, Your Honor.

9    Andy Marovitz for Lear Corporation.

10         Would it make sense -- I mean, we are happy just to

11   serve it upon lead counsel for each of the plaintiff groups,

12   all the demonstrative slides, and that would avoid the need

13   for formal filing with the Court and that way plaintiffs

14   would receive it?

15         THE COURT:  That would be very good.

16         MR. MAROVITZ:  If we can receive the same courtesy

17   with respect to the plaintiffs?

18         THE COURT:  Yes, if anybody submitted slides --

19         MR. DAVIDOW:  My team says that I can accept that

20   offer, it is very gracious, and we will reciprocate.  Thank

21   you.

22         To try to keep this fast, make my plane, miss

23   another dinner in Greektown, which was very good last night,

24   the lamb chops were excellent, I'm going to state five

25   principles of law that I think all of us in this field know,

1    including Your Honor, and those five or six principles really

2    end this case without, you know, a lot of other things.

3            The first principle is that when we sue each of the

4    defendants here who has pleaded guilty we don't have to know

5    that each of them sold every 1 of the 12 types of wire

6    harness.  As far as I know Yazaki sold 7 of the 12 kinds, or

7    Sumitomo sold 4 of the -- there is simply no requirement that

8    says if you define a product area in which there was price

9    fixing and you sue people and they sold you something that

10   the Government listed they had to sell every product.  Well,

11   then do we get to a minimum, that is if it is 4 of the 12 you

12   are still in but if it is 3 of the 12 you are out or so on?

13           Then I would ask to make a practical point, which

14   is there's lots of ways to run a bid rig.  Just from

15   experience in my 40 years of fooling around with this stuff,

16   you could trade products, that is, it would be a bid rig to

17   say I will bid on ECUS this week if you will let me win on

18   the main wire harness next week.  So even though that

19   particular deal wasn't ECU versus ECU, it was I will trade

20   you an ECU bid for you staying out so I can win a different

21   bid next week or something else.

22           Next there can be cooperative bids, that is if

23   somebody wants a wire harness and an ECU and they want a

24   price for both, two or three people can put together a

25   syndicate and they could have a syndicate in which they are

```
 1    perfectly aware that they are going to fix the bid but the
 2    bid is going to be a combination of three products, an ECU
 3    and a harness or something else, in which case there are lots
 4    of ways to run a bid rig, which we will learn gradually as
 5    this case goes on, of what was traded, what was combined,
 6    what was bid.
 7              THE COURT:  You aren't trying to convince them, are
 8    you?
 9              MR. DAVIDOW:  It is not going to work.
10              MR. SANKBEIL:  Can we vote now?  Poll the jury,
11    Your Honor.
12              MR. DAVIDOW:  It is not going to work.  They are
13    beyond reason.  Okay.
14              The third point is that Twombly wants to know
15    whether you have a claim that's not speculative.  Well, if
16    GS Electech says in essence, yes, I did fix a price on a wire
17    harness product that has a dollar value and it went into
18    products which, let's say, we didn't -- you didn't ask him
19    the question of which car company it was.  Let's say it was
20    Honda or Toyota.  So it was a $5 product, they talked to
21    Sumitomo, it went into a Honda, and among my dealers we have
22    Honda dealers, Toyota dealers, we have a class that would
23    include all the Honda dealers in America, all the Toyota
24    dealers, and at $5 apiece, I think there's 300,000 dealers
25    and 7,000 Honda -- 7 million Honda Civics are sold, so at $5
```

1    a Honda Civic, 7 million, it adds up and suddenly it is a lot

2    of money.

3           So the answer is when they pleaded guilty to fixing

4    prices on a product that is a wire harness with Sumitomo to

5    Honda which is then sold to my Honda dealers, the question is

6    is that speculation or is that a perfectly good Twombly case,

7    and the answer is it is a perfectly good case.  We are not

8    making the case up.

9           The question then comes the lawyer for GS Electech

10   makes what my father would call a rachmonus (phonetic)

11   argument, which means compassion, it says we are very small

12   and it is awful that we might be in a very big case with a

13   very large thing when we only did a little piece of the

14   conspiracy, which is fine, but there are three answers to

15   that.

16          The first is the law to detour people doesn't read

17   that way.  It says if you take a step to further the

18   conspiracy, which turns out to be big, you owe all of it,

19   joint and several liability for an overt act.  The size of

20   the conspiracy can be determined as discovery goes on.

21          The second way of putting it is I didn't know I was

22   helping a big conspiracy.  That can be absolutely true.  If

23   GS Electech was asked by Sumitomo, look, don't ask us why, we

24   will do you a favor, don't go too low on this bid, and then

25   we put Sumitomo on the stand and say well, why did you say

1    that to GS Electech?  Well, we had talked to Yazaki and so on

2    and we didn't want the prices to start going down, so to

3    prevent the whole thing from falling apart I asked Electech

4    to do it and they did it.

5            So the answer is it doesn't matter whether Electech

6    knew that Sumitomo had a great big elastic purpose in asking

7    them to fix that big.  Whether they did or not is a straight

8    deposition question.  I deposed the person from Sumitomo and

9    Yazaki who talked to Electech and say what was the

10   circumstances, why did you talk to others about going to see

11   Electech.  It turns out yes or no either way.  It is a trial

12   point.

13           The next point is, all right, so they are small.

14   Now, we have a law called Xperia, and that says if you are

15   the first to squeal, if you came in -- if Electech had come

16   in in the beginning then they would get Xperia rights and

17   Xperia rights would say very specifically in federal law 2004

18   that they cannot be punished for more money than their share

19   of the market.  This would have been a wonderful strategy on

20   the part of Electech but they weren't quick enough, and since

21   you either get it or you don't, they missed the boat.  They

22   are not under Xperia as a leniency candidate, and those are

23   the only people who escape joint and several liability for

24   the size of the conspiracy.

25           The last point, which is not for me to do but I

Motion Hearing • December 6, 2012

**174**

1    used to be a defense lawyer for clients for 20 years, is you

2    form a joint defense committee with a settlement committee

3    and to be reasonable you tell Electech that it only has to

4    contribute one percent to the settlement money because it

5    only made one percent, and that's a very just and reasonable

6    way for defendants to act but that's between them.  And this

7    argument by Electech isn't for you, as the Judge, or for me,

8    it is for the defendants in allocating the settlement burden

9    on Electech.  If they got Electech in a lot of trouble and

10    they want to get them out cheap they will get them out cheap,

11    but I don't have any legal duty to listen to this plea about

12    how Electech was -- what it was.

13           Lastly we come to the obvious point here, which

14    goes back to where we -- are in the case, and that is that we

15    know that they have conspired with a major player, we know

16    that the major players were are in all the products, we know

17    there was conversations about it, we don't know what was

18    said.  We know the Government didn't want to go further but

19    we also know it was the rule of law that we have a lower

20    burden of proof and we are simply not bound by that.  If we

21    think there is a 30 percent chance that the Electech

22    conspiracy was really part of a broader conspiracy, and we

23    can get that out by asking an even better question of the

24    person they talked to, we have an absolute right to use all

25    of our skill for our plaintiffs and try to prove that, and we

Motion Hearing • December 6, 2012

**175**

1    only need this slight evidence rule.  I would say that the

2    case I cited was Flat Glass, which says that it only takes

3    slight evidence to add to the broader conspiracy.  That was

4    written by Michael Chertoff, who I think is a magnificent

5    federal judge and the head of Homeland Security, and I would

6    certainly follow his wisdom on that.

7             I think those are the principles that govern this

8    case, and that I don't need any more time.

9             THE COURT:  Thank you, Mr. Davidow.

10            Mr. Romano, we now know your share.  If you would

11   get together and have a settlement conference.

12            MR. ROMANO:  I would just like to make a couple of

13   points.  One is it is nice to hear a generalization of what

14   generally happens.  What generally happens isn't what

15   happened in this case however when the Government got up and

16   agreed with the statement and not only included Yazaki and

17   Furukawa but it said and other major suppliers.  Now, they

18   didn't tell us at the time that one of those other major

19   suppliers was Sumitomo, they meant there was no meeting of

20   the minds between GS Electech and Sumitomo with respect to a

21   global, massive conspiracy assuming Sumitomo had such a plan.

22   There was no meeting of the mind by us.  That is an essential

23   feature.

24            The cases that they cite where you don't have to

25   know all the details that a co-conspirator is involved in are

Motion Hearing • December 6, 2012

**176**

 1     meaningless cases because all of those cases say as a
 2     safeguard you must establish that there was a meeting of the
 3     minds for the plan that is being charged as part of the
 4     conspiracy, and they don't have that.  They don't have it in
 5     their pleading, and they don't have it because of the
 6     Government's judicial concession, so on that score alone,
 7     Your Honor, I think the argument to respond to us fails.  I
 8     think that's all I have to say.
 9             THE COURT:  Okay.
10             MR. BARNES:  Nothing further.
11             THE COURT:  All right.  I think in checking we are
12     done.  Did I miss anybody?
13             (No response.)
14             THE COURT:  Anybody have any other comments?
15             (No response.)
16             THE COURT:  Okay.  Let me just say your briefing is
17     excellent, it is somewhat overwhelming.  I kind of laugh with
18     my law clerk and I, I don't know how you put together all of
19     these thousands of pages.  I like the charts, I like the way
20     that was all laid out, that was very good and it will be very
21     helpful.  As I said to you yesterday, try and put your main
22     cases in the actual brief.  I know you like footnotes, I used
23     to always tell my law clerks I don't read footnotes, I guess
24     it is a warning.  We will do briefs.  Really, I'm at an
25     absolute loss to tell you how long that would take.  It was

Motion Hearing • December 6, 2012

1   my hope that I would get everything out in a couple of

2   months, and it still is my hope, but I don't know.  I don't

3   know particularly with all the different states I found it

4   was very hard to read, and I read it and then I said what did

5   I just read.  I'm sure you have had that experience.

6           So the Court will do opinions and we will get them

7   out as quickly as we can but we do want to probably take more

8   time on this first set because I see it as being something

9   that will be very important for every other part, though I'm

10  a little concerned with some of the arguments here as to

11  whether they should be separate parts and all of that other

12  kind of thing.  We will see what happens.  I do want to say

13  that you all did a marvelous job, and it is a real pleasure

14  to be working with you and to see the quality of work that

15  you do.  It doesn't mean I'm going to approve a lot of fees

16  but I do appreciate your work.  I wish you all a very good

17  holiday, and we will see you in March.

18          (Proceedings concluded at 3:40 p.m.)

19                      _    _    _

20

21

22

23

24

25

1          *CERTIFICATION*

2

3          I, Robert L. Smith, Official Court Reporter of

4     the United States District Court, Eastern District of

5     Michigan, appointed pursuant to the provisions of Title 28,

6     United States Code, Section 753, do hereby certify that the

7     foregoing pages comprise a full, true and correct transcript

8     taken in the matter of Automotive Parts Antitrust Litigation,

9     Case No. 12-02311, on Thursday, December 6, 2012.

10

11

12                         *s/Robert L. Smith*
                          Robert L. Smith, RPR, CSR 5098
13                        Federal Official Court Reporter
                          United States District Court
14                        Eastern District of Michigan

15

16

17     Date:  12/14/2012

18     Detroit, Michigan

19

20

21

22

23

24

25