```
 1                     UNITED STATES OF AMERICA
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                          —    —    —

 4   IN RE:  AUTOMOTIVE PARTS          Master File No. 12-md-02311
     ANTITRUST LITIGATION              Hon. Marianne O. Battani
 5
     _____/
 6

 7               STATUS CONFERENCE / MOTION HEARINGS

 8           BEFORE THE HONORABLE MARIANNE O. BATTANI
                    United States District Judge
 9            Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
10                       Detroit, Michigan
                      Wednesday, June 4, 2014
11

12   APPEARANCES:

13   Direct Purchaser Plaintiffs:

14           DOUGLAS ABRAHAMS
             KOHN, SWIFT & GRAF, P.C.
15           One South Broad Street, Suite 2100
             Philadelphia, PA  19107
16           (215) 238-1700

17           THOMAS C. BRIGHT
             GOLD, BENNET, CERA & SIDENER, L.L.P.
18           595 Market Street, Suite 2300
             San Francisco, CA  94105
19           (415) 777-2230

20           WILLIAM G. CALDES
             SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
21           1818 Market Street, Suite 2500
             Philadelphia, PA  19103
22           (215) 496-0300

23           DAVID H. FINK
             FINK & ASSOCIATES LAW
24           100 West Long Lake Road, Suite 111
             Bloomfield Hills, MI  48304
25           (248) 971-2500
```

```
 1   APPEARANCES: (Continued)

 2   Direct Purchaser Plaintiffs:

 3         LEWIS H. GOLDFARB
           McELROY, DEUTSCH, MULVANEY & CARPENTER, L.L.P.
 4         1200 Mount Kemble Avenue
           Morristown, NJ  07962
 5         (973) 993-8100

 6         GREGORY P. HANSEL
           PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
 7         One City Center
           Portland, ME  04112
 8         (207) 791-3000

 9         WILLIAM E. HOESE
           KOHN, SWIFT & GRAF, P.C.
10         One South Broad Street, Suite 2100
           Philadelphia, PA  19107
11         (215) 238-1700

12         JONATHAN M. JAGHER
           SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
13         181 Market Street, Suite 2500
           Philadelphia, PA  19103
14         (215) 496-0300

15         STEVEN A. KANNER
           FREED, KANNER, LONDON & MILLEN, L.L.C.
16         2201 Waukegan Road, Suite 130
           Bannockburn, IL  60015
17         (224) 632-4502

18         JOSEPH C. KOHN
           KOHN, SWIFT & GRAF, P.C.
19         One South Broad Street, Suite 2100
           Philadelphia, PA  19107
20         (215) 238-1700

21         SARA BIGGS LEIVICK
           KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
22         1633 Broadway Avenue
           New York, NY  10019
23         (212) 506-1716

24

25
```

```
 1   APPEARANCES: (Continued)

 2   Direct Purchaser Plaintiffs:

 3           ERIC J. PELTON
             KIENBAUM, OPPERWALL, HARDY & PELTON, P.L.C.
 4           280 North Old Woodward, Suite 400
             Birmingham, MI  48009
 5           (248) 645-0000

 6           MATTHEW RUAN
             COHEN MILSTEIN
 7           1100 New York Avenue NW, Suite 500 West
             Washington, D.C.  20005
 8           (202) 408-4600

 9           EUGENE A. SPECTOR
             SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
10           1818 Market Street, Suite 2500
             Philadelphia, PA  19103
11           (215) 496-0300

12           JASON J. THOMPSON
             SOMMERS SCHWARTZ, P.C.
13           2000 Town Center, Suite 900
             Southfield, MI  48075
14           (248) 355-0300

15           RANDALL B. WEILL
             PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
16           One City Center
             Portland, ME  04112
17           (207) 791-3000

18   End-Payor Plaintiffs:

19           WARREN T. BURNS
             SUSMAN GODFREY, L.L.P.
20           901 Main Street, Suite 5100
             Dallas, TX  75202
21           (214) 754-1928

22           FRANK C. DAMRELL
             COTCHETT, PITRE & McCARTHY, L.L.P.
23           840 Malcolm Road
             Burlingame, CA  94010
24           (650) 697-6000

25
```

```
 1    APPEARANCES:   (Continued)

 2    End-Payor Plaintiffs:

 3          E. POWELL MILLER
            THE MILLER LAW FIRM, P.C.
 4          950 West University Drive, Suite 300
            Rochester, MI  48307
 5          (248) 841-2200

 6          ALYSON OLIVER
            OLIVER LAW GROUP
 7          950 West University Drive, Suite 300
            Rochester, MI  48307
 8          (248) 327-6556

 9          HOLLIS L. SALZMAN
            ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
10          601 Lexington Avenue, Suite 3400
            New York, NY  10022
11          (212) 980-7405

12          ADAM T. SCHNATZ
            THE MILLER LAW FIRM, P.C.
13          950 West University Drive, Suite 300
            Rochester, MI  48307
14          (248) 841-2200

15          STEVEN G. SKLAVER
            SUSMAN GODFREY, L.L.P
16          1901 Avenue of the Stars, Suite 950
            Los Angeles, CA  90067
17          (310) 789-3123

18          STEVEN N. WILLIAMS
            COTCHETT, PITRE & McCARTHY, L.L.P.
19          840 Malcolm Road
            Burlingame, CA  94010
20          (650) 697-6000

21    Dealership Plaintiffs:

22          DON BARRETT
            BARRETT LAW OFFICES
23          P.O. Drawer 987
            Lexington, MS  39095
24          (601) 834-2376

25
```

```
 1 │  APPEARANCES:  (Continued)

 2 │  Dealership Plaintiffs:

 3 │        JONATHAN W. CUNEO
       │        CUNEO, GILBERT & LaDUCA, L.L.P.
 4 │        507 C Street NE
       │        Washington, D.C.  20002
 5 │        (202) 789-3960

 6 │        JOEL DAVIDOW
       │        CUNEO, GILBERT & LaDUCA, L.L.P.
 7 │        507 C Street NE
       │        Washington, D.C.  20002
 8 │        (202) 789-3960

 9 │        BRENDAN H. FREY
       │        MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
10 │        1361 East Big Beaver Road
       │        Troy, MI  48083
11 │        (248) 457-9200

12 │        JOHN KAKINUKI
       │        KAKINUKI LAW OFFICE, P.C.
13 │        2 Civic Center Drive, #4222
       │        San Rafael, CA  94913
14 │        (415) 492-2011

15 │        GERARD V. MANTESE
       │        MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
16 │        1361 East Big Beaver Road
       │        Troy, MI  48083
17 │        (248) 457-9200

18 │        SHAWN M. RAITER
       │        LARSON KING, L.L.P.
19 │        30 East Seventh Street, Suite 2800
       │        Saint Paul, MN  55101
20 │        (651) 312-6500

21 │        VICTORIA ROMANENKO
       │        CUNEO, GILBERT & LaDUCA, L.L.P.
22 │        507 C Street NE
       │        Washington, D.C.  20002
23 │        (202) 789-3960

24 │

25 │
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3          ALDEN L. ATKINS
            VINSON & ELKINS, L.L.P.
 4          2200 Pennsylvania Avenue NW, Suite 500 West
            Washington, D.C.  20037
 5          (202) 639-6613

 6          GARY K. AUGUST
            ZAUSMER, KAUFMAN, AUGUST & CALDWELL, P.C.
 7          31700 Middlebelt Road, Suite 150
            Farmington Hills, MI  48334
 8          (248) 851-4111

 9          CRAIG D. BACHMAN
            LANE POWELL, P.C.
10          601 SW Second Avenue, Suite 2100
            Portland, OR  97204
11          (503) 778-2100

12          DONALD M. BARNES
            PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
13          1919 Pennsylvania Avenue NW, Suite 500
            Washington, D.C.  20006
14
            MICHAEL G. BRADY
15          WARNER, NORCROSS & JUDD, L.L.P.
            2000 Town Center, Suite 2700
16          Southfield, MI  48075
            (248) 784-5032
17
            JEREMY CALSYN
18          CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
            2000 Pennsylvania Avenue NW
19          Washington, D.C.  20006
            (202) 974-1500
20
            STEVEN F. CHERRY
21          WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
            1875 Pennsylvania Avenue NW
22          Washington, D.C.  20006
            (202) 663-6321
23
            KATHERINE CLEMONS
24          ARNOLD & PORTER, L.L.P.
            555 Twelfth Street NW
25          Washington, D.C. 20004
            (202) 942-5000
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3          JAMES L. COOPER
            ARNOLD & PORTER, L.L.P.
 4          555 Twelfth Street NW
            Washington, D.C. 20004
 5          (202) 942-5000

 6          KENNETH R. DAVIS, II
            LANE POWELL, P.C.
 7          601 SW Second Avenue, Suite 2100
            Portland, OR  97204
 8          (503) 778-2100

 9          DEBRA H. DERMODY
            REED SMITH, L.L.P.
10          225 Fifth Avenue, Suite 1200
            Pittsburgh, PA  15222
11          (412) 288-3302

12          GEORGE B. DONNINI
            BUTZEL LONG, P.C.
13          150 West Jefferson Avenue, suite 100
            Detroit, MI  48226
14          (313) 225-7000

15          DAVID P. DONOVAN
            WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
16          1875 Pennsylvania Avenue NW
            Washington, D.C.  20006
17          (202) 663-6868

18          MOLLY M. DONOVAN
            WINSTON & STRAWN, L.L.P.
19          200 Park Avenue
            New York, NY  10166
20          (212) 294-4692

21          DAVID A. ETTINGER
            HONIGMAN, MILLER, SCHWARTZ & COHN, L.L.P.
22          2290 First National Building
            660 Woodward Avenue, Suite 2290
23          Detroit, MI  48226
            (313) 465-7368
24

25
```

```
 1  │ APPEARANCES:  (Continued)

 2  │ For the Defendants:

 3  │         J. CLAYTON EVERETT, JR.
    │         MORGAN, LEWIS & BOCKIUS, L.L.P.
 4  │         1111 Pennsylvania Avenue NW
    │         Washington, D.C. 20004
 5  │         (202) 739-5860

 6  │         PETER M. FALKENSTEIN
    │         JAFFE, RAITT, HEUER & WEISS, P.C.
 7  │         27777 Franklin Road, Suite 2500
    │         Southfield, MI  48034
 8  │         (248) 351-3000

 9  │         JAMES P. FEENEY
    │         DYKEMA GOSSETT, P.L.L.C.
10  │         39577 Woodward Avenue, Suite 300
    │         Bloomfield Hills, MI  48304
11  │         (248) 203-0841

12  │         MICHELLE K. FISCHER
    │         JONES DAY
13  │         51 Louisiana Avenue NW
    │         Washington, D.C.  20001
14  │         (202) 879-4645

15  │         LARRY S. GANGNES
    │         LANE POWELL, P.C.
16  │         1420 Fifth Avenue, Suite 4100
    │         Seattle, Washington  98101
17  │         (206) 223-7000

18  │         DAVID C. GIARDINA
    │         SIDNEY AUSTIN, L.L.P.
19  │         One South Dearborn Street
    │         Chicago, IL  60603
20  │         (312) 853-4155

21  │         JASON R. GOURLEY
    │         BODMAN P.L.C.
22  │         1901 St. Antoine Street, 6th Floor
    │         Detroit, MI  48226
23  │         (313) 259-7777

24  │

25  │
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3          ADAM C. HEMLOCK
            WEIL, GOTSHAL & MANGES, L.L.P.
 4          767 Fifth Avenue
            New York, NY  10153
 5          (212) 310-8281

 6          FRED K. HERRMANN
            KERR, RUSSELL & WEBER, P.L.C.
 7          500 Woodward Avenue, Suite 2500
            Detroit, MI  48226
 8          (313) 961-0200

 9          HOWARD B. IWREY
            DYKEMA GOSSETT, P.L.L.C.
10          39577 Woodward Avenue, Suite 300
            Bloomfield Hills, MI  48304
11          (248) 203-0526

12          HEATHER LAMBERG KAFELE
            SHEARMAN & STERLING, L.L.P.
13          801 Pennsylvania Avenue NW
            Washington, D.C.  20004
14          (202) 508-8097

15          JEFFREY L. KESSLER
            WINSTON & STRAWN, L.L.P.
16          200 Park Avenue
            New York, NY  10166
17          (212) 294-4655

18          MEREDITH KINGSLEY
            ALSTON & BIRD, L.L.P.
19          1201 West Peachtree Street
            Atlanta, GA  30309
20          (404) 881-7000

21          ERIC MAHR
            WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
22          1875 Pennsylvania Avenue NW
            Washington, D.C.  20006
23          (202) 663-6099

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3         ALLYSON M. MALTAS
           LATHAM & WATKINS, L.L.P.
 4         555 Eleventh Street NW, Suite 1000
           Washington, D.C.  20004
 5         (202) 637-2200

 6         ANDREW S. MAROVITZ
           MAYER BROWN, L.L.P.
 7         71 South Wacker Drive
           Chicago, IL  60606
 8         (312) 701-7116

 9         W. TODD MILLER
           BAKER & MILLER, P.L.L.C.
10         2401 Pennsylvania Avenue NW, Suite 300
           Washington, D.C.  20037
11         (202) 663-7822

12         BRIAN M. MOORE
           DYKEMA GOSSETT, P.L.L.C.
13         39577 Woodward Avenue, Suite 300
           Bloomfield Hills, MI  48304
14         (248) 203-0772

15         GEORGE A. NICOUD, III
           GIBSON, DUNN & CRUTCHER, L.L.P.
16         555 Mission Street
           San Francisco, CA  94105
17         (415) 393-8200

18         RONALD S. NIXON
           KEMP KLEIN LAW FIRM
19         201 West Big Beaver Road, Suite 600
           Troy, MI  48084
20         (248) 528-1111

21         SETH B. ORKAND
           WILMER, CUTLER, PICKERING, HALE & DORR, L.L.P.
22         60 State Street
           Boston, MA  02109
23         (617) 526-6142

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3        MATTHEW L. POWELL
          KERR, RUSSELL & WEBER, P.L.C.
 4        500 Woodward Avenue, Suite 2500
          Detroit, MI  48226
 5        (313) 961-0200

 6        STEVEN ALAN REISS
          WEIL, GOTSHAL & MANGES, L.L.P.
 7        767 Fifth Avenue
          New York, NY  10153
 8        (212) 310-8174

 9        COURTNEY A. ROSEN
          SIDNEY AUSTIN, L.L.P.
10        One South Dearborn Street
          Chicago, IL  60603
11        (312) 853-7669

12        COREY W. ROUSH
          HOGAN LOVELLS US, L.L.P.
13        555 Thirteenth Street NW
          Washington, D.C.  20004
14        (202) 637-560

15        TIANA LEIA RUSSELL
          ARNOLD & PORTER, L.L.P.
16        555 Twelfth Street NW
          Washington, D.C.  20004
17        (202) 942-6807

18        DARIN M. SANDS
          LANE POWELL, P.C.
19        601 SW Second Avenue, Suite 2100
          Portland, OR  97204
20        (503) 778-2100

21        WM. PARKER SANDERS
          SMITH, GAMBRELL & RUSSELL, L.L.P.
22        1230 Peachtree Street NE
          Promenade Two, Suite 3100
23        Atlanta, GA  30309
          (404) 815-3684

24

25
```

Status Conference / Motion Hearings • June 4, 2014

**12**

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3        LARRY J. SAYLOR
          MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
 4        150 West Jefferson Avenue, Suite 2500
          Detroit, MI  48226
 5        (313) 496-7986

 6        JOHN E. SCHMIDTLEIN
          WILLIAMS & CONNOLLY, L.L.P.
 7        725 Twelfth Street NW
          Washington, D.C.  20005
 8        (202) 434-5901

 9        BRADLEY J. SCHRAM
          HERTZ SCHRAM, P.C.
10        719 Griswold Street, Suite 820-128
          Detroit, MI  48226
11        (313) 438-5001

12        SCOTT T. SEABOLT
          FOLEY & LARDNER, L.L.P.
13        500 Woodward Avenue, Suite 2700
          Detroit, MI  48226
14        (313) 234-7100

15        CRAIG SEEBALD
          VINSON & ELKINS, L.L.P.
16        2200 Pennsylvania Avenue NW, Suite 500 West
          Washington, D.C.  20037
17        (202) 639-6585

18        DAVID SHOGREN
          SIMPSON, THACHER & BARTLETT, L.L.P.
19        1155 F Street NW
          Washington, D.C.  20004
20        (202) 636-5562

21        STEPHEN J. SQUERI
          JONES DAY
22        901 Lakeside Avenue
          Cleveland, OH  44114
23        (216) 586-3939

24

25
```

Status Conference / Motion Hearings • June 4, 2014

**13**

```
 1    APPEARANCES:   (Continued)

 2    For the Defendants:

 3            ANITA STORK
              COVINGTON & BURLING, L.L.P.
 4            One Front Street
              San Francisco, CA  94111
 5            (415) 591-7050

 6            MARGUERITE M. SULLIVAN
              LATHAM & WATKINS, L.L.P.
 7            555 Eleventh Street NW, Suite 1000
              Washington, D.C.  20004
 8            (202) 637-2200

 9            JOANNE GEHA SWANSON
              KERR, RUSSELL & WEBER, P.L.C.
10            500 Woodward Avenue, Suite 2500
              Detroit, MI  48226
11            (313) 961-0200

12            RACHEL L. TALBOT
              CROWELL & MORING
13            1001 Pennsylvania Avenue NW
              Washington, D.C.  20004
14            (202) 624-2763

15            MAUREEN T. TAYLOR
              BROOKS, WILKINS, SHARKEY & TURCO
16            401 South Old Woodward Avenue, Suite 400
              Birmingham, MI  48009
17            (248) 971-1721

18            TEALE TOWEILL
              CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
19            2000 Pennsylvania Avenue NW
              Washington, D.C.  20006
20            (202) 974-1587

21            MICHAEL F. TUBACH
              O'MELVENY & MYERS, L.L.P.
22            Two Embarcadero Center, 28th Floor
              San Francisco, CA  94111
23            (415) 984-8700

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3         LINDSEY ROBINSON VAALA
           VINSON & ELKINS, L.L.P.
 4         2200 Pennsylvania Avenue NW, Suite 500 West
           Washington, D.C.  20037
 5         (202) 639-6585

 6         A. PAUL VICTOR
           WINSTON & STRAWN, L.L.P.
 7         200 Park Avenue
           New York, NY  10166
 8         (212) 294-4655

 9         WILLIAM A. VIGEN
           WILLIAMS & CONNOLLY, L.L.P.
10         725 Twelfth Street NW
           Washington, D.C.  2005
11         (202) 434-5000

12   Other Appearances:

13         TIMOTHY FRASER
           OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA
14         The Capital, PL-01
           Tallahassee, FL  32399
15         (850) 414-3733

16         KANCHANA WANGKEO LEUNG
           KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
17         1633 Broadway Avenue
           New York, NY  10019
18         (212) 506-1700

19         PATRICK F. MORRIS
           MORRIS & MORRIS, L.L.C.
20         4001 Kennett Pike, Suite 300
           Wilmington, DE  19807
21         (302) 426-0400

22         JAYE QUADROZZI
           YOUNG & ASSOCIATES
23         27725 Stansbury Boulevard, Suite 125
           Farmington Hills, MI  48334
24         (248) 353-8620

25
```

1    APPEARANCES:  (Continued)

2    **Other Appearances:**

3            LESLEY E. WEAVER
             **GREEN & NOBLIN, P.C.**
4            700 Larkspur Landing Circle, Suite 275
             Larkspur, CA  94939
5            (415) 477-6700

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          TABLE OF CONTENTS

 2                                                          Page

 3
    Status of Temporary Stay...........................18
 4

 5  Discussion of Scheduling of End-Payor Plaintiffs......23

 6
    Status of Settlements..............................55
 7

 8  Discovery Issues regarding Wire Harness..............66

 9
    City of Richmond Case..............................72
10

11  Discussion For an Order Directing Defendants to
    Identify Settlement Class Members....................76
12
    Schedule Subsequent Status Conferences...............77
13
    Motions:
14
        NTN Corporation and NTN USA's Motion to Dismiss....79
15
        Schaeffler AG and Schaeffler Group USA, Inc.'s
16      Motion to Dismiss..............................108

17      NSK Americas & NSK, Inc.'s Motion to Dismiss......128

18      Occupant Safety Systems' Motion to Dismiss........143

19

20

21

22

23

24

25
```

1   Detroit, Michigan

2   Wednesday, June 4, 2014

3   at about 10:01 a.m.

4                                  —   —   —

5            THE CASE MANAGER:  All rise.  Hear ye, hear ye,

6   hear ye.

7            The United States District Court for the Eastern

8   District of Michigan is now in session, the Honorable

9   Marianne O. Battani presiding.  All those having business,

10  please draw near and you shall be heard.  God bless these

11  United States and this Honorable Court.

12            Please be seated.

13            The Court calls Case No. Master File 12-MD-02311,

14  In Re:  Automotive Parts Antitrust Litigation.

15            THE COURT:  Good morning, everybody.

16            ATTORNEYS:  (Collectively) Good morning.

17            THE COURT:  It looks like you are all back today.

18  Okay.  Let me begin by introducing to you my new clerk.  Some

19  of you may not know that Bernadette Thebolt retired after

20  40 years with the court so she is no longer with me, but my

21  new courtroom clerk is Ms. KaMyra Doaks, and Kay is welcome.

22  This is her first week.  I'm going to excuse her after this

23  because I don't want her to quit before she knows about us.

24            Kay is also covering -- she is with Judge

25  Julian Cook, if any of you know Judge Cook, and he's leaving

1    this summer some time, right?

2            THE CASE MANAGER:  September.

3            THE COURT:  September.  So she is going to be doing

4    double duty for a while, but I hope those of you who contact

5    the Court and deal with us more directly will get to know

6    Kay, and I hope she will get to know and love this MDL case.

7    Okay.  Thank you, Kay.

8            All right.  Let's start with the item on the

9    agenda, the status of the temporary stay.

10           We will follow the same procedure, if you would

11   give your name before you speak, that's true of everybody.

12           MR. WILLIAMS:  Yes.  Thank you, Your Honor.  My

13   name is Steve Williams.  I represent the end-payor class.

14           On this stay the DOJ's report to the Court is due

15   on June 23rd.  I don't want to speak for them, but what I did

16   want to tell the Court is the perspective of our group and I

17   think the other plaintiffs' groups share this, is that this

18   stay affects a very profound and severe limitation on our

19   ability to do any real meaningful discovery at this point.

20           We have the ability to take depositions but we

21   can't ask anything about substance, so therefore there is

22   really no reason for us to do it particularly given we will

23   have limits on how many we can take and we are not going to

24   use our depositions now when we can't ask meaningful

25   questions.

1           Given what we know from DOJ's statements and guilty

2   pleas that secretive conduct was engaged in, code words were

3   used, documents were destroyed, that limitation really bars

4   us on the plaintiffs' side from doing anything meaningful

5   other than --

6           THE COURT:  Wait a minute.  You are representing

7   the end payors?

8           MR. WILLIAMS:  I represent the end payors, but I

9   think what I say is equally applicable to all the plaintiff

10  groups.

11          So the point of this is just to let the Court know

12  from our perspective until such time as the stay is lifted,

13  other than the limited amount we've gotten from DOJ

14  productions, there is not much we can do meaningfully to

15  progress on our side to learn the facts of the case.

16          THE COURT:  Is there anybody here from the DOJ?

17          (No response.)

18          THE COURT:  We tried calling them hoping to get a

19  little -- I guess they decided not to appear.  Okay.  We will

20  have to wait then until we get that report on the 23rd, which

21  I don't know what format it will be in but I certainly would

22  intend on notifying all of you or dispersing it in some

23  fashion so that you will know -- or you may know before I

24  know, I don't, however these things work.

25          It was entered in December, right?  That was the

1       first part of the stay was December, so this is six months

2       now.  Okay.  And I could appreciate, Mr. Williams, what you

3       said.  All right.

4               Counsel?

5               MS. SULLIVAN:  Your Honor, if I may respond just

6       briefly?  My name is Marguerite Sullivan and I represent

7       Sumitomo defendants in the wire harness case.

8               The defendants in the wire harness case disagrees

9       completely with what Mr. Williams stated about the limits on

10      discovery that the stay has imposed.  In this case in

11      particular the stay only bars merits depositions, that's it.

12      So there is no limit to deposition discovery -- I'm sorry, to

13      document discovery, there is no limit to interrogatories,

14      there are no limits to the plaintiffs' depositions, to

15      third-party discovery, to 30(b)(6) depositions of the

16      defendants, and there are a lot of issues that we can get

17      through -- a lot of discovery issues that need to be dealt

18      with during this period while the stay is in place

19      particularly class-certification-related issues which are

20      critical to this case.

21              THE COURT:  Mr. Williams?

22              MR. WILLIAMS:  Your Honor, Steve Williams again for

23      the end payors.  I have to respond to what was just said.

24              To say that there is no limit other than merits

25      kind of swallows the exception.  If we can't talk about

1    merits what 30(b)(6) depositions of the defendants would we

2    have any interest in taking?  We don't.  The defendants

3    perpetrated the wrongful conduct.  The defendants pled

4    guilty.  Some of the defendants have already admitted to

5    destroying evidence.  So to suggest we're in an ability to do

6    anything meaningful when we can't ask a merits question at a

7    deposition is not correct.  To suggest that we can --

8              THE COURT:  You need your merits depositions before

9    you do your class certification, is this your argument?

10             MR. WILLIAMS:  Of course, yeah, there is no doubt.

11             THE COURT:  Sure.  Okay.

12             MR. WILLIAMS:  And the state of the law is to the

13    extent that those issues relate to the 23 questions -- the

14    Rule 23 questions we have to address them, and there is no

15    doubt in my mind at least that the defendants, when they

16    respond to our motion, will be raising merits questions.  So,

17    of course, we need merits discovery.  So it is not free and

18    full and fair and open at this point.  Our hands are tied.

19             THE COURT:  Okay.  Your hands are tied but you have

20    enough to do.

21             MR. WILLIAMS:  We have --

22             THE COURT:  You have plenty to do.

23             MR. WILLIAMS:  We have things to do but what we

24    can't get to is the facts of the misconduct, we are barred

25    from that, and that's what this case is about.  So if we

```
 1   can't do that then the work we can do, and hopefully later
 2   when we talk about coordination the Department of Justice has
 3   agreed that there is some information they would not object
 4   to the defendants providing us, that would be meaningful,
 5   transactional information would be meaningful, information
 6   about what makes and models of cars they pled guilty to
 7   conspiring about would be meaningful, but until we can put
 8   witnesses under oath and ask them questions about what they
 9   did our hands really are tied because what we are limited is
10   looking at coded documents, wondering what's missing because
11   documents were destroyed, hidden or concealed.  So we need to
12   get to the point where the stay is lifted to meaningfully
13   progress in terms of discovery.
14            THE COURT:  Okay.
15            MR. WILLIAMS:  Thank you.
16            THE COURT:  At this point there is nothing we can
17   do about it.  The DOJ will let us know when they let us know.
18   I mean, I wish I would have known he wasn't voluntarily
19   appearing, I would have subpoenaed him to appear or
20   something, but we will get to it June 23rd.
21            Okay.  Anybody else have any comment on that?
22            (No response.)
23            THE COURT:  Okay.  I take it both sides join in
24   with what was said.
25            All right.  Let's go to the next item then, and
```

```
1    this is the discussion in scheduling of the end-payor

2    plaintiffs, auto dealer plaintiffs, State of Florida and City

3    of Richmond's motion to consolidate or coordinate all actions

4    in the MDL.

5              MR. DAMRELL:  Your Honor, good morning.  My name is

6    Frank Damrell on behalf of the moving plaintiffs.

7              The genesis of this motion really is the colloquy

8    that you and I had at the last hearing, Your Honor, in which

9    you instructed me to see if we could work out some type of a

10   way to streamline the motion practice in this case with

11   respect to the motions to dismiss, in particular regarding

12   issues that have been resolved by the Court, and the need to

13   continue to file briefing -- extensive briefs on those issues

14   that you've already decided.

15             As a result of that colloquy, the moving plaintiffs

16   felt that there was really more to this issue than simply the

17   motion practice; that there was a point that we had reached

18   in this case that we needed true coordination.  That is

19   typical of most MDLs of this complexity and size.

20             Your Honor, this -- the responses to this motion

21   raise the issue of whether or not we really have an MDL in

22   many ways because the defendants in this case would prefer to

23   proceed with each case seriatim as if these were -- this case

24   is lumped together.  Now, I will acknowledge that I think

25   there is some agreement here generally that would be best to
```

1    coordinate the motion practice and in dealing particularly

2    with the motions to dismiss.  I think there is an opportunity

3    there for further agreement on that, but at present there is

4    no such agreement and we believe that under the circumstances

5    presently we should attempt in every way to help the Court

6    coordinate this case among the various defendants.

7           The -- it could be argued I think and persuasively

8    that this is a classic MDL.  This is not a case where you

9    have strands here and there, this is a case of components, of

10   car-part components.  And if you look at this case in terms

11   of an assembly line, these components would be put into this

12   car and ultimately the end payors or the dealers, they buy

13   the car, they sell the car, it is the car we are talking

14   about, and these are all components of the car.

15          Now, some defendants argue that well, this is -- in

16   fact, we should not even consider this an MDL, that this

17   should be somehow -- this case should be parsed among other

18   judges or assigned to other judges, and --

19          THE COURT:  You don't need to go there.  I'm not --

20          MR. DAMRELL:  You're not persuaded by that

21   argument?

22          THE COURT:  No, and I have read it and I really

23   don't want to hear a lot of argument because I have another

24   idea I am going to get to, I'm just going to let you argue

25   for a couple minutes, but I am not getting rid of -- I'm not

1    removing parts of this case, I could remove the whole case,

2    that wouldn't bother me, but I am not removing parts.

3              MR. DAMRELL:  That's understandable.  I will not

4    spend any time on that but I do think, Your Honor, it is

5    important with respect to this case that we coordinate the

6    motion practice.  And I think the notion of tranches or

7    grouping this is classic.  We started with tracks and we

8    started with templates, and we passed that point.  We are at

9    a point now where we need to coordinate and group the

10   defendants in a logical fashion.  And by no means am I

11   suggesting that we have an answer to that, perhaps there is a

12   better way to group these defendants, but in dealing with

13   motions it seems to me that we can move this along in a way

14   that would give the defendants their prerogatives and rights

15   with respect to appeal and narrow the issues for the Court so

16   that we could promptly move beyond the pleading stage and

17   into discovery, particularly after the stay is lifted.

18              Your Honor, in that regard, I am -- this is a case

19   I have never really encountered when you have the victims,

20   the plaintiffs in this case, and you have those that pled

21   guilty, that destroyed evidence, seem to feel that there is

22   a -- that we are on the same -- there is a certain equanimity

23   here between the two parties, and there really isn't.  And

24   the point that we would want to make is that the plaintiffs

25   should be allowed, and obviously hopefully with some

 1    cooperation from the defendants, to group these defendants in

 2    such a fashion that we can deal with issues not just with

 3    respect to the motion practice but with discovery as well.

 4              And in a case such as this, you know, they say this

 5    is a very unusual case.  Well, it is an unusual case.  It is

 6    unusual because there are so many defendants.  It is unusual

 7    because all the defendants pled guilty.  But let's think

 8    about that because by pleading guilty there was no hearing,

 9    there was no trial, there was no -- we --

10              THE COURT:  We don't want to stay all of the

11    defendants.

12              MR. DAMRELL:  Virtually all.

13              THE COURT:  That's not as I read the briefs.

14              DEFENSE ATTORNEYS:  (Collectively) No.

15              THE COURT:  Okay.

16              MR. DAMRELL:  Virtually all?

17              DEFENSE ATTORNEYS:  (Collectively) No.

18              THE COURT:  No.

19              MR. DAMRELL:  How about 29, 29?

20              MR. TUBACH:  We are ready to render a verdict, Your

21    Honor.

22              MR. DAMRELL:  These are all the good guys, Your

23    Honor.  Look at the point being there were multiple --

24              THE COURT:  Of 90-some defendants we could say a

25    few or some.

```
 1            MR. DAMRELL:  Well, it was my understanding that
 2    there were 29 defendants I believe that entered pleas of
 3    guilty.  Fair enough.  That's a lot of defendants.
 4            Nevertheless, in terms of what they know is
 5    something that we have no idea of in terms of the plaintiffs.
 6    We don't know what they know.  We don't have any idea what
 7    this conspiracy consisted of.
 8            And in terms of the destruction of evidence that is
 9    also a grave concern and Mr. Williams has already commented
10    on that.  The point I'm trying to make here --
11            THE COURT:  Basically -- Mr. Damrell, excuse me for
12    interrupting but we need to move this along.  We are really
13    looking for a procedure to better coordinate what is going on
14    here and to move the case as efficiently as we can.  Is
15    that -- that's basically what you are --
16            MR. DAMRELL:  And we have submitted such a
17    procedure, Your Honor.
18            THE COURT:  I understand that.  Okay.  I have read
19    it, and I think that's enough argument for right now because
20    I'm going to discuss something in just a minute.  Let me hear
21    the defense argument.
22            MR. DAMRELL:  Could I ask, Mr. Williams, he was
23    going to take part of my time so if he could do that now that
24    may be helpful?
25            THE COURT:  It doesn't look like it is
```

1    Mr. Williams.

2              MR. WILLIAMS:  Mr. Barrett.

3              MR. BARRETT:  Just briefly, Your Honor?

4              THE COURT:  Okay.

5              MR. BARRETT:  Your Honor, I'm Don Barrett, one of

6    the co-leads for the auto dealers.

7              There is another facet to this motion to

8    coordinate, and that's the discovery coordination.  It would

9    be terribly inappropriate to depose the class representatives

10   now as some of the defendants are insisting.  Our clients

11   would be blindsided if they are forced to give depositions

12   before they know the facts of the conspiracy, and we, that is

13   their lawyers, can adequately advise them.  We are stayed

14   as --

15             THE COURT:  How would they be blindsided?

16             MR. BARRETT:  Well, we don't know much about the

17   conspiracy except what we read in the paper.  We don't know

18   what the parts are involved.  We don't know what the -- we

19   don't even know all of the car models or even all of the

20   makes that are involved.

21             We are stayed, as Mr. Williams said, from effective

22   discovery but they are not.  They know what they did, and

23   they have -- they would have an enormous advantage over us if

24   they were able to take advantage of the -- of their knowledge

25   of the criminal acts that they have committed.  We don't know

1    what prices were fixed on all models, we don't know by how

2    much as yet, so it would be grossly prejudicial to our

3    clients who really are honest businessmen and consumers to be

4    prematurely forced into depositions.

5         Your Honor, there is another thing.  There is

6    nothing that these plaintiffs right now could really add.

7    There is no reason to take their depositions.  All they need

8    from the auto dealers are their acquisition data.  We have

9    been giving them -- we've given them hundreds of thousands of

10   pages and we are continuing to do that.

11        And they don't want to take one deposition, they

12   are insisting on taking 20 or 30 depositions of each car

13   dealer, for example, and, Your Honor, that's a -- it is an

14   abusive idea that they have.  The whole point of it is to

15   take a useless, repetitive, abusive and premature set of

16   depositions hoping to harass these businessmen out of this

17   litigation.  It is the world turned upside down, Your Honor.

18        These defendant corporations, if they were

19   flesh-and-blood people and standing before you today they

20   would have on orange jumpsuits and leg shackles.  They are

21   entitled to a fair procedure and they are entitled to a fair

22   trial, but they are not entitled to have priority over their

23   victims in discovery.

24        THE COURT:  Do you have motions now to take the

25   depositions of 20 some people in your dealerships?  Are those

1    filed?

2          MR. BARRETT:  No, but that has been discussed, that

3    is what they are insisting on in their -- in their motion

4    concerning the wire harness, the protocol.

5          THE COURT:  Okay.  Defendants?

6          MS. SULLIVAN:  Marguerite Sullivan on behalf of the

7    Sumitomo defendants.  I will be speaking on behalf of the

8    wire harness defendants only.  I understand that there are

9    some other lawyers in the room that would like to speak on

10   behalf of other defendants in the larger MDL.

11         Just to set the stage here, this is not a classic

12   MDL.  A classic MDL is the wire harness MDL where there were

13   17 cases filed by multiple different classes all over the

14   country.  Those cases went before the judicial panel on

15   multidistrict litigation and the JPML transferred them all to

16   Your Honor and formed an MDL called the wire harness MDL

17   originally.  That is a classic MDL.

18         This is a completely different animal because what

19   happened here was that you had the wire harness MDL

20   transferred to Your Honor, and then the JPML considered the

21   HCP case, the fuel sender case and the instrument panel

22   cluster case to be sufficiently related such that they should

23   also get transferred to Your Honor.

24         And then the plaintiffs filed 25 other cases in

25   this court and those were joined with this case, but those 25

```
1    other cases are completely different cases.  There are 36
2    defendant families, and I know the number is much higher when
3    you look at individual defendants, and 26 of those defendant
4    families are only in one product category case, they are not
5    across the board in all of these cases.  So that's an
6    important thing to understand.  This is not a classic MDL.
7              Second, we hear a lot both in the briefing and in
8    the argument that we just heard about the victims, the
9    indirect purchasers are who are calling themselves victims,
10   and they claim that their rights trump the defendants'
11   rights, but they are assuming that they have proved their
12   case already, Your Honor, and they haven't done that.  They
13   have a long way to go before they do that.
14             As you know, they have pled in their complaints
15   that there were conspiracies -- I'm going to talk
16   specifically about the wire harness complaints, but they
17   claim that there was a conspiracy that related to RFQs issued
18   by OEMs, auto manufacturers.  These indirect purchasers are
19   not auto manufacturers admittedly.  So what they have to
20   prove to establish their claims, to establish that they were
21   victims, is that they paid more for the cars that they
22   purchased because of an overcharge that was charged to the
23   OEMs.
24             Your Honor noted in the -- in your ruling on the
25   defendants' motion to dismiss that that might be difficult
```

1    for them to do, and we agree, we don't think they are going

2    to be able to do it, but that's not really the focus of

3    today's discussion.  My point is just that plaintiffs'

4    counsels' outrage at the fact that the defendants in this

5    case would actually want to defend ourself are totally

6    unwarranted because they haven't yet proven their case, and

7    that's what brings me to the crux of the defendants'

8    opposition to their motion to coordinate.

9           We want to continue to move this case forward so

10   that we can prove to Your Honor that the conspiracy in the

11   wire harness industry was not nearly as broad as plaintiffs

12   claim that it is.  We want to prove to Your Honor that they

13   were not victims and that they were not impacted by the

14   defendants' conduct, but they want to push everything off.

15   They don't want us to get there.  They want to push off the

16   plaintiffs' depositions indefinitely so we can't even figure

17   out exactly what the plaintiffs' purchased or from whom or

18   how they set the price of the cars that they purchased,

19   whether they negotiated them.  We don't get to ask any of

20   those questions until some other point in time until after

21   the plaintiffs have progressed in these other 28 product

22   cases that are completely unrelated to our case.

23          They want to push off some of the defendants'

24   depositions indefinitely, again, while they learn about

25   unrelated conduct with respect to unrelated products.  And

1    they want to delay a determination on --

2            THE COURT:  What about the merits deposition in the

3    wire harness case?

4            MS. SULLIVAN:  The merits depositions are stayed

5    for the moment, that's true.  As I indicated earlier, there

6    is a lot of discovery related to class certification, which

7    is a huge issue for the plaintiffs in this case, which, of

8    course, they want to push off until some later date again

9    undetermined.

10           But merits depositions will occur as soon as the

11   DOJ stay lifts.  I don't know for sure but I would expect

12   that the DOJ's stay related to wire harness would lift before

13   some of the other products.  The stay currently is different

14   for the products.  The first four cases only have a stay in

15   place related to merits depositions, but all other discovery

16   can proceed.  The other 25 cases behind the first four have a

17   more broad stay.  So the DOJ is not treating these product

18   cases similarly even with respect to the stay.

19           THE COURT:  But you agree they need the merits

20   deposition -- excuse me, they need to be able to get to the

21   merits before we can really get into the class certification?

22           MS. SULLIVAN:  They do, they do.  And as we

23   discussed the last time that we debated the schedule for

24   class certification, the defendants proposed that we schedule

25   class certification briefing originally for 180 days after

```
 1    the DOJ stay lifted in the wire harness case for that precise
 2    reason.  But it is not true that they can't proceed with
 3    their case or that they can't develop their class
 4    certification theories.  I mean, they need to know, for
 5    example, the procurement practices of the OEMs and the
 6    process that each defendant went through when it responded to
 7    an RFQ.  How do we set the prices for the wire harness
 8    generally?  That has nothing to do with conspiratorial
 9    conduct.  It is 30(b)(6) testimony that they can obtain now.
10    And, you know, the representation that they can't proceed
11    with their case, they can't develop their case, is just not
12    true.
13         This happens all the time, by the way.  There are
14    other examples of cases where there has been a DOJ stay on
15    merits discovery and tons of discovery has occurred during
16    that stay while the stay is in place.
17         I will address specifically the plaintiffs'
18    depositions because it's -- we are willing -- the defendants
19    are willing to use our best efforts to try to avoid
20    duplication.  It is not true that we are insisting on 20 some
21    odd depositions of each of these individual plaintiffs.  We
22    have not made that statement.  In fact, we said the opposite,
23    we said that we will work with the plaintiffs to try to avoid
24    duplication and that we may be able to accomplish it to some
25    extent.  For example, the wire harness defendants I imagine
```

```
 1    could probably cover together with the HCP defendants, the
 2    fuel sender defendants, the instrument panel cluster
 3    defendants, they could probably cover all of those products
 4    when they are asking questions at the plaintiffs'
 5    depositions.
 6              And to the extent that there are other defendants
 7    that are in a position to examine plaintiffs now, there is no
 8    reason why that couldn't happen, but to mandate that there
 9    can only be one deposition of each of these plaintiffs across
10    all 29 product cases would be, A, logistically impossible I
11    think because you've got defendants in some of the later
12    cases that, A, have not even been served, and then, B, even
13    when they have been served the logistics of organizing and
14    coordinating these depositions would be extremely difficult,
15    but putting that aside the more important point is that it
16    would delay the wire harness case significantly.
17              We expect that the depositions of the plaintiffs
18    will enable us to prove that some plaintiffs did not purchase
19    price-fixed wire harnesses at all or cars containing
20    price-fixed wire harnesses, and we expect that we'll be able
21    to eliminate plaintiffs' claims on other grounds as well
22    without getting into the weeds of all of that now, but they
23    are suggesting that we wait for years before we can depose
24    these people.
25              THE COURT:  All right.  Thank you.
```

```
1        MS. SULLIVAN:  Your Honor, I will add just before I
2   sit down, there are other ways where we think we can avoid
3   duplication and streamline discovery, third-party discovery
4   is one way.  We are using our best efforts to avoid
5   duplicative discovery of -- or depositions of defendants is
6   another way.  So there are many ways we can do this, they
7   just didn't give us an opportunity to work it out with them.
8        THE COURT:  I am a little bit curious as to your
9   recommendation, of course, you're only wire harness so I
10  don't know, but your recommendation that other parts go to
11  other judges.
12       MS. SULLIVAN:  Oh, that's not my motion.
13       MR. KESSLER:  Your Honor, good morning.  I'm
14  Jeffery Kessler from Winston & Strawn.  I'm here speaking on
15  behalf of the 18 defendants who have filed what we have
16  called the deferred defendants' brief.
17       THE COURT:  I like that name, deferred defendants.
18       MR. KESSLER:  We consist of 12 corporate families
19  involving 13 different product categories.  My individual
20  clients in that group are Panasonic Corporation and Panasonic
21  North America.
22       Your Honor, I heard you loud and clear about your
23  reaction to our request for relief, so what I would like to
24  do is spend a little time explaining the problem we see and
25  then maybe the Court has ideas on a solution if you don't
```

1    like the solution we propose, but the problem is overwhelming

2    and severe.

3            We all agree --

4            THE COURT:  So how many judges were you thinking

5    this should be sent out to?

6            MR. KESSLER:  Your Honor, we were going to leave it

7    to the fair decision making of this courthouse perhaps in

8    consultation with the chief judge here.

9            Let me explain how this has been done when this has

10   come up before and the problem, if I may.  I think the

11   plaintiffs, the defendants, the Court, everyone agrees the

12   purpose of this proceeding under the federal rules and the

13   MDL rules is to have a fair and efficient proceeding.  No one

14   could dispute that.

15           The problem we have, and it is nobody's fault, it's

16   least of all the Court's fault, it is nobody's fault that the

17   proceedings at the moment are neither fair nor efficient for

18   most of the defendants in this case, and the reason --

19           THE COURT:  What do you mean, they are not fair?

20           MR. KESSLER:  I will explain that, Your Honor.

21           The reason for that is because when the MDL panel

22   originally ruled there were four product categories that it

23   considered.  There are now 29 product categories.  There was

24   about six or seven cases at that time.  There are now almost

25   100 cases -- I just counted and I believe it is 98, Your

1    Honor, we are about to get to 100.  And very, very

2    importantly, Your Honor, there is no end in sight.  The

3    Department of Justice has made it --

4            THE COURT:  I wish you wouldn't say it like that.

5            MR. KESSLER:  But, Your Honor, that's the reality

6    we have to face.  The DOJ has made it clear that there are

7    many investigations continuing.  We have to expect, and I'm

8    not exaggerating, there are going to be dozens more cases

9    filed over the next year or two involving numerous new

10   product categories, involving defendants who are currently

11   not in the MDL.  The fire marshal is going to eventually have

12   to put a restriction on the number of lawyers who can come

13   into this courtroom, so this is unprecedented.

14           And in that regard, there has -- what has happened,

15   why do we call ourselves the deferred defendants?  Because

16   the deferred defendants have not yet even had an amended

17   complaint because I don't know what the charges are against

18   them.  They are under a permanent cloud, that indefinite

19   cloud of litigation.

20           By the way, most of the deferred defendants have

21   not pled guilty, which is why you heard the uproar about

22   this.  Okay.  The majority of the defendants in this MDL have

23   not pled guilty, nor have they been charged by the Department

24   of Justice, nor is there any indication they will be charged

25   by the Department of Justice.

1          So the unfairness is while the federal rules say

2   you get an efficient, fair proceeding, they are in limbo not

3   knowing the charges against them in this litigation, watching

4   other cases go by that have no connection to them.  And this

5   is what I will call the myths that plaintiffs have

6   perpetuated in the MDL.

7          Myth number one is these cases are related because

8   they are auto parts.  In point of fact, many of these

9   defendants are in one product, don't know these other

10  companies, are not alleged ever to have met and spoken to

11  them let alone be in any common set of facts with them,

12  completely unrelated claims of conspiracy, unrelated

13  defendants in most cases.  The initial cases had a couple

14  overlapping defendants, most of the cases have no overlapping

15  defendants.  It is interesting in the case that I have for

16  Panasonic Corporation we are the only defendant so far, no

17  one else has even been joined; presumably when they amend the

18  complaint some day we will know who they claim we conspired

19  with.  So they are not related.

20         Second is the MDL order required all of this.  Your

21  Honor, that's completely untrue.  In fact, if this was an MDL

22  proceeding for all of these cases they would have tagged --

23  it's called tagging each of these other cases, the 80 cases

24  that have come since the original MDL, as an MDL case, they

25  would have gone to the proceedings where you get to object if

1    you want to to the MDL panel and say no, this doesn't belong

2    in this MDL, and the panel decides.  They avoided all of

3    that.  What they did was they filed all the other cases after

4    the original four in this court, in the Eastern District of

5    Michigan, and they just said oh, it is all related to the

6    auto parts MDL, let's get here, so it has never gone through

7    the MDL process, it is not required by the MDL rules, so

8    that's a myth.

9         The next thing is the myth that somehow by putting

10   us all here there is going to be a global settlement as if

11   this was one conspiracy.  Let's be very clear, no complaint

12   alleges one conspiracy.  No department plea agreement alleges

13   one conspiracy.  No foreign proceeding alleges one

14   conspiracy.  Each of the settlements that have been presented

15   so far are not of one conspiracy, it is an individual

16   defendant about an individual part separately, so none of the

17   ideas that you normally have in an MDL that if you get

18   everybody together maybe they all can settle together, it is

19   impossible in this case, there is no prospect of it, it will

20   never happen, and yet the cases keep coming through the door

21   and they are going to keep coming through the door with no

22   end in sight.

23        The next myth about this, that somehow there are

24   many efficiencies going on here.  Why are there not many

25   efficiencies?  The reason is if you are in different parts

1    the discovery is about different parts, they don't overlap.

2    Different companies are involved.  Different defendant

3    witnesses are involved, not the same ones in most cases.  If

4    you are certifying a class, for example, at the direct level

5    you are -- their expert will have to do a separate

6    predominance analysis of each part separately with different

7    regressions, with different studies.  There's no overlap in

8    the direct purchaser certification.  There's going to be no

9    efficiency there at all.

10            The only overlap, which is why they raise this

11   issue, is that for the plaintiffs' depositions they chose to

12   have the same class representatives in these 98 cases.  Now,

13   that wasn't our fault.  The classes are big.  They could have

14   chosen different class representatives for each case, but

15   their complaint is, well, we decide and then we hear that the

16   poor auto dealer who chose to be a plaintiff in 30, 40

17   different cases says I don't want to be deposed in those

18   cases when they can't be the class representative.  It is

19   very simple.  No one forces anyone to be a class

20   representative.  When you step up -- how do you know they are

21   an adequate class representative?  How do you get discovery?

22            So the efficiency issue is really all on their side

23   because they picked the same plaintiffs.  Now, we are willing

24   to work on that, Your Honor.  We are not saying that a

25   plaintiff, even though they submitted to this, should be

1    deposed 50 times, but they also have to be deposed and it is

2    going to be more than once because it is impossible unless

3    you are going to say now, Your Honor, these cases are stayed,

4    all of them until the Department of Justice is finished,

5    which may be three, four years from now, and we see how many

6    hundreds of cases we are up to then, and I would say, Your

7    Honor, that would be neither efficient nor fair to anyone.

8    Unless you are going to do that, these cases have to move

9    forward in some way.  People have a right to do that.

10          So the question becomes what is the answer?  Now,

11   we came up with one answer which Your Honor doesn't like.

12   The answer, we said the number and diversity of these cases

13   is so much that no one judge, the finest judge in the

14   country, couldn't possibly have the time to give the

15   consideration to all of these 40 different -- no, it is going

16   to be 80 different class certification motions and growing,

17   each one having to be separately situated, hundreds, if not

18   thousands, of discovery disputes.  It's just not feasible.

19          And the MDL rules themselves say, even if it is an

20   MDL, right in the decisions they talk about in some cases it

21   is appropriate to avoid -- to involve multiple judges because

22   the workload is simply too great.  Certainly this district's

23   local rules would allow there to be coordination.  We are not

24   trying to get rid of coordination, we are quite confident

25   that you and several colleagues could come up with a plan to

1   coordinate where was there, but our concern is -- and we are

2   open to any other solution obviously Your Honor comes up

3   with.  Unless we get a solution we have clients sitting there

4   saying when will this case move?  When do we get to -- we

5   didn't plead guilty, when do we get to clear our name?  When

6   do we get what Rule 23 says, which is to decide class

7   certification as soon as practicable?

8           What the plaintiffs want to do is keep this

9   indefinitely for very obvious reasons; they would like to

10  frighten defendants whether they are guilty or not, whether

11  there's merits or not, whether they are victims or not, to

12  settle these cases, and I'm sure some companies will settle

13  these cases but most will not, and there will never be a

14  global settlement, and the problem is we have to find a

15  solution, so, Your Honor, I obviously have great respect, if

16  you don't like our idea it is there, but we need a solution

17  for all of these deferred defendants.

18          THE COURT:  At this point we know that we need to

19  be done with the DOJ investigation or we have to do something

20  with the DOJ to say this is the cutoff and discovery is going

21  to be allowed.

22          MR. KESSLER:  Your Honor doesn't have to grant

23  their request for a stay, that's Your Honor's decision.  At

24  some point these cases have to move forward, but my point is

25  even if the DOJ ended their stay today there is a problem of

1    more and more cases coming, and they are going to come.  And

2    this problem -- right now, so under the plaintiffs' proposal

3    my defendant, Panasonic, would get an amended complaint for

4    the first time about a year from now, and that's only if Your

5    Honor raced like a clock and was issuing these decisions

6    constantly ahead of us, and that's not fair to the Court,

7    these are important issues.  You know, I don't know how to

8    get there.

9            So under their schedule, which I think no judge

10   could follow, a year from now we first get our amended

11   complaint and start thinking about what the charges are

12   against us and what's there.  That's not the American justice

13   system.  It is not what MDLs are designed to do.

14           So, Your Honor, I'm going to sit down unless you

15   have questions for me but that's why with all due respect we

16   suggested the idea that it is appropriate to sit down and

17   find a unique way envisioned by the rules to get additional

18   judicial resources so that all of the defendants and the

19   plaintiffs can get their fair and efficient day in court.

20           THE COURT:  All right.

21           MR. KESSLER:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23           MR. WILLIAMS:  Your Honor, I know -- I'm sorry.

24   Steve Williams for the end payors and the moving plaintiffs.

25           I know you said that you had a thought, and I'm

1    sure we all want to hear it, but I want to respond to some of

2    the things that were just said because I don't think they

3    fairly or accurately describe what's going on here.

4          First, I don't know where the idea about amended

5    complaints a year from now came from, certainly I don't think

6    we said it, but to satisfy those defendants you will have

7    ours next week.

8          Service.  We served everyone, everyone in all of

9    our cases except one of those defendants who pled guilty but

10   refuses to accept service even though they could and insist

11   we go through the Hague process.

12         The argument you chose to be a plaintiff, we didn't

13   choose that, but you refuse to be deposed.  We didn't say

14   that.  What we are saying is I bought a car and the facts

15   about me buying a car are the same whether the attorney in

16   the first case asks it or the attorney in the last case asks

17   it.  There's no difference.  However, they did choose to

18   conspire, that was their choice.

19         Now, there is a lot of uproar about how many

20   defendants pled guilty but the fact is, and I don't think

21   they are going to deny this, 36 corporate families, 27 guilty

22   pleas.  So I don't think we have to fight about that.  We

23   know that most of them did this.  Those that didn't plead

24   guilty here, most were fined by another jurisdiction, some

25   are applicants so therefore they don't plead guilty.

```
 1              I really think we need to get away from fighting
 2      about we don't know what they are charging us with, it is not
 3      fair to us, we have to wait.  I agree with a lot of what
 4      Ms. Sullivan said.  Both of us -- both sides deserve a fair
 5      opportunity, for us to try to prove our claims and for them
 6      to assert whatever defenses they have, but when you listen to
 7      the argument that says -- and there was an irony in the way
 8      it was presented because they said well, the plaintiffs
 9      assume that they were victims and that they've won.  We don't
10      assume we've won but we assume that when the Attorney General
11      and the Assistant Deputy Attorney General running the
12      investigation say American consumers and businesses paid more
13      for their cars, that they know what they are talking about
14      and that we deserve an opportunity to try to prove that, both
15      of us fairly, not tilted one way or the other.
16              So I want to focus on a few things because they are
17      getting lost here.  Number one, it is an MDL.  The common
18      core of it, the conduct all of them are alleged to have
19      engaged in, and that 27 of those corporate families pled
20      guilty to, putting aside the destruction of evidence and the
21      obstruction of justice, is fixing the prices of component
22      parts of cars, and we allege they did it the same way.  So
23      that's the common core and that's what an MDL is about.
24              So as the Court is all too familiar, when you get
25      the motion to dismiss in case five it says the same things
```

1    that the motion to dismiss in case one said, and that's why

2    you have an MDL, so you can have common rulings on those

3    issues that don't deviate.  That's why we are here.

4         And there are a few key things.  We talked about

5    third parties.  For the indirect purchasers in particular we

6    need third-party discovery in order to certify our classes.

7         THE COURT:  We are not there yet.

8         MR. WILLIAMS:  I understand, but there is a

9    critical point here because what you heard the wire harness

10   defendants say, we can do that, we've got to go get this

11   third-party discovery.  We can't go to them 29 times.  We,

12   indirect purchasers, we can only go to them once because,

13   Your Honor, if Toyota came before you and said this is my

14   fifth subpoena now, this is unfair, I'm a third party, you

15   can't keep subjecting me to this, they would have a pretty

16   good argument.  We are entitled to have this on the table so

17   we can go to them once, jointly if we have to with

18   defendants, and we will try to work with them because we want

19   the information, they want the information, but we can't go

20   to them 29 times.

21        THE COURT:  Okay.

22        MR. WILLIAMS:  Thank you.

23        THE COURT:  That's kind of what I want to talk

24   about here because as I read the motion I realize that before

25   this case does get out of hand, and it's not there yet but if

1 the DOJ drops ten more parts tomorrow and we have more cases,

2 I mean, it could be -- it could be quite the challenge.  I

3 think what we need, and I have hesitated to do this in the

4 past and you know that, but I do think now we need -- I'm

5 calling it a facilitator.  We need some person who is going

6 to be a discovery-scheduling facilitator, administrator, who

7 needs to be a neutral person who can go to both sides, see

8 all of these issues that you are talking about with the

9 discovery and who are the main third parties, for instance,

10 that are going to be deposed and arrange some kind of

11 coordination.  I can't do that for you, and I think that

12 somebody needs to do that.

13        I don't know who that person will be.  It needs to

14 be an outside person, not somebody within our court, because

15 I have nobody here, a magistrate judge, anybody else, who can

16 devote full time, and I see this as a very major job for a

17 period of time.

18        What I would like, I want to hear -- I want to hear

19 your comments about this, and it's really not open for yes or

20 no, I want to hear what you feel this person could best do,

21 and I want you to be in a position to submit names to me.  I

22 want somebody you are all satisfied with, and maybe you could

23 prescribe a process with this selection.  I plan based on

24 written submissions to make the selection in the end myself

25 from these people.

1          Comments?

2          (No response.)

3          THE COURT:  No comments.  Okay.

4          MR. KESSLER:  I have a question, Your Honor?

5          THE COURT:  Yes.

6          MR. KESSLER:  Would this person in effect be

7     appointed a special master by the Court in effect under

8     Rule 53, is that the Court's idea?

9          THE COURT:  I think it would have to be under

10    Rule 53.  I don't know how --

11         MR. KESSLER:  I think where this has been used in

12    other MDLs I think that's the procedure that has been

13    followed, and then it becomes a designation under Rule 53 as

14    to what you are delegating and it can be appealed up, Your

15    Honor.  I'm just asking if that's the procedure the Court is

16    envisioning?

17         THE COURT:  Yes, I guess is the answer to that

18    question.

19         MR. WILLIAMS:  Your Honor, Steve Williams for the

20    end payors.

21         This is something we have all discussed on our

22    side, and in a number of the electronic cases that the

23    defendants frequently refer to in the northern district we

24    have used this type procedure, someone who the parties agree

25    on or the Court selects who can devote time to issue reports

1     and recommendations to the Court on issues that come up.  So

2     I think the idea makes sense and it then would be up to us to

3     confer and see what we can propose to you in the submissions.

4            THE COURT:  I want to make clear that the

5     magistrate judge, and I see Magistrate Judge Majzoub is here,

6     may very well still get the discovery disputes but, of

7     course, we are not talking about -- I don't know, Magistrate

8     Judge Majzoub, if you were here when you heard them talk

9     about thousands of disputes.  That word thousands is scary.

10    I don't know if it will become necessary to even add to this

11    a second person, but I really am looking for to start with a

12    person who is -- who knows this business, perhaps somebody

13    who knows the auto business would be really nice, but who is

14    a great administrator because this needs administration and

15    facilitation.

16           I am not so worried about how to resolve a

17    discovery dispute because certainly I could do it, our

18    magistrate judge could do it.  It is just the volume that may

19    lead us out to somebody else to do it, but in terms of the

20    administration that requires somebody with special skills and

21    somebody who can be fair to both sides, and needs to have a

22    good grasp of what is going on here.

23           Somebody else wanted to --

24           MR. HANSEL:  Good morning, Your Honor.  Greg Hansel

25    for the direct-purchaser plaintiffs.  May it please the

1    Court, just a few comments on the suggestion of a

2    facilitator.

3            It appears that the Court has decided that Your

4    Honor would like to appoint someone in that capacity.  And,

5    of course, the direct purchasers will be happy to work with

6    the defendants, the other plaintiffs, the different plaintiff

7    groups, to see if we can reach an agreement on someone who

8    meets the criteria that Your Honor just put forward; a strong

9    administrator, perhaps someone even with a background in the

10   automotive industry, someone who could help, for lack of a

11   better word, coordinate and ride herd over a lot of the

12   administrative details in this case.

13           To date the parties have done a lot of that on

14   their own, and not --

15           THE COURT:  Yes, you have.

16           MR. HANSEL:  -- notwithstanding, you know, the

17   concerns that have been raised today, I will say we are sort

18   of proud we have reached agreement on a lot of the agreed

19   orders, it has taken months and months sometimes but we have

20   reached agreements on a lot of agreed orders, stipulations

21   that I think have smoothed the process so far.  And I must --

22           THE COURT:  Well, let me interrupt you there,

23   because I don't mean in any way by this suggestion to

24   denigrate what you've done.  You have worked amazingly well

25   together, I certainly recognize that, my staff recognizes it.

 1    I just see as we go into the discovery we need protocol, we

 2    need coordination, and it's something that you need somebody

 3    who is independent of both sides to say this is the way it

 4    should be.

 5         MR. HANSEL:  That makes a lot of sense, Your Honor.

 6    Two more comments.  Direct purchasers disagree with

 7    Panasonic's assessment that the sky is falling in this case.

 8    We think the case is going smoothly and will continue to go

 9    smoothly, and we think it is manageable.

10         One of the core principles of that is that it is

11    Your Honor who is the ultimate decisionmaker on issues of

12    merits, and we do not understand that Your Honor is proposing

13    that a special master or facilitator would start making

14    merits determinations.  We think that the Court's ultimate

15    authority here is really what drives agreements that are made

16    in the conferences that we have in between these status

17    conferences, the conferences among the parties.  Thank you.

18         THE COURT:  I'm not advocating any authority.

19    Okay.  Let's just say I would like you to meet and confer, to

20    come up with suggestions and a proposed order appointing

21    under Rule 53 a master who will coordinate and develop

22    protocol for discovery and other administrative matters as

23    they arise.  However that's worded, I want it clear that I

24    have the final say-so -- and what I have the final say-so and

25    what matters that you will deem this person, whatever we call

```
 1   him.  I hate to call him a master, I don't know why I don't
 2   like that word, facilitator or administrator, you know, what
 3   his or her duties will be and what he or she has the final
 4   say-so.
 5            I'm going to ask that the attorneys, perhaps
 6   through your lead attorneys, with the defendants -- the
 7   problem is with so many defendants we don't have a
 8   defendants' group so anybody who wants to participate will,
 9   of course, be able to participate.
10            MR. WILLIAMS:  I wanted to make a point on what
11   Your Honor just said.  We need a defense liaison.  It is
12   customary in these cases to have one.
13            THE COURT:  Yes.
14            MR. WILLIAMS:  And throughout the course of this we
15   have worked well and people have acted in that role, but we
16   don't have somebody designated to be the point person, and we
17   need that.
18            THE COURT:  Defendants are shaking their heads.
19            MS. SULLIVAN:  Well, Your Honor, just as the
20   plaintiffs have multiple liaison counsel, I think that the
21   defendants' side could probably work together to identify
22   multiple liaison counsel but I don't think it is possible to
23   have one lawyer representing all of the defendants in all
24   separate and unrelated 29 product cases.
25            THE COURT:  I don't think it is possible either but
```

1    it would be nice if you got together and formed some kind of

2    a group amongst you less than all the defendants, but even

3    that I am not so concerned with right now.  I want to get

4    this other person in line, and I think these things will

5    naturally develop from that.  So I am interested in doing

6    this relatively quickly, I do not want to delay in this

7    matter for something like this.  I'm going to ask -- do you

8    think two weeks is sufficient time for you to do that, at

9    least to the point of suggesting names to me?

10           MR. WILLIAMS:  Yes, for plaintiffs.

11           THE COURT:  Defense?

12           MS. SULLIVAN:  Yes, Your Honor.

13           THE COURT:  Anybody else on the defense want to

14    speak?

15           (No response.)

16           THE COURT:  Okay.  Let's do that.  Let me -- I will

17    tell you what, today is the 4th, Wednesday, let me ask you to

18    submit something in writing by Friday, the 20th.

19           There also, of course, would have to be provisions

20    for payment.  I know that you all know more about that than I

21    do so however this is to be paid amongst all parties.  Okay.

22           MR. WILLIAMS:  Steve Williams again.

23           There is an issue a little bit later in the agenda

24    but I think it is part of this issue.  In the wire harness

25    case there was an item for a deposition protocol, and all of

1  the issues we've been talking about from the plaintiffs' side

2  are within there, the coordination, the need to avoid

3  duplication.  We think that the better course is not to have

4  that deadline but to have that worked out with whoever is

5  chosen under Rule 53.

6       THE COURT:  Oh, no, definitely, that deposition

7  protocol will be worked out with whoever this person is.  No,

8  that's one of the reasons why I took this route actually.

9       MR. WILLIAMS:  Thank you.

10      THE COURT:  Okay.  Any other comments?

11      (No response.)

12      THE COURT:  All right.  Going on in our agenda, the

13  status of the settlements?

14      MR. BARRETT:  Don Barrett again, and Warren Burns.

15      Over the last year or so, Your Honor, the auto

16  dealers' and the end-payors' counsel have worked closely

17  together in most areas of the litigation but especially in

18  settlement discussions.  This has really facilitated

19  settlement negotiations at least with those defendants who

20  have had enough sense to sit down and talk with us.

21      We've previously announced a settlement to Your

22  Honor with Nippon Seiki a couple of status conferences ago.

23  Today we are pleased to announce four new settlements with

24  Lear, with AutoLiv, with TRW and with Yazaki.  Your Honor, we

25  are not free yet for the next few days to disclose the

1    amounts of all of these settlements but I will say that the

2    numbers are quite substantial and they are going to make the

3    class members, and we certainly hope the Court, very, very

4    pleased.

5         We would note that in settling with Yazaki in

6    particular that this is a major accomplishment in light of

7    Yazaki's significance as a large supplier of wire harnesses.

8    We think that this litigation is headed in the right

9    direction, Your Honor.  Mr. Kessler is just wrong; of course

10   there is an end in sight to this litigation.

11        MR. BURNS:  Warren Burns with Susman Godfrey for

12   the end payors.

13        Mr. Williams, my co-counsel, alluded to this

14   earlier, a few weeks ago Deputy Attorney General

15   Bruce Schneier noted in an interview that it is a very, very

16   safe assumption that U.S. consumers paid more, and sometimes

17   significantly more, for their automobiles as a result of this

18   conspiracy.

19        We are not in a position to announce amounts and we

20   won't get into that here, but I think it is a very, very safe

21   assumption that this is a significant step forward in this

22   litigation, and particularly it is a significant step forward

23   to make sure that the victims of this conspiracy, American

24   consumers and automobile dealers, are compensated for their

25   damages.

```
 1            I would add one final thing.  The settlements also
 2    include robust cooperation clauses from each of the
 3    defendants we have settled with today, and we certainly took
 4    that into account as we were negotiating with them in valuing
 5    these settlements.
 6            I think it is also a very safe assumption, Your
 7    Honor, that as we are forced further and further down this
 8    litigation road that the way we view cooperation and the way
 9    we assess and value that in the context of successive
10    negotiations and settlements will change, and we hope the
11    defendants will recognize that simple fact.
12            THE COURT:  I do have one question on -- AutoLiv
13    was the one that I knew about that came in.  Are you ready
14    yet for me to set dates for you to have a preliminary
15    hearing?
16            MR. BARRETT:  Yes, ma'am.  We were talking about --
17    that was what I was going to bring up.  We would hope that --
18    and we have not talked to all of the defendants about this
19    but we have just -- we are hoping that the Court could set
20    the preliminary approval hearings for all of these four on
21    one day, July 14th, 15th, 16th preferably, maybe the 17th as
22    an alternate.  If the Court --
23            THE COURT:  Well, I'm looking at the schedule and
24    July 14th is a Saturday.  I love you but I'm not coming in.
25            MR. BARRETT:  I don't mean for it to be.
```

```
 1              THE COURT:  The 16th is a Monday, the 17th is a
 2   Tuesday.  How long --
 3              MR. BARRETT:  July 14th is a Monday.
 4              THE COURT:  I'm sorry, I'm in June.  Let me get
 5   into July.  I'm trying to push you a little faster.  Okay.
 6              Do you think that an hour and-a-half, two hours, if
 7   there are four of them?
 8              MR. BARRETT:  A couple hours.
 9              THE COURT:  Okay.
10              MR. BURNS:  Your Honor, we will confer with each of
11   the defendants on those dates if that week looks generally
12   open to y'all -- or to the Court?
13              THE COURT:  I will tell you what, it is not
14   generally open, but I will give you any of those days in the
15   afternoon and I will move what I have so that you can
16   coordinate that.
17              MR. BARRETT:  Thank you, Your Honor.  We will be
18   back to the Court seasonably on that.
19              THE COURT:  All right.
20              MR. KANNER:  Good morning, Your Honor.
21              THE COURT:  Good morning -- after -- no, it is
22   still morning.
23              MR. KANNER:  Is it still morning?  It is, indeed.
24   Steve Kanner on behalf of the direct-purchaser class.
25              I can only make a comment that, borrowing a little
```

1    bit from Mark Twain, that the reports of the apocalypse in

2    this courtroom are somewhat exaggerated and premature.

3              I would like to report on three items this morning

4    by way of status and in terms of new developments.

5              The first is the instrument panel cluster, which

6    the Court heard us talk about on the 15th of May.  We are

7    currently awaiting the customer information from the

8    defendants which is produced -- is to be produced within

9    60 days of our hearing for preliminary approval, which was

10   May 16th.  The hearing for final approval is set for

11   November 5th, and we will come back to that in a moment.

12             The second matter is the settlement with Lear

13   which, as you know, we introduced to this Court some time

14   ago.  And that settlement, of course, had a wrinkle in the

15   sense that it had to be approved by the bankruptcy court

16   before we could move for preliminary approval here.

17             THE COURT:  Right.

18             MR. KANNER:  That approval took place in the

19   Southern District of New York by Judge Groper on May 27th.

20   The appeal period on that order expires on June 10th.  We

21   would expect to file our motion for preliminary approval on

22   June 11th.  Obviously we could have a hearing on preliminary

23   approval 18 or 19 days thereafter, and so certainly there is

24   an opportunity to coordinate this so that Your Honor can hear

25   multiple hearings on the same day, and we are open to trying

1     to do that to maximize the efficiency of this Court.

2          As I also understand it, Your Honor entered an

3     order on the stipulation with the defendants to produce the

4     customer lists for purposes of notice within 60 days.

5          THE COURT:  I think that was just entered

6     yesterday?

7          MR. KANNER:  It was, indeed, so that's in motion,

8     and the subsequent dates for the summary notice and the

9     related stips will, of course, be dependent on this Court's

10    ruling on the motion for preliminary approval, so it is

11    hard to -- I don't want to put the cart before the horse, but

12    we would certainly be eager to have that motion for

13    preliminary approval heard at the Court's earliest

14    convenience within that time period, 18 or so days from

15    June 11th, which puts us into that category that my

16    colleagues from --

17         THE COURT:  That July date you might get in on the

18    same --

19         MR. KANNER:  I don't see any reason why we

20    couldn't, Your Honor.

21         THE COURT:  Okay.

22         MR. KANNER:  And if experience is a factor over

23    here, the hearing on the motion for preliminary approval for

24    Nippon Seiki, of course in the absence of any objections, and

25    that's the only but-for over here, didn't take much more than

1    a half hour.

2           THE COURT:  Right.  Why don't you coordinate that

3    with them and talk to my staff?  I suggest you contact

4    Molly Roehrig up here -- Molly, I think they know you -- to

5    set this up, and then she will deal with Kay Doaks since she

6    is new to make sure we have the time and rearrange the

7    schedule to accommodate that.

8           MR. KANNER:  Certainly.

9           THE COURT:  Okay.

10          MR. KANNER:  The third item, Your Honor, of course

11   I think my colleagues for the end purchasers and auto dealers

12   alluded to, and that relates to the settlement which was

13   filed before Your Honor yesterday on the AutoLiv matter with

14   the direct-purchaser plaintiffs.  It is a substantial

15   settlement, I won't go into discussing it because it has just

16   been filed before the Court, and those discussions which we

17   would like to have are more suitable for the hearing on

18   preliminary approval.  That can also take place anytime two

19   and-a-half weeks from today.  If Your Honor would be disposed

20   to couple that with those -- with the motions referred to by

21   the other plaintiffs, we can do that, otherwise we are

22   prepared to move for preliminary -- to hear preliminary

23   approval anytime this Court would give us a date, which we

24   could do frankly in two and-a-half weeks, we can still do

25   that third week of June if Your Honor is inclined to have

1    that hearing.

2           THE COURT:  We could do that but I think it might

3    be better just to do them all on the same date just for our

4    coordination.

5           MR. KANNER:  Certainly, Your Honor.

6           THE COURT:  If we need more time, you know, instead

7    of starting at 2:00 we can do 1:00 to 5:00 or 1:00 to 4:00 so

8    that we can get them all in.

9           MR. KANNER:  That's fine, Your Honor.  Our interest

10   is to maximize the efficiencies over here.

11          THE COURT:  Okay.

12          MR. KANNER:  There currently under discussion with

13   defense counsel on that AutoLiv settlement is a production of

14   the customer lists because, of course, that's a requirement

15   for us to send out notice, and I hope to be able to report to

16   this Court shortly that we have reached an agreement and that

17   those will be presented in due course.

18          A final matter on this, Your Honor, and it tends to

19   bleed into the arguments on the motions to dismiss for the

20   OSS case.  Counsel for AutoLiv will represent to the Court

21   certainly that their involvement in the motion to dismiss

22   will be altered as a result of the settlement.

23          THE COURT:  Okay.

24          MR. KANNER:  Thank you very much.

25          THE COURT:  Thank you very much, Mr. Kanner.

1    Counsel?

2            MR. SANDERS:  Your Honor, this is Parker Sanders,

3    I'm counsel for Kyungshin-Lear Sales and Engineering Sales.

4            We heard just for a moment about the date in July.

5    I just want to go ahead and mention I have a conflict that

6    entire week, I'm going to be out of the country.

7            THE COURT:  And you are for Lear so we need you?

8            MR. SANDERS:  Yes, Your Honor, I'm for

9    Kyungshin-Lear Sales and Engineering, so I just wanted to --

10           THE COURT:  Well, I'm going to want you fellows to

11   work together to find a date.  If it doesn't work that week,

12   you know, we can accommodate you, I will accommodate you, you

13   just give me a couple dates and we will take care of it.

14   Okay.

15           MR. SANDERS:  Yes, Your Honor.  I am happy to do

16   that, I just wanted to go ahead and put it on the record.

17           THE COURT:  Thank you very much.  Okay.  Anything

18   else?

19           MR. KANNER:  Your Honor --

20           THE COURT:  Mr. Kanner?

21           MR. KANNER:  -- my only consideration is that we

22   are trying at some point to coordinate -- hoping to

23   coordinate final approval hearings.

24           As you may recall, on the 16th I mentioned that the

25   final approval hearings, which do take on a different

1    significance and are more of a robust hearing, we would like

2    to try to coordinate Lear final approval hearing with the

3    Nippon Seiki.

4            THE COURT:  The November date?

5            MR. KANNER:  Yes, that November date which

6    ultimately -- the further out we push the Lear hearing it

7    becomes an impossibility.

8            THE COURT:  Well, maybe you can move it up.  If you

9    need to separate them and we can't do them all the same day

10   then we can't, so just keep it in mind.

11           MR. KANNER:  I just wanted to raise that

12   possibility.

13           THE COURT:  Whatever date we need.  I agree with

14   you that that November date would be really nice to have all

15   of those --

16           MR. KANNER:  And that might be another -- we will

17   just go with that, Your Honor.  As that date -- as we

18   approach this if we feel a need to move with Lear earlier we

19   will address that with counsel and the Court.

20           THE COURT:  All right.

21           MR. MAROVITZ:  Good morning, Your Honor.

22   Andy Marovitz, I'm counsel for Lear Corporation.

23           I just wanted to make clear that Lear and

24   Kyungshin-Lear are two separate defendants.  The slight

25   confusion is because those two defendants are parties to the

1    settlement agreements for the dealer plaintiffs and for the

2    end-payor plaintiffs.  For the direct-purchaser plaintiffs

3    only Lear is a signatory to that.  And I can assure the --

4              THE COURT:  Kyungshin-Lear is not on that one?

5              MR. MAROVITZ:  They are not a party to that case.

6              THE COURT:  Yes.

7              MR. MAROVITZ:  I assure the Court, and we have

8    worked cooperatively with plaintiffs' counsel and we can

9    probably even do it today at some point during a break, that

10   we will work to find a date.  It is in Lear's interest in

11   this matter given the fact that Lear did not plead guilty,

12   was not found guilty, did not pay a fine, but frankly looking

13   around the room the Court can understand how expensive these

14   cases are and its interest in getting out of it.  Lear wants

15   to be out as quickly as possible, and is hoping to get the

16   preliminary and final approval process done as expeditiously

17   as possible.

18        So we will meet with plaintiffs' counsel today and

19   with Mr. Sanders today to try to find a date.  We very much

20   appreciate your accommodation in terms of fitting us in when

21   you can, and Lear will continue to do its best to resolve all

22   of the cases as quickly as possible.

23             THE COURT:  Well, it is interesting that you

24   mention that looking around the room and why you would be

25   interested in settling because I looked at the hours that the

```
 1   plaintiffs -- different plaintiff groups submitted, because
 2   the Court does keep track of that, I don't know the hours
 3   that the defense groups have put into this case but I have to
 4   assume it is significant.  So on my way home last night I'm
 5   thinking remember in the old days, you may not be old enough
 6   to remember this, but we used to settle cases, we will say,
 7   okay, nuisance value, attorney fees.  So I thought, well,
 8   let's make this a nuisance value case; if everybody puts in
 9   what they have got in attorney fees to date we probably have
10   plenty enough to settle this, so keep that in mind.
11           MR. MAROVITZ:  We are very reasonably priced, Your
12   Honor.
13           MR. KANNER:  There might be some at this table that
14   look at it other than nuisance value, just for the record.
15           THE COURT:  All right.  Anything else on that?
16           (No response.)
17           THE COURT:  All right.  The next item is the wire
18   harness matters.  We have had some updates.
19           MR. SQUERI:  Yes, Your Honor.  Steven Squeri from
20   Jones Day here on behalf Yazaki.
21           As was announced earlier, our client has entered
22   into an agreement with the auto dealers and the end payors
23   concerning a settlement.  However, we are still in the case
24   because we also have the claims that are brought against us
25   by the direct purchasers and also the City of Richmond has a
```

1    complaint pending at this time.

2         As the Court knows, I'm just referring to the first

3    item on the agenda for wire harnesses, the parties recently

4    concluded the negotiation and stipulation for the

5    supplemental discovery plan.

6         THE COURT:  Right.

7         MR. SQUERI:  I just might point out that this comes

8    after more than seven months of very hard negotiations

9    between plaintiffs and defense counsel, and we also have had

10   briefing with the Court in between, we had the issue

11   argued -- issues argued extensively at the last hearing but

12   fortunately we were able to come to a conclusion.

13        I do want to personally extend thanks to Mr. Hansel

14   and Mr. London, the direct-purchaser counsel, whom I had an

15   opportunity to work with extensively as we finalized this

16   plan, and we are happy that we were able to get it done, and

17   as the Court knows I think it was filed about two weeks ago

18   and the Court entered the order approximately a week or so

19   ago.

20        Just to sum up what we have accomplished there

21   because I think it is important to understand where we are

22   and what may be immediately under the -- on the horizon,

23   based upon that plan we came up with provisions that deal

24   with the coordination of discovery among the three class

25   cases as well as the related case that was filed by

1    Ford Motor Company.  We came up with a schedule for the

2    service of comprehensive document requests which, in fact,

3    has been already concluded.  Those document requests have

4    been served, there have been responses, and the parties are

5    engaged in the meet-and-confer process.  Under the plan we do

6    have a schedule in place for resolving disputes, and then

7    once disputes are resolved for the production of documents to

8    take place.

9            Significantly with respect to that, just so the

10   Court knows what may be on the horizon, based upon what the

11   parties agreed there is certainly a June 23rd deadline for

12   the conclusion of the meet-and-confer process with respect to

13   document request issues as the comprehensive document

14   requests.  The parties can by agreement extend it.  I don't

15   think there have been any extensions agreed to as of yet, but

16   what that also means is that that becomes a deadline for the

17   filing of either motions to compel discovery or motions for

18   protective order related to any of those issues that cannot

19   be resolved.  And I just want to point that out to the Court

20   given the fact that we are talking about the facilitator here

21   and how that might or might not fit into that particular

22   process.

23           Relatedly, the supplemental discovery plan also

24   says that depositions can take place.  Once the deposition

25   protocol is completed they can be noticed.  Under the plan

1    that was agreed to by the parties and filed and signed by the

2    Court, the deadline for concluding the deposition protocol

3    would be coincidentally June 23rd, it's technically 30 days

4    after the order is filed.  So once again we have something

5    that may be on the horizon to discuss with a facilitator,

6    although I know some of the counsel, Ms. Sullivan primarily

7    for the defendants, have been engaged in a number of

8    communications with plaintiffs' counsel in trying to arrive

9    at that, but we do have that deadline, and whether or not a

10   facilitator is going to be required to resolve anything I

11   guess we don't know just yet but the parties have been

12   engaged in discussion on that particular issue.

13          Beyond that we have dealt with other issues like

14   maximum number of interrogatories, deadlines for written

15   discovery, and some of it is tied to the end of the DOJ stay,

16   which for wire harnesses may be earlier simply because of the

17   fact that we were the first of the auto parts cases that were

18   filed in recent years.  And there is also a specific

19   provision that deals with scheduling of class certification

20   briefing that we discussed last time that we were here, and

21   what is provided in the plan is that the parties are

22   required, and this was in accordance with the Court's

23   instruction at the hearing the last time, the parties are

24   required once the DOJ stay is entered -- excuse me, lifted, I

25   should say, with respect to wire harnesses, that the parties

1  are required within 30 days thereafter to suggest to the

2  Court what the schedule might be for briefing, but I think

3  that generally sums up where we are.

4        THE COURT:  I do want to say on wire harness, which

5  is ahead of the other cases, I know there are discussions as

6  to when the class motion should be filed, but I do think we

7  may very well be able and I'm going to hold off on any

8  ruling, I want to see with this facilitator and how easy that

9  goes in, the wire harness may very well be its own and go

10  ahead and let's start looking at what we are looking at here

11  for classes.  So please don't think or get the impression

12  that I am intending to hold wire harness back.  Okay.  So I

13  say that for both sides.  I don't know yet where it is going

14  but I would like to move forward with one of these and let's

15  see where we are going with class cert.

16        MR. SQUERI:  Okay.  We would agree, Your Honor.

17  Thank you.

18        THE COURT:  All right.  Ms. Sullivan?

19        MS. SULLIVAN:  Hello, Your Honor.  On the

20  deposition protocol, Mr. Squeri is correct that we do have a

21  deadline of June 23rd in the supplemental discovery plan

22  currently, but I agree with Mr. Williams that we should

23  probably vacate that deadline given that some of the issues

24  that are in dispute and that will require the facilitator are

25  imbedded within that protocol, so I think we should take that

1    June 23rd deadline off the table and hopefully we won't have

2    to start from scratch and that the six weeks of negotiations

3    that we had relating to other provisions in the protocol we

4    will be able to build on as we now work with the facilitator,

5    but I think that June 23rd deadline probably doesn't make any

6    sense.

7            THE COURT:  Thank you.  Mr. Williams?

8            MR. WILLIAMS:  Thank you.  I actually was going to

9    say what Ms. Sullivan said, but I also wanted to respond to

10   the comments about how wire harness progresses in that

11   certification motion, and simply state for at least our group

12   that we would simply request that judgment be reserved until

13   the stay is lifted, and we know how it looks because we as

14   the party who makes the motion might have a different

15   proposal to make to the Court how we do that.

16           THE COURT:  Judgment is reserved, I just want you

17   to know.  I don't want you to assume anything because the

18   faster we can move along with these obviously the better.

19           Counsel?

20           MS. LEUNG:  Good morning, Your Honor.

21   Kanchana Leung on behalf of Ford Motor Company.

22           I am pleased to report that the proposed

23   supplemental discovery provisions have been agreed upon and

24   have been entered by the Court last week.

25           While I'm up here I want to seek clarification

```
1   about the discussion on the special master and facilitator
2   because Ford had also received Rule 45 subpoenas and their
3   deadlines for us to complete our meet-and-confer process, and
4   I just want to clarify that that would also be subject to
5   whatever facilitator or special master was appointed?
6           THE COURT:  Yes, absolutely, Ford would be in
7   there.
8           MS. LEUNG:  Thank you.
9           THE COURT:  That would be also true of the City of
10  Richmond.
11          MS. QUADROZZI:  Good morning, Your Honor.
12  Jaye Quadrozzi from Young & Associates on behalf of the City
13  of Richmond.
14          I want to introduce Leslie Weaver to the Court.
15  She is from the Green & Noblin firm with whom we are serving
16  as local counsel.
17          THE COURT:  Okay.  Thank you.
18          MS. GREEN:  Good morning, Your Honor.
19          THE COURT:  Good morning.
20          MS. GREEN:  I and my firm represent the City of
21  Richmond, which filed a complaint on February 20th of this
22  year.  We have asserted claims that were on behalf of
23  indirect purchasers of similarly-situated states, state
24  subdivisions, agencies and instrumentalities, so that would
25  include municipalities, certain counties, et cetera.
```

```
1          THE COURT:  Wait a minute.  Say that again.
2          MS. GREEN:  We have asserted claims for indirect
3   purchasers who were excluded from the end-payor class, and
4   what was excluded expressly by the end-payor purchasers were
5   essentially municipalities, state subdivisions, et cetera, so
6   that would include the City of Richmond, California who was
7   the plaintiff with whom we filed our first case.  We are also
8   representing in this matter not yet filed but Oakland County,
9   Michigan, Traverse City, Michigan and a few other
10  municipalities, a county in North Carolina, a city in
11  New York.  We anticipate being retained by additional state
12  subdivisions.  We are also coordinating with other state
13  agencies and entities, this is all in the works right now in
14  this action, for the 19 states which have repealer statutes
15  which allow municipalities to bring claims.
16          And the reason that we are here, Your Honor, is our
17  firms and our co-counsel have facility representing
18  municipalities and state subdivisions, and we became aware
19  that because of the exclusion those entities that purchase
20  our police cars and our ambulances, et cetera, would be
21  excluded from recovery in these cases if an individual
22  purchaser did not step forward, which is what the City of
23  Richmond did first, and we anticipate additional filings to
24  follow in cases other than wire harness although that's the
25  only case which is currently on file.
```

```
1          THE COURT:  Well, you have these municipalities
2   that you've talked about like Traverse City and --
3          MS. GREEN:  Yes.
4          THE COURT:  What's to prevent many more
5   municipalities coming in?
6          MS. GREEN:  We have asserted class claims, Your
7   Honor, so the issue we are hoping we can discuss with you
8   today is what we had put on our civil cover sheet is just
9   creating a class pursuant to the December 23rd, 2013
10  electronic case management protocol to give us classification
11  of 2.13-CV-00106, akin to the dealer direct and indirect
12  purchaser classes, and we would represent them.
13         THE COURT:  Yes.  In terms of the classification,
14  that's something I put on here too, and we are going to
15  create a new category, like we have 01 is direct and 02 and
16  03 are the indirects, and you would be, because we have Ford,
17  06, and we will call that the public entities' category.
18         MS. GREEN:  Thank you, Your Honor.
19         THE COURT:  While we are on that, we noted there
20  are some errors in the CM/ECF and we are going to start
21  working on that.  So if you see other errors -- if you see
22  errors please just drop a note or an e-mail to us so that we
23  can correct this.  We know while we are talking about it, not
24  to confuse everything, but on that 2311, that list is not in
25  chronological order and had to do with the way things were
```

```
 1    originally -- an individual case was entered on, and there is
 2    no way to fix it.  The CM/ECF program does not provide for
 3    any way to scramble -- to sort those in chronological order.
 4    So when you see that you might have, you know, 0010 and then
 5    skip to 0015 or something, you just have to look through that
 6    list to get your part; there is no numerical order.
 7              MS. GREEN:  Thank you.  And just to report a little
 8    bit on the work we have done since we filed.  We have been
 9    coordinating and are familiar with the outstanding counsel
10    for the different plaintiff classes, so we have been
11    participating in the discussions regarding the deposition
12    protocol, the discovery protocol, et cetera, and I think your
13    ruling today will also enable us to the extent there are
14    defendants out there also wishing for global relief that we
15    can act on behalf of the claims asserted as well.  We
16    appreciate your ruling.
17              There is -- I can report the defendants have
18    declined to accept service --
19              THE COURT:  You are in Hague right now?
20              MS. GREEN:  Sorry?
21              THE COURT:  You are at the Hague right now?
22              MS. GREEN:  Exactly, we are.  We served our papers
23    on the central authority in Japan on April 25th.  We are told
24    it will take 60 to 70 days to serve and then another 60 to 70
25    days to get the proof of service back, and so to the extent
```

```
 1    we would like to move forward we would appreciate it if the

 2    defendants would accept service, they have declined to do so,

 3    so that is the schedule we are currently on, but in the

 4    meantime we are coordinating for as smooth a transition as

 5    possible so we can engage in discovery in step with everybody

 6    else once we are let out of the gate, as it were.

 7           THE COURT:  Okay.  And you will participate in the

 8    selection process for the facilitator?

 9           MS. GREEN:  Yes, Your Honor, we will.

10           THE COURT:  Okay.  Thank you.

11           MS. GREEN:  Thank you.

12           THE COURT:  Oh, and the same thing, by the way, in

13    Richmond about the schedule for the motions to dismiss, you

14    can discuss scheduling with the facilitator but you can go

15    ahead and file those that you are prepared to file right away

16    without any waiting.

17           MS. GREEN:  Okay, Your Honor.

18           THE COURT:  The next item is discussion and

19    scheduling of direct-purchaser plaintiffs' motion for an

20    order directing defendants in the direct-purchaser class

21    action wire harness to identify settlement classes.

22           MR. SPECTOR:  Good morning, Your Honor.

23           THE COURT:  Good morning.  We haven't heard from

24    you today.

25           MR. SPECTOR:  There was no need up until this
```

```
 1    point.

 2            THE COURT:  Okay.

 3            MR. SPECTOR:  That order was entered yesterday,

 4    Your Honor.

 5            THE COURT:  Mr. Spector, for the record, would you

 6    put your name --

 7            MR. SPECTOR:  Yes, Your Honor.  Eugene Spector for

 8    the direct-purchaser plaintiffs.

 9            That order was entered yesterday.  We worked out a

10    stipulation and hope to do the same thing in the AutoLiv case

11    with the defendants.

12            THE COURT:  Very good.  Thank you.

13            MR. SPECTOR:  Thank you.

14            THE COURT:  Thank you.  So we don't need anything

15    else on that.  All right.

16            I think the next thing is to go into the bearings

17    motions.  I'm looking at motions pending and I have -- that's

18    under B on the 3-B.  The first one, oral arguments are

19    waived, and second one --

20            (An off-the-record discussion was held at

21            11:30 a.m.)

22            THE COURT:  Molly, always being on top of things,

23    said why don't we skip the motions to the end in case some of

24    you want to leave, and I think that's a great idea, so let's

25    skip the motions and go right to the next item, which would
```

1    be number six, I believe.  Administratively the next status

2    conference is October 8th at 10:00.  Everybody's still in

3    agreement October 8th at 10:00?

4            I have also gone ahead and set the next one, so let

5    me get your comments if there is any problem with the date,

6    after the October 1st is January 25th of 2015.

7            MR. FINK:  Is that a Sunday?

8            THE COURT:  Is it a Sunday?  I certainly don't want

9    to do it on Sunday.

10           MR. FINK:  I will bring bagels, Your Honor.

11           THE COURT:  Well, well, maybe we can do it then.

12   Let me take a look here.  You're right, I did that well.  How

13   did I do that?  We want to do it on a Wednesday.

14           January 28th?  Actually if I could read my own

15   writing that is probably an 8.  January 28th?  Okay.

16   October 8th and then January 28th.

17           Now, I reviewed the schedule and I saw many parts

18   have all of their service done, and so I would like to do --

19   have motion hearings or waived motion hearings, depending

20   when you get there, on a number of those where service is

21   complete, so I'm going read you the numbers.  I need my sheet

22   to tell me what they are.  0800, that's anti-vibrational

23   rubber parts; 1000, that's the radiators; 1300, which is the

24   switches; 1500, which is motor generators; 1600, steering

25   angle sensors; 1700, HID ballast; 1900, electronic powered

1    steering assemblies; 2100, fan motors; 2300, power window

2    motors; and 2800, windshield washer systems.

3            MR. KESSLER:  Jeffery Kessler for the Panasonic

4    defendants.

5            I think the issue is, and I just don't know if

6    plaintiffs can answer, is whether or not any amended

7    complaint is going to be filed because we did stipulations on

8    a schedule based on the prospect that there would be an

9    amended complaint.  So right now, for example, in the cases

10   of 1300, the switches, and 1600, the steering angle sensors,

11   and 1700, HID ballast, there is only one defendant, my

12   client, Panasonic, and we have been told there is going to be

13   an amended complaint but none has been filed.

14           So I think service is not the issue, the question

15   is are they standing on their complaint?  If they are

16   standing on that complaint then we can proceed but I don't

17   know the answer.

18           MR. WILLIAMS:  The answer is we are going to file

19   them and serve them real soon.  What we would like to do is

20   get away from -- I think it made sense before to have the

21   extended briefing periods we had, but now that we are seeing

22   most of the issues have been addressed by the Court to

23   shorten that schedule so we can get these things briefed,

24   submitted to the Court, decided, and all of us can move

25   forward.

```
 1                  THE COURT:  When are you going to submit the
 2       amended complaint?
 3                  MR. WILLIAMS:  We should be serving the amended
 4       complaint no later than next Friday and potentially sooner,
 5       and we will speak with counsel for Panasonic beforehand.  I
 6       think our stipulation provides for us to talk to you about
 7       that.
 8                  THE COURT:  Of course, the amended complaint you
 9       are adding defendants?
10                  MR. WILLIAMS:  I think we are, they have to
11       conspire with someone.
12                  THE COURT:  I mean, that makes a difference.
13                  MR. KESSLER:  Those defendants may not be in this
14       MDL, Your Honor, so I don't know how we can discuss the
15       schedule --
16                  MR. WILLIAMS:  Those defendants may be in this
17       courtroom right now, Your Honor.
18                  MR. KESSLER:  I mean, that's the problem, Your
19       Honor, until we at least get plaintiffs on a schedule, they
20       have to file all of their amended complaints in all of these
21       29 actions so at least in the 29 actions we know who all the
22       defendants are and can get them served.  Putting aside future
23       actions, how do we do a schedule?  That's the problem.
24                  MR. WILLIAMS:  Your Honor, we need to stop --
25                  THE COURT:  We will do that, and our facilitator --
```

1   see, that's a wonderful thing, somebody needs to keep track

2   of that.  And I did have a note here whether you were going

3   to amend, and I guess it wasn't mentioned.

4           MR. WILLIAMS:  We will soon, and we would like to

5   move forward.

6           MS. KAFELE:  Your Honor, Heather Kafele on behalf

7   of JTEKT.

8           I will also like to note with Mr. Kessler --

9           THE COURT:  On behalf of who?

10          MS. KAFELE:  JTEKT, J-T-E-K-T.

11          That the electronic power steering assembly case is

12  similarly situated to Mr. Kessler's cases insomuch as we are

13  the only defendants so far in that case.  There hasn't been

14  an amended complaint, so service isn't the issue, it is the

15  same thing as Mr. Kessler --

16          THE COURT:  All right.  What I want plaintiff to do

17  is submit to the Court within one week of today and the

18  defendants if they are going to amend the complaint and who

19  they are going to add, and then we will see can you do a

20  shortened schedule and still stay on track or not.  I don't

21  know and you don't know because you don't know who your

22  co-defendants are going to be, so we will have to see.

23          MS. KAFELE:  Okay.

24          THE COURT:  I will -- all of those that will be

25  amended I will give you the proposed date, you have the

1   proposed date, those of you who are in the litigation right

2   now of October 8th.  If you need to adjourn that just submit

3   an order.

4           MR. KESSLER:  That's the date to file the motion,

5   Your Honor?

6           THE COURT:  Pardon me?

7           MR. KESSLER:  That's the date to file the motion,

8   or you said October 8th, that's the hearing date?

9           THE COURT:  That's the hearing date, but you may

10  submit an order --

11          MR. KESSLER:  We will submit a schedule after the

12  defendants are named and whether it is possible to do it or

13  not.

14          THE COURT:  I will keep it on October 8th so I can

15  keep track of it at this point and then file a motion to

16  adjourn that date.

17          MR. WILLIAMS:  What I would like to suggest is that

18  the October 8th date could be a backstop, but as we suggest

19  in our motion, if oral argument is not necessary for the

20  Court that perhaps it can just be submitted and maybe even

21  decided before that date.

22          THE COURT:  Obviously if you waive oral argument

23  then just let me know.

24          MS. ROMANENKO:  Your Honor, Victoria Romanenko from

25  Cuneo Gilbert --

```
 1              THE COURT:  Excuse me one minute because we are

 2     getting dates here.  Okay.  The filing date for the motion

 3     would be July 14th, if you could do it by July 14th, that's

 4     to file the motion to dismiss.  August 25th for the response.

 5     September 8th for reply.

 6              MR. WILLIAMS:  I'm sorry, Your Honor, just to be

 7     clear, in which cases -- is that in all the cases?

 8              THE COURT:  These are in all the cases that I just

 9     mentioned, all of the cases I just mentioned.  The Court

10     understands some of those where you are going to do an

11     amended complaint may need to have a motion -- a short motion

12     to the Court to adjourn the date because defendant doesn't

13     even know they are being sued right now.  Okay.  That's to

14     keep it on track.  July 14th, August 25th, September 8th.

15              I'm sorry, Counsel.  Go ahead.

16              MS. ROMANENKO:  Victoria Romanenko for dealership

17     plaintiffs.

18              Just to clarify, within a week we will advise the

19     Court and the defendants as to whether we will be adding

20     additional defendants to the actions that Your Honor has

21     listed as ready for amendment and briefing?

22              THE COURT:  Right, and you will be adding those

23     defendants like forthwith, right?

24              MS. ROMANENKO:  Yes.

25              THE COURT:  Because you've had time.
```

1      MR. KESSLER:  Your Honor, I'm sorry to raise

2  another point about this.  So in the cases I have mentioned,

3  the three matters, there's no direct-purchaser case at all

4  let alone an amended complaint, and so the question is is

5  there going to be a date by which we know whether there is

6  ever going to be a direct-purchaser case?  Is that going to

7  be off track?  That's true in a number of these dockets as

8  well, there is simply no case and so not only do we not know

9  the defendants, we don't know anything about it, so I just

10  pose that to direct purchasers as to what the status is.

11      THE COURT:  So we need a date -- a cutoff date for

12  amendments of the complaints anyway to add --

13      MR. KESSLER:  It wouldn't be amendment, it would be

14  the first case, but if it is going to be part of the

15  schedules then we have to have something.

16      MR. SPECTOR:  Well, Your Honor --

17      THE COURT:  I don't want you to sit there and think

18  who am I going to sue to get it in.

19      MR. SPECTOR:  Well, that seems to be the question,

20  doesn't it, Your Honor?

21      Eugene Spector, again, for the direct-purchaser

22  plaintiffs.

23      Your Honor, if we have been retained by a client we

24  have filed suit.  If we have not been retained by a client we

25  cannot file suit.  At this point we have not been retained by

1    clients in those cases in which we have not filed suit and

2    therefore I can't answer the question that has been raised by

3    Mr. Kessler.  I don't think any of us can.

4         THE COURT:  Okay.  Then we are just going to assume

5    we have what we have right now unless you notify them in the

6    next week that there are other parties to be added, we are

7    just going to go on that.

8         MR. SPECTOR:  And, Your Honor, obviously we will

9    file suit if we are retained and promptly notify the Court

10   and the parties.

11        THE COURT:  Okay.

12        MR. SPECTOR:  Thank you.

13        THE COURT:  All right.  So let's see now, we are

14   set for October 8th.  We noted in several of those, like

15   Panasonic was the only defendant in several of them, and the

16   other was Mitsuba, there was another defendant that was the

17   only one, so I hope they can be coordinated.

18        MR. KESSLER:  I think the issue will be who the

19   other defendants are, we don't know who they are, how they

20   will be served, or even who their counsel is.

21        THE COURT:  Okay.

22        MR. WILLIAMS:  Your Honor, I'm sorry, that's not an

23   issue.  There is no complaint, there is nothing to respond

24   to.  We keep bringing up things that aren't issues.  We could

25   have a settling defendant who is not named as their

```
 1   co-conspirator, so I think I would just like to avoid
 2   raising --
 3           THE COURT:  We like to bring up all issues.
 4           MR. WILLIAMS:  -- prospective things that don't
 5   matter.
 6           THE COURT:  We need more to talk about.  Don't
 7   worry about it.  That's okay.  All right.  So the schedule is
 8   out.
 9           Then there is the request for judicial notice but
10   we have received your responses on that so the Court is
11   ready -- will do an opinion on the judicial notice issues,
12   particularly Docket No. 136.
13           Other matters, I had the preliminary approval for
14   AutoLiv but we have talked about those settlements so we
15   don't need that.
16           Does anybody have any other matter to discuss
17   outside of the motions which we will have to argue?
18           (No response.)
19           THE COURT:  Nobody?  Yay.  Okay.  All right.  We
20   will then -- let's take a break or do you want to go to lunch
21   for an hour and come back and do the motions?
22           MR. KESSLER:  Your Honor, if it is possible to not
23   take the lunch break, we don't think the arguments are going
24   to be that long and we can drive through, that I think would
25   at least help out-of-town counsel if that's possible?
```

```
1              THE COURT:  I'm more than willing to do that.
2    Let's take about ten minutes right now and then we will start
3    our argument.
4              MR. KESSLER:  Thank you.
5              THE COURT:  Thank you all.
6              THE LAW CLERK:  All rise.
7              (Court recessed at 11:43 a.m.)
8                            -   -   -
9              (Court reconvened at 12:01 p.m.; Court, Counsel and
10             all parties present.)
11             THE LAW CLERK:  All rise.  You may be seated.
12             THE COURT:  All right.  We have something for the
13   record on the Lear.  Counsel?
14             MR. MAROVITZ:  Thank you, Your Honor.
15   Andy Marovitz for Lear Corporation and Steve Kanner for the
16   direct-purchaser plaintiffs.
17             We had a chance during the break to find a
18   convenient date for counsel for Lear, for Kyungshin-Lear as
19   well as counsel for the direct-purchaser plaintiffs, the
20   dealer plaintiffs and end-payor plaintiffs for the
21   consideration of the preliminary approval hearing, and
22   July 1st, with the Court's indulgence, would work for all of
23   those groups.  We are hopeful that would be convenient for
24   the Court.
25             THE COURT:  All right.  Let me -- that's a Tuesday?
```

 1              MR. KANNER:  I think that's a Monday.

 2              THE COURT:  It's a Tuesday, July 1st, 2014 is a

 3    Tuesday.

 4              MR. KANNER:  Okay.

 5              THE COURT:  Is that okay?  I can't change the

 6    calendar.

 7              MR. KANNER:  You have judicial authority, Your

 8    Honor.

 9              THE COURT:  All right.  Let's pick a time.  I do

10    have -- I do have something at 3:00 but if we could do it in

11    the morning.  Is that good?  Now, you are coming from out of

12    town?

13              MR. MAROVITZ:  I am but at your convenience, Your

14    Honor.  July 1st works for us?

15              THE COURT:  Do you fly in in the morning or --

16              MR. MAROVITZ:  It depends how early.  Will you give

17    us just ten seconds?

18              (An off-the-record discussion was held at

19              12:03 p.m.)

20              MR. KANNER:  We were just clarifying, Your Honor,

21    the requirement -- the local requirement in between the date

22    for filing the motion for preliminary approval and the

23    hearing date.  And I believe if we file on the 18th --

24              MR. MAROVITZ:  On the 11th.

25              MR. KANNER:  On the 11th of June, excuse me, we do

```
 1    just make it, so the hearing could be on July -- actually it
 2    could be July 1st, 2nd, in that time period.
 3              THE COURT:  Well --
 4              MR. KANNER:  But before we set the date we wanted
 5    to make sure we are in compliance.
 6              THE COURT:  You think you can do it?  If we do it
 7    July 1st that would be a good date?
 8              MR. MAROVITZ:  That's right.
 9              THE COURT:  Let's do it July 1st, it really won't
10    take all that long, so how about 11:00?
11              MR. KANNER:  11:00 is fine, Your Honor.
12              MR. MAROVITZ:  Thank you, Your Honor.
13              MR. KANNER:  Thank you very much.
14              THE COURT:  Okay.  All right.  Going on then to the
15    motions, the first one I have to be argued is the NTN motion
16    to dismiss all class actions.
17              MR. KESSLER:  Yes, Your Honor.  It is
18    Jeffery Kessler again.
19              The only connection between NTN and Panasonic --
20              THE COURT:  Just one minute, Counsel.  I want to
21    pull up the motion.
22              MR. KESSLER:  Thank you, Your Honor.  I'm appearing
23    for NTN and NTN USA.
24              Let me start out by saying that we are not seeking
25    in this motion to reargue, to change, to alter any of the
```

```
 1   legal rulings that you've made in your prior decisions in

 2   wire harnesses or in instrument panel clusters or anything

 3   else.  We fully understand the standards you have adopted and

 4   the reasoning you have applied and we accept all of that, so

 5   this is not an attempt to reargue.

 6          What we do believe, Your Honor, is that applying

 7   each and every one of the standards this Court has pronounced

 8   applied to the specific allegations regarding NTN and

 9   NTN USA, that plaintiffs have not met their burden under

10   those standards of this Court.  What plaintiffs like to say,

11   and I'm sure they will say it again, is that you have heard

12   these arguments a million times before, Your Honor, and

13   everyone is going to get up and make these arguments.  With

14   all due respect to plaintiffs, Your Honor, my arguments are

15   based on my client's allegations and the facts about what

16   they said about them.  It is not based on anybody else's

17   allegations.  You have never looked at this issue before.  So

18   I hope that you will look at it independently, I know you

19   will, and I will explain why I believe that these two clients

20   are entitled to be dismissed from both the direct and the

21   indirect cases.

22          First of all, Your Honor, let me just review

23   quickly what there isn't alleged about my client because that

24   makes it very different from some of the cases you have

25   already had.  There is no allegation that my clients attended
```

1    any specifically identified competitor meetings concerning

2    the United States, none.  There is nothing identified, there

3    is no claim.  I mean, there is a general allegation all

4    defendants conspired but there is nothing more specific about

5    either one of my clients about that.

6         There are no allegations that my clients entered

7    into any plea agreements because they did not.  My clients

8    have not pled, they have not been charged, okay, so there is

9    no basis to use that against them in any way.

10        Further, the two pleas that there are in bearings,

11   which they are certainly entitled to use, don't mention my

12   client, don't indicate anything about my client.  They are

13   limited to the two companies who pled primarily, not my

14   clients, so you can't add anything from them.  I'm not saying

15   limit them to the pleas, I'm saying they don't add anything

16   with respect to my clients.  There is no allegations about

17   what role my client played in the conspiracy, either one of

18   them, what they did, how they did it.  This isn't like wire

19   harnesses when there was a discussion of the RFQ process and

20   what happened.  There is just nothing there about that.

21   There is no allegation we had any information exchanges about

22   the United States, nothing at all.

23        So what is there?  So that's what there is not.  So

24   what is there?  And, Your Honor, I'm not going to tell you

25   what there is in my own words.  What I urge you to do is they

 1    filed their opposition, their opposition from pages 1 to 3
 2    details their statement of the facts against NTN and NTN USA,
 3    so this is it, this is all they have called to your attention
 4    to say here is what we have alleged.  When you look at what
 5    they have stated, and that's what I'm going to go through,
 6    and consider it all together -- I'm not -- I'm not telling
 7    you look at it one by one and wipe the slate clean or
 8    anything else that they are going to say, I'm saying look at
 9    it all together but I have to discuss it one by one, Your
10    Honor, because the English language requires me to do that.
11         THE COURT:  I want to get the dates right when
12    they -- when the Japanese Fair Trade Commission gave the
13    cease and desist order.
14         MR. KESSLER:  I will be happy to address that.  The
15    first thing and most of their brief is about the fact that
16    the JFTC has issued a cease and desist order and allegations
17    and charges against NTN, the Japanese company, okay, about
18    violations of doing something regarding sales in Japan.  That
19    is all, period, end of story.  They do not make an allegation
20    in this complaint -- this is very important -- that the
21    conduct that the JFTC charged discussed the United States or
22    discussed any U.S. sales, so this is the pure situation like
23    in the elevator case in the 2nd Circuit where there were EU
24    charges filed about a conspiracy involving sales in the EU,
25    and the 2nd Circuit said you can't just infer just because

1   somebody did something in one market that makes it plausible

2   they did it elsewhere, and I will explain why.

3          The United States antitrust laws are much tougher.

4   It is criminal.  There are good reasons why to infer the

5   opposite, that if somebody might do something in a country

6   like Japan where it is not exactly enforced the same way, or

7   at least it has not been historically, that they wouldn't do

8   something here bolstered by the fact that my client has not

9   been charged in the United States.  So we could assume --

10  they point out -- they plead that my U.S. subsidiary got a

11  subpoena in the United States.  Let's assume that's true

12  because that's what they pled.  So we respond to a subpoena,

13  we give information to the United States, and the United

14  States makes no charges against NTN.

15         What those collective facts show is unless you are

16  willing to become the first court in the country, and I would

17  say it is the first court to say just because you are charged

18  in another jurisdiction about doing something in a foreign

19  company I will just assume like you are a bad company, so it

20  is plausible and you meet the Twombly test that you did

21  something in the United States, that doesn't get them past

22  it.  That's the essential issue about that.  That's their

23  failure.

24         The second thing that they allege -- that's almost

25  half of their facts that they allege is the JFTC, that's what

1    they come back with.  What else did they do?  After the JFTC

2    and Japanese proceedings -- and, by the way, they point out

3    NTN executives are criminally charged in Japan.  Same issue,

4    it is only about doing things in Japan, there is no

5    allegations they are being --

6              THE COURT:  What were they doing in Japan?

7              MR. KESSLER:  They are charged, Your Honor, with

8    having engaged in price fixing involving sales in Japan

9    which, of course, are not subject to the United States

10   antitrust laws.  Again, Your Honor, you can't draw the

11   inference that just because they might have or might not

12   have, they are defending so I don't want to say they have,

13   just because they have been charged there you can't draw an

14   inference and say here, especially when the Department of

15   Justice has looked at it here and has done nothing, and when

16   the pleas here, the two pleas very clearly don't relate to

17   the behavior of my client in terms of that in the United

18   States.

19             We can assume -- it is interesting, they point out

20   that NSK and JTEKT were in the Japanese case also, in other

21   words, they are charged in Japan also.  Okay.  So one would

22   assume that if they had information to implicate us in the

23   United States, something as part of the pleas that were

24   entered or as part of the leniency application that was made,

25   the department would have that information and charge our

1    client about that, but they haven't done that because, Your

2    Honor, there is nothing to charge my client about in the

3    United States.  So, again, it is all based on solely

4    something in another market.  There have been cases and they

5    pointed out some --

6              THE COURT:  Okay.  Let me go back though.  I still

7    want to get these dates.  JFTC issued its cease and desist

8    order in 2013; was that right?

9              MR. KESSLER:  I believe that's correct, Your Honor.

10             THE COURT:  And it alleges the price fixing from

11   what period to what period?

12             MR. KESSLER:  It was 2010 going forward.  That's

13   what was charged in the JFTC order.  Again, nothing about

14   this earlier period which, again, their conspiracy they

15   allege in the United States and about which they have pleas

16   from other defendants is different conduct, a different

17   period of time involving the United States so, again, it is

18   just separate about them and that again the case I would

19   refer Your Honor to is the elevator case in the 2nd Circuit.

20             Now, they do cite cases where foreign allegations

21   have been looked at where the plaintiff had facts saying here

22   are foreign charges and I am now alleging facts that during

23   those foreign meetings there was this discussion about the

24   United States.  So in that context the court said oh, well,

25   we can look at that together as part of the different courts

```
1    that have said that.  There are no such allegations here,
2    that's very significant.  They don't allege that at the
3    meetings that the JFTC charged in 2010 there was any specific
4    discussion about the United States and the United States
5    prices or anything involving the United States.  So that's
6    their gap and that's what the courts have said is not enough
7    to get through the hurdle.  Even if they have enough to get
8    through the clients who did pleas, obviously somebody pled in
9    the United States, they may have something to say about them,
10   it doesn't bring in our client necessarily.
11           Now, what else do they say?  In addition to that,
12   and this is all that they say, they say that NTN's United
13   States subsidiary has been served with a DOJ subpoena.  Okay.
14   How does that help them?  I think that goes the other way.
15   You know, they have been served with a subpoena, they have
16   been investigated by the DOJ and the DOJ has done nothing.
17   How does that support an inference -- a Twombly inference
18   that we participated in a conspiracy in the United States?
19   So that's their next one.
20           One after that, NTN USA is a wholly owned
21   subsidiary of NTN Corporation.  That obviously doesn't
22   advance the ball on anything, Your Honor herself has noted
23   that, that doesn't move anything particularly here because
24   there is nothing against the parent, so being a sub of the
25   parent doesn't move anything.
```

1          Then they go during the class period USA's

2    activities have been under the control and direction of

3    NTN Corp.  Even assume that's true, it doesn't advance the

4    ball because there is nothing to connect anything.  The acts

5    done by NTN USA were authorized, ordered and condoned by

6    their parent company but there are no acts alleged.  So,

7    again, there is like a fundamental gap.

8          I'm reading literally every single thing they said

9    after the JFTC.  Through its wholly-owned and controlled

10   subsidiaries, NTN Corp has marketed, manufactured and/or sold

11   bearings -- automotive bearings purchased throughout the

12   United States.  Well, that's true too, okay, but unless it

13   can be guilt by association the fact that they have sold in

14   the United States can't be enough.

15         And here is the last one -- I'm sorry, there's

16   something after that.  NTN USA manufactured, marketed and/or

17   sold bearings that were purchased in the United States during

18   the class period, including by firms that sold them to the

19   dealership plaintiffs and the class members.  That's it for

20   NTN.

21         Their final paragraph is the market is conducive to

22   conspiracy because they have alleged there are high barriers

23   to entry, it is highly concentrated, and it has opportunities

24   to conspire.

25         Your Honor, take every single allegation in their

1   complaint, take everything they said from page 1 to 3 of

2   their brief, okay, and they do not advance the ball on

3   Twombly with respect to my two clients who have not pled

4   guilty, who have not been charged in the United States.

5          My final point, Your Honor, I don't know if they

6   are going to raise the EU thing because that's what they

7   filed the judicial notice motions before you, but if Your

8   Honor let's that in, and we argue you should not, but let's

9   assume you let it in for a moment, if you let it in that's

10  only specifically about the EU.  If you read the press

11  release they charge it is something very specific about the

12  EU, a different conspiracy, a different time period, and by

13  the way, only automotive, nothing to do with industrial.

14         Remember the directs have an added burden than the

15  indirects because they have alleged an industrial bearings

16  conspiracy.  There is nothing about the U.S. and industrial

17  bearings for my two clients.

18         So, Your Honor, I hope that you will scrutinize

19  those allegations, and I'm quite confident you will not find

20  another case in this MDL docket or any other case in the

21  country that has said this is enough against these two

22  defendants.  Thank you very much.

23         THE COURT:  Thank you.  Response?

24         MR. DAVIDOW:  Joel Davidow for the dealer

25  plaintiffs.

```
 1              Let me start for a moment with the obvious
 2  comparison between an elevator and a ball bearing.  As far as
 3  I know, if you wanted an elevator for a building here in
 4  Detroit you wouldn't have it made in Europe and put it on a
 5  ship and mail it because it is very big and very heavy and
 6  very wasteful.  But if you wanted ball bearings would you
 7  possibly get them from Europe and Japan?  The answer is
 8  people do every day.  There is a worldwide trade.  Ball
 9  bearings are small, they are made in all sizes and all shapes
10  to meet all needs.  The idea that there is -- because there
11  is no world trade in elevators there is no world trade in
12  ball bearings is nonsense.
13              To take a particular example, there has been a
14  five-year anti-dumping case called certain ball bearings from
15  Japan and including automotive.  Well, an anti-dumping case
16  only starts when the U.S. industry complains that Japanese
17  imports into the United States are growing too fast.  That
18  case was now dismissed, there is a press release, and it is
19  dismissed.  Well, how do you get it dismissed?  The answer is
20  by pulling your U.S. prices up to your Japanese prices.  If
21  your -- and Mr. Kessler is an expert in anti-dumping, if you
22  want to get rid of an anti-dumping case you make sure the
23  U.S. price is exactly the same.
24              To go back let's start with a simple point.  In
25  most books that have a chapter under national antitrust and
```

1    U.S., and they start with a colloquy between Senator

2    John Sherman of Ohio, a 6th Circuit person, and a doubting

3    senator who said, Senator, how are you going to make sure

4    that if the price fixing is offshore you catch it?  And the

5    senator said well, I'm not going to write a bill just about

6    restraint of the interstate commerce of the United States.

7    My bill, the Sherman Act, is going to say that you are guilty

8    and suable in treble damages if you restrain the interstate

9    or the foreign commerce of the United States.

10          When the law was clarified by limiting U.S.

11   application to export sales or purely foreign sales it said

12   imports were not subject to the reform.  In other words,

13   imports were always a per-se violation.  If you fix prices

14   and it is as to imports the violation of the U.S. law is

15   complete.

16          Now, let's --

17          THE COURT:  If you fix prices --

18          MR. DAVIDOW:  As to things that are going to be

19   imported.

20          Now, here you get to two simple points, there is a

21   magic word that Mr. Kessler uses and it is the word

22   concerning the U.S., that is his view is if the Japanese as

23   they fix their prices in Japan and in 26 European countries

24   didn't mention the word U.S., that it wasn't a discussion

25   concerning the U.S.  Well, there are two things wrong with

1    that.

2          To take an example, Harry Martin, my original

3    client, imports Volkswagens.  If you have an enormous

4    price-fixing cartel in the common market, the largest maker

5    of cars in the common market is Volkswagen, and there will be

6    NTN or its co-conspirator ball bearings in every Volkswagen

7    that comes in, and it doesn't matter whether the NTN when

8    they were fixing the price to Volkswagen said oh, gee, they

9    are going to the U.S. or they just knew it.  If they fixed it

10   and they knew it they are guilty, full stop, summary

11   judgment.

12         The same thing, the Lexus is made in Japan.  If

13   they all agree in Japan that all of their prices in Japanese

14   sales would be up ten percent then they raise the price ten

15   percent on all of the ball bearings that went to the Lexus,

16   and when the Lexus is largely sold in the United States and

17   it is not made here.  Well, obviously they know perfectly

18   well the Lexus is made for the U.S. market but they might not

19   have mentioned the word U.S. market.

20         THE COURT:  So your argument basically is if they

21   fix the prices in Japan --

22         MR. DAVIDOW:  Yes.

23         THE COURT:  -- and they know those parts are coming

24   to the U.S., that's sufficient?

25         MR. DAVIDOW:  It is full stop.  Let's go further.

1   There was a mention of Europe, and remember I would pose that

2   there are two ways in which you could accept this judgment of

3   the common market.  One is the judicial notice of foreign

4   thing, but the other one it says specifically in the press

5   release, which you have, that NTN got a ten-percent fine

6   reduction because it admitted its guilt.  Well, admissions of

7   guilt under exception of Federal Rule of Evidence 601, I

8   believe, are fully admissible unless Mr. Kessler says that

9   there was some error and his client really didn't admit their

10  guilt.

11          The next point is we are supposed to show here that

12  it is plausible that when they agreed to prices in Europe and

13  when they agreed to prices in Japan they would have

14  implicitly or explicitly raised them in the U.S. as well.

15  Well, I would submit that it is implausible that they could

16  have possibly avoided that.  For instance, if they are

17  selling to Toyota, and they have branchs here that sell to

18  Toyota and branchs there, and they raise the price of a

19  packet of ball bearings from $4.00 to $4.40 in Japan, if they

20  didn't raise it to $4.40 in the U.S., Toyota being the smart

21  person would ask, one, how come you are charging me less than

22  the U.S., or Toyota, being a smart buyer, would start buying

23  entirely from their U.S. sub.

24          So the only way they can make the conspiracy work

25  is to tell their sub to exactly match their price to Toyota

1    since they supplied them in both markets and Toyota talks to

2    each other and have the same price, otherwise they would be

3    arbitraged against them so that -- and the other point --

4            THE COURT:  Who did they conspire with?

5            MR. DAVIDOW:  NTN, NSK and so on conspired with

6    each other in Japan and conspired with each other in Europe,

7    and they conspired on -- taking the four main defendants in

8    which NTN received the second highest fine, NSK and NTN,

9    we're supposed to have fixed all automotive prices in Japan.

10   Well, prices to Toyota or prices to Lexus are automotive

11   prices in Japan, but I'm saying that the practicalities --

12   the plausibility is that it would be implausible for them not

13   to raise their U.S. price to Toyota simultaneously with their

14   decision to raise the prices by cartel in Japan so that each

15   of the conspirators which had branchs in the U.S., which sold

16   to the transplants of the Japanese, would by necessity have

17   to match those prices in the U.S. to avoid questions or

18   arbitrage --

19           THE COURT:  Okay.

20           MR. DAVIDOW:  -- so it is highly, highly

21   implausible.

22           The further evidence of this, of course, they are

23   now -- they have conspired with NSK, both in Europe and in

24   Japan.  The NSA guilty plea didn't say NTN was innocent, it

25   just didn't name who its co-conspirators were.  They are

 1    treating it somehow as silence is an exoneration of NTN.

 2            The extreme of this, by the way, is the potash case

 3    in which Judge Diane Wood actually had a group of Russian and

 4    Canadian price fixers who met and set Canadian and worldwide

 5    potash prices, with a great anti-trust lawyer, said we

 6    exclude the U.S., totally exclude the U.S., which is not

 7    claimed here, and -- but when they sold to the U.S. they said

 8    we sell to you at world-market prices, so world-market prices

 9    have just been set by the cartel.

10            And Judge Wood said well, whether you set U.S.

11    prices or you tell the U.S. that you have to pay world-market

12    prices, you have just cartelized the world, it comes to the

13    same thing, we are not stupid, we understand when you caused

14    the increase through your cartel activities in the U.S.,

15    whether you did it by specific orders, by matching orders, by

16    reference to world-market prices, it is implausible that you

17    could have a two-price system on a fungible good that you

18    make here and there for the same cars that travel around the

19    world in the same goods.

20            The last line I would only say just because I like

21    the story is Umpire Bill Klem, strict man, and he called

22    batter out, batter was very annoyed, he threw his bat way up

23    in the air.  Bill Klem said young man, if that bat comes down

24    you're out of the game.

25            Well, it seems to me that what I would say to

1    Mr. Kessler is that if one ball bearing that you fixed the

2    price of in Japan or Europe, if you didn't prevent every one

3    of them from getting here and every one of them from being in

4    a part that gets here, that every time that one of them gets

5    here you have lost the Twombly game and, in fact, you have

6    lost it a million times before this case before we made this

7    motion.

8              THE COURT:  Thank you.  Brief?

9              MR. KESSLER:  Brief, Your Honor, but it is

10   significant, very significant, because this argument is

11   nowhere in their complaint, nowhere in their brief, so we

12   have never addressed it before, so please indulge me.  There

13   are three strikes so he's out on this argument.

14             Strike number one is contrary to what he just told

15   you, and we will file a supplemental brief if Your Honor

16   likes that under the Foreign Trade Antitrust Improvements

17   Act, which amended the Sherman Act discussion that he spoke

18   about, it is specifically not enough that you've sold a

19   bearing in Japan and could imagine that it would be imported

20   into the United States some day.  That is not the legal test.

21             The legal test, as he knows, is either it must be a

22   discussion to directly affix the import price, the import

23   price, so when you are importing it for which there are no

24   allegations in the complaint, none, or -- or it has to have a

25   direct, substantial and foreseeable effect in the United

1    States.  They cannot plead the direct effect, and they have

2    not pled anywhere in their case the direct effect.  There has

3    been a huge decision on this just now by the 7th Circuit that

4    is actually on a rehearing en banc.  There have been

5    decisions in other circuits.  He has not done anything to

6    plead the economic effects that are required under the

7    Foreign Trade Antitrust Improvements Act.  I would like an

8    opportunity to brief that, Your Honor, because I can show

9    that while he waxed eloquently about this it is legally

10   wrong.  It would be completely wrong.

11            THE COURT:  All right.

12            MR. KESSLER:  The second thing, Your Honor, is

13   everything he said is not in his complaint.  There are no

14   allegations in his complaint that at the Japan meetings or

15   the EU meetings there was a discussion to set a world price

16   like he alleged about potash.  If he alleges that in his

17   complaint he would violate Rule 11, but if he alleged that in

18   his complaint then I have to deal with that allegation.  He

19   doesn't get to just come up here and tell Your Honor, Your

20   Honor, I'm going to tell you it is this, it is that, it is

21   there.  Let him do that under Rule 11.  Dismiss the complaint

22   and see if he will put that under the Rule 11.  I don't know

23   what basis he has to say there were agreements about, but if

24   you look at the JFTC materials he cited and the EU materials

25   he cited, they only discuss Japan prices in the JFTC and they

 1    only discuss EU prices in the EU, and they say nothing about

 2    export prices to the United States.  They say nothing about

 3    import prices to the United States.

 4          So he's giving you a hypothetical scenario that is

 5    not in his complaint, that's exactly what you can't do.  If

 6    he -- if you want to dismiss with leave to replead, let's see

 7    him try to plead those facts.  I don't know what basis he

 8    will have to possibly plead them to tie that here.  That's

 9    what the cases say.  That's the second strike about this.

10          The third strike here he said to you it is

11    implausible that you would set a price in Japan and have a

12    different price in the United States.  Well, he also told you

13    there was a dumping case against bearings.  What does a

14    dumping case mean?  It means the allegation was there was

15    higher prices in Japan than in the United States.  That's

16    what he told you about the dumping case.  He didn't plead it.

17    That gives you a totally plausible reason why you cannot

18    infer because there were higher prices in one market there

19    would not be lower prices in the United States.  That is what

20    the dumping laws are about.

21          Now, frankly I have tremendous respect for

22    Mr. Davidow, he actually was involved in some of these laws

23    in the Department of Justice, but he's dead wrong about the

24    FTIA, he's dead wrong about the plausibility here based on

25    the dumping laws, and there is nothing in his complaint that

 1   satisfies that.  So, Your Honor, since he's raised these

 2   issues of world effects and jurisdiction, I would request

 3   that we get to file a supplemental brief.  Your Honor, it can

 4   be brief, so we can present to you the law on the FTIA

 5   because it was never argued in his brief and never presented

 6   in his complaints.

 7          THE COURT:  All right.  You may file a supplemental

 8   brief, no more than ten pages in seven days.

 9          MR. KESSLER:  Thank you, Your Honor.

10          MR. DAVIDOW:  May I have a moment, Your Honor?

11          THE COURT:  May you have a what?

12          MR. DAVIDOW:  May I have a moment for a sur-reply

13   brief?

14          THE COURT:  You may file a sur-reply brief.

15          MR. DAVIDOW:  No more oral?

16          THE COURT:  No more oral.  Three days after, no

17   more than five pages.

18          MR. WILLIAMS:  I wanted to make sure I heard, did

19   you say three days after their brief?

20          THE COURT:  Yes.

21          MR. WILLIAMS:  And a five-page limit?

22          THE COURT:  Right.

23          MR. WILLIAMS:  Thank you.

24          MR. MAHR:  Good afternoon, Your Honor.  I'm

25   Eric Mahr for Schaeffler AG and Schaeffler Group USA.

1      Just to put Schaeffler -- the two Schaeffler

2  entities in the context of this morning's discussions,

3  neither Schaeffler entity has been named in any other suit,

4  we are only in the bearing suit.  Neither Schaeffler entity

5  has pled guilty.

6      We have two motions, a 12(b)(6) motion and a

7  12(b)(2) motion.  Mr. Kessler just vigorously argued the

8  12(b)(6) points that we would make also.  I would just point

9  out that plaintiffs' complaint with respect to bearings

10  focuses particularly on Japanese conduct among Japanese

11  corporations in Japan affecting Japanese customers.  The two

12  guilty pleas in the bearings cases are Japanese entities, and

13  Schaeffler is a German company, it is just kind of one step

14  removed.  So I agree with everything Mr. Kessler is saying,

15  and just note that Schaeffler AG and Schaeffler USA are both

16  one step removed from that.

17      THE COURT:  Okay.

18      MR. MAHR:  I also understand that you don't want to

19  hear the same old thing from us, and I think I do have

20  something unique because at least for the hearings that I

21  have been in attendance, I think I will be the first defense

22  counsel to come to the podium and fully embrace this

23  principle of consistency that you have established in these

24  cases, at least as it goes to the 12(b)(2) personal

25  jurisdiction motions, because applying that principle of

1   consistency, which I take to mean where you have the same

2   facts you get the same result, applying that principle to

3   Schaeffler AG and comparing it to the Leoni AG dismissal and

4   the S-Y Europe dismissals in the wire harness case, the

5   result is clear that Schaeffler AG should be dismissed for

6   the same reasons and on the same grounds.

7          In fact, if anything, Schaeffler AG, the minimum

8   contacts with this jurisdiction of the United States are even

9   more remote with respect to Schaeffler AG.  For example,

10  Leoni provided financing services, IT services, had bank

11  accounts in the United States, none of that was enough.  But

12  in the case of Schaeffler AG none of that exists; Schaeffler

13  AG doesn't have any bank accounts.

14         Also in this case we have made an extensive

15  affirmative showing, even though it is plaintiffs' burden to

16  establish personal jurisdiction, we have provided you with

17  three affidavits.  They go through, and I won't go through

18  them now, you know the test, but they go through the general

19  jurisdiction test, they go through all of this other machine

20  factors, all of the Alexander Associates factors concerning

21  alter-ego jurisdiction, and in each case we have come forward

22  with a declaration from the relevant people at Schaeffler AG

23  or Schaeffler USA concerning each of those.

24         The 6th Circuit has made it very clear in the

25  Carrier vs. Outokumpu case, in the Tennyson vs. Matthews case

1    that, quote, in the face of a properly supported motion for

2    dismissal a plaintiff must, by affidavit or otherwise, set

3    forth specific facts showing that the court has jurisdiction,

4    end quote.  That's from Carrier, 673 F.3rd at 449.

5         I say that because not only is it their burden to

6    establish the Court's personal jurisdiction, but in the face

7    of our motion they have to come forward with specific facts

8    and they have come forward with nothing.  Our briefs go

9    through the various allegations they make in their opposition

10   but not in any kind of affidavit or any other form --

11        THE COURT:  There is no affidavit.

12        MR. MAHR:  Just to hit on two of them, they state

13   in their brief that a Mr. Klaus Rosenfeld is CFO of both

14   Schaeffler AG and Schaeffler USA, and they are wrong on both

15   counts.  With respect to Schaeffler AG, Klaus Rosenfeld is

16   the CEO of that entity.  With respect to Schaeffler USA,

17   Klaus Rosenfeld has never worked for Schaeffler USA, he's

18   never been their CFO, CEO or anything else.  He's never been

19   on the board of directors.  He has no --

20        THE COURT:  Nobody has ever been on both at the

21   same time in any event?

22        MR. MAHR:  We point out a couple.  Over the last

23   ten years there has been a couple instances when the

24   founders -- this is a company founded by two brothers, one of

25   their sons, who is still alive, has sat on -- there are

1    different level of boards in Germany, but it is the highest

2    level of the board in Germany and the board in the United

3    States.  He no longer does but he did for a period.

4         But I think in addition to our affirmative showing

5    that there is not personal jurisdiction, when you look at the

6    quality of what they have come back with it really

7    underscores a lack of a showing on their part.  In addition

8    to the mistakes about Mr. Rosenfeld and other employees, they

9    actually went out and apparently pulled off the Internet 30

10   names that they felt were German sounding that Dun &

11   Bradstreet said were related to the USA entity,

12   Schaeffler USA, and they said because these 30 people have

13   German sounding names out of 5,000 Schaeffler USA employees

14   that there must be some kind of minimum contacts with the

15   United States of Schaeffler AG, the other entity.

16        Even if that were true it wouldn't be enough, but

17   we went out and looked at those 30 names, only 9 of them have

18   ever been employed by Schaeffler USA currently or formerly,

19   and of those 9 none of them were also simultaneously or

20   otherwise employed by the German entity Schaeffler AG.

21        THE COURT:  Okay.

22        MR. MAHR:  So all of this I think makes clear that

23   there is no basis for personal jurisdiction here and there is

24   no reason to give them discovery on it because they have

25   essentially got that by kind of throwing out these

1    allegations and having us respond to them with affidavits and

2    sworn statements, they really got more information about

3    Schaeffler AG than they are entitled to.

4              THE COURT:  Thank you.

5              MR. MAHR:  Thank you.

6              THE COURT:  Who is responding?

7              MR. HOESE:  May it please the Court, my name is

8    William Hoese, and I'm with the Kohn, Swift firm.  It is

9    H-O-E-S-E.

10             I'm here to address the motions to dismiss by

11   Schaeffler AG and Schaeffler Group USA under 12(b)(6) on

12   behalf of all of the plaintiff groups.  And I'm also here to

13   address the personal jurisdiction motion filed by

14   Schaeffler AG also on behalf of all of the plaintiff groups.

15             THE COURT:  Okay.

16             MR. HOESE:  Your Honor, if I could also beg your

17   indulgence, Mr. Davidow in his argument may have neglected to

18   mention some allegations in the direct-purchasers' complaint

19   regarding NTN and the United States market, and at the end of

20   my presentation regarding Schaeffler, if it's okay with the

21   Court, I would like to at least put that on the record.

22             THE COURT:  All right.

23             MR. HOESE:  The presentation regarding -- by

24   Schaeffler on the 12(b)(6) motion was brief but to the point.

25   However, the standard here is whether it is plausible that

1   the Schaeffler entities were a part of a conspiracy that had

2   effects in the United States, and as this Court has said with

3   respect to a number of the other cases, if I may paraphrase,

4   it is undisputed that price fixing in the bearings market

5   occurred, and I think that is undisputed.  There are two

6   guilty pleas in the United States by two of the Japanese

7   manufacturers, and among other things in the guilty pleas the

8   government says that it would have proven that had it gone to

9   trial that these Japanese manufacturers, NSK and JTEKT,

10  participated in a conspiracy with other bearing

11  manufacturers, plural.  So the suggestion that it was limited

12  to these two I think doesn't -- isn't borne out by what the

13  Government said.

14          There is also an attempt to downplay the connection

15  between the European governmental action against all of the

16  defendants in this case, every single one of them, as well as

17  some others, were caught up in the EU investigation.  And if

18  I may read for a second from the EC press release, the

19  European Commission have found that two European companies,

20  SKF and Schaeffler, and four Japanese companies, JTEKT, NSK,

21  NFC, which is Nachi-Fujikoshi, and NTN with its French

22  subsidiary, operated a cartel in the market for automotive

23  bearings.  The companies colluded to secretly coordinate

24  their pricing strategy vis-à-vis automotive customers for

25  more than seven years from April 2004 until July 2011 in the

 1   whole European economic area, which I didn't know was 26

 2   countries until Mr. Davidow mentioned it.

 3           Going further, the companies involved in this

 4   secret cartel coordinated the passing on of steel-price

 5   increases to their automotive customers, colluded on requests

 6   for quotations and for annual price reductions from customers

 7   and exchanged commercially sensitive information.  This

 8   occurred through multi, tri and bilateral contacts.

 9           And with respect to Schaeffler, Schaeffler as well

10   as some of the Japanese and the Swedish company benefited

11   from reductions of fines under the 2006 leniency notice for

12   their cooperation.  The reductions reflect the timing of

13   their cooperation and the extent to which the evidence they

14   provided helped the commission to prove the existence of the

15   cartel.  These guys turned themselves in after the

16   investigation started.  That's Schaeffler.

17           And if I may also say Schaeffler is not a public

18   company but because it borrows lots of money does prepare

19   annual reports.  Schaeffler started to disclose because of

20   the -- it didn't want to run afoul, I guess, of not telling

21   potential creditors of problems, antitrust problems, what it

22   said, and this is in the -- for example, in the 2011

23   Schaeffler annual report, and this is by the Schaeffler

24   Group, the Schaeffler AG --

25           THE COURT:  All of them.  Okay.

1          MR. HOESE:  They hold themself out as an integrated

2     worldwide group, and I can't go through the entire

3     superstructure, which is all of these other holding companies

4     above Schaeffler AG, but as I will mention with respect to

5     the 12(b)(2) motion, Schaeffler AG is the holding company

6     that manages all of the operating companies, so it really --

7     and we will get into the control aspect of it, but in 2011

8     Schaeffler writes, and this is a public document, in late

9     2011 several antitrust authorities have commenced

10    investigations of several manufacturers of rolling and plain

11    bearings for the automotive and other industrial sectors.

12    The authorities are investigating possible agreements

13    violating antitrust laws.  Schaeffler AG and some of its

14    subsidiaries are subject to these investigations.  Schaeffler

15    goes on to say it is cooperating.  Essentially it makes the

16    same disclosures in 2012.  So this is Schaeffler AG that is

17    under investigation and its subsidiaries.

18          Here Schaeffler has the Schaeffler Group USA, and

19    the Schaeffler Group USA manufactures and sells essentially

20    all the bearings for the Schaeffler Group in the United

21    States and other countries of North America.  Not only does

22    it manufacture and sell them here to 23 auto manufacturers,

23    as set forth in the Schaeffler annual reports, and tier one

24    and two component part manufacturers, ball bearings made in

25    Germany are also imported by the Schaeffler Group USA and

1    presumably sold in the United States.

2            So all of these are indicia that Schaeffler was

3    involved in this conspiracy.  Not only that, we have the

4    Japanese, which you talked to Mr. Davidow about, both the

5    civil and the criminal activities that were uncovered and

6    prosecuted in Japan.  The Japanese as well import bearings

7    into the United States, and there was a discussion about what

8    that shows, and I'm certainly not prepared to address that

9    today, but these allegations about Japanese investigations,

10   prosecutions that resulted in guilty verdicts, multi --

11   hundreds of millions of dollars worth of fines, the United

12   States Department of Justice has brought two cases and has

13   subpoenaed Schaeffler Group USA as well.

14           THE COURT:  Schaeffler AG does not manufacture or

15   sell any product?

16           MR. HOESE:  That's my understanding, Your Honor,

17   that it does not manufacture or sell directly, it operates

18   through its various subsidiaries around the world, one of

19   which is the Schaeffler Group USA, which is in South

20   Carolina, but Schaeffler Group North America, I mean, they

21   really kind of have different expressions for what I think is

22   the same thing, has a center in Troy, Michigan as well, not

23   that the contacts have to be with Michigan with respect to

24   personal jurisdiction, but they serve the auto industry in

25   the U.S.

1           The Japanese guilty pleas relate to the auto

2    industry in the U.S.  It said the discussions were in the

3    U.S. and elsewhere.  They sold to Japanese manufacturers and

4    component suppliers in the United States and elsewhere.

5           Just when you put all of this together with the

6    allegations that the Court found sufficient in wire harness,

7    heater control, instrument panel cluster, of the market

8    structure, again, here these -- the defendants have

9    60 percent of the market.  Schaeffler is one of the top three

10   it says in industrial and in automotive.  The fact that there

11   are all high barriers to entry, there is a free flow of these

12   materials we believe pushes our complaint and the allegations

13   in the complaint, and again I'm speaking about all of the

14   complaints, over the line to plausibility.

15          Perhaps before I get into the 12(b)(2), if I could

16   just mention the NTN, Your Honor?

17          THE COURT:  All right.

18          MR. HOESE:  I apologize for having to do it but I

19   think it is important.  In the direct-purchaser complaint,

20   consolidated amended class action complaint, which is

21   Document 100 filed in the bearings cases, there is a

22   discussion of the U.S. bearings market starting on page 27

23   and going to page 28, and it talks about exportation of

24   bearings by NTN, NSK, Nachi-Fujikoshi and JTEKT, where we

25   allege that they exported on average 55 percent of their

1    bearings to the United States and Europe, and that the

2    United States imports 40 percent of its bearings from Asia.

3    We also allege that NTN derives the majority of its revenue

4    from sales within the United States.

5         In paragraph 118 we also allege that prices in the

6    United States increased during the same period that the

7    Japanese and other bearings manufacturers have admitted to

8    conspiring to raise bearing prices outside of the United

9    States.

10        We also make allegations, although this didn't

11   arise, about control of the U.S. subsidiaries by the Japanese

12   parents.  Specifically we allege that NTN had a complete

13   shadow-management structure to oversee sales of bearings in

14   the United States, and that defendants and their

15   co-conspirators, domestic pricing was also controlled by

16   foreign parents with a foreign entity acting as suppliers of

17   the domestic subsidiaries.  So I just wanted to bring that to

18   the Court's attention that there were more allegations in the

19   direct-purchasers' complaint regarding NTN and the linkage

20   being demanded by the defendants between activities that did

21   take place in Japan and affects in the United States.

22        THE COURT:  Okay.  Let's go back to Schaeffler.

23        MR. HOESE:  Yes, Your Honor.  Thank you for

24   indulging me.

25        Schaeffler AG -- well, let me start and say that

1    the question presented by Schaeffler's motion is whether it

2    would be fair and just under the circumstances to exert

3    personal jurisdiction over Schaeffler AG.  We believe that we

4    have presented enough facts or otherwise for the Court to

5    find that Schaeffler AG is the alter ego of Schaeffler Group

6    USA, or that there is sufficient contacts with the United

7    States by Schaeffler AG, and in addition that the Calder

8    effects test, which the Carrier decision pointed to, enhanced

9    some of the -- or all of the facts that we have asserted that

10   would allow the Court to take jurisdiction.

11          As I mentioned, given the circumstances that our

12   burden because the Court is relying on written submissions is

13   relatively slight, and I won't go through all of the

14   standards which the Court has already set forth in its

15   opinions, but the pleadings and the affidavits do have to be

16   viewed in the light most favorable to the plaintiffs, and the

17   Court should not weigh controverting assertions of the party

18   seeking dismissal here, Schaeffler AG.

19          What the plaintiffs need to do at this stage is

20   make out a prima facie case that the Court has jurisdiction,

21   and we believe that we have.

22          As I mentioned before, the Schaeffler AG is at the

23   top of this -- it is almost at the top of the pyramid but it

24   is responsible as Mr. Rosenfeld, who was mentioned by

25   Schaeffler's counsel, stated in his declaration, which we

Status Conference / Motion Hearings • June 4, 2014

1    attached as Exhibit 8 to our response, that Schaeffler AG is

2    the management holding company covering the operating

3    business of Schaeffler AG and its majority-owned subsidiary

4    entities collectively called the Schaeffler Group, and we

5    will get to him in a minute.

6         Among other things, Schaeffler files consolidated

7    financial statements, and I'm not saying every time a company

8    files consolidated financial statements it shows a level of

9    control necessary for the Court to pierce the corporate veil,

10   but here I think the rules that allowed Schaeffler to do that

11   and which it has done for many years are indicia of control.

12   These are IFRS-10 consolidated financial statement rules.

13        In order for a company to legally be able to

14   consolidate or under the accounting rules consolidate the

15   entities it controls it has to meet three tests.  IFRS-10

16   further defines control as follows:  An investigator, and

17   that would be Schaeffler AG I believe in this circumstance

18   because it is the one consolidating all of the financial

19   statements, controls an investee if, and only if, all of the

20   following elements are met, and the first one is power over

21   the investee, that would be Schaeffler Group.  The investor

22   has existing rights that give it the ability to direct the

23   relevant activities, and in parens, the activities that

24   significantly affect the investee's return, which I read to

25   mean that what it sells, who it sells to and so on.  The

```
 1    investor has to have exposure or rights to variable returns
 2    from its involvement with the investee.
 3           And one of the affidavits -- and I don't understand
 4    this, Mr. Crowe said that no part of the revenue of
 5    Schaeffler Group USA goes to Schaeffler AG based upon the
 6    filing of the consolidated financial statements.  I'm not
 7    sure how that can be true, but I am not -- it may be an
 8    intermediate company where it goes first, I don't know.
 9           And three is the ability to use its power over the
10    investee to affect the amount of the investors' returns.
11    Again, to me that says it can tell them what to do or what
12    not to do in order it make more money, make less money, sell
13    to this person, not sell to this person.  So it's in effect
14    it is Schaeffler and its other operating company are one
15    entity operated by Schaeffler AG, and the Carrier court found
16    that important.
17           Let me -- I think also that the declarations that
18    Schaeffler AG put in provide facts in addition to the ones
19    that we alleged about control and contacts that provide even
20    more evidence that we have presented a prima facie case.
21    What is admitted by Schaeffler AG?  It indirectly owns
22    100 percent of Schaeffler Group USA's stock.  That's been
23    considered a factor by courts in the 6th Circuit in trying to
24    determine if personal jurisdiction is appropriate.
25           Schaeffler AG says Schaeffler AG board members
```

1    occasionally travel to the United States to attend meetings

2    and trade shows, but who travels here, how often they travel

3    here, where do they go, what do they do, who do they meet?

4    If they go to trade shows they are going to tell me that they

5    never meet with a customer in the United States of a

6    Schaeffler bearing?  Maybe it is true, but we don't know and

7    that's something we wouldn't be able to know until we took

8    discovery.

9           It was touted that Schaeffler didn't provide some

10   of the services that Leoni does, but Schaeffler AG in its

11   declarations states that it provides a limited number of

12   administrative services to Schaeffler Group USA, Inc. and the

13   many other Schaeffler Group companies around the world

14   including tax and legal coordination services, accounting

15   coordination services in connection with the consolidated

16   annual account of the Schaeffler Group, so they said it right

17   in their declaration.

18          They then go on to say Schaeffler AG personnel

19   occasionally visit the United States to provide these

20   services.  Again, who, how often, what services, are they

21   paid for, how much, if not why not, we don't know yet.

22          Schaeffler AG board members -- this is Schaeffler

23   telling us this -- have held positions on the board of

24   directors of Schaeffler Group USA, Inc.  For example,

25   Juergen Geissinger was on the Schaeffler Group USA board from

```
 1    2005 to 2013.  He's the CEO of Schaeffler AG.
 2    George F.W. Schaeffler, again, the son of the founder, is an
 3    80-percent owner of the Schaeffler Group, was a
 4    Schaeffler Group USA board member from 1996 until 2010, and
 5    he serves --
 6              THE COURT:  But he wasn't on both of them at the
 7    same time?
 8              MR. HOESE:  Well, he was on the board -- I'm sorry,
 9    Your Honor.  If I could ask you to repeat your question?
10              THE COURT:  It wasn't simultaneously?
11              MR. HOESE:  I believe Mr. Geissinger and
12    Mr. Schaeffler were both on the Schaeffler Group USA board at
13    the same time; Mr. Geissinger was on from 2005 to 2013, and
14    George Schaeffler was on between 1996 and 2005, so -- excuse
15    me, 2010, so that's an overlap of five years.
16              Schaeffler AG provides corporate communication and
17    investor relation services for Schaeffler Group USA.
18    Schaeffler AG provides some, and this I'm taking from
19    Mr. Crowe's affidavit, some of -- by implication some of
20    SG USA's capital, and Schaeffler Group USA purchases some
21    supplies from Schaeffler AG.
22              Now, the -- Mr. Crowe's declaration was designed to
23    look at the factors set forth in the Alexander case, but the
24    Alexander case was -- again, it was a Michigan law -- it was
25    construing Michigan law about what was necessary, and my
```

1    reading of the Michigan cases is that it is not necessarily

2    the same as what is required under the law in federal court,

3    that Michigan may be more limited in terms of allowing the

4    exercise of personal jurisdiction.

5              THE COURT:  Okay.

6              MR. HOESE:  If I may, I wanted to mention, it was

7    said that we made some mistakes in the complaint regarding

8    crossover of officers, Mr. Rosenfeld for one.  Again, I'm not

9    saying everything on the Internet is true by any stretch of

10   the imagination but there was backup for all of the

11   allegations that were made and there was a -- just to defend

12   our honor, a -- let me see -- oh, something called

13   Inside View listed Klaus Rosenfeld as the CEO of the

14   Schaeffler AG, that's the basis for that allegation.  They

15   claim it is untrue, but at this stage we don't know yet, we

16   haven't spoken to Mr. Rosenfeld.

17             With respect to Mr. Geissinger where we said that

18   he was the CEO of Schaeffler AG and Schaeffler Group USA,

19   that was part of the executive profile and biography that was

20   put up by Business Week.  So, again, these weren't

21   allegations that were just pulled out of thin air, there was

22   a basis for making these allegations, and at this point I

23   believe under the standards that the Court isn't to weigh

24   which one is accurate or which one isn't.

25             THE COURT:  Okay.

1          MR. HOESE:  So I think based upon the allegations

2    that we made in the complaint regarding control,

3    participation in the conspiracy by Schaeffler AG, which seems

4    to be borne out by the EC decisions so far, that we have

5    presented a prima facie case for personal jurisdiction over

6    Schaeffler AG.

7          THE COURT:  Thank you.

8          MR. HOESE:  Thank you very much, Your Honor.

9          THE COURT:  Reply?

10         MR. MAHR:  Just three points, Your Honor.

11         First, on the 12(b)(6) I just wanted to make clear

12   that the EC decision press release clarifies that the conduct

13   there involves specific RFQs in Europe for European

14   customers, so it is not so easy to make this jump to the

15   United States.

16         As the elevators case said, you have to have

17   adequate allegations that the transactions or the RFQs in

18   Europe had effects here in the United States.  You just can't

19   say that because they did it over there they must have done

20   it over here.

21         Second point with respect to the EC press release,

22   I just want to emphasize it has nothing at all to do with

23   personal jurisdiction over Schaeffler AG.  Whatever

24   Schaeffler AG may or may not have done in Europe doesn't

25   enhance its minimum contacts with the United States as a

1    jurisdiction.

2         You already have ruled that there is not a

3    conspiracy personal jurisdiction theory in the 6th Circuit,

4    you held that in the S-Y Europe case, and that all it would

5    go to and there is just no such theory.

6         Also, that the fact of the EC press release doesn't

7    distinguish Schaeffler AG from Leoni AG or from S-Y Europe,

8    your previous dismissals on personal jurisdiction grounds,

9    because in both of those cases there were also press releases

10   and also findings by the European Commission under the very

11   same settlement procedures that those companies had engaged

12   in conduct in Europe.  That didn't change the minimum

13   contacts analysis in the United States.

14        And finally with respect to the various 12(b)(2)

15   arguments by Mr. Hoese, again, nothing he said distinguishes

16   in any way Schaeffler AG from Leoni AG or from S-Y Europe.

17   Holding yourself out as a corporate family to the public

18   doesn't mean that your holding company has minimum contacts

19   to the United States.

20        And the idea -- I think he said -- I haven't seen

21   this in a complaint, I haven't seen this in an affidavit, but

22   he said that Schaeffler USA imports bearings while at the

23   same time manufacturing them here.  If it imports bearings

24   from Europe it doesn't import them from Schaeffler AG because

25   Schaeffler AG doesn't make any bearings that it would be able

1    to import.

2          I think what Mr. Hoese is trying to do is put

3    together kind of a personal jurisdiction stew where you take

4    a little here, take a little there, take some from this

5    company and some from this company, take a little from this

6    press release and that press release.  That's not the

7    standard.  The standard after a properly supported

8    Rule 12(b)(2) motion, which we have filed, is laid out

9    clearly in the Carrier case and the Tennyson case, and it

10   requires plaintiffs to come forth with specific facts in

11   affidavits or otherwise and they just haven't done that.

12   That's all I have.

13         THE COURT:  Okay.  Thank you very much.  All right.

14   NSK?

15         MS. TOWEILL:  Thank you, Your Honor.  My name is

16   Teale Toweill.  I'm here on behalf of NSK Americas, Inc.

17         We also have a 12(b)(6) Twombly motion.  You have

18   the papers in front of you.  I do agree that Mr. Kessler has

19   pretty vigorously argued the relative paucity of the

20   allegations in the three complaints, but there are a few

21   points I would like to quickly make.

22         THE COURT:  Okay.

23         MS. TOWEILL:  Mr. Kessler noted that in the

24   opposition filed by the plaintiffs, pages one through three

25   list their various allegations that they claim are sufficient

1    to support their pleading burden under Twombly.  We actually

2    have pages three through nine, which I don't know is a good

3    thing or a bad thing but --

4            THE COURT:  It's a good thing I read all the pages.

5            MS. TOWEILL:  Sorry?

6            THE COURT:  I said it's a good thing I read all the

7    pages.

8            MS. TOWEILL:  Good thing you read all the pages.

9    Well, you can read all of these pages, that's fine, because

10   as it turns out pretty much none of these are allegations as

11   to NSK Americas specifically.  The allegations as to

12   NSK Americas are very limited, they relate to corporate form,

13   NSK Americas' relation to NSK, Ltd., its parent company in

14   Japan.

15           Two of the three complaints, the dealership and

16   end-payor complaints, note that there were two executives who

17   at one point worked at NSK Americas and at some point left

18   their employment there and subsequently took positions at

19   NSK, Ltd.  The third complaint, the direct-purchaser

20   complaint, makes the same shadow management team allegation,

21   the exact contours of which are somewhat unclear, and

22   otherwise plaintiffs seek to rely instead on allegations that

23   don't name NSK Americas at all.

24           So setting aside the allegations as to NSK Americas

25   specifically, which I think we can all sort of agree don't

1  create antitrust liability alone, so plaintiffs have two

2  separate arguments as to why NSK Americas should still be

3  considered a plausible member of this conspiracy as required

4  by Twombly.

5       The first is their reliance on generic allegations

6  as to defendants as a group.  There are sort of two

7  problems -- well, one and-a-half problems with this

8  particular reliance.  First, the end payors, and I will

9  acknowledge this is an argument as to form, not to substance,

10  but the end payors did, in fact, define defendants not to

11  include NSK Americas, so at least insofar as we are talking

12  about the end-payor complaints all of their allegations as to

13  defendants generically can't as a matter of definition go to

14  NSK Americas' conduct, but regardless the 6th Circuit has

15  already rejected the idea that allegations as to defendants

16  as a group can satisfy alone the plaintiffs' pleading burdens

17  under Twombly, I think, so Total Benefits Planning Agency,

18  which was decided by the 6th Circuit in 2008, held, and I

19  quote, generic pleading alleging misconduct against

20  defendants without specifics as to the role each played in

21  the alleged conspiracy was specifically rejected by Twombly.

22       Carrier Corp. is a 2012 6th Circuit case that was

23  previously discussed held the same thing, that the

24  pleadings -- or the complaint must specify how each defendant

25  was involved in the alleged conspiracy.  Generic

1    complaints -- or generic allegations as to defendants simply

2    don't satisfy that standard.

3          So if we set aside everything that just says

4    defendants what we have left is a series of allegations as to

5    entities that are not NSK Americas, and to sort of deal with

6    these what the plaintiffs try to do is claim that

7    NSK Americas is, in fact, an alter ego of NSK, Ltd. such that

8    any wrongdoing alleged as to NSK, Ltd. can be imputed to

9    NSK Americas, and they do this by going through a litany of

10   statements regarding foreign proceedings as to NSK, Ltd. in

11   Japan, in Singapore and other Asian jurisdictions.

12         They might, although they didn't at the time,

13   reference the EC press release that is now under

14   consideration by the Court, but none of those -- none of

15   those pleadings have anything to do with NSK Americas in the

16   first instance, these are all allegations as to conduct that

17   took place in foreign jurisdictions by an entity that was not

18   NSK, Ltd.

19         To sort of get through this alter-ego path the

20   plaintiffs rely actually on this Court's decision in

21   GS Electech, which was one of the wire harness decisions, and

22   we don't disagree with that reliance, but what we do disagree

23   with is the plaintiffs' sort of cavalier disregard of what

24   that decision actually said.  So what Your Honor said in

25   GS Electech is that the evidence -- and this is a quote, the

1    evidence must show that there is such a complete identity

2    between the defendant and the corporation as to suggest that

3    one was simply the alter ego of another.  Complete identity.

4    In GS Electech you did find that the alter-ego test had been

5    satisfied, and in doing so you relied on Carrier Corp., the

6    2012 6th Circuit decision, but Carrier Corp. had a panoply of

7    allegations going far beyond anything that happened here to

8    support the idea of alter ego.

9            Here we have statements about corporate forum, the

10   shadow-management structure, two people who once worked at

11   the U.S. subsidiary and then subsequently worked at the

12   Japanese parent company, and that is it.  That is far from

13   sufficient to show that there was a complete identity between

14   NSK Americas and NSK, Ltd. such that the wrongdoing alleged

15   against NSK, Ltd. in these complaints can be imputed to

16   NSK Americas.  They simply haven't satisfied the test that

17   this Court said was the relevant test, and that leaves us

18   with nothing.  That leaves us with a statement that

19   NSK Americas is a Delaware corporation, it is engaged in the

20   business of selling bearings, it is owned by a Japanese

21   corporation against whom allegations have been made, and a

22   couple guys worked there and then worked somewhere else, and

23   none of those facts even taken as a whole can be sufficient

24   to support a finding that NSK Americas plausibly participated

25   in the alleged conspiracy, and for that reason we think

1    NSK Americas should be dismissed.

2             THE COURT:  Thank you.

3             MR. FREY:  Good afternoon, Your Honor.

4    Brendan Frey, counsel from Mantese, Honigman, Roseman &

5    Williamson, P.C., counsel for the auto dealers.

6             I will be arguing in opposition to NSK Americas'

7    motion on behalf of directs and end payors as well.

8             THE COURT:  How do you spell your last name?

9             MR. FREY:  Frey, F-R-E-Y.

10            THE COURT:  Thank you.

11            MR. FREY:  Your Honor, there is an often-quoted

12   statement from Twombly which I am sure the Court is familiar

13   with.  It provides that even if the allegations in the

14   complaint might strike a savvy judge as unlikely to lead to

15   the discovery of supporting evidence, and is improbable, the

16   complaint may proceed as long as the allegations contain

17   enough facts to be plausible.

18            And NSK Americas tries to turn the standard on its

19   head.  NSK Americas is the wholly-owned subsidiary of

20   NSK, Ltd.  NSK, Ltd. has admitted to or have been found to

21   have been fixing the price of bearings around the world.  As

22   Mr. Davidow explained, it is very unlikely that NSK, Ltd.

23   would have fixed the price of bearings for over a decade

24   without -- while at the same time allowing its wholly-owned

25   subsidiary to undercut the price fix in the United States by

 1    selling bearings at whatever price it wanted to sell them.

 2         NSK Americas' culpability is not only plausible, it

 3    is probable, or as Mr. Davidow said, it is implausible that

 4    NSK Americas would not have been involved in the conspiracy

 5    aimed at the United States.

 6         Plaintiffs sufficiently allege NSK Americas'

 7    involvement in the conspiracy.  Plaintiffs allege that

 8    defendants conspired to fix the price of bearings sold in the

 9    United States.  NSK Americas raises a concern about the

10    end-payor complaint because there was one paragraph that did

11    not include NSK Americas, but the rest of the complaint when

12    viewed as a whole it clearly said that all defendants in

13    their allegations and NSK Americas is clearly listed as a

14    defendant in the complaint.

15         End payors have requested if necessary to make that

16    more explicit if the Court deems it necessary, but they do

17    not believe it is necessary to do so because when the

18    complaint is read as a whole NSK Americas is clearly included

19    in the allegations relating to the defendants.

20         NSK sold price-fixed bearings through its

21    subsidiaries in the United States.  NSK Americas

22    manufactured, marketed and sold price-fixed bearings in the

23    United States under control and direction of NSK, Ltd., and

24    NSK, Ltd. is an admitted global price fixer of bearings and

25    has been fined 380 million Yen in Japan where the Tokyo

```
 1   District Court held that NSK carried out the central role in
 2   the cartel.  NSK has been ordered to pay a fine in Canada for
 3   fixing the price of bearings.  Just last week Singapore's
 4   competition authority announced a fine against NSK and its
 5   subsidiary in Singapore for collusive conduct relating to
 6   bearings.  NSK has agreed to plead guilty to price fixing
 7   bearings in Europe and to pay a fine of over 62 million Euro,
 8   and NSK has agreed to plead guilty to fixing prices of
 9   bearings sold in the United States from 2000 -- from at least
10   2000 to 2011 and has agreed to pay a fine of $68.2 million.
11           The plea agreement with the Department of Justice
12   further provides that it requires the cooperation of NSK's
13   subsidiaries and provides the United States will not bring
14   further criminal charges against NSK or its related entities
15   for any offense related to this bearings price-fixing
16   conspiracy.
17           As Your Honor held in the GS Electech opinion and
18   order, which defendants state they admit is right on point,
19   this plea agreement creates an inference supporting
20   NSK Ltd.'s control of NSK Americas.  NSK Americas'
21   participation is not only plausible, it is probable.
22           There are additional factors supporting NSK's
23   control of NSK Americas.  NSK Ltd.'s annual report includes
24   aggregate financials for all of the NSK entities, it is
25   reported by sector such as the automotive sector, it is not
```

1    separate by subsidiaries.  NSK, Ltd. and NSK Americas have

2    shared numerous executives.  NSK's subsidiaries around the

3    globe have been investigated and fined in connection with

4    bearings price-fixing conspiracy.  NSK's subsidiary in Europe

5    was inspected by the European Commission.  NSK's subsidiary

6    in South Korea was inspected by the Cree of Fair Trade

7    Commission.

8              THE COURT:  Slow down.

9              MR. FREY:  Sorry.  So I think I said Europe,

10   South Korea, Singapore, I already mentioned the subsidiary

11   was fined, and plaintiffs' complaint also cites the quarterly

12   report from prior to the NSK's guilty plea where the report

13   provided that NSK's subsidiary in the United States received

14   a subpoena in connection with U.S. Department of Justice

15   price-fixing investigation, and they raise an issue with this

16   saying it is not specific enough to be directed to

17   NSK Americas but the allegation is that its subsidiary in the

18   United States received the subpoena, not one of its

19   subsidiaries.  NSK Americas is the only NSK entity listed in

20   the complaint.

21             THE COURT:  Okay.

22             MR. FREY:  So -- and then further notably

23   NSK Americas' receipt of the subpoena was followed by

24   NSK Ltd.'s guilty plea, which included a non-cooperation

25   agreement in exchange for NSK Americas' cooperation.

1    NSK Americas' participation is not only plausible, it is

2    probable.  And the defendants don't like it when we say this

3    but I think it is worth repeating, the Court has heard these

4    arguments before in wire harness, and as ruled in Tokai Rika

5    and TRAM's motion to dismiss and GS Electech's motion to

6    dismiss.  And the Court's opinion in wire harness -- opinions

7    are supported by the Carrier case.  And plaintiffs'

8    allegations in this case are consistent with allegations that

9    were made in the Carrier Corp. case.

10          The 6th Circuit in Carrier referenced the fact that

11   plaintiffs allege that the price-fixed product has been sold

12   in the United States through the subsidiaries, and that there

13   have been an overlap of executives between the subsidiaries

14   and the parent company.  Those allegations are consistent

15   with allegations in this case.

16          THE COURT:  Okay.

17          MR. FREY:  Thank you.

18          THE COURT:  Reply?

19          MS. TOWEILL:  Just a few hopefully brief and not

20   too quickly spoken points for Your Honor.

21          First, just to be clear, our issue with the

22   end-payor complaints is not that there is one paragraph that

23   does not include NSK Americas, it is that paragraph four of

24   the end-payor complaint which, in fact, defines the proper

25   noun defendants does not reference NSK Americas as one of the

1    defendants so defined.  It's unclear why they would bother to

2    define the word defendants if it was meant to be inconclusive

3    rather than exclusive as they claim in their reply.

4         And further, although they've made in their reply a

5    brief mention of the possibility of amendment should the

6    Court require it necessary, and have made a passing request

7    to do the same now, I would note that that is not a proper

8    request for leave to amend, and if they do file such a

9    request we will, of course, respond.

10         THE COURT:  Okay.

11         MS. TOWEILL:  Now, as to all of these proceedings

12    that were just listed, the European proceeding, the Singapore

13    proceeding, the South Korean proceeding, the JFTC

14    proceedings, some of which apparently included findings as to

15    subsidiaries of NSK, Ltd., the point is that none of those

16    included any findings as to NSK Americas and none of those

17    included any findings as to conduct in America, so unless

18    this Court finds that NSK Americas is an alter ego of

19    NSK, Ltd. all of that is irrelevant.

20         And for that test, the test of alter ego, what we

21    are looking for again is complete identity, and we've heard

22    that the allegations in these complaints are consistent with

23    the allegations in the Carrier Corp. case, and it is

24    certainly the case that the allegations made here also showed

25    up in the Carrier Corp. case, but I think what plaintiffs are

1    sort of disregarding is that many, many, many other

2    allegations also showed up in the Carrier Corp. complaint

3    that was not here -- that were not made here.

4         We have briefed these and I won't waste the Court's

5    time going through them, but one in particular that the

6    plaintiffs seem particularly interested in is this idea of

7    personnel having worked at both the parent and the subsidiary

8    corporation.  Here they have alleged, as I said before, two

9    employees of NSK Americas at some point left NSK Americas and

10   subsequently took up positions at NSK, Ltd.

11        In Carrier Corp. the allegation was that key

12   managerial personnel rotated between the various subsidiaries

13   on a schedule to ensure complete control and consistent

14   control of those entities.  That promotion in one entity was

15   practically impossible unless you had rotated through one of

16   the other entities.  And in Carrier Corp. the court had the

17   benefit of a finding by the European Commission that at least

18   the European Finnish subsidiary of the parent corporation had

19   no separate corporate identity, it was functionally the same

20   company.  None of those allegations are here.

21        So while the things they have said were also said

22   in Carrier Corp., I think they are pretty dramatically

23   overlooking the things that have not been said.

24        And then just one final point, all of these --

25   these litany of allegations about NSK, Ltd., which may or may

1    not be sort of borne out in the long run, NSK, Ltd. is a

2    defendant in this case and NSK, Ltd. is not making a 12(b)(6)

3    motion.  NSK, Ltd. is not challenging the sufficiency of

4    these allegations.  It is NSK Americas, a separate U.S.

5    subsidiary, to which essentially no argument has been made,

6    and I think it is important to note that the Court keep in

7    mind that there is still plenty of fodder for those NSK, Ltd.

8    allegations even if this motion is granted because NSK, Ltd.

9    is a completely separate company.

10              THE COURT:  Okay.

11              MS. TOWEILL:  If I could just add one more point?

12   I'm glad I didn't number them at the beginning because I

13   would have miscounted.

14              They have made mention of the NSK, Ltd. plea

15   agreement, and I would just like to note two things as to

16   that plea agreement.  One, as seems to be a theme here, the

17   plea agreement relates to NSK, Ltd. and not to NSK Americas.

18   NSK Americas is not named.  The plea agreement does require

19   cooperation of subsidiaries of NSK, Ltd., but NSK Americas

20   agreeing to cooperating with the DOJ in return for

21   non-prosecution seems to me equally plausibly explained as an

22   independent business decision by a company that would rather

23   not be prosecuted by the DOJ regardless of whether or not its

24   parent company had the authority to control or direct such

25   compliance.  So relying on that as a way to sort of define

1    alter ego seems inconsistent with the actual terms of the

2    plea.

3            THE COURT:  Thank you.

4            MS. TOWEILL:  Thank you.

5            MR. FREY:  May I have a brief sur rebuttal?

6            THE COURT:  All right.

7            MR. FREY:  Thank you, Your Honor.

8            NSK Americas acknowledges that the allegations in

9    our complaint are equally plausible to what they counter as

10   some other scenario.  We only need to meet the plausibility

11   test.

12           I also want to point out that the Carrier Corp.

13   statement that they tried to make hay of because Carrier

14   Corp. does trace very similar allegations that are in our

15   complaint, and then it does have a statement more importantly

16   about some other allegations which are also consistent with

17   our complaint, but the more important part of that, in

18   Carrier Corp. there was a finding of a conspiracy in Europe

19   and the plaintiffs were trying to connect that to the

20   United States.

21           Here we are already in the United States, NSK, Ltd.

22   has already pled guilty to fixing the price of bearings in

23   the United States, and it is implausible that NSK Americas

24   would not have been involved in that price-fixing conspiracy

25   aimed at the United States.

```
 1              THE COURT:  Thank you, Mr. Frey.
 2              MR. FREY:  Thank you.
 3              MS. ROMANENKO:  Your Honor, Victoria Romanenko.
 4         On behalf of auto dealers and end payors, we would
 5    like to request Your Honor to reconsider Mr. Kessler's
 6    request for a supplemental briefing.  The defendants could
 7    have raised the Foreign Trade Antitrust Improvements Act
 8    argument in their motion to dismiss and they didn't do that
 9    because they felt that they didn't have the legal support to
10    do so.  Now they are trying to get a --
11              THE COURT:  Is he here?
12              UNIDENTIFIED ATTORNEY:  No, Your Honor.
13              THE COURT:  I can't consider this motion, he's
14    already left.
15              MS. ROMANENKO:  He's left?
16              THE COURT:  Yes.  Too late.
17              MS. ROMANENKO:  Okay.
18              THE COURT:  It is brief.
19              MR. WILLIAMS:  Your Honor, I have one last thing
20    actually.  I promised one of the defense counsel, he had
21    raised a concern that in the brief on coordination as to the
22    deferred defendants, and I listed the guilty pleaders and I
23    just said Mitsubishi, that he wanted me to make clear that it
24    is Mitsubishi Heavy Industries which was the signatory to
25    that brief and not Mitsubishi Electronics, which is part of
```

```
1    one of the other briefs, and he just asked me to clarify that
2    on the record.
3              THE COURT:  All right.  That's noted for the
4    record.  Thank you.
5              Anything else?
6              (No response.)
7              THE COURT:  Well, thank you all very much.  We will
8    see you in October if not before -- oh, wait a minute.
9              MR. FEENEY:  We have OSS, Your Honor, one motion.
10             THE COURT:  We have one motion left?
11             MR. FEENEY:  On OSS, not bearings.
12             THE COURT:  I thought those were all waived?
13             MR. FEENEY:  Not with respect to TRW Automotive
14   Holdings' motion to dismiss the direct-purchaser complaint.
15             James Feeney on behalf of TRW Automotive.
16             THE COURT:  Okay.  I'm going to ask you to do a
17   very brief argument, Counsel, because we thought it was
18   waived and I --
19             MR. FEENEY:  That's fine, Your Honor.
20             THE COURT:  Is your opponent here?
21             MR. HANSEL:  Yes, Your Honor.
22             THE COURT:  I just wanted to make sure.
23             MR. FEENEY:  Mr. Kessler is on the other side, Your
24   Honor, my side.
25             Your Honor, for the record, James Feeney appearing
```

1   on behalf of TRW Automotives.

2          As the Court heard this morning, TRW Automotive

3   Holdings and TRW Deutschland have entered into a settlement

4   agreement with the end payors and the auto dealers.  They

5   have not settled, however, with the direct purchasers, which

6   gives rise to the pendency of this motion only as it relates

7   to TRW Automotive Holdings only as it relates to the

8   direct-purchaser complaint.

9          And I'm sure the Court -- I know the Court has read

10  the briefs and is familiar with the argument, and you have

11  heard a good deal of argument this morning about parents and

12  subsidiaries, but I would like to spend just a couple

13  minutes, Your Honor, highlighting for the Court why this

14  complaint directed against TRW Automotive Holdings, which is

15  a holding company, which has -- does not sell any OSS

16  products that are part of the alleged cartel, does not

17  manufacture any products, there are no allegations of

18  overlapping executives, there are no allegations of meetings

19  occurring at TRW Automotive Holdings, there are no

20  allegations of any participation direct and independent by

21  TRW Automotive Holdings.

22         The plea agreement that was entered involved a

23  German subsidiary, an indirect subsidiary, TRW Deutschland.

24  TRW Deutschland operates independently in Germany.  The

25  cartel that was the subject of the plea agreement involved

1    German-based conduct according to the plea agreement directed

2    to two German manufacturers.  No allegations were made, no

3    mention was made, no statement was made about TRW Automotive

4    Holdings participating in any way in this conduct, and unless

5    the Court is prepared to adopt as a standard that simply

6    because a parent is sued and a subsidiary -- an indirect

7    subsidiary, for that matter, pleads guilty, that that is

8    sufficient to create the plausibility of conspiratorial

9    conduct by the parent, notwithstanding the absence of any

10   specific factual allegations involving the parent, then that

11   would articulate a standard that has not been previously

12   adopted either by this Court or the 6th Circuit, nor is it a

13   standard that is recognized under Michigan law involving

14   piercing the corporate veil.

15          There has to be, as the Court -- as other counsel

16   has pointed out, complete identity, there is no allegation of

17   that.  There is no allegation of any wrongdoing specifically

18   directed to Automotive Holdings.  The statements that are

19   made are made in a conclusory fashion, Your Honor.  They

20   really amount to a statement that rises to the level of

21   essential strict liability.

22          THE COURT:  Okay.  Thank you.

23          MR. FEENEY:  Thank you.

24          MR. HANSEL:  Good afternoon, again, Your Honor,

25   Greg Hansel for the direct-purchaser plaintiffs.

```
 1          TRW Automotive's motion to dismiss should be denied
 2    for three reasons.  First, the Court has already denied other
 3    motions to dismiss in the wire harness case based on the same
 4    issue that TRW Automotive is raising.  Second, TRW -- the OSS
 5    direct-purchaser plaintiffs have pled a plausible claim
 6    against TRW Automotive because TRW Automotive is the American
 7    connection for TRW Deutschland who pled guilty.  Third, on
 8    the veil-piercing issue, federal corporate law does allow
 9    piercing the veil where the corporate form is used to commit
10    antitrust violations.
11          I know the Court wants to be brief so I have
12    slashed and burned most of my argument.  I will try to be as
13    quick as possible.
14          Operative allegations in the complaint include that
15    TRW Automotive Holdings is a Delaware corporation with its
16    headquarters in Livonia, Michigan.  TRW Deutschland Holding,
17    also a holding company, but that doesn't seem to bother TRW
18    in this case, pled guilty to price fixing in occupant safety
19    systems and agreed to pay a $5.1 million fine -- criminal
20    fine in the United States.
21          The complaint alleges TRW Automotive wholly owned
22    TRW Deutschland, controlled it, directed it, and directly or
23    through subsidiaries manufactured, marketed and sold OSS
24    products purchased in the United States.  Plaintiffs allege
25    TRW Automotive was an active, knowing participant in the
```

1    conspiracy, that it knew, approved of, authorized, ordered

2    and condoned the acts of TRW Deutschland, that the DOJ

3    subpoenaed TRW Automotive directly first in the United States

4    even before the EC visited TRW Deutschland in Europe, and

5    that TRW Automotive as a whole has 20 percent of the OSS

6    market globally.

7           The other defendants in this case, the other

8    groups, are Tokai Rika, Takata and AutoLiv, and together with

9    TRW they control 73 percent of the global market for OSS

10   products.

11          There are four defendant groups in this case, and

12   of those four TRW Deutschland has pled guilty, Takata has

13   pled guilty, AutoLiv has pled guilty as did its employee,

14   Takayoshi Matsunaga, and Tokai Rika, the fourth defendant,

15   has pled guilty to other products, heater control panels, as

16   well as to obstruction of justice.  Tokai Rika's former

17   employee, Hitoshi Hirano, was indicted on May 22nd, 2014 for

18   price fixing in heater control panels and obstruction of

19   justice, destroying and ordering destruction of documents.

20          The rulings that the Court has made before that

21   apply here very briefly are the ruling that on Tokai Rika and

22   TRAM's motion to dismiss in the wire harness case, which is

23   Docket No. 74-10, there as here the plaintiffs sued two

24   corporate affiliates, a parent and an alleged wholly-owned

25   and controlled subsidiary.  There as here, one affiliate had

1    pled guilty, the other had not.

2         Quoting briefly from Your Honor's opinion, the

3    District Court should not dismember the complaint.  The

4    complaints notify TRAM and Tokai Rika what wrongdoing they

5    are alleged to have committed.  Tokai Rika's guilty plea does

6    not establish immutable boundaries for civil cases because

7    guilty pleas are negotiated.  The Court finds the complaints

8    sufficiently allege an agency relationship that the

9    activities of TRAM were under the direction and control of

10   defendant Tokai Rika.  Plaintiffs have alleged that TRAM was

11   wholly owned and controlled by Tokai Rika and have met their

12   pleading burden.  There is further support of the

13   relationship inasmuch as Tokai Rika pleaded guilty to conduct

14   that occurred at TRAM.

15        Here in OSS, plaintiffs' case is even stronger

16   because TRW Deutschland pled guilty to price fixing in the

17   same product, OSS products, whereas in Tokai Rika's case it

18   was a different product, it was heater control panels, but it

19   was kept in the wire harness cases.

20        The second point, we all remember the great classic

21   movie The French Connection.  What was the American

22   connection here between TRW Deutschland, which counsel has

23   argued is an independent subsidiary, if there is such a

24   thing, an independent subsidiary in Germany, what is their

25   connection with the U.S. market such that they would plead

1    guilty to price fixing in the United States?  The answer is

2    their American connection is TRW Automotive.

3         What is -- so the Sherman Act only reaches conduct

4    that affects the United States.  TRW Deutschland has no

5    office in the United States, it only operates here through

6    TRW Automotive, which has 28 locations in the United States

7    and its headquarters down the road in Livonia.  So

8    TRW Automotive has consolidated financials, the annual report

9    cited by the defendants in their brief does not even mention

10   TRW Deutschland, and the financials are consolidated.

11        What TRW entity did the Department of Justice

12   investigate in the United States?  DOJ subpoenaed

13   TRW Automotive and did so before the EC investigation in

14   Europe, so that order is significant.

15        And what role does TRW Automotive play in the

16   global TRW group?  Well, it plays a dominant role.  As the

17   Court stated in the GS Electech motion denying the motion to

18   dismiss, allegations of dominance may, quote, create an

19   inference, end of quote, that multiple entities, quote,

20   participated in the conspiracy.

21        To hear TRW tell it, TRW Automotive doesn't make or

22   sell anything.  Well, this may come as news to the

23   well-compensated senior executives of TRW Automotive in

24   Livonia, including the executive vice president of

25   manufacturing and operations at TRW Automotive, I guess he

1    has nothing to do.  The executive vice president of sales at

2    TRW Automotive, who I guess has a no-show job also, and the

3    executive vice president and CFO who must not be involved in

4    finance and pricing.  What do these three executives do all

5    day in Livonia?

6          TRW Automotive is the parent and sole owner of

7    TRW Deutschland.  It owned and controlled and dominated it.

8    It is not plausible that in the backyard in America of its

9    dominant parent TRW Deutschland could participate in a

10   price-fixing conspiracy without its knowledge.

11         Finally, on the veil piercing, Your Honor, we

12   briefed it, I won't belabor it, but under federal common law

13   there is a lower standard than under state veil-piercing law

14   where there is an allegation that a corporation has used a

15   subsidiary to violate the antitrust laws.  We have fully

16   briefed it.  The Court has also addressed that in the

17   GS Electech and the TRAM and Tokai Rika cases.  There is one

18   more case which I provided to counsel this morning which

19   cites a case that TRW cites in its brief, the TFT LCD case.

20         THE COURT:  The what?

21         MR. HANSEL:  If I may, this case I'm referring to

22   now is called the Marine Hose Antitrust Litigation.  If I may

23   approach I have a copy for the Court?

24         THE COURT:  All right.  Thank you.

25         MR. HANSEL:  Very similar facts to this.  It was an

1    antitrust class-action MDL.  The court had found already that

2    one entity, a subsidiary called ITR, that the allegations

3    against ITR had been sufficient.  This is a Southern District

4    of Florida.  But the plaintiffs were also suing the parent

5    company of ITR called SAIAG, and SAIAG'S parent Cumital

6    SAIAG.  And the court ruled that the allegations were

7    sufficient to sustain the complaint against all three

8    entities, the parent and the ultimate parent, and held

9    plaintiff need not differentiate between related corporate

10   entities.

11           For those reasons, Your Honor, direct-purchaser

12   plaintiffs in OSS respectfully ask the Court to deny

13   TRW Automotive's motion to dismiss.  Thank you.

14           THE COURT:  Thank you.

15           MR. FEENEY:  Very briefly, Your Honor but

16   importantly?

17           THE COURT:  Okay.

18           MR. FEENEY:  Point number one, Your Honor, with

19   regard to the wire harness opinions, in wire harness, in TR,

20   the parent pled guilty to conduct that took place at its

21   subsidiary.  There is no allegation of that in this case

22   because they cannot make that allegation.  Here the parent

23   did not plead guilty to anything and the subsidiary -- the

24   indirect subsidiary pled guilty to conduct occurring in

25   Germany, not in the United States, in terms of the cartel

1    activity.

2            Point number two, with regard to the GSE case, the

3    parent was alleged to have sold price-fixed products through

4    its U.S. subsidiaries.  Again, that did not occur and there

5    is no allegation that that occurred in this case.  The

6    price-fixed products that are the subject of the plea

7    agreement and the guilty plea entered by TRW Deutschland were

8    sold to German manufacturers -- German manufacturers in

9    Germany, they made their way into the United States.  That is

10   the American connection.  It has nothing to do with what

11   three executives in Livonia are doing on daily basis.  There

12   is no allegation in the complaint to the contrary, and for

13   counsel to suggest that it is different ignores the plea

14   agreement and ignores the allegation -- the allegations in

15   their own complaint.

16           I would invite the Court to simply look at

17   page four -- pages four and five of our reply brief where we

18   outline every one of these allegations that is made, and the

19   Court will see upon scrutiny that none of these specifically

20   involve conduct occurring at or by TRW Automotive.

21           Finally, Your Honor, the last time I checked

22   Michigan law applies, and the case law is clear on that with

23   regard to the alter-ego issue.  Thank you.

24           THE COURT:  Thank you.

25           MS. KINGSLEY:  Your Honor, Meredith Kingsley on

1    behalf of the AutoLiv defendants.  I was admitted and sworn

2    this morning, so those papers should be before you.

3            Just very briefly in light of AutoLiv's

4    settlements, I wanted to make the Court aware they should be

5    expecting papers by which AutoLiv can withdraw from the

6    pending motions to dismiss in all the class actions that

7    pending against us without prejudice to be reasserted later

8    if the settlements don't go forward.

9            THE COURT:  All right.  Thank you.

10           MS. KINGSLEY:  Thank you, Your Honor.

11           THE COURT:  I'm going to ask, anything else?

12           (No response.)

13           THE COURT:  That's it.  Thank you all.

14           ATTORNEYS:  (Collectively)  Thank you, Your Honor.

15           THE COURT:  Have a good summer working.

16           (Proceedings concluded at 1:45 p.m.)

17                        _    _    _

18

19

20

21

22

23

24

25

```
1                          CERTIFICATION

2

3           I, Robert L. Smith, Official Court Reporter of

4    the United States District Court, Eastern District of

5    Michigan, appointed pursuant to the provisions of Title 28,

6    United States Code, Section 753, do hereby certify that the

7    foregoing pages comprise a full, true and correct transcript

8    taken in the matter of IN RE:  AUTOMOTIVE PARTS ANTITRUST

9    LITIGATION, Case No. 12-02311, on Wednesday, June 4, 2014.

10

11

12                          s/Robert L. Smith
                            Robert L. Smith, RPR, CSR 5098
13                          Federal Official Court Reporter
                            United States District Court
14                          Eastern District of Michigan

15

16

17   Date:  06/12/2014

18   Detroit, Michigan

19

20

21

22

23

24

25
```