# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

_____

City of Richmond, City of Traverse City, )
County of Oakland, Mecklenburg County, )
And Village of Northport, on behalf of )
Themselves and all similarly situated )
entities )
  )
             Plaintiffs )
      v. )
  )    Master File No. 12-md-02311
DENSO Corporation, DENSO International )
America, Inc., Fujikura Ltd., Furukawa )
Electric Co., Ltd., American Furukawa, Inc., )    CLASS ACTION COMPLAINT
Lear Corporation, Kyungshin-Lear Sales )
and Engineering, LLC, Leoni Wiring )
Systems, Inc., Leonische Holding, Inc., )
Sumitomo Electric Industries, Ltd., )
Sumitomo Electric Wintec America, Inc. )    <u>JURY TRIAL DEMANDED</u>
Sumitomo Wiring Systems, Ltd., Sumitomo )
Electric Wiring Systems, Inc., K&S )
Wiring Systems, Inc., Sumitomo Wiring )
Systems (U.S.A.) Inc., Yazaki Corporation, )
Yazaki North America, Inc., Tokai Rika )
Co., Ltd., TRAM, Inc., G.S. Electech, Inc., )
G.S. Wiring Systems Inc., and G.S.W. )
Manufacturing Inc., )
  )
           Defendants )
_____ )

# TABLE OF CONTENTS

SUMMARY OF THE CLAIMS .................................................................3

JURISDICTION AND VENUE...............................................................9

PARTIES ...............................................................................................12

    A.      PLAINTIFFS ...........................................................12

    B.      DEFENDANTS .........................................................15

          1.    The DENSO Defendants.........................................15

          2.    The Fujikura Defendant..........................................16

          3.    The Furukawa Defendants.......................................17

          4.    The Lear Defendants ..............................................17

          5.    The Leoni Defendants.............................................19

          6.    The Sumitomo Defendants......................................20

          7.    The Yazaki Defendants...........................................22

          8.    The Tokai Rika Defendants .....................................23

          9.    The G.S. Electech Defendants.................................24

AGENTS AND CO-CONSPIRATORS ..................................................25

FACTUAL ALLEGATIONS...................................................................26

    A.    The Automotive Wire Harness System ...........................26

    B.    The Request for Quotation Process ................................29

C.     **Defendants Increased Prices for Automotive Wire Harness Systems despite Stable Costs** ...................................................32

D.     **The Structure and Characteristics of the Automotive Wire Harness Systems Market Render the Conspiracy More Plausible** ...................................................33

     1.     **The Automotive Wire Harness Systems Market Has High Barriers to Entry** ...........................................34

     2.     **There is Inelasticity of Demand for Automotive Wire Harness Systems** ...................................................35

     3.     **The Market for Automotive Wire Harness Systems Is Highly Concentrated** ...................................................36

     4.     **Defendants Had Ample Opportunities to Conspire** ............38

E.     **Government Investigations** .................................................39

F.     **Likely Existence of a Cooperating Defendant** .................................41

G.     **JFTC Cease and Desist Orders** .........................................42

H.     **The European Commission Investigation** .......................................43

I.     **Guilty Pleas** ...........................................................44

     1.     **Guilty Pleas of Furukawa Electric and Executives** .............44

     2.     **Guilty Pleas of Yazaki Corporation and Executives** ...........50

     3.     **Guilty Plea of Fujikura Ltd. and Indictment of Executives** ...................................................53

     4.     **Guilty Pleas of DENSO Corporation and Executive** ...........55

     5.     **Guilty Plea of G.S. Electech, Inc. and Indictment of Executive** ...................................................58

     **J.**     **Guilty Pleas in Related Markets in the Automotive Industry** ...............................................................**59**

**CLASS ACTION ALLEGATIONS** ......................................**64**

**PLAINTIFFS AND THE CLASSES SUFFERED
ANTITRUST INJURY** ...............................................................**68**

**PLAINTIFFS' CLAIMS ARE NOT BARRED
BY THE STATUTE OF LIMITATIONS**...............................**75**

     **A.**     **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims** .............**75**

     **B.**     **Fraudulent Concealment Tolled the Statute of Limitations** ...........................................................**76**

**FIRST CLAIM FOR RELIEF**...............................................**80**

**SECOND CLAIM FOR RELIEF** ..........................................**82**

     **Arizona**........................................................................**84**

     **California** ....................................................................**86**

     **Iowa** .............................................................................**88**

     **Maine**...........................................................................**89**

     **Maryland** ....................................................................**91**

     **Michigan** .....................................................................**92**

     **Minnesota** ...................................................................**94**

     **Nebraska** .....................................................................**95**

     **Nevada**.........................................................................**96**

New Hampshire................................................................................98

New Mexico ..................................................................................99

New York ....................................................................................101

North Carolina ............................................................................102

North Dakota ..............................................................................104

South Dakota ..............................................................................105

West Virginia ..............................................................................107

Wisconsin ....................................................................................108

**PRAYER FOR RELIEF**................................................................**111**

1. Plaintiffs (defined herein), by their undersigned attorneys, bring this action against Defendants (defined herein) based on the Defendants' illegal combination and conspiracy with co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, fix, stabilize and maintain the prices of, and allocate the supply of electronic automotive wire harness systems and related components installed in automobiles, trucks and other vehicles ("Automotive Wire Harness Systems") during the period from and including January 1, 2000 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period").

2. Plaintiffs bring this action on behalf of themselves and other similarly situated states, state subdivisions, agencies and instrumentalities, and local government subdivisions and agencies, including but not limited to municipalities, cities, counties and towns(hereinafter "Public Entities") that purchased or leased new vehicles manufactured during the Class Period and were injured by paying supra-competitive prices for those vehicles, reflecting the artificially inflated prices Defendants were able to charge for the Automotive Wire Harness Systems due to Defendants' collusive and anti-competitive conduct alleged herein. Plaintiffs bring this class claim for damages, injunctive relief and other relief pursuant to federal antitrust laws as well as state antitrust and unfair competition laws.

3. Except as to allegations specifically pertaining to themselves and their

1

own actions, which are made based on direct knowledge, Plaintiffs' claims are made on information and belief based on the investigation conducted by Plaintiffs' counsel. That investigation included reviewing and analyzing information obtained from, among other sources, publicly available press releases, news articles, and other media reports (whether disseminated in print or by electronic media) and criminal Informations, plea agreements, announcements and other documents filed or released by the U.S. Department of Justice ("DOJ") in connection with multiple criminal guilty pleas by various of the Defendants and the DOJ's longstanding investigation of the automotive parts industry. Those sources collectively support Plaintiffs' allegations that, during the Class Period, Defendants collusively and systematically fixed prices, rigged bids and allocated supply of Automotive Wire Harness Systems.

4. Except as alleged in this Complaint, Plaintiffs, other Class members, and members of the public do not have access to the underlying facts relating to Defendants' improper activities. Rather, that information lies exclusively within the possession and control of Defendants and other insiders, which prevents Plaintiffs from further detailing Defendants' misconduct. Moreover, ongoing governmental investigations by competition regulators around the world concerning potential price-fixing, bid-rigging and allocating market share for Automotive Wire Harness Systems, among other automotive parts, may yield

further information from other Defendants and/or co-conspirators that could bear significantly on the Plaintiffs' claims.

## SUMMARY OF THE CLAIMS

5.     The manufacture and sale of Automotive Wire Harness Systems is a multi-billion dollar industry.  In its complaint filed in this Court against, *inter alia*, defendant Fujikura Ltd., the Ford Motor Company ("Ford") states that between January 2000 and at least February 2010, Ford purchased in excess of $10 billion of Automotive Wire Harness Systems in the U.S. and elsewhere.  Similarly situated Public Entities are currently excluded from the class definition of pending cases, leaving them unrepresented in this action. Plaintiffs bring this lawsuit as a proposed class action against Defendants, who collectively control more than70% of the global market for Automotive Wire Harness Systems, to recover on behalf of those Public Entities.

6.     Plaintiffs allege that Defendants and other co-conspirators have engaged in a conspiracy beginning in or around January 2000 with the intention and effect of inflating and fixing prices, rigging bids and allocating the supply of Automotive Wire Harness Systems used in motor vehicles sold in the U.S. and elsewhere during the Class Period.  As a result, the manufacturing cost for those vehicles was artificially inflated based on the supra-competitive prices the co-conspirators charged for Automotive Wire Harness Systems, which constitute a

critical and significant component in all motor vehicles sold in the U.S. These supra-competitive prices were passed through to Plaintiffs and other similarly situated Public Entities that purchased or leased new vehicles manufactured during the Class Period, paying artificially inflated prices for those motor vehicles as the result of Defendants' illegal conduct.

7. Automotive Wire Harness Systems, which act as the central nervous system of a motor vehicle, are electrical distribution systems that act to direct and control electronic components, wiring, and circuit boards in an automobile. Automotive Wire Harness Systems include the following parts and sub-systems: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, power distributors, and speed sensor wire assemblies.

8. As set forth herein, the Defendants, including (i) the Denso Defendants, (ii) the Fujikura Defendant, (iii) the Furukawa Defendants, (iv) the Lear Defendants, (v) the Leoni Defendants, (vi) the Sumitomo Defendants, (vii) the Yazaki Defendants, (viii) the Tokai Rika Defendants, and (ix) the G.S. Electech Defendants (all as defined below, and collectively "Defendants") manufactured, marketed and/or sold Automotive Wire Harness Systems in the United States during the Class Period.

9. Competition authorities in the United States, the European Union, and

Japan, among others, have been investigating a conspiracy in the market for Automotive Wire Harness Systems, which first became public in February 2010. As part of its criminal investigation, the United States DOJ has sought information about anticompetitive conduct in the market for Automotive Wire Harness Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants issued on a showing of probable cause, carried out in the U.S. offices of some of the Defendants. The European Commission ("EC") Competition Authority has also conducted dawn raids at the European offices of several of the Defendants.

10. In addition, defendants Furukawa Electric Co. Ltd., Yazaki Corporation, DENSO Corporation, G.S. Electech, Inc., and Fujikura Ltd., have each separately pled guilty to participating in the Automotive Wire Harness Systems cartel during the Class Period, and have agreed to pay substantial criminal fines totaling more than $770 million under plea agreements with the DOJ related to their unlawful conduct. These defendants have admitted to their participation in a combination and conspiracy with co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Automotive Wire Harness Systems sold to automobile manufacturers and others in the United States and elsewhere.

As the result of ongoing global regulatory investigations, Defendant

Furukawa Electric Co. Ltd. ("Furukawa Electric"), and three of its executives have pled guilty to participating with co-conspirators in the Automotive Wire Harness Systems cartel from at least as early as January 2000 and continuing until at least January 2010. Furukawa Electric has agreed to pay a $200 million criminal fine related to its unlawful conduct.

11.    Defendant Yazaki Corporation, and five of its executives have also pled guilty to colluding with co-conspirators to fix prices, rig bids and allocate supplies of Automotive Wire Harness Systems, from at least as early as January 2000 and continuing until at least February 2010. Yazaki Corporation has agreed to pay a $470 million criminal fine for its agreements to restrain prices for Automotive Wire Harness Systems, as well as several other automotive components.  This fine was the second highest fine ever paid for a criminal antitrust violation, up to that time.

12.    Defendant Fujikura, Ltd. has admitted to engaging in the conspiracy with co-conspirators to restrain competition for Automotive Wire Harness Systems from at least as early as January 2006 and continuing until at least February 2010. Fujikura Ltd. and two of its executives have pled guilty to fixing prices, rigging bids and allocating the supply of Automotive Wire Harness Systems in the U.S. Fujikura Ltd. has agreed to pay a $20 million criminal fine for its participation in the Automotive Wire Harness Systems conspiracy.

13.    Defendant G.S. Electech Inc. has pled guilty to engaging in a

conspiracy with co-conspirators to fix prices, rig bids and allocate supply of speed sensor wire assemblies (which comprise the antilock brake system ("ABS")/speed sensor wire harness, a portion of the Automotive Wire Harness System), from at least as early as January 2003 and continuing until at least February 2010. G.S. Electech, Inc. has agreed to pay a $2.75 million criminal fine for this misconduct.

14.     Defendant DENSO Corporation has pled guilty to engaging in a conspiracy with co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids, fix prices and allocate supplies of electronic control units ("ECUs"), a component of Automotive Wire Harness Systems, beginning in January 2000 and continuing until at least February 2010. DENSO Corporation has agreed to pay $78 million for engaging in the above conspiracy, as well as in a conspiracy to rig bids for, and fix, stabilize, and maintain prices of another automotive part, heater control panels, during the same period.

15.     The above Defendants have admitted by their guilty pleas, that the combination and conspiracy they engaged in with their co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

16.     As part of their plea agreements, the above Defendants have agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts

industry.

17.     In addition to regulatory investigations and guilty pleas in connection
with Automotive Wire Harness Systems, the DOJ has also entered into plea
agreements with automotive parts manufacturers for conspiracies to rig bids, fix
prices and allocate supplies of other automotive parts, including, *inter alia*, heater
control panels, seatbelts, airbags, steering wheels, ignition coils, steering angle
sensors, turn and wiper switches, starter motors, alternators, air flow meters, fuel
injection systems, windshield wiper and washer systems, bearings, radiators,
automatic transmission fluid warmers, air conditioning systems, compressors and
condensers.  Recently, for example, Bridgestone agreed to pay a $425 million fine
before a Judge in the Northern District of Ohio in Toledo for engaging in a
conspiracy "to allocate sales of, to rig bids for and to fix, raise and maintain the
prices of automotive anti-vibration rubber part."

18.     In total, as of mid-2014, the DOJ has charged at least 27 companies
and 34individualsin connection with its investigations into price-fixing and bid-
rigging in the automotive parts industry.  Pursuant to these investigations, to date,
the DOJ has collected over $2.3 billion in criminal fines and imposed over 240
aggregate months of prison in connection with this widespread antitrust scheme.

19.     As a direct result of the anti-competitive and unlawful conduct alleged
herein in connection with the Automotive Wire Harness Systems, Plaintiffs and the

Public Entity members of the Classes (defined herein) paid artificially inflated prices for new motor vehicles they bought or leased during the Class Period as a result of the pass-through of supra-competitive prices charged for Automotive Wire Harness Systems, and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

20.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust and unfair competition laws, and seek to obtain restitution, recover damages and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1),and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different

from some Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

22.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

23.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*:

   (a)     transacted business in the United States, including in this District;

   (b)     directly or indirectly sold or marketed substantial quantities of Automotive Wire Harness Systems throughout the United States, including in this district;

   (c)     had substantial aggregate contacts with the United States as a whole, including in this district; or

   (d)     was engaged in an illegal price-fixing conspiracy that was directed at,

10

and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

Each Defendant also conducts business in the United States, including in this District, and has purposefully availed itself of the laws of the United States.

24.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

25.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

26.     Automotive Wire Harness Systems manufactured abroad by Defendants and sold for use in automobiles that were either manufactured in the United States or manufactured abroad and sold or leased in the United States are goods brought into the United States for sale or lease, and therefore constitute import commerce. To the extent any Automotive Wire Harness Systems are purchased in the United States, and such Automotive Wire Harness Systems do not constitute import commerce, Defendants' unlawful activities during the Class

Period with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

27. By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to the Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Automotive Wire Harness Systems, which conspiracy unreasonably restrained trade and adversely affected the market for Automotive Wire Harness Systems.

28. Defendants' conspiracy and wrongdoing described herein adversely affected Public Entities in the United States that(through the purchase or lease of new automobiles not for resale) paid supra-competitive prices for Automotive Wire Harness Systems, including Plaintiffs and members of the Classes.

**PARTIES**

### A.   PLAINTIFFS

29. Plaintiff City of Richmond ("Richmond") is a California charter city organized under Article XI, Section 3 of the California Constitution.  Incorporated in 1905, Richmond had a population of approximately 103,701 residents at the

time of the 2010 Census.  It is the second largest city in Contra Costa County and the 61st largest city in California.  During the Class Period, Richmond purchased Automotive Wire Harness Systems indirectly from one or more Defendants or their co-conspirators, and was damaged by paying supra-competitive prices as the result of Defendants' illegal conduct.  Since 2000, Richmond has purchased vehicles for use by, for example, its Police Department, Fire Department, Public Works Department, Library, Recreation Department, Engineering and Wastewater Department, Paratransit program, and for general pool use.  These vehicles contain Automotive Wire Harness Systems manufactured by one or more of the Defendants.

30.     Plaintiff City of Traverse City ("Traverse City") is a Michigan municipal corporation and a home rule city. Voters approved the Charter of Traverse City on April 10, 1913.  During the Class Period, Traverse City purchased Automotive Wire Harness Systems indirectly from one or more Defendants or their co-conspirators, and was damaged by paying supra-competitive prices as the result of Defendants' illegal conduct.  Since 2000, Traverse City has purchased vehicles for use by, for example, its Police Department, Fire Department, Public Works Department, Recreation Department, Engineering and Wastewater Department, and for general pool use.  These vehicles contain Automotive Wire Harness Systems manufactured by one or more of the

Defendants.

31.     Plaintiff Oakland County ("Oakland County") is political subdivision of the State of Michigan.  During the Class Period, Oakland County purchased Automotive Wire Harness Systems indirectly from one or more Defendants or their co-conspirators, and was damaged by paying supra-competitive prices as the result of Defendants' illegal conduct.  Since 2000, Oakland County has purchased vehicles for use by, for example, its airports, Sheriff's Department, Animal Control Department, Building Authority, Facilities Maintenance and Operations Department, Libraries, Medical Examiner, Parks and Recreation Department, Support Services Department, and for general pool use.  These vehicles contain Automotive Wire Harness Systems manufactured by one or more of the Defendants.

32.     Plaintiff Mecklenburg County ("Mecklenburg County")is a body politic and a corporate and political subdivision of the State of North Carolina. During the Class Period, Mecklenburg County purchased Automotive Wire Harness Systems indirectly from one or more Defendants or their co-conspirators, and was damaged by paying supra-competitive prices as the result of Defendants' illegal conduct.  Since 2000, Mecklenburg County has purchased vehicles for use by, for example, its Sheriff's Department, Department of Social Services, Library, Parks and Recreation Department, Public Health and Area Mental Health

Departments, Land Use and Environmental Services Department, Tax Department and Community Support Services, and for general pool use. These vehicles contain Automotive Wire Harness Systems manufactured by one or more of the Defendants.

33. Plaintiff Village of Northport ("Northport") is a political subdivision of the State of New York. During the Class Period, Northport purchased Automotive Wire Harness Systems indirectly from one or more Defendants or their co-conspirators, and was damaged by paying supra-competitive prices as the result of Defendants' illegal conduct. Since 2000, Village of Northport has purchased vehicles for use by, for example, its Police Department, Fire Department and for other municipal uses. These vehicles contain Automotive Wire Harness Systems manufactured by one or more of the Defendants.

34. Collectively, Richmond, Traverse City, Oakland County, Mecklenburg County and Northport are referred to herein as "Plaintiffs."

B. DEFENDANTS

1. The DENSO Defendants

35. Defendant DENSO Corporation is a Japanese corporation. DENSO Corporation –directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness

Systems that were purchased in the United States, including in this District, during the Class Period.

36. Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. At all times during the Class Period, DENSO International America, Inc. was a subsidiary of and wholly owned and/or controlled by, and its activities in the United States were under the control and direction of its Japanese parent, DENSO Corporation. Defendant DENSO International America, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

37. Defendants DENSO Corporation, and DENSO International America, Inc. are collectively referred to herein as the "DENSO Defendants" or "DENSO."

## 2. The Fujikura Defendant

38. Defendant Fujikura Ltd. is a Japanese corporation. Fujikura Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

### 3. The Furukawa Defendants

39. Defendant Furukawa Electric Co., Ltd.("Furukawa Electric") is a Japanese corporation. Furukawa Electric – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

40. Defendant American Furukawa, Inc. is a Delaware corporation with its principal place of business in Plymouth, Michigan. At all times during the Class Period, American Furukawa, Inc. was a subsidiary of and wholly owned and/or controlled by, and its activities in the United States were under the control and direction of its Japanese parent, Furukawa Electric. American Furukawa, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

41. Defendants Furukawa Electric and American Furukawa, Inc. are collectively referred to herein as the "Furukawa Defendants" or "Furukawa."

### 4. The Lear Defendants

42. Defendant Lear Corp. is a Delaware corporation with its principal place of business in Southfield, Michigan. Lear Corp. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed

and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

43. Defendant Kyungshin-Lear Sales and Engineering, LLC is a Delaware corporation with its principal place of business in Selma, Alabama. It is a joint venture between Lear Corp. and Kyungshin Corporation of South Korea. Kyungshin-Lear Sales and Engineering, LLC manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

44. Defendants Lear Corp. and Kyungshin-Lear Sales and Engineering, LLC are collectively referred to herein as the "Lear Defendants" or "Lear."

45. Lear filed for Chapter 11 bankruptcy protection on July 7, 2009. After their emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy alleged herein. As a result, from and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices. In2010 alone, Lear had approximately $2.6 billion in total sales in its electric power and management systems, which includes significant sales for Automotive Wire Harness Systems in the United States pursuant to the conspiracy hereinafter alleged.

### 5. The Leoni Defendants

46. Defendant Leoni Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona. At all times during the Class Period, Leoni Wiring Systems, Inc. was a subsidiary of and wholly owned and/or controlled by, and its activities in the United States were under the control and direction of its German parent, Leoni AG. Leoni Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

47. Defendant Leonische Holding, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona. At all times during the Class Period, Leonische Holding, Inc. was a subsidiary of and wholly owned and/or controlled by, and its activities in the United States were under the control and direction of its German parent, Leoni AG. Leonische Holding, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

48. Defendants Leoni Wiring Systems, Inc. and Leonische Holding, Inc. are collectively referred to herein as the "Leoni Defendants" or "Leoni."

### 6. The Sumitomo Defendants

49. Defendant Sumitomo Electric Industries, Ltd. is a Japanese corporation. Defendant Sumitomo Electric Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

50. Defendant Sumitomo Electric Wintec America, Inc. is a Kentucky corporation with its principal place of business in Edmonton, Kentucky. At all times during the Class Period, Sumitomo Electric Wintec America, Inc. was a subsidiary of and wholly owned and/or controlled by, and its activities in the United States were under the control and direction of its Japanese parent, Sumitomo Electric Industries, Ltd. Sumitomo Electric Wintec America, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

51. Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation. Sumitomo Wiring Systems has asserted that it is "proud to hold the world's top share in the automobile wiring harness field." It – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed

and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

52.     Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd., and at all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants. Sumitomo Electric Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

53.     Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee.  At all times during the Class Period, K&S Wiring Systems, Inc. was a subsidiary of and wholly owned and/or controlled by, and its activities in the United States were under the control and direction of its Japanese parent, Sumitomo Electric Industries, Ltd. K&S Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

54.     Defendant Sumitomo Wiring Systems (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan. It is a joint

venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd., and at all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants. Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

55.     Defendants Sumitomo Electric Industries, Ltd., Sumitomo Electric Wintec America, Inc., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc. and Sumitomo Wiring Systems (U.S.A.) Inc. are collectively referred to herein as the "Sumitomo Defendants" or "Sumitomo."

### 7.     The Yazaki Defendants

56.     Defendant Yazaki Corporation is a Japanese corporation. Yazaki Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled –manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

57.     Defendant Yazaki North America, Inc. is an Illinois corporation with its principal place of business in Canton Township, Michigan.  At all times during the Class Period, Yazaki North America, Inc. was a subsidiary of and wholly

owned and/or controlled by, and its activities in the United States were under the control and direction of its Japanese parent, Yazaki Corporation. Yazaki North America, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

58.    Yazaki Corporation and Yazaki North America, Inc. are collectively referred to herein as the "Yazaki Defendants" or "Yazaki."

### 8.    The Tokai Rika Defendants

59.    Defendant Tokai Rika Co., Ltd. is a Japanese company with its principal place of business in Toyota, Japan. Tokai Rika Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

60.    Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. ("TRAM, Inc.") is a Michigan Corporation with its principal place of business in Plymouth, Michigan. At times during the Class Period, TRAM, Inc. was a subsidiary of and wholly owned and/or controlled by, and its activities in the United States were under the control and direction of its Japanese parent, Tokai Rika Co., Ltd. TRAM, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that

were purchased throughout the United States, including this District, during the Class Period.

61.     Tokai Rika Co., Ltd. and TRAM, Inc. are collectively referred to herein as the "Tokai Rika Defendants" or "Tokai Rika."

### 9.     The G.S. Electech Defendants

62.     Defendant G.S. Electech, Inc. is a Japanese corporation with its principal place of business in Toyota, Japan. G.S. Electech, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

63.     Defendant G.S. Wiring Systems Inc. is an Ohio corporation based in Findlay, Ohio. Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent, G.S. Electech, Inc. G.S. Wiring Systems Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

64.     Defendant G.S.W. Manufacturing Inc. is an Ohio corporation based in Findlay, Ohio. Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent, G.S. Electech, Inc. G.S.W. Manufacturing Inc., which represents itself as a Tier 1 and 2supplier(defined below) of Automotive

24

Wire Harness Systems, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this District, during the Class Period.

65.     G.S. Electech, Inc., G.S. Wiring Systems Inc. and G.S.W. Manufacturing Inc. are collectively referred to herein as the "G.S. Electech Defendants" or "G.S. Electech."

## AGENTS AND CO-CONSPIRATORS

66.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

67.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the illegal anti-competitive conduct.

68.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they

were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.    The Automotive Wire Harness System

69.    A vehicle's electrical system is powered by, and dependent on, the battery and alternator, which supply electricity to all of a vehicle's electrical components. The alternator supplies power to a vehicle's accessories – such as the radio, lights and horn – during normal engine operation. The battery supplies the initial charge, which allows the vehicle to be started, and the alternator then supplies a constant electrical feed that permits the vehicle to continue to operate. The alternator also recharges the battery during engine operations.

70.    Automotive Wire Harness Systems are networks of wires that carry electricity from power sources, such as the battery or alternator, to devices that consume electricity (*e.g.*, the radio, headlights and dashboard display). Automotive Wire Harness Systems also transmit data and information (*e.g.*, automobile speed information from the wheels and axles to the speedometer) and are essential to operate vehicle system controls (*e.g.*, heating, cooling, braking and other systems). Wire Harnesses include color-coded wires designed to support specific electrical and electronic automotive features. See Figure 1:



Figure 1

71.     Components of the Automotive Wire Harness System include: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks and power distributors.  The Automotive Wire Harness System runs throughout the vehicle. *See* Figure 2:



Figure 2

72.    To ensure safety and basic functions (*e.g.*, driving, turning, and stopping), as well as to provide comfort and convenience, automobiles are equipped with various electronics that operate using control signals running on electrical power supplied from the battery.  The Automotive Wire Harness System is the conduit for the transmission of these signals and electrical power.  Most, if not all, electrical and electronic devices in an automobile rely on a wire harness to provide electric current and data transmission for operation.

73.    Automotive Wire Harness Systems are installed by automobile original equipment manufacturers ("OEMs") – typically automotive manufacturers, such as, for example, Ford, General Motors and Toyota – in new vehicles as part of the automotive manufacturing process.  They are also installed

in vehicles to replace worn out, defective or damaged Automotive Wire Harness Systems.

74.     For new vehicles, the OEMs purchase Automotive Wire Harness Systems directly from auto parts suppliers such as Defendants. Automotive Wire Harness Systems may also be purchased by component manufacturers who then supply such systems to OEMs. These component manufacturers are also called "Tier Manufacturers" in the automotive industry. A Tier 1 manufacturer supplies Automotive Wire Harness Systems directly to an OEM.

**B.     The Request for Quotation Process**

75.     OEMs require multiple sources for motor vehicle parts. As part of their supply chain and procurement process, OEMs issue Requests for Quotation ("RFQs") to parts suppliers on a model-by-model basis for model specific automotive part, such as Automotive Wire Harness Systems. An RFQ identifies the specifications of, for example, the Automotive Wire Harness System to be produced, and requests a proposal from the supplier detailing the supplier's ability to manufacture and supply the Automotive Wire Harness System, including information about cost, design, engineering and logistics.

76.     Issuing a RFQ is a standard business practice that allows parts suppliers to submit price quotations or bids on specific products or services. Both

domestic and foreign OEMs participate in the RFQ process to procure parts for

U.S.-manufactured vehicles, both abroad and in the United States.

77.     Generally, OEMs issue RFQs for automotive parts, such as

Automotive Wire Harness Systems, to begin the bidding process approximately

three years prior to production of a motor vehicle. OEMs' RFQs typically include

specifications and other relevant information for each motor vehicle product.

78.     In response to RFQs, parts suppliers submit price quotations, or bids,

to OEMs to be considered for an award. After receiving responses to RFQs from

each respective bidder, OEMs then award the business to the selected parts

suppliers, generally for the life of the vehicle model, and further confirmed with

annual purchase orders.

79.     Describing the RFQ process, in its complaint filed in the Automotive

Wire Harness Systems antitrust litigation, Ford stated:

> Ford issued RFQs for Wire Harnesses on either a per-model or per
> platform basis. An automobile model refers to a particular line of
> vehicles, such as the Ford Explorer or Ford Focus, which is
> manufactured by a single automaker.  An automotive platform is a
> common set of structural, design, engineering and production
> parameters, including major components such as the chassis, used for
> more than one model.  Because of the time necessary for the
> engineering and design of Wire Harnesses, Ford generally issued
> RFQs for the manufacture and supply of Wire Harnesses years before
> commencement of the manufacture of the vehicle model or platform
> covered by the RFQ.

80.     As alleged herein, suppliers to OEMs have been required to directly purchase Automotive Wire Harness Systems from Defendants at prices established by the OEMs and Defendants in the RFQ bidding process.

81.     Defendants and their co-conspirators supplied Automotive Wire Harness Systems, and other automotive parts subject to collusive misconduct, to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  As set forth, for example, in the DENSO, Yazaki, Furukawa and GS Electech  criminal Informations, to which each defendant pled guilty, Defendants and their co-conspirators, at a minimum, manufactured Automotive Wire Harness Systems and/or related products:

a.      in the United States for installation in vehicles manufactured and sold in the United States,

b.      in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and

c.      in Japan for installation in vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

82.     Plaintiffs and Public Entity members of the proposed Classes purchased Automotive Wire Harness Systems indirectly from the Defendants. By way of example, a Public Entity may have indirectly purchased one or more Automotive Wire Harness Systems from the Defendants or their co-conspirators as

31

part of purchasing or leasing a new vehicle, or when buying new Automotive Wire Harness Systems as replacement parts.

## C. Defendants Increased Prices for Automotive Wire Harness Systems despite Stable Costs

83.     In a competitive market, falling material and labor costs, or the stabilization of material and labor costs over time, as well as the existence of and the desire to maintain economies of scale, would lead to decreased prices because each competitor would be afraid that other competitors would attempt to take advantage of their lower or predictably steady costs to lower their prices in order to capture market share. The only economically rational action in such a situation is for each competitor to lower its own prices.

84.     In a market where ostensible competitors have engaged in a conspiracy to fix prices and refrain from competing for customers, however, competitors do not lower prices even when faced with steady or decreasing input costs. Such price decreases are unnecessary because the conspirators know that they will not lose sales to any lower-priced competitors.

85.     The price of Automotive Wire Harness Systems increased during the Class Period, while major input costs virtually remained the same. In fact, according to *Research In China*, an international market research and market data firm, Sumitomo and Furukawa own their own copper mines and effectively control

their copper input costs. Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems. Thus, both of these Defendants had the power to effectively keep their costs steady and knew that due to their control of a key input in Automotive Wire Harness Systems, the costs of manufacture would likely remain steady. In a competitive market, such steady input costs should have caused Defendants to lower prices for Automotive Wire Harness Systems. But in a market where Defendants have agreed not to compete on price, such steady input costs have no effect on price.

86. Defendants' anti-competitive and collusive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

**D.     The Structure and Characteristics of the Automotive Wire Harness Systems Market Render the Conspiracy More Plausible**

87. The structure and other characteristics of the Automotive Wire Harness Systems market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, as detailed below, the Automotive Wire Harness Systems market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

## 1. The Automotive Wire Harness Systems Market Has High Barriers to Entry

88.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to join the industry and increase competition.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

89.     There are substantial barriers that preclude, reduce or make more difficult entry into the Automotive Wire Harness Systems market.  A new entrant into the business would face high and continuous start-up costs, including multi-million dollar costs associated with manufacturing plants, equipment, energy, transportation, distribution infrastructure, skilled labor and long-standing customer relationships.  Moreover, within the Automotive Wire Harness Systems industry, there is a significant amount of technology and engineering expertise required to build Automotive Wire Harness Systems that can operate efficiently and effectively.

90.     The design of an Automotive Wire Harness System must be synergized by Automotive Wire Harness System manufacturers and OEMs.  Designing Automotive Wire Harness Systems pursuant to such stringent

specifications involves a great degree of sunk costs and resources. In addition, once the contract is awarded and production begun, OEMs cannot easily or inexpensively change Automotive Wire Harness System suppliers because the OEMs design the features of their vehicles so that the Automotive Wire Harness System they purchase for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model.

91.     For these reasons, among others, a new manufacturer of Automotive Wire Harness Systems entering the market would likely have to wait until the next cycle of vehicles was being manufactured by any given OEM to even have a chance at competing in an RFQ for any model of car and attempt to take advantage of the lack of competitive prices for Automotive Wire Harness Systems, by offering more competitive prices to OEMs.

92.     It is also important for parts suppliers to maintain minimum viable scale in order to efficiently produce parts within the price and quantity parameters established by the major OEMs.

### 2.     There is Inelasticity of Demand for Automotive Wire Harness Systems

93.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in

the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

94.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

95.     Demand for Automotive Wire Harness Systems is highly inelastic. This is because there are no close substitutes for these products. OEMs must purchase Automotive Wire Harness Systems, which are an essential part of a vehicle – no vehicles are or can be operated without them – even if the prices are kept at a supra-competitive level.

### 3.     The Market for Automotive Wire Harness Systems Is Highly Concentrated

96.     Highly concentrated markets are more susceptible to collusion and other anti-competitive practices, because the fewer competitors there are, the easier collusion is to coordinate, maintain and enforce.  The Automotive Wire Harness Systems industry is heavily concentrated.  During the Class Period six of the top

Automotive Wire Harness Systems manufacturers, all named Defendants, controlled over71%, and the top two, alone, controlled almost 55% of the global market. *See* Figure 3:

**Market Shares of World's Major Manufacturers of Automotive Wiring Harness, 2009**

| Manufacturer | Percentage of Global Market |
|---|---|
| Yazaki | 29.81% |
| Sumitomo | 24.38% |
| Leoni | 6.05% |
| Lear | 4.70% |
| Furukawa | 3.61% |
| Fujikura | 2.69% |

Figure 3

97.     According to *Research in China*, the global automotive wiring harness market reached U.S. $25.3 billion in 2009, grew by 6.6% to $26.9 billion in 2010, and was projected to increase to almost U.S. $33 billion over 2013.

98.     As reflected in Figure 3 above, Yazaki controlled almost 30% of the global market for Automotive Wire Harness Systems as of 2009.  As it states on its website, its Automotive Wire Harness Systems are "used by every carmaker in Japan," and it "commands a top share in the global market."  In fact, 77% of Yazaki's sales are from Automotive Wire Harness Systems, with 37% of its 2007 sales were in the Western Hemisphere.  Defendant Sumitomo is the second largest

manufacturer of Automotive Wire Harness Systems, and controls 24% of the global market.

99.     By virtue of their market shares, Defendants are dominant manufacturers and suppliers of Automotive Wire Harness Systems in the United States and globally.

### 4.     Defendants Had Ample Opportunities to Conspire

100.     Defendants routinely attended industry events where they had the opportunity to meet and conspire under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. For example, certain of the Defendants and their co-conspirators have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan and the Automotive Aftermarket Products Expo in Las Vegas, Nevada. Indeed, according to the NAIAS website, Defendant DENSO Corporation was a premier sponsor of the 2012 event, held January 9 to January 22.

101.     Moreover, for example, the DOJ criminal Informations related to Automotive Wire Harness Systems cited, among the actions undertaken in support of the combination and conspiracy in connection with Automotive Wire Harness Systems, participation by co-conspirators in meetings, conversations and communications in the United States, Japan and/or elsewhere to discuss, among

other matters, the bids, price quotations and allocation of supplies to automobile manufacturers in the United States and elsewhere.

### E. Government Investigations

102.　A globally coordinated antitrust investigation is ongoing in the United States, Europe, Japan, Australia, Canada and South Korea, aimed at suppliers of Automotive Wire Harness Systems.  The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").

103.　On February 24, 2010, officials from the Competition Directorate of the EC executed surprise raids at the European offices (in Germany, France and the United Kingdom) of certain defendants as part of an investigation into anticompetitive conduct related to the manufacturing and sale of Automotive Wire Harness Systems.

104.　The EC also carried out additional raids at the European offices of several suppliers of Automotive Wire Harness Systems on June 7, 2010.Specifically, EC investigators raided the offices of, among others, Leoni AG, the German parent of the Leoni Defendants, Lear Corporation's French subsidiary and Yazaki Corporation.  According to a statement released at the time, the EC confirmed its investigation into a "suspected cartel in the sector of automotive electrical and electronic components suppliers," and stated that: "[t]he Commission

has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices."

105.   In February 2010, Japan's Fair Trade Commission ("JFTC") raided the Tokyo offices of Furukawa Electric, Sumitomo Electric and Yazaki Corporation as part of an expansive investigation into collusion in the industry dating back to at least 2003.

106.   On February 23, 2010, around the same time as the raids of Automotive Wire Harness Systems manufacturers by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation. The FBI executed warrants and searched the offices of these companies, including Yazaki North America– Yazaki Corporation's subsidiary in Canton Township, Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

107.   In 2010, the FBI also raided the offices of TRAM and executed search warrants related to unfair competition, price-fixing and bid-rigging of Automotive Wire Harness Systems.

108.   To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that

is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**F.     Likely Existence of a Cooperating Defendant**

109.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

110.    In light of the guilty pleas in this case, the guilty pleas in related automotive parts antitrust cases and the DOJ's ongoing investigations into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

## G. JFTC Cease and Desist Orders

111.    On January 19, 2012, nearly two years after the above discussed regulatory raids, and after the JFTC's evaluation and analysis of, among other information, the documents, data and other materials seized from members of the wire harness cartel, the JFTC issued Cease and Desist Orders against Fujikura Ltd., and Yazaki Corporation, and fined Sumitomo Electric, Fujikura Ltd., and Yazaki Corporation, after assessing the companies' bidding practices with regard to Automotive Wire Harnesses Systems and related products.

112.    The JFTC press release regarding the issuance of the Cease and Desist Orders stated that "the JFTC gave the enterprises in question an advance notification on the contents of the orders and an opportunity to present their views and to submit evidence. Considering the views and evidence from them, the JFTC issued the orders."

113.    Having evaluated all of the evidence before it, including rebuttal evidence from the accused companies, the JFTC determined that the companies had engaged in illegal anticompetitive activities. Finding that Sumitomo Electric, Fujikura Ltd. and Yazaki Corporation all violated Japan's Antimonopoly Act by rigging bids to OEMs Toyota, Honda, Nissan and Fuji (manufacturer of Subaru-brand vehicles) on wire harnesses and related products, the JFTC stated that Sumitomo Electric, Fujikura Ltd. and Yazaki Corporation carried out their

conspiracy by "appointing the designated successful bidder and managing to have the designated successful bidder win the bidding," And that Furukawa Electric had also participated in the described bid-rigging conspiracy, in violation of the Antimonopoly Act.

114. The JFTC, finding that the conspiracy began as early as July 2000,ordered these Defendants to make surcharge payments totaling 12.9billion yen, or approximately U.S.$124 million.

### H.  The European Commission Investigation

115. The EC has been conducting a wire harness cartel investigation since at least early 2010.

116. On August 9, 2012, the EC announced it had opened proceedings "against suspected participants in *several* cartels for the supply of automotive wire harnesses." The EC press release stated: "[t]his case is part of a wider effort to investigate possible cartels in the automotive sector."

117. On July 10, 2013, the EC announced it had imposed fines totaling approximately €141 million (U.S.$180.2 million) against, among others, Yazaki, Furukawa and Leoni for their participation in the conspiracy directed to sales of Automotive Wire Harness Systems in the European Union. In its press release announcing the fines, the EC stated that due to their "cooperation and the extent to which the evidence they provided helped the Commission to prove the respective

cartels," all of the companies received "reductions of fines ranging from 20 to50%." In addition, the companies received an additional 10% reduction because they "acknowledged their participation in the cartel and their liability in this respect." Automotive Wire Harness Systems affected by the cartel conduct subject to these fines were sold to Toyota, Honda, Nissan and Renault between 2000 and 2009.

118. Although the EC found that Sumitomo was a participant in the Conspiracy, Sumitomo was not fined by the EC because the company received immunity "for revealing the existence of the cartels to the [EC]," according to the EC press release announcing the fines.

119. In addition, on December 13, 2012, the Australian Competition Authority announced that it had commenced civil proceedings against Yazaki and its Australian subsidiary, alleging that from between 2003 until at least late 2009, the companies had "engaged in cartel conduct, market sharing and price fixing," in the sale of Automotive Wire Harness Systems in Australia.

## I. Guilty Pleas

### 1. Guilty Pleas of Furukawa Electric, and Executives

120. On September 29, 2011, the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of

Automotive Wire Harness Systems to automobile manufacturers. The DOJ also announced that three Furukawa executives– Junichi Funo ("Funo"), Hirotsugu Nagata ("Nagata") and Tetsuya Ukai ("Ukai") – who are Japanese nationals, also agreed to plead guilty and to serve prison time in the United States.

121.    According to DOJ guilty pleas, Furukawa Electric and its co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize and maintain the prices of Automotive Wire Harness Systems and related products sold to automobile manufacturers in the United States and elsewhere in violation of the Sherman Act. § 1.Furukawa Electric's participation in the conspiracy occurred from at least as early as January 2000, until at least January 2010.

122.    Furukawa Electric stated in a press release at the time that"[a]fter analyzing the applicable laws and facts as a whole, Furukawa Electric has decided to enter into a plea agreement with the US Department of Justice" and that it "acknowledges the allegations in the criminal proceeding relating to cartel activities with certain competitors for the automotive wire harness and related products."

123.    According to the DOJ, Furukawa Electric and its co-conspirators carried out the conspiracy by, among other conduct:

a.   participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b.   agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c.   agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

d.   agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e.   submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f.   selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g.   accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h.   engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i.   employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

124.   At its November 14, 2011, Plea and Sentencing hearing, Defendant

Furukawa Electric pled guilty, and was ordered to pay its $200 million fine within

45 days. At the hearing, Defendant Furukawa Electric described its participation in

the conspiracy as follows:

> From the time period listed in the Information, that is, approximately
> from January, 2000 to January, 2010, officers and employees of my
> company had discussions with employees of competitors that also
> manufactured and sold automotive wire harness products. . . . These
> discussions took place in face-to-face meetings or by telephone. The
> discussions took place in the United States and elsewhere.
>
> During . . . such meetings and conversations, a conspiracy was formed
> and agreements were reached to allocate the supply of automotive
> wire harnesses and related products sold to automobile manufacturers
> on a model-by-model basis and to rig bids quoted to automobile
> manufacturers for automotive wire harnesses and related products.
>
> Therefore, as a result of these meetings, my company produced and
> sold automotive wire harnesses and related products that were the
> subject of the illegal price fixing agreements that my company had
> made with competitors. Those products and the payments for those
> products traveled in interstate and foreign commerce and substantially
> affected interstate and foreign trade and commerce.
>
> For the purposes of this plea agreement, during the time period of
> January, 2000 to January, 2010, our sales of automotive wire
> harnesses and related products affecting U.S. auto manufacturers
> totaled approximately $839 million.
>
> Finally, we note to the Court that some of the products affected by the
> conspiracy were sold to automobile manufacturers by one of our
> subsidiaries [American Furukawa], which is located here in the
> Eastern District of Michigan.

Plea & Sentencing, *United States v. Furukawa Electric Co.*, No. 11-cr-20612 (E.D. Mich.), at14-16.

125.   Furukawa Electric executives Funo, Nagata, and Ukai also admitted their participation in the unlawful cartel in open court:

a.      At his October 24, 2011, Guilty Plea Hearing, Nagata admitted that he participated in "an agreement to submit non-competitive bids in an amount greater than$100 million." The purpose of the agreement was to "suppress and eliminate competition in the automotive parts industry." In Nagata's own words, he furthered the unlawful conspiracy with Defendants by having "a meeting [with] co-conspirators and some agreement [on] price for automobile manufacturing parts" primarily Automotive Wire Harness Systems. He personally participated in "several" unlawful meetings to further the conspiracy, at which Defendants made agreements on pricing for Automotive Wire Harness Systems, including rigging bids. Some of the meetings occurred within the Eastern District of Michigan, and Nagata conceded that the unlawful agreements would impact businesses with their principal place of business within the Eastern District of Michigan. Nagata noted that the price-fixed Automotive Wire Harness Systems were being sold in a number of different states

in the United States, and undermined and prevented competition within the United States. Pursuant to his plea, Nagata was sentenced to serve 15 months in prison, fined $20,000, and pledged to cooperate with the DOJ in the ongoing investigation.

b.     At his October 24, 2011, Guilty Plea Hearing, Furukawa Electric executive Funo admitted that he participated in a conspiracy to restrain trade. Fun admitted entering into agreements with competitors, *i.e.*, Defendants herein, in order to set prices and maintain them, including rigging bids that were solicited from customers. The agreements also sought to control, and did control, price adjustments. In Funo's own words, he "did price fixing for automotive parts." That price fixing "generally involved .. . wiring harnesses and related products." The price fixing affected the sales of goods throughout the United States. Funo was personally present at meetings during which such unlawful agreements were reached, including meetings that occurred in the Eastern District of Michigan. Pursuant to his plea, Funo was sentenced to serve 1 year in prison, fined $20,000, and pledged to cooperate with the DOJ in the ongoing investigation.

c.      At his November 10, 2011, Guilty Plea and Sentencing

Hearing, Furukawa Electric executive Ukai stated that he "fix[ed]

price[s] over parts – auto parts with other suppliers." He

acknowledged that he met with competitors "in order to fix prices and

rig bids with respect to wire harnesses and related products," and

conceded that the price-fixing meetings occurred both within the

United States and elsewhere. He also acknowledged that the price-

fixing would affect commerce in the United States and elsewhere,

including in the Eastern District of Michigan through a Furukawa

subsidiary –presumably American Furukawa. In addition, Ukai agreed

that the commerce affected exceeded $100 million. Pursuant to his

plea, Ukai agreed to serve 18 months in prison, paid a $20,000 fine,

and pledged to cooperate with the DOJ in the ongoing investigation.

### 2.      Guilty Pleas of Yazaki Corporation and Executives

126.   Yazaki is a major global automotive parts supplier.  Its customers

include Ford, Chrysler, General Motors, Toyota, Honda, Isuzu, Mitsubishi, Mazda,

Nissan, Subaru, Suzuki, Volkswagen, Volvo, and Renault.  Yazaki North

America's website states that: ". . .  YNA [has] become a valued supplier to

virtually every major auto manufacturer in the world."  According to the industry

journal Automotive News, Yazaki has consistently been ranked among the largest

global OEM parts suppliers, based on global OEM automotive parts sales, ranking, for example 16th, 13th, 14th and 10th each year from 2009 through 2012, respectively.

127.  On January 30, 2012, the DOJ announced that Yazaki Corporation and four of its executives had agreed to plead guilty to participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize and maintain prices of Automotive Wire Harness Systems from at least as early as January 2000 and continuing until at least February 2010.  On September 26, 2012, a fifth executive also pled guilty to the same conspiracy.

128.  Like Furukawa Electric, Yazaki Corporation pled guilty to executing the conspiracy by, among other actions:

a.   participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

b.   agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

c.   agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to certain automobile manufacturers in the United States and elsewhere on a model-by-model basis;

d.   agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in the United States and elsewhere;

e.   submitting bids, price quotations, and price adjustments to certain automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f.   selling Automotive Wire Harness Systems to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g.   accepting payment for Automotive Wire Harness Systems sold to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h.   engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i.   employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

129.   Yazaki Corporation agreed to pay a fine of $470 million for its conspiracy with regard to Automotive Wire Harness Systems and two other automotive components, instrument panel clusters, and fuel senders, in violation of the Sherman Act, § 1. According to the DOJ press release, dated January 30, 2012, the Yazaki criminal fine was "the second largest criminal fine obtained for a Sherman Act antitrust violation."

130.   In a statement released on January 31, 2012, Yazaki Corporation announced, with regard to its plea agreement that, "Yazaki Corporation concluded a plea agreement with the United States Department of Justice to the effect that the company acknowledges the allegations, pleads guilty and pays a fine of US$ 470million in the criminal proceedings relating to cartel activities with certain competitors for automotive wire harnesses and related products." It also asserted that, "Yazaki Corporation has been faithfully cooperating with the DOJ investigation since its inception on February 23, 2010."

131.   In addition to Yazaki Corporation, five executives (all Japanese nationals)–Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa, Hisamitsu Takada and Kazuhiko Kashimoto– also pled guilty to participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Automotive Wire Harness Systems sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1. These five executives each agreed to pay a criminal fine of $20,000 and to serve prison time ranging from 14to 24 months

### 3.    Guilty Plea of Fujikura, Ltd. and Indictment of Executives

132.   On April 23, 2012, Fujikura Ltd. agreed to plead guilty to participating in the conspiracy to fix prices, rig bids and allocate supply with

regard to Automotive Wire Harness Systems, from at least as early as January 2006 and continuing until at least February 2010, in violation of the Sherman Act, § 1.

133. Like Furukawa Electric and Yazaki Corporation, Fujikura Ltd. admitted to agreeing with its co-conspirators to participate in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize and maintain prices of Automotive Wire Harness Systems. Conduct in furtherance of this conspiracy included agreeing with co-conspirators "on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere," "to allocate the supply of automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere on a model-by-model basis" and to "coordinate price adjustments requested by an automobile manufacturer in the United States and elsewhere."Likewise, Fujikura Ltd. also pled guilty to "employing measures to keep their conduct secret, including but not limited to using code names and meeting at remote locations."

134. Fujikura Ltd. agreed to pay a criminal fine of $20 million for its anticompetitive conduct.

135. Separately, on September 19, 2013, two Fujikura Ltd. executives, Ryoji Fukudome and Toshihiko Nagashima, were indicted for conspiring to fix the

price of Automotive Wire Harness Systems sold to Fuji Heavy Industries, the maker of Subaru automobiles between 2005 and 2010.

### 4.    Guilty Pleas of DENSO Corporation and Executive

136.    DENSO International America Inc.'s website, under "Customers," listed the following, *inter alia*, as "Major North American Customers" Honda, Toyota, General Motors, Mercedes-Benz, BMW, Ford, Chrysler, Subaru, Mazda, Suzuki, Mitsubishi, Nissan, Kia, Hyundai, John Deere, Caterpillar, International Truck & Engine, Mack Trucks, Freightliner and Volvo Trucks.  The website stated that:

> As one of the world's top automotive suppliers, DENSO works hand-in-hand with all major automakers worldwide in the fields of climate control, engine management, body electronics, driving control and safety, hybrid vehicle components, and information and communications.

> From the automobile or motorcycle you drive to work or school, to heavy duty trucks and farm and construction machinery, DENSO products can be found in almost every area of the vehicle.

137.    Automotive News has also consistently ranked DENSO among the very largest global OEM parts suppliers, based on global OEM automotive parts sales, ranking it, for example, 1st, 2nd, 2nd, and 2nd each year from 2009 through 2012, respectively.

138.    On January 30, 2012, DENSO Corporation agreed to plead guilty to two counts for conduct in violation of the Sherman Antitrust Act; 15 U.S.C. § 1

from at least as early as January 2000 until at least February 2010. The first count was in connection with a component part of Automotive Wire Harness Systems, the electrical control unit ("ECU").[1] Specifically, DENSO pled guilty to "participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix stabilize, and maintain the prices of, certain electronic control units ("ECUs") sold to an automobile manufacturer in the United States and elsewhere." The second count was for conspiracy to rig bids for, and fix, stabilize, and maintain prices of heater control panels during the same period

139. Like other Defendants that entered into guilty pleas with the DOJ in connection with Automotive Wire Harness Systems, DENSO pled guilty to executing the collusive scheme by, *inter alia*:

a.    participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

---

[1]ECUs are one of the components to wire harness systems listed in the DOJ Automotive Wire Harness Systems plea agreements and criminal Informations. For example, the Yazaki Corporation Information (at ¶ 5) states:

Automotive wire harnesses are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards. The following are defined as "related products" for the purposes of this Information: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, **electronic control units**, fuse boxes, relay boxes, and junction blocks. (Emphasis added).

b.  agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

c.  agreeing, during those meetings, conversations, and communications, to allocate the supply of ECUs sold to an automobile manufacturer in the United States and elsewhere on a model-by-model basis;

d.  agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by an automobile manufacturer in the United States and elsewhere;

e.  submitting bids, price quotations, and price adjustments to an automobile manufacturer in the United States and elsewhere in accordance with the agreements reached;

f.  selling ECUs to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

g.  accepting payment for ECUs sold to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

h.  engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i.  employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

140.  DENSO Corporation agreed to pay a criminal fine in the amount of $78 million for its violations.

141.  In addition, on May 21, 2013, one DENSO Corporation executive, Yuji Suzuki ("Suzuki"), agreed to plead guilty to conspiring to fix prices of

ECUs(as well as of a second automotive part – heater control panels). Pursuant to the guilty plea, entered on August 5, 2013, Suzuki agreed to pay a criminal fine of $20,000 and to serve 16 months prison time.

### 5. Guilty Plea of G.S. Electech, Inc. and Indictment of Executive

142. On May 16, 2012, G.S. Electech Inc. pled guilty to "participating in a combination and conspiracy to suppress and eliminate competition in the automotive industry by agreeing to rig bids for, and to fix stabilize, and maintain the prices of, speed sensor wire assemblies sold to an automobile manufacturer in the United States and elsewhere."

143. Speed sensor wire assemblies are installed on vehicles with antilock brake systems ("ABS"). Their function is to connect a sensor on each tire of the vehicle to the ABS and carry electrical signals from those sensors to the ABS to alert it as to when to engage. Speed sensor wire assemblies comprise the ABS/Speed sensor wire harness, a portion of the Automotive Wire Harness System.

144. G.S. Electech Inc. admitted to agreeing during meetings, conversations and communications to rig bids, fix prices and price quotations, and allocate the supply of speed sensor wire assemblies on a model-by-model basis from at least as early as January 2003 and continuing until at least February 2010,

to an automobile manufacturer in the United States and elsewhere, and agreed to pay a criminal fine in the amount of $2.75 million for its violations.

145. Separately, on September 11, 2013, an executive of G.S. Electech Inc., Shingo Okuda, was indicted by the DOJ for conspiracy to fix the prices of speed sensor wire assemblies sold to Toyota between 2003 and 2010.

## J. Guilty Pleas in Related Markets in the Automotive Industry

146. A number of additional companies have pleaded guilty to engaging in virtually identical price fixing conduct as the Defendants in connection with other automotive parts, including: alternators; heater control panels; occupant safety restraint systems; automotive bearings; windshield wipers; air conditioning systems; radiators; ignition coils; automatic transmission fluid warmers; fan motors; switches; steering angle sensors; HID ballasts; automotive lamps and anti-vibration rubber parts.

147. These companies include: Valeo Japan Co., Ltd., Takata Corporation, Diamond Electric Manufacturing Co., Ltd., Hitachi Automotive Systems, Ltd., Nippon Seiki Co., Ltd., TRW Deutschland Holding GmbH; Autoliv, Inc.; JTEKT Corporation; Mitsubishi Heavy Industries, Ltd.; NSK Ltd.; Mitsubishi Electric Corporation; Mitsuba Corporation; Panasonic Corporation; T. RAD Co., Ltd.; Yamashita Rubber Co., Ltd. and Bridgestone Corporation. The majority of these violators pled guilty to engaging in bid-rigging, price-fixing and allocation of the

supple of relevant automotive parts during periods over-lapping with the periods of

wrongdoing by the Defendants here, with multiple OEMs as their targets.

148.    The U.S. government has said its automotive parts cartel criminal

investigation will continue and other suppliers could be charged.  Sharis A. Pozen,

then the Acting Assistant Attorney General in charge of the DOJ's Antitrust

Division, said in January 2012 that there is no doubt **consumers** were hurt

financially by the similar automotive wire harness price-fixing conspiracy.  She

further stated: "By rigging bids . . . [automotive parts manufacturers engaged in a

price-fixing conspiracy] inflated what some of their auto manufacturing clients

paid, and indirectly, what consumers paid for some cars."  She further explained

that "[a]s a result of this international price-fixing and bid-rigging conspiracy,

automobile manufacturers paid noncompetitive and higher prices for parts in cars

sold to U.S. consumers."

149.    In addition, Ms. Pozen stated that "[t]his cartel harmed an important

industry in our nation's economy, and the Antitrust Division with the Federal

Bureau of Investigation will continue to work together to ensure that these kinds of

conspiracies are stopped."  She went on to say that there was no doubt that United

States consumers were hurt financially by the cartel's activity.  In a separate press

statement, Ms. Pozen vowed that the DOJ would continue the investigation into

"pernicious cartel conduct that results in higher prices to American consumers . . .

."

150.    According to FBI Special Agent in Charge Andrew G. Arena.

This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold.

When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system.

The FBI is committed to aggressively pursuing any company involved in antitrust crimes.

151.    On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article:

The investigation is broader than what we've announced so far   ... [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  **I say the biggest with respect to the impact on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation**.  (Emphasis added).

152.    Other recent press reports related to the DOJ's ongoing automotive parts investigation continue to demonstrate that the collusion has saddled U.S. drivers with millions of dollars in extra costs:  As Brent Snyder, a deputy assistant attorney general in the antitrust division, reported in a recent interview "It's a very,

very safe assumption that U.S. consumers paid more, and sometimes significantly

more, for their automobiles as a result of this conspiracy."

153. Examples of other DOJ guilty pleas related to the automotive parts

industry include:

- On May 16 and June 27, 2012, two DENSO Corporation executives, Norihiro Imai and Makoto Hattori, respectively, agreed to plead guilty to conspiring to fix prices of heater control panels. Both agreed to pay a $20,000 criminal fine, and to serve 12 and 14 months, respectively, in prison. Separately, August 5, 2013, another DENSO executive, Hiroshi Watanabe, agreed to plead guilty to conspiring to fix prices of heater control panels. Like Imai and Hattori, Watanabe was required to pay a $20,000 criminal fine, and agreed to serve 15 months in prison.

- On September 26, 2012, an additional Yazaki executive, Toshio Suds, agreed to plead guilty to conspiring to fix prices of instrument panel clusters. Suds agreed to pay a $20,000 criminal fine and to serve 14 months in U.S. prison.

- On August 5, 2013, Panasonic Corporation agreed to pay a $45.8 million criminal fine and to plead guilty to price-fixing allegations in connection with, among other automotive parts, turn, wiper and other switches, steering angle sensors, and high intensity discharge ballasts.

- On June 21 and September 25, 2012, Autolive, Inc. and TRW Deutschland Holding GmbH, respectively, pled guilty to price-fixing allegations in connection with seatbelts, airbags and steering wheels, and agreed to pay total criminal fines of almost $20 million.

- On October 30, 2012, defendant Tokai Rika Co., Ltd. agreed to pay a $17.7 million criminal fine and to plead guilty to price-fixing allegations in connection with heater control panels.

- On September 24, 2013, a Panasonic Automotive Systems Corporation executive, Shinichi Kotani, was indicted for a conspiracy to fix prices of various switches and steering angle sensors.

- On September 26, 2013, nine additional Japanese automotive suppliers and two more executives agrees to plead guilty to conspiracy charges and pay more than $740 million in fines for their roles in rigging the prices of 30 products.

154.    The diagram below, which was prepared by the DOJ, illustrates the recent guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted to price-fixing.



155.    As of mid-2014, at least 27 companies and 34 executives have been charged in the Antitrust Division's ongoing investigation into price fixing and bid rigging in the auto parts industry.  Each of the companies have either pled guilty or

have agreed to plead guilty and have agreed to pay more than $2.3 billion in criminal fines.  In addition, the DOJ has imposed over 240 aggregate months of prison.

## CLASS ACTION ALLEGATIONS

156.   Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All municipalities, cities, counties, villages, towns and other local government subdivisions, agencies, districts, special districts and public utilities that indirectly purchased in the United States from any Defendant (or any current or former subsidiary or affiliate thereof, or any co-conspirator) during the Class Period, an Automotive Wire Harness System not for resale, including the purchase of an Automotive Wire Harness System as a stand-alone replacement product or as a component of a new motor vehicle purchased or leased.

157.   Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust and unfair competition laws of the states of Arizona, California, Iowa, Maine, Maryland, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin, whose laws are identified in ¶¶217-250 below (the "Relevant States").  These claims are brought by

Plaintiffs on behalf of themselves and other Public Entities as follows (the

"Damages Class"):

> All Relevant States, and their state subdivisions, agencies and
> instrumentalities (excluding the States of California, Iowa, Nebraska,
> New Hampshire, Nevada, North Dakota, South Dakota and
> Wisconsin and their state subdivisions, agencies and
> instrumentalities) and their local government subdivisions and
> agencies, including but not limited to municipalities, cities, counties,
> villages, towns, districts, special districts and public utilities
> (collectively "Public Entities") that indirectly purchased in any of the
> Relevant States from any Defendant (or any current or former
> subsidiary or affiliate thereof, or any co-conspirator) during the Class
> Period, any Automotive Wire Harness System not for resale,
> including the purchase of an Automotive Wire Harness System as a
> stand-alone replacement product or as a component of a new motor
> vehicle purchased or leased.

158.   The Nationwide Class and the Damages Class are referred to herein as

the "Classes."  Excluded from the Classes are Defendants, their parent companies,

subsidiaries and affiliates, and any co-conspirators, and any federal governmental

entities and instrumentalities of the federal government.

159.   While Plaintiffs do not know the exact number of the members of the

Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

160.   Common questions of law and fact exist as to all members of the

Classes.  This is particularly true given the nature of Defendants' conspiracy,

which was generally applicable to all the members of both Classes, thereby

making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.  whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Automotive Wire Harness Systems sold in the United States;

b.  the identity of the participants of the alleged conspiracy;

c.  the duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.  whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

e.  whether the alleged conspiracy violated certain state antitrust and unfair competition laws, as alleged in the Second Claim for Relief;

f.  whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

g.  the effect of the alleged conspiracy on the prices of Automotive Wire Harness Systems sold in the United States during the Class Period;

h.  whether the Plaintiffs knew, or had any reason to know, of the conspiracy engaged in by Defendants;

i   whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

j.  the appropriate injunctive and related equitable relief for the Nationwide Class; and

k.  the appropriate class-wide measure of damages for the Damages Class.

161.   Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Wire Harnesses purchased indirectly from Defendants or their co-conspirators.

162.   Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  The Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation, as well as in representing public entities.

163.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

164.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary

duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

165. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

166. Defendants' price-fixing conspiracy had the following effects, among others:

a.  price competition has been restrained or eliminated with respect to Automotive Wire Harness Systems;

b.  the prices of Automotive Wire Harness Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

c.  indirect purchasers of Automotive Wire Harness Systems, such as the Public Entities, have been deprived of free and open competition.

167. As a consequence of Defendants' collusive anti-competitive conduct during the Class Period detailed herein, Plaintiffs and the members of the Classes paid supra-competitive prices for Automotive Wire Harness Systems and sustained economic loss as a result.

168.     The markets for Automotive Wire Harness Systems and the market for automobiles are inextricably linked and intertwined because the market for Automotive Wire Harness Systems exists to serve the vehicle market.  Without the vehicles, the Automotive Wire Harness Systems have little to no value, because they are designed and manufactured expressly to operate in vehicles, and otherwise have no independent utility.  Indeed, the demand for vehicles creates and maintains the demand for Automotive Wire Harness Systems.  As Lear stated in its 2010 Annual Report: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

169.     Automotive Wire Harness Systems are identifiable, discrete, significant and economically substantial physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Automotive Wire Harness Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Wire Harness Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

170.     Just as Automotive Wire Harness Systems can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Automotive Wire Harness Systems affect prices

paid by indirect purchasers of new motor vehicles containing Automotive Wire Harness Systems and Automotive Wire Harness Systems purchased for repair or replacement purposes.

171. While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces. The OEM and dealer markets for new motor vehicles are subject to vigorous price competition. The OEMs and dealers have thin net margins, and are therefore at the mercy of their component costs, such that increases in the price of components such as Automotive Wire Harness Systems lead to corresponding increases in prices for new motor vehicles and replacement parts at the OEM and dealer levels.

172. When downstream distribution markets are highly competitive, as they are in the case of new motor vehicles containing Automotive Wire Harness Systems as components, overcharges are passed through to ultimate consumers, such as the indirect-purchaser Plaintiffs and other Public Entity class members.

173. Hence the inflated prices of Automotive Wire Harness Systems – both in new motor vehicles and those purchased for repair and as replacement parts – resulting from the Defendants' and their co-conspirators' price-fixing conspiracy have been passed on to Plaintiffs and other Public Entity class members by OEMs and dealers.

174.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

175.    As University of Michigan Professor Jeffrey K. Mackie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Certification), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers.  When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers.  …  Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets.  This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

176.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to fix, stabilize and maintain the price of Automotive Wire Harness Systems and, as a direct and foreseeable result, the price of new motor vehicles containing Automotive Wire Harness Systems and the price of Automotive Wire Harness Systems purchased for repair purposes.

177.    Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of Automotive Wire Harness Systems on prices for new motor vehicles, even though such products contain a number of other components whose prices may be changing over time.

178.    A regression model can explain how variation in the price of Automotive Wire Harness Systems affects changes in the price of new motor vehicles.  In such models, the price of Automotive Wire Harness Systems would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of Automotive Wire Harness Systems impact the price of new

motor vehicles containing Automotive Wire Harness Systems while controlling for the impact of other price-determining factors.

179. The precise amount of the overcharge impacting the prices of new motor vehicles containing Automotive Wire Harness Systems can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and Public Entity class members can be quantified.

180. In addition to the regression analysis discussed above demonstrating impact on consumers, as set forth at ¶¶ 146 - 155 above, the DOJ's Antitrust Division, which has been investigating anticompetitive conduct in the automotive parts industry for some time, as well as the FBI have **concluded that there is "no doubt" that consumers were hurt financially**, with the DOJ stating: **"It's a very, very safe assumption that U.S. consumers paid more, and sometimes significantly more, for their automobiles as a result of this conspiracy."**

181. As set forth in the DOJ Statement of William J. Baer, Assistant Attorney General Antitrust Division and Ronald T. Hooks, Assistant Director, Criminal Investigative Division, Federal Bureau of Investigation Before the Subcommittee on Antitrust, Competition Policy and Consumer Rights, Committee on the Judiciary, United States Senate, Hearing on "Cartel Prosecution: Stopping

Price Fixers and Protecting Consumers," presented on November 14, 2013 (the "DOJ Statement"), Messrs. Baer and Hooks testified to Congress that:

> To date the division has charged a total of 21 companies and 21 executives. All 21 companies have either pleaded guilty or have agreed to plead guilty. The immediate victims of these conspiracies include such automobile manufacturers as Ford, General Motors, Chrysler, Honda, Toyota, Nissan, Subaru, Mazda and Mitsubishi. The parts involved included safety systems such as seatbelts, airbags and antilock brake systems, making it costlier for car manufacturers to provide many safety features. Many car models were fitted with multiple parts that were fixed by auto parts suppliers. . . . The cases filed to date involve conduct affecting over $8 billion in auto parts sold to car manufacturers in the U.S. and parts used in more than 25 million cars purchased by American consumers.

182. The DOJ Statement also states: "At the end of the day, our enforcement actions result in lower prices for consumer goods and services, including computers, televisions, automobiles, shipping, hospital services, and financial services."

183. By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Wire Harness Systems than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED
## BY THE STATUTE OF LIMITATIONS

**A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims**

184.    Plaintiffs repeat and re-allege the allegations set forth above.

185.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before the initial complaint was filed in this multi-district litigation. Plaintiffs and the members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until February 24, 2010, at the earliest, the date when the investigation of Automotive Wire Harness Systems manufacturers' potentially collusive conduct first became public.

186.    Plaintiffs and the members of the Classes are consumers who purchased or leased automobiles or purchased Automobile Wire Harness Systems to replace or repair damaged or defective Automotive Wire Harness Systems in their automobiles. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the February 23, 2010 raids on certain Automotive Wire Harness Systems manufacturers detailed above were made public.

187. No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the public announcement on February 24, 2010 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price-fix and rig bids for Automotive Wire Harness Systems. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

188. For these reasons, the statute of limitations as to the claims of Plaintiffs and the Classes did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## B. Fraudulent Concealment Tolled the Statute of Limitations

189. In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not know and could not have known of the existence of the conspiracy and unlawful combination alleged herein until February 24, 2010, at the earliest, the date when the investigation of Automotive Wire Harness Systems manufacturers' potentially collusive conduct became public.

190.    Before that time, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know before then that they were paying supra-competitive prices for Automotive Wire Harness Systems throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that put them on notice that they were being injured by Defendants' unlawful conduct.

191.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

192.    By its very nature, Defendants' anti-competitive conspiracy and unlawful combinations were inherently self-concealing. Automotive Wire Harness Systems are not exempt from antitrust regulation and, thus, Plaintiffs and the members of the Classes reasonably considered it to be a competitive industry. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.

193.    For instance, Defendants Fujikura Ltd., Furukawa Electric, G.S. Electech, Inc., DENSO Corporation and Yazaki Corporation all pled guilty to, *inter alia*, "employing measures to keep their conduct secret, including but not

limited to using code names and meeting at private residences or remote locations."

194.   In addition, individual corporate officers – including, for example, Funo, Nagata and Ukai from Furukawa Electric, Hanamura, Kawai, Ogawa, Kashimoto and Takada from Yazaki Corporation and Suzuki from DENSO Corporation – have pled guilty to, among other actions in furtherance of the conspiracy, using code names and/or meeting at private residences or remote locations in order to help keep their collusive conduct secret.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the lawfulness of Defendants' Automotive Wire Harness Systems prices.

195.   Plaintiffs and the members of the Classes could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

196.   Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof.  Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious

activity such as using code names and meeting at private residences or remote locations. The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty in this Court to criminal violations of the Sherman Act. These Defendants have not provided any documents and information about these admitted acts of concealment to Plaintiffs or the members of the Classes.

197. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and the members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until February 24, 2010, at the earliest, the date when the investigation of Automotive Wire Harness Systems manufacturers' potentially collusive conduct became public.

198. For these reasons, the statute of limitations applicable to the claims of the Plaintiffs and the Classes was tolled and did not begin to run until February 24, 2010, at the earliest.

# FIRST CLAIM FOR RELIEF

## Violation of Section 1 of the Sherman Act
## (on behalf of Plaintiffs and the Nationwide Class)

199.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

200.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

201.   The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

202.   From at least as early as January 2000 and continuing until at least February 2010, the exact dates being unknown to the Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Wire Harness Systems, thereby creating anticompetitive effects.

203.   The anti-competitive acts were intentionally directed at the United States market for Automotive Wire Harness Systems and had a substantial and

foreseeable effect on interstate commerce by raising and fixing prices for Automotive Wire Harness Systems throughout the United States.

204. The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Wire Harness Systems.

205. As a result of Defendants' unlawful conduct, the Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Wire Harness Systems have been harmed by being forced to pay inflated, supra-competitive prices for Automotive Wire Harness Systems.

206. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

207. Defendants' conspiracy had the following effects, among others:

a. price competition in the market for Automotive Wire Harness Systems has been restrained, suppressed, and/or eliminated in the United States;

b. prices for Automotive Wire Harness Systems sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States; and

  c.  Plaintiffs and members of the Nationwide Class who purchased

    Automotive Wire Harness Systems indirectly from Defendants and

    their co-conspirators have been deprived of the benefits of free and

    open competition.

  208. Plaintiffs and members of the Nationwide Class have been injured and

will continue to be injured in their business and property by paying more for

Automotive Wire Harness Systems purchased indirectly from Defendants and the

co-conspirators than they would have paid and will pay in the absence of the

conspiracy.

  209. The alleged contract, combination, or conspiracy is a *per se* violation

of the federal antitrust laws.

  210. Plaintiffs and members of the Nationwide Class are entitled to an

injunction against Defendants, preventing and restraining the violations alleged

herein.

## SECOND CLAIM FOR RELIEF

### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

  211. Plaintiffs incorporate by reference the allegations in the preceding

paragraphs.

212.    From at least as early as January 2000 and continuing until at least February 2010, the exact dates being unknown to the Plaintiffs, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Wire Harness Systems in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

213.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing, *inter alia*, to rig bids for, and to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Automotive Wire Harness Systems and to allocate supplies of Automotive Wire Harness Systems in the United States.

214.    In formulating and effectuating this conspiracy, Defendants and their coconspirators performed acts in furtherance of the combination and conspiracy, including:

a.      participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Automotive Wire Harness Systems at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by

Plaintiffs and members of the Damages Class with respect to

Automotive Wire Harness Systems sold in the United States;

b.      allocating supplies of Automotive Wire Harness Systems in the

United States in furtherance of their agreements; and

c.      participating in meetings and conversations among themselves in the

United States and elsewhere to implement, adhere to, and police the

unlawful agreements they reached.

215.    Defendants and their co-conspirators engaged in the actions described

above for the purpose of carrying out their unlawful agreements to rig bids, to fix,

maintain, or stabilize prices, to allocate supplies of and to suppress and eliminate

competition with respect to Automotive Wire Harness Systems.

216.    Defendants' anticompetitive acts described above were knowing,

willful and constitute violations or flagrant violations of the following state antitrust

statutes.

**Arizona:**

217.    Defendants have entered into an unlawful agreement in restraint of

trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

a.      Defendants' combinations or conspiracies had the following effects:

(1)     Automotive Wire Harness Systems price competition was

restrained, suppressed, and eliminated throughout Arizona;

(2)     Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona;

(3)     Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4)     Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

218.   Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available

only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**California:**

219.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

a.    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate supplies of, Automotive Wire Harness Systems at supra-competitive levels.

b.    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate supplies of, Automotive Wire Harness Systems.

c.    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which

they combined and conspired to do, including but in any way limited to the acts, practices and course of conduct set forth above and the following:

(1) Fixing, raising, stabilizing, and pegging the price of Automotive Wire Harness Systems; and

(2) Allocating among themselves the production of Automotive Wire Harness Systems.

d. The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

(1) Price competition in the sale of Automotive Wire Harness Systems has been restrained, suppressed, and/or eliminated in the State of California;

(2) Prices for Automotive Wire Harness Systems sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and

(3) Those who purchased Automotive Wire Harness Systems directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

e.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property in that they paid more for Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.

220.  As a result of defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

**Iowa:**

221.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

a.  Defendants' combinations or conspiracies had the following effects:

(1)  Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Iowa;

(2)  Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa;

(3)  Plaintiffs and members of the Damages Class were deprived of free and open competition; and

88

(4)     Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*

222.     Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**Maine:**

223.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

a. Defendants' combinations or conspiracies had the following effects:

    (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Maine;

    (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine;

    (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

    (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

224. Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**Maryland:**

225. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Code Annotated, Commercial Law §§ 11-209, *et seq.*

    a.    Defendants' combinations or conspiracies had the following effects:

        (1)    Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Maryland;

        (2)    Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland;

        (3)    Plaintiffs and members of the Damages Class were deprived of free and open competition; and

        (4)    Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.    During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maryland Code Annotated, Commercial Law §§ 11-209, *et seq*.

226.   Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**Michigan:**

227.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

a.    Defendants' combinations or conspiracies had the following effects:

(1)    Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Michigan;

92

(2)    Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan;

(3)    Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4)    Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

228.    Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available

only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**Minnesota:**

229.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

a.    Defendants' combinations or conspiracies had the following effects:

(1)    Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Minnesota;

(2)    Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota;

(3)    Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4)    Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been

injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.

230.    Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**Nebraska:**

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq*.

a.      Defendants' combinations or conspiracies had the following effects:

(1)     Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Nebraska;

(2)     Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska;

(3)     Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4)     Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*

232.    Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**Nevada:**

233.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

a. Defendants' combinations or conspiracies had the following effects:

    (1)    Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Nevada;

    (2)    Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada;

    (3)    Plaintiffs and members of the Damages Class were deprived of free and open competition; and

    (4)    Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

234. Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**New Hampshire:**

235. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

    a. Defendants' combinations or conspiracies had the following effects:

        (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New Hampshire;

        (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire;

        (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

        (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

98

b. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*

236. Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**New Mexico:**

237. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

a. Defendants' combinations or conspiracies had the following effects:

(1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New Mexico;

(2)     Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico;

(3)     Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4)     Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

238.   Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available

only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**New York:**

239. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

a.     Defendants' combinations or conspiracies had the following effects:

(1)     Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New York;

(2)     Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York;

(3)     Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4)     Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems when they purchased vehicles containing Automotive Wire Harness Systems, or purchased products that were otherwise of lower quality, than would have been absent the conspirators illegal acts, or were unable to purchase

products that they would have otherwise have purchased absent the illegal conduct.

b.     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act.

240.     Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**North Carolina:**

241.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

a. Defendants' combinations or conspiracies had the following effects:

    (1)    Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout North Carolina;

    (2)    Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina;

    (3)    Plaintiffs and members of the Damages Class were deprived of free and open competition; and

    (4)    Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

242.    Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**North Dakota:**

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

a.    Defendants' combinations or conspiracies had the following effects:

(1)    Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout North Dakota;

(2)    Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota;

(3)    Plaintiffs and members of the Damages Class were deprived of free and open competition; and

104

(4)     Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

244.   Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**South Dakota:**

245.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

a. Defendants' combinations or conspiracies had the following effects:

   (1)  Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout South Dakota;

   (2)  Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota;

   (3)  Plaintiffs and members of the Damages Class were deprived of free and open competition; and

   (4)  Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

246.   Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**West Virginia:**

247.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

a.   Defendants' combinations or conspiracies had the following effects:

(1)   Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout West Virginia;

(2)   Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia;

(3)   Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4)     Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.*

248.    Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

**Wisconsin:**

249.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq.*

a.     Defendants' combinations or conspiracies had the following effects:

(1)     Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Wisconsin;

(2)     Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin;

(3)     Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4)     Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Public Entity members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

250.   Accordingly, Plaintiffs and members of the Damages Class seek monetary redress for injury to their business or property, including damages, costs

and reasonable attorneys' fees, and excluding any form of relief or order available only to the State in its sovereign regulatory capacity, such as criminal sanctions, fines or civil penalties.

\* \* \*

251.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and Public Entity members of the Damages Class have paid more for Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

252.    In addition, Defendants have profited significantly from the aforesaid conspiracy.  Defendants' profits, derived from their anticompetitive conduct, come at the expense and detriment of the Plaintiffs and the Public Entity members of the Damages Class.

253.    Accordingly, Plaintiffs and the Public Entity members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular

jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.  The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.  That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

   (i)   An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

   (ii)  A *per se* violation of Section 1 of the Sherman Act; and

   (iii) An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition laws as set forth herein.

C.  Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the

Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.     Plaintiffs and members of the Classes have such other and further

relief as the case may require and the Court may deem just and proper.

DATED: October 3, 2014


                                        **YOUNG & ASSOCIATES**

                                          /s/ Rodger D. Young
                                        Rodger D. Young (P22652)
                                        Jaye Quadrozzi (P71646)
                                        27725 Stansbury Boulevard, Suite 125
                                        Farmington Hills, Michigan 48334
                                        (248) 353-8620
                                        efiling@youngpc.com
                                        P22652


Counsel for Plaintiffs:

Renne Sloan Holtzman Sakai LLP
Louise H. Renne
K. Scott Dickey
Steve Shaw
350 Sansome Street, Suite 300
San Francisco, CA  94104
(415) 678-3800
lrenne@publiclawgroup.com
sdickey@publiclawgroup.com
sshaw@publiclawgroup.com

Green & Noblin, P.C.
Robert S. Green
James Robert Noblin
Lesley E. Weaver

700 Larkspur Landing Circle
Suite 275
Larkspur, CA   94393
(415) 477-6700
rsg@classcounsel.com
jrn@classcounsel.com
lew@classcounsel.com

Morris and Morris LLC
    Counselors At Law
Karen L. Morris
Patrick F. Morris
R. Michael Lindsey
4001 Kennett Pike
Suite 300
Wilmington, DE  19807
(302) 426-0400
kmorris@morrisandmorrislaw.com
pmorris@morrisandmorrislaw.com
rmlindsey@morrisandmorrislaw.com

Law Offices of Mark A. Cuthbertson
Mark A. Cuthbertson
434 New York Avenue
Huntington, NY 11743
(631) 351-3501
mcuthbertson@cuthbertsonlaw.com

Williams Montgomery & John Ltd.
Charles E. Tompkins
233 S. Wacker Dr., Suite 6100
Chicago, Illinois 60606
(312) 443-3286
cet@willmont.com

Rabon Law Firm PLLC
Gary Jackson
225 E. Worthington Avenue, Suite 200
Charlotte, NC  28203

(704) 377-6680
gjackson@ncadvocates.com

Williams Montgomery & John Ltd.
Charles E. Tompkins
233 S. Wacker Dr., Suite 6100
Chicago, Illinois 60606
Telephone: 312-443-3286
Facsimile: 312-630-8586
cet@willmont.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2014, I caused the foregoing Class Action Complaint to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

YOUNG & ASSOCIATES

  /s/ Rodger D. Young
Rodger D. Young (P22652)
Jaye Quadrozzi (P71646)
Counsel for City of Richmond/Public Entity
Plaintiffs
27725 Stansbury Boulevard, Suite 125
Farmington Hills, Michigan 48334
248.353.8620
efiling@youngpc.com
P22652