UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : | 12-md-02311 Hon. Marianne O. Battani |
| In Re:  All Cases | : : : | |
| THIS DOCUMENT RELATES TO: All Actions | : : : | |

### SPECIAL MASTER'S ORDER REGARDING DIRECT PURCHASER PLAINTIFFS'MOTION TO LIMIT UNIFORM SUBPOENA TO OEMS

This matter is currently before the undersigned Special Master upon a Motion by Direct Purchaser Plaintiffs ("DPPs") To Strike, Limit Or Stay The Proposed Uniform Subpoena to be issued to Original Equipment Manufacturers ("OEMS") dated May 13, 2015.  This Motion was supported, in part, by a Response issued by Ford Motor Company dated May 20, 2015.

The opposition to this Motion included the following:

1.      Defendants' Opposition To Direct Purchaser Plaintiffs' Motion To Limit Uniform Subpoena To OEMS dated May 27, 2015.

2.      Notice Of Joinder Of Truck And Equipment Dealer Plaintiffs And Auto Dealership Plaintiffs' Opposition To Direct Purchaser Plaintiffs' Motion To Limit Uniform Subpoena To OEMS dated May 28, 2015.

3.      Auto Dealership Plaintiffs' Opposition To Direct Purchaser Plaintiffs' Motion To Limit Uniform Subpoena To OEMS dated May 27, 2015.

4.      Indirect Purchaser Plaintiffs' Response In Opposition To Direct Purchaser Plaintiffs' Motion To Strike, Limit Or Stay The Uniform Subpoena To OEMS And To Ford Motor Company's Response To The Proposed Uniform OEM Subpoena dated May 27, 2015.

DPPs filed a Reply in support of their original Motion To Limit Uniform Subpoenas To OEMS dated June 1, 2015.

## FACTUAL BACKGROUND

In this multi-district litigation involving alleged price fixing in automotive parts production and sales, the Court indicated on at least two occasions that the Defendants should cooperate with other interested parties in developing a Uniform Subpoena to be issued in this action to OEMS.  Such a Subpoena was prepared and is attached hereto as *Exhibit 1* via cooperation between Defendants, End-Payor Plaintiffs ("EPPs"), Auto Dealer Plaintiffs ("ADPs"), Truck and Equipment Dealer Plaintiffs, the City of Richmond, and the State of Florida, to be utilized in the thirty (30) different product tracts involved in this action.

During a session before the Court, DPPs requested the ability to review and comment upon the Uniform Subpoena to be issued to the OEMS.  The Court indicated that DPPs were free to work with the other parties in agreeing upon a Uniform Subpoena to the OEMS.

At this point, a divergence of facts exists.  DPPs indicate that they were never involved in negotiating the Uniform Subpoena, while Defendants and the related party Plaintiffs mentioned above indicate that at no time did DPPs ever participate, or even indicate a desire to participate, in the drafting of a Uniform Subpoena to OEMS.

## LEGAL POSITIONS

DPPs and Ford Motor Company ("Ford") have taken the position that the proposed Uniform Subpoena to be issued to the OEMS should be prohibited by the undersigned and this Court for numerous reasons, including the following:

1.  <u>Non-Party Status</u>.  Except for Ford, none of the OEMS from whom information is sought is a party in this litigation and, as such, must be treated as uninvolved third parties.  A long line of cases establishes that courts should not permit parties to litigation to shift the cost and burden of discovery to third parties who are not active in the litigation, absent a showing of particularized need for information that is not otherwise available from the parties themselves or other sources at a more reasonable cost.

2.  <u>Confidential Information</u>.  Both the DPPs and Ford argue that many of the requests set forth in the Uniform Subpoena seek highly confidential commercial information from OEMS involving their pricing strategies, purchasing strategies, sales strategies and supplier acquisition strategies.  Any such information would be of great value to competitors of the OEMS producing this information.

3.  <u>Other Available Sources</u>.  DPPs and Ford argue that much of the information being sought is available from other sources.  In particular, the information being sought concerning sales of vehicles by the OEMS to the Auto Dealers are available in the ADPs upstream information that is currently being produced.  Additionally, the downstream information being produced by the Defendants is the equivalent of the upstream information being requested from the OEMS.  Finally, as to vehicle and model sales statistics, such information is readily

available from recognized industry data companies, including J.D. Power, R.L Polk & Company and the Automotive News.

4. _Irrelevancy_.  Both DPPs and Ford argue that much of the information is completely irrelevant to these proceedings.  This would include information regarding the OEMS' financing, inventory status level and projections regarding sales or leased vehicles for a coming year.

5. _Burdensome_.  Both the DPPs and Ford argue that the Uniform Subpoena is breathtaking in its scope.  By way of example, Ford points out that the Uniform Subpoena requests all information regarding fifty-six (56) parts in twelve (12) vehicle types covering a period of 23 years.  Ford estimates that this would be approximately eighty million vehicles.  By simply extrapolating, if there are ten (10) documents per vehicle, Ford would be producing eight hundred million documents.  If there are twenty (20) documents per vehicle, Ford would be producing one billion six hundred million documents.  While the other OEMS may not enjoy the same sales level as Ford, if this Uniform Subpoena is, in fact, issued, several billion documents may, in fact, be involved.  Ford points out that this type of subpoena is unprecedented in the history of litigation in the United States.

All of the opposing parties put forth the same arguments concerning why the Motion To Strike The Uniform Subpoena To The OEMS should not be granted, nor reduced, or stayed.

It is not necessary to analyze each of the arguments set forth by the opposing parties to this Motion.  Suffice it to say that the undersigned is of the opinion that the Motion of the DPPs

and Ford must be denied because it is either premature or, as in the case of the DPPs, the party bringing the Motion lacks standing.

Defendants and the supporting parties point out that the proper procedures to be followed in the issuance of a subpoena is for the subpoena to be issued upon the interested party and the interested party alone is then permitted to object to the offending portions of the subpoena on whatever grounds it may have. Often times, the objections will lead to negotiations between the competing parties which will narrow the scope of the subpoena and result in an agreement for the production of highly critical and relevant documents in the litigation.

Defendants and their supporting parties point out that the OEMS are sizable, commercial organizations with large legal staffs and access to the best legal firms in the country and are fully capable of defending their own respective interests regarding any subpoena that may be issued to them in this litigation. No one, other than the OEMS receiving the subpoena, has a stronger and more vital interest in limiting the production made pursuant to the subpoena. Defendants and those opposing, striking, staying or limiting the Uniform Subpoena to the OEMS are correct in this position.

Accordingly, the Motion of the DPPs and Ford Motor Company to strike, stay, or limit the Uniform Subpoena proposed to be issued to the OEMS is hereby DENIED.

This Order may be appealed by any party to Judge Battani pursuant to the Order Appointing Special Master dated August 29, 2014.


Dated: June 3, 2015

/s/ Gene J. Esshaki
GENE J. ESSHAKI, Special Master


4835-2157-3412, v. 1

5

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : |
| In Re:  All Cases | : : : Master File No. 12-md-02311 : Honorable Marianne O. Battani |
| THIS DOCUMENT RELATES TO: All Actions | : : : : : : : |

## [DRAFT] SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

TO:      [OEM]

☐ *Production:*  **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**See Attachment A**

| Place:      [OEM] | Date and Time: |
|---|---|

☐ *Inspection of Premises:*  **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

DATE:

DAVID J. WEAVER, CLERK OF COURT

OR

_____          _____
       *Signature of Clerk or Deputy Clerk*                                             *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____, who issues or requests this subpoena, are:

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $_____.

My fees are   $_____   for travel and   $_____   for services for a total of   $_____.

I declare under penalty of perjury that this information is true.

Date: _____        _____
                                                    *Server's signature*

                                      _____
                                                    *Printed name and title*

                                      _____
                                                    *Server's address*

Additional information regarding attempted service, etc.:

**(c) Place of Compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

## ATTACHMENT A

**REQUEST NO. 1:**     Data or documents (in the absence of data) sufficient to show the

following information for each purchase by You or on Your behalf, of (a) a Component or (b) an

Assembly for installation in a new Vehicle sold or leased in the U.S.:

a.     Date of purchase;

b.     Seller from whom the Component or Assembly was purchased, including name,

address, and other identifiers;

c.     Manufacturer, name or description, part type, part number, and other identifiers of

the Component or Assembly, including model, model year, and other identifiers

of the Vehicle(s) in which the Component or Assembly was designed or intended

to be installed, and quantity purchased (including measurement unit for quantity);

d.     Terms and conditions on which the Component or Assembly was purchased,

including but not limited to:

(1)     Net price of the Component or Assembly (including currency and

exchange rate, if applicable), and any adjustments to purchase price and

Incentives or allowances issued or applied at any time, including but not

limited to, taxes, amortization and amortization schedule, installment

payments, financing, rebates, lump sum or other discounts, refunds, credit

for returns, and currency or input cost adjustments, and the manner in

which provided, whether by unit or by total purchase;

(2)     Information sufficient to show:  (a) the total amount of money You paid,

on a yearly basis, for each type of identified Component or Assembly that

You purchased; and (b) the total number of units purchased for each type

of identified Component or Assembly that You purchased; and

1

(3)     Shipping or freight costs, and by whom such costs were paid.

e.     "Ship-from" and vendor "pay-to" address(es) from which the Component or Assembly and invoice for it were shipped or sent, date(s) the Component or Assembly and invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the Component or Assembly and invoice were shipped or received, and date(s) the Component or Assembly and invoice were received;

f.     Information sufficient to track each Component or Assembly after it was installed in a Vehicle, including model, model platform, model year, model project or development code, vehicle identification number ("VIN"), and/or part number, and other identifiers of the specific Vehicle(s) in which the Component or Assembly was installed, and quantity or number of each Component and Assembly installed (including measurement unit for quantity or number);

g.     RFQ(s), if any, pursuant to which the Component or Assembly was procured, and the following information for each RFQ:

(1)     Names, designations, and/or other identifiers for the RFQ;

(2)     Entity issuing the RFQ and its address;

(3)     Name, address, and other identifiers of each potential supplier to whom the RFQ was sent and the date sent to each potential supplier;

(4)     Name or description, part number, and other identifiers for each Component or Assembly, and other product(s) (if any) that was the subject of the RFQ;

2

(5)     Model(s) or model platform(s), model year(s), model project or
development code(s), and/or part number, and other identifiers of
the Vehicle(s) for which the Component or Assembly was
designed or intended;

(6)     Guidelines or instructions for responding to the RFQ, as set by
You and communicated to any potential supplier, including rules
relating to the initial bid price, number of responses, and response
deadline, or any other Documents relating to Your bid solicitation
criteria, Your bid submission system, or Your bid evaluation and
selection process;

(7)     Terms of the RFQ, including supply period covered, design or
specifications of the Component or Assembly, Directed Buying or
Directed Sourcing (if any) of Components or Assemblies,
approved supplier(s) of Component(s) or Assemblies or
subcomponents thereof, and any changes in such terms, design or
specifications, including post-RFQ changes in terms, design, or
specifications (*e.g.*, resulting from manufacturing improvements
and APRs);

(8)     Responses to the RFQ from potential suppliers, including but not
limited to, bids, cost and profit margin information or estimates,
bill of materials, cost schedules or breakdowns, proposed changes
in the design, manufacturing, materials, or specifications of the
Component or Assembly and resulting price changes, and any

3

lump sum or other discounts, rebates, allowances, Incentives, or other terms offered;

(9) Cost model(s) or estimate(s), if any, developed, used, or considered with respect to potential suppliers;

(10) Potential suppliers, if any, that provided on-site engineers or other personnel or services in connection with the Component or Assembly;

(11) Target Price, Limit Price, or anticipated or expected purchase price for the Component or Assembly before and after the supplier was selected, after application of all anticipated or expected discounts, rebates, or other allowances or Incentives, and any revisions or changes to such prices;

(12) VE Price or VA Price, if any, for the Component or Assembly, and any revisions thereto;

(13) Revised prices or other terms offered by potential suppliers after their initial response to the RFQ;

(14) The dates and topics of RFQ kickoff meetings, seminars, and other supplier meetings pertaining to each RFQ, the potential suppliers (and employees thereof) who attended each meeting, and changes, if any, to guidelines, instructions, terms, specifications, Target Price, Limit Price, anticipated or expected purchase price, VE Price or VA Price communicated to potential suppliers at each meeting;

4

(15)     Each supplier and the date it was selected to supply the Component or Assembly and the quantity each supplier was selected to supply;

(16)     Letters of intent, award letters, early sourcing agreements, statements of work, or similar documents regarding purchase of the Component or Assembly;

(17)     Any summary or recap of the RFQ and responses thereto, including but not limited to, each factor considered in deciding from which supplier(s) to purchase the Component or Assembly, and the reasons each potential supplier was selected or not selected to supply the Component or Assembly;

(18)     Any adjustments made after awards, including changes to price or the quantity allocated to each supplier; and

(19)     Documents, data, or Studies related to historical Component or Assembly bid solicitations, offered bids or winning bids.

h.      Monetary components of the transaction beyond unit price (*e.g.*, sales tax, shipping or delivery fees) or non-monetary components of, or Incentives for, the purchase of the Component or Assembly, including but not limited to, (1) any service, benefit, and/or product that You provided, or received, in connection with the purchase of the Component or Assembly, including service agreements, warranties, or installation, and (2) the value of each such service, benefit, or product;

i.      For each Component or Assembly purchased by one of Your suppliers pursuant to Directed Buying or Directed Sourcing, the price and terms of any such

5

arrangement, including the entity from which the supplier was directed to
purchase the Component or Assembly and at what price and terms;

j.     For each Component or Assembly that You purchased without soliciting
proposals, bids, or responses to an RFQ from more than one potential supplier, the
manufacturer and supplier of such Component or Assembly, its name or
description, part number, and other identifiers, and the reasons why each such
Component or Assembly was purchased without soliciting proposals, bids, or
responses to an RFQ;

k.     All information sought or obtained by You or on Your behalf concerning a market
or competitive price for the Component or Assembly, including but not limited to,
any market test conducted with respect to the Component or Assembly;

l.     All Documents relating to non-RFQ methods of procurement (*e.g.*, sole-sourcing),
including but not limited to, benchmark or other informal bid or pre-bid pricing,
price lists, price sheets, price reductions and reduction attempts, value engineering
pricing, discounts, price changes, negotiations, bidding, contracts (resulting from
other methods of procurement), or agreements (formal or informal) between You
and any Defendant, and any correspondence relating to any negotiations or
agreements made; and

m.    For each Component or Assembly purchased by You, Documents sufficient to
describe, identify, and interpret all part numbers assigned, including the
manufacturer's model number, any internal codes, product identifiers, or part
numbers used by You.

REQUEST NO. 2:   Documents sufficient to show any target prices, bids, award prices, and subsequent price adjustments with respect to any RFQ for any Component or Assembly intended to be purchased by You or on Your behalf for installation in a new Vehicle sold or leased in the U.S.

REQUEST NO. 3:   Documents sufficient to show Your agreements with suppliers for Components or Assemblies, including but not limited to any documents relating to and/or constituting Long Term Agreements, Master Purchase Agreements, Component Purchase Agreements, and Memoranda of Understanding applicable to any purchase of Components or Assemblies by You or on Your behalf for installation in a new Vehicle sold or leased in the U.S.

REQUEST NO. 4:   Data or documents (in the absence of data) sufficient to show the following information for each new Vehicle sold by You or on Your behalf, that was manufactured (a) in the U.S. for later sale or lease in the U.S. or (b) outside the U.S. for later sale or lease in the U.S.:

     a.      Purchaser (*e.g.*, Vehicle distributor, Vehicle dealer, or fleet purchaser) to whom the Vehicle was sold, including name, address, and other identifiers, and

         (1)     Date of sale;

         (2)     Model, model year, make, and other identifiers of the Vehicle, including VIN, and product identifier for each Vehicle sold;

         (3)     Terms and conditions of sale, including but not limited to:

             (a)     Your list or invoice price for the Vehicle (including currency and exchange rate, if applicable) to the purchaser;

             (b)     Net sale price paid by purchaser before taxes and after any adjustments to invoice price, such as dealer holdback and any other

7

manufacturer or distributor subsidies, rebates, bonuses, allowances
and Incentives issued or applied at any time;

(c) Adjustments to invoice price and Incentives or allowances issued
or applied at any time, including but not limited to, taxes,
commissions, rebates, discounts, refunds, bonuses, advertising
subsidies, floor-plan assistance, fuel allowance, dealer inspection
charge, and/or other credits or debits, and the manner in which
provided, whether by Vehicle or by total sale, and any adjustment
identifiers;

(d) Dealer holdback and model changeover allowance, if any;

(e) Amount paid at time of sale, and any remaining balance due, terms
of financing, if any, and duration of monthly or installment
payments;

(f) Shipping or freight costs, and by whom such costs were paid;

(g) Any credit associated with return or repair;

(h) Unit price (MSRP and invoice);

(i) Any offered and accepted price that is different from list;

(j) Total sales price for the transaction; and

(k) Any other terms and conditions of the sale.

(4) Terms and conditions of floor plan financing, if any, for the purchase of
the Vehicle, including interest, fees and other charges paid by purchaser;

(5) "Ship-from" and vendor "pay-to" address(es) from which the Vehicle and
invoice for it were shipped or sent to purchaser, date(s) the Vehicle and

invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the Vehicle and invoice were shipped or received, and date(s) the Vehicle and invoice were received, and location of sale;

(6)    Monetary components of the transaction beyond unit price (*e.g.*, financing, sales tax, and fees) or non-monetary components of, or Incentives for, the sale distinct from net sale price, including but not limited to, (a) any service, benefit, and/or product You received, or provided, in connection with the sale of the Vehicle, including service agreements, warranties, installation, Vehicle options, and (b) the value of each such service, benefit, or product;

(7)    Invoice date;

(8)    A transaction number, invoice number, purchase order number, or any number used to link different records;

(9)    Receipts, invoices, bills of sale, purchase contracts, as well as any product-specification requirements and purchase orders You have for these transactions;

(10)    All other information included on invoices sent to any Customer during the relevant period;

(11)    A description identifier for each Vehicle;

(12)    Manufacturer(s) and seller(s) of each Vehicle sold;

(13)    Quantity sold (units);

    b.    Retail purchaser (*e.g.*, consumer, fleet purchaser, leasing company, or other lessor), to whom the Vehicle was eventually sold or leased, including name, address, and other identifiers, and

        (1)    Date and place (including address) of sale or lease;

        (2)    Terms and conditions of sale, including but not limited to:

                (a)    MSRP and seller's (*e.g.*, Vehicle distributor or Vehicle dealer) invoice price for the Vehicle;

                (b)    Net sale price paid by purchaser (including currency and exchange rate, if applicable) before taxes and after any adjustments to list price and Incentives or allowances issued or applied at any time;

                (c)    Adjustments to list price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, rebates, discounts, refunds, credits, or allowances for vehicle trade-ins, and OEM and model, model year, VIN, and other identifiers, and mileage of vehicle for which a trade-in allowance was provided

                (d)    Amount paid at time of sale, and any remaining balance due, terms of financing, and duration of monthly or installment payments; and

                (e)    Terms of any insurance or warranties provided or sold to the retail purchaser.

    c.    For leases, name, address, and other identifiers of person or entity to whom the Vehicle was leased (*e.g.*, lessee), and:

        (1)    Date and place (including address) of lease;

        (2)    Terms and conditions of lease, including but not limited to:

(a)   Term of lease;

(b)   Capitalized cost of lease;

(c)   Capitalized cost reduction or down payment, if any;

(d)   Lessee's monthly or periodic lease payments;

(e)   Money factor, or finance or interest rate;

(f)   Depreciation and finance charges;

(g)   Mileage allowance and any excess mileage charges;

(h)   Deposits, and acquisition or inception, disposition, termination, or other fees or charges;

(i)   Actual and/or proposed residual or resale value of the Vehicle at conclusion of lease term;

(j)   List and/or negotiated amounts to be paid at inception of lease and conclusion of lease term;

(k)   Net amounts paid by lessee at inception of lease and at conclusion of lease term, including extraordinary damage to Vehicle and applicable excess mileage charges, before taxes and after any adjustments to such list and/or negotiated amounts;

(l)   Adjustments to list and negotiated amounts to be paid at inception of lease and conclusion of lease term, including but not limited to, taxes, rebates, discounts, refunds, or credits;

(m)   MSRP and seller's (*e.g.*, Vehicle distributor or Vehicle dealer) list price for the Vehicle;

11

  (n) Net sale price of the Vehicle before taxes and after any adjustments to list price and Incentives or allowances issued or applied at any time; and

  (o) Adjustments to list price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, rebates, discounts, refunds, credits, or allowances for vehicle trade-ins, and OEM and model, model year, VIN, and other identifiers, and mileage of Vehicle for which a trade-in allowance was provided.

d. Any payments, credits, distributor subsidies, rebates, bonuses, Incentives, allowances or consideration received by purchaser (*e.g.*, Vehicle distributor, Vehicle dealer or fleet purchaser) in connection with financing, warranties, insurance, service agreements, or other services or products provided to or purchased by retail purchaser (*e.g.*, consumer, leasing company, or other lessor) or lessee of the Vehicle;

e. Monetary components of the transaction beyond unit price (*e.g.*, financing, sales tax, and fees) or non-monetary components of, or Incentives, distributor subsidies, rebates, bonuses, or allowances for, the sale of the Vehicle to the retail purchaser (*e.g.*, consumer, leasing company, or other lessor) or lease of the Vehicle distinct from net sale price, including but not limited to (1) commissions, and any service, benefit, and/or product the purchaser (*e.g.*, Vehicle distributor or dealer), retail purchaser or lessee received, or provided, in connection with the sale or lease, including service agreements, or warranties, and (2) the value of each such service, benefit, or product;

12

f.     Repairs or recalls with respect to the Vehicle, nature of repair or recall, whether the Vehicle was returned, and amount of any associated payment, refund or credit;

g.     Address and other identifiers of the facility where the Vehicle was manufactured or assembled;

h.     Your actual, or if actual is not available, estimated, direct and indirect materials, manufacturing, marketing, distribution, selling, and other costs of goods sold for the Vehicle, both fixed and variable, including but not limited to, direct and indirect costs of (i) each Component and Assembly, (ii) each other part or component of the Vehicle, and (iii) management, labor, tooling, overhead, energy, materials, sales and marketing, leasing, freight, and research and development;

i.     Purchaser's (*e.g.*, Vehicle distributor's or Vehicle dealer's) actual, or if actual is not available, estimated, direct and indirect purchase, marketing, distribution, selling, leasing and other costs in connection with the purchase and sale or lease of the Vehicle, both fixed and variable, including but not limited to, direct and indirect costs of management, labor, commissions, real estate, financing, overhead, energy, and freight;

j.     Your gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements for the manufacture, sale and/or lease of the Vehicle, "cost plus" pricing, gross margin target percentages, job cost and margin reports, financial statements, and any financial Analyses performed by corporate finance personnel;

k.     Your income for each Vehicle for products or services sold by Your finance and insurance department or affiliate, including without limitation finance, insurance,

service contracts, extended warranties, and GAP insurance (broken out by units,

total dollars, finance income, insurance income, service-contract, extended

warranty, and GAP insurance income); and

l.    Purchaser's (*e.g.*, Vehicle distributor's or dealer's) gross profit, profit margin or

level, operating profit, projected profit, net profit, and/or profit-and-loss

statements for the purchase, sale to a retail purchaser (*e.g.*, consumer, leasing

company, or other lessor) and any lease of the Vehicle.

**REQUEST NO. 5:**    Data or documents sufficient to show the following information,

for each model (and each model year) for each new Vehicle sold or leased by You or on Your

behalf for sale or lease in the U.S.:

a.    The start of production date;

b.    The year when You began selling the Vehicle;

c.    The year you stopped selling the Vehicle if You no longer sell it;

d.    Your schedule of base model invoice prices; and

e.    Your schedule of MSRP.

**REQUEST NO. 6:**    VIN databases that include complete specifications for every new

Vehicle sold by You or on Your behalf for sale or lease in the U.S.

**REQUEST NO. 7:**    Documents identifying, for each year, the total number of new

Vehicles sold in the U.S. that were financed, the total dollar amount of finance income earned,

the total amount of finance reserve not yet earned, and the total amount of finance commission

paid to Vehicle dealers.

**REQUEST NO. 8:**   Documents sufficient to show the chronological progress of the prices You charged to each Vehicle dealership for each Vehicle You sold to a Vehicle dealership in the U.S.

**REQUEST NO. 9:**   For all new Vehicles sold or leased by Your Customers in the U.S. containing a Component or Assembly installed by You, all Documents relating to finance, insurance, and service contract income (broken out by units, by total dollars, by finance income, by insurance income, and by service contract income) by month.

**REQUEST NO. 10:**   Monthly or periodic reports on Your inventory levels with respect to new Vehicles intended for sale or lease in the U.S.

**REQUEST NO. 11:**   Monthly or periodic composite trend reports and expense composite reports for specific expected Vehicle sales by You or on Your behalf for sale or lease in the U.S.

**REQUEST NO. 12:**   Documents, including number, code, or data dictionaries or similar documents, sufficient to disclose, identify, describe, and explain the (a) manufacturer, supplier, vendor, and customer numbers or codes; (b) product, component, and part numbers or codes; (c) model, model platform, VIN, model project or development, and model year numbers or codes; (d) RFQ and RFQ response numbers or codes; (e) plant or facility numbers or codes; (f) Target Price, Limit Price, VE Price or VA Price, or other price numbers or codes; (g) transaction types, including standard sales, credits, debits, returns, and other adjustments related to purchases, sales and any leases of Vehicles, Components, and Assemblies; (h) contract or agreement and invoice numbers or codes; and (i) data fields, that are reflected in data or documents produced in response to these Requests.

**REQUEST NO. 13:**  Documents sufficient to disclose, identify, describe, and explain the policies, procedures, methods, standards, decision-making, guidelines, factors, and reasons for  determining, setting or revising Your prices, including without limitation MSRP and dealer-invoice price and any Incentives relating to sales provided to dealers or consumers, for the sale of new Vehicles sold or leased in the U.S.

      a.      Your studies, analyses, research, or evaluations concerning the market(s) and competitive conditions for the manufacture and sale of Vehicles, including but not limited to, competitors, market shares, market definition(s), profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends, and surveys and/or research concerning the Vehicles, models, brands, and classes of Vehicles that You compete with, including price levels and price comparisons; and

      b.      Your studies, analyses, research, or evaluations concerning how the cost of Components or Assemblies is calculated into, or otherwise impacts or influences, the ultimate price of the Vehicle to Purchasers.

**REQUEST NO. 14:**  Documents sufficient to disclose, identify, describe, and explain the policies, procedures, methods, standards, decision-making, guidelines, factors, and reasons for (i) Your purchases of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., and (ii) Your decisions to select and/or not to select particular manufacturers and suppliers of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., including but not limited to:

      a.      Your review and evaluation of potential manufacturers and suppliers and the Components and Assemblies they offer, including but not limited to, documents

16

sufficient to show comparisons of the quality and/or technological capabilities of the potential suppliers and manufacturers;

b.    Your (1) issuance of RFQs, and (2) solicitation of proposals, bids, and responses to RFQs from potential manufacturers and suppliers of Components and Assemblies, including Your consideration, solicitation or use of Target Prices, Limit Prices, cost tables or schedules (*e.g.*, standards or directives regarding the amount a supplier may charge for subcomponents of Components or Assemblies or labor used in the assembly of Components or Assemblies), or the supplier's VE Prices or VA Prices;

c.    Your review and evaluation of (1) proposals, bids, and responses to RFQs, and (2) manufacturers and suppliers of Components and Assemblies, including Your consideration of (a) estimates of input and other costs and profit margins of manufacturers or suppliers, and (b) manufacturers' or suppliers' ability to meet Target Prices, Limit Prices, anticipated or expected prices, Your cost tables or schedules, or VE Prices or VA Prices for Components and Assemblies;

d.    Variations in Vehicle price or Incentives over time or with respect to different geographic areas;

e.    Variations in Vehicle price or Incentives as affected by prices of particular competitive models or trims;

f.    Variations in Vehicle price or Incentives as affected by levels of sales or inventory;

g.    Any actual or proposed program or requirement (1) that potential manufacturers and suppliers of Components and Assemblies (a) provide engineers or other personnel or services on-site, or (b) provide or estimate their input and other costs

17

related to the manufacture and sale of Components and Assemblies that You are considering purchasing or acquiring; or (2) that such input and other costs be negotiated with, dictated by, and/or approved by You or on Your behalf;

h.      Your negotiation of (1) prices, terms, and conditions of sale, including any rebates, discounts, off-invoice discounts, or other price concessions or Incentives required from, or offered by, potential manufacturers or suppliers of Components and Assemblies, or (2) changes in prices, terms, and conditions of sale, including post-RFQ pricing (*e.g.*, cost-down pricing and Annual Price Reductions);

i.      Audits or reports of Your purchases of Components and Assemblies pursuant to International Organization for Standardization ("ISO") rules or regulations; and

j.      Your provision or disclosure to actual or potential manufacturers or suppliers of Components and Assemblies of information about prices or other terms and conditions offered or charged by other actual or potential manufacturers or suppliers.

**REQUEST NO. 15:**  Documents sufficient to disclose, identify, describe, and explain any studies, reports, analyses, policies, procedures, research, or evaluations concerning the extent (if any) that changes in costs related to Your manufacture, sale and/or lease of new Vehicles in the U.S., including but not limited to, changes in the input costs of a Vehicle (*e.g.*, Raw Material prices or prices for Components and Assemblies) and changes in costs pursuant to Annual Price Reductions, are passed on to purchasers (*e.g.*, Vehicle distributors or Vehicle dealers), retail purchasers (*e.g.*, consumers, leasing companies, or other lessors), or lessees in the sale or lease prices of Vehicles, including whether and how much (1) You pass on changes in Your costs to purchasers from You (*e.g.*, Vehicle distributors or Vehicle dealers), and (2) such purchasers pass on changes in Your costs to their customers (*e.g.*, consumers, leasing companies, or lessees).

18

**REQUEST NO. 16:**  Studies, analyses, research or evaluations concerning: (1) the impact or effect of changes with respect to Your acquisition costs for any particular Components or Assemblies or any other inputs on MSRP or on the "street prices" (*e.g.*, retail or consumer prices of Vehicles) paid by final consumers for new Vehicles sold or leased in the U.S. and (2) how You or Your retailers (*e.g.*, Vehicle dealerships or Vehicle distributors) set or adjust the prices at which new Vehicles containing Components or Assemblies are sold or leased in the U.S.

**REQUEST NO. 17:**  All studies, analyses, research, evaluations, or trade association materials concerning the market(s) in which You or other purchasers of Components and Assemblies have acquired or potentially could have acquired any such Components or Assemblies from any suppliers of such Components or Assemblies for installation in new Vehicles sold or leased in the U.S., including but not limited to studies, analyses, research, evaluations, and trade association materials concerning (a) the nature, scope, competitive conditions, degree of concentration, structure, or other significant aspects of any such market(s); or (b) the identity, size, relative market share, quality, reputation or other significant attributes of any of the participants (including both buyers and sellers) in any such market(s).

**REQUEST NO. 18:**  All documents relating to any comments, observations, suspicions, or suggestions that the market(s), market or competitive conditions, and market structure(s) for the manufacture, sale, or purchase of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., or for the manufacture, sale, purchase or lease of new Vehicles containing any such Components and/or Assemblies in the U.S. (a) may not be competitive, (b) may involve collusion between or among manufacturers and suppliers of

19

Components and Assemblies, or (c) may involve collusion between or among any OEMs, distributors, or dealerships.

**REQUEST NO. 19:**  Documents sufficient to show Your internal transfer costs, pricing, or sales of Components and Assemblies for installation in new Vehicles sold or leased in the U.S. between or among divisions or entities within Your corporate family.

**REQUEST NO. 20:**  Documents sufficient to show and describe:  (a) what systems are in place for Vehicle dealers and Vehicle distributors to report new Vehicle purchases, sales, and leases in the U.S.; (b) what other information these systems track; and (c) whether each such system includes information on OEM-to-Vehicle dealer, OEM-to-Vehicle distributor, and/or OEM-to-consumer Incentives (*e.g.*, dealer cash, customer cash, holdback, rebates, etc.).

**REQUEST NO. 21:**  All monthly, annual, and other periodic reports concerning or reflecting purchases, leases, and/or sales of new Vehicles in the U.S. by each of Your Vehicle dealerships or Vehicle distributors (*e.g.*, financial statements or dealer operating reports) and (b) all studies, analyses, or reports concerning the business performance of Your Vehicle dealerships or Vehicle distributors with respect to purchases, leases and/or sales of new Vehicles in the U.S. Both (a) and (b) should include, but not be limited to, such reports, studies and analyses concerning sales volume by make and model, prices at which dealers or distributors sold the Vehicles by make and model, and any other characteristics of those sales, as well as such dealerships' and distributors' financial results, throughput volumes, salesperson activity, market-share performance, and expected-opportunity performance.

**REQUEST NO. 22:**  All letters, memoranda, or other communications from You to all or any group of Your dealerships in the U.S. (*e.g.*, dealerships in a particular geographic region) announcing prices or changes in prices charged to the dealers for new Vehicles, setting prices or

discounts, or explaining discounts or prices for new Vehicles charged or Incentives provided to the dealers (*e.g.*, why prices went up or went down, or how prices were arrived at), including price lists from the manufacturer for new Vehicles.

**REQUEST NO. 23:**  Documents sufficient to show: (1) Annual Price Reductions or "APRs" issued to each supplier or manufacturer of Components or Assemblies for installation in new Vehicles sold or leased in the U.S. for each APR negotiation period for each such Component or Assembly and the dates of such APR requests; (2) APRs, credits, money, or other consideration received from suppliers of Components or Assemblies in connection with any negotiated price reductions and the dates of receipt; (3) the impact and traceability of APRs and APR requests to particular Components or Assemblies, including but not limited to, the methods, policies, procedures, factors, and standards for (a) how You calculate and issue APR requests issued to suppliers and manufacturers of Components or Assemblies, (b) how and when You account for or credit APRs received from suppliers, and (c) how and when any audit of suppliers' costs impact Your APR requests; (4) any variation, and the reason for the variation, between Your APR requests issued to each of the suppliers and manufacturers of a particular Component or Assembly; and (5) Your long-term cost reduction initiatives, including but not limited to, announcements, PowerPoint presentations, and supplier meetings containing information about these initiatives.

**REQUEST NO. 24:**  Documents sufficient to show, for each model of new Vehicle manufactured by You that is sold or leased in the United States, the models of Vehicles manufactured by other OEMs that You consider to be competitors and how (if at all) You considered the pricing by such other OEMs of such models in setting the price of the model manufactured by You.

21

**REQUEST NO. 25:**  Organizational charts or other documents sufficient to identify Your divisions, departments and managerial employees that have responsibility for: (a) purchasing Components or Assemblies for installation in new Vehicles sold or leased in the U.S., (b) manufacturing new Vehicles sold or leased in the U.S., (c) pricing of new Vehicles sold or leased in the U.S., and (d) sales and marketing of new Vehicles containing such Components and/or Assemblies to Your Customers for sale or lease in the U.S.

**REQUEST NO. 26:**  For all produced data extracted from a larger data system, identify (a) the software hosting the original data (including version number); (b) the process used to extract the data; and (c) the specific queries used to extract the data.  For any data that has been altered from the original form in which it was stored, produce the descriptions of any manipulations to the data fields or values, any removed data, any data summarization performed prior to production, and any other alternations that would be required to reproduce the data as originally stored.

**REQUEST NO. 27:**  All Documents and/or transactional data produced to any regulatory or governmental authority within or outside the United States as part of any investigation relating to Components or Assemblies for installation in new Vehicles sold or leased in the U.S.

**REQUEST NO. 28:**   All Documents, including but not limited to, any Studies and/or Analyses relating to Your suppliers' (including Defendants') pricing of Components or Assemblies sold to You for installation in new Vehicles sold or leased in the U.S., including Documents relating to prices and proposals submitted in response to RFQs and other requests for procurement or price changes.  Please include Documents relating to the relationship between the prices charged or submitted to You for Components or Assemblies and the prices charged or

22

submitted to other Vehicle manufacturers that purchased Components or Assemblies, including

for Components or Assemblies that are jointly sourced or for Vehicles that share platforms, share

elements, are badge-engineered, or are made for different OEMs who are involved in joint

ventures or projects.  Please also include Documents relating to the relationship or similarities

between the prices charged or submitted for Components or Assemblies for different models or

makes of Vehicles, including Vehicles You manufacture.

**REQUEST NO. 29:**  Any Documents or data You have provided to the J.D. Powers'

Power Information Network (PIN) concerning new Vehicles sold or leased in the U.S., including

but not limited to data that contains the Vehicle make, model and trim, transaction prices, costs,

and transaction dates, financing details and trade-in information.

**REQUEST NO. 30:**  All Documents concerning any agreement or understanding that

prices charged to one OEM for Components or Assemblies for installation in new Vehicles sold

or leased in the U.S. will not be below or above prices charged to another OEM, or that prices for

Components or Assemblies for installation in new Vehicles sold or leased in the U.S. must be at

a particular competitive level.

**REQUEST NO. 31:**  All Documents relating to Your or other OEMs' negotiations or

Communications with any of the Defendants or other Components or Assemblies suppliers in

connection with Defendants' and other Components or Assemblies suppliers' conduct at issue in

MDL No. 2311 and Documents Defendants or other Components or Assemblies suppliers

provided to You or other OEMs, in connection with the facts described in any Plaintiffs'

Complaints.

**REQUEST NO. 32:**  All Documents related to requests by You that Defendants or Your

other suppliers decrease prices charged, submitted or provided for any Component or Assembly

23

for installation in new Vehicles sold or leased in the U.S., and techniques used to accomplish these reductions.

**REQUEST NO. 33:**   Documents comparing the Components or Assemblies You purchase, or have purchased, for installation in new Vehicles sold or leased in the U.S. to Components or Assemblies other OEMs purchase or have purchased, as well as Components or Assemblies made by different suppliers.

**REQUEST NO. 34:**   For new Vehicles that were sold to Your Customers in the U.S. and financed by You (or any of Your related financing entities), Your disaggregated transactional data, including but not limited to the cost of each Vehicle, the dealer invoice price for each Vehicle (*i.e.*, the invoice price to Your franchise-dealer Customer), and the final sales price for the Vehicle to the end-payor (*i.e.*, the ultimate consumer of the Vehicle).

**REQUEST NO. 35:**   Documents sufficient to show the extent to which suppliers participated in the design and engineering of Components and Assemblies to be incorporated in manufacturing new Vehicle models with respect to new Vehicles manufactured or sold in the U.S.

**REQUEST NO. 36:**   Documents sufficient to show the existence of lists or compilations of OEM-approved parts suppliers, to the extent they include suppliers of Components or Assemblies for installation in new Vehicles sold or leased in the U.S., the criteria for the inclusion of a supplier on such lists or compilations, the process by which OEMs approve suppliers to be added to such lists or compilations, and the lists or compilations themselves.

## DEFINITIONS

1.      "All" also includes "each" and "any," and vice versa.

2.      "And" and "or" are to be considered both conjunctively and disjunctively, and "or" is understood to include and encompass "and," and vice versa.

3.      "Annual Price Reduction" or "APR" means annual or semi-annual price reductions or routine cost-downs applied to Components, including any long-term cost reduction initiatives.

4.      "Assembly" means a Vehicle part, module, or assembly in which a Component (as defined below) is a component, installed, or incorporated.

5.      "Component" means (as defined in Plaintiffs' various complaints) any of the following Vehicle parts (in bold):

i.      <u>Wire Harness Systems</u>:   Wire Harness Systems comprise the "central nervous system" of a Vehicle and consist of the wires or cables and data circuits that run throughout the Vehicle.  To ensure safety and basic functions (*e.g.*, going, turning, and stopping), as well as to provide comfort and convenience, Vehicles are equipped with various electronics that operate using control signals running on electrical power supplied from the battery.  The Wire Harness System is the conduit for the transmission of these signals and electrical power.

a.      **Wire Harness Products**

- **Electrical wiring**:  Electrical wiring is the wiring that runs throughout the Vehicle.

- **High voltage wiring**:  High voltage wiring is integral to Vehicles equipped with hybrid, fuel-cell or electric-powered powertrains.

- **Lead wire assemblies**:  Lead wire assemblies connect a wire carrying electrical current from the power source to an electrode holder or a group clamp.

- **Cable bonds**:  Cable bonds are the electrical connection between the armor or sheath of one cable and that of an adjacent cable or across a wire in the armor.

- **Wiring connectors**:  Wiring connectors connect various types of wires in a Vehicle.

- **Wiring terminals**:  Wiring terminals are the ends of a wire that provide a point of connection to external circuits.

- **Electrical control units**: Electrical control units are embedded modules or systems that control one or more of the electrical systems or subsystems in a Vehicle. Vehicles are equipped with a large number of electronic control units which operate various functions and exchange large volumes of data with one another.

- **Relay boxes**: Relay boxes are modules that hold the electrical switches that transit impulses from one component to another, and can be used to connect or break the flow of the current in a circuit. Once a relay is activated it connects an electrical or other data supply to a particular component or accessory.

- **Junction blocks**: Junction blocks are used as electrical connection points for the distribution power or distribution of a ground.

- **Power distributors**: Power distributors serve to distribute power at varying levels to various electrical components.

- **Speed sensor wire assemblies**: Speed sensor wire assemblies are installed on Vehicles with Antilock Brake Systems ("ABS"). The speed sensor wire assemblies connect a sensor on each tire to the ABS and carry electrical signals from the sensors to the ABS to instruct it when to engage.

- **Semiconductor devices**: Semiconductor devices are used as a Component in an Electrical control unit or other part of a wire harness systems.

ii.  **Instrument Panel Clusters**: Instrument Panel Clusters are the mounted array of instruments and gauges housed in front of the driver of a Vehicle. They are also known as "meters."

iii.  **Fuel Senders**: Fuel Senders reside in the fuel tank of a Vehicle and measure the amount of fuel in the tank. Fuel Senders consist primarily of a float and a variable resistor. The resistor measures the amount of pressure the float puts on a bar. As the fuel goes down the float goes down with it. As it dips, the electrical current in the variable resistor sends weaker electrical signals to the fuel gauge. The gauge then drops, indicating that there is less fuel in the tank.

iv.  **Heater Control Panels**: Heater Control Panels are located in the center console of a Vehicle and incorporate switches that control the temperature of the interior environment of a Vehicle. The electronic Heater Control

26

Panel product category is broken down into manual and automatic Heater Control Panels. Manual Heater Control Panels are known as low-grade while automatic Heater Control Panels are commonly referred to as high-grade.

v.   **Bearings**:  Bearings are spherical balls, rounded joints, or rotating parts that bear friction and are constructed of steel, aluminum, platinum, stainless steel, etc.

vi.   **Occupant Safety Systems**:  Occupant Safety Systems are generally comprised of the parts in a Vehicle that protect drivers and passengers from bodily harm. Occupant Safety Systems include seat belts, airbags, steering wheels or steering systems, and safety electronic systems.

- **Seat belts**:  Seat belts are safety strap restraints designed to secure an occupant in position in a Vehicle in the event of an accident.  A seat belt includes belt webbing, a buckle, a retractor, and hardware for installation in a Vehicle, and may also include a height adjuster, pretensioner, or other associated devices.

- **Airbags**:  Airbags are occupant restraints designed to control the movement of an occupant inside a Vehicle in case of an accident.  An airbag consists of fabric, an inflator, and an initiator to start the deployment, and may include an injection molded plastic cover or other associated devices.

- **Steering Wheels**:  Steering wheels aid in the control of a Vehicle.  A steering wheel may consist of a die-cast armature (frame) covered by molded polyurethane and finished with leather, wood trim, or plastic.

- **Safety electronic systems**:  Safety electronic systems are electronic systems that may help prevent accidents before they occur and/or that work with seat belts, airbags and steering wheels to mitigate the results of an accident.

vii.   **Alternators**:  Alternators are devices that charge a Vehicle's battery and power a Vehicle's electrical system when its engine is running. If an Alternator is not working correctly, a battery will lose charge and all Vehicle electrical systems will stop working.  When an Alternator is not working, it is usually replaced rather than repaired.

viii.   **Anti-Vibration Rubber Parts**:  Anti-Vibration Rubber Parts are comprised primarily of rubber and metal and are installed in Vehicles to reduce engine and road vibration.  Anti-Vibration Rubber Parts are

27

installed in suspension systems and engine mounts, as wells as other parts of a Vehicle. A Vehicle can have numerous Anti-Vibration Rubber Parts.

ix.     **Windshield Wiper Systems**: Windshield Wiper Systems are devices used to remove rain and debris from a Vehicle's windshield. Windshield Wiper Systems generally consist of an arm, pivoting at one end and with a long rubber blade attached to the other. The blade is swung back and forth over the glass, pushing water from its surface.

x.      **Radiators**: Radiators, which include radiator fans, are devices that help to prevent Vehicles from overheating. Radiators are a form of heat exchanger, usually filled with a combination of water and antifreeze, which extracts heat from inside the engine block and includes an electrical fan, which forces cooler outside air into the main portion of the radiator. The radiator indirectly exposes coolant, heated by traveling through the engine block, to cool air as the Vehicle moves. Radiators are replaced when a Vehicle consistently overheats.

xi.     **Starters**: Starters are devices powered by a Vehicle's battery to "turn over" and start the engine when the driver turns the ignition switch.

xii.    **Vehicle Lamps**: Vehicle Lamps include headlamps and rear combination lamps. A headlamp is a Vehicle Lamp installed in the front of a Vehicle that consists of lights such as headlights, a clearance lamp, and turn signals. A rear combination lamp is a Vehicle Lamp installed in the rear of a Vehicle that consists of lights such as a backup lamp, stop lamp, tail lights, and turn signals.

xiii.   **Switches**: Switches include one or more of the following: (i) the steering wheel switch, which is installed in the steering wheel of a Vehicle and is operated by the driver of the Vehicle to control functions within the Vehicle; (ii) the turn switch, which is a lever switch installed behind the steering wheel of a Vehicle and is operated by the driver of the Vehicle to signal a left or right turn and control hi/lo beam selection; (iii) the wiper switch, which is a lever switch installed behind the steering wheel of a Vehicle and is operated by the driver of the Vehicle to activate the Vehicle's windshield wipers; (iv) the combination switch, which is a combination of the turn and wiper switches as one unit, sold together as a pair; and (v) the door courtesy switch, which is a switch installed in the door frame of a Vehicle that activates the courtesy lamp inside the Vehicle when the Vehicle door opens.

xiv.    **Ignition Coils**: Ignition Coils are part of the fuel ignition system and release electric energy suddenly to ignite a fuel mixture. There are multiple types of ignition coils, such as coil on plug (including pencil style, single output, dual output, and dual output with integrated igniter), distributor-less ignition systems (including output side terminal, output top

28

terminals, and output bolt-on cassette package), and distributor-based single coils (including single output epoxy filled and single output epoxy filled with ballast resistor).

xv. **Motor Generators**: Motor Generators are electric motors used to power electric drive systems that can also capture energy from the process of stopping a Vehicle to generate electricity through regenerative braking.

xvi. **Steering Angle Sensors**: A Steering Angle Sensor is installed on the steering column of a Vehicle and may be connected to, and part of, a combination switch. It detects the angle of the Vehicle's wheels during turns and sends signals to the Vehicle stability control system, which maintains the Vehicle's stability during turns.

xvii. **HID Ballasts**: An HID Ballast is an electrical device that limits the amount of electrical current flowing to an HID headlamp, which would otherwise rise to destructive levels due to the HID headlamp's negative resistance.

xviii. **Inverters**: Inverters provide power to motors by converting direct current ("DC") electricity from a Vehicle's battery to alternating current ("AC") electricity.

xix. **Electronic Powered Steering Assemblies**: Electronic Powered Steering Assemblies include electric power steering motors, provide electronic power to assist the driver to more easily steer the Vehicle. Electric Powered Steering Assemblies link the steering wheel to the tires, and include the column, intermediate shaft, and electronic control unit, among other parts, but do not include the steering wheel or tires.

xx. **Air Flow Meters**: Air Flow Meters measure the volume of air flowing into engines and are part of the engine management systems and Vehicle sensors segment of the Vehicle market.

xxi. **Fan Motors**: Fan Motors are small electric motors used to turn radiator (see above) cooling fans.

xxii. **Fuel Injection Systems**: Fuel Injection Systems admit fuel or a fuel/air mixture into engine cylinders and may include injectors, high pressure pumps, rail assemblies, feed lines, electronic throttle bodies, throttle motors, airflow meters, engine control units, fuel pumps, fuel pump modules, manifold absolute pressure sensors ("MAP Sensors"), pressure regulators, pulsation dampers, purge control valves and other components sold as a unitary system. Fuel Injection Systems can also be sold as part of a broader system, such as an engine management system. Fuel Injection Systems are part of the powertrain segment of the Vehicle market.

29

a. **Fuel Injection Components**

- **Injectors**: Injectors atomize a pre-determined amount of fuel and delivers the fuel spray toward the intake valve based on signals from the engine ECU.

- **Rail assemblies**: Rail assemblies include the common rail system (sometimes abbreviated as "CRS"), which enables higher pressure and more precise fuel injection with its supply pump and common rail, which generates extremely high fuel pressure, and electrically controlled injectors. The common rail system is comprised of a supply pump, injectors, the engine ECU, and the rail itself.

- **Feed lines**

- **Electronic Throttle Bodies** (see below)

- **Throttle Motors**

- **Air Flow Meters** (see above)

- **Engine control units:** Engine control units are computers that send instructions to various actuators to create optimal operating conditions. The Engine ECU receives signals from various sensors to determine the appropriate instructions to send to the actuators.

- **Fuel Pumps**: Fuel pumps are part of the **Fuel Pump Module** (which also includes the fuel filter, pressure regulator, and fuel-sender gauge) and are installed in gasoline engine Vehicles. Diesel engine Vehicles do not use the conventional fuel pump. There is generally one fuel pump and one fuel pump module in the fuel injection system for gasoline engine Vehicles. However, certain gasoline engine Vehicles (those with a direct injection system) use two types of pumps as part of their fuel injection systems. The first is the standard Fuel Pump (referred to simply as the "fuel pump"), which pumps fuel up from the fuel tank and sends fuel to the engine. All gasoline Vehicles use this standard "fuel pump." The second pump, used in certain Vehicles, applies high pressure to the fuel. This type of pump is used only in Vehicles with a direct injection system. For gasoline engine Vehicles, this pump is called a "direct injection pump" or "high pressure (fuel) pump." For diesel engine Vehicles, the "pump up" function and the "apply high

pressure" function are generally combined and there is just one pump, referred to as the (conventional) "diesel injection pump," or it may be called Supply Pump for common rail systems (other terms include "VE pump" or "rotary pump" and "PFR pump"). All diesel engine Vehicles use a direct injection system, which may be (1) a "diesel conventional direct injection (not "common rail")" or (2) "diesel high pressure direct injection (*i.e.*, "common rail")." In some cases, a supplemental "pump up" type of fuel pump is added to the diesel Vehicle—it is installed in the fuel tank.

- **Manifold Absolute Pressure Sensor**: The manifold absolute pressure sensor ("MAP sensor" or "MAPS") detects the pressure of air drawn into the engine cylinder. A MAP sensor may also be equipped with an air intake temperature sensor, which is called a T-MAP Sensor.

- **Pressure Regulator**: A Pressure Regulator is a valve that regulates the pressure of fuel. Usually, a pressure regulator is installed in the fuel tank next to a fuel pump. Pressure regulators are generally installed in Vehicles with a large amount of exhaust gas as well as Vehicles that have piping to return excess fuel from the pump to the gasoline tank. Pressure regulators are occasionally sourced as part of a fuel injection system.

- **Pulsation Damper**: A Pulsation Damper is a device used to control fuel pressure changes or pulsations caused by the opening and closing of the fuel injector. The dampener absorbs these pulsations and evens out fuel delivery.

- **Purge Control Valve**: A Purge Control Valve ("PCV") is part of the purge control system, which includes the PCV and the fuel tank inner pressure sensor. The PCV opens or closes as directed by the engine control unit to control the flow of fuel vapor from the canister to the engine.

xxiii.  **Power Window Motors**: Power Window Motors are small electric motors used to raise and lower Vehicle windows.

xxiv.  **Automatic Transmission Fluid Warmers**: Automatic Transmission Fluid Warmers are devices located in the engine compartment of a Vehicle that warm the automatic transmission fluid.

xxv.  **Valve Timing Control Devices**: Valve Timing Control devices control the timing of engine valves' operation, and include the VTC actuator

31

and/or solenoid valve, and are part of the engine management system of the Vehicle market.

xxvi. **Electronic Throttle Bodies**: Electronic Throttle Bodies control the amount of air flowing into a Vehicle's engine and are a main part of an electronic throttle control system. (See above under Fuel Injection System.)

xxvii. **Air Conditioning Systems**: Air Conditioning Systems are systems that cool the interior environment of a Vehicle and are part of the thermal segment of the Vehicle market. Air Conditioning Systems, whether sold together or separately, are defined to include one or more of the following: compressors, condensers, control panels, HVAC units (typically consisting of a blower motor, actuators, flaps, evaporator, heater core, and filter embedded in a plastic housing), sensors and associated hoses and pipes.

xxviii. **Windshield Washer Systems**: Windshield Washer Systems are systems that help maintain the cleanliness of a Vehicle's windshields. When a driver activates the windshield washer assembly, a pump provides pressure to enable washer fluid to flow through a nozzle and out onto the exterior of a Vehicle's windshield. Windshield Washers include components such as the pump, hoses, nozzle and tank necessary to deliver washer fluid to Vehicle windows.

xxix. **Constant Velocity Joint Boot Products**: Constant-Velocity-Joint Boot Products are composed of rubber or plastic, and are used to cover the constant-velocity-joints of a Vehicle to protect the joints from contaminants.

6.       "Auto Parts MDL" means all cases in the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division.

7.       "Communication" or "Communications" mean and include every disclosure, transfer, transmittal or exchange of information, whether orally or in writing or otherwise, face-to-face, by telephone, fax, mail, personal delivery, e-mail, telecommunication, or otherwise.

8.       "Customer" or "Customers" mean and include any entity or person who purchases or has purchased Vehicles from You containing a Component or Assembly, including but not limited to Vehicle dealers and fleet Customers.

9.       "Defendant" or "Defendants" mean and include all entities listed in Attachment "[COMPLETE LIST TO BE INSERTED]" to this subpoena and their employees, officers, directors, agents, attorneys, affiliates, subsidiaries, joint ventures, successors, predecessors, or any person acting on their behalf.

32

10.     "Directed Buying" and "Directed Sourcing" mean the purchase or acquisition of a Component or Assembly by a manufacturer or supplier of Components or Assemblies at Your direction or by agreement with You, pursuant to terms negotiated by You or on Your behalf.

11.     "Document" or "Documents" mean and include all "writings," "recordings" or "photographs" as those terms are defined in Federal Rule of Civil Procedure 34 and Rule 1001 of the Federal Rules of Evidence. Without limiting the generality of the foregoing, the term "Documents" includes both hard copy "Documents" as well as electronically stored data files including e-mail, instant messaging, shared network files and databases. With respect to electronically stored data, "Documents" also includes, without limitation, any data on magnetic or optical storage media (*e.g.*, servers, storage area networks, hard drives, backup tapes, CDs, DVDs, thumb flash drives, floppy disks or any other type of portable storage device, etc.) stored as an "active" or backup file, in its native format.

12.     "Incentive" includes any rebate, coupon, discount, reward, bonus, spiff, or any other payment, deduction from price, allowance, or subsidy offered or provided to distributors, dealers, or consumers.

13.     "Limit Price" means a price for the purchase and sale of a Component or Assembly set by an OEM that a particular manufacturer or supplier of such Component or Assembly was asked to meet in order to sell such Component or Assembly to the OEM.

14.     "MSRP" means the manufacturer's suggested resale price.

15.     "OEM" means Vehicle original equipment manufacturer and its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, and their respective officers, directors, current and former employees, agents, representatives, attorneys, or anyone else acting or who has acted on its or their behalf.

16.     "Raw Material" means the raw materials and raw components contained in Components, including but not limited to, steel, aluminum, rubber, resin, and copper.

17.     The term "relating to" means, without limitation, the following concepts: analyzing, assessing, commenting, concerning, constituting, dealing with, discussing, describing, estimating, evaluating, evidencing, pertaining to, projecting, recording, referring to, reflecting, reporting, studying, surveying, summarizing, or otherwise involving, in whole or in part.

18.     "RFQ" means requests to purchase of any kind, including invitations to bid or submit proposals, requests to quote on development projects, and formal requests for quotation.

19.     "Studies" and/or "Analyses" mean and include all reports, memoranda, statistical compilations, slide presentations, reviews, audits and other types of written, printed, or electronic submissions of information.

20.     "Target Agreement(s)" means a contract or agreement between an OEM and a manufacturer or supplier of a Component or Assembly in which the OEM and manufacturer or supplier agree to jointly design and develop a Component or Assembly that meets a given set of performance, quality, price and delivery specifications, criteria or targets.

33

21.   "Target Price" means a price for the purchase and sale of a Component or Assembly set by an OEM that manufacturers or suppliers of such Component or Assembly were asked to meet, or the OEM's estimated, anticipated or expected price for the purchase and sale of a Component or Assembly (whether or not disclosed to actual or potential manufacturers or suppliers), including a price based on (a) the input and other costs of manufacturers or suppliers of such Component or Assembly, (b) a reasonable profit margin for such manufacturers or suppliers, (c) reductions in the price of such Component or Assembly as compared to the price of the product or a similar product that was purchased or acquired previously by the OEM, (d) post-RFQ price reductions (*e.g.*, cost-down pricing and Annual Price Reductions), (e) anticipated or expected manufacturing or production efficiencies, or (f) other factors.

"Vehicle" means an automobile or other motor Vehicle that is principally used for transporting from one to eight passengers and is designed to operate primarily on roads, typically with two or four wheels, including sedans, sport-utility Vehicles, motorcycles, and pickup trucks. In addition, to the extent that any of the Requests seek documents with respect to Wire Harness Systems or Bearings.  Vehicle also includes medium-duty (Class 4, 5, 6, & 7) trucks, heavy-duty (Class 8) trucks, buses, commercial Vehicles, construction equipment, mining equipment, agricultural equipment, railway Vehicles, and other similar Vehicles.

22.   "VE Price" and "VA Price" mean the price that was offered to an OEM by a manufacturer or supplier, or that an OEM anticipated or expected to pay, for the purchase and sale of a product after anticipated or expected reductions in costs as a result of improvements in the engineering, design, or specifications of the product.

23.   "You," "Your," and "Your Company" mean [OEM] and its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including without limitation any organization or entity that is or was subject to its management, direction, or control, together with its and their present and former directors, officers, employees, agents, representatives, or any Person acting or purporting to act on its behalf.

## INSTRUCTIONS

1.   Attached hereto is a copy of the Stipulation and Protective Order Governing Production and Exchange of Confidential Information, ECF No. 200, 2:12-md-02311-MOB-MKM (filed July 10, 2012), entered by the Court in the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division, that governs documents and information produced in the Auto Parts MDL.  You may designate documents for protection under the Protective Order.

2.   The relevant time period for each Request is 1992 through the present.

3.   To the extent documents or data relate to a particular Component or Assembly, they should be provided separately, along with any other documents relating to the same Component or Assembly.  Thus, the documents and data should not be commingled with documents and data relating to different Components or Assemblies.

      4.     You are requested to immediately meet and confer regarding the form and manner in which You will produce Documents stored electronically for the parties to avoid any unnecessary expense.