REDACTED

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In Re: **AUTOMOTIVE PARTS ANTITRUST LITIGATION** | 12-md-02311<br>Honorable Marianne O. Battani |

In Re: **WIRE HARNESS CASES**

**THIS RELATES TO:**
**All Wire Harness Cases**          2:12-cv-00100-MOB-MKM

**CERTAIN DEFENDANTS' OPPOSITION TO DELPHI AUTOMOTIVE SYSTEMS, LLC'S MOTION FOR PROTECTIVE ORDER AND CROSS-MOTION TO COMPEL DELPHI CONNECTION SYSTEMS US, INC.'S AND DELPHI AUTOMOTIVE SYSTEMS, LLC'S COMPLIANCE WITH SUBPOENAS**

**Oral Argument Requested**

REDACTED

In addition to their Opposition to Delphi Automotive Systems, LLC's Motion for Protective Order, Certain Defendants[1] ("Defendants") cross-move the Court, pursuant to Federal Rules of Civil Procedure 26(b), 37(a), and 45, for an Order compelling non-parties Delphi Connection Systems US, Inc. and Delphi Automotive Systems, LLC ("Delphi") to comply with the subpoenas *duces tecum* served on them by the Furukawa Defendants on February 23, 2016.

1.      This Cross-Motion is based upon and supported by the accompanying Brief and Declaration of Larry S. Gangnes ("Gangnes Dec."), oral argument of counsel, and such other materials as the Court may consider.

2.      For the better part of two years, Plaintiffs, the Furukawa Defendants (on behalf of Defendants), and Delphi (a former Defendant in this litigation) engaged in discussions regarding Delphi's informal production of certain documents and data with respect to Delphi's sales of Wire Harness Products[2] without the need for a subpoena.  The parties and Delphi were on the cusp of an agreement until Delphi suddenly changed course and offered to produce only limited transactional data, rather than the more extensive production of documents and data that the parties and Delphi had been discussing for months.

---

[1] "Certain Defendants" include Defendants Furukawa Electric Co., Ltd. and American Furukawa, Inc. (the "Furukawa Defendants"); DENSO Corporation; DENSO International America, Inc.; Fujikura Automotive America LLC; Fujikura Ltd.; G.S. Electech, Inc.; G.S.W. Manufacturing, Inc.; G.S. Wiring Systems, Inc.; Leoni Wiring Systems, Inc.; Leonische Holding Inc.; Chiyoda Manufacturing Corporation; Chiyoda USA Corporation; and Mitsubishi Electric Corporation; Mitsubishi Electric US Holdings, Inc.; Mitsubishi Electric Automotive America, Inc.

[2] "Wire Harness Products" are defined in the Subpoenas as they are in Plaintiffs' operative Complaints to "mean automotive wire harnesses used in Automobiles, and the following components of such wire harness or used with such wire harnesses: automobile electrical wiring, automotive wiring connectors, automotive wiring terminals, cable bonds, electronic control units, fuse boxes, high voltage wiring, junction blocks, lead wire assemblies, power distributors, relay boxes, and speed sensor wire assemblies."  (See Gangnes Dec. Ex. S at 12.)

REDACTED

3.    Following Delphi's about-face, on February 23, 2016, the Furukawa Defendants (on behalf of Defendants) served Delphi with subpoenas *duces tecum* pursuant to Fed. R. Civ. P. 45 (the "Subpoenas") for documents and data relating to Delphi's sales of Wire Harness Products.  For the most part, the Subpoenas seek the documents and data that Delphi had previously offered to produce to the parties informally and voluntarily.

4.    Following issuance of the Subpoenas, Delphi reiterated its refusal to produce anything more than limited transactional data or to discuss ways in which any burdens imposed by the Subpoenas might be mitigated, including modifying or limiting the scope of the Requests in the Subpoenas.  Delphi Automotive Systems, LLC then moved for a protective order relieving it of the obligation to make even that limited data production.

5.    The information sought in the Subpoenas is highly relevant to this litigation.  As a non-Defendant supplier of Wire Harness Products, information concerning Delphi's sales of such products could potentially be used as a "yardstick" to analyze Defendants' alleged overcharges, if any, resulting from the price-fixing conspiracy alleged by Plaintiffs and the extent, if any, of Plaintiffs' alleged damages.

6.    In addition, Delphi has not satisfied, and cannot satisfy, its burden to show that its compliance with the Subpoenas would be unduly burdensome.  Defendants have offered to retain a consultant at their expense to pull transactional data from Delphi's system, and Delphi had previously indicated that it could and would produce the other categories of documents sought in the Subpoenas, undermining any argument that such a production would be unduly burdensome to Delphi.  Defendants are also willing to enter into a cost-sharing arrangement with Delphi regarding its reasonable expenses in producing the requested discovery and to reimburse Delphi pursuant to such an arrangement once it provides a viable estimate of those expenses.  Moreover,

2

REDACTED

Delphi's concerns about confidentiality are fully addressed by the Stipulated Protective Order already entered in this litigation.

    7.    As required by Local Rule 7.1(a), counsel for the Furukawa Defendants sought concurrence from counsel for Delphi regarding this Cross-Motion on March 28, 2016.  In those email communications, counsel for the Furukawa Defendants explained the nature of this Cross-Motion and its legal basis and requested, but did not obtain, concurrence in the relief sought.

3

REDACTED

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In Re: **AUTOMOTIVE PARTS**
**ANTITRUST LITIGATION**

12-md-02311
Honorable Marianne O. Battani

In Re: **WIRE HARNESS CASES**

**THIS RELATES TO:**
**All Wire Harness Cases**

2:12-cv-00100-MOB-MKM

/

**BRIEF IN SUPPORT OF CERTAIN DEFENDANTS' OPPOSITION TO DELPHI
AUTOMOTIVE SYSTEMS, LLC'S MOTION FOR PROTECTIVE ORDER AND
CROSS-MOTION TO COMPEL DELPHI CONNECTION SYSTEMS US, INC.'S AND
DELPHI AUTOMOTIVE SYSTEMS, LLC'S COMPLIANCE WITH SUBPOENAS**

REDACTED

## CONCISE STATEMENT OF THE ISSUE

Whether the Master and the Court should deny Delphi Automotive Systems, LLC's motion for a protective order quashing or modifying the Subpoena issued to it, and should instead enter an Order requiring it and Delphi Connection Systems US, Inc. to comply with the Subpoenas served on them, which seek information regarding Delphi Automotive Systems, LLC's and Delphi Connection Systems US, Inc.'s sales of Wire Harness Products that is highly relevant to the claims and defenses in this litigation, as well as to class certification, and which are proportional to the needs of these cases?

**Answer**: Yes

REDACTED

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

Fed. R. Civ. P. 26(b)

Fed. R. Civ. P. 45

REDACTED

# TABLE OF CONTENTS

CONCISE STATEMENT OF THE ISSUE.................................................................5

CONTROLLING OR MOST APPROPRIATE AUTHORITIES .................................6

I.     PRELIMINARY STATEMENT .......................................................................1

II.    FACTUAL BACKGROUND..........................................................................3

    A.   For Nearly Two Years, Delphi Has Acknowledged It Has Relevant Documents and Has Been Negotiating the Scope of Their Production..................3

    B.   Over a Year Ago, Delphi Met with the Parties and Explained The Categories of Relevant Documents It Had in Its Possession. ..................................4

    C.   Delphi Offers to Produce Documents and Data Before Changing its Mind, Leading to the Issuance of the Subpoenas. ................................................5

III.   ARGUMENT.................................................................................................8

    A.   Delphi Bears a Particularly Heavy Burden In Showing That the Subpoenas Are Unduly Burdensome and Oppressive...........................................8

    B.   The Discovery Sought From Delphi Is Highly Relevant To The Parties' Claims and Defenses and To Class Certification............................................9

IV.   THE DISCOVERY SOUGHT IS PROPORTIONAL TO ...............................13

    A.   The Issues at Stake Are Important, and the Amount in Controversy Is Substantial..............................................................................................13

        1.   Only Delphi has access to the discovery sought.........................................14

        2.   Delphi has substantial resources. ..............................................................15

        3.   The discovery sought is highly important to resolving class certification and damages issues....................................................................15

        4.   The likely benefit of the proposed discovery outweighs Delphi's burden and expense in providing it.............................................................16

V.    DELPHI CONNECTION SYSTEMS US, INC. HAS FAILED TO TIMELY OBJECT TO OR MOVE AGAINST THE SUBPOENA ISSUED TO IT.......................19

VI.   CONCLUSION.............................................................................................20

REDACTED

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alexander v. FBI,*
   194 F.R.D. 316 (D.D.C. 2000)................................................................8, 9, 13

*Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic,*
   152 F.3d 588 (7th Cir. 1998) .........................................................................10

*Cason-Merenda v. Detroit Medical Center,*
   No. 06-15601, 2013 WL 1721651 (E.D. Mich. Apr. 22, 2013) ...............10, 11, 12

*Columbus Drywall & Insulation, Inc. v. Masco Corp.,*
   No. 2:06-MC-0034, 2006 WL 2871834 (S.D. Ohio Sept. 25, 2006)......................10

*Conwood Co., L.P. v. U.S. Tobacco Co.,*
   20 F.3d 768 (6th Cir. 2002) ..........................................................................10

*Deman Data Sys., LLC v. Schessel,*
   4:13-mc-00520, 2014 WL 204248 (M.D. Pa. Jan. 16, 2014) ...............................19

*In re Cardizem CD Antitrust Litig.,*
   200 F.R.D. 326 (E.D. Mich. 2001) ..................................................................10

*In re Dom. Drywall Antitrust Litig.,*
   300 F.R.D. 234 (E.D. Pa. 2014)......................................................................19

*In re Exxon Valdez,*
   142 F.R.D. 380 (D.D.C. 1992).......................................................................18

*In re Live Concert Antitrust Litig.,*
   863 F. Supp. 2d 966 (C.D. Cal. 2012) .........................................................10, 11

*In re Mushroom Direct Purchaser Antitrust Litig.,*
   No. 06-0620, 2012 WL 298480 (E.D. Pa. Jan. 31, 2012).................................10

*In re Subpoenas to Plains All Am. Pipeline, L.P.,*
   No. H-13-2975, 2014 WL 204447 (S.D. Tex. Jan. 17, 2014)............................8, 18

Snyder Dec., No. 2:12-md-02311-MOB, ECF No. 1247-2, ¶¶ 17-19 .........................11

*Taylor v. Universal Auto Grp. I, Inc.,*
   No. 14-mc-50, 2015 WL 1810316 (S.D. Ohio Apr. 17, 2015).................................8

REDACTED

*United States v. Blue Cross Blue Shield of Michigan,*
  No. 10-CV-14155, 2012 WL 4513600 (E.D. Mich. Oct. 1, 2012) ............................................8

*Wells Fargo Bank, N.A. v. MPC Investors, LLC,*
  No. 09-CV-11249, 2010 WL 3259371 (E.D. Mich. Aug. 2, 2010) ........................................20

## OTHER AUTHORITIES

Fed. R. Civ. P. 26 .........................................................................................................8, 9, 13

Fed. R. Civ. P. 26(b)(1) ...........................................................................................8, 9, 11, 13

Fed. R. Civ. P. 37(a)(5)(A) ................................................................................................18

Fed. R. Civ. P. 37(a)(5)(A)(ii) .........................................................................................19

Fed. R. Civ. P. 45 ............................................................................................................8

Fed. R. Civ. P. 45(d)(2) ..................................................................................................20

REDACTED

## I. PRELIMINARY STATEMENT

Certain Defendants[1] ("Defendants") oppose Delphi Automotive Systems, LLC's ("Delphi") Motion to Quash, and bring this Cross-Motion to Compel to address Delphi's recent, and surprising, decision to backtrack on nearly two years of negotiations for informal data and document production and refusal to produce certain categories of highly relevant data and documents that it had previously offered to produce without a subpoena. Delphi, like Defendants in this litigation, is a supplier of Wire Harness Products—and is thus a competitor of Defendants. Delphi, too, was formerly a Defendant in some of these cases, but the Direct Purchaser and Auto Dealer Plaintiffs voluntarily dismissed their claims against it without prejudice. Thereafter, beginning in the spring of 2014, Delphi and counsel for both Plaintiffs and Defendants discussed the scope of Delphi's voluntary production of documents and data relating to its purchases and sales of Wire Harness Products, and had seemingly come close to reaching an agreement by January 2016.

Suddenly, in February 2016, Delphi reversed course without explanation, repudiating its prior offers to produce numerous categories of documents, and proposing instead to produce only limited transactional data for its sales of only certain categories of Wire Harness Products. Defendants' efforts to engage Delphi, find out the reasons for its about-face, and attempt to resolve Delphi's (yet unknown) concerns, were met with silence.

---

[1] The joinder of other Defendants with the Furukawa Defendants in this Opposition and Cross-Motion belies Delphi's suggestion that the Furukawa Defendants alone are seeking the data, documents, and information requested in the Subpoenas. (*See* Delphi Mot. at 6, 9-10, 14.) Further, Plaintiffs are no longer joining with Defendants in seeking this discovery (*see id.* at 6, 9-10) because, unlike Defendants, Plaintiffs are unwilling to bear any costs of its production. (Gangnes Dec. ¶ 23.) But Plaintiffs are certainly *interested* in obtaining the information—the Requests in the Subpoenas track closely the documents requested *by Plaintiffs' counsel* in a letter sent to Delphi last summer. (*Compare* No. 2:12-md-02311-MOB, ECF No. 1257-5 *with* ECF No. 1257-8 at 9-13.)

REDACTED

Defendants renewed these efforts after Delphi was served with the Subpoenas—which largely track Delphi's previous tentative commitments—and offered again to discuss ways in which any burdens imposed by the Subpoenas might be mitigated, including modifying or limiting the scope of the Requests in the Subpoenas. But Defendants' efforts were rebuffed once again; Delphi's position was unchanged, necessitating this Cross-Motion.

The documents and data sought in the Subpoenas are highly relevant to this litigation. As a non-Defendant supplier of Wire Harness Products that is no longer accused of participating in the alleged price-fixing conspiracy, Delphi may prove to be a suitable comparator firm for a so-called "benchmark" or "yardstick" analysis, in which Defendants' prices for Wire Harness Products are compared to prices charged for similar products by a non-participant (Delphi) in the alleged conspiracy. Such a comparison may be used to analyze whether any overcharges by Defendants resulted from the alleged conspiracy, as Plaintiffs claim. The comparison may also be used to inform the Court's analysis as to whether any impact and damages to the putative Plaintiff classes resulting from the alleged overcharges may be determined by a common methodology—a required inquiry for purposes of class certification.

The discovery sought in the Subpoenas is also proportional to the needs of this litigation. As the Court is well aware, these cases are virtually unprecedented in scope, and the damages Plaintiffs allege are staggering. The information sought in the Subpoenas is, to a large extent, only in Delphi's possession. Delphi is a large multi-national corporation with substantial resources, and responding to the Subpoenas will not create an undue burden—a fact that Delphi essentially acknowledged when it previously offered to provide much of the information now being requested. Defendants have never refused to reimburse Delphi for its share of reasonable

REDACTED

expenses in producing the requested discovery or reach a cost-sharing agreement, and remain willing to do so once Delphi provides a viable estimate of those expenses.

Finally, Delphi need not be concerned with improper disclosure of its confidential information, as a Stipulated Protective Order with an "Attorneys' Eyes Only" provision is already in place here, and Delphi has offered no colorable reason to believe that the parties' counsel and their experts would not comply with it. The Court should therefore order Delphi Automotive Systems, LLC and Delphi Connection Systems US, Inc. to produce the data, documents and information called for in the Subpoenas.

## II.    FACTUAL BACKGROUND

### A.    For Nearly Two Years, Delphi Has Acknowledged It Has Relevant Documents and Has Been Negotiating the Scope of Their Production.

Delphi, like Defendants in these cases, is a supplier of Wire Harness Products. (*See* Direct Purchasers' Consolidated Amended Class Action Complaint, No. 2:12-md-02311-MOB, ECF No. 86, ¶¶ 23-27, 101; Automobile Dealers' Consolidated Class Action Complaint, No. 2:12-md-02311-MOB, ECF No. 85, ¶¶ 86-90, 144 ("Delphi was the third largest maker of Automotive Wire Harness Systems [in the world] as of 2009.")) Delphi Automotive Systems, LLC and several of its affiliates were previously named as Defendants in the Direct Purchaser and Automobile Dealer Actions. (*See id.*) Those Plaintiff groups, however, voluntarily dismissed their claims against the Delphi-affiliated entities without prejudice in mid-2012. (*See* Notices of Voluntary Dismissal, No. 2:12-md-02311-MOB, ECF Nos. 130, 133.)

Shortly before those dismissals, counsel for the Furukawa Defendants alerted Delphi's in-house counsel, Joseph Papelian, that the remaining Defendants would likely need discovery from Delphi. (Gangnes Dec. ¶ 5, Ex. A.) Mr. Papelian indicated that he should be the point of contact for that inquiry. (*Id.*) Accordingly, in April 2014, counsel for the Furukawa Defendants again

3

REDACTED

reached out to Mr. Papelian to discuss developments and the specific discovery needed from Delphi. (*Id.*)

In those discussions, Mr. Papelian confirmed that Delphi had provided Plaintiffs with the documents relating to Wire Harness Products that Delphi had produced to the U.S. Department of Justice ("DoJ") in connection with DoJ's investigation, and had agreed to provide Plaintiffs certain other documents they had requested. (Gangnes Dec. ¶ 6, Ex. B.)  Mr. Papelian also confirmed that Delphi's production of documents to DoJ was quite limited because Delphi had been instructed by DoJ to suspend its production long before it was completed. (*Id.* ¶ 6.) Delphi later provided those documents to Defendants. (*Id.* ¶ 10.)

After learning about the limited scope of Delphi's DoJ document production and speaking with Defendants' experts, the Furukawa Defendants provided Delphi with a list of requests for additional information that was narrower than the specific discovery Defendants had initially sought earlier in 2014. (Gangnes Dec. ¶ 7, Ex. C.)  During the remainder of 2014, counsel for the Furukawa Defendants and Plaintiffs continued to coordinate with Delphi concerning information needed by both sides in an effort to narrow their requests and obtain such discovery informally and voluntarily. (Gangnes Dec. ¶¶ 8-12.)

**B.**   **Over a Year Ago, Delphi Met with the Parties and Explained The Categories of Relevant Documents It Had in Its Possession.**

In early February 2015, and at Mr. Papelian's suggestion, representatives of Delphi met in person with counsel for both Plaintiffs and Defendants at Delphi's offices in Troy, Michigan, to provide background on Delphi's Wire Harness Products business for the purpose of guiding the discussion of the scope of a further voluntary production from Delphi. (Gangnes Dec. ¶¶ 13-14.)  Doug Gruber, Vice President of Delphi's Packard or "Wiring Products" Division, gave a presentation (using a PowerPoint document) explaining the Delphi Price Review Group

4

REDACTED

("DPRG") process, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*)

**C.      Delphi Offers to Produce Documents and Data Before Changing its Mind, Leading to the Issuance of the Subpoenas.**

Delphi and counsel for both Plaintiffs and Defendants continued to negotiate the scope of Delphi's voluntary document production.  (Gangnes Dec.¶¶ 16-18.)  By the summer of 2015, Delphi had tentatively agreed to search for and produce the following documents relating to its primary OEM customers:  its DPRG packages, purchase orders, "KE30" monthly summaries of transactional sales data, its Five-Year Revenue Plans, and policies and training relating to bidding and setting prices, subject to the parties' agreement to bear the cost of that production. (*Id.* Ex. J.)  In September 2015, the parties and Delphi also discussed hiring a third-party

REDACTED

consultant to gather more granular transactional data from Delphi's SAP database (as opposed to the "KE30" monthly sales summaries). (*Id.* ¶ 18, Ex. K.) Delphi tentatively agreed to create a list identifying the custodians of the documents it produced to DoJ in connection with its wire harness investigation. (*Id.*) On January 29, 2016, Mr. Papelian sent an e-mail to counsel for Plaintiffs and Defendants summarizing and reiterating the scope of those previous tentative agreements. (*Id.* ¶ 22, Ex. O.)

Scarcely more than a week later, Delphi abruptly executed an about-face on the nearly *two years* of previous negotiations. In an e-mail dated February 8, 2015, Mr. Papelian stated that Delphi would produce *only* transactional data for certain categories *only* (wire harnesses)[2] of the thirteen separate categories of Wire Harness Products. (Gangnes Dec. Ex. P.) Mr. Papelian said that this offer was Delphi's "final proposal in an effort to reach a compromise and supersedes all previous discussions. **In other words, Delphi does not agree to provide the remainder of the information outlined in the various telephone calls and emails regarding this subject.**" (*Id.* (emphasis added).)[3]

Counsel for the Furukawa Defendants reached out to Mr. Papelian again on February 16, 2016, in an email attaching a draft of the Subpoena and advising that Defendants still hoped to

---

[2] Delphi defines "wire harnesses" as "automotive wire harnesses, speed sensor wire assemblies, automotive electrical wiring, lead wire assemblies and high voltage wiring." (See Gangnes Dec. Ex. P. at 1.)

[3] Delphi attempts to excuse its behavior by suggesting that, unlike Fujikura Ltd. and Fujikura Automotive America LLC (the "Fujikura Defendants"), with whom Delphi was able to reach an agreement to produce documents, the other parties were unreasonable in their requests. (*See* Delphi Mot. at 9.) What Delphi leaves out, however, is that it only produced documents to the Fujikura Defendants after twice being threatened with a subpoena. (*See* Gangnes Dec. ¶ 30, Ex. V.) Moreover, the Fujikura Defendants' requests were more limited because they related to a single RFQ, the Ford CD4 RFQ, and further did not relate to this class action litigation, but rather to separate claims against the Fujikura Defendants asserted only by Ford Motor Company. (*See id.*)

REDACTED

reach agreement with Delphi to obtain the necessary discovery informally without serving the Subpoena, and were prepared to listen and attempt to accommodate Delphi's concerns, whatever they might be. (*Id.* Ex. Q.) Mr. Papelian did not respond. (*Id.* ¶ 26.)

Faced with Delphi's abrupt refusal to produce documents it had previously indicated it would provide, and its limitation of a voluntary production to a subset of data that would not be adequate for purposes of this litigation, on February 23, 2016, the Furukawa Defendants served the Subpoenas on Delphi on behalf of Defendants. (Gangnes Dec. ¶ 27, Ex. S.) The documents and data requested in the Subpoenas largely track the categories of documents and data that Delphi had previously stated it was prepared to provide:

- Transactional data regarding Delphi's sales of Wire Harness Products, as well as a "data dictionary" for deciphering that data (Request Nos. 1-3);

- Delphi's DPRG packages (Request No. 4);

- The PowerPoint presentation Mr. Gruber gave at the February 2015 meeting (Request No. 5);

- Documents concerning Delphi's purchases and sales of Wire Harness Products to or from the Direct Purchaser Plaintiffs (Request No. 6);

- Delphi's Five-Year Revenue Plans (Request No. 7);

- Purchase Orders for the sale of Wire Harness Products (Request No. 8);

- Documents regarding Delphi's policies and training regarding bidding and setting prices (Request No. 9); and

- A list of the custodians for the documents Delphi produced to DoJ, Plaintiffs, and Defendants (Request No. 10).

(See Gangnes Dec. ¶ 17, Exs. J, S.)

REDACTED

## III. ARGUMENT

### A. Delphi Bears a Particularly Heavy Burden In Showing That the Subpoenas Are Unduly Burdensome and Oppressive.

Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense" and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1) (as revised effective December 1, 2015) (the "new Rule 26").[4] A subpoena to a third party under Rule 45 is governed by the same standards as Rule 26. *See United States v. Blue Cross Blue Shield of Michigan*, No. 10-CV-14155, 2012 WL 4513600, at *5 (E.D. Mich. Oct. 1, 2012).

Once the relevance of the subpoenaed discovery is established, the burden shifts to the objecting party to show why the discovery should not be permitted. *Alexander v. FBI*, 194 F.R.D. 316, 325–26 (D.D.C. 2000). A nonparty seeking to modify a subpoena bears the burden of demonstrating that the discovery sought should be denied, and in doing so cannot merely assert that compliance would be burdensome and onerous without demonstrating the manner and extent of the burden and the injurious consequences of complying. *Blue Cross*, 2012 WL 4513600, at *5. Thus, where the Court finds that the information and documents are relevant, the nonparty "bear[s] a *particularly heavy burden* in showing that [the] subpoena[] impose[s] an undue burden." *Id* at *6 (emphasis added); *see also Taylor v. Universal Auto Grp. I, Inc.*, No. 14-mc-50, 2015 WL 1810316, at *6 (S.D. Ohio Apr. 17, 2015) (granting motion to compel subpoena requests where nonparty both failed to identify the type of burden and to provide anticipated compliance costs); *In re Subpoenas to Plains All Am. Pipeline, L.P.*, No. H-

---

[4] Although the 2015 Amendments to Rule 26 were implemented after the cases at issue were filed, they should apply here "insofar as just and practicable." *See Order of the Supreme Court of the United States Adopting and Amending Rules*, Order of April 29, 2015 (amending, *inter alia*, Fed. R. Civ. P. 26) ("Order of April 29, 2015").

REDACTED

13-2975, 2014 WL 204447, at *3 (S.D. Tex. Jan. 17, 2014) ("Regarding burdensomeness, the movant bears the burden of persuasion that 'compliance with the subpoena would be unreasonable and oppressive' . . . . This showing has been described as 'heavy.'") (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818–19 (5th Cir. 2004))).

In evaluating a subpoenaed entity's argument that requested discovery should not be permitted, new Rule 26 requires the Court to consider the proportionality of the discovery based on the following six factors:  (1) the importance of the issues at stake in the action; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of the discovery in resolving the issues; and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.  Fed. R. Civ. P. 26(b)(1).  The Advisory Committee made clear, however, that "[t]he change *does not place on the party seeking discovery the burden* of addressing all proportionality considerations." *See* Fed. R. Civ. P. 26(b)(1) Advisory Committee's Note to 2015 Amendments (emphasis added).  Rather, once the relevance of the material sought has been established, *the objecting party then bears the burden* of showing why discovery should not be permitted. *Alexander*, 194 F.R.D. at 325-26.

**B.      The Discovery Sought From Delphi Is Highly Relevant To The Parties' Claims and Defenses and To Class Certification.**

In its Motion for a protective order, Delphi Automotive Systems, LLC says that the Furukawa Defendants have "provided no reason for seeking the documents other than to broadly claim it will assist in [their] defense." (Motion at 16.)  But Delphi has never questioned the relevance of the requested discovery.  (Gangnes Dec. ¶ 32.)  Indeed, Delphi's near two-year discussions with the parties over production of the requested data and documents, and its tentative agreement to produce most of it, indicate that it well understood their relevance.

9

REDACTED

In any event, as discussed below, the information sought is highly relevant to analysis of alleged overcharges (if any) by Defendants and whether there is a common method for determining any resulting impact on the putative Plaintiff classes and damages, and to class certification. It is precisely for such reasons that courts specifically recognize the relevance, importance, and added value of nonparty discovery in the antitrust context. *See In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2012 WL 298480, at *4 (E.D. Pa. Jan. 31, 2012) (approving a third party subpoena in an antitrust matter); *see also Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 2:06-MC-0034, 2006 WL 2871834, at *2 (S.D. Ohio Sept. 25, 2006) (approving a third party subpoena in an antitrust matter because "information from a non-party participant in the market may, from a tactical standpoint, present advantages in the litigation not easily realized from parties or experts").

For example, the Subpoenas seek documents and data from Delphi that could potentially be relevant to the "yardstick test," which is a "generally accepted method[ ] for proving antitrust damages." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 20 F.3d 768, 793 (6th Cir. 2002); *see also, e.g., Cason-Merenda v. Detroit Medical Center*, No. 06-15601, 2013 WL 1721651, at *6 (E.D. Mich. Apr. 22, 2013) ("the 'benchmark' or 'yardstick' approach * * * is a 'well accepted' method of proving antitrust damages") (citation omitted); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 333 (E.D. Mich. 2001) (yardstick method is a "widely accepted economic method[ ]" for measuring antitrust damages). In the context of an alleged agreement among competitors to divide up the market, the "yardstick approach" can take the form of "comparing the defendant's prices with the prices of other sellers" who were not part of the alleged conspiracy. *Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998); *see also, e.g., In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974

10

REDACTED

(C.D. Cal. 2012) (discussing application of the "yardstick" approach in which "the average ticket price for rock concerts promoted by Defendants" was "compared * * * to the average ticket price for rock concerts promoted by other promoters").

Here, information concerning Delphi's sales of Wire Harness Products could potentially be relevant to a "benchmark," "yardstick," or "differences-in-differences" analysis of impact and overcharges, if any, and determining whether impact and Plaintiffs' damages can be measured using a common methodology and, if so, what the amount of those damages is.[5]  (*See* Snyder Dec., No. 2:12-md-02311-MOB, ECF No. 1247-2, ¶¶ 17-19.)  Delphi, like Defendants in these cases, is a supplier of Wire Harness Products, and Delphi Automotive Systems, LLC and several of its affiliates were formerly Defendants in the Direct Purchaser and Automobile Dealer actions. (*See* Direct Purchasers' Consolidated Amended Class Action Complaint, No. 2:12-md-02311-MOB, ECF No. 86, ¶¶ 23-27; Automobile Dealers' Consolidated Class Action Complaint, No. 2:12-md-02311-MOB, ECF No. 85, ¶¶ 86-90.)  By voluntarily dismissing their claims against the Delphi-affiliated entities, the Direct Purchaser and Automobile Dealer Plaintiffs have implicitly conceded that Delphi was not a participant in the alleged antitrust conspiracy.  Thus, Delphi's sales and cost data might provide the basis for a "benchmark" or "yardstick" analysis.

---

[5] To be clear, Certain Defendants do *not* concede that a "benchmark" or "yardstick" analysis is necessarily appropriate in this litigation, or that Delphi's sales would serve as an appropriate "benchmark" or "yardstick."  The "benchmark" or "yardstick" data "must be sufficiently comparable to the market under consideration to permit the conclusion that price differences are the product of antitrust violations, and not other factors."  *Cason-Merenda*, 2013 WL 1721651, at *6 (citation omitted); *see also In Re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 975 (rejecting as inadmissible a "yardstick" comparison that did "not account for *any* other possible explanation(s) for th[e] disparity" in prices between the defendants and non-defendant competitors) (emphasis in original).  But until Delphi's sales information is actually *obtained and analyzed*, it will not be possible for either side's experts to evaluate whether it can serve as an appropriate "yardstick."  Defendants are entitled to explore that possibility, even if the information ultimately shows that Delphi is not a good "benchmark" or "yardstick."  *See* Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable").

REDACTED

While Delphi has offered to produce limited transactional data regarding sales of wire harnesses (but not all Wire Harness Products) in response to the Subpoenas (see p. 6, *supra*), Delphi's offer falls far short of what would be needed to conduct a proper "yardstick" analysis. Data relating only to *certain categories* (wire harnesses) of the thirteen separate categories of "Wire Harness Products" defined in Plaintiffs' operative complaints would leave the parties without Delphi's potential "benchmark" or "yardstick" data for those other categories of Wire Harness Products.[6]

Moreover, limiting Delphi's production only to transactional *data* would omit crucial information necessary to determine if Delphi's sales are "sufficiently comparable" to the defendants' sales to be used as a valid "benchmark" or "yardstick." *See Cason-Merenda*, 2013 WL 1721651, at *6 (citation omitted). For example, as discussed above (p. 5, *supra*), ███████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████.[7] Additional documents concerning Delphi's sales to

---

[6] Despite Delphi's criticism of the scope of the Subpoenas' definition of "Wire Harness Products" (*see* Delphi Mot. at 11-12), the Subpoenas simply track the definition of "Wire Harness Products" in Plaintiffs' operative complaints—while Defendants do not agree with this definition, they must seek discovery on all products for which Plaintiffs are asserting claims.

[7] The documents Delphi produced to the Fujikura Defendants concerning Ford's Global CD4 RFQ confirm the potential relevance of the discovery sought in the Subpoenas. These documents show ████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

the Direct Purchaser Plaintiffs (Request No. 6) may provide further information concerning those sales that would not be reflected in the raw transactional data, and that could be particularly relevant to the class certification analysis regarding whether the Direct Purchase Plaintiffs' purchases and claims were typical and whether impact and their damages can be determined using a common methodology.  All of the information discussed above is highly relevant for evaluating the extent to which Delphi's sales may serve as an appropriate "benchmark" or "yardstick" for impact, damages, and class certification purposes.

## IV.   THE DISCOVERY SOUGHT IS PROPORTIONAL TO THE NEEDS OF THIS LITIGATION.

In addition to being highly relevant, the discovery sought by Defendants is proportionate to the needs of this litigation under the new Rule 26 factors.  *See* Fed. R. Civ. P. 26(b)(1) (listing factors).  Given the requested documents' and data's clear, undisputed relevance in the litigation, Delphi ultimately bears the "particularly heavy" burden of demonstrating that compliance is not proportional, *Alexander*, 194 F.R.D. at 326, yet each of the new Rule 26 factors weighs in favor of enforcing the Subpoena.

### A.   The Issues at Stake Are Important, and the Amount in Controversy Is Substantial.

The first two Rule 26 factors—the importance of the issues at stake and the amount in controversy—both weigh heavily in favor of enforcing the Subpoenas.  The scope of the Wire Harness Cases—which are themselves only one part of the larger auto parts litigations relating to thirty-two distinct auto parts—is unprecedented.  The Wire Harness Cases involve four different



. (Gangnes Dec. ¶ 33.)

REDACTED

Plaintiff groups, Ford, and nine Defendant groups. These suits potentially impact millions of consumers throughout the United States and implicate hundreds of millions of purchases and leases of vehicles over the course of the last 20 years. The amounts in controversy in the Wire Harness Cases are also substantial, implicating billions of dollars of automotive sales and leases. Settlements to date in the Wire Harness Cases *alone* total over $300 million. It is clear that both the issues at stake and the amounts in controversy here weigh in favor of compelling the discovery sought.

     **1.**      **Only Delphi has access to the discovery sought.**

     The third factor—the parties' relative access to the relevant information sought—also weighs heavily in favor of enforcing the Subpoenas. Defendants obviously do not have access to their competitor Delphi's sales information. *Some*—but not all—of Delphi's sales data may be available from OEMs, but the OEMs are themselves resisting subpoenas for that and other information. (*See* The Specified Subpoenaed Entities' Joint Opposition to the Parties Motions to Compel, No. 2:12-md-02311-MOB, ECF No. 1227.) And neither the OEMs nor any of the Plaintiffs would have access to Delphi's internal analyses of the markets for wire harness products, reflected in documents such as its DPRG packages (Request No. 4), Five-Year Revenue Plans (Request No. 7), and pricing and bidding policies (Request No. 9). Nor is there any source other than Delphi for its internal documents concerning its purchase and sales transactions with Direct Purchaser Plaintiffs (Request No. 6), the identities of the custodians of the documents it produced to DoJ (Request No. 10), or its summary sales reports (Request No. 2). Delphi's suggestion that the information sought in the Subpoenas could be obtained from "other named parties in the case" (Delphi Mot. at 17) simply ignores reality.

REDACTED

### 2.    Delphi has substantial resources.

Delphi is a large and sophisticated company with substantial resources.  Indeed, the most recent 10-K filed by Delphi's parent company, Delphi Automotive PLC, states:

> We are a leading global vehicle components manufacturer and provide electrical and electronic, powertrain and active safety technology solutions to the global automotive and commercial vehicle markets.  We are one of the largest vehicle component manufacturers, and our customers include all 25 of the largest automotive original equipment manufacturers ("OEMs") in the world.  We operate 126 major manufacturing facilities and 14 major technical centers utilizing a regional service model that enables us to efficiently and effectively serve our global customers from low cost countries.  We have a presence in 44 countries and have over 19,000 scientists, engineers and technicians focused on developing market relevant product solutions for our customers.

(Gangnes Dec.¶ 3.) The 10-K discloses that Delphi's parent had over $15 billion in revenue in each of the last three years, including net sales revenue of $15.165 billion in 2015, with U.S. sales of more than $5.5 billion; 2015 operating income of $1.723 billion; and $859 million in cash and equivalents as of December 31, 2015, with property, plant and equipment in the U.S. valued at almost $900 million (net of accumulated depreciation).  (*Id.*)  Delphi Automotive PLC's Electrical/Electronic Architecture segment designs, manufactures and sells certain Wire Harness Products, among other vehicle electrical and electronic components.  According to the 10-K, this segment had net sales revenue of $8.18 billion and adjusted operating income of $1.095 billion in 2015. (*Id.*)  Delphi cannot seriously contend that responding to the Subpoenas will have a material impact on its available resources, particularly if the parties enter into a reasonable cost-sharing arrangement.

### 3.    The discovery sought is highly important to resolving class certification and damages issues.

As discussed in Section IV. above, the discovery sought from Delphi is highly relevant to issues relating to impact, damages and class certification, including the viability and application

REDACTED

of a "benchmark" or "yardstick" analysis in determining whether there were any alleged overcharges and whether there is a common methodology for proving impact and damages to the putative classes.

### 4.    The likely benefit of the proposed discovery outweighs Delphi's burden and expense in providing it.

Delphi has not met its heavy burden to show that compliance with the Subpoenas would impose an undue burden. Delphi's complaints about the financial costs of compliance rely on what appear to be vastly overstated estimates of those costs[8], and Defendants remain willing to discuss reasonable cost-shifting proposals. Similarly, Delphi's concerns about competitive harm from disclosure of its information are vastly overblown, given that its competitors will never even *see* that information under the Stipulated Protective Order, which permits an Attorneys' Eyes Only designation for competitively sensitive information.

With respect to the request for transactional data (Request No. 1), Defendants have already offered to provide their own consultant, who is very familiar with Delphi's database platform, to pull the available data from Delphi's system. (Gangnes Dec. ¶ 28, Ex. T.) Delphi (which tentatively agreed to the use of Defendants' consultant earlier in negotiations) now says it does not want a consultant "rummaging around Delphi's files" (Delphi Mot. at 10). But running a targeted electronic query on Delphi's system (under Delphi's close supervision, if it so wishes) hardly constitutes "rummaging." Delphi admits that its only costs associated with Defendants' transactional data request would be $75 per hour for its representative to provide guidance to and answer questions for the consultant. (No. 2:12-md-02311-MOB, ECF No. 1257-11, ¶ 6.a.)

---

[8] For example, Delphi originally estimated that pre-production review of the documents sought by the Fujikura Defendants by contract attorneys retained by Delphi would cost $100,000. In the end the actual cost was $1,426. (Gangnes Dec. ¶¶ 30, 31, Exs. V at 3, W.)

16

REDACTED

Delphi claims that providing its monthly sales reports (Request No. 2) would take 160 hours and cost Delphi $12,000. (No. 2:12-md-02311-MOB, ECF No. 1257-11, ¶ 6.b.) Those estimates are difficult to credit given that Delphi has represented it has data going back only to 2006—meaning that there could be no more than approximately 120 monthly reports. In addition, the sample report Delphi readily provided during the parties' negotiations does not appear to include any data or information that would require a review for privilege or other substantive concerns. (Gangnes Dec. ¶ 18.)[9]

Delphi claims that producing the DPRG packages (Request No. 4) would take between 80 and 160 hours and cost between $6,000 and $12,000, with additional costs associated with a privilege review. (No. 2:12-md-02311-MOB, ECF No. 1257-11, ¶¶ 6.c.-d.) But Delphi's estimates are again difficult to credit given that Delphi has *already searched for and identified* 28,000 documents concerning DPRG Packages generated prior to 2011 that are located on a single server. (Gangnes Dec. ¶ 18.) Thus, much of the work Delphi includes in its estimate has already been done, yet Delphi refuses to produce even those documents it has already found that are responsive to this Request.

Delphi's Five-Year Revenue Plans (Request No. 7), purchase orders (Request No. 8), documents concerning its purchases from and sales to particular identified customers (Request No. 6), and policies and training regarding bidding and setting prices (Request No. 9) are clear, discrete categories of documents should not be overly difficult to gather or produce, and Delphi makes no attempt to show that producing those materials would be burdensome. Indeed, Delphi previously tentatively agreed to provide almost all of those documents (as well as the monthly sales reports and DPRG packages discussed above) during the parties' negotiations. Likewise,

---

[9] See note 8, *supra*.

REDACTED

Delphi does not and cannot contend that a list of definitions for product or other data codes (Request No. 3), a list of custodians for documents previously produced (Request No. 10), or a single PowerPoint presentation (Request No. 5) would be burdensome to produce.

Delphi also asserts that it lacks custody or control over some of the information requested in the Subpoenas (No. 2:12-md-02311-MOB, ECF No. 1257-11, ¶ 6.e.). If that is the case, then Delphi is under no obligation to produce that information, and it bears no burden whatsoever as to those categories of documents (if any).

In any event, to the extent the Court concludes compliance of the Subpoenas will have a substantial financial cost that Delphi should not bear alone, Defendants remain open to reasonable cost-shifting proposals, provided that Delphi provides a viable estimate of what the costs of compliance are expected to be. Delphi complains that the Furukawa Defendants "balked" at Delphi's request that they reimburse Delphi's production costs (Delphi Mot. at 14), but that is simply untrue. While the Furukawa Defendants did not offer a blank check to cover Delphi's costs in the absence of any estimate of what those costs might be, Defendants (unlike Plaintiffs) have never refused to consider reasonable cost-shifting. (Gangnes Dec. ¶ 23.) But Delphi's insistence that the parties requesting the information bear *all* of the costs of its production is not reasonable. Courts routinely order subpoenaed non-parties to bear at least a share of the production costs. *See, e.g., In re Exxon Valdez*, 142 F.R.D. 380, 382-84 (D.D.C. 1992) (ordering third party to bear 29 percent of the total cost of subpoena compliance, the percentage as the portion of the third party's income attributable to payments by the defendants).[10]

---

[10] Delphi's demand that it also be awarded reimbursement of its costs and attorney's fees in filing its Motion is similarly unjustified. (*See* Delphi Mot. at 24.) Federal Rule of Civil Procedure 37(a)(5)(A) provides that even a successful movant may be barred from recovering its

REDACTED

Finally, Delphi repeatedly expresses concern with maintaining the confidentiality of its information from its competitors.  (Delphi Mot. at 12, 16-17, 19-20.)  But the Court has already entered a Stipulated Protective Order in this case that would permit Delphi to designate competitively sensitive information "Attorneys' Eyes Only," thus ensuring its competitors would never see it.  Courts have repeatedly acknowledged that such orders can adequately address the types of concerns Delphi raises.  *See, e.g., In re Dom. Drywall Antitrust Litig.*, 300 F.R.D. 234, 246-47 (E.D. Pa. 2014) (ordering production of information deemed confidential by subpoenaed third party); *Deman Data Sys., LLC v. Schessel*, 4:13-mc-00520, 2014 WL 204248, at *5-6 (M.D. Pa. Jan. 16, 2014) (instituting protective order designating specific tiers of information as "attorneys' eyes only" and recognizing use of filing under seal to protect against misuse of trade secrets).  Delphi's confidentiality concerns ring especially hollow given its prior productions of its DoJ and other documents to Plaintiffs, Defendants, and most recently to the Fujikura Defendants.  Delphi has not shown that its confidentiality concerns make compliance with the Subpoenas unduly burdensome.[11]

## V. DELPHI CONNECTION SYSTEMS US, INC. HAS FAILED TO TIMELY OBJECT TO OR MOVE AGAINST THE SUBPOENA ISSUED TO IT.

Although Delphi Automotive Systems, LLC and Delphi Connection Systems US, Inc. were each served with a separate Subpoena (*see* Gangnes Dec. Ex. S), only Delphi Automotive

---

costs where the opposing party's position was "substantially justified."  Fed. R. Civ. P. 37(a)(5)(A)(ii).  As discussed at length in this Cross-Motion, Defendants have demonstrated a substantial need for the materials sought in the Subpoena, and have negotiated in good faith and at great length to seek Delphi's agreement to produce the materials.  Under these circumstances, Delphi would not be entitled to recover its costs and fees even if it were to prevail on its Motion.

[11] Delphi's suggestion that the Furukawa Defendants would not abide by the terms of that order based on a years-old and completely unrelated dispute between them and Delphi (*see* Delphi Mot. at 12 n.2, 17) is disingenuous at a minimum, and frankly, beyond the pale.  The Furukawa Defendants' counsel take their legal and ethical obligations seriously, and would never disclose information designated "Attorneys' Eyes Only" to persons not authorized to see it.

19

REDACTED

Systems, LLC has moved for a protective order quashing the Subpoena issued to it.  Delphi
Connection Systems US, Inc. has neither moved against the Subpoena nor objected to it within
the 14 days permitted by Fed. R. Civ. P. 45(d)(2).   (Gangnes Dec. ¶ 27.)   The date for
compliance with that Subpoena has now passed. (*See id.*, Ex. S.)  Therefore, Delphi Connection
Systems US, Inc.'s time to challenge the Subpoena issued to it has also passed, and it must
comply. *See Wells Fargo Bank, N.A. v. MPC Investors, LLC*, No. 09-CV-11249, 2010 WL
3259371, at *2 (E.D. Mich. Aug. 2, 2010) (to be "timely," a motion to quash must be "made at or
before the date specified in the subpoena for compliance").

## VI.   CONCLUSION

For the foregoing reasons, Certain Defendants respectfully request that the Court deny
Delphi Automotive Systems, LLC's motion for protective order, and instead enter an Order
requiring Delphi Automotive Systems, LLC and Delphi Connection Systems US, Inc. to comply
with the Subpoenas.

REDACTED

Respectfully submitted,

LANE POWELL PC

March 31, 2016                     By:   /s/Larry S. Gangnes
                                         Larry S. Gangnes
                                         Heidi B. Bradley
                                         LANE POWELL PC
                                         U.S. Bank Centre
                                         1420 Fifth Ave., Suite 4200
                                         P.O. Box 91302
                                         Seattle, WA 98111-9402
                                         Telephone: (206) 223-7000
                                         Facsimile: (206) 223-7107
                                         gangnesl@lanepowell.com
                                         bradleyh@lanepowell.com

                                         Craig D. Bachman
                                         Kenneth R. Davis II
                                         Darin M. Sands
                                         Masayuki Yamaguchi
                                         Peter D. Hawkes
                                         LANE POWELL PC
                                         MODA Tower
                                         601 SW Second Ave., Suite 2100
                                         Portland, OR 97204-3158
                                         Telephone: (503) 778-2100
                                         Facsimile: (503) 778-2200
                                         bachmanc@lanepowell.com
                                         davisk@lanepowell.com
                                         sandsd@lanepowell.com
                                         yamaguchim@lanepowell.com
                                         hawkesp@lanepowell.com

                                         Richard D. Bisio (P30246)
                                         Ronald S. Nixon (P57117)
                                         KEMP KLEIN LAW FIRM
                                         201 W. Big Beaver, Suite 600
                                         Troy, MI 48084
                                         Telephone:  (248) 528-1111
                                         Facsimile:  (248) 528-5129
                                         richard.bisio@kkue.com
                                         ron.nixon@kkue.com

                                         *Attorneys for Defendants Furukawa Electric
                                         Co., Ltd. and American Furukawa, Inc.*

REDACTED

WILMER CUTLER PICKERING HALE AND
DORR LLP

March 31, 2016                    By:   */s/Steven F. Cherry* (w/consent)
                                        Steven F. Cherry
                                        David P. Donovan
                                        Brian C. Smith
                                        Kurt G. Kastorf
                                        WILMER CUTLER PICKERING HALE AND
                                        DORR LLP
                                        1875 Pennsylvania Avenue, N.W.
                                        Washington, D.C. 20006
                                        Telephone: (202) 663-6000
                                        Fax: (202) 663-6363
                                        steven.cherry@wilmerhale.com
                                        david.donovan@wilmerhale.com
                                        brian.smith@wilmerhale.com
                                        kurt.kastorf@wilmerhale.com

                                        *Attorneys for Defendants DENSO International
                                        America, Inc. and DENSO Corporation*

                                        Steven M. Zarowny (P33362)
                                        General Counsel
                                        DENSO International America, Inc.
                                        24777 Denso Drive
                                        Southfield, MI 48033
                                        Telephone: (248) 372-8252
                                        Fax: (248) 213-2551
                                        steve_zarowny@denso-diam.com

                                        *Attorney for Defendant DENSO International
                                        America, Inc.*

22

REDACTED

ARNOLD & PORTER LLP

March __, 2016

By:  _/s/James L. Cooper_  (w/consent)
James L. Cooper
Michael A. Rubin
Katherine Clemons
Stephanie L. Fine
ARNOLD & PORTER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (facsimile)
james.cooper@aporter.com
michael.rubin@aporter.com
katherine.clemons@aporter.com
stephanie.fine@aporter.com

Joanne Geha Swanson (P33594)
Fred Herrmann (P49519)
Matthew L. Powell (P69186)
KERR, RUSSELL AND WEBER, PLC
500 Woodward Avenue, Suite 2500
Detroit, MI  48226
(313) 961-0200
(313) 961-0388 (facsimile)
jswanson@kerr-russell.com
fherrmann@kerr-russell.com
mpowell@kerr-russell.com

*Attorneys for Defendants Fujikura Ltd. and
Fujikura Automotive America LLC*

REDACTED

O'MELVENY & MYERS LLP

March 31, 2016    By:    */s/Michael F. Tubach*  (w/consent)
Michael F. Tubach
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: (415) 984-8700
Fax: (415) 984-8701
Mtubach@omm.com

Michael R. Turco (P48705)
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, MI 48009
Telephone: (248) 971-1713
Fax: (248) 971-1801
turco@bwst-law.com

*Attorneys for Defendants Leoni Wiring Systems, Inc. and Leonische Holding, Inc.*

March 31, 2016    PORTER WRIGHT MORRIS & ARTHUR LLP

By:    */s/ Donald M. Barnes* (w/consent)
Donald M. Barnes
Jay L. Levine
John C. Monica
Molly S. Crabtree
Karri N. Allen
PORTER WRIGHT MORRIS & ARTHUR LLP
1919 Pennsylvania Ave., NW, Ste 500
Washington, DC 20006
Telephone: (202) 778-3054
Facsimile: (202) 778-3063
dbarnes@porterwright.com
jlevine@porterwright.com
jmonica@porterwright.com
mcrabtree@porterwright.com
kallen@porterwright.com

*Attorneys for Defendants G.S. Electech, Inc., G.S.W. Manufacturing, Inc., and G.S. Wiring Systems, Inc.*

REDACTED

March 31, 2016

TORYS LLP

By:  */s/ David Wawro* (w/consent)
David Wawro
TORYS LLP
1114 Avenue of the Americas, 23rd Floor
New York, New York 10036
Phone:  (212) 880-6288
Fax:  (212) 682-0200
dwawro@torys.com

*Attorneys for Defendants Mitsubishi Electric
Corporation, Mitsubishi Electric US Holdings,
Inc., and Mitsubishi Electric Automotive
America, Inc.*

WARNER NORCROSS & JUDD LLP

March 31, 2016

By:  */s/ William R. Jansen* (w/consent)
William R. Jansen (P36688)
Michael G. Brady (P57331)
Amanda M. Fielder (P70180)
WARNER NORCROSS & JUDD LLP
2000 Town Center, Suite 2700
Southfield, MI 48075-1318
Phone: 248-784-5000
wjansen@wnj.com
mbrady@wnj.com
afielder@wnj.com

Michael Martinez
Steven Kowal
Lauren Norris
Lauren Salins
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Phone: 312-807-4404
Fax: 312-827-8116
michael.martinez@klgates.com
steven.kowal@klgates.com
lauren.norris@klgates.com
lauren.salins@klgates.com

*Attorneys for Chiyoda Manufacturing
Corporation and Chiyoda USA Corporation*

25

REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2016, I caused the foregoing **CERTAIN DEFENDANTS' OPPOSITION TO DELPHI AUTOMOTIVE SYSTEMS, LLC'S MOTION FOR PROTECTIVE ORDER AND CROSS-MOTION TO COMPEL DELPHI CONNECTION SYSTEMS US, INC.'S AND DELPHI AUTOMOTIVE SYSTEMS, LLC'S COMPLIANCE WITH SUBPOENA** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/Larry S. Gangnes*
Larry S. Gangnes

709315.0013/6629653.5