**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS<br>ANTITRUST LITIGATION | |
| ALL PARTS | Case No.: 12-md-02311<br>Honorable Marianne O. Battani |
| THIS RELATES TO: ALL CASES | |

## NON-PARTY FCA US LLC'S "SHORT STATEMENT OF OPPOSITION" TO THE PARTIES' RENEWED MOTIONS TO COMPEL

Pursuant to the schedule set by the Special Master, Non-Party FCA US LLC ("FCA US") submits the following "short statement of opposition" to the parties' renewed motions to compel filed on November 8, 2016. *See* Williams Decl. (ECF 1499) ¶ 9. FCA US will file its full opposition brief on November 22nd as necessary and in accordance with the schedule. *Id.*

### A. The Meet and Confer Process Was Cut Short

In their rush to establish an expedited briefing schedule, the parties approached the meet and confer process with the purpose of reaching impasse rather than agreement. After the depositions, their first proposal called for everything in every system or repository ever mentioned by FCA US's deponents, with no regard for burden or accessibility. Doing so was consistent with the strategy laid bare by the deposition process, in which the parties assiduously *avoided* inquiring into burden (though determining it was *the point* of the depositions). As described below and in FCA US's letters to the parties, FCA US, in contrast, made a substantial

offer of production that, while still imposing significant burden, covers each category of the parties' "Narrowed List" (Williams Decl. ¶ 8) and reduces the burden the parties sought to impose through their subpoena. In exchange, FCA US asked for an agreement that its reasonable costs and attorneys' fees would be covered as provided by Rule 45, and that its offer would satisfy its obligations under the subpoena.

The parties refused and declared impasse. But the parties are unable to point to any category of information absent from FCA US's offer for which they have a substantial need. Instead, their renewed motion seeks unneeded extras. Yet with each additional request, the parties increase the burden on FCA US unjustifiably. Accordingly, the only open issue should be cost shifting.

### B.     No Showing of Substantial Need

Denso has moved to stay upstream OEM discovery in light of settlements and summary judgment motions in the *Wire Harness* case, making the discovery "entirely unnecessary." ECF 323 at 4. In other words, the parties do not really need all the information they continue to request and recognize the burdens they impose. The premise of the Denso motion is that any OEM discovery at this time would "waste judicial resources and impose potentially large expenses on the OEMs ...." *Id.* at 4, 7. Indeed, Denso does not seek *any* OEM discovery at this point, conceding "the necessary scope of any such discovery is highly uncertain at this time because even party discovery in those cases has not started." *Id.* at 7. Denso admits that for many of the cases, the parties have not even conducted Rule 26(f) conferences or engaged in initial party discovery. *Id.* at 5. As the Special Master is well-aware, Denso is no fringe defendant whose needs might be lighter than other defendants; the record discloses that Denso has frequently acted as *lead* defendant across these proceedings.

2

Likewise, the auto-dealer plaintiffs ("ADPs") have defected from the parties, and do not join their renewed motion. ECF 1495 at n.2. Were it really necessary, the ADPs would surely be seeking the same upstream discovery and most of the same downstream discovery the end-payors seek. Finally, the direct purchaser plaintiffs ("DPPs") have *never* joined in the Subpoena or these motions. Again, if the discovery demanded was needed for class certification, liability, or damages, the DPPs surely would join these requests.

Denso's motion, and the refusal of two of the three plaintiff classes to seek the discovery, shows that the parties lack a substantial need for the information they are requesting. On that basis alone, the subpoena could be quashed. But FCA US has no interest in being subjected to the possibility of renewing this process over and over again as various parties come to the conclusion they need some information. Instead, FCA US has crafted an offer of production that should meet the parties' legitimate needs, and should satisfy FCA US's obligations under the subpoena.[1]

---

[1] In lieu of making a showing of need, the Parties try to make their point anecdotally by rehashing the same set of indirect purchaser cases they have described previously. P. Br. 13-15; Williams Decl. at ¶¶ 13, 21. The SSEs have already explained that the Parties' descriptions are inaccurate. ECF 1227 at 27 n.27. Indeed, in prior briefing discussing these very cases, the EPPs correctly observed that "while discovery was taken of certain intermediaries in the sales chains, **nearly all of those entities were parties** to the actions. In addition, the discovery of those intermediaries was generally on a **macro level – not individual transaction level**…" 12-cv-103, Dkt. 386 at 3. The SSEs' citations bear this out. ECF 1227 at 27 n.27. The parties' only new citation is to the *Batteries* case, which is even more misleading. Williams Decl. at ¶ 21. The Parties contend that "[t]he court rejected [Bosch's burden and relevance] arguments and ordered production of the requested data." *Id.* In fact, the indirect purchasers there sought **more than ten years** of data from Bosch, which the Court cut back by 80%, to two years. *Compare id* at Ex. B (parties' letter) at 5-6 ("the IPPs demand transaction-level data … from January 1, 2000 through May 31, 2011 (the "Relevant Period"), a period spanning more than a decade") *with* Ex. B (Order by Judge Ryu) ("Bosch shall produce requested purchase and sales data … for 1/1/2010 through 12/31/2011."). The Parties' attempt to use a decision some among their counsel *lost* should be disregarded.

### C.     FCA US's Offer of Production

After the depositions, the parties inquired about three categories of information: (1) Purchase and Procurement; (2) Cost and Pricing; and (3) Sales.  Williams Decl. ¶ 8.  So FCA US offered to produce accessible information in each area:

1. Purchasing: data for as far back as maintained in FCA US's PentaSAP and COMPASS systems – approximately 2001.

2. Procurement: RFQ data for as far back as maintained in FCA US's webRFQ system – approximately 2003.

3. Cost: Product Cost Studies for as far back as maintained in FCA US's PCS system – approximately model year 2011.

4. Pricing: Product Committee PowerPoint presentations with pricing information for as far back as maintained in FCA US's EMMS system – approximately 2009.

5. Pricing / Sales: Code Guides with MSRP and invoice prices for as far back as FCA US maintains them – approximately model year 2007.

This offer is more than enough to satisfy the parties' needs.  It will provide reasonably accessible purchasing and RFQ data, as well as cost and pricing information responsive to the parties' requests.  Conspicuously absent from the parties' renewed motion is a claim of need, let a substantial need, for anything more.

### D.     Purchasing Data

The parties accepted FCA US's offer of purchasing data.  Though listed as a "request at impasse," the parties identify no such thing.  They asked for a set of fields "to the extent available;" FCA US responded that they would be included "to the extent available."  Klein Decl. ¶ 17.

E.      **Procurement Data**

The parties also accepted FCA US's offer of procurement RFQ data.  The only point of "impasse" is whether FCA US should be forced to search a second system for two additional years of data on top of the thirteen FCA US offered to produce.  The parties cite to the deposition testimony of Mr. Lynch as support for their contention that two more years of RFQ data exists, but there is no such testimony.  There is no dispute that RFQ data in FCA US's webRFQ system goes back to 2003.  Mr. Lynch was asked, "Is there a predecessor system?"  Answer: "*No.*" Lynch Tr. at 70.  Yet the parties continue to seek RFQ data from a system called COMPASS, insisting the data there goes back to 2001.  *Purchasing* data in COMPASS goes back to 2001, but as FCA US explained to the parties, RFQ data in COMPASS is more limited, going back to 2004.  FCA US Nov. 6th Ltr. at 2.

Thus, FCA US has offered to produce the most robust set of RFQ data reasonably available.  Ignoring their admitted obligation to "avoid imposing undue burden," Fed. R. Civ. P. 45, the parties still declare impasse.

F.      **"Pre-RFQ Documents"**

Neither the parties' renewed motion nor the accompanying Williams Declaration mention the "target prices" or the "pre-RFQ" sourcing recommendations that the parties seek from FCA US.  That is because such information is ancillary at best to the parties' claims and defenses. They make no claim that this information is actually needed.  Indeed, it holds no relevance to the issues of pass-through or the existence of a price fixing conspiracy.

FCA US's internal target prices would not shed any light on the prices FCA US actually paid or whether those prices were passed through to vehicle sales.  The parties do not deny that FCA US has offered to produce information that actually *is* relevant to those issues.  Despite this,

5

and despite recognizing the burden associated with searching for and producing target prices, the parties continue to press their request.  They are well aware that their offer to stagger production and begin with certain lead parts is no compromise and does not lessen any burden, as the SSEs have informed the parties of this reality since negotiations began.

Pre-RFQ sourcing recommendations also have no relevance to the existence of price fixing or to pass-through of prices, and would be extremely burdensome to collect.  As Mr. Lynch testified, locating sourcing recommendations before 2013 is "part of the problem" because it would involve the near-impossible task of identifying possible custodians and repositories over the past couple decades.  Lynch Tr. at 80.[2]

The parties point to no substantial need that could overcome such undue burden.  Indeed, they are irrelevant.  "[S]ourcing recommendation documents" would reflect "reject[ion of] technical proposal[s]" or "quality problems."  Lynch Tr. at 77-79.  By definition, pre-RFQ recommendations are unrelated to price, which is what these cases are about.  What matters is what happens *after* an RFQ is issued.  Such *post*-RFQ recommendations would be included in the RFQ data FCA has offered to produce.  Mr. Lynch explained, "[A] lot of that information that's in those sourcing recommendations is in webRFQ, so we can at least go back to webRFQ, and, as I mentioned before, you know, the buyers can enter in free text into webRFQ as well in terms of what supplier they're going to recommend and why."  Lynch Tr. at 80.  The parties cannot demonstrate any legitimate need for an additional search for sourcing recommendations.

---

[2] The parties claim Mr. Lynch can nonetheless locate sourcing recommendations, but that claim is conspicuously without citation.

**G.**     **Agreements With Auto Parts Suppliers**

The parties request all of FCA US's agreements with auto parts suppliers without regard to relevance, substantial need, or burden.  They concede that they have agreements produced from defendant suppliers; but *plaintiffs* don't trust that they have "all" such agreements.  Klein Decl. ¶ 24.  That is not a basis to impose discovery burdens on a non-party.  Indeed, the parties' purported willingness to accept a "sample set" belies any claimed need for "all" supplier agreements, or even non-defendant supplier agreements.

The parties argue FCA US's offer would not reflect "all relevant terms," but they do not contest that any payment or pricing terms – again, the issue of relevance – would be reflected in the purchasing and RFQ data FCA US has offered to produce.  The parties do not identify what other "relevant terms" they could be missing given FCA US's offer of production and the fact that they already have agreements produced by defendants.

The parties' request would require a manual search and review of systems like GEN-008 in order to locate documents the parties either already have or do not need.  There is no basis for FCA US to undertake the burden of searching for, collecting, and reviewing all supplier agreements over the past two decades.

**H.**     **Cost Data**

There should be no dispute as to FCA US's offer of production regarding cost data.  The parties request "all reasonably available Product Cost Studies."  That is what FCA US has offered to produce.  The fact that the reasonably available cost studies do not cover the entire alleged class periods does not create impasse – it means FCA US has offered to produce what it has.

7

The parties' suggestion to "only" conduct a targeted search within FCA US's senior managers' files is without basis. At deposition, Mr. Novak identified the FCA employee, Mr. Haas, with responsibility for product cost studies, but he did *not* testify that Mr. Haas's files would contain any more product cost studies than FCA US has offered to produce. To the contrary, Mr. Novak's testimony was that Mr. Haas has access to the system where product cost studies are housed – the very system from which FCA US has offered to produce. Novak Tr. at 114.

The parties also seek VIN-level cost data, but they do not claim that FCA's offer is insufficient. Their only support is that they are "seeking input-by-input data." That is not a reason to impose discovery burdens, particularly when those burdens implicate some of the most sensitive information in FCA US's files. Indeed, the law and economics are to the contrary. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 555090, at *4 (N.D. Cal. Feb. 21, 2012) ("[p]laintiffs need not identify the overcharge on each and every panel sold to direct purchasers, and they need not trace that specific overcharge through the manufacturing and retail chains to the ultimate purchaser."); Dr. McDonald Decl. (ECF 1227-20) at ¶¶ 20-21 (explaining that an economic analysis of pass-through just requires estimating the relationship between price and *gross* cost, not input-by-input).

The parties do not address the law or the economics. They have shown no legitimate need for FCA US to search for, collect, review, and produce additional cost data. Indeed, the "input-by-input" data they request is so voluminous, it is only maintained for one or two years. FCA US Nov. 6th Ltr. at 4. Furthermore, compiling the kinds of reports Mr. Novak described at deposition requires weeks of effort for just a handful of VINs. *See* Novak Tr. at 139; FCA US Oct. 23rd Ltr. The parties have identified no substantial need to justify imposing the burden of

8

producing this kind of data that is (1) extremely sensitive and (2) does not begin to cover the alleged class periods.

## I.    **Downstream Pricing**

There should be no impasse regarding FCA US's offer to produce MSRP and invoice prices from model year 2007.  The parties request more, though they know from deposing Mr. Novak that FCA US's offer encompasses MSRP and invoice information as far back as maintained.  Novak Tr. at 45 ("Q. Is there any other data or system I can use to find out the MSRP and the wholesale price prior to the seven years? Prior to 2009? A. I do not believe so.").  The parties then simply accept FCA US's offer pertaining to Product Committee PowerPoint presentations.  There is no impasse there.

## J.    **Vehicle Sales Data**

FCA US has offered to produce everything the parties could legitimately need to conduct a pass-through analysis: cost and price information at the model and trim levels.  The parties do not claim their experts are unable to use this information, yet they seek more.

At deposition, Mr. Novak's answered all the parties' questions about the availability of transaction-level sales data to dealers.  The answer, as the parties concede, is that such data exists but is not accessible in a reportable format.  That is simply the nature of FCA US's systems.  Yet the parties fault FCA US for "fail[ing] to provide further information on whether an alternative system exists."  There is nothing to fault.  Indeed, Mr. Novak testified that "CVI is the only place that would hold" VIN-specific sales data."  Novak Tr. at 44-45.  FCA US provided a knowledgeable deponent who personally spent 20 hours preparing, not including the work Mr. Novak's staff put into gather information about the various systems that could possibly be

implicated by the parties' subpoena.  Novak Tr. at 23.  The parties do not fault Mr. Novak's preparation or identify any question he was unable to adequately answer.

It is not FCA US's fault that the parties may not be happy with the reality that vehicle sales data is not accessible, and it is certainly no basis for a motion to compel.

### K.   <u>Vehicles Received from FCA Italy</u>

FCA US has offered to produce MSRP and invoice information for all models and trim levels for as far back as maintained.  It has offered to produce model and trim-level cost data for as far back as maintained.  Such a production would cover millions of vehicles.

Yet in seeking impasse rather than agreement, the parties continue to seek information relating to 150,000 vehicles from FCA Italy.  The parties make no representation of need for this information.  Indeed, such a small subset of data would not impact the regressions the parties' experts would run with the data FCA US has already offered.  *See* Dr. McDonald Decl. at ¶¶ 12-14.  There is no need to impose additional discovery burdens, particularly in light of FCA US's offer of production.

### L.   <u>Request No. 31</u>

The plaintiffs have renewed their demand for FCA US's internal settlement deliberations, settlement-related communications with defendants, and communications with non-defendant suppliers about these cases, if any.  The SSEs have explained why this information is non-discoverable on its face.  ECF 1227 at 35-37.

In short, FCA US's internal deliberations are protected by the attorney client privilege, the attorney work product doctrine, and the binding law of the Sixth Circuit.  *See id.,* Fed. R. Civ. P. 26(b)(3)(A) ("a party may not discover documents … prepared in anticipation of litigation."); *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 982-83

(6th Cir. 2003).  As for external communications with defendants, *Goodyear* plainly controls. *Id.* (the settlement privilege furthers the "strong public interest in favor of secrecy of matters discussed by parties during settlement negotiations.").  Moreover, such communications, if they exist, are available from the defendants, who have agreed to produce them.  ECF 1227 at 37 (quoting plaintiffs' brief).

Plaintiffs' invitation to apply a Magistrate Judge's easily distinguishable unpublished disposition (*Little River*) instead of the Sixth Circuit's controlling law, if accepted, would lead the Special Master directly into error.  As for communications with non-defendants, plaintiffs have never justified sending non-parties on a wild goose chase for industry gossip.  ECF 1227 at 37 (citing cases).

M.   **Cost and Fee Shifting**

As Judge Battani noted at the June 23rd hearing, "the party asking for the information is the one who pays."  June. 23rd Tr. at 103.  To be sure, the parties keep saying that they are "willing[] to discuss appropriate cost-sharing … once there has been an opportunity to determine what responsive information exists, and what burdens may be associated with production." Williams Decl. ¶ 17.  The parties, through depositions, have now had that opportunity.  It is time to engage in a meaningful discussion of cost and fee shifting, and it should be part of an overall agreement regarding the subpoena.  The parties appear to agree: "[A cost estimate] is necessary for the Parties' assessment of whether … to pursue certain discovery in the first instance."  Klein Decl. ¶ 5.  Though FCA US has provided an estimate of the cost in terms of employee time, the parties have not responded.  Klein Decl. ¶ 14.

11

Dated: November 11, 2016                    Respectfully submitted,

/s/ Colin R. Kass
Colin R. Kass
Scott M. Abeles
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Suite 600 South
Washington, D.C. 20004
(202) 416-6800
ckass@proskauer.com
sabeles@proskauer.com

David A. Munkittrick
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
(212) 969-3000
dmunkittrick@proskauer.com

Cheryl A. Bush (P37031)
Susan M. McKeever (P73533)
BUSH SEYFERTH & PAIGE PLLC
3001 W. Big Beaver Road, Suite 600
Troy, MI 48084
(248) 822-7800
bush@bsplaw.com
mckeever@bsplaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on February 19, 2016.  Any other counsel of record will be served by first class mail.

By:  _/s/ Cheryl A. Bush_____

13