```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3                           —   —   —

 4    IN RE:  AUTOMOTIVE PARTS         Master File No. 12-02311
      ANTITRUST LITIGATION
 5    _____      Hon. Marianne O. Battani

 6

 7

                           FINAL APPROVAL HEARING
 8                Truck and Equipment Dealer Plaintiffs

 9           BEFORE THE HONORABLE MARIANNE O. BATTANI
                    United States District Judge
10           Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
11                       Detroit, Michigan
                    Thursday, November 17, 2016

12

13    APPEARANCES:

14    FOR THE TRUCK AND
      EQUIPMENT DEALERS:    J. MANLY PARKS
15                          DUANE MORRIS, L.L.P.

16

17                          WAYNE A. MAKC
                            DUANE MORRIS, L.L.P.

18

19                          WILLIAM SHOTZBARGER
                            DUANE MORRIS, L.L.P.

20

21                          SEAN P. McCONNELL
                            DUANE MORRIS, L.L.P.

22

23

             To obtain a copy of this official transcript, contact:
24              Robert L. Smith, Official Court Reporter
                (313) 964-3303 • rob_smith@mied.uscourts.gov

25
```

```
 1    APPEARANCES:  (Continued)

 2    FOR THE DEFENDANTS:    JOANNE GEHA SWANSON
                             KERR, RUSSELL & WEBER, P.L.C.
 3

 4                           PETER KONTIO
                             ALSTON & BIRD, L.L.P.
 5

 6                           ALLYSON M. MALTAS
                             LATHAM & WATKINS, L.L.P.
 7

 8                           HOWARD B. IWREY
                             DYKEMA GOSSETT, P.L.L.C.
 9

10                           STEPHEN J. SQUERI
                             JONES DAY
11

12                           STEVEN F. CHERRY
                             WILMER HALE
13

14                           LARRY S. GANGNES
                             LANE POWELL, P.C.
15

16                           DONALD M. BARNES
                             PORTER, WRIGHT, MORRIS & ARTHUR,
17                           L.L.P.

18
                             MICHAEL R. TURCO
19                           BROOKS, WILKINS, SHARKEY & TURCO,
                             P.L.L.C.
20

21

22

23

24

25
```

Case 2:12-md-02311-SFC-RSW   ECF No. 1571, PageID.29225   Filed 12/22/16   Page 3 of 34
Final Approval Hearing re: TED Plaintiffs • November 17, 2016

3

TABLE OF CONTENTS

Page

Final Approval Hearing................................ 5

```
 1    Detroit, Michigan
 2    Thursday, November 17, 2016
 3    at about 2:58 p.m.
 4                         —    —    —
 5             (Court and Counsel present.)
 6             THE CASE MANAGER:  Please rise.
 7             The United States District Court for the Eastern
 8    District of Michigan is now in session, the Honorable
 9    Marianne O. Battani presiding.
10             You may be seated.
11             THE COURT:  Good afternoon.
12             THE ATTORNEYS:  Good afternoon.
13             THE COURT:  We have a table empty, is this -- this
14    is the table?  Okay.  All right.
15             This is the final approval order for the TED
16    plaintiffs.  Let me start by getting appearances.
17             MR. PARKS:  Manly Parks with my colleagues
18    Wayne Mack, Bill Shotzbarger and Sean McConnell for the truck
19    and equipment dealers, all from Duane Morris.
20             THE COURT:  Okay.  Let's start --
21             MS. SWANSON:  Joanne Geha Swanson, Your Honor, for
22    AutoLiv.
23             MR. KONTIO:  Peter Kontio, Your Honor, for AutoLiv.
24             MS. MALTAS:  Allyson Maltas, Latham Watkins, for
25    Sumitomo defendants.
```

1           MR. IWREY:  Good afternoon.  Howard Iwrey, Dykema,

2    for the TRW defendants.

3           MR. SQUERI:  Good afternoon, Your Honor.

4    Steven Squeri, Jones Day, on behalf of Yazaki Corporation and

5    Yazaki North America.

6           MR. CHERRY:  Good afternoon, Your Honor.

7    Steve Cherry from Wilmer Hale for the Denso defendants.

8           MR. GANGNES:  Good afternoon, Your Honor.

9    Larry Gangnes from Lane Powell for the Furukawa defendants.

10          MS. CRABTREE:  Molly Crabtree for the GS Electech

11   defendants.

12          MR. BARNES:  Good afternoon, Your Honor.

13   Don Barnes from Porter Wright for the GS Electech defendants.

14          MR. TURCO:  Good afternoon.  Mike Turco on behalf

15   of the Leoni defendants.

16          THE COURT:  Okay.  Why don't you take the podium,

17   Mr. Parks.  I assume you are the one doing it?

18          MR. PARKS:  I am, Your Honor.  Thank you.

19          THE COURT:  Okay.

20          MR. PARKS:  Your Honor, as you know, this motion

21   covers nine settlements in the wire harnesses and occupant

22   safety systems cases, seven are from wire harnesses, two are

23   occupant safety systems.

24          In wire harnesses there are settlements now with

25   all of the defendants before the Court, and specifically

1    that's the Furukawa group of defendants, the Yazaki group of

2    defendants, the Denso defendants, Sumitomo defendants,

3    GS Electech defendants, Tokai Rika defendants and the Leoni

4    group defendants.

5            In occupant safety systems there are settlements

6    with all but one defendant in that case, and the settlements

7    are specifically with the AutoLiv group of defendants and the

8    TRW group of defendants.

9            Taken together these nine settlements provide for

10   just over $5 million in cash benefits, and many of the

11   settlements mandate various types of what we believe to be

12   very valuable or to have been very valuable cooperation on

13   the part of the settling defendants.

14           I should note that while cooperation with the wire

15   harness case is less relevant today given that all the

16   defendants have now settled, it should be noted that the

17   cooperation pledges and some of the cooperation we received

18   from the settlements was instrumental in securing the

19   remaining settlements from the other wire harness defendants,

20   so some of the benefits of that cooperation were already

21   realized.

22           As set forth in our moving papers, we believe that

23   these nine settlements are meaningful, substantial, fair,

24   reasonable and adequate, and on that basis should be granted

25   final approval.  Each of the settlements has unique language

1    defining the settlement class, although the language

2    variations are generally not significant among the two OSS

3    settlements and the seven wire harness settlements, although

4    technically we are talking about nine settlement classes we

5    are really talking about two generally similar groups of

6    settlement classes between the two cases.  The specific class

7    definitions are found in the settlements themself and they

8    are part of the public record of this case.

9          Regarding the benefits of the settlements, the

10   chart at page 3 of our motion sets forth each -- the cash

11   component of each settlement.  The amount of each settlement

12   was a function of several factors including the evidence of

13   that defendant group's conduct and our assessment of it, the

14   volume of commerce affected or potentially affected, and the

15   value of the non-cash components of the settlements, such as

16   cooperation.  We believe that accounting for the prospects of

17   success, the defenses asserted, the volume of commerce

18   impacted or potentially impacted, the risks of proceeding,

19   and those associated with the case otherwise, we think the

20   settlements are a great outcome for the class.

21         On the topic of notice, notice was provided to

22   prospective class members in accordance with the notice plan

23   approved by this Court.  That notice plan followed closely

24   other notice plans previously approved by this Court, most

25   notably that employed in settlements involving the auto

1   dealer plaintiffs and their classes, and that notice plan was

2   reviewed and determined to be fair, reasonable and

3   appropriate by the firm of RG2, which the Court has permitted

4   in the preliminary approval motion for us to use as

5   consultants in our notice related issues.

6           RG2 also oversaw execution of the notice plan as

7   detailed in the declaration of Ms. Tina * Jango from RG2

8   which is attached to our moving papers.  RG2 set up a

9   specific settlement website which went live on October 2nd of

10  this year, purchased the file containing over 50,000 names

11  and addresses of C level executives who work at approximately

12  12,000 different truck, agricultural implement, construction,

13  mining, railroad and commercial vehicle dealerships.  Notice

14  was then mailed by U.S. mail to each of those 50,000

15  individuals.  Notice was also e-mailed to each of those

16  50,000 individuals representing 12,000 dealerships.

17          An ad regarding the settlement was placed in the

18  weekly newsletter of the American Truck Dealers Association

19  newsletter each week throughout October, and the American

20  Truck Dealers Association is a division of the National

21  Automotive Dealers Association, or NADA, and is the premier

22  organizational group in our assessment among truck and

23  implement dealers in the country.

24          The summary notice was also released via PR

25  press -- newswire as a press release, the notice was printed

1   in the Wall Street Journal and in Automotive News as well as

2   the October issue of World Truck Magazine, and an ad was

3   included in the NADA's e-newsletter as well.

4          We believe and represent to the Court that this

5   notice program was thorough and was designed to reach and did

6   reach a very large percentage of the potential class members

7   here.

8          On the issue of reaction of the class members, the

9   reaction has been very positive in the sense that there has

10  been no appearances entered, no objections filed, and no opt

11  outs from the class.

12         As noted yesterday by counsel for the auto dealer

13  plaintiffs in connection with the final fairness hearing that

14  Your Honor heard yesterday afternoon, these businesses that

15  are members of -- potential members of these classes are

16  sophisticated, large commercial businesses almost without

17  exception have legal counsel already established and ongoing

18  relationships with lawyers, in many instances may even be big

19  enough to have an in-house lawyer or in-house legal

20  department, and so these are sophisticated consumers of legal

21  services and are in the position to speak up and make

22  themselves known if they are not happy with the provisions of

23  a class settlement such as this, and we'll understand what

24  they are receiving when they receive such a notice in the

25  mail, and we think it is important to understand the silence

1    from the class in the context of who the class is here and

2    that it is particularly meaningful given who the class is.

3         Our moving papers review the specific elements of

4    Rule 23, each of which we believe is satisfied by the

5    settlements before the Court.  Those elements and the

6    arguments regarding them are set forth in our papers, but

7    they, of course, include likelihood of success on the merits

8    as weighed against the amount and form of the relief offered

9    by the settlement as the first.

10        On this issue, I would note, and, of course, the

11   Court has seen other settlements in other classes including

12   the auto dealers' classes and some of those settlement

13   numbers are significantly greater than what we present here

14   today, and to address that issue, and I know that the

15   defendants will appreciate this because it is something we

16   talked about extensively in our settlement discussions, the

17   volumes of commerce we are talking about here when we are

18   talking about the volumes of parts, wire harness and related

19   components and occupant safety system related components, as

20   compared to the volumes of commerce for automobiles, the

21   volumes of commerce for truck and equipment vehicles are

22   significantly smaller and that led, of course, understandably

23   to a totally different range of settlement discussions and a

24   totally different range of settlement outcomes in terms of

25   the dollars.  And it is very natural and understandable and,

1    of course, as a point reminded to me many, many times by my

2    friends here to my left, your right, that the value of the

3    case has to be considered in light of the volumes of

4    commerce, and so that was a factor that yielded the numbers

5    that we are looking at here today for these two part -- or

6    these two types of parts in these two cases.

7         On the issue of complexity, expense and likely

8    duration of further litigation, it is well known that this is

9    a very complex matter, perhaps one of the more complex and

10   expansive pieces of antitrust litigation MDLs that certainly

11   I have seen, there is significant expense in pursuing it

12   among other things with the expense of experts and obviously

13   the other costs associated with pursuing a case of this

14   magnitude or cases of these magnitude, and the duration, as

15   Your Honor noted yesterday, could be a long time, we will

16   leave it at that, and we think that there is real value in

17   having a recovery for the class in this shorter term.

18        The opinions of class counsel and the class

19   representatives are set forth in the papers.  We obviously

20   wouldn't be here or wouldn't have entered into these

21   settlements unless we believe they were appropriate and

22   represented good outcomes for the class.

23        The amount of discovery engaged in by the parties,

24   it certainly was extensive in wire harnesses, we attended

25   over 50 depositions, there were millions and millions of

1    pages of documents produced by the settling defendants and

2    discovery was in wire harnesses.

3          In occupant safety systems the settling defendants

4    provided key information at our request pursuant to Rule 408

5    that allowed us to fairly evaluate the merits of those claims

6    and in particular the volumes of commerce likely impacted

7    which allowed us to be able to advance settlement discussions

8    at a pace that would be ahead of where discovery might

9    otherwise permit us to proceed.

10          The reaction of absent class members we've

11   discussed.  There is no risk of fraud or collusion, and

12   certainly we believe the settlements are in the public

13   interest because settlements generally are, and we believe

14   these are fair and appropriate outcomes here.

15          The settlement classes meet the requirements of

16   Rule 23(a) and (b).  They are too numerous for joinder to be

17   practical, we believe these classes likely comprise of at

18   least thousands and maybe tens of thousands of dealers.

19   There are common questions of law and fact as is generally

20   observed in antitrust conspiracy cases of this sort, this is

21   no different.  The claims of the class representatives are

22   typical to those of the class.  The class representatives are

23   dealers and have claims that are indistinguishable in

24   important respects, in the fundamental respects from the

25   class.  And the representation will be -- will fairly and

1    adequately protect the interest of the class, we believe that

2    it has and will do so.

3            I would certainly be happy to answer any further

4    questions Your Honor has about any of those issues at this

5    point.

6            THE COURT:  Nothing about any of these issues.

7            MR. PARKS:  Okay.  Now, one note, we had an issue

8    yesterday regarding the CAFA or CAFA notice date and timing

9    of the Court's final order should it be forthcoming here.

10           THE COURT:  Right.

11           MR. PARKS:  We also have to be sensitive to that

12   here as well.  We have dated our proposed final order as

13   January 16th, 2017, which would be after the last CAFA notice

14   period would expire, and we can certainly, to jog the Court's

15   memory so the Court doesn't have to calendar this item for

16   itself, we can send along a final order on the 16th of

17   January or thereabouts.

18           THE COURT:  Yes.  I would like you to do the same

19   thing that we did yesterday, if you would send it when it

20   is -- the time period has expired or the time for the order

21   to enter along with a little cover memo as to why just to jog

22   my memory.

23           MR. PARKS:  Sure.

24           THE COURT:  I don't want to --

25           MR. PARKS:  We will do that.  Also there was a

1    mention yesterday of individual forms of final judgment for

2    the individual settling defendants, and we have talked about

3    this with counsel for the settling defendants and we agree

4    probably the easiest way to proceed there is on the same day

5    we have reached the 91st day for the last CAFA notice day to

6    send an individual final judgment for all of the settling

7    defendants on that date, and we can include it with the final

8    order that we are proposing here for the overall approval of

9    the settlement.

10            THE COURT:  Okay.  Just a question on that CAFA

11   notice.  Do you -- in general I have never had CAFA come back

12   or heard of it.  I mean, do you anticipate any CAFA problems

13   with this?

14            MR. PARKS:  We don't, Your Honor.  Our sense -- my

15   sense, I will speak specifically for me, my sense is that the

16   attorneys general are well aware of these cases, they have

17   been around for quite a long time.  I am aware that some of

18   the attorneys general have been participants in various

19   aspects of the discovery in wire harnesses in particular, and

20   I don't think there is any surprise or lack of awareness, and

21   there has been no communications suggesting that these

22   attorneys general would like to appear or be heard or object

23   in any way to the settlements.  So I really don't anticipate

24   any issue on that front, it is simply a matter of making sure

25   that we get to the appropriate period and don't create a

1    technical problem for everyone.

2              THE COURT:  I just wondered thinking about it

3    because we do have the attorneys general who became part of

4    the case but not all of them.

5              MR. PARKS:  Right, right.  So that's what I have to

6    address in terms of the motion for final approval.  I know we

7    also have a motion for approval of allocation plans and a fee

8    motion as well, and I can turn to those if you would like me

9    to or if you have any questions for me I'm happy to answer?

10             THE COURT:  No, you can turn to those and we will

11   do it all at once.

12             MR. PARKS:  Great.  Also in front of the Court is a

13   motion for approval of allocation plans.

14             THE COURT:  Wait a minute.  I have to stop you.

15   One other thing while we are there, is there any comment from

16   any defendant on the settlement?

17             (No response.)

18             THE COURT:  Okay.  Everybody is saying no.  Okay.

19             MR. PARKS:  There is a motion for approval of

20   allocation plans.  We have a proposed specific allocation

21   plan for the wire harness settlement -- or settlements and

22   another specific allocation plan for the occupant safety

23   systems settlements.  Each is tailored to the facts and

24   circumstances of those cases as we have determined them to be

25   through discovery and other information we have been able to

1    obtain and review.  Although the allocation plans are similar

2    in overall structure and design to those proposed by the auto

3    dealer plaintiffs and previously approved by the Court, that

4    is they ensure some measure of recovery for every claimant

5    with a valid claim, it is on a point system where by simply

6    submitting a valid claim you are entitled to a certain

7    minimum number of points, and then based on the nature of

8    your claim, the types of vehicles, the number of units and/or

9    number of parts you would earn additional points for each

10   such unit or part within the period, and then ultimately when

11   you determine the number of claims and the number of points

12   then the settlement funds would be divided proportionately

13   among the claimants.

14         The details of each of the two plans are slightly

15   different as, of course, they should be because we had

16   slightly different evidence with respect to what models or

17   vehicles were impacted in our assessment by the alleged

18   conduct.

19         And they are also -- the point system we have

20   employed is weighted to account for the variations in

21   economic value of certain components.  So the purchase of a

22   seat belt is accorded a different economic value than the

23   purchase of an airbag system, for example, because a seat

24   belt would be less expensive than an entire airbag system,

25   and that's reflected in the point value structure in the

1   occupant safety system settlement.

2          The allocation plans we have proposed to the Court

3   have been reviewed and endorsed by RG2 from a fairness

4   perspective, they are a settlement administration firm, we

5   are also using them for notice purposes here as well, but

6   they are a settlement administrator and we intend to use them

7   as the settlement administrators for the settlements, and

8   they have reviewed the plans and determined them to be

9   workable from a settlement administration standpoint, which I

10  think is important.

11         THE COURT:  Who is William Wickersham?

12         MR. PARKS:  Wickersham is a principal at RG2, and

13  Tina Jango is also an employee of RG2.  Those were the two

14  principal resources at RG2 that we are dealing with and who

15  will be overseeing the claims process should the Court grant

16  final approval of these settlements.

17         As I mentioned, the plan details are set forth in

18  the moving papers and I'm certainly happy to answer any

19  questions the Court has about the plans or the details of the

20  plans.

21         THE COURT:  No.  It looks like a very similar point

22  system to what we used in the other cases with a few

23  variations.

24         MR. PARKS:  It seemed to be a practical way to

25  proceed and we certainly didn't feel we needed to come up

 1    with something wholly brand new when something that seemed

 2    pretty workable was out there and so we tried to just take

 3    what was there and modify it in a way that we felt was

 4    appropriate for the facts and circumstances that we had in

 5    our cases.

 6              THE COURT:  All right.

 7              MR. PARKS:  All right.  And so also in front of the

 8    Court and finally is a motion for award of attorney fees and

 9    payment of -- or reimbursement of certain expenses and

10    service awards.

11              On the attorney-fees component of that motion, the

12    award of fees if granted would represent the first fees of

13    any kind recovered in this entire MDL by counsel for the

14    truck and equipment dealers.  We have not been paid any funds

15    at all to date in the two plus years we've been involved in

16    this litigation.  We have during that time advanced something

17    over half a million -- over $600,000 worth of expenses in

18    pursuit of just these two particular cases, occupant safety

19    systems and wire harnesses, and, of course, we are also

20    involved in a number of other proceedings and are, of course,

21    advancing expenses in those cases as well.

22              The movant seeks fees equal to one-third of the

23    total amount of the settlements, the total amount of

24    settlements is approximately $5.1 million.  The fees we are

25    requesting would be 1.538833 million, that's $1,538,833.  The

1    settlement amount -- and that number is calculated by the

2    settlement amount minus escrow agent costs of approximately

3    $56,000 and notice and claims administration related costs

4    and projected costs of about $500,000.

5         The fee represents less than 45 percent of the

6    Loadstar for our firm on these two cases, the Loadstar being

7    around $3.5 million time invested in pursing these two cases.

8         THE COURT:  What is the net to the parties in that

9    roughly?

10        MR. PARKS:  I'm sorry.  What is the what?

11        THE COURT:  From the 5 million or 5.1 million, what

12   would be the net to the parties?

13        MR. PARKS:  I don't have that math in front of me,

14   but I believe it would be in -- north of $3.5 million.

15        THE COURT:  Okay.  Thank you.

16        MR. PARKS:  Or in the range of $3.5 million, but I

17   will double check the math, and it certainly is what it is.

18        THE COURT:  It is close enough.

19        MR. PARKS:  And to give you a little bit of further

20   insight into the Loadstar, we have attorney hours for

21   Duane Morris attorneys, and we are the sole firm involved as

22   counsel for the truck and equipment dealers in these

23   proceedings, through the end of September of this year of

24   5,462 hours in furtherance of these two cases, and, again,

25   there has obviously been time since then including preparing

```
 1   for the hearing today and so forth, but through the end of
 2   September it is just under 5,500 hours towards these two
 3   cases.
 4           In addition, we have 1,173 paralegal hours again
 5   just on these two cases, and approximately 98 litigation
 6   support staff hours on these two cases, and that's primarily
 7   IT/IS litigation support and research librarian support.
 8           The activities we have performed in those hours are
 9   detailed on page 5 and 6 of our motion papers and include
10   extensive legal work in these cases.
11           I think it is important to note that the criminal
12   enforcement proceedings that brought about this civil MDL
13   proceeding were in the case of wire harnesses and occupant
14   safety systems focused entirely on passenger vehicles, not on
15   trucks or equipment, and that meant in order for us to build
16   a case that the truck and equipment components were impacted
17   by these conspiracies we had to develop that evidence from
18   scratch, and we are very pleased to have been able to have
19   done so to the point we were able to secure meaningful
20   settlements for the class here, and absent having been able
21   to do that there would be no recovery at all for the class of
22   truck or equipment dealers.
23           I can go on and talk about service awards, but I'm
24   happy to field any questions Your Honor has about the
25   attorney fee request.
```

1    THE COURT:  When you have down your library, what

2    are you talking about, library staff, who's the library

3    staff?

4    MR. PARKS:  So we have an in-house library at my

5    law firm where we have research librarians, and they would

6    help us with things like making sure we have the correct

7    address for an overseas defendant so that we would be able to

8    get service to that defendant properly.  They would also help

9    us do research on background information about components

10   that would be, for example, occupant safety systems, what

11   information is available in any public space about who is

12   purchasing those, what types of truck or equipment OEMs are

13   purchasing those products, which types of products they

14   purchase, market studies about relative market share, those

15   are all things that rather than having lawyers at much higher

16   rates do that kind of research we had research professionals

17   who are really experts at doing that kind of research do for

18   us and then provide us with the results.  We think that's a

19   more efficient way to handle it, that's how we would handle

20   similar matters for our hourly rate-paying clients.

21   THE COURT:  Okay.  Hold on a minute.  Molly.

22   (An off-the-record discussion was held at

23   3:23 p.m.)

24   THE COURT:  Are there any other non-lawyer jobs

25   included in your Loadstar?

```
 1              MR. PARKS:  There are.  There are IS/IT litigation
 2     support professionals, these are technology support folks.
 3     We have had a lot of digital or electronic discovery in this
 4     case both in terms of collecting databases and electronic
 5     documents from the class representatives and taking
 6     electronic productions that have been made by the defendants,
 7     uploading them and getting them in a viewable and
 8     understandable format, and that, in my experience,
 9     unfortunately I'm not an expert at some of the technological
10     aspects of that.
11              THE COURT:  Would that be the cost though versus
12     the attorney fees?
13              MR. PARKS:  Well, these are in-house folks at our
14     firm.  Those services can be provided by outside vendors but
15     we have a relatively fully developed IS/IT litigation support
16     staff at Duane Morris and, again, it is common practice for
17     us for our hourly billable clients to charge the rates that
18     we have charged for these services because if we didn't do
19     that we would have to send the matter out to an outside
20     vendor and pay an outside vendor to do the same thing.
21              THE COURT:  Okay.
22              MR. PARKS:  Now with respect to the service awards,
23     here the class representatives have performed and continue to
24     perform an invaluable service to the class.  Simply put,
25     without the class representatives there would be no truck or
```

1    equipment dealer actions in this MDL and there would be no

2    recovery for any of the class members.  The class

3    representatives have invested considerable time and energy in

4    this case gathering and producing over nearly 900,000 pages

5    of documents to date with further productions to come, very

6    likely to exceed a million pages before productions are

7    complete.

8         They have met and spoken with lawyers at class

9    counsel on countless occasions about a wide variety of issues

10   including -- or consulting about issues relating to truck and

11   equipment vehicles, parts and the overall marketplace, and

12   they have produced highly sensitive sales and inventory

13   databases, and much, much more is detailed in our papers.

14        The service awards requested are $10,000 per

15   plaintiff, and that is less than half of the service awards

16   that I believe, at least as I understand it, were requested

17   and approved by this Court for other dealer class

18   representatives in other settlements that's a part of this

19   MDL.

20        THE COURT:  What about -- I mean, now we have the

21   Blue Cross Blue Shield case, it gives us a little bit more

22   direction as to the service awards.  What about the time your

23   class reps have spent, have you -- I don't know who would

24   keep track of it because I'm sure they didn't keep track of

25   it outside of probably saying it was a lot.

1    MR. PARKS:  I can't speak to the particular hours.

2    What I can say is that it's easily hundreds of hours because

3    I have been on calls and been involved in communications and

4    other projects that the folks who were working with the

5    different class representatives had to undertake at our

6    request that have easily used that much time.  We have

7    obviously had to consult about understanding the way that the

8    class representatives' various documents are kept, we have to

9    understand their computer systems, we have to understand

10   their databases in order to collect and produce those things

11   or determine if they might be responsive.

12       We also have to understand the technological

13   aspects of the parts we are talking about.  I'm not a

14   mechanic by trade and the folks fortunately at these class

15   representatives do understand the mechanical componentry of

16   trucks and equipment and have provided really invaluable

17   service over a number of phone calls to help us understand

18   aspects, for example, what are the components of a wire

19   harness, how do they work, how are they different in a truck

20   versus in a passenger vehicle and those types of issues which

21   are very important to being able to advance our case and

22   advance the case on behalf of the class.

23       THE COURT:  How many named plaintiffs did you have?

24       MR. PARKS:  I believe 18, but obviously the face of

25   the complaint will -- whatever that number is is the

1    appropriate number.

2            THE COURT:  And each of them have expended these

3    hours that you are talking about to --

4            MR. PARKS:  Collectively, yes, absolutely.  Now,

5    there will be some that may have more input than others

6    depending on how big that business is, but it seemed to us to

7    be very difficult to distinguish that one particular

8    plaintiff may have spent a little bit more or a little less

9    time and certainly the obligations on them all have been

10   essentially equivalent.

11           THE COURT:  How about depositions?

12           MR. PARKS:  There will be depositions forthcoming.

13   To date there has been one deposition of a representative

14   from the parent company of these companies and so that

15   involved obviously considerable preparation and sitting for

16   that deposition.

17           THE COURT:  All right.  Did you have some formula

18   to come up with this $10,000 that the Court should consider?

19           MR. PARKS:  Not particularly, other than we looked

20   at the service awards that have been approved, we thought

21   that in this instance because the settlements were a lower

22   amount, meaning there is less available to the class to

23   disperse, but there were quite a bit of the same, in fact,

24   possibly more obligation in terms of production of documents

25   and so forth in some of the class representatives in the

1    other cases, it seemed to us to be the right number, but that

2    is why we are asking for a meaningfully less amount than has

3    been awarded to some of the other class representatives in

4    some of the other settlements.

5              THE COURT:  Okay.  Thank you.

6              MR. PARKS:  We have also asked for reimbursement of

7    past expenses connected directly to these two cases in the

8    amount of $674,137, and those are detailed in Exhibit 2 of

9    our motion.  I'm happy to answer any questions the Court has

10   about any of those expenses.

11             THE COURT:  What was the expense for arbitrators or

12   mediators, what is that?

13             MR. PARKS:  As I understand it, when we have a

14   mediation before the Special Master that there is a charge

15   that the parties -- in connection with the OEM process, I

16   believe there is a charge that the parties involved in that

17   process share, and we paid half of it and I believe the

18   defendants participating also paid half.

19             THE COURT:  This is the cost for the Master, that's

20   what you are saying?

21             MR. PARKS:  Yes, correct.  That's our share of it,

22   which is 50 percent of the cost assessed.

23             THE COURT:  The forensic support that you have

24   listed, will that be support that will be used also in the

25   other parts or is this going to end up --

1    MR. PARKS:  We will be using the same vendors,

2    however, that's at best as we can determine the forensic

3    support specific to the documents and materials in these

4    cases.  There will be productions from other defendants in

5    other cases, we will be using the same vendors for those

6    services, and there will certainly be some efficiencies of

7    scale, there will be some initial costs that were incurred to

8    get some of the things up to speed for wire harness as the

9    lead case that I suppose in theory you could spread out

10   amongst the different cases, but it unfortunately defied our

11   abilities to be able to be more refined in this number than

12   the number you see here.

13        THE COURT:  I'm sorry.  Just a minute.

14        (An off-the-record discussion was held at

15        3:33 p.m.)

16        THE COURT:  Okay.

17        MR. PARKS:  So the only other points I would simply

18   note is that we have asked for the Court to approve notice

19   expenses up to a cap of $500,000, those have been provided

20   for already in the terms of the settlements, and to the

21   extent that we don't use that much in notice and

22   administration costs the money will revert to the settlement

23   class for dispersal and for escrow fees of $56,000.

24        THE COURT:  Okay.  Thank you.  All right.  Any

25   defendant have any statement or anything that anybody wants

1    before I proceed?

2                (No response.)

3                THE COURT:  No.  Okay.

4                MR. PARKS:  Yes, ma'am.

5                THE COURT:  All right.  Certainly, I really am

6    basically reiterating what you said because I have looked at

7    all of this and this $5.1 million settlement there was

8    certainly notice to everybody and I guess I can address that

9    now.  You indicated that you had mail and e-mail to these

10   50 some thousand individuals plus notice in the newspapers

11   particularly relating to truck and equipment, and there is

12   a -- in these ads the link to the website, and I think that

13   this notice is fair notice and certainly is deemed to reach

14   most of these individuals.

15                There have been no objections and no opt outs,

16   that's a very good sign of a good settlement.  And the Court

17   finds that in reviewing the standards which, of course, we

18   have gone through a number of times in this case but I find

19   that the -- that the likelihood of success in this case has

20   been -- the case has been vigorously defended, the Court is

21   well aware of the litigation that has gone on in this case,

22   and actually in all of the antitrust cases, and the

23   likelihood of success is there but there is the likelihood

24   that there would not be success, I think that's a big issue

25   in this case, and so it is a significant factor in settling

1    this case.

2           Certainly it is very complex, I don't think I need

3    to go into the complexity of the case.  The expense, we can

4    see how expensive it is just for these two parts that we have

5    in terms of the costs that have been incurred in resolving

6    it, and the future costs in terms of the notifications,

7    et cetera.

8           The judgment of experienced counsel is very

9    significant to this Court because the Court does note that

10   counsel is experienced and well-versed in these areas, it has

11   been obvious to me in terms of all counsel in this case, and

12   the Court does believe that counsel has operated at arm's

13   length in coming up with a fair and reasonable settlement in

14   the best interest of the classes.

15          The reaction of class members we have gone over,

16   there really has been none, this is good.  The public

17   interest is one that is well served by this settlement due to

18   the fact that the Court does find it is fair and reasonable,

19   and was conducted in arm's length negotiations with

20   experience counsel.

21          The notice was proper, I have already gone over

22   that.  And in terms of the 23(a) factors, certainly there is

23   numerosity, I don't think we need to go into that, joinder

24   would be absolutely impractical.  There is commonality here,

25   the antitrust price fixing cases by their nature deal with

1    common legal and factual -- is that you going out?  What is

2    that?

3              UNIDENTIFIED ATTORNEY:  Sorry, Your Honor.

4              THE COURT:  Okay.  There are too many bells and

5    whistles.

6              So they do have common questions.

7              The claims of the representative parties are

8    typical of the claims of the class because the injuries arise

9    from the same wrong to one person, to the representative as

10   to the whole class, and the representative will fairly and

11   adequately protect the interest of the class because they

12   have the same interest as other class members, and the

13   allocation plans don't give any preferential treatment to any

14   of the named representatives.

15             Rule 23(b)(3) is satisfied because the class

16   plaintiffs demonstrate that common questions predominate over

17   questions affecting only individuals.  The claims involve

18   conspiracies from which each of the proposed settlement class

19   members' injuries arise.  Evidence is clear that a violation

20   as to one settlement class member is common to the class and

21   will provide a violation to all.  Certainly the class method

22   is superior to adjudicating these as individual claims, so I

23   do find that the prerequisites of Rule 23 are met.

24             The Court approves the plan of allocation.  The

25   Court has reviewed a number of these plans, and I think I

1   have said before, as to the mathematics I can't agree but as

2   to the expertise of the individuals involved in developing

3   these plans as to the use of the point system is very logical

4   to the Court and, again, I rely on the expertise of counsel

5   as to their input in the allocation plan, so I do find that

6   they are fair and reasonable and will compensate individuals

7   based on their injury and dependent upon the volume,

8   et cetera.  I think all of these factors have been

9   considered.

10          The Court should award attorney fees.  Now, this is

11  an interesting issue because you have heard what the Court

12  has done on it and I have basically yesterday said I would do

13  20 percent, but in your case I'm going to give you 30 percent

14  and I'm doing that because looking at the crosscheck that has

15  been made with the Loadstar but specifically looking at the

16  amount of the settlement, the fact that this is the first

17  monies given to the plaintiffs who have been working on this

18  and I think that -- what did we come up with, 1 point what

19  million?

20          MR. PARKS:  The 1.538 is the number we asked based

21  on 33 percent, so the math is the math but it will be a

22  little bit less than that.

23          THE COURT:  Yeah, just over a million, I think is a

24  fair and reasonable fee for this, and that amount comes, the

25  30 percent, after the costs that have been allocated here.

1    The Court does award the costs that have been submitted, they

2    have been delineated by category, and the Court with the

3    questions answered that I have will award these costs.

4            The next issue is service awards, and I think that

5    the service awards issue has become a little more difficult

6    because of the recent case of Blue Cross Blue Shield, but I

7    also have noted through the discovery issues in this case the

8    amount of time that these representative class members have

9    to put in and the discovery that they have, I mean, I don't

10   think in the trucks but we have in the others people who

11   don't want to be representatives anymore because it is just

12   too much trouble, and given the hundreds of hours that you

13   have indicated, Counsel, that these 18 or so class

14   representatives have put in, I think that it is very fair to

15   award them the $10,000, this is less than in the other class

16   but this is a smaller litigation so the Court will award the

17   $10,000 service award to each of the representative named

18   class members.

19           All right.  Is there anything that I have

20   forgotten?

21           MR. PARKS:  I don't believe so.  We will, as we

22   have discussed, get you an order around January 16th to allow

23   the CAFA notice period to expire, and then obviously if there

24   are intervening developments with the attorneys general we

25   can address that, I don't believe there will be anything like

 1    that, and we will also get you individual final judgment

 2    forms with input from defense counsel on the format of those

 3    final judgment documents at that same time with the

 4    memorandum that the Court has requested reminding the Court

 5    of why we are providing those at that time.

 6              THE COURT:  Okay.  Sounds good.

 7              MR. PARKS:  Thank you.

 8              THE COURT:  Thank you very much.

 9              MR. PARKS:  I appreciate it.

10              THE COURT:  Again, happy holidays to everybody.

11              MR. PARKS:  Thank you.

12              (Proceedings concluded at 3:43 p.m.)

13                         _    _    _

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4     the United States District Court, Eastern District of

 5     Michigan, appointed pursuant to the provisions of Title 28,

 6     United States Code, Section 753, do hereby certify that the

 7     foregoing pages comprise a full, true and correct transcript

 8     taken in the matter of Automotive Parts Antitrust Litigation,

 9     Case No. 12-2311, on Thursday, November 17, 2016.

10

11

12                           s/Robert L. Smith
                             Robert L. Smith, RPR, CSR 5098
13                           Federal Official Court Reporter
                             United States District Court
14                           Eastern District of Michigan

15

16

17     Date:  12/22/2016

18     Detroit, Michigan

19

20

21

22

23

24

25
```