UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | : | Master File No. 12-md-02311 |
| | : | |
| | : | Honorable Marianne O. Battani |
| In Re:  All Cases | : | |
| | : | |
| | : | |
| THIS DOCUMENTS RELATES TO: | : | |
| | : | |
| All Actions | : | |
| | : | |

**DECLARATION OF STEVEN N. WILLIAMS IN SUPPORT OF THE PARTIES'
RESPONSE TO CERTAIN OEMS' OBJECTION TO SPECIAL MASTER'S ORDER ON
RENEWED MOTION TO COMPEL DISCOVERY**

I, STEVEN N. WILLIAMS, declare as follows:

1.      I am an attorney duly licensed to practice in the State of California and I am admitted to this Court.  I am a Partner with the law firm of Cotchett, Pitre & McCarthy, LLP and am interim co-lead counsel of record for the End Payor Plaintiffs in the above-entitled action.  I make this declaration pursuant to 28 U.S.C. § 1746 in support of the Parties' Response to Certain OEMs' Objection to Special Master's Order on Renewed Motion to Compel Discovery.[1]  I have personal knowledge of the facts set forth in this declaration and, if called upon, I could and would competently testify thereto.

2.      In their Objection, the OEMs point to pre-subpoena briefing by the Direct Purchaser Plaintiffs ("DPPs") and Ford Motor Company ("Ford") in April 2015.  While the Parties were required to send the DPPs a copy of the draft subpoena prior to sending it to the OEMs, all of the objections that were made and briefed by the DPPs and Ford were completely denied and have no bearing on the OEMs' own response to the subpoena that was served in late July and early August 2015.   Ford has not even joined the other OEMs in protesting the subpoena.  To the contrary, Ford has been cooperating and has engaged in meet and confers with the Parties since service of the subpoena.  Further, the proceedings with the DPPs and Ford put the OEMs on notice of what discovery was sought, as well as the fact that the Court had authorized proceeding in this manner not once, but twice.

3.      While the subpoena was comprehensive, upon service it did not require the OEMs to do more than in any other case – namely, to meet and confer with the Parties to provide

---

[1] This Declaration is in response to Certain Non-Party Original Equipment Manufacturers' Objection to Order Regarding the Parties' Renewed Motion to Compel Discovery From Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities, 2:12-md-02311-MOB-MKM, ECF No. 1602 (E.D. Mich. Jan. 18, 2017) (hereinafter "Objection").

information and negotiate over objections.  The subpoena was not unworkable or void on its face; it was simply a reflection of the coordination that was ordered to occur across parts cases and parties.  Importantly, even if the OEMs ultimately would have a greater burden to collect and produce documents than in other cases, there was no greater burden on them to participate in individual meet and confers with the Parties regarding what they could produce (or not), or what burdens may have existed, from the outset.  There was no excuse for the OEMs' complete refusal to meet and confer with the Parties individually and to work toward understanding and, ultimately, negotiating an agreement on a narrowed list of requests, as has finally been achieved after 18 months of litigation.  This point is even clearer now given that each OEM has ended up with a separate order and agreement based on the particular systems, information, and burdens pertaining to each.

4.      By the time the subpoena was issued to OEMs in July and August 2015, a number of OEMs had already made productions to the Department of Justice ("DOJ"), containing some of the information sought by the subpoena.  Information produced by OEMs to the DOJ likely was already compiled on a disk, thumb drive, or other form of electronic storage that was easily accessible.

5.      After many months of trying to work with the OEMS in their requested group format, to no avail, impasse was clear.  On January 19, 2016, the Parties had no choice but to move to compel on 14 of the original 37 requests.

6.      After the Rule 30(b)(6) discovery-on-discovery depositions took place, certain OEMs began to work with the Parties toward negotiating production agreements.  Even then, however, the OEMs still conditioned their cooperation on an agreement by the Parties to pay all

of their costs and attorneys' fees. Therefore, while there was some progress on substance, the Parties could not move forward and the entire effort was still delayed by the OEMs.

7.      Given the OEMs' unreasonable demands for costs and fees, the Parties had no choice but to move forward with the Renewed Motion to Compel. The OEMs contested certain aspects of the briefing schedule, causing further delay and necessitating a conference call with the Special Master on October 10, 2016. The Special Master set the schedule and built in a day of mediation for the OEMs. The Parties and certain OEMs participated in mediation with the Special Master on November 15, 2016. However, despite some progress in mediation on getting the OEMs to accept the Parties' compromises, the OEMs would not accept the Parties' unprecedented offer to pay 50 percent of the OEMs' reasonable costs of collecting and producing any discovery that may not be readily accessible, and the OEMs continued to hold up the process by demanding full payment of costs and full reimbursement of attorneys' fees. In other words, the process still could not move forward, even where agreements on substance had been reached. The Parties continued to meet and confer with the OEMs, offering further compromises up until the morning of the hearing with the Special Master on the Renewed Motion to Compel on December 9, 2016. At the hearing, the Special Master affirmed the relevance of the information sought and ruled to grant the Renewed Motion to Compel in large part. The Special Master also ruled in unprecedented fashion to award the OEMs 60 percent of their costs, including reasonable outside counsel attorneys' fees, incurred in preparing for and participating in Rule 30(b)(6) depositions and 70 percent of their costs, excluding attorneys' fees, for collection and production of documents and data. The remaining 40 percent and 30 percent, respectively, was allocated to the OEMs. As instructed, the Parties drafted orders to accurately memorialize the Special Master's ruling and sent them to the OEMs. Certain OEMs objected to the draft orders

and submitted their own versions.  The Special Master entered the individual orders as submitted

by the Parties.  The Special Master also entered the Orders submitted by the Parties regarding the

main motion to compel ("Main Motion Order") (ECF No. 1584) as well as the handling and

confidentiality of certain pricing documents ("Confidentiality Order") (ECF No. 1579).  The

OEMs now object to both the Main Motion Order and the Confidentiality Order, necessitating

yet another round of briefing and potential hearing.

       8.      Collectively, the Parties' counsel includes hundreds of attorneys, many of whom

specialize in litigating similar antitrust cases and have many years of experience in the field.  In

all of the Parties' collective experience, none can recall any similar price-fixing case where costs

for third party discovery have been awarded in any significant amount, if at all, let alone in such

a high percentage.

       9.      Any follow-up questions by the Parties to the OEMs after the Rule 30(b)(6)

depositions were largely a result of gaps in the record generated by the OEMs themselves.   The

OEMs were provided with a detailed outline of topics and questions (at their request) so that they

could sufficiently prepare and bring witnesses who could testify on those topics, and answer

those questions.  In several instances, the OEMs did not provide sufficient witness testimony to

cover the topics and time periods on which information was needed.  For example, both GM and

FCA did not bring witnesses to cover the topics and time period at issue.  One GM witness,

Christopher Hatto, was only in his position at GM for eight months and, before that, was not in a

position that would have informed his testimony.  Hatto Transcript at 11:1-7 (dated August 25,

2016).  Mr. Hatto also had no knowledge of how the pricing process and data at GM changed

over time.  *Id.* at 13:14-14:8.  Mr. Hatto could not answer questions about GM's sales and

marketing process systems.  *Id.* at 19:14-25.  Mr. Hatto could not testify regarding certain

predecessor systems before he took his position in 2015. *Id.* at 48:17-25, 58:7-59:10. In certain instances, Mr. Hatto provided contradictory information, testifying in one instance one way, and in another instance, another way. *Id.* at 28:7-18, 55:21-56:5. *See also* FCA Deposition of Kelly Lynch at 25:6-11 (dated September 20, 2016) (when asked about FCA's retention policy, Mr. Lynch responded that the people who could best answer that question were in the "ICT" department, and not involved in the deposition).

10.     It should also be considered that the OEMs' conduct has caused the Parties to incur a monumental amount of expense and attorneys' fees. At least on the Plaintiffs' side, this is likely to diminish the net recovery to the Plaintiff classes.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 30th day of January, at Burlingame, California.


Dated: January 30, 2017                                    */s/ Steven N. Williams*
                                                          Steven N. Williams

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2017, I electronically filed the foregoing paper with

the Clerk of the Court using the ECF system which will send notification of such filing to ECF-

registered counsel in this matter.

>
> */s/E. Powell Miller*
> E. Powell Miller (P39487)
> 950 W. University Dr., Suite 300
> Rochester, MI 48307
> Telephone: (248) 841-2200
> epm@millerlawpc.com