48

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION

Master File No. 12-md-02311
Honorable Marianne O. Battani

| | |
|---|---|
| In Re: Wire Harness | 2:12-cv-00103 |
| In Re: Instrument Panel Clusters | 2:12-cv-00203 |
| In Re: Fuel Senders | 2:12-cv-00303 |
| In Re: Heater Control Panels | 2:12-cv-00403 |
| In Re: Bearings | 2:12-cv-00503 |
| In Re: Alternators | 2:13-cv-00703 |
| In Re: Anti-Vibrational Rubber Parts | 2:13-cv-00803 |
| In Re: Windshield Wiper Systems | 2:13-cv-00903 |
| In Re: Radiators | 2:13-cv-01003 |
| In Re: Starters | 2:13-cv-01103 |
| In Re: Ignition Coils | 2:13-cv-01403 |
| In Re: Motor Generator | 2:13-cv-01503 |
| In Re: HID Ballasts | 2:13-cv-01703 |
| In Re: Inverters | 2:13-cv-01803 |
| In Re: Elec. Powered Steering Assemblies | 2:13-cv-01903 |
| In Re: Fan Motors | 2:13-cv-02103 |
| In Re: Fuel Injection Systems | 2:13-cv-02203 |
| In Re: Power Window Motors | 2:13-cv-02303 |
| In Re: Auto. Transmission Fluid Warmers | 2:13-cv-02403 |
| In Re: Valve Timing Control Devices | 2:13-cv-02503 |
| In Re: Electronic Throttle Bodies | 2:13-cv-02603 |
| In Re: Air Conditioning Systems | 2:13-cv-02703 |
| In Re: Windshield Washer Systems | 2:13-cv-02803 |
| In Re: Spark Plugs | 2:15-cv-03003 |
| In Re: Automotive Hoses | 2:15-cv-03203 |
| In Re: Ceramic Substrates | 2:16-cv-03803 |
| In Re: Power Window Switches | 2:16-cv-03903 |

THIS DOCUMENT RELATES TO:
End-Payor Actions

## OBJECTION OF MARK RAY AND SEAN HULL

## INTRODUCTION

The Sixth Circuit recently addressed several of the defects present in this $379 million common fund antitrust settlement. In *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 309 (6th Cir. 2016), the Court instructed that "[c]lass members cannot participate meaningfully in the process contemplated by the Federal Rules of Civil Procedure 23(e)" when they cannot access documents relied upon by the parties in signing off on the settlement.

The class here lacks critical evidence considered by class counsel concerning the estimated dollar amount of commerce affected by the defendants' antitrust conduct. Class counsel offer no frame of reference for this Court or the class members to evaluate the settlement against the claims released, and obstruct meaningful participation by the class members.

The Sixth Circuit also clarified in *Vassalle*, 655 Fed. Appx. 352, 356–57 (6th Cir. 2016) that recovery as between unnamed class members and the class representatives is an important consideration in the fairness inquiry. Yet, class counsel failed to disclose what incentive awards, if any, the class representatives will seek, or the basis for any such recovery. Without this and other missing information, the settlement should not be approved.

The settlement and plan of allocation also fail to account for the disparate recoveries by repealer-state class members, which exposes the lack of adequate

representation for these groups with inherent, intra-class conflicts. FED. R. CIV. P. 23(a)(4). Sub-classes with separate counsel for the differing state recoveries are required. This inadequate representation precludes approval of the settlement.

Class counsels' $104 million fee request (more than half of which is for the DENSO settlement) is excessive and relies upon the misimpression that the weight of authority within the Sixth Circuit cuts against the diminishing percentages approach. It does not. Numerous courts from within the Circuit apply the decreasing percentage model to mega-fund settlements like this one, recognizing that awarding smaller percentages as the size of the fund increases serves "a primary goal for class action litigation: passing on to class members the benefit of economies of scale." *See e.g., In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679, 692–93 (N.D. Ohio 2015); *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 754 (S.D. Ohio 2007) (following the declining percentage principle). The Sixth Circuit itself upheld a district court's decreasing percentages' analysis in *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996). Thus, the idea that class counsel are asking this Court to follow accepted methodology in this Circuit is patently false. This Court should reject class counsels' request for 27.5% of the common fund, and enter an award that properly takes into account the size of the fund.

## STANDING AND PROCEDURES TO OBJECT

The Objectors' full names, addresses and telephone numbers are as follows:

(1) Mark Weston Ray, 8010 Slough Road, Corpus Christi, Texas 78414; (361) 813-6949; and (2) Sean Kenneth Hull, 7890 Witney Place, Lone Tree, Colorado 80124, (303) 519-8711.

<u>Mark Ray</u>

In July, 2014, Mr. Ray purchased a new vehicle, a 2004 Ford F-350 in the United States. Declaration of Mark Weston Ray and Exhibits, attached hereto as Exhibit "1", incorporated by reference as though set forth in full. The vehicle was not purchased for resale. *See id.*

The settlement website indicates that Mr. Ray's vehicle is included in the *In re: Fuel Injection Systems* case. *See id.* The Class Notice[1] further indicates that *In re: Fuel Injection Systems* case was settled in the DENSO Settlement Agreement and/or the Mitsubishi Electric (MELCO) Settlement Agreement. Thus, Mr. Ray is objecting to the DENSO Settlement Agreement and/or the Mitsubishi Electric (MELCO) Settlement Agreement, involving the fuel injection system.[2]

---

[1] Class Notice, at 9 (accessible at http://www.autopartsclass.com/docs/long_form_notice.pdf) (last visited Mar. 16, 2017).

[2] The class notice indicates that "To object to or comment on a Round 2 Settlement, you must specify which Settlement (including the specific vehicle part) you are objecting to and include the following in your objection letter." Class Notice, at 17 (accessible at http://www.autopartsclass.com/docs/long_form_notice.pdf). However, according to class counsel, "No potential claimant has ever been required to identify what part was in his or her

Based on the foregoing, Objector Mark Ray is a person who, from January 1, 1998 through July 14, 2016, purchased or leased a new Vehicle in the United States not for resale that included one or more Fuel Injection Systems as a component part, which were manufactured by or sold by a Defendant,[3] any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant. *See id.* As such, Mr. Ray is a class member as defined in the class notice and settlement agreements, and has standing to assert this objection. Additionally, on March 8, 2017, Mr. Ray filed a claim on the settlement website (claim number 84112E5D9F), a true and correct copy of which is attached hereto as Exhibit A-1.

Sean Hull

On or about February 20, 2006, Mr. Hull purchased a new 2006 Infiniti G35 from a dealership in Pleasanton, California. *See* Declaration of Sean Kenneth Hull and Exhibits, attached hereto as Exhibit "2", incorporated by reference as though set forth in full. He purchased the vehicle while residing in the State of California. *Id.* His address at the time was 3537 Gulfstream St., Pleasanton, California 94588.

---

Vehicle in order to object or opt out and no objection has ever been rejected on that basis." End-Payor Plaintiffs' Motion for Orders Granting Final Approval of the Round 2 Settlements and Approving the Plan of Allocation in Connection with the Round 2 Settlements, at 11. Objection is made to the extent identifying the specific vehicle part is a requirement for asserting an objection. Any such requirement would serve the sole purpose of artificially driving down objections, and violate the class members' due process rights to assert an objection under FED. R. CIV. P. 23.

[3] In specifying that Mr. Ray's vehicle "is included in the following auto parts cases: In re Fuel Injection Systems[,]" the settlement does not designate whether the Mitsubishi Electric Defendants or the DENSO Defendants manufactured the fuel injection system.

*Id.* The vehicle was not purchased for resale. *Id.*

The settlement website revealed that the 2006 Infiniti G35 that Mr. Hull purchased is an eligible vehicle included in the settlements in the *In re Automotive Parts Litigation*: http://www.autopartsclass.com/. Specifically, the settlement website indicated the vehicle is included in the *In re: Radiators, In re: Fan Motors, In re: Power Window Motors, In re: Windshield Wiper Systems, and In re: Windshield Washer Systems* cases.

The Class Notice further indicates that the *In re: Radiators, In re: Fan Motors, In re: Power Window Motors, In re: Windshield Wiper Systems, and In re: Windshield Washer Systems* cases were settled in the DENSO Settlement Agreement.[4] Thus, Mr. Hull is a class member, and is objecting to the DENSO Settlement Agreement involving the radiator, fan motor, power window motor, windshield wiper system, and windshield washer system.

Based on the foregoing, Mr. Hull is a person who, from January 1, 1998, through July 14, 2016, purchased or leased a new Vehicle in the United States not for resale that included one or more (Radiators, Fan Motors, Power Window Motors, Windshield Wiper Systems, and Windshield Washer Systems) as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-

---

[4] Class Notice, at 9.

conspirator of a Defendant. *Id.* As such, Mr. Hull is a class member as defined in the class notice and settlement agreements, and has standing to assert this objection.

Mr. Hull filed a claim on the settlement website (claim number B06CBBCD3D), a true and correct copy of which is attached hereto as Exhibit 2-A. After searching his records, Mr. Hull was unable to find purchase documents of the 2006 Infiniti G35. He traded the vehicle in to a different dealership in November, 2006. *Id.* It is not his practice to keep records from car purchases for that extended period of time (*i.e.*, more than ten years). *Id.* Mr. Hull intends to make efforts to secure the purchase documents, including contacting the dealership (located in Pleasanton, California) where he purchased the 2006 Infiniti G35. *Id.* As soon as Mr. Hull is able to obtain the purchase documentation, he will supplement his claim and objection with the material. *Id.*

To the extent Mr. Hull's inability to locate documents more than ten years old affects his claim and/or objection, when he has submitted a sworn declaration confirming the purchase and the required information, objection is made that the requirement is unreasonable and an improper attempt to drive down objections under FED. R. CIV. P. 23. *Bezdek v. Vibram USA, Inc.,* 809 F.3d 78, 84 (1st Cir. 2015) ("[b]ecause parties to a settlement have a shared incentive to impose burdensome requirements on objectors and smooth the way to approval of the

settlement, district courts should be wary of possible efforts by settling parties to chill objections").

Further, class counsel have submitted no evidence concerning how many class members are likely to have a proof of purchase. Accordingly, there is no way to know whether almost all, or almost none, can be included in the class. If most "class" members cannot produce "proof of purchase" documents, then the settlement should fail as violative of Rule 23's ascertainability requirement. *See Belfiore v. Proctor & Gamble Co.*, 311 F.R.D. 29, 65-67 (E.D.N.Y. Oct. 5, 2015); *Red v. Kraft Foods, Inc.*, 2012 WL 8019257, at *4 (C.D. Cal. Apr. 12, 2012) ("[w]hether analyzed under the implied ascertainability requirement, or, the superiority requirement of 23(b)(3) as informed by the manageability component imparted in 23(b)(3)(D), the issue of whether class members will be able to identify themselves to the Court in any even remotely verifiable way remains a significant legal an practical hurdle for Plaintiff's certification under 23(b)(3)").

Objectors are represented by Christopher Bandas, with Bandas Law Firm, PC, 500 N. Shoreline, Corpus Christi, Texas 78401, who was granted limited admission in this Court in accordance with the rules governing multidistrict cases.[5]

---

[5] *See e.g.,* Opinion and Order Granting Final Approval of Class Action Settlement (Round 1), 12-00103, ECF Doc. 497, at 16 (June 20, 2017) (noting the "Eastern District of Michigan also publishes an Attorney Admissions Manual which addresses attorneys that have not been admitted to practice in the district. Because most multidistrict cases involve out-of-state attorneys, who never appear in person, the Eastern District grants limited admission. Therefore,

Objectors object to, *inter alia*, the proposed settlement, the plan of allocation, and request for attorneys' fees in *In re: Automotive Parts Antitrust Litigation*, No. 12-md-02311, including the DENSO Settlement Agreement and/or the Mitsubishi Electric (MELCO) Settlement Agreement involving the fuel injection system and the DENSO Settlement Agreement involving the radiator, fan motor, power window motor, windshield wiper system, and windshield washer system. This objection is filed for the purpose of improving the settlement for the benefit of the class members.

Objectors do not intend on appearing at the fairness hearing either in person or through counsel but ask that their objection be submitted on the papers for ruling at that time. Objectors rely upon the documents contained in the Court's file in support of these objections. Objection is made to any procedures or requirements to object in this case that require information or documents other than those that are contained herein on grounds that such requirements seek irrelevant information to the objections, are vague and unnecessary, are not adequately described in the class notice, are unduly burdensome, are calculated to drive down the number and quality of objections to the settlement and violate Objectors' and counsel's due process rights and/or Rule 23. Objectors incorporate by reference the arguments and authorities contained in other filed objections, if any, made in

---

these attorneys can register to receive a login and password for e-filing once certain criteria are met.").

opposition to the fairness, reasonableness and adequacy of the proposed settlement, the adequacy of class counsel and to the proposed award of attorneys' fees and expenses that are not inconsistent with this objection.

## ARGUMENT

## I. Class Counsel Failed to Carry their Burden of Establishing Fairness and have Provided the Class with Insufficient Information.

This class action settlement process suffers from a fundamental lack of information available to the Court and class. "The burden of proving the fairness of the settlement is on the proponents." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 719 (6th Cir. 2013) (citations omitted). Class counsel failed to satisfy this burden because there is little to no information concerning class representative service awards or the value of the claims released. *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) ("counsel did not provide information to the Court, preventing it from properly assessing whether the settlement was in the best interest of the class as a whole").

### A. Incentive Awards.

An adequate Rule 23(e) fairness inquiry cannot be conducted on the information presented by class counsel. *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir.2007) (before a district court approves a settlement, the court must

9

find that the settlement is "fair, reasonable, and adequate").[6] They have not indicated whether they will seek incentive awards for the class representatives, if so, how much they will seek, and the bases of any requested awards. There is no way to know, as of the objection deadline, whether the class representatives will take disproportionately more than the unnamed class members.

The Sixth Circuit considers this part of the fairness analysis. "[I]n evaluating the fairness of a settlement . . . we look in part to whether the settlement gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members. [S]uch inequities in treatment make a settlement unfair." *Pampers*, 724 F.3d at 718 (quotations omitted); *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013) ("[w]e have held that such inequities in treatment make a settlement unfair"). Thus, in *Pelzer v. Vassalle*, 655 Fed. Appx. 352, 356–57 (6th Cir. 2016), the Sixth Circuit reversed because the district court "abused its discretion in finding the settlement to be fair, reasonable, and adequate" where "[t]he named class members would have had their debts . . . forgiven and each received $2,000, while the unnamed class members would have received a mere $17.38 each."

---

[6] A district court looks to seven factors in determining whether a class action settlement is fair, reasonable, and adequate: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *UAW*, 497 F.3d at 631.

Disparate awards can also leave the named plaintiffs inadequate representatives. *Pampers*, 724 F.3d at 721–22. When incentive payments "make the class representatives whole, or (as here) even more than whole[,] . . . [they] have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief." *Pampers*, 724 F.3d at 722 (citing *Radcliffe v. Experian Info. Solutions,* 715 F.3d 1157, 1161 (9th Cir.2013) (holding that the "incentive awards significantly exceeded in amount what absent class members could expect upon settlement approval" and thus "created a patent divergence of interests between the named representatives and the class")). In such cases, "[t]he named plaintiffs are inadequate representatives under Rule 23(a)(4), and the district court abuse[s] its discretion in finding the contrary." *Pampers*, 724 F.3d at 722.

This Court should not approve the settlement without more information on what the representatives will take relative to the unnamed class members. The fairness inquiry "needs to be, as much as possible, practical and not abstract. If 'the parties have not' on their own initiative 'supplied the information needed' to make the necessary findings, the court should 'affirmatively seek out such information.'" *Baby Products*, 708 F.3d at 175.[7]

---

[7] *See also Martin v. Cargill, Inc.*, 295 F.R.D. 380, 386 (D. Minn. 2013) ("And yet the parties seek the Court's blessing over their settlement, based primarily upon their *ipse dixit*—the proposed settlement is fair, adequate, and reasonable because they say so. The Court cannot

To the extent any incentive awards are subsequently contemplated, a new notice should issue allowing class members opportunity to review the basis for the awards and sufficient time and opportunity to object. The class notice (and class counsels' fee motion) give no indication whether the class representatives will seek incentive awards, and if so, in what amount.[8]

## B. Value of the Claims Released.

Also missing is the value of the class members' claims. While $379 million is obviously a substantial sum, it cannot be considered in a vacuum. It must be weighed against the claims released. *See e.g., Gascho v. Glob. Fitness Holdings, LLC*, 2:11-CV-436, 2014 WL 1350509, at *21 (S.D. Ohio Apr. 4, 2014), *report and recommendation adopted*, 2:11-CV-00436, 2014 WL 3543819 (S.D. Ohio July 16, 2014), *aff'd*, 822 F.3d 269 (6th Cir. 2016) (noting the settlement "recovery is significant in light of the estimated average injuries allegedly suffered by class members"); *People ex rel. Wilcox v. Eq. Funding Life Ins. Co.*, 335 N.E.2d 448, 456 (Ill. 1975) ("[b]asic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation")

---

approve a settlement on such a rocky foundation. Because 'the existing record does not provide any evidence or methodology by which the Court can determine the class members' potential ranges of recovery or their chances of collecting a verdict,' the Court is left 'unable to make any reasoned assessment of the value of the claims'" and, hence, is unable to approve the proposed settlement.").

[8] When discussing the fairness hearing, the Notice merely indicates the court will "decide whether to approve . . . *any* requests by Settlement Class Counsel for fees, costs, expenses, and class representative awards."Class Notice, at 18.

(quoting *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968)).

If the released claims are worth $1 or $2 billion, then perhaps this amount is within the range of reasonableness. If their value is significantly more, perhaps not.

Class counsels' motion for final approval and motion for fees give no indication of the value of the claims. Nor does the class notice. The fee motion and supporting declaration state that "[a]s part of the settlement negotiations, EPPs considered the available evidence regarding the Round 2 Settling Defendant's conduct, *the estimated dollar amount of commerce affected by that conduct*, and the value of the other settlement terms (such as the value of the cooperation offered by the Round 2 Settling Defendant)."[9] Yet, it is not clear what evidence class counsel considered, nor what the estimated dollar amount of commerce affected was.

The Sixth Circuit instructs that "[c]lass members cannot participate meaningfully in the process contemplated by Federal Rule of Civil Procedure 23(e) unless they can review the bases of the proposed settlement and the other documents in the court record." *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 309 (6th Cir. 2016). In *Shane Group*, the Sixth Circuit vacated approval of the settlement where an expert report discussing damages (and

---

[9] *See* End-Payor Plaintiffs' Motion for Orders Granting Final Approval of the Round 2 Settlements and Approving the Plan of Allocation in Connection with the Round 2 Settlements, 12-00103, ECF Doc. 558, at 6; Joint Declaration of Hollis Salzman, Steven N. Williams, and Marc M. Seltzer, ECF Doc. 559, at ¶ 15.

other documents), which the parties considered in signing on to the proposed settlement, were not made accessible to the class. *Id.* at 306, 309 (vacating approval where expert report, "whose valuation of the class's claims by all accounts was the keystone of the settlement agreement," was kept under seal). Because class members could not view this critical information, the Court found that "[t]he Rule 23(e) objection process seriously malfunctioned." *Id.* at 309.

The class members here have similarly had no occasion to analyze the evidence considered by class counsel on the defendant's conduct and the estimated dollar amount of commerce affected by that conduct. Approval of the settlement should not be granted.

The class also has no valuation of the injunctive relief or the discovery cooperation provisions. Regardless, "[t]he fairness of the settlement must be evaluated primarily based on how it *compensates class members* "—not on whether it provides relief to other people. . . ." *Pampers Litig.*, 724 F.3d at 720 (emphasis original) (citations omitted). These provisions do not necessarily benefit the Round 2 class members any more than non-members. The settlement should not be approved in light of the critical information that is lacking.

## II. Separate Counsel Should Have Been Appointed to Account for the States with Varying Antitrust Recovery.

The settlement also fails on adequacy of representation under FED. R. CIV. P. 23(a)(4). The allocation plan fails to differentiate among class members in repealer

states based on varying state recovery. Sub-classes with separate counsel for these groups was required.

Rule 23(a)(4) and the Due Process Clause require that "the representative parties ... fairly and adequately protect the interests of the class," compelling the district court "to uncover conflicts of interest between named parties and the class they seek to represent," as well as the "competency and conflicts of class counsel." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 626 n. 20 (1997). One means of ensuring adequate representation is the formation of sub-classes and appointment of separate counsel. This "allow[s] for adequate structural protections to assure the differently situated plaintiffs negotiate for their own unique interests[.]"*Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 327 (3d Cir. 2011) (quotation omitted); *see also Sandoval v. M1 Auto Collisions Centers*, 309 F.R.D. 549, 569–70 (N.D. Cal. 2015) ("[c]lass counsel may be inadequate under Rule 23 if they seek to represent class members with different interests"); *In re Southeastern Milk Antitrust Litig.*, 2:07-CV 208, 2011 WL 3878332, at *4 (E.D. Tenn. Aug. 31, 2011) (rejecting settlement in the face of a conflict of interest that required subclass represented by separate counsel).

Here, the varying recovery allowed in repealer states created an intra-class conflict. The mandatory treble damages rule applicable in California, for example, suggests that California plaintiffs have a greater right to recovery than purchasers

in many other states – including other repealer states. *See Uneedus v. California Shoppers, Inc.*, 86 Cal.App.3d 932, 942 (1978). Nebraska plaintiffs, in contrast, would only be entitled to actual damages. NE Code § 59-821. Yet, the plan of allocation purportedly compensates them the same, and makes no attempt to address these and other disparate recoveries.[10]

The idea that all class members should treated equally, while facially appealing, is not an argument against separate counsel. To the contrary, one of the:

> fatal deficienc[ies] in the *Ortiz* settlement was that all present claimants were treated equally, notwithstanding that some had claims that were more valuable. 'It is no answer to say . . . that these conflicts may be ignored because the settlement makes no disparate allocation of resources as between the conflicting classes' for the very decision to treat them all the same is itself an allocation decision with results almost certainly different from the results that [the disparate claimants] would have chosen.

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 232 (2d Cir. 2016) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999)).

In the Sixth Circuit, "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Vassalle*, 708 F.3d

---

[10] Tennessee, as further example, provides for recovery of the "full consideration or sum paid by the person" for the subject product or service. TENN. CODE ANN. § 47-25-106. Additionally, the requirements for obtaining treble damages, where allowed, vary by state. Some states have statutorily mandated trebling of actual damages upon proof of violation. *See, e.g.,* CA Bus. & Prof. Code § 16750, Code of District of Columbia § 28-4508(a), Florida Statutes § 542.22, Maine Rev. Stat. § 1104. Others require a finding of willfulness or malicious intent to obtain treble damages. 5 New Mexico Statutes § 57-1-3, Michigan Compiled Laws § 445.778(2).

at 757 (internal quotation marks and alterations omitted). There is no indication here that class counsel advocated the relative strength of state antitrust laws to protect any specific state's class members' interests.

Because "the need for the adequacy of representation finding is particularly acute in settlement class situations[,]" "[t]hese requirements are scrutinized more closely, not less, in cases involving a settlement class." *Southeastern Milk*, 2011 WL 3878332, at *4. In fact, the Supreme Court requires "undiluted, even heightened, attention in the settlement context [ ]" to the certification requirements of Rule 23. *Amchem*, 521 U.S. at 620. Accordingly, without subclasses and separate counsel taking into account disparate state recovery among repealer states, the settlement and plan of allocation should not be approved.

## III.   Class Counsels' Request for 27.5% of the $379 Million Round 2 Settlements is Patently Excessive.

This Court ostensibly sided with class counsels' request for a fixed percentage of the Part 1 settlements. Nevertheless, Objectors urge that a 27.5% recovery of the $379 million settlement, or approximately $104 million ($53 million from the DENSO settlement alone), would be grossly excessive.

## A.   The Court Should Award Fees Based on a Diminishing Percentages Approach.

Although class counsel disagree, there *is something* "*inherently unreasonable* in awarding . . . 25 to 33% of a common fund settlement . . . due to

the size of that . . . settlement."[11] Commentators and jurists in this Circuit and elsewhere have repeatedly explained why.

It isn't ten times as hard to try a $100 million case as it is a $10 million case; just as it isn't ten times easier to try a $100 million case than a billion-dollar case. *See In re NASDAQ Marketmakers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y 1998) ("It is generally not 150 times more difficult to prepare, try and settle a $150 million case than it is to try a $1 million case."). At some margin, the costs diminish relative to the size of the recovery.

This $379 million mega-fund settlement is, in significant part, a product of the magnitude of the class action (with the benefit of considerable assistance from the Department of Justice), and the fee award must allow for that fact. Empirical data from several well-recognized class action experts confirms that percentages for attorneys' fees decrease as settlements increase. *See e.g.,* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Studies 27, 28 (2004) (examining large class action settlements and observing that "a scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases."); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993–2008,* 7 J. Empirical Legal Studies 248 (2010); Brian T.

---

[11] End-Payor Plaintiffs' Memorandum in Support of Motion for an Award of Attorneys' Fees, 12-00103, ECF Doc. 562, at 11.

Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811, 839 (2010). In their most recent study, Eisenberg and Miller find that the mean award from settlements above $170 million is 12% and the median is 10.2%. Eisenberg, 7 J. Empirical Legal Studies, at 265. For settlements between $69.6 million and $175.5 million, the mean fee is 19.4% and the median is 19.9%. *Id.* And, for settlements between $38.3 million and $69.6 million, the mean fee is 20.5% and the median is 21.9%. Class counsels' anecdotal examples of private, non-class action cases awarding high percentages should therefore not serve as guidance here.[12]

The Sixth Circuit has not expressly "endorsed the reduced percentage approach[,]"[13] likely because it has not directly addressed the issue. However, in *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996), it upheld a 10% fee award where "the economies of scale involved in a class action of [that] size suggested that an award of 20% of the fund, *i.e.*, $33 million, would be excessive." *Bowling*, at the very least, suggests the Sixth Circuit approves of the reduced percentage approach.

Several district court opinions (ignored on this point by class counsel) indicate the reduced percentage approach is the standard for large settlements like

---

[12] End-Payor Plaintiffs' Memorandum in Support of Motion for an Award of Attorneys' Fees, 12-00103, ECF Doc. 562, at 18.
[13] *Id.* at 14.

this one. For example, a district court in the Southern District of Ohio applied the declining percentage method and awarded 18%, not the 24% requested, from a $600 million settlement that was the largest securities class action settlement in the Sixth Circuit. *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 754 (S.D. Ohio 2007). Although there was no question about the "superb" quality of legal work,[14] the court recognized that the "huge fees in a huge case might be less a function of the amount or quality of the attorneys' work, or even of the risk undertaken, and more simply a function of the fact that the lawyers managed to find and bring a case with huge damages." *Id.* (quotation omitted). To address this concern, "the Court follow[ed] the 'declining percentage principle,' meaning the percentage of recovery allocated to attorneys' fees decreases as the size of the recovery increases. *Cardinal Health*, 528 F. Supp. 2d at 763-64 (citations omitted); *see also Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1283 (S.D. Ohio 1996) (awarding 10% of a large settlement despite a request for 20% in light of the "economies of scale"), *on reconsideration in part*, 927 F. Supp. 1036 (S.D. Ohio 1996), *aff'd sub nom. Arthur Ray Bowling v. Pfizer, Inc.*, 103 F.3d 128 (6th Cir. 1996), and *aff'd*, 102 F.3d 777 (6th Cir. 1996).

More recently, a court within the Sixth Circuit rejected a 30% fee; awarding 23.6% of a $102.3 million common fund. *In re Polyurethane Foam Antitrust Litig.*,

---

[14] *Cardinal Health*, 528 F.Supp.2d at 768.

135 F. Supp. 3d 679, 692–93 (N.D. Ohio 2015). The court emphasized that awarding smaller percentages as the size of the fund increases serves "a primary goal for class action litigation: *passing on to class members the benefit of economies of scale.*" *Id.* at 693 (emphasis added).

Class counsel rely primarily on an Eastern District of Tennessee opinion, *In re Southeastern Milk Antitrust Litig.*, 2:07-CV 208, 2013 WL 2155387, at *8 (E.D. Tenn. May 17, 2013), in advocating against this approach. Yet, *Southeastern Milk* (and class counsels' fee motion) fails to distinguish *Bowling*, *Cardinal Health*, or *Polyurethane Foam.*

Further, the high fees in *Southeastern Milk* were justified by the exceptional 70% recovery of the total damages calculated by plaintiffs expert. *Id.* at *4. Although, as described *supra*, the figures in this case have not been disclosed, it is doubtful they will approach even half that recovery.

Whether applied to the aggregate $379 million for the Round 2 settlements or the $193.8 million for the DENSO settlement, the empirical data suggests fees than 20%. Eisenberg, 7 J. Empirical Legal Studies, at 265. Whatever approach is followed, class counsels' fees should be far less than the $104 million sought based on the economies of scale.

**B.    The Lack of Information Also Impedes a Proper Fee Analysis.**

In any event, class counsel have not provided the Court or the class with

adequate information to award fees. The first *Ramey* factor,[15] the benefit of the settlement to the class, is regarded as the most important. *See Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 640 F.Supp. 697, 700 (S.D.Ohio 1986). As described *supra*, the value of the $379 million settlement relative to the claims released appears to be undisclosed. Hampered in the ability to conduct this critical comparison, this Court should not enter a fee award. *Compare Southeastern Milk*, 2011 WL 3878332, at *4 (granting class counsel a one-third share of a $158 million settlement, but only where "[t]he total settlement, when combined with the prior settlement, [wa]s over 70% of the total damages calculated by plaintiffs' damages expert"); *Cardinal Health*, 528 F. Supp. 2d at 764 (noting the "class recovered 20% of its alleged loss" when considering the first *Ramey* factor).

## IV. Class Counsels' Lodestar Appears Considerably Overstated.

Class counsels' claimed lodestar is built upon rates that the Sixth Circuit recently admonished as "exceedingly high" in *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 310 (6th Cir. 2016). Consequently, class counsels' suggested cross-check does nothing to justify their $104 million request.

---

[15] The *Ramey* factors include: "1) the value of the benefit rendered to the corporation or its stockholders, 2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, 3) whether the services were undertaken on a contingent fee basis, 4) the value of the services on an hourly basis [the lodestar cross-check], 5) the complexity of the litigation, and 6) the professional skill and standing of counsel involved on both sides." *Ramey v. Cincinnati Enquirer, Inc.,* 508 F.2d 1188, 1196 (6th Cir.1974).

Like *Shane Group*, many lawyers here billed the class in excess of $700 per hour, with some billing $900 or more.[16] Seven paralegals charged in excess of $300 per hour, far beyond the rates charged by the top 1% of paralegals nationwide.[17] *Id.* (citing Nat'l Ass'n of Legal Assistants & Paralegals, 2015 National Utilization and Compensation Survey Report, Section 3 Billing Rates, at 2-3 available at https://www.nala.org/sites/default/files/15SEC3.pdf). As the Sixth Circuit emphatically remarked, "[t]hese are Bently rates, not Cadillac rates." *Id.* These inflated rates should not be accepted as part of class counsels' lodestar.

Class counsels' methodology is likewise skewed. They cite no binding authority requiring this Court to lump lodestar from prior settlements in performing a cross-check. By including lodestar from the Round 1 settlement, class counsel are able to claim a modest 1.37 multiplier when, as applied to this round of settlements, it appears to be twice that.

Class counsel represented their lodestar as $71,648,000 at the May 11, 2016 fairness hearing for the Round 1 settlements.[18] Their Round 2 fee motion specifies the total lodestar from March 23, 2012 to December 31, 2016 is $108,693,616.93.[19] If Round 1's $71,648,000 is removed from that figure, the lodestar accumulated

---

[16] Compendium of Firm Declarations, 12-00103, ECF Doc. 563-2, at Ex. 1-B, 2-B, and 3-B.

[17] *Id.* at 1-B, 2-B.

[18] Transcript from Fairness Hearing from Part 1 Settlements, 12-02311, ECF Doc. 1365, at 32.

[19] End-Payor Plaintiffs' Memorandum in Support of Motion for an Award of Attorneys' Fees, 12-00103, ECF Doc. 562, at 18.

since (notwithstanding the unreasonably high rates) is $37,045,616. To arrive at the proposed $104 million Round 2 fee, a 2.8 multiplier is required. This suggest a windfall and cements the need for application of a diminishing percentage approach.

## V.     Class Counsel Should Not be Awarded a Lump Sum Fee to be Distributed Among their Various Firms.

Though the Sixth Circuit has not weighed in, several Circuits have observed that in "a class action settlement, the district court has an independent duty . . . to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *See In re High Sulfur Content Gasoline Prods. Litig.* (5th Cir. 2008) 517 F.3d 220, 227–28 ; *In re "Agent Orange" Prods. Liab. Litig.* (2d Cir. 1987) 818 F.2d 216, 223. The district court "*must not* … delegate that duty to the parties." *High Sulfur,* 517 F.3d at 228 (internal quotation omitted).

Inherent conflicts among the various firms make this necessary even though "lead counsel may be in a better position . . . to evaluate the contributions of all counsel seeking recovery of fees[,]" the allocation should be supervised by the court in light of inherent conflicts among the attorneys. (*Id.* at 234-35 [citing *In re Diet Drugs Prods. Liab. Litig.* (3d Cir. 2005) 401 F.3d 143, 173 (Ambro, J., concurring)]) ("They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?'").

24

Admittedly, not every district court assumes this obligation. *See e.g., In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1006 (N.D. Ohio 2016). Yet, the notion that once fees are awarded, class members are no longer interested is misguided. The class members have a direct interest in how the funds from their common fund are distributed. *See e.g., Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) ("in addition to asking 'whether the *class settlement,* taken as a whole, is fair, reasonable, and adequate to all concerned,' we must also determine 'whether the *distribution* of the approved class settlement complies with our standards governing *cy pres* awards'") (emphasis original).

This Court should exercise its fiduciary obligation to the class and allocate fees among the various firms rather than simply award a lump sum and trust EPP class counsel will do so fairly.

## CONCLUSION

Class counsel have failed to satisfy their burden that the settlement if fair, adequate, and reasonable as contemplated by FED. R. CIV. P. 23. The settlement should not be approved, and class counsels' fees should fall below 20% of the common fund, and in no case approaching $104 million (or the more than $50 million for the DENSO settlement alone).

Dated:    March 16, 2017          Respectfully submitted,

/s/ *Christopher A. Bandas*
Christopher A. Bandas
BANDAS LAW FIRM, P.C.
500 North Shoreline, Suite 1020
Corpus Christi, TX 78401
(361) 698–5200 (tel)
(361) 698-5222 (fax)
*Attorney for Objectors Mark Ray and
Sean Hull*

Mark Weston Ray
Class Member/Objector

Sean Kennetth Hull
Class Member/Objector

## Certificate of Service

The undersigned certifies that today he filed the foregoing objection and associated declarations on ECF which will send electronic notification to all attorneys registered for ECF-filing. The undersigned further certifies he caused to be served via USPS First Class Mail, postage prepaid, a copy of this Objection and associated exhibits upon the following.

U.S. District Court for the Eastern District of Michigan
Clerk's Office
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd., Room 564
Detroit, MI 48226

Auto Parts Settlements Objections
P.O. Box 10163
Dublin, OH 43017-3163

Dated: March 16, 2017                    /s/ *Christopher A. Bandas*
                                         Christopher A. Bandas

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| In Re: Wire Harness | 2:12-cv-00103 |
| In Re: Instrument Panel Clusters | 2:12-cv-00203 |
| In Re: Fuel Senders | 2:12-cv-00303 |
| In Re: Heater Control Panels | 2:12-cv-00403 |
| In Re: Bearings | 2:12-cv-00503 |
| In Re: Alternators | 2:13-cv-00703 |
| In Re: Anti-Vibrational Rubber Parts | 2:13-cv-00803 |
| In Re: Windshield Wiper Systems | 2:13-cv-00903 |
| In Re: Radiators | 2:13-cv-01003 |
| In Re: Starters | 2:13-cv-01103 |
| In Re: Ignition Coils | 2:13-cv-01403 |
| In Re: Motor Generator | 2:13-cv-01503 |
| In Re: HID Ballasts | 2:13-cv-01703 |
| In Re: Inverters | 2:13-cv-01803 |
| In Re: Elec. Powered Steering Assemblies | 2:13-cv-01903 |
| In Re: Fan Motors | 2:13-cv-02103 |
| In Re: Fuel Injection Systems | 2:13-cv-02203 |
| In Re: Power Window Motors | 2:13-cv-02303 |
| In Re: Auto. Transmission Fluid Warmers | 2:13-cv-02403 |
| In Re: Valve Timing Control Devices | 2:13-cv-02503 |
| In Re: Electronic Throttle Bodies | 2:13-cv-02603 |
| In Re: Air Conditioning Systems | 2:13-cv-02703 |
| In Re: Windshield Washer Systems | 2:13-cv-02803 |
| In Re: Spark Plugs | 2:15-cv-03003 |
| In Re: Automotive Hoses | 2:15-cv-03203 |
| In Re: Ceramic Substrates | 2:16-cv-03803 |
| In Re: Power Window Switches | 2:16-cv-03903 |

THIS DOCUMENT RELATES TO:
End Payor

# DECLARATION OF MARK WESTON RAY IN SUPPORT OF

# OBJECTION

Comes now MARK WESTON RAY and states the following under oath and under penalty of perjury in support of his objection:

"My name is Mark Weston Ray. I am over the age of eighteen (18) years. I have never been convicted of a felony. I am qualified and competent to make this affidavit. The facts stated herein are within my personal knowledge."

"My current address is 8010 Slough Road, Corpus Christi, Texas 78414. My current phone number is (361) 813-6949."

"On July 30, 2004, I purchased a new 2004 Ford F-350 in the United States. The vehicle was not purchased for resale."

"On March 8, 2017, I confirmed at the following website that the 2004 Ford F-350 that I purchased is an eligible vehicle included in the settlements in the *In re Automotive Parts Litigation*: http://www.autopartsclass.com/. The settlement website indicated my vehicle is included in the *In re: Fuel Injection Systems* case."

"I reviewed the class notice that breaks down the Auto Parts Round 2 Settlements by case and settling defendant. It indicates the *In re: Fuel Injection Systems* case was settled in the DENSO Settlement Agreement and the Mitsubishi Electric (MELCO) Settlement Agreement. I am objecting to the DENSO Settlement Agreement and/or the Mitsubishi Electric (MELCO) Settlement Agreement, involving the fuel injection system."

"Based on the foregoing, I am a person who, from January 1, 1998 through July 14, 2016, purchased or leased a new Vehicle in the United States not for resale that included one or more Fuel Injection Systems as a component part, which were manufactured by or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant."

1

"On March 8, 2017, I filed a claim on the settlement website (claim number 84112E5D9F), a true and correct copy of which is attached hereto as Exhibit "A." As part of the claim, I uploaded documents to the settlement website reflecting my purchase of the Ford 2004 Ford F-350, true and correct copies of which are attached hereto as Exhibit "B." These documents identify the date of purchase as July 30, 2004, the make and model year of the vehicle as a 2004 Ford F-350, and Texas as the state where I purchased the new vehicle."

Dated this the 15th day of March, 2017.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Mark Weston Ray

2

# EXHIBIT A

# In Re: Automotive Parts Antitrust Litigation Website www.AutoPartsClass.com

## THANK YOU AND PRINT

Thank you for submitting your Auto Parts Class Claim Form. The details of your submission are below.

**PLEASE PRINT** and save a copy of this page for your records. All information will be kept private. It will not be disclosed to anyone other than the Court, the Settlement Administrator, and the Parties in this case, and will be used only for purposes of administering these Settlements. Updates to your contact information can be made by writing to the Settlement Administrator at the address below. You may submit any documentation supporting your claim to the address below. When submitting documentation by mail, you must reference your claim number. For further information, please bookmark this website or write to:

Auto Parts Settlements
c/o GCG
P.O. Box 10163
Dublin, OH 43017-3163

---

## CLAIMANT CONTACT INFORMATION

| | |
|---|---|
| Claim Number : | 84112E5D9F |
| Claimant Name : | Mark W Ray |
| Mailing Address : | 8010 SLOUGH RD. CORPUS CHRISTI TX 78414 |
| Phone Number : | (361) 813-6949 |
| Email : | mray@bordenins.com |

## PURCHASE/LEASE CLAIMS SECTION

| | |
|---|---|
| Are you making a claim for the purchase or lease of a new vehicle? | Yes |

For how many vehicles are you making a     1
claim?

## Vehicle(s) Claimed:

| Vehicle Year | Vehicle Make | Vehicle Model | VIN (Vehicle Identification Number) | State of Residence or Principal Place of Business at Time of Purchase | Date of Purchase or Lease | Purchase or Lease? |
|---|---|---|---|---|---|---|
| 2004 | FORD | F-350 | 1ftsw31s24ec10729 | TX | 7/30/2004 | Purchase |

## REPLACEMENT PART CLAIMS SECTION

Are you making a claim for the purchase of an     No
eligible vehicle replacement part?

For how many replacement parts are you     0
making a claim?

## Replacement Part(s) Claimed:

## UPLOADED DOCUMENTS

| File Name | Date Uploaded |
|---|---|
| ford title reg.pdf | 3/8/2017 5:21:44 PM |
| 2004 Ford - VIN 0729.pdf | 3/8/2017 5:22:21 PM |

# EXHIBIT B

Texas Department of Transportation

# TITLE APPLICATION RECEIPT

COUNTY: CALHOUN
STICKER NO: 2099029WF
PLATE NO: 83VVZ1
DOCUMENT NO: 0292003820909052B

TAC NAME: GLORIA OCHOA
DATE: 08/12/2004
TIME: 09:05AM
EMPLOYEE ID: 029PJAC

EFFECTIVE DATE: 08/12/2004
EXPIRATION DATE: 7/2005
TRANSACTION ID: 02920038209090528

OWNER NAME AND ADDRESS
MARK W RAY
630 BRADSHAW
CORPUS CHRISTI, TX 78412

REGISTRATION CLASS: TRUCK-LESS/EQL. 1 TON
PLATE TYPE: TRUCK PLT
STICKER TYPE: WS

VEHICLE IDENTIFICATION NO: 1FTSW31S24EC10729     VEHICLE CLASSIFICATION: TRK<=1
YR/MAKE: 2004/FORD  MODEL: 150  BODY STYLE: PK   UNIT NO:
EMPTY WT: 6300   CARRYING CAPACITY: 2000   GROSS WT: 8300   TONNAGE: 1.00   TRAILER TYPE:
BODY VEHICLE IDENTIFICATION NO:                              TRAVEL TRLR LNG/WDTH: 0
PREV OWNER NAME: PORT LAVACA FORD          PREV CITY/STATE: PORT LAVACA, TX

INVENTORY ITEM(S)                    YR
WINDSHIELD STICKER                   2005
TRUCK PLT

| FEES ASSESSED | | |
|---|---|---|
| TITLE APPLICATION FEE | $ | 13.00 |
| TERP FEE | $ | 15.00 |
| SALES TAX FEE | $ | 1,530.39 |
| WINDSHIELD STICKER | $ | 75.22 |
| REG FEE-DPS | $ | 1.00 |
| REFLECTORIZATION FEE | $ | 0.30 |
| CNTY ROAD BRIDGE ADD-ON FEE | $ | 8.00 |
| TOTAL | $ | 1,642.91 |

VEHICLE RECORD NOTATIONS
RELEASE OF PERSONAL INFO RESTRICTED
ACTUAL MILEAGE

METHOD OF PAYMENT AND PAYMENT AMOUNT:
CHECK #        $        1,642.91

TOTAL AMOUNT PAID $        1,642.91

ODOMETER READING: 20     BRAND: A
OWNERSHIP EVIDENCE: MANUFACTURER'S CERT. OF ORIGIN
1ST LIEN        DATE: 07/30/2004
FORD MOTOR CREDIT COMPANY
PO BOX 105704
ATLANTA, GA 30348-5704

2ND LIEN

3RD LIEN

SALES TAX CATEGORY: SALES/USE

Sales Tax Date: 07/30/2004

| | | |
|---|---|---|
| Sales Price (Less $1,500.00 rebate) | $ | 37,486.17 |
| Less Trade In Allowance | $ | 13,000.00 |
| Taxable Amount | $ | 24,486.17 |
| Sales Tax Paid | $ | 1,530.39 |
| Less Other State Tax Paid | $ | 0.00 |
| Tax Penalty | $ | 0.00 |
| TOTAL TAX PAID | $ | 1,530.39 |

Batch No: 2003820901        Batch Count: 4

CERTIFICATE OF TITLE WILL BE MAILED TO 1st LIENHOLDER
THIS RECEIPT TO BE CARRIED IN ALL COMMERCIAL VEHICLES.

THIS RECEIPT IS YOUR PROOF OF APPLICATION FOR CERTIFICATE OF TITLE AND REGISTRATION.

AL
ITS (REV. 3/2001) DHT157490

# APPLICATIONS

**REPLACEMENT LICENSE RECEIPT**
I, the undersigned, state that my original license plate(s) and/or sticker(s) have been lost, stolen, or mutilated and that any current plate(s) and/or sticker(s) remaining in my possession which are being replaced have been returned to the County Tax Assessor-Collector. I further state that the replacement plate(s) and/or sticker(s) will not be used on any vehicle other than the vehicle described on the face of this receipt and that the plate(s) and/or sticker(s) being replaced, if recovered, will not be used on any vehicle.

**NOTICE OF FEDERAL MOTOR CARRIER SAFETY REGULATIONS AND HAZARDOUS MATERIALS REGULATIONS FOR OWNERS OF THE FOLLOWING LISTED VEHICLES:**

VEHICLES WEIGHING IN EXCESS OF 10,000 LBS.

FARM VEHICLES WEIGHING IN EXCESS OF 10,000 LBS.

VEHICLES TRANSPORTING 15 OR MORE PASSENGERS.

VEHICLES TRANSPORTING HAZARDOUS MATERIAL REQUIRING A PLACARD.

"Payment of required registration fees is a declaration of knowledge that Texas has adopted and enforces the Federal Motor Carrier Safety Regulations and Hazardous Materials Regulations, and it is the obligation of the registrant to be familiar with applicable requirements."

**WARNING:**
**THE TRANSPORTATION CODE, SECTION 502.410, A person commits an offense if the person violates a provision of this chapter and no other penalty is prescribed for the violation.**

X_____
(Signature of Owner or Agent)

**72 / 144 - HOUR PERMITS**
This permit is issued to commercial vehicles owned by residents of the United States, Mexico, or Canada subject to registration by the State of Texas and which are not authorized to travel on the public roads of the State for lack of registration or for lack of reciprocity with a state of the United States, a state of the United Mexican States, or a province of Canada in which such a vehicle is registered. The applicant, by signing this form in the space provided, hereby certifies the applicant is:

1. the owner or authorized agent of the owner of the vehicle described on the face of this receipt, and
2. a resident of the United States, Mexico, or Canada.

**CURRENT PROOF OF LIABILITY INSURANCE REQUIRED.**

**ONE-TRIP PERMIT**
This temporary registration is valid for the transit of the vehicle only and shall not be used for the transportation of any passenger or property for compensation or otherwise unless the vehicle is a bus operating under charter which is not covered by a reciprocity agreement with the State or Country in which it is registered. The applicant, by signing this form in the space provided, hereby certifies that the vehicle described on the face of this receipt will not be operated in violation of the Transportation Code, Section 502.354, and that the vehicle will not be carrying a load, fixed or otherwise.
**CURRENT PROOF OF LIABILITY INSURANCE REQUIRED.**

**30-DAY TEMPORARY REGISTRATION**
The 30-Day Temporary Registration is valid for use on passenger vehicles, motorcycles, private buses, trailers and semitrailers with a gross weight not exceeding 10,000 lbs., and light commercial vehicles not exceeding a manufacturer's rating of one ton. A light commercial vehicle exceeding one ton, utilizing this permit must be operated unladen. The applicant, by signing this form in the space provided, hereby certifies that the vehicle described herein is unregistered and will not be operated in violation of the provisions of the Transportation Code, Section 502.354. The applicant also certifies that this vehicle is not a junked, salvage, or nonrepairable vehicle.
**CURRENT PROOF OF LIABILITY INSURANCE REQUIRED.**

NOTE: The applicant, by signing this form in the space provided, hereby certifies the applicant is not purchasing this permit as a result of being apprehended for violating the registration laws of this state.

**BALLOON CONTRACT PROVISIONS**

☐   Your last installment payment under this contract is a balloon payment.

**EXCESS WEAR, USE AND MILEAGE CHARGES**
If the box directly above is checked, this section, Paragraph B, and Paragraph C of this contract apply. You may be charged for excessive wear based upon our standards for normal use. If you exercise the option to sell the vehicle back to Creditor under Paragraph B, you must pay the Creditor $0/ N/A _____ per mile for each mile in excess of N/A _____ miles shown on the odometer.

**EXTRA MILEAGE OPTION CREDIT**
If this contract contains a balloon payment (as indicated above), and you have exercised your Option to sell the vehicle to the Creditor under Paragraph B, this paragraph applies to your contract. At the scheduled end of this contract, You will receive a credit of $0/ N/A _____ per unused mile for the number of unused miles between N/A _____ and N/A _____ miles, less any amounts You owe under this contract. You will not receive any credit if the vehicle is destroyed, this contract ends early, or you are in default. You will not receive any credit if the credit is less than $1.00.

Any change to this contract must be in writing. Both you and we must sign it. No oral changes to this contract are enforceable.

Buyer
Signs _____    Co-Buyer
Signs _____

**YOU ACKNOWLEDGE THAT YOU HAVE READ AND AGREE TO BE BOUND BY THE ARBITRATION PROVISION ON THE REVERSE SIDE OF THIS CONTRACT.**

**The Annual Percentage Rate may be negotiated with the Seller. The Seller may assign this contract and may retain its right to receive a portion of the Finance Charge.**

## CONSUMER WARNING

**Notice to the buyer - Do not sign this contract before you read it or if it contains any blank spaces. You are entitled to a copy of the contract you sign. Under the law, you have the right to pay off in advance all that you owe and under certain conditions may save a portion of the finance charge. You will keep this contract to protect your legal rights.**

**BUYER'S ACKNOWLEDGEMENT OF CONTRACT RECEIPT**
**YOU AGREE TO THE TERMS OF THIS CONTRACT AND ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF IT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT.**

| Buyer Signs | 07/30/2004 Date | (Co) Buyer Signs | Date |
|---|---|---|---|

PORT LAVACA FORD

| Seller Signs | By | Title | 07/30/2004 Date |
|---|---|---|---|

THIS CONTRACT IS NOT VALID UNTIL YOU AND CREDITOR SIGN IT.

**GUARANTY**

Guarantor hereby guarantees the collection of the above described amount upon failure of the Seller named herein to collect said amount from the Buyer named herein.

Guarantor _____    Address _____

Guarantor _____    Address _____

Seller may transfer this contract to another person. That person will then have all Seller's rights, privileges, and remedies. By signing below, the Seller assigns this contract to M C C _____ ("Assignee").

CONSUMER CREDIT COMMISSIONER NOTICE. To contact Assignee about this account, call _____
visit their website WWW.FORDCREDIT.COM _____, or write to them at P O BOX 152271
IRVING, TX 75015 _____. This contract is subject in whole or in part to Texas law which is enforced by the Consumer Credit Commissioner, 2601 N. Lamar Blvd., Austin, Texas 78705-4207; (800) 538-1579; (512) 936-7600, and can be contacted relative to any inquires or complaints.

Seller PORT LAVACA FORD _____ By _____ Title _____

FC 17642-SI   May 04 (Previous editions may NOT be used.)
FC 17642-B-SI
TX

**SEE BACK FOR ADDITIONAL AGREEMENTS**

**BUYER'S COPY**

interest in the motor vehicle.

**E. WAIVER OF NOTICE OF INTENT TO ACCELERATE AND NOTICE OF ACCELERATION: You** give up (waive) your common law rights to receive notice of intent to accelerate and notice of acceleration. This means that you give up the right to receive notice that we intend to demand that you pay all that you owe on this contract at once (accelerate), and notice that we have accelerated.

at any time in connection with this contract.

**Q. Applicable Law:** You agree that this contract will be governed by the laws of the state of Texas.

**R. General:** This contract contains the entire agreement between Creditor and you relating to the sale and financing of the motor vehicle. If any part of this contract is not valid, all other parts stay valid. If Creditor doesn't enforce Creditor's rights every time, Creditor can still enforce them later. Creditor will exercise all of Creditor's rights in a lawful way.

If your last installment payment under this contract is a balloon payment and you sell the Motor Vehicle back to the Creditor under Paragraph B, the Assignee has assigned to "Intermediary" as defined in the Agreement to Terms of Assignment, its rights (but not its obligations) with respect to the purchase of this vehicle and the sale of this vehicle at contract termination.

## FTC NOTICES

**NOTICE - ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**Used Motor Vehicle Buyers Guide.** If you are buying a used vehicle with this contract, federal regulations may require a special Buyers Guide to be displayed on the window of the vehicle. **THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.**

## ARBITRATION PROVISION

Arbitration is a method of resolving any claim, dispute, or controversy (collectively, a "Claim") without filing a lawsuit in court. Either you or Creditor ("us" or "we") (each, a "Party") may choose at any time, including after a lawsuit is filed, to have any Claim related to this contract decided by arbitration. Such Claims include but are not limited to the following: 1) Claims in contract, tort, regulatory or otherwise; 2) Claims regarding the interpretation, scope, or validity of this clause, or arbitrability of any issue; 3) Claims between you and us, our employees, agents, successors, assigns, subsidiaries, or affiliates; 4) Claims arising out of or relating to your application for credit, this contract, or any resulting transaction or relationship, including that with the dealer, or any such relationship with third parties who do not sign this contract.

**RIGHTS YOU AND WE AGREE TO GIVE UP**
If either you or we choose to arbitrate a Claim, then you and we agree to waive the following rights:

- **RIGHT TO A TRIAL, WHETHER BY A JUDGE OR JURY**
- **RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR A CLASS MEMBER IN ANY CLASS CLAIM YOU MAY HAVE AGAINST US WHETHER IN COURT OR IN ARBITRATION**
- **BROAD RIGHTS TO DISCOVERY AS ARE AVAILABLE IN A LAWSUIT**
- **RIGHT TO APPEAL THE DECISION OF AN ARBITRATOR**
- **OTHER RIGHTS THAT ARE AVAILABLE IN A LAWSUIT**

**Rights You And We Do Not Give Up:** If a Claim is arbitrated, you and we will continue to have the following rights, without waiving this arbitration provision as to any Claim: 1) Right to file bankruptcy in court; 2) Right to enforce the security interest in the vehicle, whether by repossession or through a court of law; 3) Right to take legal action to enforce the arbitrator's decision; and 4) Right to request that a court of law review whether the arbitrator exceeded its authority.

Either Party must contact any association below and the other Party to start arbitration. The applicable rules (the "Rules") may be obtained from the association.
- American Arbitration Association ("AAA"), at 1-800-778-7879, or www.adr.org;
- J.A.M.S./Endispute, at 1-800-448-1660, or www.jamsadr.com;
- National Arbitration Forum, at 1-800-474-2371, or www.arb-forum.com.
If there is a conflict between the Rules and this contract, this contract shall govern. This contract is subject to the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the Federal Rules of Evidence. The arbitration decision shall be in writing with a supporting opinion. We will pay your total reasonable arbitration fees and expenses (not including attorney fees, except where applicable law otherwise provides) in excess of $125. We will pay the whole filing fee if we demand arbitration first. Any portion of this arbitration clause that is unenforceable shall be severed, and the remaining provisions shall be enforced.

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| In Re: Wire Harness | 2:12-cv-00103 |
| In Re: Instrument Panel Clusters | 2:12-cv-00203 |
| In Re: Fuel Senders | 2:12-cv-00303 |
| In Re: Heater Control Panels | 2:12-cv-00403 |
| In Re: Bearings | 2:12-cv-00503 |
| In Re: Alternators | 2:13-cv-00703 |
| In Re: Anti-Vibrational Rubber Parts | 2:13-cv-00803 |
| In Re: Windshield Wiper Systems | 2:13-cv-00903 |
| In Re: Radiators | 2:13-cv-01003 |
| In Re: Starters | 2:13-cv-01103 |
| In Re: Ignition Coils | 2:13-cv-01403 |
| In Re: Motor Generator | 2:13-cv-01503 |
| In Re: HID Ballasts | 2:13-cv-01703 |
| In Re: Inverters | 2:13-cv-01803 |
| In Re: Elec. Powered Steering Assemblies | 2:13-cv-01903 |
| In Re: Fan Motors | 2:13-cv-02103 |
| In Re: Fuel Injection Systems | 2:13-cv-02203 |
| In Re: Power Window Motors | 2:13-cv-02303 |
| In Re: Auto. Transmission Fluid Warmers | 2:13-cv-02403 |
| In Re: Valve Timing Control Devices | 2:13-cv-02503 |
| In Re: Electronic Throttle Bodies | 2:13-cv-02603 |
| In Re: Air Conditioning Systems | 2:13-cv-02703 |
| In Re: Windshield Washer Systems | 2:13-cv-02803 |
| In Re: Spark Plugs | 2:15-cv-03003 |
| In Re: Automotive Hoses | 2:15-cv-03203 |
| In Re: Ceramic Substrates | 2:16-cv-03803 |
| In Re: Power Window Switches | 2:16-cv-03903 |

THIS DOCUMENT RELATES TO:
End Payor

## DECLARATION OF SEAN KENNETH HULL IN SUPPORT OF OBJECTION

Comes now SEAN KENNETH HULL and states the following under oath

and under penalty of perjury in support of his objection:

"My name is Sean Kenneth Hull. I am over the age of eighteen (18) years. I have never been convicted of a felony. I am qualified and competent to make this affidavit. The facts stated herein are within my personal knowledge."

"My current address is 7890 Witney Place, Lone Tree, Colorado 80124. My current phone number is (303) 519-8711."

"On or about February 20, 2006, I purchased a new 2006 Infiniti G35 from a dealership in Pleasanton, California. I purchased the vehicle while I was residing in the State of California. My address at the time was 3537 Gulfstream St., Pleasanton, California 94588. The vehicle was not purchased for resale."

"On March 14, 2017, I confirmed at the following website that the 2006 Infiniti G35 that I purchased is an eligible vehicle included in the settlements in the *In re Automotive Parts Litigation*: http://www.autopartsclass.com/. The settlement website indicated my vehicle is included in the *In re: Radiators, In re: Fan Motors, In re: Power Window Motors, In re: Windshield Wiper Systems, and In re: Windshield Washer Systems* cases.

"I reviewed the class notice that breaks down the Auto Parts Round 2 Settlements by case and settling defendant. It indicates the *In re: Radiators, In re: Fan Motors, In re Power Window Motors, In re: Windshield Wiper Systems*, and *In re: Windshield Washer Systems* cases were settled in the DENSO Settlement Agreement. I am objecting to the DENSO Settlement Agreement involving the radiator, fan motor, power window motor, windshield wiper system, and windshield washer system."

"Based on the foregoing, I am a person who, from January 1, 1998, through July 14, 2016, purchased or leased a new Vehicle

in the United States not for resale that included one or more Radiators as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant."

"I am also a person who, from January 1, 1998, through July 14, 2016, purchased or leased a new Vehicle in the United States not for resale that included one or more Fan Motors as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant."

"I am also a person who, from January 1, 1998, through July 14, 2016, purchased or leased a new Vehicle in the United States not for resale that included one or more Power Window Motors as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant."

"I am also a person who, from January 1, 1998, through July 14, 2016, purchased or leased a new Vehicle in the United States not for resale that included one or more Windshield Wiper Systems as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant."

"I am also a person who, from January 1, 1998, through July 14, 2016, purchased or leased a new Vehicle in the United States not for resale that included one or more Windshield Washer Systems as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant."

"On March 14, 2017, I filed a claim on the settlement website (claim number B06CBBCD3D), a true and correct copy of which is attached hereto as Exhibit "A." After searching my records, I was unable to find purchase documents of the 2006 Infiniti G35. In November, 2006, I traded the vehicle in to a different dealership

located in Concord, California. It is not my practice to keep records from car purchases for that extended period of time (i.e., more than ten years). I intend to make efforts to secure the records documenting my purchase, including contacting the dealership where I purchased the 2006 Infiniti G35. As soon as I am able to obtain the purchase documentation, I will supplement my claim and objection with the material."

Dated this the 16th day of March, 2017.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Sean Kenneth Hull

# EXHIBIT A

# In Re: Automotive Parts Antitrust Litigation Website www.AutoPartsClass.com

**THANK YOU AND PRINT**

Thank you for submitting your Auto Parts Class Claim Form. The details of your submission are below.

**PLEASE PRINT** and save a copy of this page for your records. All information will be kept private. It will not be disclosed to anyone other than the Court, the Settlement Administrator, and the Parties in this case, and will be used only for purposes of administering these Settlements. Updates to your contact information can be made by writing to the Settlement Administrator at the address below. You may submit any documentation supporting your claim to the address below. When submitting documentation by mail, you must reference your claim number. For further information, please bookmark this website or write to:

Auto Parts Settlements
c/o GCG
P.O. Box 10163
Dublin, OH 43017-3163

---

**CLAIMANT CONTACT INFORMATION**

|  |  |
|---|---|
| Claim Number : | B06CBBCD3D |
| Claimant Name : | SEAN HULL |
| Mailing Address : | 7890 WITNEY PLACE<br>CO<br>7890 WITNEY PLACE<br>LONE TREE<br>CO<br>80124 |
| Phone Number : | (303) 519-8711 |
| Email : | sxhull@gmail.com |

**PURCHASE/LEASE CLAIMS SECTION**

|  |  |
|---|---|
| Are you making a claim for the purchase or lease of a new vehicle? | Yes |
| For how many vehicles are you making a claim? | 1 |

**Vehicle(s) Claimed:**

| Vehicle Year | Vehicle Make | Vehicle Model | VIN (Vehicle Identification Number) | State of Residence or Principal Place of Business at Time of Purchase | Date of Purchase or Lease | Purchase or Lease? |
|---|---|---|---|---|---|---|
| 2006 | INFINITI | G35 | | CA | 2/20/2006 | Purchase |

## REPLACEMENT PART CLAIMS SECTION

Are you making a claim for the purchase of an eligible vehicle replacement part?      No

For how many replacement parts are you making a claim?      0

**Replacement Part(s) Claimed:**

## UPLOADED DOCUMENTS

| File Name | Date Uploaded |
|---|---|
| | |