```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3                           —   —   —

4    _____
                                     )
5    IN RE:  AUTOMOTIVE PARTS        )   Master File No. 12-2311
     ANTITRUST LITIGATION            )   Hon. Marianne O. Battani
6    _____ )
                                     )
7    IN RE: All Auto Parts Cases     )
     _____ )
8                                     )
     THIS RELATES TO:                )
9    All Auto Parts Cases            )
     _____ )

10

11       DEFENDANTS' AND CERTAIN NON-PARTIES' OBJECTIONS TO THE
                          MASTER'S ORDER

12        BEFORE THE HONORABLE MARIANNE O. BATTANI
                  United States District Judge
13         Theodore Levin United States Courthouse
                231 West Lafayette Boulevard
14                   Detroit, Michigan
                  Tuesday, May 16, 2017

15

16   APPEARANCES:

17   DEALERSHIP PLAINTIFFS

18   VICTORIA ROMANENKO
     CUNEO, GILBERT & LaDUCA, L.L.P.
19   507 C Street NE
     Washington, D.C.  20002
20   (202) 789-3960

21

22

23

24       To obtain a copy of this official transcript, contact:
               Robert L. Smith, Official Court Reporter
25           (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1   APPEARANCES:  (Continued)

 2   NON-PARTY OEMS

 3   ADAM WOLFSON
     QUINN, EMANUEL, URQUHART, OLIVER & SULLIVAN, L.L.P.
 4   865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
 5   (213) 443-3000

 6   DANIEL T. FENSKE
     JENNER & BLOCK
 7   353 N. Clark Street
     Chicago, IL 60654-3456
 8   (312) 222-9350

 9   SARAH GIBBS LEIVICK
     KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
10   1633 Broadway
     New York, NY  10019
11   (212) 506-1765

12   DOMINIC SURPRENANT
     QUINN, EMANUEL, URQUHART, OLIVER & SULLIVAN, L.L.P.
13   865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
14   (213) 443-3000

15   JEFFREY D.  PERCONTE
     DRINKER, BIDDLE & REATH, L.L.P.
16   191 N. Wacker Dr., Ste. 3700
     Chicago, IL  60606
17   (312) 569-1361

18

19

20

21

22

23

24

25
```

# TABLE OF CONTENTS

Page

1    Detroit, Michigan

2    Tuesday, May 16, 2017

3    at about 10:28 a.m.

4                        —   —   —

5              (Court and Counsel present.)

6              THE CASE MANAGER:  Please rise.

7              The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Marianne O. Battani presiding.

10             You may be seated.

11             THE COURT:  Good morning.

12             THE ATTORNEYS:  (Collectively) Good morning.

13             THE COURT:  All right.  This is the defendants' and

14   certain non-parties' objections to the Master's order.  So

15   let me have your -- wait a minute.  May I have your

16   appearances, please?

17             MR. WOLFSON:  Good morning, Your Honor.

18   Adam Wolfson, from Quinn Emanuel, on behalf of

19   General Motors.

20             MR. FENSKE:  Dan Fenske on behalf of Mitsubishi

21   Electric.

22             MS. LEIVICK:  Sara Leivick on behalf of Ford Motor

23   Company.

24             MR. SURPRENANT:  Your Honor, Dominic Surprenant,

25   Quinn Emanuel, on behalf of the 17 Daimler entities.

 1          MR. PERCONTE:  Your Honor, Jeff Perconte on behalf

 2   of Nissan North America, Inc.

 3          MS. McKEEVER:  Susan McKeever on behalf of the

 4   FCA US, LLC.

 5          MR. SHERKER:  Elliott Sherker --

 6          THE COURT:  Are you going to argue?

 7          MR. SHERKER:  I'm not intending to, Your Honor, we

 8   haven't filed our own objections.

 9          THE COURT:  Okay.  We don't need your appearances

10   then, let's stick with the ones who are going to argue today.

11          Ms. Romanenko.

12          MS. ROMANENKO:  Good morning, Your Honor.

13   Victoria Romanenko for dealership plaintiffs.  We'll be

14   arguing in opposition of the objections and in favor of the

15   Master's ruling.

16          THE COURT:  Okay.  Ms. Li, are you going to be --

17          MS. LI:  Good morning, Your Honor.  I'm not going

18   to argue today.

19          THE COURT:  Okay.  Who's going to start,

20   Mr. Wolfson?

21          MS. ROMANENKO:  Your Honor, just one small

22   housekeeping thing.  We would suggest if Your Honor thinks

23   this is a good idea to let whoever wants to argue go and then

24   we would respond, we think that might be more efficient than

25   trying to respond after each successive one.

1    THE COURT:  Yes, I think one response would be

2    sufficient.

3         MS. ROMANENKO:  Okay.  Great.

4         MR. WOLFSON:  Good morning, Your Honor.  My name is

5    Adam Wolfson.  I'm appearing here on behalf of GM, but I have

6    been nominated to present some of the common arguments for

7    the various other OEMs that filed briefs with us.

8         THE COURT:  Are they all non-party OEMs?

9         MR. WOLFSON:  Yes, yes.  And there are a few

10   OEM-specific arguments that some of my colleagues who

11   announced themselves plan to address themselves, so I'm not

12   going to speak on their behalf for those unique arguments.

13        THE COURT:  Okay.

14        MR. WOLFSON:  Before I begin, one question is

15   whether Your Honor would like me to direct my arguments to

16   any specific issues that you have questions about or whether

17   I should just launch into it.

18        THE COURT:  I think you should just launch into it.

19   I mean, there are two main parts, let's discuss each of them.

20        MR. WOLFSON:  Sure.  So the Special Master's order

21   ordered that non-party OEMs -- or I should say the OEMs to

22   produce documents related to any proffers or discussions at

23   initial meetings and then also the settlement agreements.

24        THE COURT:  Let's talk about the initial meeting

25   because I would like to have more of a framework for that.

1          MR. WOLFSON:  Okay.  Sure.

2          THE COURT:  Describe for me, if you could, the

3    circumstances in which the OEMs met with these suppliers.

4    Defendant -- well, they may be defendants, they may not be

5    defendant suppliers, but, you know, did -- how was the

6    meeting set up?  Are we going to discuss how to resolve this

7    or we have a confession to make?  I mean, what was the

8    circumstance?

9          MR. WOLFSON:  So, Your Honor, one constraint I have

10   is that I understand as a general matter that many of these

11   discussions were governed by confidentiality agreements, so I

12   believe that I need to speak somewhat in generalities.  But

13   my understanding -- and also I can tell you that I don't have

14   full insight into what other OEMs, how their process worked;

15   however, I do understand the generalities of the way it did

16   proceed.

17         THE COURT:  All right.

18         MR. WOLFSON:  The way it would proceed is that an

19   auto parts supplier would either plead guilty or was

20   implicated by other guilty pleas, and then a discussion

21   started between them, between an OEM and a parts supplier,

22   saying we think we need to have some sort of compensation for

23   the collusion that happened against us.  Typically before --

24         THE COURT:  So before they met they really knew by

25   way of these pleas and/or other information that this

 1    particular supplier had participated probably in this?

 2         MR. WOLFSON:  It was the primary purpose to reach

 3    out and begin discussions in the first place.  And before

 4    substance was discussed, I understand that there are

 5    generally pre-substantive discussions about how these would

 6    proceed, confidentiality agreements, things perhaps not in

 7    all cases but in at least several, tolling agreements in

 8    order to toll the statute of limitations on any claims,

 9    general framework discussions to make sure that these were

10    confidential discussions and were kept within the bounds of

11    knowing that they were settlement discussions in an effort to

12    avoid having to file litigation or resolve out of court.

13         So the set-up before an initial face-to-face

14    meeting or an initial video conference or an initial

15    substantive teleconference was establishing that these would

16    be confidential and specifically aimed at trying to resolve

17    the brewing dispute between the parties.

18         So once there was -- well, one of the problems with

19    the Special Master's orders is what constitutes an initial

20    meeting; is it this first reach out where, well, we

21    understand that your client had wronged our client, we need

22    to set up a meeting to discuss that, is that the initial

23    meeting?  Is the initial meeting where the parties sit down

24    face to face and try to discuss some of the substance so

25    there is a framework for the settlement discussions to

1   proceed, is that the initial meeting?  One of the problems

2   here is there is not specificity as to when these things

3   occurred, there is just an assumption that there were

4   substantive discussions at the very beginning and we don't

5   quite know what initial meeting means.

6        Once these conversations started though, we do

7   believe that had the Special Master actually conducted a

8   factual inquiry and looked into the facts of the discussions,

9   because he didn't, but if he did, he would have learned and

10  understood that these were discussions in furtherance of

11  settlement, which is the keystone for the Goodyear settlement

12  privilege.  And had he conducted this factual inquiry, which

13  we believe is necessary in order to make the privilege

14  discussion -- or the privilege determination, then it would

15  have been clear that these were in furtherance of settlement

16  discussions.

17       And the plaintiffs, they have raised a couple of

18  different arguments.  They have said, well, they couldn't

19  really be in furtherance of settlement because no litigation

20  had been started yet, and we cited cases back saying no, no,

21  that's not the purpose of privilege.  Often courts want to

22  encourage parties to settle before they even get into

23  litigation, and the Goodyear privilege specifically protects

24  those types of discussions because we want to encourage

25  settlement, we don't want to burden the Court, we don't want

1    to force all of these OEMs to file however many dozen

2    additional suits before this Court swelling the size of this

3    MDL even more.

4         In discussing why the plaintiffs need or say they

5    need these communications, they offer up a number of

6    different reasons that largely go towards liability.  I could

7    read the full quote, it is in their opposition at page 4, but

8    the gist is they want to know about the scope of the

9    conspiracy, the length of the conspiracy, the method and

10   conduct of the conspiracy, who was in the conspiracy, how

11   normal bids as part of the bidding process for auto parts

12   supplies was circumvented, and how the defendants concealed

13   the conspiracy, and each of these points goes towards

14   liability.

15        And why do I mention that?  Because unlike the

16   majority of Rule 26 relevance decisions on the scope of

17   discovery, the Sixth Circuit was clear in Goodyear that there

18   needs to be a, quote, legitimate admissible use for

19   settlement communications in order for them to even be

20   considered potentially discoverable.  It is different than

21   the normal Rule 26 analysis, but it is what it is based on

22   the Goodyear opinion.

23        And for each of these purposes, the only ones that

24   the plaintiffs have identified for seeking these

25   communications, they all go towards liability, which is a

1    direct violation of Federal Rule of Evidence 408.

2         So beyond the fact that these are -- that we

3    believe these are all discussions that were in furtherance of

4    settlement, the next step, the one that is essentially game

5    over under Goodyear is that there is no even contemplated

6    admissible use for these documents and/or these

7    communications, and therefore it is not discoverable under

8    the Goodyear standard.

9         In addition, to the extent that these are -- these

10   communications are desired in order to show how things worked

11   in the industry, we believe there are far less burdensome,

12   just more typical avenues of discovery that the plaintiffs

13   have pursued at length, they have gone extensively to

14   defendants, and any constraints on the documents that

15   defendants have apply equally to the dealership plaintiffs

16   and the other indirect purchaser plaintiffs as to the OEMs.

17        They also have access to discovery from the OEMs,

18   that I know we are ironing out the final full extent of that

19   discovery in this hearing and the next one, but the scope of

20   what the plaintiffs have gotten from the OEMs or gotten

21   agreements to produce is quite extensive and it goes towards

22   what happened, how the OEMs were overcharged, when they were

23   overcharged, what their costs were, the data that the

24   indirect purchaser plaintiffs can use to try to assess that

25   passthrough if they can prove it through their economist.

1    All of that sort of discovery is available and will be

2    produced to them.

3          So the idea that settlement communications, which

4    the Sixth Circuit is already skeptical of, will shed

5    additional light on that considering that it is duplicative

6    discovery at best but then also strongly protected and would

7    be burdensome for the plaintiffs to produce because going

8    back into these -- I'm sorry, the OEMs to produce going back

9    into these communications --

10         THE COURT:  Are the statements of the suppliers

11   regarding their participation in this scheme, are those

12   really something that should be protected or should not

13   plaintiff know the scope and who is involved, how they did

14   it, from the defendants' mouth?  That would seem to me to

15   take care of a lot of problems in this case.

16         MR. WOLFSON:  Well, there's an important underlying

17   policy that the Sixth Circuit talked about in Goodyear which

18   is that in these discussions, there is a certain amount --

19   first of all, we can't take what somebody says about their

20   liability at face value in these discussions.  Plaintiffs

21   will underplay, defendants will overplay the liability issues

22   when they are discussing settlement, and at some point they

23   reach an acceptable medium in order for there to be some sort

24   of compromise.

25         The full and frank discussion of parties' positions

1   is also something that the Sixth Circuit wants to encourage,

2   and making statements about liability discoverable despite

3   the settlement privilege would defeat that, and it would lead

4   to defendants actually being much less forthcoming with the

5   OEMs in future settlement discussions if that does become

6   discoverable.

7          The plaintiffs continue to have the ability to

8   conduct discovery of these defendants and of the part

9   suppliers; they can take depositions, they can look at guilty

10  pleas, they can look at what they've admitted.  To the extent

11  there are Fifth Amendment depositions, they are able to seek

12  and obtain discovery through that including potentially

13  inferences down the line.  All of this is fully available to

14  them.  They just want to see what was said directly to the

15  OEMs in confidential settlement communications that

16  unquestionably were part of settlement negotiations, so

17  Goodyear protects that.

18         And frankly, for our purposes, we are worried as

19  out-of-court plaintiffs or potential plaintiffs that forcing

20  the defendants to produce those types of discussions will

21  have a chilling effect on future settlements and force us

22  unfortunately to file when we would prefer to deal with this

23  as we have been, largely out of court and largely through

24  confidential but more informal discussions as opposed to in a

25  mediation.

1          So the chilling effects we believe are a very

2     relevant and important point to consider, that, yes, a

3     defendant saying, well, here's where we think we colluded, it

4     is a good shortcut, I agree, but there is back and forth,

5     that's not the end of the discussion.  And the Special Master

6     said, well, this initial proffer, this initial time where

7     they said anything to you about what they thought their scope

8     of liability was, that's discoverable but everything after

9     that is not, and what's -- there is no real difference

10    between those discussions except that --

11         THE COURT:  It is hard to find the bright line to

12    separate those two.

13         MR. WOLFSON:  It is.  And if we're in settlement

14    negotiations, the bright line is when did settlement

15    negotiations start?  It's not when was liability first

16    discussed within those settlement negotiations.

17         So our position is just that the Special Master

18    made a non -- he made a finding without the facts before him

19    that is in violation of the Goodyear privilege.  There is

20    very good reasons to stick with the privilege here because

21    these so squarely fall within it, and that in any event, the

22    plaintiffs, the reason they want these communications are not

23    for admissible purposes which is another requirement of the

24    Goodyear test.

25         THE COURT:  Well, actually the Master did, in fact,

1    recognize the Goodyear privilege.  It is just a matter of

2    when did that privilege attach.

3              MR. WOLFSON:  Complete -- absolutely, he did, and

4    it is not -- it is -- our belief is that the error was by

5    concluding that it only began at these, quote, initial

6    meetings as opposed to when the parties first understood that

7    they were in settlement negotiations.

8              THE COURT:  I just can't quite grasp this.  When

9    they understood they were in settlement negotiations, must

10   they not have then been in a meeting or planning a meeting,

11   let's meet to discuss how we resolve this?  That would be

12   settlement.

13             MR. WOLFSON:  Absolutely, and I believe this is

14   part of problem.  What is -- this is going back to what is in

15   an initial meeting, quote/unquote, because that's in the

16   order, is that if the initial meeting is that first e-mail or

17   call, we believe that your client based on this guilty plea

18   or based on this other fact owes our client some money or

19   some compensation, then there is really no issue because

20   that's an initial meeting and there is no discovery.  But if

21   the initial meeting is the first time that the parties all

22   come together for the purposes of settlement, that's where we

23   believe that it is -- already the privilege is attaching to

24   those conversations.

25             THE COURT:  Okay.  Thank you.

 1          MR. WOLFSON:  No problem.  Would you like me to

 2    move on to the settlement agreements?

 3          THE COURT:  Yes, please.

 4          MR. WOLFSON:  So the settlement agreements, Your

 5    Honor, we believe -- well, first of all, the requirement here

 6    is that the plaintiffs need to show relevance of the

 7    settlement agreements, and we don't believe that they have.

 8    And part of this is because they are indirect purchaser

 9    plaintiffs and the OEMs are direct purchaser plaintiffs.  But

10    also the broader issue is we need a reason why.  Settlement

11    agreements, yes, they sometimes are discoverable, and in some

12    instances courts do order the production of settlement

13    agreements, we acknowledge that.  But there needs to be a

14    good reason why to order settlement agreements because,

15    again, you have this problem of creating chilling effects.

16          And here the plaintiffs' justifications for these,

17    just summarizing, just paraphrasing, they say that, first,

18    that they might shed light on the practices and the mechanics

19    of OEMs' commercial relationships with their suppliers,

20    that's their first reason.  There's a lot of discovery on

21    that, a lot.  We are -- I mean, just from GM's perspective,

22    we are producing an incredible amount of costing data,

23    purchasing data, sales data, a whole bunch of information

24    that talk about the historical practices -- that show

25    literally the practices and the mechanics of our commercial

1   relationship with our suppliers, and the other OEMs are

2   producing an incredible amount of information along similar

3   lines.  The defendants have produced an incredible amount of

4   information on how the relationships and the mechanics of the

5   OEM supplier relationship work.

6         So, first, right there, it is questionable to us

7   why settlement agreements that shed unique light on that

8   particular aspect of these cases.

9         The next justification they give is that the

10  settlement agreements are commercial agreements rather than

11  agreements to resolve pending court cases, and it is --

12  that's a bit of a rose by another name.  The agreements

13  settle claims between the parties.  They are not resolving

14  pending court cases but they are resolving disputes, they are

15  resolving claims between parties.  They include things like

16  releases because the whole purpose of a settlement agreement

17  is to resolve these claims and release future claims.

18        The idea that these would be commercial agreements

19  that would be normally discoverable and as some sort of

20  commercial -- it is going to affect price is, in our view, it

21  is a bit misguided.  But if there were changes in prices due

22  to these agreements that were within the relevant periods

23  that the plaintiffs are requesting, the price changes are

24  going to be reflected in the copious amounts of data that we

25  are producing.

1       So if we -- if -- and this is a big if, if there

2   was a price change in parts that a supplier sold to an OEM as

3   the result of a settlement agreement, it would already be

4   reflected in the discovery that is being produced, and

5   frankly it would be a -- it would be a price down, it would

6   be a step down of some kind.

7       So if this is going to be used to show damages such

8   as the delta between the previous part price and the

9   subsequent part price, we believe that would also have

10  problems with -- again with 408.  We can't use settlement

11  discussions or settlement-related documents to show damages.

12  And if the idea is that, well, this is going to show the

13  difference or a reduction in price and we can use that to

14  establish our damages, then this runs into the similar

15  problems as the settlement negotiations.

16      The plaintiffs have said this is relevant as a

17  potential source of bias because OEMs have submitted

18  declarations and affidavits in this case that -- about how

19  their business works and that if there's a settlement

20  agreement, that it might have given them a reason to shade

21  the truth in those.

22      Frankly, I will put aside for a moment that these

23  are OEMs that were cheated for over a decade and there's very

24  little reason to support the suppliers that were the

25  conspirators.  But the broader point here is if there's

1    some -- something in the record to show that the OEMs are not

2    describing their businesses accurately, the discovery that is

3    already provided, the extensive discovery, would show that.

4         So, again, if we are balancing burden on the third

5    party, the necessity for the discovery, again, we think that

6    what we have already promised to provide is more than

7    adequate to address that concern.

8         And then finally the plaintiffs argue that they can

9    use the settlement agreements as a basis to understand what

10   to request in terms of documents.  I believe the Special

11   Master has spoken to this point and I believe Your Honor has

12   actually also mentioned this, that this subpoena was pretty

13   big.  We -- I believe the Special Master called it the

14   largest in the history of the federal court system.  But the

15   plaintiffs knew what to request for and they did.  They

16   requested a lot of different documents, data, production of

17   in some respects a huge swath of the OEMs' business for the

18   past 20 years.  They knew what to request.  They don't need

19   the settlement agreements now at this date to understand what

20   to request document-wise.

21        So for the settlement agreements, we just believe

22   that they are not relevant, and even if there is some minimal

23   relevance, we have to balance burden.  If we are going to

24   force the third-party OEMs to produce their settlement

25   agreements with the defendants, this comes back again to the

1    problem of chilling effects.  If we produce them, not only

2    are the plaintiffs requesting them going to see these

3    settlement agreements, every single other defendant is also

4    going to see these settlement agreements.  Every single other

5    OEM is going to see their competitor's settlement agreements.

6          These are sensitive materials.  They deal with

7    collusion and conspiratorial conduct that affected OEMs to

8    different amounts but in large amounts for over a decade.

9    And the fact that these sensitive financial terms could not

10   only go to the conspirators that affected the OEMs for so

11   long but also every one of their -- one of our competitors

12   and mutually so, it creates a large problem and disincentive

13   to have these negotiations really papered.  It is -- there is

14   a -- it just creates a lot of crosswinds that will make

15   future settlement difficult.

16          So we are speaking also from a practical reason

17   here.  Due to the minimal relevance, due to the burden, and

18   due to the fact that this will be spread across the wind, we

19   don't believe that the settlement agreements should be

20   produced here.

21          THE COURT:  Okay.  Thank you.

22          MR. WOLFSON:  Thank you, Your Honor.

23          THE COURT:  Mr. Fenske.

24          MR. FENSKE:  Yes, Your Honor.  Dan Fenske on behalf

25   of Mitsubishi Electric, and I will be speaking on behalf of

1    all the defendants today.

2          I would like to take them in the same order that

3    Mr. Wolfson took them in, and I will start with settlement

4    communications and address some of the concerns that Your

5    Honor -- or the questions that Your Honor asked Mr. Wolfson.

6          First, I took sort of a practical question, how did

7    this work?  And, again, like Mr. Wolfson, I have some

8    restrictions on what I can say because of confidentiality

9    agreements, but I can speak in general terms.  And in

10   general, when the conduct in question was made public through

11   a plea agreement or an FBI search or something like that, at

12   some point either the OEM or the defendant would reach out

13   and say should we talk, and they will then generally enter

14   into an a confidentiality agreement.  The confidentiality

15   agreement will make clear that all of the statements that are

16   made pursuant to that agreement are for the sole purpose of

17   settlement under Rule 408 and under the settlement privilege.

18   They might also engage as part of that in a dispute

19   resolution agreement that will define how the process of

20   resolving the claims will go.

21         But the key point, Your Honor, is that these are

22   not ad hoc discussions.  These are discussions between --

23   usually between counsel for the defendant, counsel for the

24   OEMs for the avowed purpose of discussing a potential

25   resolution of claims.  These are not business discussions or

1    anything like that in general.

2         And any of the statements that the Special Master

3    generally -- target statements about the factual admissions

4    about the misconduct in question, how the conspiracy

5    operated, its time frame and et cetera, would take place

6    generally after those sorts of either written or perhaps oral

7    agreements were entered into.  And so they were clearly were

8    for, in the words of Goodyear, statements made, communication

9    in furtherance of settlement, which under the plain language

10   of Goodyear are privilege.

11        And Your Honor expressed some concerns, well,

12   should they be protected?  And the answer I think is yes, and

13   the reason is very simple.  The public policy favors settling

14   dispute, and confidentiality is necessary to settle disputes

15   because otherwise the parties won't make statements in the

16   first place for fear they will be used against them, in the

17   words of Goodyear, by some future third party like the class

18   plaintiffs here.

19        So the question isn't if the Master's decision is

20   upheld, the statements won't be made in the first place.  The

21   parties will have less information to evaluate an appropriate

22   settlement and settlement will become much harder, and that's

23   exactly why the court in Goodyear recognized the settlement

24   privilege.

25        I mean consider this -- the impact on just the

1    class cases here.  If the Special Master's decision were

2    upheld and a defendant were -- it would logically apply to

3    discussions with the class plaintiffs as well, and if you

4    were engaged in settlement discussions, for example, with the

5    indirect purchasers and you wanted to disclose facts about

6    what happened, you won't do that if the DPPs can simply serve

7    a discovery request and say tell me the same thing even

8    though your settlement discussions with the DPPs, you are in

9    a totally different posture with the DPPs as to settlement,

10   so you will be dissuading parties from making the sorts of

11   disclosures that are necessary to settle.

12        And I would just point out that the case law is

13   fairly clear that Rule 408 and the settlement privilege, and

14   they are essentially cousins, they are essentially very

15   similar rule, apply to factual admissions.  We cited in

16   addition to Goodyear, the plain language of Goodyear itself,

17   the Thornton case from the Northern District of Ohio applied

18   the settlement privilege to interrogatory responses, factual

19   admissions about the underlying contacts that were made to

20   government regulators.

21        We cited a wealth of cases in our reply brief

22   showing that courts clearly apply Rule 408 to factual

23   admissions.  And one court couldn't have put it better: it

24   does not matter that the statements involved were not

25   actually offers but rather facts proffered about the dispute.

1        So, Your Honor, this in our view is a fairly

2   straightforward issue.  The Special Master has ordered the

3   production of agreements that are at the very core of the

4   Goodyear settlement privilege and will dissuade the parties

5   from settling.

6        On the initial meeting point specifically, in

7   addition -- in addition to the fact that it --

8        THE COURT:  What would those documents be if we are

9   talking about this settlement -- not settlement agreements, I

10  mean the discussions beforehand, what are we talking about?

11       MR. FENSKE:  Well, that would again vary on a

12  defendant by defendant basis, but there would generally have

13  been a meeting.  Assuming that these sorts of factual

14  proffers happened, and I think it is safe to assume that

15  generally they did in some fashion, there would have been a

16  meeting and there would be documents created and associated

17  with those meetings.  Those documents may or may not be

18  protected by other privileges like the attorney-client

19  privilege or the attorney work product privilege, but in

20  general there will be documents associated with that sort of

21  initial meeting.

22       And the distinction between initial meetings and

23  later meetings really make no sense when you look at the

24  purpose of the -- the purpose of the privilege is to --

25  focuses on the purpose of the communication, not when it was

 1    made.  That's the same rule that is applied in the

 2    attorney-client privilege where the question is merely were

 3    the communications made for the purpose of seeking legal

 4    advice.  And if they were even before an attorney-client

 5    relationship forms, we cited some cases on this, the Banner

 6    case, then the attorney-client privilege attaches even before

 7    the relationship forms.

 8              And the same thing sort of happens here.  The

 9    question is what is the purpose of the communication, and not

10    when it was made, and we cited a number of cases for Your

11    Honor on that.

12              And just to step back just to remind the Court, you

13    know, our position is that the Court should review the

14    Master's decision de novo, and we cited the case law that

15    privilege issues are de novo, so there is no deference to the

16    Master's decision on this point.

17              And it is telling that the auto dealers in their

18    briefing do not cite a single case and we were not able to

19    find one that actually compelled applying the settlement

20    privilege within this circuit that actually compelled the

21    production of settlement communications.

22              All of the cases that they cite involved the

23    compelling other things, not settlement communications.  The

24    QSI case, the State Farm case, the Kelly case, none of those

25    cases, the primary cases upon which they rely as to

1    settlement communications actually compelled settlement

2    communications, and for the very good reason those are core

3    aspects of the settlement privilege.

4            And just to build on a point that Mr. Wolfson made

5    regarding the plaintiffs' supposed need for this information

6    to learn about the scope of the conspiracy, obviously they

7    have interrogatory responses that they can serve on the

8    defendants, they have our DOJ productions, they have the

9    ability to depose witnesses, they have cooperation from

10   settling defendants, they have amnesty applicants, so they

11   have a number of alternative sources to get this information.

12           But the fundamental point, and Goodyear expressly

13   holds this, is that communications made in settling -- during

14   -- for the purposes of settlement are never relevant, that's

15   a quote from Goodyear, and the reason is because parties say

16   things in litigation -- for settlement that may differ

17   substantially from what their litigation position might be.

18   You may make concession for -- a defendant may make a

19   concession to a valued OEM customer simply because it wants

20   to resolve the case and move on with its business

21   relationship, not because it is conceding that there is any

22   factual merit to the contention or not.  They might just

23   agree to disagree and compromise.

24           And so Goodyear says that because of that, because

25   of puffering and posturing during settlement communications,

1    that settlement communications just are not relevant.

2           And unless Your Honor has any questions on that, I

3    will move to settlement agreements.

4           Your Honor, I will be brief because Mr. Wolfson

5    touched on most of the points here, but, again, this is a

6    decision that in our view the Court reviews de novo.  The

7    Special Master did not make any finding that these settlement

8    agreements are relevant.  His sole ground for ordering their

9    production was his finding that they are not privileged.

10   Relevance is a question of law for the Court as we cite, and

11   no question of the Master's authority is also a question of

12   law as we cite in our reply brief on page 1.

13          The reason why the Master never made a finding that

14   these are relevant is because nobody asked him to compel

15   production of settlement agreements, and our submission is he

16   exceeded his authority under the order appointing him by

17   compelling the production of something that no party asked

18   him to compel.

19          And of course the reason for that, the reason no

20   one asked for it, the reason why this wasn't the focus of the

21   briefing before the Master is because they are not relevant.

22   There is -- as Mr. Wolfson laid out, and I won't go into it

23   in too much detail, but the plaintiffs say that they need

24   this to understand how the RFQ sourcing process and the

25   business sort of relationship between the parties and how

 1    that historically went, and, of course, no settlement

 2    agreement is going to give them that kind of information.  It

 3    doesn't generally contain factual recitations of the business

 4    relationship between the parties.

 5            To the extent that they -- they also say they want

 6    post-collusion pricing insight.  Well, they are going to have

 7    the defendants' transactional data, they are going to have

 8    the OEMs' transactional data, they can have that information

 9    there, and in general, a settlement agreement that generally

10    makes a lump sum payment isn't going to provide them that

11    information.

12            And Mr. Wolfson addressed the issues associated

13    with OEM bias.

14            And as to the discovery specifically, I will just

15    note that their desire to have the settlement agreements for

16    the purpose of formulating a discovery strategy is just

17    insufficient as a matter of law.  The question under Rule 26

18    is, is the information relevant to a claim or a defense.  Its

19    usefulness for formulating a discovery strategy is really

20    beside the point.

21            And then just one last point, Your Honor, on again

22    the chilling effect that producing these settlement

23    agreements may have on the parties attempting to resolve

24    their disputes.  Under Rule 26, essentially this Court has to

25    balance the need for this information against the other

1    public policy interests served by the confidentiality of

2    these settlement agreements.  And our position is fairly

3    straightforward, that there is really, as I discussed, no

4    need for these agreements.

5          And there is a serious possibility that if a

6    defendant fears that their confidential settlement agreement

7    or an OEM fears that its confidential settlement agreement

8    will be produced to a third party, they won't be able to make

9    the sorts of concessions that are necessary to solve cases

10   because they will have -- fear that some third party in the

11   future will use that against them, so it reduces options for

12   parties to settle and makes it harder for them to settle.

13         So on the one hand we have no need for these, and

14   on the other hand we have a substantial risk of chilling the

15   ability of parties in this MDL and in private negotiations

16   from reaching a settlement.

17         For that reason, Your Honor, we would ask that you

18   reverse the Master's order.

19         THE COURT:  Thank you.

20         MR. FENSKE:  Thank you.

21         THE COURT:  Ms. Leivick.

22         MS. LEIVICK:  Good morning, Your Honor.

23   Sara Leivick for non-party Ford Motor Company.

24         And just as an initial matter, Your Honor, Ford --

25         THE COURT:  Non-party Ford?

1    MS. LEIVICK:  Non-party.  Ford has resolved its

2  case against Fujikura, Your Honor, and is now a non-party in

3  this action.

4    THE COURT:  Okay.  Thank you.  I forgot that for a

5  second.

6    MS. LEIVICK:  Sure.  So initially, Your Honor, Ford

7  was not subject to the motion to compel that lead to the

8  Special Master's order on request 31.  Ford is continuing to

9  work with the serving parties to try to work out any

10  remaining issues regarding the subpoena, but the serving

11  parties are seeking the same documents in response to request

12  number 31.  And Ford chose to submit its objection as an

13  interested non-party because this is the first time that

14  these issues have come before the Court, and Ford wanted to

15  ensure that Your Honor understands the importance of these

16  issues to Ford and that Ford has similar concerns regarding

17  the Special Master's order as the other OEMs and the

18  defendants do.

19    And like the other OEMs, Your Honor, ever since the

20  disclosure of the auto parts cartel, Ford has been privately

21  working to restore the business relationship between Ford and

22  its suppliers and obtain redress for the harm caused to Ford

23  by these conspiracies and avoid involvement in prolonged

24  litigation.  And Ford has been largely successful in these

25  efforts and has avoided litigation in all but one case as

1    Your Honor pointed out.

2         But requiring production of the settlement

3    agreements and the settlement communications as mandated by

4    the order is not only contrary to law but would strike at the

5    heart of these confidential negotiations as Mr. Fenske and

6    Mr. Wolfson have explained.  This could threaten future

7    settlements and likely lead to additional litigation.

8         And the proposed invasion of the confidentiality

9    interests of the OEMs and their suppliers is in no way

10   proportional to the needs of this case where such an evasion

11   is unlikely to resolve any of the issues in this action and

12   the discovery can be obtained from other sources.

13        And Ford agrees with what has been said by

14   Mr. Wolfson and Mr. Fenske, and I just want to make a few

15   additional points.  First, on the standard of review, Ford

16   agrees that the order should be reviewed de novo because

17   issues involving privilege and relevance are questions of law

18   or mixed question of law and fact.

19        But even if the order is reviewed under an abuse of

20   discretion standard, it should still be reversed because the

21   Special Master did not exercise any discretion with respect

22   to the issue of relevance of the settlement agreements, and

23   his decision on the settlement communications is in

24   contravention of Goodyear.

25        So I will just take the issues in the order which

1     Your Honor has been discussing them.  With respect to the

2     settlement communications, again, Ford's position is that

3     these settlement communications are protected by the

4     privilege established in Goodyear.  And in requiring the

5     production of these materials, the Special Master ignored the

6     context in which a supplier would describe the scope of the

7     conspiratorial conduct to an OEM customer.  And Ford agrees

8     with Mr. Wolfson and Mr. Fenske's description of the general

9     process in which a supplier would come to an OEM and confess

10    all of its misconduct, and such a confession, Your Honor,

11    would only take place in the context of settlement

12    negotiations and --

13              THE COURT:  It must be a hard discussion to have.

14              MS. LEIVICK:  I'm sorry?

15              THE COURT:  That must be a really hard discussion

16    to have.

17              MS. LEIVICK:  Yes, Your Honor, yes.  And a supplier

18    would only be willing to do that if they knew that they were

19    coming to an OEM, and as a result of this discussion and

20    these negotiations they may be able to resolve their claims,

21    hopefully without litigation.

22              And Master Esshaki drew a distinction that just

23    does not exist in Goodyear and its progeny.  Goodyear doesn't

24    differentiate between factual communications made at the very

25    beginning of settlement negotiations and other types of

 1   settlement negotiations.  And Mr. Wolfson and Mr. Fenske have

 2   covered this, but to the extent that plaintiffs are seeking

 3   factual information about the conspiracies, they have a

 4   number of other tools at their disposal to obtain this

 5   information, and it is not proportional to the needs of the

 6   case to invade these settlement negotiations to try to obtain

 7   information that is available to plaintiffs from other

 8   sources.

 9        Now, with respect to the settlement agreements,

10   again, the Special Master made no finding of how these

11   settlement agreements are relevant to the plaintiffs' claims

12   and the plaintiffs have failed to explain their relevance.

13   And the main reasons why these settlement agreements are not,

14   in fact, relevant to the plaintiffs' claims is because Ford

15   and the other OEMs are not similarly situated to the indirect

16   purchaser plaintiffs.  Ford and the other OEMs are direct

17   purchasers of these impacted auto parts and the plaintiffs

18   are, of course, indirect purchasers.

19        I say this not because Ford is opining on the

20   viability of plaintiffs' claim here, that's not what Ford is

21   doing.  Rather, there has been no finding that the terms of

22   any settlement agreement involving direct purchaser claims

23   can have any applicability to the indirect purchaser claims

24   in this litigation.  This is not a case where there is an

25   issue of setoff where the amount of plaintiffs' damages may

1    be reduced because of a settlement between an OEM and its

2    supplier.

3          And these settlement agreements are not applicable

4    to plaintiffs' claims largely because the scope of the

5    settlement agreements may be very different from the scope of

6    plaintiffs' claims.  For example, Ford and the other OEMs

7    operate globally, and any settlement agreements may release

8    all claims arising out of impacted purchases around the

9    world, and they would not necessarily be limited to the

10   claims arising out of U.S. purchases like those at issue

11   here.

12         They may also release claims relating to multiple

13   parts, including parts that are no longer in this litigation

14   or perhaps parts that have never been a subject of this

15   litigation.

16         And these potential differences in the scope of the

17   claims highlight what we think is really a crucial fact, Your

18   Honor, which is we don't actually know what the scope of

19   plaintiffs' claims will be at trial, if there is a trial,

20   because no class has been certified and no potential

21   witnesses have been identified.  So it is impossible to know

22   at this stage whether Ford or any other OEM witness will be

23   called to testify at trial.

24         And Mr. Fenske and Mr. Wolfson referenced the issue

25   of witness bias.  The plaintiffs make some vague allusions to

Objections to the Special Master's Order • May 16, 2017

1    a potential bias that may be demonstrated through the

2    settlement agreements, but that's insufficient to establish

3    relevance where no particular witnesses have been identified.

4    The confidential settlement agreements courts have found are

5    not relevant to the issue of witness bias or credibility

6    where there is no indication that a particular witness will

7    testify.

8           Now, as you've heard, plaintiffs have speculated

9    that the settlement agreements will shed light on the

10   practices and mechanics of the OEMs' commercial relationship

11   with their suppliers and that they may contain admissions

12   concerning the scope or the workings of the conspiracy, but

13   this is really just speculation.  There is absolutely no

14   indication that the settlement agreements would contain this

15   type of information.  And the plaintiffs are well aware that

16   typical settlement agreements such as the ones they have

17   entered into in this case do not generally contain factual

18   descriptions or admissions of liability, and plaintiffs offer

19   no explanation as to why they think these settlement

20   agreements would depart so radically from standard negotiated

21   agreements.

22          So even if the Court finds that there is some

23   tangential relevance of the settlement agreements, again, it

24   is not proportional to the needs of the case to require the

25   production of all agreements where production of these

 1   agreements is unlikely to resolve any of the pertinent issues

 2   in this litigation, and the production would likely

 3   negatively impact these important business relationships and

 4   have a chilling effect on future settlements.

 5          So, Your Honor, Ford asks that you reverse the

 6   Special Master's order.

 7          THE COURT:  Okay.

 8          MS. LEIVICK:  Thank you.

 9          MR. SURPRENANT:  Dominic Surprenant, Quinn Emanuel,

10   for the 17 Daimler entities.  Your Honor, I will be brief.

11          I agree with the arguments of -- that have been

12   made.  I would add briefly that the chilling effect is real.

13   As Your Honor said, these are hard discussions to have

14   anyway, and if we are sitting at a mediation and we are

15   trying to get a deal together on a global basis involving

16   claims that are not before this Court, knowing that we are

17   going to have to or could have to produce that document is

18   going to make it that much harder, so the chilling effect is

19   not academic, it is real.

20          Your Honor, on behalf of the Daimler entities, I am

21   kind of surprised to be here.  The motion to compel was made

22   a long time ago, the Special Master granted it, we appealed

23   on behalf of the Daimler entities, and Your Honor set it

24   aside.  And I would never tell Your Honor what Your Honor

25   intended, but what we understood is there would be discovery

1   of the six OEMs, they would then produce documents and figure

2   out what they had, and based on the information they gained

3   they would move ahead.

4          And so Your Honor set it aside and the moving

5   parties did not renew it, they didn't file a renewed motion

6   to compel as against my clients, they didn't file the new

7   motion to amend, and so I shouldn't be here.  I shouldn't --

8   my clients shouldn't have been ordered to produce any

9   privilege material.

10          And so I think on the merits, the Special Master's

11  order should be reversed, and it certainly should be reversed

12  as to my clients.

13          THE COURT:  Okay.

14          MR. SURPRENANT:  Thank you, Your Honor.

15          MR. SCHERKER:  Your Honor --

16          THE COURT:  You didn't think you would speak but

17  maybe you will?

18          MR. SCHERKER:  I wasn't sure.  I appreciate the

19  Court's indulgence.  My name is Elliott Scherker on behalf of

20  KMG.

21          THE COURT:  How do you spell your last, Counsel?

22          MR. SCHERKER:  S-C-H-E-R-K-E-R.

23          When we were here in June of last year arguing on

24  behalf of the smaller SSEs to be carved out and the Court did

25  so, with all due respect to Daimler, I was surprised to see

1    that Daimler filed anything.  You will notice none of the

2    other smaller SSEs that have been carved out in June,

3    including KMG, did because it was our clear understanding

4    based on the Court's ruling from the bench that we were going

5    to be set aside to one side in ongoing process, and that when

6    the parties and the --

7            THE COURT:  Just temporarily.

8            MR. SCHERKER:  Temporarily, correct.  And there had

9    been no word otherwise.  I don't read the Special Master's

10   order as doing that, but out of an abundance of caution, I

11   would just like it to be clear that if anyone in the

12   courtroom thinks the order that you are considering right now

13   has any application to us, we completely join in what Daimler

14   is saying, that we weren't -- we never intended to waive

15   anything, and I'll bet none of the other smaller SSEs did

16   either, by not filing something that Daimler had the

17   prescience to file.  I just wanted that on the record, Your

18   Honor.

19           THE COURT:  Okay.

20           MR. SCHERKER:  Thank you.

21           MR. PERCONTE:  Good morning, Your Honor.

22   Jeff Perconte on behalf of Nissan North American, Inc.

23           And I will also be brief.  I want to echo my

24   colleagues' statements that the Court has already heard this

25   morning, and will not repeat them.

1          We appeared, Judge, and have filed a separate brief

2     just to inform the Court that also the chilling effect is

3     real.  Nissan has been able to resolve claims with suppliers

4     confidentially without filing suit.  The goal of that and the

5     benefit of that is that it has allowed Nissan to maintain

6     relationships with its suppliers as the Court has expressed

7     and multiple counsel have now pointed out.  These initial

8     conversations are not easy to have, but they have allowed

9     Nissan to continue to be able to supply with the parts that

10    it needs to build its vehicles.  And it also, of course,

11    allows the parties to avoid the expense of litigation.

12          As counsel pointed out, I also need to speak

13    generally because of confidentiality agreements.  But I do

14    want to emphasize that these confidentiality agreements are

15    in place before any sort of discussions take place, and it is

16    clear that the parties are sitting down to talk about

17    settlement when these, quote/unquote, initial meetings occur.

18    These settlements are preceded by months of negotiations,

19    Judge, and exchange of information all for the purposes of

20    settlement and covered by these confidentiality agreements.

21          And I think that the Special Master's error here

22    regarding communications is drawing a line that is arbitrary

23    and irrelevant to the settlement privilege between initial

24    meetings and subsequent conversations.  Our understanding of

25    the Special Master's order as a, quote/unquote, initial

1    meeting is not covered, but all follow-up communications are

2    covered by the privilege up until the settlement agreement

3    itself.

4            And, Judge, I think a simple hypothetical shows why

5    that is completely arbitrary, and that is if during an

6    initial -- quote/unquote initial meeting where there is

7    discussion about potential activity undertaken by a supplier

8    and Nissan comes back a few weeks later and sends an e-mail

9    asking hey, what about Y?  You told us about X but what about

10   Y?  The discussion about X would not be covered during the

11   initial meeting, quote/unquote initial meeting, but the

12   question and answer about Y that comes after that initial

13   meeting would be covered by the privilege under the Special

14   Master's order, and it is just a nonsensical difference,

15   Judge.

16           And I think the problem that Nissan is now

17   experiencing is that confidentially suppliers have expressed

18   to them they know -- they do -- are concerned about

19   continuing settlement discussions post the Special Master's

20   ruling in December.  And suppliers with whom Nissan has not

21   yet begun discussions have also expressed concerns

22   confidentially about beginning those discussions given the

23   Special Master's ruling.

24           And, Judge, so those are the real chilling effects

25   of the Special Master's ruling here and I think that's the

1   very foundation of the Goodyear opinion.  The Goodyear

2   opinion really has three important holdings: one,

3   confidentiality is needed for settlement and that there is a

4   long tradition in American legal community of that being the

5   case.  Rule 408, second, is a reflection of that, that the

6   communications are not relevant and they are never admissible

7   as the Court says.  And then three, near the end of the

8   opinion the Court says any statements made in furtherance of

9   settlement discussions are privilege, any statements, and the

10  Special Master's ruling, Judge, respectfully treads all over

11  that holding.

12          And so the making initial discussions not subject

13  to the privilege and settlement agreements not subject to the

14  privilege but everything in between subject to the privilege

15  has a chilling effect both on starting new discussions with

16  suppliers to avoid litigation but also continuing ongoing

17  discussions with suppliers to maintain relationships and to

18  avoid having to drag suppliers into court to remedy these

19  issues.

20          Judge, with that, I don't have any further

21  argument, and we have adopted our co-counsel's arguments.

22          THE COURT:  Okay.  Thank you.

23          MR. PERCONTE:  Thank you.

24          THE COURT:  All right.  Ms. Romanenko.

25          MS. ROMANENKO:  Good morning, Your Honor.

1    Victoria Romanenko for dealership plaintiffs.

2         Your Honor, just as far as one general issue, Ford

3    has presented argument today, they've put in several briefs.

4    Our view on that is they can do that but they shouldn't

5    receive two bites at the apple.

6         THE COURT:  Say that again.  Could you speak into

7    the microphone?  I'm having a little bit of a time hearing

8    you.

9         MS. ROMANENKO:  Sure.  So our view is Ford should

10   not be receiving two bites at the apple.  If they want to

11   participate at this stage and have the issue resolved at this

12   stage, that's fine.  If they want to wait until their

13   discovery is teed up, that's fine.  But what we don't agree

14   with is that they can argue here, get a ruling, avoid that

15   ruling, and then make the same arguments again down the road

16   when it is time for them to produce the discovery and the

17   dispute -- the same dispute is teed up between the plaintiffs

18   and Ford.  So if they want to submit their arguments here,

19   that's fine, but any decision should apply to them as well if

20   their arguments are being considered.  So just that general

21   issue, we wanted to make that point.

22        Now, as far as responding to what we've heard this

23   morning, what we are asking for here today are really some of

24   the most basic facts about the conspiracy.  We've been

25   through it.  How is the conspiracy carried out?  How is it

1    concealed?  How long did it last?

2            THE COURT:  But that's not the issue.  The issue is

3    you are asking for facts that occurred during some meetings

4    and I suppose are then put into documents because it is a

5    document production thing.  But how do you get by that

6    Goodyear privilege, how do you get by that?

7            MS. ROMANENKO:  So that's a good question.  What

8    the parties are asking the Court to do here is they are

9    asking you to apply an over-expansive construction of the

10   Goodyear privilege, and I will explain why.  They basically

11   say we want to keep the plaintiffs in this litigation from

12   hearing any -- from knowing about any discussions about the

13   conspiracy.  And what we pointed out to the Master and what

14   we've pointed out in our briefs to Your Honor is that that

15   would be a -- construing the privilege so expansively, and I

16   will get to why Goodyear doesn't construe it that

17   expansively, but overexpanding that privilege would be a

18   violation of the Supreme Court's edict in U.S. v. Nixon where

19   the Supreme Court said that evidentiary privileges are not,

20   quote, expansively construed for they are in derogation of

21   the search for truth.  So the privilege has to be narrowly

22   construed, and that's been recognized by other cases within

23   the Sixth Circuit.  We've cited to Your Honor Winchester vs.

24   City of Hopkinsville.

25            THE COURT:  What does that mean?  What does it mean

1    in the terms of what we are talking about here to narrowly

2    construe it?  If you have a meeting, which apparently is for

3    the purpose apparently of settlement discussions, what do you

4    do, cut out half of what's in the meeting, or can you speak

5    freely in the meeting, or do you go on the record and say

6    okay, now this is secret and then -- I mean, I don't

7    understand how you divide these things up and narrow the

8    privilege.

9            MS. ROMANENKO:  Sure.  So what Goodyear says,

10   we should -- let's start with Goodyear because --

11           THE COURT:  Okay.

12           MS. ROMANENKO:  -- they do.

13           So what Goodyear was reviewing, what the

14   Sixth Circuit was reviewing was the decision that settlement

15   talks are always confidential, right.  And in making its

16   determination, what the Sixth Circuit said in Goodyear was

17   that settlement negotiations were protected under the

18   privilege.  So what the Court said it was trying to protect

19   was proposals of, quote, compromises that most effectively

20   lead to settlement and, quote, proposed solutions to the

21   parties' issues.  So what we are talking about here, what

22   Goodyear protects is offers of the terms of settlement.

23           Now, the descriptions in the conspiracy are not,

24   quote, proposed solutions, they are not compromises, they are

25   not settlement negotiations.  They are just not discussions

1    of what terms are we going to settle this case on.

2    Descriptions of the legal conspiratorial conduct were not at

3    issue in the Goodyear case and Goodyear doesn't protect

4    those.  The opinion in Goodyear was about disclosure of the

5    terms of an offer of settlement.  That's what precipitated

6    this case is that someone disclosed the terms of an offer in

7    settlement and a later party sought to compel testimony about

8    that disclosure.

9           That's what Goodyear was looking at and that's why

10   Goodyear was specifically focused on settlement negotiations,

11   how are we going to resolve this.  So that's when the

12   supplier says I will give you 50 million and cooperation so

13   that you can settle your claims against the other defendants,

14   and the OEM says no, no, no, you owe us 100 million and --

15          THE COURT:  So if in these documents there is a

16   description of what happened, you are saying that is not

17   privilege.  But --

18          MS. ROMANENKO:  Correct.

19          THE COURT:  -- in the same document there is a

20   proposal to pay X dollars, okay, that's privileged?

21          MS. ROMANENKO:  Yes.

22          THE COURT:  So you are talking about documents, you

23   would have to go document by document to see whether or not

24   there was something privileged in it?

25          MS. ROMANENKO:  That's right, that's right.

1      THE COURT:  How long would that take if we have a

2  million documents?

3      MS. ROMANENKO:  Well, here we are talking about a

4  pretty discrete universe of documents, right.  We are talking

5  about just the documents that were exchanged during a couple

6  month period, maybe a five-month period, to discuss what

7  happened and then how to resolve it.  I mean --

8      THE COURT:  That's not what the Master ordered

9  either, right?  Of course, this is de novo if it is

10  privilege, I would think you would agree with that.

11      MS. ROMANENKO:  So actually, Your Honor, just to

12  very briefly address that, the standard of review here would

13  be -- the standard of review for any review of a decision

14  about the scope of the discovery is abuse of discretion, and

15  Your Honor has reviewed multiple decisions by the Master on

16  the scope of discovery under the abuse of discretion

17  standard, so that would be the appropriate standard here.

18      THE COURT:  But is this not more substantive in

19  that it is talking about what is the privilege?

20      MS. ROMANENKO:  Well, the issue isn't the

21  substance.  This is not, for instance, a motion in limine.

22  If it was a motion in limine, maybe you would agree that this

23  would be de novo.  But here the Master is merely deciding

24  what to allow production of and what to prohibit production

25  of.

1    THE COURT:  Well, the Master did not allow

2    production of a document of the type we just talked about.

3    The Master put up a bright line -- well, it is not so bright

4    line -- put up a line of which from that period you turn

5    over -- you do not turn over anything, so he really didn't go

6    into the argument that you are making.

7    MS. ROMANENKO:  Well, actually, what the Master has

8    said is that proffers, quote, concerning the existence of the

9    automotive parts conspiracy, its scope, duration and extent,

10   as well as descriptions of parts involved and the wrongful

11   acts of the conspirators, which would have been exchanged at

12   initial meetings which is where the proffers took place, not

13   the settlement negotiations but the proffers, before

14   settlement discussions commenced are not privileged.  So he

15   did analyze what kind of information would be covered by the

16   privilege and what kind would not be covered by the

17   privilege.

18   He explained that discussions that occurred -- and

19   this is from the hearing -- discussions that occurred at the

20   initial meetings where defendants disclosed to the original

21   equipment manufacturers the existence of a conspiracy, the

22   nature, the scope, the duration, the parts that may have been

23   involved are not settlement negotiations.

24   So he's tracking the language of Goodyear and

25   frankly its progeny, which after Goodyear continues to say

1    Goodyear protects settlement negotiations.  They don't say

2    Goodyear protects proffers, Goodyear protects anything that

3    happens before settlement negotiations, anything that leads

4    up to settlement negotiations.  He's taking -- he read

5    Goodyear and he exactly applied what Goodyear stands for,

6    being careful, and consistently with the Supreme Court's

7    edict to construe the privilege narrowly to do so, not to

8    overexpand the privilege such that anything and everything

9    discussing the conspiracy would be swept in.

10           And he drew a bright line on two sides, right.  On

11   one side he said if you are talking about the conduct that's

12   not a settlement negotiation, I'm applying Goodyear and I'm

13   saying that's not privileged under Goodyear.  However,

14   when -- and he was actually I think extra careful.  He said

15   when we talk about documents analyzing damages created for

16   the purpose of reaching a settlement that were exchanged at

17   settlement communications, those are protected.

18           So he -- so he's saying very clearly if we are

19   talking about just conspiratorial conduct, if we are doing

20   what the OEMs have called proffers over and over again,

21   they've used a specific term for these that makes it clear

22   that these are not settlement negotiations, so if we are just

23   talking about what happened, then we are not talking about

24   privileged material that's discoverable.

25           THE COURT:  Goodyear talks about in furtherance of

1    the settlement, so are these disclosures not in furtherance

2    of this?

3              MS. ROMANENKO:  So what Goodyear does is it

4    talks -- it says -- one moment.  It says about six different

5    times that it's making a determination that settlement

6    negotiations and settlement discussions are what is covered,

7    and it explains pretty clearly that what it is trying to

8    protect is the exchange of proposed solutions and compromises

9    that lead to settlement.

10             So I know that the defendants and the OEMs have

11   kind of latched onto these two words, in furtherance, but

12   that doesn't mean let's sweep up everything around the

13   discussions.  It doesn't mean if some discussion was had and

14   eventually four months later there was a settlement, that

15   means that that discussion that didn't involve how are we

16   going to settle this but just involved a factual disclosure

17   is now subsumed.

18             In furtherance in Goodyear, merely is supposed to

19   be synonymous with the words settlement negotiations.  They

20   were just trying to use those terms interchangeably so as not

21   to constantly repeat the same thing.

22             THE COURT:  Could you not get this same information

23   from other sources?  I mean, why don't you simply depose the

24   person who was there?

25             MS. ROMANENKO:  So we've taken at this point, as

1    Your Honor knows, lots of depositions.

2            THE COURT:  Yes.

3            MS. ROMANENKO:  We've gotten lots of documents.

4    What we get a lot is somebody shows up and they say I don't

5    remember, I don't know, I don't know what happened.

6            What we also get a lot is we want to depose someone

7    and they are gone, they are no longer employed there, they

8    retired, what have you, we just can't get at them.

9            We also -- as far as what has been produced to us,

10   the data, for instance, it is very, very difficult to

11   understand and make sense of often.  I think one defendant

12   raised at a previous hearing about our clients' production,

13   that we actually spent $600,000 to try to get a clean version

14   of the defendants' data.  It is very, very difficult to take

15   something like that data and turn it into a narrative or try

16   to make sense of it.  A lot of defendants won't even produce

17   deponents to talk about the data.  So we are looking at a

18   bunch of numbers that have blanks, they come and go, maybe

19   they are negative values, and that's not the same at all as

20   getting a narrative description of that.

21           We've encountered a lot of obstacles in searching

22   out some of this basic information about what happened in the

23   conspiracy.  This is a path through which we can get it.

24   This is a path through which we can obtain a frank discussion

25   between an OEM and a business partner.  We have good reason

1    to believe that a business partner will tell the truth to its

2    OEM or will at least be forthright, and that if it is not

3    being that way, the OEM will see that.

4         So it is very different from getting segmented

5    information from the defendants, from defendants telling us

6    we can't give you a full set of interrogatory responses, we

7    have to limit this by time period or OEM, and you won't get

8    Nissan but you might get Ford, or from some defendant showing

9    up at a deposition saying I just don't remember.  This is a

10   set of information that will actually flesh out for us what

11   happened here.  It is very different from the type of

12   discovery that we have had so far, which has not been

13   sufficient to completely flesh things out for us.  That's

14   exactly why we are seeking it, so that we can pursue our

15   claims and have some sort of narrative to demonstrate to us

16   what it is that happened here.

17        Another point that I did want to make, the OEMs

18   were up here saying -- admitting that discussions started

19   when the collusion was made public, right.  So the fact of

20   the matter is a defendant may try to self-interestedly shield

21   these depositions -- sorry, these descriptions by trying to

22   later characterize them as eventually leading to settlement.

23   But these defendants and whatever other suppliers were

24   involved, their hand was already forced, right, because the

25   government agencies had made public that this collusion had

1    occurred.  So now to, as Nissan has said, save their chain of

2    supply, they needed to come to the OEMs and tell them what

3    they did.

4         So whether there was a settlement or there wasn't a

5    settlement, they weren't going to avoid making these

6    disclosures.  An OEM sees a guilty plea, they have questions,

7    right.  So a defendant can say let's cover this with a

8    settlement privilege, let's negotiate a confidentiality

9    agreement, and an OEM, they don't care.

10        THE COURT:  So you are saying really the OEM hears

11   about this and they say I want to talk to you.  This has

12   nothing to do with settlement at that point, it is just I

13   want to know what you did so I know how much more we are

14   paying or whatever.

15        MS. ROMANENKO:  Right.  As Mr. Wolfson said when he

16   started out, the collusion was made public, then these

17   conversations began.  So these conversations are happening

18   because the collusion was made public, because these

19   suppliers now know that the OEMs know what they did.

20        So I think what we are getting from the defendants

21   and to some degree the OEMs is kind of I guess I will say

22   again a self-interested attempt to cover all of these

23   communications, say, well, we ultimately got to settlement so

24   these are communications in furtherance of settlement.

25        But what these are are factual descriptions that

1   they were going to have to make no matter what.  This is --

2   what they are doing is they are creating a legal construct to

3   basically try to block our access to these, and for a number

4   of reasons that's not correct.  That's not what Goodyear

5   supports, but not only that, they have asserted no burden,

6   they've not asserted that descriptions of the conspiracy

7   aren't relevant, they couldn't do that.

8           THE COURT:  What about the confidentiality

9   agreement?

10          MS. ROMANENKO:  Well, Your Honor, as we've cited in

11  a number of cases in our brief, confidentiality agreements do

12  not make something undiscoverable.  So the fact that there

13  was a private confidentiality agreement between the OEMs and

14  the suppliers does not render it blocked from discovery;

15  that's just a private agreement.

16          And I think that actually demonstrates why this

17  kind of sort of unilateral determination that we are going to

18  block these from -- we are going to try to make efforts to

19  block these from third parties is just that.  It is not a

20  legal doctrine that actually prevents us from discovering it.

21  It is just an internal agreement, let's try to shield these

22  if we can because we would rather they not have them, right.

23  That's what is at bottom here.  It is not this is too

24  burdensome for to us produce, this is going to take too much

25  time.  It is just we don't want them to have these, we would

1   rather keep these to ourselves.

2        And frankly, that's not a rationale that is

3   considered under Rule 26 is we don't want them to have these.

4   I understand they don't want us to have these, and they would

5   produce them and they would be designated highly confidential

6   and it would be the attorneys in the case that would look at

7   them.  Frankly, there are no settlement privileges in most

8   circuits, and even in this circuit, the settlement privilege

9   has been significantly curtailed.

10       So for them to say we only had these discussions

11  because we expected that everything would be shielded under a

12  settlement privilege, that's incorrect.  A number of courts

13  have recognized that.  They can't say if you allow this, we

14  will never settle anything ever again.  That's just not how

15  it works.  They are not going to compromise away --

16       THE COURT:  What about the chilling effect that has

17  been referenced here to other settlement negotiations?

18       MS. ROMANENKO:  So these OEMs and suppliers, they

19  were never going to sue each other, right.  They were always

20  going to resolve their claims out of court.  They are not

21  suddenly going to start signing up for years of litigation

22  because a group of lawyers can see their agreements.

23       And I do want to point out Mr. Wolfson expressed

24  some concern about other OEMs being able to see settlement

25  agreements or proffers.  They are not parties to the case, so

1    just like we are not sending Subaru's data to FCA, we are not

2    going to be handing around settlement agreements, you know,

3    asking who wants to read which OEM's settlement agreement or

4    who wants to see which OEM's proffer notes?  So it's going to

5    be a very limited universe of attorneys who are going to be

6    looking at this.

7         And just to give Your Honor a quote from another

8    court who was faced with a similar argument, they said to

9    suggest, as do these plaintiffs, that the prospect of

10   revealing settlement terms to a narrowly limited audience

11   might impede out-of-court disposition seems wrongheaded,

12   given the alternative to settlement would be a double whammy:

13   the loss of the benefit of the bargain and more public airing

14   occasioned by a full-blown trial.

15        And similarly, a circuit court stated while there

16   is clearly an important public interest in favoring the

17   compromise and settlement of disputes, disputes are routinely

18   settled without the benefit of a privilege.  It is thus clear

19   that across-the-board recognition of a broad settlement

20   negotiation privilege is not necessary to achieve settlement.

21        So, Your Honor, there is just no way that your

22   allowing the productions of these documents is suddenly going

23   to lead to a stoppage of out-of-court settlements and all of

24   these OEMs suddenly suing these suppliers.  Sure, it is

25   probably more efficient for them to settle out of court and

1   they will keep doing that.  The fact that some attorneys

2   might view their materials is not going to change that.  They

3   would prefer that that not occur and they certainly have been

4   very assertive in arguing that, but that's not going to

5   change their behavior.

6        You know, just to look at what's happened so far,

7   Nissan, for instance, made clear in its brief that it's going

8   to keep resolving its claims out of court, and it has been

9   continuing to do that.  Obviously we have had no lawsuits by

10  Nissan against suppliers.  In the months that the Master's

11  opinion was filed, the OEMs haven't sued any suppliers.  You

12  know, this opinion has been in place, it hasn't changed

13  anything; they are going on as they have gone on.  The idea

14  that some lawyer is seeing what was disclosed to them is

15  going to change that, it is just an empty threat.

16       And if we are talking about public interest, you

17  know, I think we should keep in mind that the public interest

18  clearly weighs in favor of providing information to our

19  clients who are certainly some of most volnerable players in

20  this chain of supply who don't make parts, who don't make

21  cars, they don't have other access to this information, and

22  who the OEMs and the Justice Department agrees have been

23  buying cars that have been affected in the billions of

24  dollars.

25       This litigation is extremely important and involves

1   high, high amounts of damages.  There's no proportionate

2   consideration that the OEMs or the defendants have given us

3   that would countervail the high benefit of introducing

4   information into this litigation that would help us

5   understand our claims and litigate them to resolution.

6        Certainly there is nothing that we've seen where

7   parties seeking to compel information about descriptions of

8   collusive conduct have been told they can't do so.  This

9   is -- this is not us seeking information about settlement

10  negotiations.  We are just seeking basic information about

11  what happened in the conspiracy.

12        THE COURT:  Okay.  Let's look a little bit at the

13  actual order of the Master.  Talking about communications

14  prior to a date on which the conspiracy has been identified,

15  were that the words?  I don't have the exact words written

16  down here.

17        MS. ROMANENKO:  Are we talking about paragraph 2,

18  documents evidencing discussions or exchange between OEMs and

19  automotive parts suppliers?

20        THE COURT:  Is that the paragraph that has the

21  statement about before and after?

22        MS. ROMANENKO:  This paragraph defines what

23  information would have occurred at meetings before settlement

24  negotiations.

25        THE COURT:  I mean, I just wonder what is that

 1    date?  Who says -- let's say this order is enforced.  Who

 2    says when the settlement negotiations started, where is that

 3    date coming from?

 4          MS. ROMANENKO:  So when the settlement negotiations

 5    started -- so as the Master put it in his order, after the

 6    meetings discussing the existence of the conspiracy, its

 7    scope, its duration, nature, extent, description of parts,

 8    wrongful acts, after those discussions ended and when

 9    discussions analyzing the damages began, that's when we have

10    our settlement negotiation discussions beginning.

11          THE COURT:  So it is going to be up to the

12    individual person answering or entity answering the

13    interrogatory to make that determination -- I mean, yes,

14    answering the --

15          MS. ROMANENKO:  The document request.

16          THE COURT:  To make that determination as to that

17    period, so they would review their own documents and say this

18    applies here.

19          MS. ROMANENKO:  Right, right.  Once they stop

20    seeing descriptions of the conspiracy and once they get into

21    damages, that's when they say, okay, now we are covered, we

22    don't produce this.  These are settlement negotiations; that

23    over there, that's proffers.  And they don't even -- they

24    don't even call these descriptions of the conduct settlement

25    negotiations, they call them proffers, so they know, you

1  know.  They have these items on their computers, you know.

2  When they are reviewing them and copying them onto a jump

3  drive to produce, they know what is the proffer versus what

4  is the actual back-and-forth discussion of these were our

5  damages, here is how we are going to resolve it.

6        And that's exactly what the Master was thinking and

7  that's what the Goodyear court was thinking.  You know, these

8  kind of proffers, this kind of information about misconducts,

9  that was not at all contemplated in Goodyear as being subject

10  to being covered by this privilege.

11        THE COURT:  Okay.  And as to the settlement

12  agreements, what's the relevance of settlement agreements to

13  you?

14        MS. ROMANENKO:  Sure.  So as far as the settlement

15  agreement -- and just one more quick comment about the

16  defendants' Rule 408 argument.  The cases that we have seen

17  cited by mostly the defendants, also to some degree Ford and

18  the OEMs, they are all about 408, they are about

19  admissibility, right.

20        So they say, well, according to Goodyear, Rule 408

21  governs whether or not you can discover this information, not

22  Rule 26.  But obviously the federal rules make clear

23  production can't be denied on the basis of admissibility,

24  right.  The very rule that govern these disputes, Rule 26,

25  says information within this scope of discovery need not be

1    admissible in evidence to be discoverable.

2          So as one court explained, Congress chose to have

3    limits on the admissibility of settlement material rather

4    than limits on their discoverability.  We don't get to

5    discoverability until pretty far down the line in this

6    litigation.  You know, we are not saying rule today that we

7    can introduce anything we want into evidence for any purpose.

8    We are just saying at least give us the productions so we can

9    review it.  You know, if there is something down the line

10   where we want to introduce something and they disagree with

11   it, they can obviously challenge it, but that's not even an

12   issue here.  What at issue here is are these relevant, are

13   they discoverable.  It is not are they admissible.

14         So just to give you another quote, another court

15   explained the premise of plaintiff's objection that these

16   documents will be inadmissible at trial pursuant to Rule 408

17   is, as Judge Wall correctly pointed out, premature and

18   irrelevant to the question of discoverability before the

19   court.

20         THE COURT:  And what did Goodyear mean when they

21   talked about admissible?

22         MS. ROMANENKO:  Goodyear did not say that

23   admissibility is a requirement for discovery, for

24   discoverability.  Goodyear did say at the very end, frankly I

25   think it was somewhat tossed off, oh, and it is not

1   admissible either.  The plaintiffs seeking this information

2   haven't establish admissibility.  But the decision was made

3   based on privilege, not admissibility, because Goodyear could

4   not have overturned Rule 26.  A district court cannot

5   overrule a Federal Rule of Civil Procedure.

6           Just to give you one quote from the Supreme Court

7   in Chambers v. Nasco which explains that a court is bound by

8   the Rules of Civil Procedure, it says the rules themselves

9   reject the contention that they may be discarded in the

10  court's discretion.  Disregard of the applicable rules also

11  circumvents the rulemaking procedures in 28 U.S.C. 2071.  So

12  Goodyear couldn't have said we throw out Rule 26 and we use

13  this new standard for discoverability which is admissibility.

14          So Goodyear, yes, they refer to the fact that the

15  plaintiff didn't establish admissibility or an admissible use

16  for the information he was seeking, but they didn't say and

17  that's the standard that we are going to use to decide if

18  this information can be produced.  They couldn't have said

19  that because Rule 26 would not have allowed that.  And the

20  Master recognized that too.  He said during his December 9th

21  hearing in the discovery rule we know clearly that

22  admissibility is not a precondition to discovery.

23          I think Your Honor wanted to move on to the

24  settlement agreements.

25          THE COURT:  I want to know the relevance.

1          MS. ROMANENKO:  Sure.  So, first of all, as I think

2     they have all acknowledged before Your Honor, the defendants

3     and the OEMs are not arguing that the settlement agreements

4     are privileged.  They don't try to show any burden.  So,

5     again, we are in a situation where they just don't -- they

6     actually say this in one of their briefs -- they don't want

7     third parties to see them, which, again, is not a sufficient

8     countervailing purpose under Rule 26.

9          THE COURT:  So what's the relevance to you, what do

10     you need these settlement agreements for?

11          MS. ROMANENKO:  Sure.  So, first of all, these

12     agreements are going to help us understand the relationships

13     between the suppliers and the OEMs and --

14          THE COURT:  How is that?

15          MS. ROMANENKO:  So I will respond to the arguments

16     that we have heard from the others where they say that

17     business relationships and the mechanics are not in the

18     agreement.  So, first of all, that's speculation, right.

19     They don't know what one another's settlement agreements say.

20          They do say -- they said today that agreements were

21     entered in order to restore business relationships.  So of

22     course they are going to provide information about

23     relationships.  I will give you an example.  For instance, a

24     lot of our settlement agreements, a lot of the plaintiffs'

25     settlement agreements discuss this is how -- these are the

1    kinds of documents that are going to be provided as part of

2    the settlement so plaintiffs can continue to pursue their

3    claims, right, or to understand their claims or to confirm

4    what it is that they are settling.

5           So similarly here in these agreements what we would

6    expect to see is some description of these are the documents

7    we used or these are the documents we are going to provide,

8    and this is the cooperation we are going to provide, and this

9    is sort of how we are going to go about helping you determine

10   what is going on here and how our relationship was affected,

11   how it will go forward, right.  Presumably these agreements

12   have information about how their relationship will be going

13   forward.

14           THE COURT:  But why is that information important

15   to you?

16           MS. ROMANENKO:  Well, for us to understand, for

17   instance, was a bid rigged or did a bid rig affect the

18   ultimate price, we need to know how does the relationship

19   work when it is competitive, how does the relationship work

20   when it is not competitive.  So in order for us to understand

21   how the relationship works, we need some background

22   information about that so we can -- so what we are saying is

23   we will look to the settlement agreement to get that kind of

24   background information.

25           In addition to that, as I said, a lot of these -- a

1    lot of our settlement agreements explain these are the

2    documents or this is the cooperation that is going to be

3    provided to you, the plaintiff, or you, the OEM, under this

4    settlement agreement, right.

5         So we, of course, come in -- our clients, again,

6    they don't make cars, they don't make parts, so we need as

7    much information as we can get about what kinds of documents

8    we want to make sure we look at or what kinds of documents we

9    request, what kinds of documents we think about, what kinds

10   of information we go after in discovery, and this is one area

11   where this will help a lot.  You know, if somebody for

12   instance is looking at one of our settlement agreements, they

13   will see a bunch of things listed that the defendants are

14   agreeing to provide to us and they can say ah-ha, so this is

15   information that is considered to be the most crucial for

16   pursuing these claims for evaluating what you might need in

17   order to prove your case.

18        THE COURT:  Even though they are in different

19   positions, these are directs instead of the indirects?

20        MS. ROMANENKO:  Well, the indirects have all

21   alleged that the directs, correctly of course, that the

22   directs have passed their damages on to us.  So, yes, of

23   course, their agreements are going to be relevant to that and

24   the documents about their relationships are going to be

25   relevant to that.

```
 1              For instance, I will give you an example.  We
 2    requested from a number of OEMs the supplier agreements, and
 3    a number of them said we can't give them to you, they are too
 4    burdensome or, you know, we don't have them for the whole
 5    time period that you want.  So we are not getting that, you
 6    know, we are no getting that from every defendant, we are not
 7    getting the full scope of that.
 8              So something -- so an agreement like this is going
 9    to help us flesh that out, fill in those gaps.  That's
10    exactly why we need that information.  We don't have complete
11    information from the other discovery that we've received thus
12    far.
13              I think as we also talked about, a lot of the
14    defendants have said after our guilty pleas, you know, there
15    were no price effects, right, so these settlement agreements
16    will tell us have the prices been changed so drastically in
17    an ongoing contract that now there are no price effects?  We
18    are not saying we are using them to prove damages.  We are
19    saying for our own information we need to understand what
20    happened after the guilty pleas, after these conversations
21    happened and the agreement was entered into.  Is there now --
22    is there now the change such that there are no more price
23    effects on new vehicles?  All right.  So in order to
24    understand that, we need to look at the agreements
25    themselves.
```

1    Also, importantly, as the case law indicates and as

2    I think the OEMs have talked about, these will help us to

3    establish bias.  So as the OEMs admit, various OEMs have made

4    numerous statements on the record under oath multiple times

5    in this case, right, so they have submitted declarations,

6    they have given depositions.  And we have seen the defendants

7    use these in a variety of ways in motion practice against us,

8    right.

9    So, for instance, the OEMs have made a number of

10   statements about how an overcharge on a part is able or not

11   able to be factored into a price of a finished car, and the

12   defendants have made much that of, right.  We, of course,

13   disagree with that statement.  But as Your Honor will recall,

14   that was one of the statements that was the centerpiece of

15   one of the AVRP defendant's presentations about a stay.  Your

16   Honor will remember we discussed that in January, and one of

17   the defendants came up here with a PowerPoint presentation

18   and he said we can't have a stay because we need to -- we

19   have this statement from the OEMs that an overcharge on a

20   part does not make it into the price of a finished car, and

21   so we can't have a stay because we know that we are going to

22   prevail on liability.

23   Well, we, of course, disagree with that, so we need

24   these agreements to establish bias.  We need to be able to

25   say, well, these OEMs have settled with these defendants.

1   They are not just simply impartially saying that the indirect

2   purchaser plaintiffs don't have any claims.  We have to be

3   able to defend ourselves against those types of statements,

4   and that's a primary for us to do it.

5            THE COURT:  Say that again.

6            MS. ROMANENKO:  Well, I said we have to be able to

7   defend ourselves against these types of statements by the

8   OEMs, statements that attack our ability to demonstrate

9   damages, and one way to do that is to demonstrate the

10  existence of bias.  We don't know what their settlement

11  agreements might say about third-party discovery, about, you,

12  know, what positions they can take in third-party discovery,

13  what is going happen in third-party discovery.  That's all

14  going to be relevant to our analysis of the statements that

15  they have made in discovery and that have been presented to

16  Your Honor as statements against the indirect purchaser

17  plaintiffs.

18           THE COURT:  Okay.

19           MS. ROMANENKO:  In essence, Your Honor, we are not

20  seeking these settlement agreements in order to violate

21  Rule 408 in any way.  What we need from these agreements is

22  the information that we are not getting in discovery.  We

23  need to be able to get background, we need to have the

24  ability to establish bias, we need to understand how their

25  relationships changed and how the prices changed after these

1   were entered into.  It is something that these agreements

2   will give us a clear view into that we are not getting a view

3   into.

4        And given that there is no -- no argument from the

5   OEMs or the defendants that there is any burden associated

6   with providing these, no argument that there is any privilege

7   here, simply an argument that they don't want us to have

8   these because they consider them to be private, there is just

9   no reason for them not to produce these.  They are already

10  going to be making a production to us.  They are going to be

11  producing all of these other things.  If they disagree with

12  how we use them, they have the right down the line to make a

13  motion in limine.

14       But to deprive us of these now at this stage, to

15  say you can't even see them, you can't evaluate, you can't

16  judge for yourself what the contents are and how you are

17  going to be able to use these to see if they can be helpful

18  to you in your discovery efforts and your efforts to

19  understand the case, to understand the conspiracy, that just

20  can't be, we just can't be deprived of that in that fashion

21  at this juncture.  Right now we are just asking for

22  discovery.

23       THE COURT:  All right.  Anything else?

24       MS. ROMANENKO:  Yeah.  I just wanted to, Your

25  Honor, quickly address the claim that we didn't ask for

 1   these.  So we asked for all documents relating to your other

 2   OEMs' negotiations or communications with any of the

 3   defendants or other components or assembly suppliers in

 4   connection with defendants or other components or assembly

 5   suppliers' conduct at issue in MDL 2311, and documents,

 6   defendants or other components or assembly suppliers provided

 7   to you or other OEMs in connection with the facts described

 8   in any plaintiff complaints.  I know that's a mouthful.

 9            So, of course, settlement agreements are documents

10   related to OEMs and parts suppliers negotiations and

11   communications about the conspiracy and documents provided to

12   the OEMs in connection with the facts described in the

13   complaint.  And the briefing makes clear we understood

14   ourselves to have requested these.  What we said back in

15   March 2016 when describing a case, the Court ordered that any

16   settlement agreement could be produced contrary to the

17   position defendants are taking here.  We also explained in

18   another brief, agreements to resolve commercial disputes are

19   clearly discoverable and implicate no privilege issue.  The

20   same is true of settlement agreements.

21            So we did mention these in our briefing, and the

22   Master agreed.  He said on January 24th that the issue of

23   settlement agreements was, in fact, raised.  So we did

24   clearly ask for these.  If they didn't understand us to ask

25   for these, they had a year of litigation, hours of

1   negotiations to ask, hey, does this include settlement

2   agreements?  They didn't do that, all right.  They made a

3   strategic decision to just decide not to brief the issue and

4   then to raise it to Your Honor and say that we never

5   requested these.

6           THE COURT:  Did the Master ever discuss relevance

7   of these settlement agreements?

8           MS. ROMANENKO:  Well, I think he stated that the

9   materials requested were relevant.  Did he -- did he break

10  down one by one every specific type of document that could be

11  encompassed?  That would be difficult to do.

12          THE COURT:  I'm not talking about that.  I just

13  mean in general the relevance of the settlement agreements.

14          MS. ROMANENKO:  What the Master said is he -- or

15  what we understood the Master to say is that he determined

16  that what we were requesting was relevant.

17          THE COURT:  Okay.  Thank you.

18          MS. ROMANENKO:  And the defendants didn't contest

19  the relevance of the settlement agreements in any briefing

20  below, even though we made clear that they were being

21  requested, and even though they never sought clarification

22  from us as to whether they were being requested.

23          Your Honor, I would just like to address Daimler's

24  argument very quickly.

25          THE COURT:  All right.

```
 1            MS. ROMANENKO:  Daimler seems to be saying that
 2     although the privilege issues are no different for one
 3     subpoenaed automaker than they are for another automaker, it
 4     would like to create more delay and be carved out of this
 5     production, so -- and it seems like maybe Kia is making the
 6     same argument.
 7            So this argument seems to be based on a
 8     misinterpretation of the Court's order in June of last year,
 9     simply carving Daimler and the other small OEMs out of
10     depositions, right.  They say they are carved out, but all
11     they were carved out of was the 30(b)(6) depositions which
12     were needed to resolve the joint motion to compel which was
13     seeking information about sales and purchase documents and
14     data, right.  So there were two motions.  There was a joint
15     motion to compel that was filed by the defendants and the
16     plaintiffs, and then there was just the plaintiffs' motion to
17     compel seeking information that was requested by request
18     number 31.
19            So that motion was simply deferred until the joint
20     motion could be decided, right.  The Master said go take
21     depositions so you can find your information that you need in
22     order to resolve the joint motion to compel.  But with regard
23     to the plaintiffs' motion to compel seeking documents
24     requested under request number 31, he said I'm deferring it,
25     I'm specifically not ruling on it.
```

1    So basically what he did was he put it off until it
2    could be reactivated once this other motion was ready to be
3    heard.  And then when the motion was renewed, when we said
4    okay, so now the joint motion is ready to be heard, it is
5    before you, we would like to have our motion resolved too, we
6    would like to have the plaintiff's motion resolved.  We
7    didn't change the motion or whittle it down and say we are
8    asking for this information from fewer than all of the OEMs,
9    you know, we didn't say that we had modified it.  In fact, we
10   just attached our -- all of our briefing from January and
11   March of 2016 to our notice saying we would like oral
12   argument and we would like a decision on the plaintiffs'
13   motion.

14       So we made clear that we were incorporating the
15   whole thing, we weren't changing it, we weren't saying
16   Daimler doesn't apply to you or Kia doesn't apply to you.  So
17   there is no reason for Daimler to be arguing that it didn't
18   understand that its production was being sought in this
19   motion or it was somehow not part of this just because it was
20   told by Your Honor back in June that it didn't have to sit
21   for the depositions that were necessary for the other motion
22   to compel.

23       You know, obviously privilege issues or relevance
24   issues do not change OEM by OEM.  This order is either
25   enforceable or it's not enforceable whether you are Daimler

 1    or Honda or FCA, so carving out Daimler is not going to serve

 2    any purpose other than simply adding more delay.

 3              THE COURT:  Okay.  Thank you.  Reply?

 4              MR. FENSKE:  I will try to be brief, Your Honor.  I

 5    would like to first discuss the settlement communications

 6    point and Ms. Romanenko's sort of fundamental argument about

 7    Goodyear, which is essentially that Goodyear only protects

 8    haggling over the settlement terms, right, which she calls

 9    settlement negotiations.  And that's just not what Goodyear

10    holds.  As Your Honor mentioned, it clearly uses the phrase

11    any communications in furtherance of settlement are

12    privileged.

13              And in describing the reason for adopting that

14    rule, the Court -- the Sixth Circuit made statements that

15    only makes sense in the context of factual admissions and

16    factual statements.  For example, in describing why

17    settlement communications are not relevant, the Court quoted

18    another case for this.  Quote, what is stated as fact on the

19    record could very well not be the sort of evidence which the

20    parties would otherwise actually contend to be wholly true.

21    That's at page 981 of the Court's opinion.  So the Court was

22    clearly relying upon the general notion that any kind of

23    statements, whether they are factual statements or ultimately

24    haggling over the settlement terms, are not probative in

25    litigation, and for that reason, that's one reason why a

1    settlement privilege should be recognized.

2            THE COURT:  Okay.  But do you not agree that there

3    could be a meeting in which the OEM brings in the supplier

4    and says, hey, what's this about this plea, and they have a

5    discussion of the facts, no discussion of settlement, but say

6    maybe we better get together and see how we are going to

7    resolve this.  That meeting you would get the information

8    from, would you not --

9            MR. FENSKE:  If it is not --

10           THE COURT:  -- if it is not privilege?

11           MR. FENSKE:  Let me put it this way.  If there was

12   a meeting discussing the underlying facts that's not for the

13   purpose of furthering a settlement, it is not privilege and

14   we have never claimed that it is.

15           What we have said is that the Master by

16   categorically deciding that all statements at initial

17   meetings about the underlying facts are not privileged even

18   when they are made after a confidentiality agreement has been

19   entered into that says the statements are made only for

20   settlement purposes, the Master categorically ruled that even

21   those statements are not privileged and that is the

22   fundamental error, Your Honor.

23           And I won't discuss all of the cases cited in our

24   brief that apply after the settlement privilege or Rule 408

25   to factual admissions; that's there for Your Honor.  But

1  suffice it to say that there are a wealth of those cases; we

2  cite them in our reply brief.  And there is no case that we

3  have been able to find that has ever compelled applying the

4  settlement privilege underlying settlement communications.

5       There was some discussion about the differences in

6  the Master's order versus liability issues and damages

7  issues.  The Master expressly held that discussions about

8  damages are necessarily privileged, and we agree with that.

9  But, of course, that highlights the arbitrary distinction

10  between his statement in paragraph 2 of his order where he

11  compelled production of statements at initial meetings about

12  liability because damages and liability both go to the merits

13  and both are -- a discussion of both of those issues is

14  necessary to reach a reasonable resolution of claims.  So the

15  distinction that he drew between them is arbitrary.  He was

16  correct on the damages side but --

17       THE COURT:  How would you word it?

18       MR. FENSKE:  How would I word the order?

19       THE COURT:  The Master's order.

20       MR. FENSKE:  I would simply say any communication

21  made in furtherance of settlement is privileged, and then if

22  the Master were then to have concerns about the breadth of

23  that statement, there are processes for resolving privilege

24  disputes over individual documents.  There is a privilege log

25  process.  The parties can negotiate the best way to resolve

1   any disputes they may have about whether a particular

2   document is privileged.  And then, of course, if it

3   ultimately comes to it, the parties can submit the documents

4   to the Court for in-camera review or the Court can decide for

5   herself whether or not the documents are, in fact, privilege.

6   This is just sort of Privilege 101.  There are procedures in

7   place for handling the issues that Your Honor has raised.

8           And then Ms. Romanenko made the point, which we

9   don't dispute, that a confidentiality agreement by itself

10  cannot immunize certain information from discovery, and we

11  don't dispute that.

12          The reason why confidentiality agreements are

13  relevant is because, as I mentioned before, they establish

14  the factual predicate for the settlement privilege to apply,

15  namely, one, that any statements made under the settlement

16  agreement were made for the purpose of settlement -- or, I'm

17  sorry, under the communication -- the confidentiality

18  agreement were made for the purpose of settlement; and, two,

19  that they were intended to be confidential.  And if those two

20  things are, in fact, true, then under Goodyear the settlement

21  privilege applies.

22          The -- Ms. Romanenko made a point that --

23  essentially that the settlement agreements will be produced

24  under the protective order so not everyone will have access

25  to them and that somehow reduces the harm to the defendants

1   and the OEMs, but that misses the point.  The point is that

2   if the Court sustains the Master's ruling and holds on the

3   flimsy, if nonexistent showing of relevance of these

4   settlement agreements that any party can get them simply by

5   requesting them, there's nothing to stop the DPPs from asking

6   for them, there is nothing to stop one OEM from subpoenaing

7   another or one defendant from subpoenaing another.  And so

8   they will -- the general sanctity that courts show to

9   confidential settlement documents will be breached and

10  parties will therefore be dissuaded from making the kinds of

11  communications and the kinds of compromises that they need to

12  be able to settle.

13         And then not to do a battle of quotations, Your

14  Honor, but Ms. Romanenko read a lengthy quotation from a

15  court that she implied said that it's a little ridiculous to

16  think parties won't settle if their communications are made

17  public.  And there are a number of -- common sense comes out

18  the other way, and there's a court that says, quote, were a

19  court to disclose truly confidential settlement

20  communications, it might indeed be damaging to settlement

21  prospects in that case and even to parties' willingness to

22  share confidential information in other cases, and that's the

23  Holly case that we cited in our opening brief.

24         And the fundamental point, Your Honor, is that Your

25  Honor has to apply a rule of law that applies not just to

1    this case but to any case, and what the Court's decision will

2    signal to any of the parties that appear before this Court is

3    that their settlement communications are subject to

4    disclosure and so they have to be very careful about what

5    they say.  Parties who are trying to settle cases will have

6    less information available to them and it will make it harder

7    for them to settle.

8         And then just on the settlement agreements points

9    specifically, Your Honor's questioning sort of hit the point

10   home, which is that there is really no relevance that we can

11   see to these.  The direct purchasers have not moved to compel

12   these -- the OEMs and members of the direct-purchaser class,

13   so there is no set-off issue, there is no damages issue that

14   these could possibly be relevant to.

15        And as to the bias point, again, the dealers have

16   identified no witness who may testify that this may show that

17   they are biased and no explanation as to how the settlement

18   agreement might actually make them show they are biased.  And

19   it is premature, Your Honor, because trials where any

20   witnesses are going to testify are years away.  We have to go

21   through class certification, we have to go to trial, and the

22   Court can consider this, if necessary, at the appropriate

23   time but that's not now.

24        And just last I would like to just briefly address

25   the issue of whether or not the dealers asked for settlement

1    agreements.  And the short answer is that request 31 does not

2    directly ask for settlement agreements.  If it is interpreted

3    as broadly as it possibly could, arguably it encompasses

4    settlement agreements.  But look to the motion to compel

5    because the motion to compel argued why they needed these

6    documents and it asked only for communications.  They said

7    that they need communications to know how the defendants

8    described the conspiracy to their OEMs.  It makes no mention

9    of settlement agreements.

10            The quotes that Ms. Romanenko just read to you are

11   from their reply briefs after we filed our brief, after we

12   had an opportunity to brief this, and when this came up the

13   first time, which was at the hearing before the Master, we

14   jumped up and objected on relevance grounds and that's

15   reflected in the transcript.  These were not requested and

16   the Master exceeded his authority in compelling their

17   production.

18            And that's all I have, Your Honor.

19            THE COURT:  Thank you.

20            MR. WOLFSON:  Good now afternoon, Your Honor,

21   again.

22            To add a few points to what Mr. Fenske said on

23   behalf of GM.  One of the themes from Ms. Romanenko's

24   argument was that somehow the OEMs got a better proffer or

25   better evidence due to their relationship with the parts

1    suppliers, and she noted that a lot of witnesses say I don't

2    remember or they are no longer at the company or there are

3    gaps in the data, gaps in the documents.  That may be true

4    and I fully trust that that is exactly what's happening, but

5    the same thing applied to the OEMs.  The same people say I

6    don't remember or they are no longer there, the documents are

7    no longer there, the data is no longer there.

8         And the difference is that when you are in an

9    informal relationship such as this, you are not subject to

10   the power of the Court that has an obligation of the

11   attorneys to provide all information that is for -- at least

12   for interrogatories reasonably available to the party

13   being -- who is subject to the discovery request, and for

14   document requests, they have to conduct a reasonable

15   investigation.

16        So Ms. Romanenko mentioned that certain

17   interrogatories are missing information, and the parties are

18   duty bound to provide what information is available to them

19   or else be subject to sanctions.  And if the lawyers provide

20   information to OEM counsel as part of these discussions, that

21   same information is available to them and is subject to

22   discovery in this case.  So the idea that we are getting

23   somehow a better explanation or better discovery on the case,

24   we have an issue and we disagree with that.

25        The distinction between damages discussions and

1    explanation of the liability portion is it's intertwined.

2    The -- you can't have one without the other because you can't

3    calculate damages without knowing what the scope of the

4    damage was, what bids were affected, which parts were

5    affected.  And that's an iterative process where you are

6    going back and forth where there is an initial discussion

7    from the defendants saying, well, here is where we think

8    things went wrong, and then there is a back and forth of the

9    OEMs saying we think you are understating things.  This is

10   just normally how these conversations with defendants go.

11         To use an example from personal life, when I found

12   that my son was sneaking candy a couple weeks ago, I

13   confronted him with the empty wrapper and said is this it?

14   Like a good, smart six-year-old he says, yeah, Dad, you

15   caught me.  But then when I found five more wrappers, I said,

16   hey, you sure you want to really go with that that's the only

17   one?

18         I mean, this is a conversation where the wrongdoer

19   want to minimize what they are caught for, but the person

20   pursuing -- or the party pursuing the claim often finds more

21   evidence through alternative sources and discusses that and

22   eventually they come to a resolution.

23         The -- let's see.  The idea that there is this

24   definitive point where -- or I believe Your Honor mentioned

25   there was a gray line or not necessarily a bright line of

1    when these started.  We take your point on that.  And what
2    the defendants and the OEMs are saying is that any of these
3    types of discussions on substance did not occur until after
4    whatever the point was where settlement negotiations
5    officially started after that point.
6         And Your Honor asked how we would rewrite the
7    Special Master's order.  The -- the problem in the first
8    instance is that the plaintiffs haven't met their burden to
9    show discoverability, but understanding just that these were
10   not undertaken, these substantive discussions were not
11   undertaken until both parties understood they were in some
12   sort of settlement communication is one possibility.
13        The idea that Goodyear could not have admissibility
14   as part of its standard, I just want to very quickly note, we
15   are talking about privilege here.  Absolutely admissibility
16   could be part of a privilege standard.  In fact, the
17   attorney-client privilege, one of the most well-accepted,
18   prevalent privileges in the nation, it -- some courts have an
19   exception where if there's an extremely substantial need and
20   the only source for evidence on a certain point is
21   attorney-client communications, in certain very limited
22   instances you can broach the privilege to get those types of
23   documents, and part of that is that there is a need and this
24   is evidence that can be used.
25        But beyond just that analogy or that example, we

1    are also talking about proportionality under Rule 26.  And I

2    want to reiterate, this is a Rule 45 subpoena so burden is

3    implicitly part of the analysis for determining whether we

4    need to produce documents, but part of that underlying it is

5    the Rule 26 standard.  And if the plaintiffs can't establish

6    a need for this, and there are very, very good reasons to

7    hold it back such as the Goodyear privilege, such as the

8    questionability -- or the questionable nature of the

9    communications and lack of any admissibility for trial, we

10   think that would weigh against production just even on

11   proportionality issues alone.

12        And then with respect to the settlement agreements,

13   I believe my prior argument, we addressed it, Mr. Fenske

14   addressed I think the majority of the replies.

15        Ms. Romanenko, however, did say that we have not

16   argued -- no argument for burden.  Burden is not just about

17   the time it takes to get documents or the number of people,

18   the need to find them or how far you have to have go.  Burden

19   can also be more intangible, and a good example of this is

20   trade secrets.  When a third party is forced or is requested

21   to produce trade secrets or highly, highly confidential

22   information, cases say, well, that is a form of burden that

23   we recognize and that it must be weighed against the

24   relevance of the requested information.

25        And here the parties are saying look, there is

1    burden.  We have talked about the chilling effects, we have
2    talked about the confidentiality, we have talked about not
3    wanting every other parts supplier out there to know the
4    deals that we negotiated with individual part suppliers.  We
5    believe all of this adds up for a substantial burden on the
6    OEMs, and I suspect the defendants would -- well, they have
7    argued similar types of burden for themself.
8            And just to answer Your Honor's question, the
9    Special Master did not address relevance.  He, in fact,
10   said -- I'm paraphrasing here -- I'm just going to do this to
11   save time.  We will leave it for the Court to determine the
12   issues of relevance.  So we don't believe that he actually
13   weighed in on that issue.
14           Thank you, Your Honor.
15           THE COURT:  Okay.
16           MS. LEIVICK:  Just briefly, Your Honor, to respond
17   to what Ms. Romanenko said at the outset of her argument,
18   Ford, as I said, filed its objection because of the
19   significance of these issues to Ford, but does not agree with
20   Ms. Romanenko that Ford has waived its right to address these
21   issues before the Special Master if there are issues that
22   come up with respect to Ford's negotiations with the serving
23   parties on this topic.  Ford was not a part of the briefing
24   before the Special Master, did not participate in any
25   hearings.

 1        Putting that aside, with respect to the settlement

 2   communications, Ms. Romanenko implied that this effort to

 3   prevent the production of these communications as being

 4   somehow driven by the defendants and that the OEMs don't

 5   really care about the confidentiality of these communications

 6   and this was just an effort by the defendants to come --

 7   enter into a confidentiality agreement that would then

 8   somehow prevent the plaintiffs from getting this information.

 9        But I want to make it clear that Ford takes the

10   confidentiality of these negotiations very seriously, and it

11   is not the case that Ford doesn't care whether these

12   communications are kept confidential.  And as I said, Ford

13   has tried to resolve these issues confidentially with its

14   suppliers, which is exactly why Ford is here today and has

15   filed its briefs.

16        And just briefly, Your Honor, because Mr. Wolfson

17   and Mr. Fenske have addressed this, Ford agrees that this

18   process of negotiations with the suppliers is just that, a

19   process.  You can't draw a bright line where the factual

20   proffers, the factual information stops and then negotiations

21   begin.  And there is a lot of back and forth between the OEM

22   and the supplier on both the facts and damages and settlement

23   offers that are all bound up together, and you can't draw

24   that line and Goodyear does not draw that line.

25        With respect to the settlement agreements, again,

1    as Mr. Wolfson just said, the Special Master made no finding

2    with respect to relevance of those agreements.

3           And there is no indication that any of the

4    information that Ms. Romanenko thinks may be in the

5    settlement agreements is actually in there.  She said at one

6    point that these settlement agreements may contain

7    cooperation obligations or documents that the supplier is

8    going to produce to the OEM, but none of that has anything to

9    do with the mechanics of the business relationship between

10   the OEM and the supplier, and that's the reason she says that

11   they need these documents.  And I completely agree with

12   Mr. Wolfson that the burden in this case is the invasion of

13   the confidentiality interests of the OEMs and the suppliers.

14          And just on the issue of bias, again, there's --

15   courts have not found that bias is a sufficient basis for

16   relevance when there's no specific witnesses that have been

17   identified as potential trial witnesses.  And there has been

18   no reason offered why the OEMs who are victims of these

19   conspiracies would be biased in favor of the suppliers that

20   conspired against them.

21          THE COURT:  Okay.

22          MS. LEIVICK:  Thank you.

23          MR. SURPRENANT:  Briefly.

24          THE COURT:  All right.  Briefly.  We've got to

25   conclude this.

1    MR. SURPRENANT:  I know it's almost lunch.  I will

2    be brief.

3    The notion, Your Honor, that there is no chilling

4    effect because no litigation is going to happen because the

5    OEMs will never really sue their suppliers is make believe,

6    it is a fairytale.  None of these highly competent defense

7    counsel are going to write my client a check for $300 million

8    if I can't credibly threaten a billion dollar lawsuit.  It

9    just -- the litigation threat has to be real.  And counsel

10   said that these are frank discussions.  They are frank

11   discussions, they need to be frank discussions, but they are

12   not going to be frank discussions if they are discoverable.

13   One last point, Your Honor.  I think the

14   distinction is completely unworkable, but if all counsel

15   wants are statements of fact about the conspiracy, then I

16   think if that is going to be the order of Your Honor, that

17   should be clear because that's not how counsel has construed

18   the order before.  But if it is only statement of facts, we

19   did this, we did this, we did this, then the order ought to

20   be clear because I think I'm almost certain I don't have

21   anything to produce.  Thank you.

22   MS. ROMANENKO:  Your Honor, just less than five

23   minutes, very quickly.

24   Your Honor, Mr. Fenske argued that these proffers

25   are privileged because the parties ultimately settled, but I

1    just want to clarify what we are saying here is that the

2    suppliers knew that they had to talk to these OEMs that they

3    were in an ongoing relationship with.  You know, like, let's

4    say my husband finds out I cheated on him.  I'm going to talk

5    to him about that, you know, even without some kind of --

6    even if I don't know that there is going to be some kind of

7    resolution.  These OEMs found out that the suppliers with

8    whom they had been in a more than decade-long relationship

9    were actually bid rigging and price fixing to them, of course

10   there is going to be a conversation that happens.

11        The fact that they ultimately end up entering into

12   a settlement agreement doesn't change that.  They are two

13   different things.  The disclosure of what they did is

14   different from settlement negotiations which involves the

15   discussions of proposed resolution -- proposed resolutions

16   and solutions to the parties' issues, which is what Goodyear

17   was talking about.

18        As far as this being an ongoing dialogue as we

19   heard from Ford and GM, if that's the case, if there's

20   information in a document that discusses damages, they are

21   free to redact that pursuant to the order of the Master.

22        They also attack the Master for not conducting a

23   privilege log assessment, but they never -- this is one of

24   the things that upset us when we were looking at the

25   objections is there's all this new -- all these new arguments

1    and all this new material in the objections that was never

2    considered below because below they never said let's do a

3    privilege log, let's do a privilege process.  They knew if

4    the Master reviewed all of their documents, then he would

5    order at least some of them produced.  So they hedged their

6    beats and they just argued none of it was produceable.

7         They now come in and they change their position:

8    well, if some of it is produceable, then it was wrong for him

9    to not order a privilege log review.  That is not how it

10   works.  We cited a lot of cases to Your Honor like BioLumix.

11   They've got to make those arguments below.

12        And I think that's also pertinent to the burden

13   argument.  So they made this argument -- here at oral

14   argument they say we have a new definition of what burden is

15   without any case law.  Burden is disclosure of information

16   you don't want disclosed.  That's not what burden means.

17   That's not what Rule 26 looks at when it looks on burden.  It

18   is looking at the burden of production: do we have to hire a

19   bunch of vendors, do we have to copy a bunch of paper

20   documents, do we need specialists, do we need to pull people

21   off the job?  That's burden.  We don't have anything from any

22   of the defendants and OEMs saying it is burdensome to

23   disclose information you would rather keep private, so it

24   doesn't create a situation where they have to do anything.

25        And also along the lines of new arguments, you

1   know, I just want to note that the defendants didn't raise

2   the issue of relevance below.  They didn't say that this

3   information or that information or the settlement agreements

4   aren't relevant.  So they all attacked the Master for not

5   making a specific finding about settlement agreements, but

6   that's because they didn't argue about that.  The Master

7   obviously knew that we requested settlement agreements and we

8   knew that.  Otherwise why would he have randomly ruled that

9   they could be produced?  They were obviously contemplated in

10   our request, they were contemplated by the briefs, and if

11   they wanted to make a relevance argument, they could have

12   made it, we could have addressed it, and the Master could

13   have given a more full opinion on it.  But they made their

14   choices so those choices sit with them now today during their

15   objections.

16          That is all I have.  Thank you.

17          THE COURT:  All right.  Anything else?

18          MR. FENSKE:  Just briefly.  I won't even argue the

19   point, Your Honor, that there is a transcript of the hearing

20   before the Special Master where we clearly laid out a

21   relevance objection at the first time that it was brought up

22   at his ruling, and that's in the record and that's all I have

23   to say.

24          THE COURT:  Okay.  The Court will issue an opinion.

25   Thank you very much.

1          THE COURT REPORTER:  All rise.  Court is in recess.

2          (Court recessed at 12:32 p.m.)

3                        _    _    _

*CERTIFICATION*

        I, Robert L. Smith, Official Court Reporter of
the United States District Court, Eastern District of
Michigan, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing pages comprise a full, true and correct transcript
taken in the matter of In Re: Automotive Parts Antitrust
Litigation, Case No. 12-02311, on Tuesday, May 16, 2017.




                          *s/Robert L. Smith*
                          Robert L. Smith, RPR, CSR 5098
                          Federal Official Court Reporter
                          United States District Court
                          Eastern District of Michigan




Date:  06/05/2017

Detroit, Michigan