```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3                          —    —    —

 4    _____
                                     )
 5    IN RE:  AUTOMOTIVE PARTS        )   Master File No. 12-2311
      ANTITRUST LITIGATION           )   Hon. Marianne O. Battani
 6    _____ )
                                     )
 7    IN RE: All Auto Parts Cases     )
      _____ )
 8                                    )
      THIS RELATES TO:               )
 9    All Auto Parts Cases            )
      _____)

10              HONDA AND TOYOTA'S OBJECTIONS TO THE
                        SPECIAL MASTER'S ORDER
11
                BEFORE THE HONORABLE MARIANNE O. BATTANI
12                    United States District Judge
                 Theodore Levin United States Courthouse
13                   231 West Lafayette Boulevard
                           Detroit, Michigan
14                     Tuesday, May 16, 2017

15    APPEARANCES:

16    End-Payor Plaintiffs:

17    JILL S. CASSELMA
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
18    601 Lexington Avenue, Suite 3400
      New York, NY  10022
19    (212) 980-7400

20
      Truck and Equipment Plaintiffs:
21
      WILLIAM SHOTZBARGER
22    DUANE MORRIS, L.L.P.
      30 South 17th Street
23    Philadelphia, PA  19103
      (215) 979-7385

24
           To obtain a copy of this official transcript, contact:
25             Robert L. Smith, Official Court Reporter
               (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1    APPEARANCES:  (Continued)

 2    For Defendants:

 3    ADAM C. HEMLOCK
      WEIL, GOTSHAL & MANGES, L.L.P.
 4    767 Fifth Avenue
      New York, NY  10153
 5    (212) 310-8281

 6    J. DAVID ROWE
      DUBOIS, BRYANT & CAMPBELL
 7    303 Colorado, Suite 2300
      Austin, TX 78701
 8    (512) 457-8000

 9

10    For Non-Party OEMs:

11    JUSTINA K. SESSIONS
      KEKER & VAN NEST, L.L.P.
      633 Battery Street
12    San Francisco, CA  94111
      (415) 676-2293
13
      MICHAEL SCHAPER
14    DEBEVOISE & PLIMPTON, L.L.P.
      919 Third Avenue
15    New York, NY  10022
      (212) 909-6737

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

Page

HONDA'S MOTION REGARDING SPECIAL MASTER'S
12/29/16 ORDER
Motion by Ms. Sessions............................ 5
Response by Mr. Shotzbarger.......................11
Reply by Ms. Sessions.............................17
Ruling by the Court...............................20

HONDA'S MOTION REGARDING SPECIAL MASTER'S
1/19/17 ORDER
Motion by Ms. Sessions............................21
Response by Ms. Casselman.........................24
Reply by Ms. Sessions.............................29
Ruling by the Court...............................31

TOYOTA'S MOTION REGARDING SPECIAL MASTER'S ORDER
Motion by Mr. Schaper.............................32
Response by Mr. Hemlock...........................35
Reply by Mr. Schaper..............................40
Sur Response by Mr. Hemlock.......................41
Sur Reply by Mr. Schaper..........................42
Ruling by the Court...............................42

1   Detroit, Michigan

2   Tuesday, May 16, 2017

3   at about 2:04 p.m.

4                           —   —   —

5            (Court and Counsel present.)

6            THE LAW CLERK:  Please rise.

7            The United States District Court for the Eastern

8   District of Michigan is now in session, the Honorable

9   Marianne O. Battani presiding.

10           You may be seated.

11           THE COURT:  Good afternoon.

12           THE ATTORNEYS:  (Collectively) Good afternoon, Your

13  Honor.

14           THE COURT:  All right.  One minute.  All right.

15  May I have your appearances, please?

16           MS. SESSIONS:  Good afternoon, Your Honor.

17  Justina Sessions of Keker, VanNest & Peters, here on behalf

18  Honda.

19           MR. SCHAPER:  Good afternoon, Your Honor.

20  Michael Schaper from Debevoise & Plimpton on behalf of

21  Toyota.

22           MR. HEMLOCK:  Good afternoon, Your Honor.

23  Adam Hemlock, Weil, Gotshal & Manges, on behalf of the

24  Bridgestone and Calsonic defendants.

25           MS. CASSELMAN:  Good afternoon, Your Honor.

1    Jill Casselman of Robins Kaplan on behalf of the end payor

2    plaintiffs.

3              MR. ROWE:  Good afternoon, Your Honor.  David Rowe

4    for Sanden, one of the defendants.

5              MR. SCHOTZBARGER:  Good afternoon.

6    Williams Shotzbarger of Duane Morris for the truck and

7    equipment dealer plaintiffs.

8              THE COURT:  Okay.  Who wants to start?

9              MS. SESSIONS:  Your Honor, I think we have -- there

10   are two Honda objections at issue and one Toyota objection at

11   issue today.  We are happy to take them in whatever order you

12   prefer; we're flexible.

13             THE COURT:  Okay.  Why don't you start then with --

14   let me find what I have here first.  Let's take Honda's

15   objections to the December 29th order, that would be oldest

16   one first.

17             MS. SESSIONS:  Correct.  Good afternoon, Your

18   Honor.  Justina Sessions, Keker, VanNest & Peters, on behalf

19   of the Honda entities.

20             So the first Honda objection at issue is docket

21   number 1598, which deals with the Special Master's order

22   compelling Honda to produce data relating to its all-terrain

23   vehicles and side-by-sides.  And so the issue here is whether

24   Honda should be forced to produce the same massive set of

25   data that it has agreed to produce for its automobile

1    business for its separate and much smaller ATV and

2    side-by-side business.  And this request for ATV and

3    side-by-side data is made only by the truck and equipment

4    dealer plaintiffs, which they contend is relevant to the

5    truck and equipment cases, so this is not at issue in the

6    larger auto parts cases.

7         Now, the truck and equipment case seems to me to be

8    primarily focused on trucks and heavy equipment, large trucks

9    and heavy equipment like tractors or they've said mining

10   equipment and other things like that.  And I think for this

11   reason, ATVs and side-by-sides were never front and center in

12   any of the briefing that was before the Special Master and

13   they weren't front and center in the subpoena.  So the

14   Special Master --

15        THE COURT:  But isn't the issue were they included

16   in the definition in the subpoena?

17        MS. SESSIONS:  Yes, Your Honor, I think that's one

18   of the two issues here, and we contend that they are not

19   included within the definition of vehicle in the subpoena.

20   But we also contend that this request for ATV and

21   side-by-side data was not actually raised in the motion to

22   compel that was brought before the Special Master.  This was

23   raised only at the hearing after briefing was complete on the

24   motion to compel, and for that reason there was no record

25   from which the Special Master could make the required

1    findings that this request was proportional to the needs of

2    the case because there was no briefing on that issue.

3              But to get to Your Honor's question about the

4    definition within the subpoena, so the subpoena has two -- a

5    two-part definition of vehicle.  There is a definition that I

6    think generally applies to the auto parts cases, which is an

7    automobile or other motor vehicle that is primarily used for

8    transporting from one to eight passengers and is designed to

9    operate primarily on roads, and there are some examples of

10   those.  I don't think there's any dispute that ATVs and

11   side-by-sides are not designed to operate primarily on roads

12   and do not fall within that portion of the definition.

13             There is a second half of the definition that is

14   specific to certain truck and equipment cases, and that is

15   the second sentence of the definition which is in addition,

16   to the extent that any of the requests seek documents with

17   respect to wire harness systems or bearings, vehicle also

18   includes medium-duty trucks, heavy-duty trucks, buses,

19   commercial vehicles, construction equipment, mining

20   equipment, agricultural equipment, railway vehicles and other

21   similar vehicles.

22             So the truck and equipment dealers contend that

23   their request for ATV and side-by-side data falls within this

24   second portion of the definition.

25             THE COURT:  Do you define an ATV as agricultural?

1    MS. SESSIONS:  We do not, Your Honor.  I think

2    that's one of the two issues with this definition.  So, first

3    of all, this definition applies only to wire harnesses and to

4    bearings, and the truck and equipment dealers have withdrawn

5    their requests with respect to bearings documents and I

6    believe that they have as well with respect to wire harness

7    documents, but they are trying to apply this to other parts

8    as well even though the definition is explicitly limited to

9    wire harness and bearings.

10    But even if the definition were not so limited and

11    swept in other parts categories, ATVs and side-by-sides would

12    still not be agricultural equipment under this definition.

13    An ATV -- ATVs and side-by-sides are -- they are small -- I

14    sort of think of an ATV almost as a sort of motorcycle with a

15    bigger frame around it one or two people can ride on, people

16    often go off-roading in them and you can ride around in the

17    woods, use it for a variety of purposes.  And a side-by-side

18    is similar but it often has a sidecar in it so a passenger

19    can ride next to you.

20    These are not in any way similar to the other types

21    of heavy trucks and equipment that are listed in this

22    definition; buses, commercial vehicles, construction

23    equipment, mining equipment, they don't look anything like

24    that.  They are not heavy agricultural equipment either, they

25    are not tractors or combines or things like that that you

1   would expect to be lumped together with construction

2   equipment and mining equipment and other heavy trucks.

3          As we set forth in our brief, the National Highway

4   Transportation Safety Administration has a definition of

5   agricultural equipment which also would not include things

6   like ATVs and side-by-sides; that definition is tractors,

7   self-propelled machines such as beet harvesters, combines,

8   bailers or other implements that are primarily designed for

9   agricultural field operations.  ATVs and side-by-sides are

10  not primarily designed for agricultural field operations.

11         And the only evidence in the record in support of

12  the truck and equipment dealers' argument that ATVs and

13  side-by-sides are, in fact, agricultural equipment is this

14  one picture that they presented during the hearing to the

15  Special Master, which wasn't in their briefing and wasn't

16  otherwise made a part of record, which shows an ATV in a barn

17  with some baling wire on the back of it, and this does not

18  make an ATV agricultural equipment.  Just because it can be

19  parked in a barn or it might be used on a farm doesn't mean

20  it is something like a tractor or a combine or a harvester.

21         THE COURT:  There's nothing in your literature that

22  shows -- that says it is an agricultural or could be used as

23  agricultural?

24         MS. SESSIONS:  So the picture that they found is a

25  picture from a Honda website so --

1    THE COURT:  A picture is worth a thousand words.

2    MS. SESSIONS:  Well, but, Your Honor, the fact that

3  this thing was pictured in a barn just doesn't make it

4  agricultural equipment.  So I don't have a lot personal

5  experience with this, I grew up in the city, but my husband

6  grew up on a farm in Nebraska, and so I asked him -- they

7  didn't own an ATV so he couldn't tell me whether they used an

8  ATV for farm purposes, but he did park his bicycle in the

9  barn.  So if you had taken a picture of his barn, his bicycle

10  would have been in there.  And sometimes he rode his bicycle

11  around the farm to do various farm-related tasks.  The fact

12  that it lived in the barn and that he used it on the farm

13  doesn't make his bicycle agricultural equipment any more than

14  using your sedan on a farm doesn't make it agricultural

15  equipment.  So this picture doesn't really prove the point

16  that the ATVs and side-by-sides fall within this definition.

17    And Your Honor may be wondering why this is such a

18  big deal and why we are fighting this request for ATV and

19  side-by-side data and why it matters that it wasn't in the

20  subpoena.  And the answer is because the additional burden to

21  do this is significant.  As I mentioned at the outset,

22  Honda's ATV and side-by-side business is separate from its

23  passenger vehicle business, so all of the work that we've

24  done so far and the hundreds of hours that we have spent

25  interviewing witnesses and collecting documents doesn't --

 1   wouldn't apply to the ATVs and side-by-sides.  We would have

 2   to undertake an entirely new collection process with a

 3   different set of purchasing folks and a different factory in

 4   South Carolina rather than in Ohio where our passenger

 5   vehicle purchasing folks are located.  So it is a significant

 6   additional burden, but the Special Master didn't weigh that

 7   burden and didn't assess proportionality because none of that

 8   was in the record before him because this issue wasn't

 9   briefed to him because it wasn't raised in the original

10   motion to compel, it was only raised as sort of an

11   afterthought at this hearing.

12           And for that reason, we would ask that Your Honor

13   overturn the Special Master's order compelling production of

14   that data.

15           Thank you.

16           THE COURT:  Okay.  Thank you.  Plaintiff.

17           MR. SHOTZBARGER:  Good afternoon, Your Honor.

18   William Shotzbarger of Duane Morris for the truck and

19   equipment dealer plaintiffs.

20           Your Honor, we are requesting that the Court affirm

21   the Special Master's order on Honda's ATVs and side-by-sides.

22           THE COURT:  What standard do I use?

23           MR. SHOTZBARGER:  So that was going to be my first

24   point, Your Honor.  This standard is an abuse of discretion

25   standard.  This is a procedural matter under Rule 53(f)(5),

1    and you need only look at Honda's own objections because if

2    you look at their objections, you'd go to the controlling or

3    most appropriate authorities section required by the local

4    rules but there for a reason.  When you look there, they list

5    Rule 26, Rule 45, Rule 53, and then one case, the Blue Cross

6    Blue Shield of Michigan case, which interprets those Federal

7    Rules of Civil Procedure.  So therefore the proper standard

8    of review is an abuse of discretion.

9         Moving to the merits, Honda's objection should be

10   overruled for three reasons.  First, Honda cannot dispute

11   that it markets these vehicles for agricultural uses.  The

12   term agricultural vehicle appeared in the subpoena itself and

13   it appears in all of the truck and equipment dealer

14   plaintiffs' complaints.

15        The second reason is that our complaints in the

16   radiators, starters and alternators actions specifically list

17   ATVs in the definition of vehicle or trucks and equipment

18   that we used in those complaints.  And the reason that's

19   important is because when the subpoena was first served in

20   August 2015, we had not filed in radiators, starters or

21   alternators yet.  And so therefore as the subpoena was served

22   and everyone understood that it was kind of a growing,

23   amorphous subpoena to encompass later-filed cases, when we

24   filed our future complaints, we directed Honda to look at our

25   later complaints as opposed to the definition of vehicle that

1   was in the subpoena served before we filed in those later

2   cases.

3          And the third reason the objection should be

4   overruled is that Honda has failed to substantiate its claim

5   of excessive burden.

6          I want to move to a little bit of the procedural

7   history and that is because Honda was always on notice that

8   the truck and equipment dealer plaintiffs were seeking ATV

9   and side-by-side related information from Honda.  Now, we

10  first moved against Honda back in January 2016.  The serving

11  parties told Honda that we were moving to compel with respect

12  to all auto parts at issue in the multi-district litigation,

13  so not just bearings, not just wire harnesses, but all the

14  parts that the truck and equipment dealers were in at that

15  time, and that's in a letter dated January 13th, 2016,

16  ECF Number 1186, Exhibit P at page 2.

17         Honda was always on notice that the truck and

18  equipment dealer plaintiffs were moving with respect to the

19  same prioritized requests for OEMs that were involved in

20  trucks and equipment manufacturing, and Honda was always one

21  of those, at least we told them they were, regardless of what

22  they say.  And all of this procedural history was a result of

23  the parties, both the plaintiffs and the defendants,

24  cooperating together after we were instructed by the Court to

25  do so.

1          Now, with regard to specific discussions between

2    Honda and the truck and equipment dealers, we had discussions

3    between May 2016 and November 2016.  We constantly asked

4    Honda to produce information, data, anything about their

5    burden with regard to production of information for ATVs and

6    side-by-sides.  They hardly responded to us despite multiple

7    questions over multiple meet-and-confer calls.  And it had

8    been clear, as Ms. Sessions mentioned, that they were

9    certainly focused on the passenger car side.

10          Now, all this back and forth, and I say all of this

11   but it really wasn't that much, this culminated -- the

12   culmination of our discussions was the November 4th, 2016

13   letter from the truck and equipment dealers to Honda; this is

14   ECF Number 1616-2.  We laid everything out leading up to the

15   renewed motion to compel.  We were teeing up the motion.  We

16   never got a response to the letter from Honda.

17          Now, in that letter we laid it all out.  We said,

18   first, Honda markets these vehicles for agricultural uses,

19   hence the picture of the side-by-side that was used at oral

20   argument before the Special Master.  This is a Honda picture.

21   It is from hondanews.com.  They created it.  I'm not sure why

22   they are so upset that it was used at oral argument.  It is

23   their own marketing --

24          THE COURT:  They were just parking it in the barn.

25          MR. SHOTZBARGER:  It is their own marketing

1    material.  Now, it is clear that they are marketing this as

2    an all-terrain vehicle, that's what it is.  You can use it

3    for more than one use.  Sure, you can ride it on the beach,

4    but you can certainly put a fence up at the ranch with it.

5    So that is why they market it in that fashion, so they can

6    sell more of them, because after all, it is a utilitarian

7    vehicle.

8           And to go to that point, in our complaints in

9    radiators and starters and alternators, we specifically say

10   ATVs marketed for agricultural uses, and that is exactly what

11   that picture shows.

12          Now, the reason we look to those complaints, like I

13   said, is because we filed in those cases after the subpoena

14   was originally served, and Honda was on notice that we were

15   moving with respect to all the parts at issue and all the

16   cases in which the truck and equipment dealers are in, which

17   is not that many cases.  As Ms. Sessions mentioned, we have

18   only -- we've withdrew the request for wire harnesses and

19   bearings, and so that only leaves occupant safety systems,

20   radiators, starters and alternators.  So that's only four

21   parts that they need to go get the information for from the

22   manufacturing plant in South Carolina that we never even

23   heard about until we got here in December to hold argument.

24   They never he responded to our letter.  They never let us

25   know what the burden was before we got here in December

1    before the Special Master.

2            With regard to the definition in our own complaint,

3    as the truck and equipment dealer plaintiffs, we are the

4    masters of our complaint, we are the ones who are able to

5    interpret that definition.  That principle comes from Holmes

6    Group vs. Vornado; that's a U.S. Supreme Court case cited in

7    our brief.

8            So in sum, they never responded to our letter so we

9    moved to compel, and that's how we wound up here.

10           Some final points.  It is interesting how the OEMs

11   have constantly complained that this is the broadest subpoena

12   in history, yet somehow ATVs and side-by-sides are not

13   included in the subpoena.  Hardly anyone but Honda has

14   questioned the subpoena's breadth until now, and we submit

15   that the definition certainly includes ATVs and

16   side-by-sides.

17           These vehicles are not de minimus to the truck and

18   equipment dealer plaintiff class.  By our own admission, the

19   class is not going to be as big as the passenger car classes

20   with the auto dealer plaintiffs and the end payor plaintiffs.

21   Still, Honda sold 1.9 million ATVs over the bearings class

22   period, so that is not de minimus, that is a lot of vehicles,

23   economists aside.  We have dealt with truck and equipment

24   subpoena recipients selling vehicles in the tens of

25   thousands, but here we are talking about Honda, one of the

1    biggest OEMs, one of the lead six OEMs, and in the ATV sphere

2    they sold 1.9 million ATVs and side-by-sides over the class

3    period.

4           And one final point, we have evidence that Honda

5    ATVs, not just ATVs in general but Honda ATVs were affected

6    by the conspiracy, and so therefore, in order to represent

7    the class, we request that the Court affirm the Special

8    Master's order.

9           THE COURT:  Thank you.  Ms. Sessions.

10          MS. SESSIONS:  Briefly, Your Honor, on the standard

11   of review, you have heard a lot about the standard of review

12   on a lot of these issues.  Findings of fact or conclusions of

13   law of the Special Master are reviewed de novo, and only

14   procedural matters are reviewed for an abuse of discretion.

15   We would submit that the Special Master's conclusions, such

16   as they were, that ATVs and side-by-sides were included

17   within either the motion to compel or the subpoena would be

18   mixed questions of fact and law that should be reviewed de

19   novo.  But even if the standard of review is abuse of

20   discretion, I think there is ample evidence that the Special

21   Master did unfortunately abuse his discretion in this case.

22          Briefly, as to the argument that ATVs are mentioned

23   in certain of the complaints that the truck and equipment

24   dealers filed, that's really beside the point because the

25   subpoena doesn't purport to incorporate any definition from

1    any complaint and it doesn't point to the complaints at all,
2    and it is not a non-party's obligation to go out and inspect
3    other pleadings on the docket to help it interpret the
4    subpoena that it has been served with.  The definition that
5    governs is the definition that they supplied in the subpoena,
6    which does not mention ATVs and is specific only to wire
7    harnesses and to bearings.
8          There is no doubt that we had discussions prior to
9    the renewed motion to compel about this issue of ATVs and
10   side-by-sides.  That's why we were surprised when this issue
11   wasn't raised in the actual motion to compel itself.  The
12   letter that was sent to Honda was attached to the motion to
13   compel, but the motion, the memorandum of points and
14   authorities and then the Honda-specific declaration that laid
15   out all of the disputes between the parties does not mention
16   this issue of ATVs and side-by-sides.  So we had understood
17   that this issue had been dropped by the time of the renewed
18   motion to compel because it didn't show up in that motion.
19         As to the burden argument, it is true that there
20   are only four parts now at issue in the truck and equipment
21   dealer plaintiffs' complaints for which they are seeking
22   documents from us, but that doesn't mean that our production
23   is limited only to those four parts because they are also
24   seeking significant downstream discovery that applies to any
25   ATV no matter what parts went in it.

1    And last is the argument that this is not de

2    minimus.  Our problem here is that there has been no showing

3    of the relative size of Honda's ATV or side-by-side sales and

4    production relative to ATVs and side-by-sides in general or

5    to the class that the truck and equipment dealer plaintiffs

6    seek to represent which includes a lot of other kinds of

7    equipment.

8    In our brief we set forth the numbers.  We showed

9    that Honda has produced about 1.9 million ATVs during this

10   time period, ten percent of which were exported.  In

11   response, we would have expected some argument or showing

12   about what proportion of the relevant market this would make

13   up, but no such evidence has been submitted to Your Honor.

14   Aside from just saying this is important or it is not de

15   minimus, there is no actual evidence that was presented to

16   the Special Master or to you about what the actual importance

17   of this data is.  And Your Honor recognized in a slightly

18   different context with the smaller OEMs for their vehicle

19   business that they might be differently situated and that

20   that discovery might be held in abeyance while things were

21   worked out with the larger OEMs.  And similar logic might

22   apply here if we actually knew what portion of the market we

23   were talking about, but the truck and equipment dealer

24   plaintiffs have declined to provide any such information and

25   they just say, well, it is not de minimus.  That's not a

1    sufficient showing to demonstrate that their discovery

2    requests meets the basic requirements of Rule 26

3    proportionality.

4         Thank you.

5         THE COURT:  All right.  On this issue, it seems to

6    me that it is a procedural matter because it is whether these

7    ATVs and side-by-sides are covered in the subpoena, and the

8    Master made a ruling.  The Court looks at that ruling.

9    Clearly this information is relevant, nobody is really

10   arguing that, and it is something that can be produced so

11   there's no issue of how to interpret the subpoena.  And

12   actually if this were de novo, I would probably do the same

13   thing.

14        Is it de minimus?  We don't know all of the numbers

15   to say compared to -- compared to what, the cars, whatever,

16   but I think that it is significant enough that it should be,

17   in fact, turned over.  Clearly, the ATV and side-by-side -- I

18   think it is rather amusing this picture in the barn, I like

19   that, but it could be used for farming, but clearly it was

20   one of those things that were listed and Honda was on notice

21   that this included the ATVs and the side-by-sides.  So the

22   Court is going to affirm the Master's order.  Okay.

23        Next, let me --

24        MS. SESSIONS:  Your Honor, while I'm up, should we

25   do Honda's other objections or --

1          THE COURT:  The other motion, yes.  Let me just get

2     the document first.

3          MS. SESSIONS:  Sure.

4          THE COURT:  That's the January 19th.

5          MS. SESSIONS:  I believe it is January 19th.

6          THE COURT:  I think that's what it is.  Okay.

7          MS. SESSIONS:  So this is Honda's objections to the

8     Special Master's January 19th order, and Honda's objections

9     are limited just to one issue, which is the order to produce

10    CSS or cost simulation system data for intermediate model

11    years rather than just for major model changes.

12         Honda has already agreed to produce the CSS data

13    for major model changes.  And a major model change is every

14    three to five years Honda will make design changes to a

15    model, and that's when most of the part design and part

16    sourcing changes for a model, and Honda has already agreed to

17    produce that data.

18         But the dispute is whether those intermediate years

19    of data need to be produced.  And it is unnecessary to

20    require Honda to go through the additional burden of

21    producing that data because the data about sourcing and parts

22    costs can already be found in other data that Honda has

23    agreed to produce.

24         So the CSS data, as I mentioned, is from Honda's

25    cost simulation system, so it shows estimated part costs.

1    When part costs are actually finalized, when a quote is

2    accepted from a supplier and then that part goes into mass

3    production, those data are reflected in other places, and

4    Honda has agreed to produce that data.

5            So the end payors said that they wanted this

6    intermediate CSS data because part sourcing can change during

7    a model refresh cycle outside of a major model change.  And

8    while that does happen, although it is rare, the end payors

9    can find that data in the other sources that Honda has agreed

10   to produce.  For instance, Honda has agreed to produce and

11   has already produced a significant amount of its E-quote data

12   which shows the actual quotes that Honda got back from

13   suppliers and then which quotes were approved and Honda --

14           THE COURT:  Didn't a witness who testified say that

15   data comes after production like 18 to 24 months?

16           MS. SESSIONS:  So the E-quote data doesn't all come

17   after production.  So a quote is finalized before --

18   immediately before a vehicle goes into production.  So there

19   is also cost management system data that may be what the

20   parties were referring to, but Honda's 30(b)(6) --

21           THE COURT:  You read what they said in their brief

22   about that?

23           MS. SESSIONS:  Yes.  Honda's 30(b)(6) witness

24   testified that every time there is a design change, so

25   whether that be for a major model or a minor model change or

1   an intermediate model change, there is going to be a new

2   drawing issued and a new quotation issued, and when that new

3   quotation is responded to, that that data will go into

4   E-quote.  So anytime there is a design change, that quotation

5   and the approval of that quotation will be reflected in

6   E-quote, so a change in supplier or a change in the price of

7   a part will be reflected in the E-quote data.

8          And I would note that the serving parties have had

9   at least some of Honda's E-quote data for over a year, and

10  they haven't come back to us and identified a gap in that

11  data that they think needs to be filled with intermediate

12  cost simulation system data.

13         After Honda pointed out that the identity of a

14  supplier and the price at which a part is supplied can be

15  gleaned from the E-quote data that Honda is producing, the

16  end payors then argued, well, the CSS data is also otherwise

17  relevant to Honda's pricing policies and to passthrough.  But

18  the serving parties took the deposition of Honda's 30(b)(6)

19  witness on vehicle pricing and he testified that Honda does

20  not use the CSS data when it is setting vehicle prices.  He,

21  in fact, didn't know what CSS is.  For the most part, Honda

22  uses actual cost data, not simulated cost data, so cost data

23  that would come from E-quote or from Honda's other cost

24  management systems.  And then to the extent that Honda is

25  doing pricing projections before setting the final price and

1   before a vehicle has been in mass production, Honda uses

2   aggregated cost data, not part by part cost data, to do that,

3   and we have agreed to produce the aggregated cost data that

4   Honda's pricing folks use when they are doing what's called

5   imaging around what the final price of a vehicle might be, so

6   we are giving them exactly what the pricing department

7   already uses.

8        Now, the serving parties have also made the

9   argument that Honda should just produce this because the

10  burden is not qualitatively different than the burden imposed

11  by the CSS data that we have agreed to produce.  And I agree

12  the burden is not qualitatively different because it is the

13  same data, but that doesn't really answer the question of

14  what the burden is because there is no question that

15  generating additional reports and generating additional data

16  is going to require additional work for Honda.  And three to

17  five times more reports would have to be generated if we are

18  going to do those intermediate years, and there is just no

19  reason to order that production and to order Honda to bear

20  that burden when this information can be gleaned from other

21  sources.

22        THE COURT:  Okay.

23        MS. SESSIONS:  Thank you.

24        THE COURT:  Counsel.

25        MS. CASSELMAN:  Good afternoon, Your Honor.

1    Jill Casselman, Robins Kaplan, on behalf of the end payors.

2           I would like to address three points about

3    counsel's argument and also another that was mentioned in

4    their papers.

5           First, I want to talk about the relevance of the

6    CSS data.  Now, Honda has argued that we don't really need

7    this data, that we are basically just arguing for cumulative

8    data, more data for more data sake.  That's not true.  We

9    were very conscientious when we determined which items of

10   data to pursue and which to give up because there's so much

11   data that needs to be produced in this case.  CSS data for

12   mid-model changes is very important to us, and it's important

13   because we talked to our experts about what kind of

14   passthrough model is going to look like, and when you have

15   more data, your model is better.  The reason why we need

16   mid-model change, not just major model change, is because

17   major model changes, as counsel said, happen only every five

18   years, right.

19          So if you look at the Honda Accord, which is a very

20   popular vehicle in the United States, many, many vehicles at

21   issue in this class are Honda Accords, their mid-model --

22   their major model changes, excuse me, would have happened in

23   2007 relative to -- sorry, let me step back.

24          Ten years of data is what Honda has reasonably

25   accessible; we know that, it's not disputed, ten years go

1    back.  So if you look back in 2007 for the major model change

2    of a Honda Accord, the CSS data that models those pricing

3    decisions would have been maybe in 2005, 2006; it is outside

4    the ten years.  So we are not going to have Honda Accord

5    data, CSS data, for the first few years of our ten-year

6    period.  That's bad.  We need to be able to model passthrough

7    effectively using the CSS data.

8            So why is CSS data not duplicative of E-quote and

9    accounts payable?  E-quote are bids, like that is what -- the

10   bids that have been accepted go into the system.  But those

11   are not the prices that end up being used to make pricing

12   decisions because E-quote data, that often changes and those

13   changes come later after the bid is won.  We need E-quote

14   data, and it is very helpful that Honda is going to provide

15   it because it shows bid rigging; it does not help us with

16   passthrough.

17           So accounts payable, which is the amount of total

18   payments made to suppliers for certain orders for certain

19   time periods, is also useful, but we can't use it to track

20   specific vehicles or specific parts because there is -- it is

21   subject to rebates or discounts and credits and so we can't

22   get a price per part.  The CSS data, because it is modelling

23   these expected or forecasted costs, can do that, and so we

24   need that data for this purpose to show that Honda passed on

25   overcharges to customers.  This is the critical piece for

1   that.

2          THE COURT:  Now, you had the CSS data for the

3   mid -- what do you call it, or the minor model changes?

4          MS. CASSELMAN:  Yes.  So there's actually no

5   difference for our perspective for major and mid-model

6   changes.  They are both incredibly important because

7   manufacturers, OEMs like Honda -- and I should note Honda is

8   the only OEM that's objecting to this data -- it is

9   relatively rare that they are making pricing decisions like

10  this, that they are forecasting what the pricing will be.  So

11  to us, we need as much of that data as we can to show the

12  decisions and in as a robust of a manner as we can.  It is

13  not speculative, it is not overreaching.  We know that we

14  need it because we have to show passthrough for our class.

15  And so it is -- you know, the Special Master understood this,

16  we argued this, and he found that it was proportional to the

17  needs of this case, a very big case, and Honda is a very big

18  OEM.

19          I think it is interesting this is the hill that

20  Honda wants to fight on because it is just a -- it is such an

21  important piece of our case.  And the distinction between

22  major and other model changes is not what's relevant, there

23  is no significant difference between the two.

24          And to the effect that counsel raised burden, you

25  know, this Court has -- this Court and Special Master have

1    ordered 70 percent cost sharing for this reason, to help

2    alleviate the burden of doing this work that we know they

3    have to do.  Honda has claimed no special or qualitatively

4    different burden, it is just more work.  And as their

5    30(b)(6) witness testified, this CSS data is readily

6    accessible; you just put a disk into the computer and you

7    pull it out.  And granted, that would take someone some time,

8    but we are going to be helping them with that burden to make

9    it not as substantial.  And, you know, Mr. Willoughby, who is

10   the 30(b)(6) witness I'm referencing, you know, he said this

11   is something we can do, it is not difficult.

12        So I would just like to raise one more issue that

13   was discussed at the -- in the papers, not here today, this

14   contention that somehow the parties had waived this issue.

15   It has always been requested in all of our briefs, we haven't

16   changed on that.  And when we were here at the hearing, we

17   were attempting to work with our expert to see if we could

18   forego any amount of data that would make the burden less on

19   Honda, but we couldn't because of the reasons we've

20   discussed.  So it is just a mischaracterization to suggest

21   that we had an agreement and then we reneged on that

22   agreement.  That is absolutely not what happened here.

23        We need this data, it is relevant, and Honda

24   doesn't dispute that it is relevant.  They just claim it is

25   burdensome, which we don't think that they have shown any

1    abuse of discretion on the part of the Special Master.  So we

2    respectfully submit that the objection should be overruled.

3            Thank you.

4            THE COURT:  Okay.

5            MS. SESSIONS:  Your Honor, it's been argued that

6    E-quote is insufficient because it just shows bids, but

7    E-quote actually shows more than that.  E-quote shows the

8    bids that were received and then adjustments to that bid

9    price and then whatever the final price is.  So there is

10   actually -- there are two columns in E-quote, one that shows

11   a change to a bid price and a reason code column which

12   actually shows why the bid price was adjusted, and that might

13   be because of a change in raw material costs or something

14   else that affected the price at which the supplier is

15   actually going to supply the part, so E-quote does show more

16   than just initial bids.

17           It was also argued that CSS is needed because

18   E-quote and accounts payable don't include rebates.  We have

19   given rebate -- or given or agreed to give rebate data, which

20   isn't necessarily done on a part-by-part basis, but CSS

21   certainly doesn't show rebates or any sort of after-the-fact

22   adjustments to price because those are just prices that are

23   projected prior to production of the vehicle.  And that's

24   really the important point here is that it is unclear why CSS

25   is relevant to passthrough when the simulated cost doesn't

1    reflect any costs that Honda has actually incurred.  The

2    costs that Honda incurs and theoretically might be passed on

3    to a consumer are the costs that are reflected in the E-quote

4    data and the accounts payable data because those are the

5    amounts that Honda actually pays, not the forecasted costs.

6    And when the price of the vehicle is set, CSS is not used to

7    set that price.  When there's thinking about price setting

8    going on prior to that final MSRP being agreed on, Honda

9    doesn't do that by looking at individual part data but it

10   looks at aggregate cost data that comes out of CSS, but we

11   have agreed to produce those reports generated out of CSS

12   that aggregate the projected cost data.  And then when the

13   final price of the vehicle is set, that set used -- that set

14   based on actual cost data, not projected costs, that would

15   come out of CSS.

16         And in terms of the burden, it is not as simple as

17   putting a disk into a computer and just pulling it out again.

18   The data does exist, it can be generated, we don't deny that,

19   but Honda's 30(b)(6) witness explained that it is not in a

20   readily digestible form.  What Honda has to do is go into

21   that database and write a program to generate an Excel

22   spreadsheet so that the data is reasonable and

23   comprehensive -- is readable and comprehensible for someone

24   else, and that process takes time.  And it is not time that

25   Honda can't spend, but it is time that Honda would really

| | |
|---|---|
| 1 | rather not spend given the already massive amount of data |
| 2 | that Honda has already agreed to produce. |
| 3 | THE COURT: Honda already has a program to get the |
| 4 | CSS data obviously because you say you have given it to them, |
| 5 | so what would be the burden on having it for the minor model |
| 6 | changes? |
| 7 | MS. SESSIONS: I think I misspoke when I said |
| 8 | program. I didn't mean to suggest that someone has gone and |
| 9 | written some code to extract it. From my understanding, this |
| 10 | is done pretty manually. There is one person who has been |
| 11 | responsible for doing this, for responding to these requests |
| 12 | at Honda, and she goes into the system and makes the |
| 13 | appropriate queries and asks the database to generate an |
| 14 | Excel file that then -- that's been tossed out, and then that |
| 15 | file needs to be checked because the data is not as clean as |
| 16 | one might necessarily hope that it would be. So it takes |
| 17 | some time for this person to then go look at these reports |
| 18 | and make sure that there is nothing weird that happened with |
| 19 | the data that came out of it, because we did have to go back |
| 20 | and forth a few times when we were generating the first set |
| 21 | of CSS reports. |
| 22 | THE COURT: Okay. Thank you. Again, this is a |
| 23 | request that requires the Court to look at the Master's |
| 24 | ruling and to decide whether it should be affirmed or not by |
| 25 | the standard of abuse of discretion. And the Court in |

1    looking at that considered the fact that there was much

2    discussion and I saw some of the deposition of the witness of

3    Honda, and clearly the CSS data is very relevant and

4    important to the plaintiffs in determining their passthrough,

5    and the Master considered whether it was proportional to the

6    needs of the case and determined that it was.

7         So though I do understand what the defendant --

8    well, what Honda is saying in this case, that this

9    information or much of this information is already being

10   given through other programs to the plaintiff, I do see the

11   necessity to be complete and to give the mid-model

12   information to them also.  So I just can't find that it is an

13   abuse of discretion.  It may be overkill to some extent, but

14   I don't find it as an abuse of discretion, so therefore I

15   affirm the Master.

16        Okay.  Next we have Toyota.

17        MR. SCHAPER:  Good afternoon, Your Honor.  Michael

18   Schaper from Debevoise & Plimpton from the Toyota entities.

19        This is Toyota's objection to one part of the

20   Special Master's January 4th, 2017 order, and compared to

21   what you've heard today, Your Honor, I will be brief.

22        THE COURT:  Okay.

23        MR. SCHAPER:  The Special Master ordered the OEMs

24   to produce information related to non-defendant suppliers

25   without regard to whether the parties actually need that

1    information with respect to each non-defendant supplier and

2    without, in our view, sufficient confidentiality protections

3    for those non-defendant suppliers' information.

4          As a backdrop, Toyota is obligated by contract to

5    its suppliers to keep their information confidential and not

6    to disclose it to any third parties without a final

7    non-appealable court order.  We would think that the

8    defendant suppliers surely appreciate that protection because

9    were the shoe on the other foot so to say, we would stand up

10   for them in the same way and try to protect their information

11   that we hold as an OEM.

12         THE COURT:  The interesting thing is that wording,

13   a final non-appealable court order.  I mean, do you really

14   mean that, because it is not appealable until the case is

15   over?  It would take care of the issue I guess.

16         MR. SCHAPER:  Well, I think that's an issue for

17   another day, Your Honor, but surely we were able to appeal

18   the Special Master's decision to Your Honor.

19         THE COURT:  Yes.  Okay.

20         MR. SCHAPER:  Toyota had two concerns with the

21   Special Master's order, and the first I think I can say

22   appears to have been resolved through the briefing before

23   Your Honor, and that was that without knowing exactly which

24   non-defendant suppliers' information would be responsive to

25   the subpoena, there would be no way that the parties could

1    actually say whether they need it until we had told them

2    which non-defendant suppliers' information was at issue.  And

3    we felt that instead of waiting to see whose information was

4    at issue and conferring with the parties as to whether they

5    feel like they need that non-defendant suppliers'

6    information, we felt like the Special Master's order would be

7    just telling us to go notify the non-defendant suppliers that

8    it is all going to be produced.  And the parties appear to

9    have agreed in their opposition brief that it may be that

10   they don't need every non-defendant suppliers' information,

11   and they appear willing to discuss that issue further with

12   Toyota once we know exactly which non-defendant suppliers are

13   at issue, and this could be hundreds of non-defendant

14   suppliers.  We think it is roughly 18 just between AVRP and

15   bearings, and, of course, there are many other parts

16   categories at issue.  So just the process of Toyota notifying

17   each of them and engaging with them on their questions would

18   have taken a lot of information.  But we do think that the

19   parties' willingness to engage with us on that alleviates the

20   concern of us having to give a blanket notice to all

21   non-defendant suppliers.

22           And we also appreciate that the Special Master's

23   order does provide non-defendant suppliers with the ability

24   to come object to their information being produced should

25   they choose to do so.

 1          And that leaves one issue, Your Honor, and that

 2     concerns protecting the confidentiality of the non-defendant

 3     suppliers' information.  The information that will be

 4     produced includes their price quotes, the actual prices they

 5     charged Toyota and were paid by Toyota, and this is highly

 6     commercially sensitive information just on its own and also

 7     because it is being produced in a case where its competitors

 8     are parties, so there is real sensitivity there.  And so

 9     Toyota had proposed that it should be able to produce the

10     information while disguising the names of the non-defendant

11     suppliers, so bearings supplier one, bearings supplier two,

12     and it could do so in a way that is uniform across its data

13     so that it would be apples to apples when the parties were

14     looking at the data.

15          The parties resist that suggestion and they say --

16     they claim that their experts will need to know the actual

17     identity of the non-defendant suppliers in order to make use

18     of the information, but they don't put any meat on the bones

19     of that suggestion and they don't really provide a rationale

20     for why they would need the specific names.  And we think

21     that that's insufficient to warrant turning over very

22     commercially sensitive data of non-defendant suppliers who

23     are not in any part related to this case without that

24     additional protection, so we think that should be added to

25     the order.

1          THE COURT:  Okay.  Thank you.

2          MR. HEMLOCK:  Good afternoon, Your Honor.

3    Adam Hemlock, Weil, Gotshal, on behalf of the Calsonic and

4    Bridgestone defendants, and I will be speaking for the

5    serving parties in response to Toyota's argument.

6          First, to be clear, Toyota is the only OEM that has

7    raised this concern about whether it needs to get approval

8    from its non-defendant suppliers before it produces data and

9    documents relating to Toyota's purchases from those entities.

10   None of the other OEMs raised this issue and none of them

11   have joined Toyota.

12         So my first point is, is there something unique or

13   special about Toyota's position vis-à-vis its relationship

14   with its suppliers that's somehow different from the five

15   other OEMs that are part of this proceeding that don't seem

16   to have the same degree of concern.

17         The law here is clear, Your Honor.  Lots of courts

18   have said that discovery in the federal rules, under the

19   federal rules, discovery in a civil case like this trumps

20   confidentiality provisions and agreements, and that makes

21   perfect sense because one can imagine how difficult it would

22   be to engage in discovery if you could merely overcome that

23   by saying well, there is a confidentiality restriction in

24   that agreement or we had an NDA and documents were exchanged

25   pursuant to that so we can't produce any of that in

 1   discovery.

 2          Toyota cited two cases in support of its position.

 3   The Insulate America case where there the court questioned

 4   the relevance of the discovery at all, and frankly the

 5   parties themselves had questioned the strength of the

 6   protective order that was entered in that case, and here we

 7   don't have either of those concerns.  The protective order in

 8   this case -- obviously there are many cases but they are

 9   all -- all the protective orders, to my understanding, are

10   pretty much the same; they are robust, they are protecting

11   lots of confidential information.  There's no reason to

12   question that they won't be effective here with respect to

13   the information on Toyota's purchases.

14          The other case that Toyota cited was Vitamins, and

15   there that squarely addressed trade secrets.  And trade

16   secrets is a unique special category of discovery, it is

17   specifically referenced in Rule 26 and something that does

18   deserve perhaps in certain circumstances separate treatment.

19   But there's no dispute here, Your Honor, we are not talking

20   about trade secrets.  We are really just talking about the

21   transactional data and information regarding to the parts

22   that Toyota buys.

23          Now, I'm not going to say that it is something that

24   should be public, and, of course, I respect and appreciate

25   Mr. Schaper's point that we as suppliers to Toyota and others

1    also would appreciate and would care about that

2    confidentiality.  But in this particular case we believe that

3    what's appropriate is to do what you do in any other case:

4    produce it, make it highly confidential, we can make it

5    outside counsel only.  There is no reason why there needs to

6    be an additional step beyond what the federal rules already

7    anticipate with respect to this type of discovery.  So that's

8    my next point.

9         You know, Toyota talks about this being sensitive

10   information, but what is it that is unique about this

11   particular information?  Again, just transactional data and

12   documents about buying parts, that's separate and different

13   from lots of other confidential and sensitive information

14   that's sought in third-party discovery in cases all across

15   the country.  We are not talking about the Coke formula.  And

16   Toyota hasn't really in its papers tried to explain why its

17   purchasing data and the documents related to it is somehow

18   unique or special, that the federal rules don't really

19   account for it and figure out a way to alleviate the concerns

20   of its non-defendant suppliers.

21        I would note, Your Honor, that the Special Master

22   had ordered production of certain DMS data from Honda.  This

23   was data that Honda had received from certain of its auto

24   dealers and they had provided that data to Honda, and the

25   serving parties had been seeking that data and there was a

 1    back and forth about whether Honda should be required to

 2    produce it, and you may recall that the auto dealers had

 3    objected to that.  Well, the Special Master figured that out.

 4    He looked at the standard for third-party discovery and he

 5    ultimately said, well, they should be given notice, and sure

 6    enough, Honda provided notice to all of those auto dealers

 7    who had information that was going to be produced by Honda,

 8    and they were given an opportunity to come and object, and

 9    that's exactly what we think should happen here.  Notice is

10    enough.  They should be able to come in, if they have a

11    concern about it they can object, and Your Honor or Special

12    Master Esshaki can figure it out.

13            Finally, I would just note there is again a bit of

14    a policy concern here which is we have the federal rules, we

15    have a system in place that accounts for how to deal with

16    this situation, but the OEMs in this and in other

17    circumstances have endeavored to add more.  And one of the

18    concerns here is that by doing so, it is going to require

19    coming back to this Court again and again to try and work

20    this out.  What is going to happen if we proceed as Toyota

21    has suggested is they will tell all of their non-defendant

22    suppliers, or at least the ones from whom we want certain

23    data, they will say, oh, the serving parties would like the

24    documents and data, is that okay?  And of course they are

25    going to say no.  And then Toyota has no interest in

1    negotiating on our behalf, they clearly sympathize with the

2    non-defendant suppliers, so they are not going to endeavor to

3    encourage them to produce it, so we are going to be at a

4    standstill again.  What's going to happen?  We are going to

5    come back to you or we are going to have to come back to

6    Special Master Esshaki and we are looking at another three

7    months of wallowing in OEM discovery when, respectfully, I

8    think we all hope we can move forward and get on with the

9    litigations with the OEM discovery that the parties require

10   to litigate their cases.

11          Thank you, Your Honor.

12          THE COURT:  Okay.  Thank you.

13          MR. SCHAPER:  Your Honor, as to the point that

14   Toyota is the only OEM objecting on this particular issue,

15   it's hard to say why the parties and the Special Master dealt

16   with each of the OEMs separately, and some OEMs have had

17   issues like the ones that Honda briefed for you and addressed

18   earlier today, GM has some of its own issues and Toyota has

19   its own issue.  We have our own contract with suppliers and

20   that's our relationship with them, but I don't think it is --

21   I don't think that really reveals much.

22          Just to be clear, we are not -- Toyota is not

23   claiming that it should never have to produce this

24   information which Mr. Hemlock's arguments seem to maybe

25   suggest.  We are not saying that we won't produce it.  We are

1    just saying that there should be some protections in place

2    given that it is information of our non-defendant suppliers,

3    most specifically, the ability to anonymize their

4    information.  So that's what we are seeking.  We are not

5    saying that we should be exempt from having to produce it at

6    all.

7              Thank you, Your Honor.

8              THE COURT:  All right.

9              MR. HEMLOCK:  Your Honor, I apologize, forgive me.

10   I neglected to address the anonymity point.  May I just have

11   one minute on that?  I'm sorry.  That was my mistake.

12             Regarding the disguising of the names of the

13   non-defendant suppliers, so Mr. Schaper raised the issue of

14   why that's important to the serving parties.  So obviously a

15   big issue in all of these cases will be comparing the prices

16   of the parts that were sold by the alleged conspirators to

17   those that were not affected by the conspiracy and seeing

18   whether they are different or the same and how different

19   costs and so on may have affected those different prices.

20             Obviously knowing who the non-defendant suppliers

21   are is very important, A, because you would want to compare

22   it.  For example, if they were an AVRP supplier that sold to

23   Toyota, Nissan, Honda, you would want to be able to say,

24   okay, well if non-defendant supplier X sold to each one of

25   them, you would want to compare the data from the three

1    different OEMs to see how it all fits together.  If the names

2    of the parties are anonymized, we won't be able to do that.

3           Second of all, there may be unique circumstances

4    why certain suppliers have different prices than others that

5    could be determined through discovery.  For example, some

6    suppliers may have certain costs, maybe they manufacture

7    abroad and import and that affects their costs versus other

8    ones that manufacture domestically, and all of those things

9    would be factored into what the economists and the lawyers

10   use both at class cert as well as during the damages phase.

11   But to do any of that, you would need to know who was who,

12   and for that reason, we think that it is very important to

13   have the names of the non-defendants suppliers.

14          Thank you, Your Honor.

15          THE COURT:  All right.

16          MR. SCHAPER:  Your Honor, may I just add one thing

17   in response to that?

18          THE COURT:  Sure.

19          MR. SCHAPER:  We would think that the important

20   information there would be whether the suppliers are

21   defendants or not because if the defendants are going to say

22   that somehow non-defendant supplier pricing was similar to

23   theirs, for example, our data would allow them to do that

24   because it would be clear who the non-defendants were and the

25   defendants' names would appear, so they would have that

Case 2:12-md-02311-SFC-RSW   ECF No. 1771, PageID.32770   Filed 06/06/17   Page 43 of 45
Objections to the Special Master's Order • May 16, 2017

43

1    information and they would be able to do with that and their

2    experts would be able to work with that in that fashion, so

3    we don't think that our proposal compromises that.

4            Thank you, Your Honor.

5            THE COURT:  All right.  There seems to be

6    difficulty in that masking of the identities of the

7    companies.  It seems that -- it seems that the Master looked

8    at this, the whole issue, at a hearing.  And, again, I hate

9    to say this, but that abuse of discretion standard is a very

10   high standard, and the abuse of discretion is a standard that

11   applies here, and there is nothing showing me that this is an

12   abuse of discretion.  There are safety features that are

13   built in the protective orders, et cetera, to try and avoid

14   some of this, what do I want to say, distribution of this

15   information because clearly the Court recognizes how very

16   critical it is to the companies to have this price

17   information be kept as confidential as possible.  But I think

18   even if there are these -- well, there are these

19   confidentiality -- maybe confidentiality agreements which we

20   discussed -- well, you weren't here this morning -- and it

21   seems to me that the discovery trumps this as long as there's

22   sufficient protections in line, and I do think that there

23   are.  So I can't say this was an abuse of discretion by the

24   Master, and therefore the Court affirms him.  Thank you.

25           Okay.  I think that's all, right?  Anybody have

1    anything else?  No.  Thank you.  Very good briefs, I mean

2    very detailed.  I appreciate the -- and arguments.  Thank

3    you.  Some of these are the shortest briefs that anyone has

4    ever submitted in this MDL.

5            THE LAW CLERK:  All rise.  Court is adjourned.

6            (Proceedings concluded at 3:09 p.m.)

7                        —   —   —

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4    the United States District Court, Eastern District of

 5    Michigan, appointed pursuant to the provisions of Title 28,

 6    United States Code, Section 753, do hereby certify that the

 7    foregoing pages comprise a full, true and correct transcript

 8    taken in the matter of In Re:  Automotive Parts Antitrust

 9    Litigation, Case No. 12-02311, on Tuesday, May 16, 2017.

10

11

12                              s/Robert L. Smith
                                Robert L. Smith, RPR, CSR 5098
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15

16

17    Date:  06/05/2017

18    Detroit, Michigan

19

20

21

22

23

24

25
```