```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                         —   —   —

 4     IN RE:  AUTOMOTIVE WIRE HARNESS
       SYSTEMS ANTITRUST
 5
                       MDL NO. 2311
 6     _____/

 7
                 STATUS CONFERENCE / MOTION HEARINGS
 8                          (Redacted)

 9            BEFORE THE HONORABLE MARIANNE O. BATTANI
                     United States District Judge
10            Theodore Levin United States Courthouse
                     231 West Lafayette Boulevard
11                        Detroit, Michigan
                     Wednesday, June 7, 2017
12

13     APPEARANCES:

14     Direct Purchaser Plaintiffs:

15     WILLIAM G. CALDES
       SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
16     1818 Market Street, Suite 2500
       Philadelphia, PA  19103
17     (215) 496-0300

18
       DAVID H. FINK
19     FINK & ASSOCIATES LAW
       100 West Long Lake Road, Suite 111
20     Bloomfield Hills, MI  48304
       (248) 971-2500
21

22     NATHAN FINK
       FINK & ASSOCIATES LAW
23     100 West Long Lake Road, Suite 111
       Bloomfield Hills, MI  48304
24     (248) 971-2500

25
```

1   APPEARANCES: (Continued)

2   **Direct Purchaser Plaintiffs:**

3   GREGORY P. HANSEL
    **PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.**
4   One City Center
    Portland, ME  04112
5   (207) 791-3000

6

    ROD M. JOHNSTON
7   **SOMMERS SCHWARTZ**
    1 Towne Square, Suite 1700
8   Southfield, MI 48076
    (248) 236-5752

9

10  STEVEN A. KANNER
    **FREED, KANNER, LONDON & MILLEN, L.L.C.**
11  2201 Waukegan Road, Suite 130
    Bannockburn, IL  60015
12  (224) 632-4502

13

    RANDALL B. WEILL
14  **PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.**
    One City Center
15  Portland, ME  04112
    (207) 791-3000

16

17
    **End-Payor Plaintiffs:**
18
    JOYCE CHANG
19  **COTCHETT, PITRE & McCARTHY, L.L.P.**
    840 Malcolm Road
20  Burlingame, CA  94010
    (650) 697-6000

21

22  NOELLE FEIGENBAUM
    **ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.**
23  601 Lexington Avenue, Suite 3400
    New York, NY  10022
24  (212) 980-7405

25

```
 1    APPEARANCES: (Continued)

 2    End-Payor Plaintiffs:

 3    WILLIAM V. REISS
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 4    601 Lexington Avenue, Suite 3400
      New York, NY  10022
 5    (212) 980-7405

 6

 7    HOLLIS L. SALZMAN
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 8    601 Lexington Avenue, Suite 3400
      New York, NY  10022
 9    (212) 980-7405

10    FLOYD G. SHOREF
      SUSMAN GODFREY, L.L.P
11    190 Avenue of the Stars, Suite 950
      Los Angeles, CA  90067
12    (310) 789-3102

13

14    ELIZABETH T. TRAN
      COTCHETT, PITRE & McCARTHY, L.L.P.
15    840 Malcolm Road
      Burlingame, CA  94010
16    (650) 697-6000

17    STEVEN N. WILLIAMS
      COTCHETT, PITRE & McCARTHY, L.L.P.
18    840 Malcolm Road
      Burlingame, CA  94010
19    (650) 697-6000

20
      Dealership Plaintiffs:
21
      DON BARRETT
22    BARRETT LAW OFFICES
      P.O. Drawer 927
23    Lexington, MS  39095
      (601) 834-2376
24

25
```

```
 1   APPEARANCES: (Continued)

 2   Dealership Plaintiffs:

 3   JONATHAN W. CUNEO
     CUNEO, GILBERT & LaDUCA, L.L.P.
 4   507 C Street NE
     Washington, D.C.  20002
 5   (202) 789-3960

 6

 7   KATHRYN R. EISENSTEIN
     MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
     1361 East Big Beaver Road
 8   Troy, MI  48083
     (248) 457-9200

 9

10   J. MANLY PARKS
     DUANE MORRIS, L.L.P.
11   30 South 17th Street
     Philadelphia, PA  19103
12   (215) 979-1342

13

     VICTORIA ROMANENKO
14   CUNEO, GILBERT & LaDUCA, L.L.P.
     507 C Street NE
15   Washington, D.C.  20002
     (202) 789-3960

16

17   WILLIAM SHOTZBARGER
     DUANE MORRIS, L.L.P.
18   30 South 17th Street
     Philadelphia, PA  19103
19   (215) 979-7385

20

     For the Defendants:
21

     JEFFREY J. AMATO
22   WINSTON & STRAWN, L.L.P.
     200 Park Avenue
23   New York, NY  10166
     (212) 294-4685

24

25
```

```
 1    APPEARANCES: (Continued)

 2    For the Defendants:

 3    DAN V. ARTAEV
      THE MIKE COX LAW FIRM, P.L.L.C.
 4    17430 Laurel Park Drive North, Suite 120E
      Livonia, MI 48152
 5    (734) 591-4002

 6

 7    ALDEN L. ATKINS
      VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
 8    Washington, D.C.  20037
      (202) 639-6613
 9

10    ADYA S. BAKER
      PILLSBURY ,WINTHROP, SHAW, PITTMAN, L.L.P.
11    1200 Seventeenth Street, NW
      Washington, D.C. 20036-3006
12    (202) 663-9202

13

14    OMID G. BANUELOS
      WILLIAMS & CONNOLLY, L.L.P.
      725 Twelfth Street NW
15    Washington, D.C.  2005
      (202) 434-5648
16

17    DONALD M. BARNES
      PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
18    1919 Pennsylvania Avenue, NW, Suite 500
      Washington, D.C.  20006
19    (202) 778-.3056

20

21    MICHAEL G. BRADY
      WARNER, NORCROSS & JUDD, L.L.P.
      2000 Town Center, Suite 2700
22    Southfield, MI  48075
      (248) 784-5032
23

24

25
```

```
1    APPEARANCES: (Continued)

2    For the Defendants:

3    STEVEN F. CHERRY
     WILMER HALE
4    1875 Pennsylvania Avenue NW
     Washington, D.C.  20006
5    (202) 663-6321

6
     KENNETH R. DAVIS, II
7    LANE POWELL, P.C.
     601 SW Second Avenue, Suite 2100
8    Portland, OR  97204
     (503) 778-2100
9

10   MICHAEL R. DEZSI
     DETTMER & DEZSI, P.L.L.C.
11   615 Griswold Street, Suite 1600
     Detroit, Michigan 48226
12   (313) 879-1206

13
     J. CLAYTON EVERETT, JR.
14   MORGAN, LEWIS & BOCKIUS, L.L.P.
     1111 Pennsylvania Avenue NW
15   Washington, D.C.  20004
     (202) 739-5860
16
     MICHAEL FELDBERG
17   ALLEN & OVERY, L.L.P.
     1221 Avenue of the Americas
18   New York, NY  10020
     (212) 610-6360
19

20   DANIEL T. FENSKE
     JENNER & BLOCK
21   353 N. Clark Street
     Chicago, IL 60654-3456
22   (312) 222-9350

23
     LARRY S. GANGNES
24   LANE POWELL, P.C.
     1420 Fifth Avenue, Suite 4100
25   Seattle, Washington  98101
     (206) 223-7000
```

```
1    APPEARANCES: (Continued)

2    For the Defendants:

3    JASON R. GOURLEY
     BODMAN P.L.C.
4    1901 Street Antoine Street, 6th Floor
     Detroit, MI  48226
5    (313) 259-7777

6

     ADAM C. HEMLOCK
7    WEIL, GOTSHAL & MANGES, L.L.P.
     767 Fifth Avenue
8    New York, NY  10153
     (212) 310-8281

9

10   FRED K. HERRMANN
     KERR, RUSSELL & WEBER, P.L.C.
11   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
12   (313) 961-0200

13

     COURTNEY HOFFMAN
14   SIDLEY AUSTIN, L.L.P.
     One South Dearborn Street
15   Chicago, IL 60603
     (312) 853-7669

16

17   ELLEN MAXWELL-HOFFMAN
     BOWLES RICE
18   600 Quarrier Street
     Charleston, WV 25325
19   (304) 343-2867

20

     EMRE ILTER
21   MCDERMOTT WILL & EMERY
     500 North Capitol Street, NW
22   Washington, D.C. 20001
     (202) 756-8000

23

24

25
```

```
 1    APPEARANCES: (Continued)

 2    For the Defendants:

 3    HOWARD B. IWREY
      DYKEMA GOSSETT, P.L.L.C.
 4    39577 Woodward Avenue, Suite 300
      Bloomfield Hills, MI  48304
 5    (248) 203-0526

 6
      FRANK LISS
 7    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
 8    Washington, D.C. 20004
      (202) 942-5969
 9

10    BRADLEY R. LOVE
      BARNES & THORNBURG, L.L.P.
11    11 South Meridian Street
      Indianapolis, IN 46204
12    (317) 261-7896

13
      TIMOTHY J. LOWE
14    McDONALD HOPKINS, P.L.C.
      39533 Woodward Avenue, Suite 318
15    Bloomfield Hills, MI  48304
      (248) 220-1359
16

17    SHELDON H. KLEIN
      BUTZEL LONG, P.C.
18    41000 Woodward Avenue
      Bloomfield Hills, MI  48304
19    (248) 258-1414

20
      CARL L. MALM
21    CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
      2000 Pennsylvania Avenue NW
22    Washington, D.C.  20006
      (202) 974-1959

23

24

25
```

```
 1   APPEARANCES: (Continued)

 2   For the Defendants:

 3   MICHELLE A. MANTINE
     REED SMITH, L.L.P.
 4   225 Fifth Avenue, Suite 1200
     Pittsburgh, PA  15222
 5   (412) 288-4268

 6

 7   RONALD M. McMILLAN
     CALFEE, HALTER & GRISWOLD, L.L.P.
     1405 East Sixth Street
 8   Cleveland, OH  44114
     (216) 622-8621

 9

10   STEFAN M. MEISNER
     MCDERMOTT WILL & EMERY
11   500 North Capitol Street, NW
     Washington, D.C. 20001
12   (202) 756-8000

13

     MARK MILLER
14   BAKER BOTTS, L.L.P.

15

     RONALD NIXON
16   KEMP KLEIN LAW FIRM
     201 West Big Beaver Road, Suite 600
17   Troy, MI  48084
     (248) 528-1111

18

19   A. MICHAEL PALIZZI
     MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
20   150 West Jefferson Avenue, Suite 2500
     Detroit, MI  48226
21   (313) 496-7986

22

     ALEXANDER PEPPER
23   WINSTON & STRAWN, L.L.P.
     200 Park Avenue
24   New York, NY  10166
     (212) 294-4743

25
```

1    APPEARANCES: (Continued)

2    **For the Defendants:**

3    STEVEN REISS
     **WEIL, GOTSHAL & MANGAS L.L.P.**
4    767 Fifth Avenue
     New York, NY 10153
5    (212) 310-8174

6

     J. DAVID ROWE
7    **DUBOIS, BRYANT & CAMPBELL**
     303 Colorado, Suite 2300
8    Austin, TX 78701
     (512) 457-8000
9

10   MICHAEL RUBIN
     **ARNOLD & PORTER, L.L.P.**
11   555 Twelfth Street NW
     Washington, D.C.  20004
12   (202) 942-5094

13

     SCOTT T. SEABOLT
14   **SEABOLT LAW FIRM**
     17199 N. Laurel Park Drive, Suite 215
15   Livonia, MI  48152
     (248) 717-1302
16

17   ANGELA A. SMEDLEY
     **WINSTON & STRAWN, L.L.P.**
18   200 Park Avenue
     New York, NY  10166
19   (212) 294-4743

20

     STEPHEN J. SQUERI
21   **JONES DAY**
     901 Lakeside Avenue
22   Cleveland, OH  44114
     (216) 586-3939
23

24

25

1   APPEARANCES: (Continued)

2   **For the Defendants:**

3   ANITA STORK
    **COVINGTON & BURLING, L.L.P.**
4   One Front Street
    San Francisco, CA  94111
5   (415) 591-7050

6

    MARGUERITE M. SULLIVAN
7   **LATHAM & WATKINS, L.L.P.**
    555 Eleventh Street NW, Suite 1000
8   Washington, D.C.  20004
    (202) 637-2200

9

10  JOANNE GEHA SWANSON
    **KERR, RUSSELL & WEBER, P.L.C.**
11  500 Woodward Avenue, Suite 2500
    Detroit, MI  48226
12  (313) 961-0200

13

    JOHN TANSKI
14  **AXINN, VELTROP & HARKRIDER**
    950 F Street, NW
15  Washington, D.C. 20004
    (202) 912-4700

16

17  MICHAEL F. TUBACH
    **O'MELVENY & MYERS, L.L.P.**
18  Two Embarcadero Center, 28th Floor
    San Francisco, CA  94111
19  (415) 984-8700

20

    LINDSEY ROBINSON VAALA
21  **VINSON & ELKINS, L.L.P.**
    2200 Pennsylvania Avenue NW, Suite 500 West
22  Washington, D.C.  20037
    (202) 639-6585

23

24

25

1    APPEARANCES: (Continued)

2    **For the Defendants:**

3    A. PAUL VICTOR
     **WINSTON & STRAWN, L.L.P.**
4    200 Park Avenue
     New York, NY  10166
5    (212) 294-4655

6

7    MASA YAMAGUCHI
     **LANE POWELL, P.C.**
     601 SW Second Avenue, Suite 2100
8    Portland, OR  97204
     (503) 778-2174

9    **Non-Party Original Equipment Manufacturers:**

10

11   SUSAN M. McKEEVER
     **BUSH, SEYFERTH & PAIGE, P.L.L.C.**
     3001 West Big Beaver Road, Suite 600
12   Troy, MI  48084
     (248) 822-7800

13

14   ELLIOT H. SCHERKER
     **GREENBERG TRAURIG, L.L.P**
15   3333 Piedmont Road NE, 25th Floor
     Atlanta, GA  30305
16   (678) 553-2100

17

18   ADAM WOLFSON
     **QUINN, EMANUEL, URQUHART, OLIVER & SULLIVAN, L.L.P.**
     865 South Figueroa Street, 10th Floor
19   Los Angeles, CA  90017
     (213) 443-3000

20

21   **OTHER APPEARANCES:**

22   TIMOTHY FRASER
     **OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA**
23   The Capital, PL-01
     Tallahassee, FL  32399
24   (850) 414-3733

25

TABLE OF CONTENTS

                                                             Page

Report of Special Master........................... 14

Status of Settlements.............................. 15

Status of Scheduling Orders........................ 25

Status of Discovery................................ 30

Furukawa Defendants' Second Amended Motion for
Summary Judgment (Sealed)
    Motion by Mr. Davis............................ 40
    Response by Mr. Weill.......................... 60
    Reply by Mr. Davis............................. 84

General Motors' Objection to Special Master's
Order Compelling Production of Certain Confidential
Commercial Trade Secret Documents
    Motion by Mr. Wolfson.......................... 93
    Response by Mr. Williams.......................108, 127
    Response by Ms. Smedley........................121, 128
    Reply by Mr. Wolfson...........................128

Certain Defendants' Objection to Special Master's
Order Regarding the Production of Certain Vehicle
Pricing Information
    Motion by Ms. Smedley..........................133
    Response by Mr. Wolfson........................138, 147
    Reply by Ms. Smedley...........................142
    Reply by Mr. Williams..........................145

Case 2:12-md-02311-SFC-RSW  ECF No. 1780, PageID.32961  Filed 06/22/17  Page 14 of 149
REDACTED    REDACTED    Status Conference / Motion Hearings - June 7, 2017    REDACTED    REDACTED

14

```
 1    Detroit, Michigan

 2    Wednesday, June 7, 2017

 3    at about 10:05 a.m.

 4                        —    —    —

 5              (Court and Counsel present.)

 6              THE CASE MANAGER:  All rise.

 7         The United States District Court for the Eastern

 8    District of Michigan is now in session, the Honorable

 9    Marianne O. Battani presiding.

10         All persons having business therein draw near, give

11    attention, you shall be heard.  God save these United States

12    and this Honorable Court.

13         You may be seated.

14              THE COURT:  Good morning.

15              THE ATTORNEYS:  (Collectively) Good morning, Your

16    Honor.

17              THE COURT:  Molly told me there weren't as many

18    people so I was expecting to see half a courtroom.

19         Okay.  All right.  Let's start with the report from

20    the Special Master.  Again.

21              MASTER ESSHAKI:  Yes, Your Honor.  Thank you very

22    much.  Good morning, everybody.  It's good to see everybody

23    and a beautiful morning in downtown Detroit.

24         I am pleased to report and have reported to the

25    Judge that we had no motion hearings yesterday for the first
```

1   time in maybe two years.  We had a couple motion hearings the

2   end of last month, and as a consequence, we canceled our

3   motion hearing for yesterday.

4        I noticed that we have scheduled the next

5   settlement conferences for the 13th of September and

6   December 6th, and we have also scheduled tentative motion

7   days for September 12th and December 5th, so hopefully

8   everybody will have that in your books and we can, if need

9   be, meet again at that time.  But things are just fine from

10  the Master's side, Your Honor.

11       THE COURT:  Okay.  Does anybody have any questions

12  for the Master or any issues that you wish to bring up before

13  the Court for the Master?

14       (No response.)

15       MASTER ESSHAKI:  He's doing a good job?

16       THE COURT:  You must be doing an excellent job,

17  Mr. Esshaki.  Thank you.

18       All right.  The next issue is the status of

19  settlement, and I do have the report but I would like to hear

20  your verbal --

21       MS. SALZMAN:  Good morning, Your Honor.

22  Hollis Salzman for the end-payor plaintiffs.

23       THE COURT:  Good morning.

24       MS. SALZMAN:  On behalf of the end payors and the

25  auto dealer plaintiffs, we just want to inform the Court that

 1   since the submission of the status report, we have ten

 2   additional settlements in principle.  Those are not public

 3   yet but we hope to be able to submit those to the Court as

 4   soon as possible.  The most recent settlement was this week

 5   on Monday with Toyo Tire closing the AVRP case.

 6          After all of these next rounds of settlements are

 7   finalized, we will have 17 cases fully settled, and 13 of

 8   those cases with only one remaining defendant.

 9          And with regard to the remaining defendants in the

10   case, the indirect purchasers have either mediation scheduled

11   or we are in deep discussions of settlement with the

12   remaining defendants, or virtually all the remaining

13   defendants.

14          The mediation --

15          THE COURT:  When you say you have 17 fully settled,

16   you are talking about 17 parts with the indirects?

17          MS. SALZMAN:  Yes, correct, 17 auto part cases if

18   you include these new ten additional settlements.

19          THE COURT:  Okay.

20          MS. SALZMAN:  And things have been going -- I know

21   it's item number three, but while we are up here --

22          THE COURT:  Yes.

23          MS. SALZMAN:  -- things have been going very well

24   with the settlement administrator, Judge Weinstein.  We are

25   in discussions with them on a nearly daily basis on

 1    communications with the remaining defendants and scheduling

 2    discussions to further reach resolutions in the case.

 3              THE COURT:  And are you satisfied with the pace of

 4    this?  I don't know what he's scheduling so that's why --

 5              MS. SALZMAN:  We are, Your Honor.  We have been

 6    working very hard and have been very busy, especially with

 7    mediations.

 8              THE COURT:  Okay.  Thank you.

 9              MS. SALZMAN:  Thank you.

10              MR. BARRETT:  I would just -- for the auto dealers,

11    Don Barrett.

12              Your Honor, I would just add that we are satisfied

13    with the pace.  We think the pace will pick up.

14    Judge Weinstein has been, and Judge Rosen and the whole JAMS

15    team, have been very vigorous in dealing with us, and we

16    assume they have been as vigorous in dealing with the

17    defendants, and we think it will show results.  We think it

18    is going to pick up very soon.  We are satisfied, and we are

19    working very hard.

20              THE COURT:  Okay.  I'm asking you and I look at the

21    reports because you should know outside of a phone call from

22    Judge Weinstein, I really have no interaction.  I don't want

23    to interfere with what's going on with whatever you are

24    doing, I have no idea, but I like to get updated every once

25    in a while.

1           MR. BARRETT:  Yes.

2           THE COURT:  We are continuing obviously with the

3     case proceeding as we had planned.

4           MR. BARRETT:  One thing, Your Honor, I would like

5     to -- it is very nice that there's nobody sitting at the

6     defense counsel table.

7           THE COURT:  I see that.

8           MR. BARRETT:  That's the way it ought to be and

9     we --

10          THE COURT:  For the interns here this summer, there

11    are defendants, they are all here.

12          MR. STEVE REISS:  I took that as a challenge, Your

13    Honor.

14          MR. HANSEL:  Good morning, Your Honor.  Pardon my

15    hoarse voice, Greg Hansel for the direct-purchaser

16    plaintiffs.

17          MR. KANNER:  And Steve Kanner for the

18    direct-purchaser plaintiffs.  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. HANSEL:  The direct-purchaser plaintiffs are

21    diligently pursuing settlement discussions with various

22    defendants.  Before the Court appointed Settlement

23    Master Weinstein, as the Court is aware, we had already been

24    in discussions with many defendants.  And in addition to the

25    mediation process, which Steve Kanner will address, I think

1    it is an interesting, you know, benefit of the appointment of

2    the Settlement Master that it has sort of reinforced the

3    negotiations as well because everyone knows the mediation is

4    coming so people are being diligent in negotiations as well.

5         So we are happy to report that in those

6    negotiations we are very close but not quite able to publicly

7    disclose at this stage very close to reaching resolutions

8    with four additional defendants in more than four parts.  To

9    date we have signed settlement agreements with 15 defendants

10   in 18 parts, and those settlements are at various stages of

11   the motion for preliminary approval, motion for final

12   approval process.  There are several wire harness settlements

13   scheduled, as the Court is aware, for final approval hearing

14   on August 8th.

15         THE COURT:  Okay.  Oh, and, Mr. Hansel, did you do

16   the agenda?

17         MR. HANSEL:  Yes, in collaboration with probably

18   everybody in this room.

19         THE COURT:  Well, I want to thank you and thank

20   everybody.  It is a very, very helpful report to keep track

21   of what is getting more and more cumbersome.

22         MR. HANSEL:  You are welcome, Your Honor.  Memory

23   doesn't really allow to cover all of this so those reports

24   are helpful for all of us.

25         THE COURT:  Okay.  Thank you.  I used to think I

 1    should know all of this, and then finally I said I can't keep

 2    it straight, I need something to look at, and that's

 3    extremely helpful.  Thank you.

 4           Mr. Kanner.

 5           MR. KANNER:  Good morning, again, Your Honor.

 6           With respect to certain settlement issues, let's

 7    talk about wire harness first because that's the oldest of

 8    the cases.  As I reported to the Court earlier, the -- there

 9    are three defendants that are left.  I already mentioned to

10    the Court that MELCO, while not yet settled, we are in the

11    process of doing that, there are some issues with respect to

12    settlement agreements which both sides are diligently working

13    on, and I'm optimistic that we will get to a conclusion in

14    the very near future.  That would leave only two defendants.

15           With respect to those two defendants, and this

16    crosses the threshold into mediation now, I do know that the

17    mediators have been in contact with both of those defendants

18    and direct-purchaser plaintiffs.  With respect -- with

19    respect to one of those defendants, a possible date is set

20    for -- or at least has been met with some success in July.

21    That defendant prefers not to have its name mentioned.  There

22    are issues in terms of agreeing to a mediator, and hopefully

23    we can overcome that issue.

24           The other defendant, I'm told that it has been

25    contacted by the mediators.  We have not yet had any

```
 1   discussions with respect to either a schedule or naming a
 2   mediator.  And I highlight those because it is the oldest
 3   case and we are eager to move ahead one way or the other.
 4   Certainly those two defendants are obvious.  We are going to
 5   be arguing a motion to dismiss later on this morning against
 6   one of those entities.
 7        With respect to the next of the oldest cases, that,
 8   of course, would be bearings, and for purposes of our
 9   discussion I'm including the general bearings case, the
10   industrial bearings, the automotive bearings and what we call
11   small bearings.  With respect to those, we have settled, as
12   the Court knows, with Schaeffler and Minebea, and we have a
13   mediation scheduled for June 15th with the remaining group of
14   defendants.  Judge Weinstein will be managing that process.
15        We also have a mediation scheduled with one the
16   defendants in the following products:  Starters, fuel
17   injection systems, alternators, ignition coils, shock
18   absorbers, break hoses and valve timing control devices.
19   That is scheduled for June 27th and June 28th.  And the
20   schedule for the bearings, I didn't mention it, is set for
21   June 15th.
22        So that's what's on our immediate calendar and we
23   are eager to push ahead, but as the saying goes, it does take
24   two -- or at least in the case of bearings lots more than two
25   to tango, but we remain open and eager to address those
```

1    issues by mediation or by litigation.

2        And I think that covers what I have to tell you,

3    unless you have any questions, Your Honor?

4        THE COURT:  No -- well, I do have one question:  In

5    terms of there was one that you said there was a question

6    about selecting a mediator.

7        MR. KANNER:  That's correct.

8        THE COURT:  There are a team of mediators as I

9    understand it; is that correct?

10       MR. KANNER:  There are.  It doesn't always mean

11   that both sides are going to agree to the team of mediators.

12   In some cases outside mediators who have had no experience

13   with these cases have been named.  I can tell you from our

14   standpoint, meaning the direct-purchaser plaintiffs, the

15   mediating team that's involved in this case is knowledgeable

16   and doesn't need any additional background work.  They've

17   done their educational side of the case so they are familiar

18   with it.  But beyond that, we don't remain opposed to outside

19   mediators.

20       THE COURT:  Okay.  And they can select their own

21   under the order for appointment --

22       MR. KANNER:  They can, they can.

23       THE COURT:  -- outside of this group?

24       MR. KANNER:  That's correct.

25       THE COURT:  And on the bearings, we do have -- the

1    class cert has been filed on the bearings, correct?

2              MR. KANNER:  That's correct.

3              THE COURT:  And we are proceeding with that?

4              MR. KANNER:  We are.

5              MR. HANSEL:  Yes.  In fact, we can take care of one

6    of the agenda items --

7              THE COURT:  Jumping ahead.

8              MR. KANNER:  One-stop shopping with us.

9              MR. HANSEL:  -- Roman numeral III-A.  And just to

10   update the Court on that, the direct-purchaser plaintiffs

11   filed our motion for class certification on March 20th.  The

12   non-settling five bearings defendants' opposition is due

13   July 26th, next month.  The plaintiffs' reply brief is due

14   November 16th.  Class certification is scheduled for hearings

15   on January 11th, so it is moving forward.

16             THE COURT:  Okay.  Very good.  That's actually the

17   only part that we have the class cert going forward, correct?

18   We will get to the others but --

19             MR. KANNER:  That's correct.

20             THE COURT:  Okay.

21             MR. HANSEL:  Thank you, Your Honor.

22             MR. KANNER:  Thank you, Your Honor.

23             THE COURT:  Thank you very much.

24             MR. PARKS:  Good morning, Your Honor.  Manly Parks

25   for the truck and equipment dealer plaintiffs.

1          With respect to the status of settlements, in

2     addition to the settlements identified on the report, I'm

3     pleased to report there's one settlement that we've reached

4     that is very near being able to be disclosed publicly.  We

5     should have more information on that within about a week for

6     the Court.

7          We've also been able to secure our first settlement

8     in the starters and alternators case.  The identity of the

9     settling party has to remain confidential for now, but,

10    again, a matter that should be able to be disclosed publicly

11    very soon.

12         We have at this point one defendant left with the

13    bearings case with whom we have not yet resolved things.  We

14    have one defendant left in the occupant safety systems case

15    with whom we have not yet resolved things.  And we are in

16    active discussions, facilitated by Judge Weinstein's team,

17    with virtually all defendants in all of our cases at this

18    point.  And we are pleased with the Settlement Master's

19    efforts, level of engagement, and the progress we are making

20    there.

21              THE COURT:  Good.  Thank you very much.

22              MR. PARKS:  Thank you.

23              THE COURT:  Anybody else?

24              (No response.)

25              THE COURT:  Any defendants want to say anything?

1              (No response.)

2         THE COURT:  Where's Mr. Iwrey?  How come there's an

3    empty seat right up here?  My clerk informed me that you

4    didn't have your coat, but you do have your shirt, right?

5    Okay.  If you want, we can adjourn until you go home and get

6    your coat.

7         Okay.  The next thing is the status of scheduling

8    orders.

9         MR. WILL REISS:  Good morning, Your Honor.

10   Will Reiss for the end-payor plaintiffs.

11        So we have been negotiating the discovery plans for

12   the next tranche of cases, so these are the cases in which

13   the Court has entered an order scheduling class

14   certification.  We are the furthest along with the occupant

15   safety systems case, and we would expect within the next, I

16   would say, few weeks we will be in a position to enter

17   hopefully a negotiated plan.  To the extent that there are

18   any differences or disputes, we will bring that before the

19   Master.

20        THE COURT:  Now, you had for occupant safety, that

21   was scheduled for October of 2018?

22        MR. WILL REISS:  That's correct, Your Honor.

23        THE COURT:  So you're on target with your --

24        MR. WILL REISS:  There are some disputes at this

25   point in terms of document production issues, but we are

```
 1    hopeful that we will be able to resolve them so that we are

 2    on target for that.

 3               THE COURT:  Okay.  Thank you.

 4               MR. WILL REISS:  Thank you, Your Honor.

 5               THE COURT:  Anyone else?

 6               MR. STEVE REISS:  I was hoping that was the initial

 7    jury, Your Honor.

 8               With respect to the radiators case -- the truck

 9    radiators case, discovery has started in that case, the

10    plaintiffs served discovery on defendants, defendants have

11    served discovery on plaintiffs, and we anticipate getting a

12    proposed scheduling order to the truck plaintiffs shortly in

13    the radiators case.

14               THE COURT:  Would you put your appearance on the

15    record, please.

16               MR. STEVE REISS:  I'm sorry, Your Honor.

17    Steve Reiss, R-E-I-S-S, for the Calsonic Kansei defendants.

18               THE COURT:  Thank you.

19               MR. PARKS:  Your Honor, just very briefly,

20    Manly Parks on behalf of truck and equipment dealer

21    plaintiffs.

22               Very briefly on the radiators scheduling order, my

23    understanding is that there were some conversations primarily

24    involving the indirect -- the other indirect purchaser

25    plaintiffs groups and the defendants in radiators because the
```

```
 1    indirect purchaser groups settled out of the radiators case.
 2    Those discussions were suspended.  We were brought in right
 3    before those settlements happened, and we are prepared to
 4    pick up the ball where the other indirect purchaser
 5    plaintiffs left it in terms of those settlement discussions.
 6    And, in fact, we will be providing defendants with an updated
 7    version of the most recent draft that had been exchanged
 8    within the next few dates, maybe even later today if I get
 9    back to the office and can get it out in time, but we will be
10    moving forward with that.  Okay.
11              THE COURT:  Okay.
12              MR. PARKS:  Thank you.
13              THE COURT:  Thank you.  I just want to make sure at
14    this point I've got the class action certs right.  The
15    bearings we've already talked about.  The -- I'm talking
16    about the directs now in the wire harness.  That's been
17    adjourned until after we have motions so we don't have a date
18    on that, correct?  Okay.  And then the anti-vibration rubber
19    parts was to have been filed April 10th, but instead I think
20    we got a motion to dismiss; is that correct?
21              MR. HANSEL:  Greg Hansel, again, for the
22    direct-purchaser plaintiffs, Your Honor.
23              At the time the original scheduling order was
24    entered in the anti-vibration rubber parts case, the direct
25    purchasers had not yet filed the case, had not yet been
```

 1   retained by the direct purchasers to file that case, so when

 2   we did file the case, it was well into the existing schedule

 3   for the other plaintiffs, and so we would probably need a

 4   separate scheduling order for the direct purchaser case in

 5   AVRP.

 6            But as the Court is aware, there are -- there is a

 7   motion to dismiss which is now on its way to being fully

 8   briefed.  The defendants filed the motion, direct purchasers

 9   have now filed their response, and actually just the other

10   day the defendants filed their reply, so it is fully briefed

11   now.

12            THE COURT:  And I have a date --

13            MR. HANSEL:  Great.

14            THE COURT:  -- for a hearing.

15            MR. HANSEL:  Okay.

16            THE COURT:  I have set it for July 26th, if that

17   works, at 1:00.  We have other motions on July 26th, I think

18   there's three of them, but I think if we set it for 1:00, we

19   can get all three done.

20            MR. HANSEL:  That date looks fine.

21            MR. STEVE REISS:  Your Honor, switch hats,

22   Steve Reiss for the Bridgestone defendants.

23            I'm scheduled to be in trial in Arizona on

24   July 26th, and I would greatly -- I agree with Mr. Hansel,

25   that motion to dismiss the direct purchaser case in the AVRP

```
 1    case is fully briefed and so it is ripe for decision before

 2    Your Honor.  I think oral argument would certainly be

 3    helpful.  But I'm scheduled to be in trial in Arizona which I

 4    cannot move, it is a major trial, on July 26th, so if it is

 5    possible, Your Honor, I would appreciate some --

 6              THE COURT:  Anything is possible.

 7              MR. STEVE REISS:  Thank you, Your Honor.

 8              THE COURT:  Wait, don't go away.  Let's find a date

 9    that's good.  Mr. Hansel, come on back up.

10              MR. HANSEL:  Your Honor, direct purchasers don't

11    believe oral argument is necessary in that case.

12              MR. STEVE REISS:  So you're going to concede?

13              MR. HANSEL:  No.

14              THE COURT:  Defendants want oral argument?

15              MR. STEVE REISS:  Yes, Your Honor, we think that it

16    will be helpful.

17              MR. RUBIN:  Your Honor, could I suggest --

18    Mike Rubin, for the Amasha defendants in the AVRP case.

19              There's a direct purchaser final approval hearing

20    set for August 8th.  Would it be possible to schedule it

21    around that hearing on that same day?

22              THE COURT:  How is August 8th?

23              MR. STEVE REISS:  That works for me.

24              MR. HANSEL:  Yes.

25              THE COURT:  Why don't we set it for August 8th.
```

1   The fairness hearing is at 10:00, so let's just do it after

2   the fairness hearing.

3           MR. STEVE REISS:  That's great.

4           THE COURT:  So I will schedule it -- I will

5   schedule it at 10:30, it may go, who knows, depending on what

6   happens.

7           MR. STEVE REISS:  Thank you, Your Honor.  Much

8   appreciated.

9           MR. HANSEL:  Thank you, Your Honor.

10          THE COURT:  Okay.  Discovery, status of DOJ

11  discovery.

12          MR. WILLIAMS:  Good morning, Your Honor.

13  Steve Williams for the end-payor plaintiffs.

14          THE COURT:  Good morning.

15          MR. WILLIAMS:  Our understanding is that the only

16  cases in which the department still seeks a stay are the

17  steel tubes case --

18          THE COURT:  Pardon me?

19          MR. WILLIAMS:  Steel tubes and body sealing

20  products, and then any new cases that are filed, and that

21  even as to those, the stay they seek is for testimonial

22  deposition discovery, not documents.

23          Earlier in the case in January of 2015 the Court

24  had ordered that in all cases that are in this situation

25  where the DOJ doesn't seek a stay that the defendants should

  1    produce to plaintiffs whatever documents they produced to

  2    DOJ.  That's not been happening as much, and I think part of

  3    that may be because we don't have an order reflecting the

  4    status of the stay.  So I think for plaintiffs, what we would

  5    request would simply be an order indicating that those

  6    productions in -- or alternatively, there is no DOJ stay in

  7    cases other than body sealing products, steel tubes and newly

  8    filed cases.

  9            THE COURT:  Could you prepare such an order?

 10            MR. WILLIAMS:  I will do so, Your Honor.

 11            THE COURT:  And make sure the defendants -- you

 12    submit it to the defendants, and if there's any objections to

 13    it --

 14            MR. WILLIAMS:  Yes.

 15            THE COURT:  -- the Court will hear them.  Okay.

 16    All right.  Thank you.

 17            MR. WILLIAMS:  Thank you.

 18            THE COURT:  Are there -- I hate to ask this, but

 19    does anybody know if there are more parts in the lineup

 20    coming up?

 21            MR. WILLIAMS:  It's very quiet.  I don't have any

 22    information about that, Your Honor.

 23            THE COURT:  I didn't get that from the DOJ either.

 24    They are kind of quiet and it makes me nervous.  How many

 25    parts did you say there were in a car?

 1              MR. WILLIAMS:  In a car?

 2              THE COURT:  10,000, 12,000?

 3              MR. WILLIAMS:  They say that many, we would say

 4     fewer.

 5              THE COURT:  All right.

 6              MR. WILLIAMS:  And I'm going to stay for the next

 7     argument as well.

 8              THE COURT:  The OEM discovery?

 9              MR. WILLIAMS:  Yes, Your Honor.  On OEM discovery,

10     I first want to thank the Special Master for the work he did

11     on what was an extraordinarily difficult, cumbersome, complex

12     matter, and after today's argument to Your Honor, the last

13     objection on the matters that the Special Master has decided

14     will be either decided or under submission to Your Honor.

15              The next step as to those matters is to implement

16     the orders for the serving parties to confer on whatever cost

17     splitting has been ordered and how we will work that out, and

18     then confer with the OEMs on the former production of the

19     vendors to be used for pricing.  Part of how those orders

20     were resolved gives us the opportunity to negotiate the best

21     prices for the work to be done.

22              And I should add, there has also been adjustments

23     to what has been ordered, for example, because as the Court

24     heard this morning, the AVRP case has been completely

25     settled, so for the indirects, that take off the table some

1    discovery we might have otherwise sought.  Things like that

2    have happened in a number of cases which are narrowing the

3    discovery we will seek from the OEMs, so that will be part of

4    that continued process as well.

5         Second, the Court may recall that we had sort of

6    created two tranches of OEMs, so we had first focused on

7    those that we thought were at the core of the conduct

8    involved in the case and we had put aside OEMs such as Ford,

9    Mazda, Suzuki, Kia, Mitsubishi.  I think the next step, and

10   this has begun already, is to take what we have learned in

11   the rulings that have been made on that first round, and then

12   quickly with those additional OEMs in a more focused way,

13   taking benefit of what we have gotten, to complete the

14   process.  To the extent that we need additional discovery

15   from those OEMs, that process has begun, and we would

16   anticipate the cost of all the work that is done, that should

17   be a much shorter process now.  We are not going to reinvent

18   the wheel.  We are just going to get to either agreements or

19   bring matters to the Special Master for resolution.

20        Unless the Court has questions, that I think in

21   broad terms cover the OEMs.

22        THE COURT:  There are some things on that OEM

23   discovery, but we are going to get into that in the argument

24   on the motion with questions that I have.

25        MR. WILLIAMS:  Yes.  Thank you, Your Honor.

```
 1              THE COURT:  The next item is bearings but we've
 2    already talked about that, there is nothing else to be said.
 3    Okay.
 4              The next thing is on bearings and radiators.
 5              MR. STEVE REISS:  Your Honor, I think the agenda
 6    item is whether to set a hearing date.  It is our position,
 7    the defendants' position, again, I'm here for Calsonic
 8    Kansei, we think this motion can be decided on the papers.
 9    It is a very narrow issue.  It is a discovery issue about
10    whether certain files, less than 500 files, have to be
11    produced directly to the defendants or whether the defendants
12    have to run around and inspect.  The Special Master ruled
13    that the truck plaintiffs had to produce these files directly
14    to defendants.  The truck plaintiffs have objected.  That
15    argument -- that motion is fully briefed before the Court.
16              And the radiators defendants have simply moved to
17    join the defendants' position in that case in order to keep
18    discovery moving.  We have the same issue -- we will have the
19    same issue.
20              THE COURT:  This is going up to Iron Mountain?
21              MR. STEVE REISS:  Yes, Your Honor, exactly.
22              THE COURT:  You want to get that done before
23    winter.
24              MR. STEVE REISS:  We would like to get it done, so
25    we don't think there is any need for argument on that, Your
```

 1    Honor.

 2              THE COURT:  Okay.

 3              MR. SHOTZBARGER:  Good morning, Your Honor.

 4    William Shotzbarger for the truck and equipment dealer

 5    plaintiffs.

 6              We are certainly happy to hear for the first time

 7    that the radiators defendants agree that this dispute should

 8    be submitted on the papers because that's exactly what we

 9    told the Court back in January before the radiators

10    defendants were involved in any of this.

11              And just one point to raise that was not made clear

12    in the radiators defendants' reply brief recently filed.

13    When the radiators defendants tried to start the wheels on

14    this, they had not served any discovery on us at all, and so

15    when we filed our objection to their notice of joinder and

16    our opposition to their motion for leave, they had not

17    filed -- they have not served, excuse me, any discovery on

18    us.  That has since changed; they served discovery on

19    May 26th.  And, you know, per our representation to the

20    Court, this dispute should be submitted on the papers.

21              We are very happy where the bearings case is at

22    now.  We are very close to resolution.  The radiators

23    defendants really, you know, try to say that they are

24    cooperating and striving for judicial efficiency, but

25    radiators discovery is going on.  We haven't even responded

1    or objected to their discovery.

2         OSS discovery is going on.  We haven't yet

3    responded or objected to Takata's discovery that was served

4    on us.  So, you know, to the extent that we can, we might

5    want to put off a ruling to see where the OSS remaining

6    defendant Takata comes in with this.  We don't know whether

7    or not they are going to join in the briefing.  And we don't

8    know what the radiators defendants' or the OSS defendants'

9    position is with regard to the positions that were taken by

10   the bearings defendants.  It is the truck and equipment

11   dealers' position that the bearing -- excuse me, that the OSS

12   and the radiators defendants should be held to the exact same

13   concessions and the exact same compromises that the bearings

14   defendants made when we were getting to the objection that is

15   at issue here.

16        So, you know, we are certainly willing to submit it

17   on the papers, but, you know, we would like to see this play

18   out a little bit before a ruling comes down.

19        THE COURT:  All right.

20        MR. SHOTZBARGER:  Thank you.

21        THE COURT:  The Court is going to resolve it on the

22   papers, and we will hold it for a little bit.  Okay.  Let me

23   ask you how long do you think --

24        MR. SHOTZBARGER:  Your Honor, I don't think we need

25   that long.

1          THE COURT:  What does that mean?

2          MR. SHOTZBARGER:  A couple weeks.

3          THE COURT:  We will hold it for 30 days.

4          MR. SHOTZBARGER:  All right.  Thank you, Your

5    Honor.  That would be great.

6          THE COURT:  Okay.  All right.  The next matter is

7    the electronic powered steering assemblies.  Anybody want to

8    speak to that?  All we need to do is set hearing dates as I

9    understand it.

10          MR. KANNER:  Good morning, again, Your Honor.

11    Steve Kanner on behalf of the direct-purchaser plaintiffs.

12          With respect to EPSA, I believe we announced at the

13    last hearing, but we are much closer now to settling one of

14    the defendants in EPSA; that's Yamada.  And with respect to

15    MELCO, that is on the list of products that we hope to be

16    able to advise the Court in the near future that will be

17    resolved.  So those two defendants, those two EPSA defendants

18    should be out of the action shortly.

19          THE COURT:  Okay.

20          MR. EVERETT:  Good morning, Your Honor.

21    Clay Everett for the Showa defendants.

22          THE COURT:  Good morning.

23          MR. EVERETT:  So there still are two defendants in

24    the direct-purchaser case in EPSA --

25          THE COURT:  In the EPSA case?

```
 1              MR. EVERETT:  That's correct.  So even if those
 2    settlements are completed, the motions we believe should
 3    still be decided.
 4              THE COURT:  Okay.
 5              MR. EVERETT:  And so we are happy to set those for
 6    argument.
 7              THE COURT:  All right.  I had tentatively scheduled
 8    those also for July 26th at 1:00.  Is that date, July 26th at
 9    1:00, for the remaining defendants?
10              MR. EVERETT:  That would work for the defendants.
11              THE COURT:  Okay.  All right.  How about for Showa,
12    is that the same?
13              MR. EVERETT:  Yes.  So I represent Showa, and that
14    would be the same situation.
15              THE COURT:  All right.  So that would be July 26th
16    at 1:00?
17              MR. EVERETT:  Yes, Your Honor.
18              THE COURT:  All right.  In terms of the date for
19    the next settlement conference, we have the next two
20    scheduled for September 13th at 10:00 and then December 6th
21    at 10:00.
22              Let's move ahead and get a third one just so
23    everybody has time to schedule.  I picked some dates, all of
24    which are good for the Court, and you can tell me if there
25    are any conflicts; they are February 21st, February 28th or
```

1    March 7th.  Anybody have any comment on those dates?  Is

2    there any conflict for February 21st?

3            MR. VICTOR:  If possible, March 7th.

4            THE COURT:  If possible, March 7th.  How about

5    March 7th, any problems with March 7th?

6            MASTER ESSHAKI:  Your Honor, I have a problem on

7    the 7th.

8            THE COURT:  You have a problem on the 7th?

9            MASTER ESSHAKI:  Yes, Your Honor.  The 21st and the

10   28th work.

11           THE COURT:  How about the 28th?  Okay.  Let's do

12   February 28th.

13           MASTER ESSHAKI:  With a Master hearing on the 27th?

14           THE COURT:  Yes.

15           MASTER ESSHAKI:  Thank you, Your Honor.

16           THE COURT:  So the motions on February 27th with

17   the Master, and the status conference on the 28th.

18           Before we go into motions, is there anything else

19   that anybody else wishes to bring up?  We are all good.

20           (No response.)

21           THE COURT:  Amazing.  Okay.  Thank you all very

22   much.

23           And now we will move into Furukawa's second amended

24   motion for summary judgment.  Mr. Esshaki, you want to leave?

25           MASTER ESSHAKI:  Thank you very much, Your Honor.

1          THE COURT:  Thank you.

2          MR. DAVIS:  Your Honor, we need to hook up a

3   presentation.  It might make sense to --

4          THE COURT:  Why don't we take a ten-minute break

5   then.

6          MR. DAVIS:  Okay.

7          THE LAW CLERK:  All rise.  Court is in recess.

8          (At 10:40 a.m. court recessed.)

9                           —   —   —

10         (Court reconvened at 10:56 a.m.; Court and Counsel

11          present.)

12         THE LAW CLERK:  All rise.  Court is again in

13   session.  You may be seated.

14         THE COURT:  Don't go hide, Mr. Iwrey.  You can come

15   up here.  Okay.

16         MR. DAVIS:  Thank you, Your Honor.  Good morning.

17   Ken Davis, with Lane Powell, on behalf of the Furukawa

18   defendants.

19         Your Honor, I have spoken with Mr. Weill, who I

20   understand will be arguing this motion on behalf of the DPPs,

21   and we are in agreement that given the nature of what will be

22   discussed in the argument this morning, it is appropriate to

23   close the courtroom to all but those who have signed on the

24   protective orders in these various cases, similar to the way

25   that was done at the Denso hearing just a month or two ago.

 1          THE COURT:  All right.  Are you asking for this

 2   whole thing to be sealed then?

 3          MR. DAVIS:  At this point, Your Honor, yes, Your

 4   Honor, until we have a chance to review the transcript to be

 5   able to sort through what may be unsealed.

 6          THE COURT:  As to what may be unsealed.  All right.

 7   So anybody who is not involved would have to leave.  We have

 8   asked our interns to leave so they are gone.

 9              (Any parties not part of the protective order were

10              excused from the courtroom.)

11          MR. DAVIS:  Friendly faces.  Your Honor, at its

12   heart, this is really a very straightforward motion.  What is

13   the key to the resolution of this motion is not whether an

14   illegal conspiracy existed but whether these plaintiffs can

15   show that they were harmed by it.

16          All of the evidence in this case, Your Honor, is

17   that the conduct in this case was directed to products sold

18   to particular carmakers, Japanese carmakers in particular,

19   such as Honda and Toyota, pursuant to specific RFQs that were

20   sent to a select number of defendants of the carmakers'

21   choosing for custom-made products that typically cost

22   hundreds of dollars, took years to develop, and which

23   products were suitable only for particular makes and models

24   of automobiles.  All of the conduct in this case and all of

25   the evidence of the conduct in this case is that the targets

 1    of that conduct were these products sold pursuant to RFQs to

 2    the OEMs.

 3            Now, there is no question, for purposes of this

 4    motion, Furukawa does not dispute --

 5            THE COURT:  You are talking about the conduct of

 6    Furukawa only?

 7            MR. DAVIS:  Correct, Your Honor.  I'm talking about

 8    the conduct in this case of all of the defendants.

 9            THE COURT:  All of the defendants.

10            MR. DAVIS:  But I'm also here talking about

11    specifically Furukawa's conduct, and there is no question and

12    Furukawa does not dispute for purposes of this motion that

13    Furukawa engaged in certain discussions with competitors

14    regarding the pricing to these carmakers pursuant to this RFQ

15    process that I just discussed.  That's not at issue here.

16            Neither is there an issue that the real targets of

17    the conspiracy and the parties, if any parties were harmed,

18    the parties that were harmed, these particular OEMs, as this

19    Court has seen, they are represented by some very talented

20    lawyers who are very fully capable of asserting claims

21    against individual defendants who supplied to them.  That is

22    not at issue in this motion.

23            What is really key to this motion, Your Honor, is

24    whether these plaintiffs can build a bridge, Ambassador

25    Bridge -- I can tell those who know Detroit a little bit

1    better than others -- that can build a bridge between the

2    prices that they paid for the product that they purchased,

3    and I will talk about what that product is in just a minute,

4    with the conduct of Furukawa on the other hand.  They have to

5    build that bridge, it has to be built on facts, not

6    conjecture or speculation, and that bridge -- without that

7    bridge, the DPPs lose, and the DPPs acknowledge as much.

8         Now, there are two big hurdles that these

9    plaintiffs face in trying to build this bridge.  First and

10   foremost, there is a big difference between who these DPPs



15        Second, there is a very big difference between the

16   types of products that these DPPs purchased and the types of



9        Now, the plaintiffs admit these differences in

10  their own complaint, and I will refer Your Honor to

11  paragraphs 102, 103 and 105 of the third-amended complaint

12  where the plaintiffs admit that the targets of the conspiracy

13  were not themselves but rather were these select OEMs.

14        Similarly, Your Honor, Your Honor picked up on this

15  in a prior ruling of this Court on an earlier motion to

16  dismiss in this case, and I will refer Your Honor to docket

17  number 100 and page 18 of your opinion in which you noted

18  that DPPs admit that the conspiracy was directed at

19  automobile manufacturers rather than themselves.

20        THE COURT:  Are you -- are you then limiting your

21  argument to the notion that the conduct that occurred is

22  that -- is only that to which Furukawa pled guilty?

23        MR. DAVIS:  Your Honor, if I can address the plea

24  agreements because it's really --

25        THE COURT:  Okay.

1          MR. DAVIS:  -- the primary way in which these

2     plaintiffs try to build that bridge that we are talking about

3     here, and I will discuss that momentarily.

4          THE COURT:  All right.

5          MR. DAVIS:  So whereas all the conduct in this case

6     concerns sales to OEMs like Honda and Toyota pursuant to RFQs

7     sent to select defendants for custom-made product that took

8     years to develop and cost hundreds of dollars to purchase

9     that were suitable for use only in particular makes and

10    models of automobiles, these DPPs who bought terminals and

11    connectors were none of them.

12          Now, Your Honor gave me a good segue, how do the

13    DPPs try to build this bridge between the prices that they

14    paid for these terminals and connectors with the conduct of

15    Furukawa on the other hand?  First and foremost, the

16    plaintiffs rely on the plea agreements of the various

17    parties, and particularly -- and really the plaintiffs put

18    the vast majority of their eggs in this one basket of the

19    plea agreements.  The plaintiffs argue when Furukawa pled

20    guilty to certain conduct in paragraph 4B of that plea

21    agreement, it pled guilty, and this is the key phrase, with

22    respect to conduct of fixing -- or bid rigging with respect

23    to, quote, automotive wire harnesses and related products.

24    That's the key phrase here, Your Honor.

25          Furukawa knows that that phrase refers to the fact

1   that Furukawa engaged in certain conduct with respect to

2   certain of those related products, and the related products

3   are listed under paragraph 4A as ten distinct products.  And

4   the plaintiffs maintain that Furukawa pled guilty with

5   respect to sales of each and every one of those ten related

6   products notwithstanding the fact that Furukawa didn't even

7   sell or manufacture five of those ten products, and those

8   five are in black here on this screen.

9           They also maintain that Furukawa pled guilty to

10  each and every one of these ten products notwithstanding the

11  fact that there is no actual evidence to show a conspiracy

12  that Furukawa was involved in with respect to many of those

13  products, and we'll talk about that more in a minute as well.

14          Now, why does the plaintiffs' argument that this

15  phrase, related -- and related products, allegedly means each

16  and every one of the products, why does it not make sense?

17  Before I address that, Your Honor, I want to point out two

18  basic legal principles that apply here.  The plaintiffs seek

19  to admit the guilty plea pursuant to Federal Rule of Evidence

20  803, sub 22 I believe, which they can do, but only for

21  purposes of showing facts that are, quote, essential to the

22  judgment.  Whether Furukawa pled guilty to wire harnesses, to

23  some of the related product, to all of the related products,

24  those are not facts essential to this judgment and therefore

25  the plea cannot be admitted for that purpose.  That's legal

1    principle one.

2         Legal principle two is that the law is clear, and

3    this is citing to the United States v. Bowman case of the

4    Sixth Circuit, that any ambiguity in the plea agreement has

5    to be construed in favor of Furukawa.

6         So on either of those two legal principles alone,

7    the plaintiffs' interpretation should be dispensed with,

8    Furukawa's interpretation should be accepted by the Court.

9         But even leaving aside these two legal principles,

10   why doesn't plaintiffs' interpretation make sense?  Well,

11   first and foremost, the plaintiffs' interpretation would

12   render the plea agreement internally inconsistent.  Why?

13   Because in paragraph 4A Furukawa states -- or the plea states

14   rather that Furukawa made and sold wire harnesses and related

15   products.  Under the plaintiffs' interpretation, that would

16   mean that Furukawa was admitting in paragraph 4A that they

17   made and sold each and every one of those ten products, but

18   we know that is not true.  You cannot accept that

19   interpretation in paragraph 4B that the phrase refers to each

20   and every one of the products and have it be read

21   consistently with 4A, it just is simply not possible.

22        Furukawa's interpretation and understanding of the

23   agreement to -- on the other hand is completely consistent

24   between 4A and 4B because it is true that Furukawa conspired

25   with respect to certain of the wire harness products, and it

1    is also true that they manufactured and sold certain of the

2    wire harness products.

3         Now, for that reason plaintiffs' argument or

4    interpretation should be rejected.  But even if it is not

5    rejected and even if you disregard the two legal principles

6    that we talked about earlier, it still doesn't get the

7    plaintiffs anywhere.  Why?  Because the plea agreement is

8    crystal clear that every time there is a mention of conduct,

9    what do you see?  You see that the plea agreement is clear it

10   refers only to the conduct with respect to sales to

11   automobile manufacturers pursuant to this RFQ process that

12   we've been discussing and for products that are suitable only

13   for particular makes and models of cars.

14        In 4B alone of the plea agreement there are four

15   different instances where the conduct is described, and the

16   plea goes out of its way to make clear that the conduct

17   refers only to conduct with respect to those products sold to

18   these OEMs.  There is nothing in the plea agreement to

19   suggest that the types of products that were purchased by

20   these DPPs were in any way affected, targeted or anyway

21   involved in the conspiracy at issue.

22        And if you want to eliminate any doubt that this

23   conduct that is described in the plea is only directed at the

24   OEMs, one need only look at the information, which, of

25   course, was filed contemporaneously in this case with the

 1  plea agreement.  The information up front in paragraph one it

 2  makes clear the conduct related to automobile manufacturers.

 3  Paragraph five, paragraph six, paragraph seven describes the

 4  conduct again in the context of automobile makers.  And to

 5  leave no doubt whatsoever, paragraph eight, paragraph eight

 6  is a laundry list of various things that Furukawa was charged

 7  with doing, and each and every time, seven different times

 8  where there is conduct described, it makes clear we are

 9  talking about this OEM process, we are not talking about

10  anything else.

11       So there's nothing in the four corners of the plea

12  agreement to suggest or to support this bridge that the

13  plaintiffs need to build to connect the prices of the product

14  that they bought with Furukawa's conduct.

15       Now, Your Honor, the plaintiffs point out that the

16  plaintiffs are not limited to the metes and bounds of the

17  plea agreement, that they are entitled to prove a conspiracy

18  that goes beyond that which is described in the four corners

19  of the document.  That is true, we don't dispute that, and

20  Your Honor noted this in Your Honor's prior opinions

21  regarding motions to dismiss, all of that is true.  But the

22  point is they need to prove it, they need to prove it.  At

23  the motion to dismiss stage, all they had to do was allege

24  it.  We are past the motion to dismiss stage.  At the summary

25  judgment stage it is incumbent upon the plaintiffs to come up

1    with facts to support their version of the conspiracy that is

2    broader than one that is described within the plea

3    agreements, and they have not done so, and they have not done

4    so, Your Honor, despite the fact that we are now five years

5    into this litigation.

6            And I do note on the agenda for the status

7    conference today the date of the hearing was noticed as the

8    year 2107, and I'm sure that was a Freudian slip, but it has

9    been --

10           THE COURT:  No.

11           MR. DAVIS:  No.  Very good.  But it has been five

12   years, Your Honor.  The plaintiffs have had scores of

13   depositions in this case.  By my own count, there have been

14   118 days of just the defendants' witnesses alone.  I know, I

15   sat through a lot of them and I bear the scars to show it.

16   There have been nearly 12 million documents, not pages,

17   documents produced by the defendants to these plaintiffs in

18   this case.  And most importantly, the plaintiffs have enjoyed

19   the cooperation not only of the amnesty candidate who,

20   pursuant to the ACRA statute, is required to provide

21   cooperation to gain the benefits of that statute to the

22   plaintiffs, the plaintiffs have now settled, as you heard in

23   the status report earlier this morning, these DPPs have now

24   settled with eight different defendant families.  And those

25   settlement agreements were publicly filed, and you can see in

1    those plea agreements there's a very specific and very strict

2    provision that each of those settling defendants is required

3    to provide very stringent cooperation with the plaintiffs to

4    assist them in pursuing their claims against the remaining

5    defendants.

6            Despite the 118 days of depositions, despite the

7    12 million pages of documents, and despite the cooperation of

8    eight different settling defendants here, you don't see any

9    evidence.  You can bet your bottom dollar that the day this

10   motion was filed the plaintiffs got on the phone and talked

11   -- or tried to talk with each of these eight settling

12   defendants saying give me something, something that shows

13   that the prices, that this conspiracy affected the products

14   that we bought.  You don't see a declaration, you don't see

15   deposition testimony on point, and you don't see documents

16   that show this as well.

17           So while it is true that the plaintiffs are

18   entitled to prove their case beyond the metes and bounds of

19   the plea agreement, they just haven't done so, and they have

20   to do so now; at the motion to dismiss stage, fine, but we

21   are past that.

22           Now, as I mentioned, the plaintiffs put the vast

23   majority of their eggs into this basket of the plea

24   agreement.  So they do make some passing references to other

25   theories to build this bridge to show that the prices that

1    they paid for their pennies apiece terminals and connectors

2    somehow were affected by Furukawa's conduct.  And I'm not

3    going to try to chase every rabbit down every hole here, but

4    I will try to hit some of the highlights and try to do so

5    quickly.

6            This next issue, Your Honor, is that the plaintiffs

7    argue that the bids that Furukawa and the other defendants

8    submitted to the OEMs were done on a part-by-part basis.  And

9    the plaintiffs argue, and this is from page 8 of their brief,

10   that rather than separately conspiring on each wire harness

11   part in isolation, the fact that they did -- they submitted

12   these bids altogether shows the, quote, interrelated pricing

13   of wire harness products.  Well, that's a good theory, but

14   the two documents the plaintiffs cite in support of this

15   simply don't stand for that proposition.  There are two

16   exhibits, Exhibit 44 and Exhibit 56, that the plaintiffs cite

17   for this proposition that there is some interrelationship of

18   the pricing of the wire harness product.

19           Let's take a look at 44.  And I apologize, this is

20   a fairly convoluted document which doesn't show well in a

21   PowerPoint, but the important thing to know is that this is

22   one of these in-the-room type documents where three

23   competitors are discussing and memorializing in this document

24   the proposed order in which they will finish on a

25   component-by-component basis for this model that was to be

Case 2:12-md-02311-SFC-RSW   ECF No. 1780, PageID.33000   Filed 06/22/17   Page 53 of 149
REDACTED   REDACTED   Status Conference / Motion Hearings - June 7, 2017   REDACTED   REDACTED

53

1    sold to Honda.  In this case it pertains to the 2008 Honda

2    Accord.  Okay.

3            And in the middle -- in the light gray shading in

4    the middle you see the numbers 1, 2 and 3, and we know

5    through deposition testimony that those numbers refer to the

6    proposed order in which the three competitors would finish

7    with respect to the bidding for those particular components.

8            Now, the plaintiffs cite this document for the

9    proposition that there is an interrelationship of pricing of

10   the wire harness products.  The problem is those products

11   that are on the left-hand column there are not wire harness

12   products, those are wire harnesses.  For example, you will

13   see R cabin refers to right cabin harness, instruments refers

14   to the instrument control harness, there is a floor harness,

15   an air-conditioning sub-harness, these are all wire

16   harnesses.  They have nothing to do with wire harness

17   products, the ten enumerated categories that we saw in the

18   plea agreement, so they can't necessarily have anything to do

19   with respect to the interrelationship of the pricing of those

20   products because they don't discuss the products at all.

21           Similarly, Exhibit 56, this one is a little clearer

22   to read but a little more cryptic at the same time.  And

23   again, this is one of those in-the-room type documents which

24   show specific pricing of the three competitors who were

25   discussing pricing again with respect to the 2008 Honda

1    Accord, and the entries -- or Sumitomo, Yazaki, Furukawa.

2        On the left-hand side are a series of parts

3    numbers.  Now, the parts numbers are numbers, they don't mean

4    anything, but if you are to decipher what those part numbers

5    are referring to, they don't refer to wire harness products,

6    Your Honor.  They refer to specific wire harnesses that go

7    into that automobile and how that bid is composed of a number

8    of different wire harnesses.  So, again, this document

9    doesn't have anything to do with wire harness products, much

10   less the alleged interrelationship of the pricing of the

11   those products.

12       The next way that the plaintiffs try to build this

13   bridge between the prices they paid for their pennies

14   connectors with the conduct of Furukawa on the other side is

15   that somehow the wire harness products are functionally

16   interrelated.  So they argue, well -- and this appears on the

17   first page of the brief -- the products are functionally

18   interrelated.  First of all, just because the wire harness

19   products are functionally interrelated doesn't mean the

20   products these plaintiffs bought are functionally

21   interrelated with anything, but even if it did, so what?

22       For example, this clicker, my wife calls it a

23   clicker zapper, is functionally related to the computer that

24   is projecting onto the screen through the projector.  Now,

25   the clicker and the computer and the projector are all

1    functionally related certainly, but that does not mean that

2    their prices are interrelated in any way, it does not mean

3    that at all.  So even if it is true, and there is no evidence

4    really in the record to show that the wire harness products

5    are functionally related, and even if the products that these

6    plaintiffs bought were those products, and they weren't, just

7    because they are functionally interrelated does not mean

8    there is any relationship between the pricing of the

9    products, and therefore there is no basis to build this

10   bridge between the pricing of the plaintiffs' products that

11   they bought and these custom-made wire harnesses that took

12   years to develop, cost hundreds of dollars and were made and

13   useful for only particular makes and models of cars.

14          And trying to wrap up, Your Honor, the fourth thing

15   I wanted to point out, and this is hit upon a little bit in

16   plaintiffs' brief, is this concept of APRs or annual price

17   reductions.



14          But most importantly, the fact remains that these

15   APR discussions are originated by the OEM for products that

16   are sold pursuant to -- you've heard this before -- an RFQ

17   process for custom-made products that took years to develop,

18   only for those products, not these products.

19          And it is not like these plaintiffs, small

20   companies, you know, God bless them, America is built on

21   small companies, but it is not like these companies came to

22   the Yazakis and the Sumitomos of the world and say I'm paying

23   a penny apiece for these things, I really want a three

24   percent discount.  That didn't happen.  In fact, the

25

1

2

3                                         So this concept of

4   the APRs is simply not pertinent to this discussion at all.

5

6

7

8

9                        . Without evidence of an

10  agreement, there is no liability, and so this issue is simply

11  moot.

12            Finally --

13            THE COURT:  Is there a relationship between the OEM

14  prices they paid and list prices?

15            MR. DAVIS:  No, Your Honor.  The prices that the

16  OEM paid were for just for these custom-made products.  They

17  said give us a bid for the left cabin harness or the right

18  cabin harness or the instrument control harness.

19            THE COURT:  But for something like this little

20  piece that you are showing, is it off the shelves?

21            MR. DAVIS:  You will not find pricing for this

22  product in the record that was submitted to the OEMs, period,

23  you will not find it, so there is no connection on this

24  record, none.

25            The last point that I wanted to bring up, Your

 1    Honor, regards this concept of commercial rights, and this is

 2    a little bit more complicated but I will try to simplify it.

 3    The concept of commercial rights refers to the fact that

 4    there were discussions amongst the competitors to respect an

 5    incumbent's business to a particular OEM.

 6         So that, for example, if one supplier supplied a

 7    particular type of harness to Honda for one make and model of

 8    automobile, there might be an understanding in any particular

 9    instance that that supplier would agree to succeed to the

10    same product for the next model of that automobile.

11         And the plaintiffs argue that somehow this has

12    anything to do with the products that they purchased.  Well,

13    first of all, it doesn't.  But secondly, similar to these

14    APRs, there is no evidence that this concept of commercial

15    rights has anything to do except for the OEM process.

16         Again, these plaintiffs are not carmakers.  There

17    were no discussions about similar issues with respect to

18    sales to these particular plaintiffs or any similarly

19    situated plaintiffs, it wouldn't make sense.

20         So commercial rights is not a basis of facts to

21    build this bridge between the prices that they paid for the

22    products they purchased and these custom-made hundreds of

23    dollars suitable only for particular makes and model of cars

24    that took years to develop to customer specifications, no

25    connection.

 1          Now, in a final attempt to build this bridge, the

 2    plaintiffs say, well, wait, we need some discovery from

 3    Furukawa's expert to be able to defend against this motion,

 4    and that may be -- or that is, in my view, very telling.

 5    Plaintiffs all but admit here they lack this evidence to show

 6    a connection between the products they purchased, the price

 7    of the products they purchased and the conduct at issue, and

 8    they somehow need discovery from Furukawa's expert to get it.

 9          Now, the problem here, of course, is Furukawa's

10    expert isn't going to provide any evidence to help them out

11    here.  There is just simply not an issue.  Fact discovery has

12    been closed for months now.  I mentioned 118 days of

13    deposition, I mentioned the 12 million documents.  We are

14    long past that.  It is time for them to come up with their

15    case.

16          Furthermore, Federal Rule of Civil Procedure 56

17    only applies to fact discovery needed to create an issue of

18    fact, it has nothing to do with expert discovery.  And these

19    plaintiffs notably they have experts.  We know this because

20    in the bearings case, which is going forward to class cert,

21    as Your Honor noted earlier, these plaintiffs filed expert

22    reports from two different experts testifying as to many of

23    these same issues, and they have these experts at their

24    disposal.  They could have asked them for an opinion here

25    that somehow there is some relationship between the prices --

1    the pennies they paid for the products they bought and these

2    custom-made products that were sold to the OEMs, but you

3    don't see it.  Similar, the way you don't see any assistance

4    from any of the eight settling parties, you don't see it.

5    Why?  It doesn't exist.

6            And after five years of litigation, Your Honor, it

7    is completely appropriate at this juncture to end this

8    litigation.  There is no injury to these plaintiffs.  All the

9    targets of the alleged conspiracy, namely OEMs, have been and

10   are able to assert claims on their own.  These plaintiffs are

11   not those OEMs.  Thank you.

12           THE COURT:  Thank you.  Okay.  Response?

13           MR. DAVIS:  Do you have a slide show, Randall?

14           MR. WEILL:  We will see how it goes.  We have to

15   switch over the equipment.

16           MR. DAVIS:  Fair enough.

17           MR. WEILL:  Thanks, Ken.

18           While Mr. Fink is working on the equipment, my name

19   is Randall Weill representing the direct-purchaser

20   plaintiffs.  Nice to see you again in connection with this

21   summary judgment motion.

22           I don't need anything right now, Nate, but are you

23   all set?

24           MR. NATE FINK:  It should be coming up.

25           MR. WEILL:  So why don't I start and see how we do

1    with any graphics that show up.

2              THE COURT:  Okay.

3              MR. WEILL:  First of all, Your Honor, I would like

4    again to ask the Court to understand that from our

5    perspective as the subject of this summary judgment motion,

6    we believe we are entitled to all the reasonable inferences

7    that arise out of the evidence, which we think there are a

8    considerable number.

9              Secondly, Mr. Davis was very insistent about our

10   direct-purchaser plaintiffs only purchased terminals and

11   connectors.  I am not quite sure what the strip he had there.

23             So to start with the plea agreements which

24   Mr. Davis started with, and I don't know if the Court --

25   well, hopefully we will be able to read this without much

 1    difficulty, but the plea agreement on page 3 of the Furukawa

 2    plea agreement is very explicit about what we are talking

 3    about here.

 4        And as the Court can see, it's discussing

 5    automotive wire harnesses are the automotive electrical

 6    distribution systems used to direct and control the

 7    electronic components and circuit boards, and the following

 8    are defined as related parts, and we have talked about this,

 9    these various components of the wire harness and other --

10    itself as well as the adjunct pieces like relay boxes and

11    junction boxes, and we had a discussion about that at the

12    Denso summary judgment motion.

13        Could you go to the next page, please, Nate?

14        Now, the plea agreement itself is very specific.

15    It says during the relevant period the defendant, through

16    certain of its officers and employees, including high-level

17    personnel, participated in a conspiracy with other persons

18    and entities engaged in the manufacture and sale of

19    automotive wire harness and related products, the primary

20    purpose of which was to rig bids for and to fix, stabilize

21    and maintain the prices of automobile wire harnesses and

22    related products.

23        So the notion that the conspiracy that we are

24    discussing here is limited to related products is simply not

25    accurate.  It comprises the wire harnesses, it comprises the

 1    pieces of the wire harnesses, and it comprises the adjunct

 2    parts like the relay boxes and fuse boxes that Furukawa makes

 3    as well as body ECUs that Denso and other parties make.  It

 4    is the whole panoply of products.

 5          Now, for the purpose of the plea agreement, there

 6    is a reference to some notion that the plea is ambiguous

 7    because this mentions the definition of related products

 8    includes products that Furukawa couldn't possibly have

 9    conspired with respect to because it doesn't manufacture or

10    at least it doesn't sell them.  But what Furukawa fails to

11    mention is they pled guilty to a conspiracy to fix the prices

12    of these products.

13          And if I may cite the case of U.S. v. Hughes, a

14    Sixth Circuit case that's in our brief, it makes clear that a

15    conspirator need not to have agreed to commit every crime

16    within the scope of a conspiracy so long as it is reasonable

17    to infer that each crime was intended to further the

18    enterprise.  So it is not necessary that Furukawa had to

19    engage in some conspiracy for every related part or for every

20    wire harness if its co-conspirators were engaged in such

21    discussions and reached such agreements to fix these prices

22    because it is part of the broader conspiracy.

23          And Mr. Davis mentioned, of course, that they do

24    acknowledge that they were engaged in a conspiracy; we will

25    talk some more about with whom.  But I will say up front that

1    the primary people with whom they had their discussions were

2    Yazaki and Sumitomo and Fujikura as the four principle wire

3    harness conspirators and each of those conspirators had

4    discussions with others.  Sumitomo, we know, had price-fixing

5    discussions with Denso about body ECUs.

6            But anyhow, continuing with U.S. v. Hughes, it says

7    also that it is not necessary for each conspirator to

8    participate in every phase of the criminal venture provided

9    assent to contribute to the common enterprise is present.

10   And the plea agreement is prima facie evidence that they

11   consented, they agreed, they acknowledged they -- that

12   they -- that they participated in this price-fixing

13   conspiracy that involved all of these parts, wire harnesses

14   and related products.  Whether they sold them is irrelevant.

15           In fact, it becomes important, as we will discuss

16   when we speak about the practices themselves, in some

17   instances they withdrew themselves from any participation in

18   trying to sell such products because that was an aspect of

19   the conspiracy to respect each others market shares, their

20   commercial rights, this allocation notion, and we will go

21   into that in a little more detail.

22           But sticking with the guilty plea for a moment, I

23   think there's some other information that's also especially

24   helpful and that relates to the allocution that took place in

25   connection with the presentation of this guilty plea, and

1   that's Exhibit 2, Your Honor, of the exhibits that were

2   submitted in our opposition.

3           And it is a lengthy allocution but I think there

4   are some pieces of it I think worth describing.  It was --

5   the person present was a Mr. Kashiwagi who is from the --

6   he's the general manager of Furukawa's legal department.  And

7   I'm looking at page 6 of the allocution and I'm reading

8   certain parts of it.  For example, the Court asks whether

9   Mr. Kashiwagi has been given authority to enter into the

10  Rule 11 plea agreement.

11          He says yes, Your Honor.

12          Has the board authorized you to do so?

13          Oh, yes, Your Honor.

14          Have you gone over this Rule 11 agreement

15  carefully?

16          Yes, Your Honor.

17          And this plea agreement was also reviewed and

18  approved by the board of directors?

19          Yes, Your Honor.

20          So the notion that there's some ambiguity or, as

21  Furukawa tries to argue on page 7 of its reply brief, that

22  this agreement is ambiguous, that we really have to read

23  certain words into it that it says actually that Furukawa was

24  involved in a conspiracy to fix the prices of one or more of

25  these parts is not correct.  This witness, this gentleman

1    from the legal department of Furukawa, looked at that plea

2    agreement and acknowledged that both he read it, he approved

3    it, and the board of directors of Furukawa approved it, but

4    there's more.

5           Now, the Court, as is customary, will go through

6    the -- what the rights are that the defendant, in this case

7    Furukawa, is giving up when it agrees to the plea, and the

8    Court goes through a statement I believe beginning on

9    page 12.  It says what the government has to do to establish

10   a violation, and it has to prove that at least two persons or

11   entities got together to enter into an illegal agreement or

12   conspiracy to restrain trade.  You understand that,

13   Mr. Kashiwagi?

14          Yes, Your Honor.

15          And, secondly, the government has to prove that

16   Furukawa as a company voluntarily entered into the agreement.

17   You understand that, Mr. Kashiwagi?

18          Yes, Your Honor.

19          And thirdly, that Furukawa understood the object

20   and purpose of the agreement to restrain trade?

21          The witness -- excuse me, Mr. Kashiwagi:  Yes, Your

22   Honor.

23          So it was clear the Court was asking Furukawa do

24   you understand what it is, the rights are, that you are

25   giving up?

 1          And then it says on page 14, The Court:  How then

 2    do you plead to the charge of conspiracy to restrain trade on

 3    behalf of Furukawa, guilty or not guilty?

 4          Mr. Kashiwagi:  Guilty.

 5          He then goes on, page 15, to make a statement -- at

 6    the bottom of page 14 but then page 15 he starts to make the

 7    statement by the company of what they did, and it's familiar.

 8    I will start from page 15, the first paragraph:  From the

 9    time period listed in the information, that is, approximately

10    from January 2000 to January 2010, officers and employees of

11    my company had discussions with employees of competitors that

12    also manufactured and sold automotive wire harness

13    products -- excuse me, automotive wire harness products, yes,

14    excuse me.  These discussions took place in face-to-face

15    meetings or by telephone.  The discussions took place in the

16    United States and elsewhere.  During such meetings and

17    conversations a conspiracy was formed and agreements were

18    reached to allocate the supply of automotive wire harnesses

19    and related products sold to automobile manufacturers on a

20    model-by-model basis and to rig bids quoted to automobile

21    manufacturers for automotive wire harnesses and related

22    products.

23          Then in the next paragraph, and I think this is

24    especially significant, therefore, as a result of these

25    meetings, my company produced and sold automotive wire

Case 2:12-md-02311-SFC-RSW ECF No. 1780, PageID.33015 Filed 06/22/17 Page 68 of 149
REDACTED    REDACTED    Status Conference / Motion Hearings - June 7, 2017    REDACTED    REDACTED

68

1    harnesses and related products that were the subject of

2    illegal price-fixing agreements that my company had made with

3    competitors.  These products and payments for those products

4    traveled in interstate commerce and foreign commerce and

5    substantially affected interstate and foreign trade and

6    commerce.

7           There is no mention here about restricting this

8    affect to automobile manufacturers.  Mr. Kashiwagi is saying

9    yes, we reached these agreements and, yes, we sold these

10   products, these wire harness and related products at illegal

11   prices.

12          So, first of all, the plea agreement and the

13   related allocution put a hole in the notion that Furukawa is

14   saying we couldn't possibly have impacted anybody but the

15   specific RFQs.  In other words, they are arguing this is an

16   RFQ-by-RFQ conspiracy.  We never dreamed that we would have

17   any connection on this bid-rigging process with the

18   bid-rigging process we had before, or do we have any notion

19   that it would have any impact on the RFQ process that would

20   come in the future.  These are RFQ-by-RFQ conspiracies so

21   Furukawa alleges, but this we believe, and I think the

22   evidence demonstrates this, this is not true.  This is a

23   product of pervasive conduct that the company took as a

24   matter of course with respect to the sale of these products

25   no matter what RFQ, no matter what sale was involved, the

1    pricing of these --

2           THE COURT:  Well, are these products the same

3    products that were in the RFQ or are these, like whatever

4    this wire he's holding up, something different than would go

5    into a RFQ?

6           MR. WEILL:  Well, first of all, the products that

7    we are talking about, there was an affidavit that we

8    submitted on the record and we cite it in our brief from a

9    Mr. Sprague that talk about wire harnesses and what they are

10   and how they interrelate with each other.

11          So the wire harnesses are comprised, as the -- we

12   shot a picture up there when the -- for the Denso motion, but

13   it comprises these wires and connectors and terminals, but

14   the wire harness system itself also has these power boxes,

15   relay boxes, fuse boxes, junction boxes.  It is controlled by

16   a body ECU to tell it what to do and when to do it.  So these

17   products all comprise this interrelated, functionally

18   interrelated system.

19          THE COURT:  Okay.  But what defendant was saying is

20   that these were custom made for this particular -- for a

21   particular RFQ.

22          MR. WEILL:  Well, I understand that.  The argument

23   is that these are custom made, and perhaps we are sort of

24   getting a little ahead of ourselves but let's talk about that

25   notion.  The argument has already been from all of the

1  defendants that these products are unique, that you can't

2  compare them, there's no apples to apples, there's no pear to

3  pear, there is no possibility of doing it, yet they conspired

4  to fix the prices of these products.  So they knew -- and I

5  will get into some of details about how they did it, but, in

6  fact, one of the things that I think is a very useful comment

7  from a case that Furukawa cited originally is this U.S. v.

8  Sargent case, Sargent Electric case, from the Third Circuit,

9  but -- if I could just find the spot.

10        So I looked at the case that they argued about and

11  they claim that, oh, even in a per se case you have to create

12  a relevant product in geographic market.  I looked at the

13  case and I said okay, I see.  This is a slightly different

14  issue because it is a double jeopardy issue and so there has

15  to be some specificity about what is the crime that is the

16  subject of the double jeopardy claim.

17        But even so, the Court, and I'm looking on

18  page 1127 -- the citation is 785 F.2d at 1123 but the page is

19  1127 -- the Court says, talking about a per se violation, a

20  Section 1 violation of the Sherman Act, it says to the

21  extent, of course -- to some extent, of course, a horizontal

22  agreement tends to define the relevant market for it tends to

23  show that the parties to it are at least potential

24  competitors.  If they were not, there would be no point to

25  such an agreement.  Thus its very existence supports an

1    inference that it would have an effect in a relevant market.

2         So this notion that, Your Honor, this is a

3    conspiracy is an impossible conspiracy because each part is

4    fabricated uniquely, it is -- who knows?  They have mechanics

5    in each little cubicle and every part is handmade and then

6    created for this whatever purpose it is.

7         But the analogy I would draw to your attention,

8    Your Honor, is if I go to a store to buy a suit, at least for

9    men's clothing, you know, you have limited choices, but I go

10   to look at those choices and I say oh, I need a 44 large, 44

11   long I guess it is, and they say fine.  So they go to the

12   rack and they show me what's available in that size, but that

13   doesn't mean that each of those suits for that size is

14   unique.  Sure, they were fabricated to fit a particular

15   person as were the other suits fabricated to fit people who

16   needed that size, but that's no different from this wire

17   harness process.  They are simply getting specifications and

18   they are saying fine, we know how to make wire harnesses,

19   that's why they come to us.  We find out what they need, how

20   long a wire do you need for this part?  We will snip the

21   wire.  How many connectors?  We will get those many

22   connectors.  Do you need a fuse box?

23        Obviously it is more complicated than a suit, but

24   the sense is exactly the same, that they are creating a

25   product that is fungibly equivalent.  Otherwise they wouldn't

1    conspire to do it.  Otherwise Furukawa wouldn't join with

2    Sumitomo and Yazaki and Fujikura to decide I'm going to get

3    the L Cabin Harness, you get the rear harness.

4          That doesn't mean that each couldn't themselves

5    produce that harness.  It is simply that they agreed that

6    they would among themselves allocate how this business would

7    be addressed, how they would price their submissions and say

8    okay, I get -- I'm going to -- again, we will talk about this

9    commercial rights -- I supplied this for the Prius prior

10   model, this particular wire harness, so I get the right to

11   supply here.  Here is my price for this product that I'm

12   going to submit, you submit the higher price because I'm

13   going to get this price.  If you have a product that you had

14   for the last model, fine, I will submit the higher price for

15   that.

16         But that's what those charts are that Mr. Davis put

17   up on the board, that's exactly what they showed.  They

18   showed wire harnesses allocated among the customers -- among

19   the suppliers that showed, okay, you know, for this one,

20   Furukawa is number one, Sumitomo number two, Yazaki number

21   three, and that's the order of bidding.  Furukawa number one,

22   it gets the best price -- it submits the best price.  But

23   that's how this product -- this is how this conspiracy worked

24   and how these connect themselves together.

25         In terms of how this market is defined, the

1    co-conspirators defined it themselves.  So that the notion

2    that these are unique products is a misstatement as to how

3    this conspiracy worked because if they were unique and only

4    each of them could provide it, then there is no point of a

5    conspiracy.

6          So let me talk a moment about the conspiracy

7    itself.  Now, again, we have cited a case, U.S. v. Smith, in

8    the Sixth Circuit at 220 -- excuse me, 320 F.2d 647 to

9    address this interrelationship.  This has nothing to do with

10   interrelationship of pricing, it is the interrelationship of

11   how the products are sold.  The court in U.S. v. Smith points

12   out that what you want are three things to see how they

13   connect together: the common goal, the nature of the scheme,

14   and the overlapping participants.  That's what connects this

15   interrelationship.

16         So if I could, I would like to talk about those

17   things for a little bit.  So for that purpose, let me see,

18   let me try pulling up Exhibit 32 to the direct purchasers'

19   opposition brief.

20         Can you -- well, let me -- blow it up a little bit.

21   It is a little hard to read, but I will say that if you

22   blow -- can you blow it up a little bit more, Nate?  Yeah,

23   that's a little better.

24         So if you look at this e-mail in the middle of the

25   page, you see it is from a ███████████, and ███████████

1   is a fairly senior representative of Furukawa, and he's

2   writing to another gentleman.  He's saying -- he's writing,

3   in fact, to General Manager ███████, and it is talking

4   about -- the subject is the job description of FENA-APD GM.

5   So this is a little cryptic but I will just explain.  This

6   means Furukawa Electric North America Auto Parts Division

7   General Manager, so we are talking about the United States.

8          So ███████████ is writing to ███████████, and

9   he says I've made the first draft of the job description of

10  the general manager of FENA-APD, Furukawa North America, with

11  the presumption that another gentlemen, Mr. Nagata, will be

12  stationed in Michigan, and I estimate his work there will

13  would be 30 percent.

14         Can we turn to the next page, please?  No, the next

15  page of that prior exhibit.  Hopefully we have that.  We are

16  talking about Exhibit 32.  Okay.  There you go, we found it.

17         So this is page 2 of Exhibit 32, Your Honor.  Can

18  we blow that box up as well, please.

19         So ███████████, who, by the way, has not been

20  convicted of a crime yet but he took the Fifth Amendment at

21  his deposition, he refused to answer any questions, but

22  ███████████ says what the general manager's job

23  responsibilities would be.  I mean there are a number of them

24  of course.  Well, it is interesting that part of the job's

25  responsibilities are regular and irregular exchanges with

1   competitors, unofficial, collecting and exchanging

2   information, coordinating prices among competitors.  That's

3   his job.  Okay.

4           So now we know that's how Furukawa -- that's what

5   it expects of its managers.  It expects it to go out and

6   coordinate prices, get information from its competitors and

7   use that information in its business.

8           Could we go to 31, please.  Could we blow that up a

9   bit, please?  Okay.

10          So now ███████████ is writing to ████████████,

11  and now this is November of 2003.  The prior e-mail was also

12  2003.  And he's writing to ██████████ and also to another

13  person, ████████.  So the line, again, it says the subject is

14  LFC support tasks.  LFC is Lear Furukawa Corporation.  That

15  was a joint venture between the Lear Corporation and

16  Furukawa.  Again, support tasks for Lear Furukawa.  He's

17  writing to Vice President -- Dear ████████████ and

18  ████████████, senior people.

19          And ██████████ says I have written the details of

20  the tasks I would actually like to request Nagata -- request

21  to Nagata as far as LFC support in the attachment.  Please

22  take care in handling this as the details are what they are.

23  Please delete this after confirming.  Okay.  So there's some

24  sense that they know they are doing something wrong, and

25  especially since it is in -- it involves the United States,

1    so they are saying delete the information.

2           Can we go to the next page, please?  There we go.

3    Can we blow up the top box, please?  Okay.

4           So the first -- in terms of -- it says LFC support

5    tasks.  These are the minimum tasks that they are asking.

6    And they say, number one, getting competitor price

7    information during competitions under the table, and then he

8    goes on to describe, okay, this is how we go about

9    coordinating these things whenever we get a request.  We talk

10   to Sumitomo, the S manager Nagata, that's Sumitomo, and then

11   they talk about we can't contact Y, Yazaki, directly for some

12   particular reason, and then they go to other customers, OEMs,

13   and talk about what they do there.

14          And if you could then scroll up a bit to get to the

15   next box.

16          This is item number two, task number two.  Everyday

17   tasks to obtain information from competitors.  And so looking

18   at the first sentence, it says to obtain the information we

19   want from competitors smoothly, we hold regular meetings with

20   the division manager level of key people at competitors.  So

21   now he's describing in very specific detail not only what

22   they do but how they do it.  They could call -- as they say

23   here, they could talk on the telephone, they could have

24   meetings.

25          In fact, in this paragraph I found it interesting

1   they had this little quirk where -- regarding the

2   relationship with Isuzu and Subaru, as LFC is controlling,

3   apparently they are the lead there, or controlling Yazaki and

4   Furukawa, they are invited to eat on LFC's tab, so Yazaki and

5   Furukawa are -- cannot be written on the entertainment

6   expenses.  Okay.  That makes sense.  If you are going to

7   conspire to fix prices, you don't put it down on your expense

8   report that you submit.  But this is just the process of how

9   they go about it.

10              THE COURT:  So they have a protocol for doing it?

11              MR. WEILL:  A protocol, exactly.

12              So let me turn to next to Exhibit 55.  This I'm

13   just throwing in here.  Now, this is in 2004.  Again, this is

14   to ██████████ from Mr. Nagata, who you heard about, but I

15   thought this was an interesting little description of a day

16   in the life kind of thing.

17              He says ████████████████, I forgot to add this

18   when we talked today.  I will travel to Ohio with

19   Manager Funo -- we talked about Mr. Funo, we will talk about

20   Mr. Funo, he was -- pled guilty to price fixing -- to meet

21   with Honda people to talk about this car.  In the evening we

22   will talk about Furukawa Electric North America and LFC and

23   what they are going to do with the car.

24              And then he says after we have this discussion,

25   then I will meet with the salespeople from company S,

1   Sumitomo, for the first time over dinner to explore the

2   possibility of collaboration, Maruha, the collaboration for

3   the MDX vehicle.  Maruha is a Japanese term that suggests the

4   collaboration of agreement on prices.  So as matter of

5   today's plan, that's the subject, today's plan, I'm getting

6   this information, and then I'm going to wind up with a nice

7   little dinner with my competitor and we are going to come to

8   some collaboration agreement.

9         So that's how this pricing practice works, and it

10   impacts the market because every instance when there is an

11   opportunity to sell a product to these particular customers,

12   they are getting together and they are talking about how can

13   we collaborate on price: you give me your price, I will give

14   you my price, who gets to bid higher, who gets to bid lower.

15   ████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ██████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ██████████████████████████████████████

20   ████████████████████████████████████████████████

21   ██████████████████████████████████████████████████

22   ██████████████████████████████████████████

23   ████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ████████████████████████████████████████████████



1    ███████████

2            THE COURT:  But it is -- if they are really dealing

3    here with these things that you have shown with the OEM

4    prices, what about these direct purchasers?

5            MR. WEILL:  Okay.  So I could go into more detail

6    about how they allocated business among OEMs, among the OEMs,

7    the evidence about the OEMs, so --

8            THE COURT:  But I'm more interested right now in

9    these here small suppliers that are the direct purchasers.

10           MR. WEILL:  Right.  So in that respect there are

11   two things I would like to point out.  The first is, I have

12   already addressed one of them, is that the notion in the

13   allocution that these -- this conduct affected the product --

14   all the products that were sold by Furukawa, it didn't limit

15   itself to OEMs, number one.

16           Number two, and I've referenced this before with

17   respect to U.S. v. Sargent but I think it bears repeating.

18   In another Sixth Circuit -- a Sixth Circuit case, Expert

19   Masonry v. Boone County at 440 F.3d 336, page 342, it says in

20   a per legal -- excuse me, a per se illegal case, the market

21   impact is inferred, the market impact is inferred.

22           U.S. v Sargent says when it is a per se case -- and

23   we understand how the defendants came together and how they

24   acted.  That tells you what the relevant market is because

25   they are either actual or potential competitors.  But now

1   Expert Masonry says in a per se case, the market -- the

2   market impact is inferred.  So we have an impact on the --

3   all of the people who purchased the products that were the

4   subject of this conspiracy.

5           Now, Mr. Davis speaks about how the plaintiffs have

6   had access to all sorts of information over a long period of

7   time to establish what they previously denied was this rather

8   broad expansive conspiracy.  And what they haven't mentioned

9   is that the class certification process that this Court

10  established early in the case addresses exactly the fact that

11  they are now claiming is a failure on our part.

12          The summary judgment that they submit -- that they

13  did submit in December was accompanied soon after, I think on

14  December 23, with a request from Furukawa and Denso that the

15  class certification process be delayed.  Let's not talk about

16  class certification, let's talk about our summary judgment

17  motion.

18          Well, the class certification process has, as the

19  Court is aware from the bearings case, a number of distinct

20  requirements that need to be addressed.  For example, did the

21  plaintiffs buy the products that was the subject of the

22  conspiracy; were the plaintiffs impacted; what was the

23  measure of their damage?  This is on a common basis.  They

24  don't have to prove these things, just to show that they are

25  capable of proof at trial.

1      ██████████████████████████████████████████

2      ██████████████████████████████████████

3      ████████████████████████████████████████

4      ████████████████████████████████████████████

5      █████████████.  That's part of this class certification

6      process that these two defendants said, Your Honor, you

7      shouldn't trouble yourself with that at this time, let's just

8      focus on our summary judgment motion.

9              But now today, as I understand it, they are coming

10     to the Court and saying, Your Honor, the plaintiffs have not

11     proved that there's impact or damage, and they have had all

12     of this time to do it and they have all of these experts who

13     are working on this material and why couldn't they present

14     this information?  Well, to me, it is a bit of a procedural

15     game to say file summary judgment, delay the process that's

16     going to show the impact and the damages on our

17     direct-purchaser plaintiffs, and then claim -- put that aside

18     and then claim they haven't done that.  It -- we are not

19     deciding the issues on their merits, we are deciding them on

20     the basis of how can I gain an advantage by simply filing a

21     summary judgment motion before they've put forward their

22     requirements with respect to class certification.

23              It is -- I sort of thought about it as an analogy,

24     I don't know how perfect it is, but if someone were to file a

25     breach of contract case and they claim lost profits, the

1  defendants could say yeah, I breached your contract but I

2  want summary judgment a week after we file our answer because

3  you, plaintiff, haven't shown how you lost any profits,

4  because there's a process that's involved in this to show

5  exactly these facts.

6        And we believe, Your Honor, that if we can go

7  forward past these summary judgment motions into the process

8  that the Court established originally in which the Court

9  deferred -- has deferred, that these are precisely what will

10  be the subject of proof to the Court and to the plaintiffs.

11        Now at that point if Furukawa says, oh, I think

12  that is inadequate or, you know, whatever reason they want to

13  file summary judgment, which is normally the case when a

14  class certification process is organized, if there are any

15  such summary judgment motions, they come after class

16  certification because then they decide whether the experts

17  that provide the evidence are going to be admissible, and if

18  they aren't admissible then they say, ah-ha, there's no

19  proof, you've got no expert.

20        But it is endemic in a case like this, a per se

21  price-fixing case, in order to demonstrate this damage

22  amount, that you have the opportunity to go through it with a

23  very complex process to look at reams of transactional data

24  to show the actual impact and to go through the analytics

25  that an expert uses to determine whether or not there is an

 1    impact.  I mean, I could say perhaps there is no impact,
 2    maybe it is a negative impact, I don't know, but that's the
 3    process the Court originally expected to see and is now on --
 4    is deferred.
 5            So I say, first, there is an inference there is
 6    impact based on the cases I cited and the fact that there is
 7    pervasive price fixing that affected all of the products that
 8    are the subject of this conspiracy, but also this is the part
 9    where we are entitled to go through and have our experts look
10    at this material, examine this material, and produce these
11    reports as part of the class certification process.
12            THE COURT:  All right.
13            MR. WEILL:  Thank you, Your Honor.
14            THE COURT:  Thank you.  Reply briefly.
15            MR. DAVIS:  Thank you, Your Honor.  I will be
16    brief.
17            There were two spoiler alerts in Mr. Weill's
18    presentation to highlight my rebuttal here.  One is
19    apparently we wear the same size suit, 44L.  Despite my extra
20    pounds and inches apparently we wear the same suit size.
21            The other thing, Your Honor, was that you really
22    asked the key question here and you never got an answer.
23    That key question was, and I wrote it down, are these
24    products the same products that were part of the RFQs that
25    were sold to these OEMs?  That was Your Honor's question.

1    There was never an answer.  There was never an answer.  You

2    never saw on the screen documents that shows the products

3    that these plaintiffs bought are the same products, or even

4    if they are related in some way, functionally, price-wise,

5    otherwise, if they are at all related, there is nothing in

6    this record to answer that question.  That basis alone is

7    fatal to the plaintiffs' position on this motion, absolutely

8    fatal.

9         There is no evidence that the terminals and

10   connectors that they bought are similar, dissimilar,

11   otherwise than the terminals and connectors that were part of

12   wire harnesses that were sold to the OEMs.  ████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ██████████████████████████████████████████████.

17        The other products similarly, there is nothing in

18   this record from which the Court can conclude that they are

19   functionally related in any way, shape or form to the

20   products that are sold to the OEMs, much less that their

21   prices are somewhat related -- somehow related, just no

22   evidence whatsoever.  That's really the key point, Your

23   Honor.

24        THE COURT:  Can there be an inference, if they had

25   a terminal that they use in their wire harness or it is one

1   of the products for the wire harness, can there be an

2   inference if that's price fixed, that then they are going to

3   keep that price for these independent terminals that might go

4   in boats instead of automobiles?

5           MR. DAVIS:  Sure.  There is a factual predicate

6   first that the products -- these terminals are functionally

7   similar to the terminals that were part of the OEM -- the

8   sales to the OEMs.  That's the factual predicate which the

9   plaintiffs have not established.

10          But assuming that were the case, the answer is no,

11  that's not a reasonable inference.  And the reason why it is

12  not a reasonable inference, Your Honor, is we are not talking

13  about commodity-type products here, we are not talking about

14  Furukawa sold salt to the OEMs and then turned around and

15  sold salt to these DPPs.  If that's the plaintiffs' argument,

16  it just can't be made here.  First of all, there is no

17  evidence that these products are functionally related at all,

18  but moreover, there is evidence in the record that shows,

19  first of all, the products were not the same.

20  

21  

22  

23  

24  

25

1   did buy, which one of these billions in the constellation of

2   terminals and connectors out there they did buy, much less

3   whether it was related to the products that may have -- may

4   or may not have been part of any OEM sale.  There is no

5   evidence that the products were the same.

6          Secondly, there is no evidence that the competition

7   was the same.  These custom-made wire harnesses, as Your

8   Honor might recall, the competitors weren't just anybody;

9   they were selected by the OEMs.  They said we want Sumitomo,

10  Yazaki, Furukawa to bid on this, we are not interested in

11  anybody else, you guys go out and bid on this wire harness.

12  That determines who the competitors are for the sales to the

13  OEMs.



22          .  So the competitive landscape with respect to

23  these products that the DPPs did buy was completely different

24  than the competitive landscape for these custom-made products

25  that took years to develop and cost hundreds of dollars each,

 1    completely different market, completely different market.

 2            Finally, the method of purchase was completely

 3    different with respect to the products that these plaintiffs

 4    bought and the method of purchase with respect to the sales

 5    of the OEMs.  And we talked about this before and I won't

 6    ███████████████████████████████████████████████████████████

 7    ███████████████████████████████████████████████████

 8    ████████████████████████████████████████████████████████████

 9    █████████████.

10            So the products are not the same, the competitors

11    are not the same, and the method and the process of the sale

12    is not the same.  Therefore, it is completely inappropriate,

13    and this gets back to your original question, Your Honor, to

14    make any inference that there's any connection between the

15    pricing of the $100 or multiple hundred dollar wire harnesses

16    and the pennies connectors or even the smaller harness that

17    apparently one of the DPPs may have bought from another

18    defendant, not Furukawa.  So there is nothing in this record

19    to show, first of all, that these products are related in

20    function, form or fashion to the products that were sold to

21    the OEMs, and there certainly is no way a reasonable

22    inference can be made that there is a relationship of

23    pricing.

24            And, Your Honor, I want to point out because

25    Mr. Weill pointed out the case of U.S. v. Hughes and other

1   cases that they cited in their briefs with respect to the

2   market impact is inferred I think is the phrase that

3   Mr. Weill used.

4           Your Honor, all of these cases are easily

5   distinguishable, whether you are talking about Vitamins or

6   you're talking about Polyurethane or talking about the CRT

7   case or talking about the Hughes case, because in each of

8   those cases there was plenty of evidence of multiple

9   conspiracies.

10          The only question was whether a particular

11  defendant, or defendants in some of the cases, could be tied

12  to those conspiracies that are already existing.  There was

13  no issue in those cases whether or not the plaintiffs had

14  been impacted by those conspiracies.

15          Here the plaintiffs have not shown that there was a

16  conspiracy as to many of those wire harness products that

17  they did purchase, they are different products.  There is no

18  evidence of conspiracy with respect to those products, so

19  those cases are all distinguishable on that basis.

20          Polyurethane Foam in particular is very telling in

21  that in that case the court relied heavily on the DPPs that

22  produced evidence that showed the interrelationship of the

23  pricing of the products.  Again, there is no evidence here of

24  the interrelationship of the pricing of the products.

25          Secondly, in Polyurethane Foam the plaintiffs in

 1    that case came up with declarations from cooperating

 2    defendants who had settled with them already to tie that

 3    remaining defendant to a conspiracy that had already been

 4    proven.  Very distinguishable from this case, Your Honor;

 5    eight settling defendant families and no declaration.

 6            Finally, in Polyurethane Foam, the plaintiffs in

 7    that case produced an expert who came forward and talked

 8    about the interrelationship of the pricing between the

 9    products that were at issue and the second related conspiracy

10    and the original conspiracy.  Here, Your Honor, there is no

11    such evidence.  So the cases that the plaintiffs cite are

12    simply not applicable at all.

13            And to finish up, Your Honor, to get back to the

14    suit analogy, this is as if there were some known conspiracy

15    out there with respect to a custom-designed suit --

16    unfortunately I don't wear custom-designed suits so I can't

17    show you what one looks like -- but it is as if these

18    plaintiffs bought buttons and they are saying, well, the

19    conspiracy on the suits affected the price I paid for these

20    buttons without coming forward with any evidence that that

21    was the case, any evidence.

22            And you saw the exhibits that they did rely on here

23    today, Your Honor.  Again, even those exhibits, Exhibit 34 I

24    think with respect to some of the dialog back and forth

25    amongst Furukawa employees, talked about Honda.  The whole of

1    the conduct in this case goes back to the OEMs, all of the

2    conduct.  We don't even know what the plaintiffs bought, much

3    less whether or not it is related in function or, more

4    importantly, in price to the products that were subject to

5    the conspiracy.

6                THE COURT:  Okay.

7                MR. DAVIS:  Thank you.

8                THE COURT:  Thank you.  The Court will issue an

9    opinion on this.  We have two other motions and we will do

10   them after lunch.  Let's resume at 1:30.  1:30.  Thank you.

11               MR. WILLIAMS:  Excuse me, Your Honor.  One thing

12   very quickly.  I will try to reach counsel for the OEMs to

13   make sure they are here at 1:20 because I think that was set

14   for 2:00.

15               THE COURT:  Was it set for 2:00?

16               MR. WILLIAMS:  I have contact information so I will

17   do everything I can to get him here at 1:30 if I can.

18               THE LAW CLERK:  It said we will start early on the

19   agenda.

20               THE COURT:  Did they get the agenda?  We said we

21   could start early on the agenda but I'm not sure the OEMs got

22   the agenda.

23               MR. WILLIAMS:  He understood it was a possibility,

24   so I will do my best to reach him over the break.

25               THE COURT:  We won't start until obviously --

1     MR. CHERRY:  Your Honor, can I just address one

2  thing because I won't be here this afternoon, and Mr. Cuneo

3  is in agreement.

4     THE COURT:  Yes.

5     MR. CHERRY:  The ADPs submitted a motion about

6  allocation of the settlement proceeds, and we have had some

7  discussions about some edits to that motion and the proposed

8  order.  I think we are going to be in agreement on it, but

9  could Your Honor hold off ruling on that until they submit a

10  revised version?

11     MR. CUNEO:  A revised order.

12     THE COURT:  Is that correct?

13     MR. CUNEO:  Yes.

14     THE COURT:  Okay.  Molly, just make a note of that.

15  Okay.  Will do.

16     MR. CHERRY:  Thank you.

17     THE COURT:  Thank you.

18     THE LAW CLERK:  All rise.  Court is in recess.

19     (Court recessed at 12:21 p.m.)

20                    —   —   —

21     (Court reconvened at 1:37 p.m.; Court, Counsel and

22        all parties present.)

23     THE LAW CLERK:  All rise.  Court is again in

24  session.

25     THE COURT:  Good afternoon.

 1          THE ATTORNEYS:  (Collectively) Good afternoon.

 2          THE COURT:  All right.  We have two motions.  Let's

 3    take GM's first.  Who is here?  Okay.

 4          MR. WOLFSON:  Good afternoon, Your Honor.

 5          THE COURT:  Good afternoon.  May I have your

 6    appearances, please?

 7          MR. WOLFSON:  Yes.  Adam Wolfson, from

 8    Quinn Emanuel, on behalf of General Motors.

 9          So, Your Honor, GM's motion is fairly discrete, and

10    in order for me to explain it or provide why GM is objecting

11    to the Special Master's orders, I would just like to set the

12    table a little bit about where we are and really what this is

13    about.

14          GM so far in discussions with the parties over the

15    subpoena has been able to reach compromises with respect to

16    most of everything that they requested.  We are producing a

17    substantial amount of purchase data to the extent that is

18    available from our system; things like contract pricing,

19    amounts of parts, the types of information that show our

20    purchases to the extent that we can collect it.  We are

21    producing cost data.  These are things called uncosted bills

22    of material, which is the best we could get them regarding

23    our costs, but they provide the bills and materials for the

24    cars, not specifically broken done by parts but they do

25    provide the overall costs for the parts -- for the cars.

1          We are providing pricing and sales data, payment

2     processing transaction data.  So the transactions that GM

3     undertook for its cars, we are providing them to the extent

4     it is available.  So we have purchase, cost and sales data.

5          What the dispute is about is the so-called pricing

6     methodology documents, and there are two types: there's

7     something called a pricing review deck and a profitability

8     summary review, which they were described in general in the

9     deposition of Christopher Hatto, who is GM's North America

10    CFO.  And what the plaintiffs are saying is that they need

11    those documents in order to establish passthrough, in other

12    words, the amount of overcharges that were passed through

13    from GM's overcharged purchases on down to the indirect

14    purchasers.

15         The problem though is that the pricing methodology,

16    the specifics of how GM prices its cars is extraordinarily

17    confidential.  This has been referred to as the crown jewels

18    multiple times throughout the saga of the subpoena.  And

19    really there is actually no dispute that they are -- that the

20    pricing methodology is highly, highly confidential.  The

21    serving parties have effectively conceded that.

22    Special Master conceded it on December 9th at the hearing.

23         And the idea that this sort of information could

24    get out to a large number or even just a substantial number

25    of people is -- and if it were to become public or available

1    to GM's competitors, to its suppliers, to its customers, this

2    has -- it would very much harm GM's competitive position in

3    the market.

4          THE COURT:  This is specifically how GM prices its

5    cars?

6          MR. WOLFSON:  Yes, the factors it uses, the methods

7    it takes to calculate certain market factors.  And what we

8    have submitted on multiple occasions is a description of the

9    general approach that GM takes to pricing, but it is the

10   specifics of -- it is the nuts and bolts of how that happens

11   that we are objecting to producing because frankly what the

12   parties need to do is show absolute need.

13         The process for third parties who are asked to

14   produce trade secrets, it is a three-step process.  The first

15   is that the subpoenaed party needs to say or explain how the

16   requested information is a trade secret.  And although I

17   could get into the details of what evidence we have

18   submitted, again, this is something that doesn't seem to

19   actually be all that contested.

20         So then we go to the second step, which is that the

21   subpoenaing parties have to demonstrate what is called

22   absolute need, and what that means is that the information

23   sought is not available from other sources.  And if the

24   information is available from other sources, then that -- it

25   greatly diminishes the need argument.  This is discussed a

 1    bit in the Spartanburg case that we cited in our briefing as

 2    well as the Universal Delaware case that we cited.  We think

 3    those are excellent examples of how this analysis proceeds

 4    and where they reach the right result where the third party,

 5    subject to Rule 45 subpoena, showed to the Court that there

 6    was not an absolute need and therefore the third party should

 7    be protected from having to make the production.

 8         So why did I set the table at the beginning of my

 9    argument?  Because the need here supposedly is to show

10    passthrough.  And when you look at passthrough, it is really

11    an empirical analysis.  Were there heightened costs, were

12    there purchases of parts with those heightened costs, were

13    those then passed through to the indirect purchasers?  And

14    what they have is the data that will show that empirically.

15    If there were higher costs, then they are going to have that

16    in the data that GM is producing.  Will -- was it then passed

17    through downstream to the indirect purchasers?  They have the

18    sales data, they are able to provide that data to their

19    economists, we are in the process of collecting and producing

20    it, and then they can show passthrough.

21         The idea that there are separate materials that

22    review or reflect a thought process or the reasons why

23    certain price changes might have been made, what we know from

24    the case law is that's not a showing of absolute need if you

25    have other less burdensome approaches in discovery, and GM

```
 1   has effectively given them everything that they need for
 2   this.  So our view --
 3              THE COURT:  Well, you say there is no passthrough?
 4              MR. WOLFSON:  Your Honor, I think that what we have
 5   said is that GM's approach is not based on incremental
 6   changes in the cost of specific parts, it is more of a
 7   market-base approach.  Whether or not that means there's no
 8   passthrough or not, I think that's more of an economic issue
 9   for the experts.  It is more that -- what we -- our argument
10   here is just we have told you how we do it generally, we are
11   giving you the data, we are giving you the information that
12   you need to be able to sort through and analyze that data,
13   and therefore we are giving you quite a lot.
14              What you don't need to then get into are the
15   detailed descriptions of how we -- what variables we apply to
16   specific market factors, how we assess whatever goes into it.
17   Frankly, I can't say that I can even get into the details of
18   it because it is so highly, highly restricted.  At GM, out of
19   the thousands upon -- or tens of thousands of people, I
20   believe the evidence was that frankly just a few dozen at
21   most have access to these types of documents, and that's
22   intentional because they are so, so highly confidential.
23              With respect to that general approach, the evidence
24   that we have offered of it, the one point that is worth
25   noting is we have been dealing with the subpoena now for over
```

1    a year and a half, closer to two years at this point than

2    anything else.  The automobile industry is one of the

3    maturest industries in the United States.  You have I want to

4    say hundreds of analysts analyzing the industry, and we have

5    never seen any evidence calling into question GM's own

6    description of how it prices its cars.  That's telling we

7    think because it shows that what we are telling the parties

8    is true.

9         And they have questioned the declarations, they

10   have said that there might be certain incentives underlying

11   why GM is protecting itself or why it is making certain

12   statements.  But if there was any reason to doubt what

13   discovery GM has already provided and what discovery it will

14   provide, then we think at this point it was the serving

15   party's burden to put that into the Court at some point in

16   this process but we don't think that they have.

17        The protective order also is really not an issue

18   here.  Protective orders are necessary in many large cases

19   such as this, and we are not saying that any parties have

20   broken the protective order strictures or anything like that.

21   What this is about is a Rule 45 third-party subpoena, and the

22   case law has developed to protect third parties from

23   producing trade secrets regardless of protective orders

24   because we don't want to have to even produce that sort of

25   information as a third party if we are not actually in the

1    lawsuit.

2         THE COURT:  Okay.  Let's say you have to produce

3    it.

4         MR. WOLFSON:  Yes.

5         THE COURT:  I just want to get to the protective

6    order because I think that's the easiest.  Right now there

7    are many strictures in that protective order to protect it.

8    One of the issues is that it would be at one of I think six

9    attorneys' offices or defendants' offices.

10        MR. WOLFSON:  Uh-huh.

11        THE COURT:  And I think GM has a problem with that,

12   some of the -- and some of the parties have a problem with

13   that because if one person settles, it might take it out

14   of -- I don't know, they would have to move it or do

15   something with it.

16        And my question to you is that material is

17   available at GM, it has to be under the Master's order in a

18   non-Internet standalone computer.  Would the objection about

19   being at one office, could that be resolved by being at GM,

20   for instance?  Is there a spot where GM might be the holder

21   of the materials?

22        MR. WOLFSON:  I think the answer to that one at

23   least is yes, Your Honor.  In fact, the whole proposal to

24   have this on a non-Internet connected computer under strict

25   guidelines was actually mine at the earlier hearing, and I

```
 1    believe the Special Master -- I forget what his exact words
 2    were, but his initial reaction was that actually makes a lot
 3    of sense.  There were objections, there was argument on it,
 4    and he did subsequently revise it, but I do believe that that
 5    would be better.
 6         The way that this is handled in similar types of
 7    cases where there is highly, highly confidential information,
 8    for example, source code cases, they will have this setup
 9    where the computer is controlled by the party producing the
10    information and you essentially need to check in so there is
11    a record of who accesses it, and then if anyone prints out
12    any copies of it or otherwise makes a version that they can
13    then take for evidentiary purposes, that is also logged, so
14    we have a control and we know who is taking the materials
15    away.
16         THE COURT:  Okay.  The other part of that
17    protective order you just mentioned were the copies.
18         MR. WOLFSON:  Uh-huh.
19         THE COURT:  I'm not quite sure about -- I can't
20    remember now the wording, but reasonable need or relevance or
21    something like that.
22         MR. WOLFSON:  Uh-huh.
23         THE COURT:  But I would assume there would be a,
24    quote/unquote, reasonable need by different experts, say, and
25    so they may have to copy parts of that.  Are there -- in that
```

 1    protective order, are there any protections outside of

 2    copying the whole thing if you show a particular need?

 3           MR. WOLFSON:  Well, to answer -- well, the premise

 4    of the question, Your Honor, I believe the wording is that it

 5    would be reasonably necessary --

 6           THE COURT:  Reasonably necessary.

 7           MR. WOLFSON:  -- to make copies, things like that.

 8    And unfortunately we think that that is -- it's an exception

 9    that swallows the rule because we are all lawyers and there

10    are many excellent lawyers in this case who will be able to

11    come up with very good arguments for why things are

12    reasonably necessary.

13           THE COURT:  Well, that's why I'm questioning it.  I

14    couldn't see the limits on reasonably necessary.

15           MR. WOLFSON:  That is -- it is one of our

16    objections to the order, Your Honor.  For our purposes, we

17    think that it is more workable I believe if experts, economic

18    experts, because I would like to address the type of experts

19    that have access to the material, if they were able to make

20    copies, that I think would be -- if we are ordered to produce

21    this information, that would be more acceptable to us because

22    it is more protected.

23           One of the issues that -- I believe the Special

24    Master himself noted, well, I don't want a hundred attorneys

25    being able to look at this.  And in this case we have -- in

 1   this MDL I think we have something like 88 law firms, not

 2   attorneys, law firms that have been -- at some point have

 3   filed some sort of notice of appearance or are involved in

 4   the over 40 sub-dockets at this point.

 5           THE COURT:  Forty-two.

 6           MR. WOLFSON:  Forty-two.  I had 41 in my notes so

 7   obviously I'm behind the times.

 8           The reasonably necessary aspect to it, I do believe

 9   that we would need higher protection from that, and that is

10   one of our objections.  But then the types of experts --

11           THE COURT:  So your resolution to that particular

12   problem is to have only the experts, and you are going to get

13   into types, but only the experts have copies?

14           MR. WOLFSON:  I believe so because in the end,

15   really what this is is it is an economic question, is there

16   passthrough or not.  And by looking at these materials, can

17   we show whether or not there is passthrough?  If an economic

18   expert is looking at this and it is looking at these

19   materials and is looking for support for their economic

20   opinion, being able to look at the pricing methodology used I

21   guess theoretically could be used to make their points one

22   way or another but --

23           THE COURT:  But one would assume they would have to

24   analyze this material if there is this need, and so they

25   would have to have it on their machines I guess to run

1   whatever programs they may run, so they would also have to

2   have standalone -- sign as to standalone equipment,

3   et cetera.

4         MR. WOLFSON:  Well, this is actually an instance

5   where the materials in question are presentations.  I don't

6   know if they are PowerPoints or some other type of document,

7   but they are -- this is not data where --

8         THE COURT:  So it is not economic -- I mean it is

9   not numbers?

10        MR. WOLFSON:  No, no, it is not like spreadsheets

11  or CSP files or the other types of database entry type files

12  that economists regularly use.  This is more about internal

13  presentations that were made among GM executives about, among

14  other things, not just pricing but pricing issues.

15        So if this was in a centralized location where GM

16  controlled it, whether a law firm of its choice or at GM, one

17  of its buildings here in Detroit, if an expert wanted to make

18  a copy, they then could and -- but it would be controlled.

19  So that's the gist of the proposal, that if we are ordered to

20  produce the documents, that we would prefer.

21        And with respect to the experts, under the Special

22  Master's order what you have is industry experts can take a

23  look at these documents, not just economic experts.  And for

24  us, that effectively eviscerates the protections because what

25  you have is people who work in the automobile industry who

```
 1   they can't unlearn the facts that they see, they -- once it
 2   is there, you know, it is there.  So one of our initial
 3   objections and proposals as part of the protective order
 4   process was that only economic experts be permitted access to
 5   these files to the extent that they are ordered to be
 6   produced, and that other type of experts, particularly
 7   industry experts, are not permitted to review them because
 8   otherwise then the price methodology then gets out there.
 9        THE COURT:  It would seem, would you not think as
10   an attorney, that when you are looking for an expert, the
11   first thing you are going to look for is an industry economic
12   expert, somebody who is familiar with what is going on?
13        MR. WOLFSON:  Yes, but I think that's -- there is a
14   fundamental difference between an economist who is offering
15   damages opinions, class certification opinions, other
16   economic opinions, that they have familiarity with the auto
17   industry versus somebody that is coming in to offer
18   essentially expert opinion on how that industry works.  In
19   other words, in these cases what you often have is an
20   economist who their specialty is econometrics or other types
21   of analyses that allows them to take extraordinarily large
22   amount of data and find either the trends or find the small
23   little bits of pieces of economic evidence showing that there
24   were overcharges on a grand scale.
25            What I'm talking about more are industry experts
```

1    where you -- they are the sort of experts that we have at

2    trial to teach the jury a little bit about how the industry

3    works or to explain how what was being done was outside of

4    industry norms.  More -- they are not being offered to show a

5    hardcore economic analysis of the automobile industry but

6    rather to describe how it works for whatever purpose that the

7    parties offer.

8              THE COURT:  Well, would that put GM then -- the

9    guard or the monitor of the experts that these parties

10   choose, would GM have the right to veto these experts?

11             MR. WOLFSON:  The way I've done it in other cases

12   and the way I've seen it done in other cases is that there is

13   an objection period where an expert is disclosed to the other

14   party, that this is the expert who will want to take a look

15   at your trade secret highly-confidential information, and

16   then the party has a certain number of days, often a week,

17   but a certain amount of days to raise any objections, whether

18   it is conflict issues or they work for a competitor issues,

19   things like that, and then if there is that sort of

20   objection, then it would be submitted as necessary to the

21   Court.  That's the way it has worked -- or I have seen one

22   mechanism for making it work in other cases.  And it can't be

23   unreasonably withheld and can be specifically put into the

24   protections that it cannot be unreasonably withheld.

25             THE COURT:  I'm curious, have you disclosed this

1    information in other cases under protective orders?

2            MR. WOLFSON:  This pricing methodology?  I actually

3    don't know, Your Honor.

4            THE COURT:  I'm just wondering how that order

5    worked.

6            MR. WOLFSON:  Sure.  I can check, and if so, I

7    would suspect that it is in cases where GM was directly a

8    party if it happened, but I can check.

9            THE COURT:  The only ones that I'm familiar with it

10   has been GM was a party and it was a product that they were

11   protecting of some type, but okay, all right.

12           With that, let's go now to the basic question, the

13   need for this.

14           MR. WOLFSON:  Yes, Your Honor.  Well, I think --

15   sorry, I'm just making a note so I don't forget Your Honor's

16   request.

17           The basic need is what's -- I think what I

18   mentioned before is that it is a heavy showing that needs to

19   happen here, is that they -- once we have established this is

20   trade secret, they need to show, this is the quote from the

21   case law, absolute need, and the absolute need here we think

22   is just not present.  They have the tools to assess

23   passthrough and are getting them, and -- but what they want

24   is more, and what they want is essentially something

25   describing thought processes but not the actual execution on

1    GM's pricing, not the actual sales which they are getting,

2    not the actual costs that were taken into account for the

3    end -- well, not taken into account for the end price but

4    taken into account for GM's accounting purposes, which we are

5    producing, not the actual purchasing data, which we are

6    producing, but rather materials that just describe how GM is

7    going through the preproduction process and then afterwards

8    its profitability and how the sales for the different cars

9    have occurred.

10        And since we have submitted briefing on this, I

11    mean, just facts that largely -- they show why ordering us to

12    produce this information now may have -- well, it may put the

13    information out there for no purpose.  Originally when we

14    were going through all of this, the AVRP and the bearings

15    cases, they were furthest along and they were the ones where

16    we were asked to focus our inquiries and our collections.  We

17    have now been told that plaintiffs largely don't want that

18    information any more because they are -- well, I assume

19    because they have either settled the cases or are mostly at

20    that point.

21        We have a number of different cases coming down the

22    pike that aren't even as far along as the AVRP and the

23    bearings case were, and I understand that Your Honor has been

24    having discussions with the parties about trying to resolve

25    those.  So if those are resolved and they get to the

1    resolution point before any real discovery happens, if we are

2    ordered to produce this in the short term, it will be

3    effectively putting it out into the ether for cases that

4    don't actually need it.

5           So our view is that the parties have to show

6    absolute need, it is just part of the case law.  They

7    haven't.  We have shown the extreme harm that would occur to

8    us if these -- if this information were to get out there.

9    Therefore we have satisfied our burden under the case law but

10   they have not, and that's why we object to the Special

11   Master's order.  He admitted at the December 9th hearing that

12   he was right on the edge on this, and we think he erred, not

13   egregiously so, but he erred in failing to take into account

14   their failure to actually satisfy their burden.

15           THE COURT:  Okay.

16           MR. WOLFSON:  Thank you, Your Honor.

17           MR. WILLIAMS:  Good afternoon, Your Honor.

18   Steve Williams for the end payors and for the serving

19   parties.

20           THE COURT:  Let's start for you with this absolute

21   need.

22           MR. WILLIAMS:  Thank you.  And I would like to

23   because the briefing kept using different terms which was

24   substantial need, which is certainly a lesser standard than

25   absolute need.

1          THE COURT:  Right.

2          MR. WILLIAMS:  And I think what I would say in that

3     regard is from the time that this Court decided the first

4     motion to dismiss, the argument I have seen in every

5     subsequent briefing discussion is that the indirect

6     purchasers, the auto dealers and the end payors face a

7     tremendous hurdle in this case, as the Court has recognized,

8     because they have to show that price increases, if any, were

9     passed through by the OEMs down the chain of distribution to

10    the purchasers.  That was identified at the earliest point

11    once the pleadings were settled as perhaps the most critical

12    issue for us in this case, and the discovery we are talking

13    about here is tied directly to that issue.

14         We don't, nor do I believe Special Master Esshaki

15    in any way, diminished that this is important information to

16    General Motors and is confidential.  No one is disputing

17    that, nor are we disputing that General Motors has provided a

18    lot of information, as has all the other OEMs who were

19    subject to the first round, but only General Motors, and not

20    the other OEMs, says they won't turn this information over,

21    the others all will.  And the reason there is a need is

22    because --

23         THE COURT:  What's the nature of the others?  Tell

24    me again, the manufacturers, the OEMs.

25         MR. WILLIAMS:  Which ones or --

1          THE COURT:  Which ones?

2          MR. WILLIAMS:  Those would be, if my memory serves,

3     Toyota, Honda, Nissan, Fiat Chrysler and Fuji Heavy

4     Industries, which is Subaru.

5          THE COURT:  So we had six I think at the beginning.

6          MR. WILLIAMS:  We did those six, I think that's all

7     of them.

8          And specifically, counsel is absolutely right, the

9     analysis is empirical.  And he's absolutely right, they did

10    agree to give us a lot of information, but they didn't agree

11    to give us everything that we had sought because if we

12    had all costs --

13         THE COURT:  Let me ask you this too though.  When

14    we talk about the five others, do they price the same way or

15    is there something unique about GM's that -- if you know.  I

16    don't know that you know that yet.

17         MR. WILLIAMS:  Well, it is hard to say, but, Your

18    Honor, I think that goes to the need issue, which is they are

19    all basically doing the same thing.  I mean they are buying

20    parts from the defendants and they are building a car and

21    they are selling it to consumers.  There might be differences

22    in how they do it, but as counsel said, it is a mature

23    industry.  It would seem that -- in fact, even as GM says in

24    what it has disclosed, it looks at the market, it looks at

25    what other automakers are doing, it looks at prices out

1    there.  So I would imagine that there are some similarities,

2    but -- and to me I think this gets to what the issue is --

3    because General Motors in particular has put out some

4    information, you know, their declaration saying a cost

5    increase on a particular part wouldn't cause necessarily a

6    price increase for the finished product, this is now an

7    argument we hear from the defendants every time we see them,

8    which is critical to that core issue that I mentioned about

9    is the cost passed through or not, that is really only going

10   to be answered by reference to the documents that we are

11   talking about here.

12          And had GM been able to or agreed to produce all of

13   the cost data we sought, which it didn't, and all the pricing

14   data that we sought, which it didn't, we might be able to do

15   it differently, but we didn't obtain that.  And I think given

16   that deficiency and given the statements they have already

17   put out there that would suggest in GM's view that price

18   increases or cost increases don't change the price --

19          THE COURT:  Well, what cost data didn't you get?

20   He talks about giving you a lot of information, and I assume

21   that's true, so what didn't you get?

22          MR. WILLIAMS:  It is a lot, but it is in a more

23   aggregated sense, it is not on a part by part sense, which is

24   in an ideal world you have every cost input to the vehicle so

25   that you can model all of those costs and then how they

1   relate to the prices and how they relate to cost changes over

2   time so you can show the trends or impact in this pricing.

3           So because they have now put this statement out

4   there and that's in the record, if we go through class

5   certification, you will see their argument no doubt on the

6   first page of the defendants' brief.  The failure of

7   plaintiffs' motion is it doesn't acknowledge that

8   General Motors has said cost increases don't get passed

9   through.  So that issue has now been put out there and we

10  have had no opportunity to test it.

11          And counsel had argued that, well, the serving

12  parties have not put anything before you to rebut what we

13  have said about that, but in our view, that's because we

14  don't have access to it.  They know what that information is

15  and they have made certain affirmative statements.  We have

16  had no ability to test that.  The depositions taken to date

17  were only for the purpose of knowing what documents they had

18  and where they are kept and how much would it cost to produce

19  them.  We didn't have an opportunity to cross-examine on this

20  subject, and to us --

21          THE COURT:  So, again, going back to this data,

22  this cost and this pricing data, are you saying that you want

23  what you are seeking now in place of the cost in pricing data

24  by part, or would you suffice with the cost and pricing data

25  by part?

1    MR. WILLIAMS:  I think given the time we've taken,

2  how long we have gone to get to the point we are at now, it

3  is too late for the purposes of these cases to revert back to

4  something else.  We have litigated it.  I commend counsel

5  because throughout the entire process they met in good faith

6  and we met as much as we could where agreements could be

7  reached, and with the assistance of the Special Master, he

8  pushed us to make additional compromises.  We did everything

9  we could.  I don't think we can go back and redo all of that

10  at this point.  I think that it is too late in the process

11  and would cause too much havoc to the schedule in these cases

12  to go back and do that now.

13    Your Honor's question though, it reminded me of one

14  point I did want to make to respond to some of the arguments

15  that counsel made near the end about how he made a reference

16  to AVRP and bearings and those cases are settled and we now

17  don't have to produce that.  I just want to note, that has

18  nothing to do with what we are talking about now.  What we

19  are talking about now is the pricing of the finished vehicle,

20  and all that has been taken off the table because of AVRP and

21  bearings is the upstream side, which is the part acquisitions

22  from the defendants to the automakers, so that argument

23  doesn't really address what we are talking about here.

24    And I want to note as well or come back to this

25  suggestion of looking at this, at GM.  Special Master Esshaki

1    when he first heard it did say that makes sense.  But when

2    you heard what the parties who were going to have to use the

3    information thought about the extreme difficulties we would

4    face if we had to take turns from flying around the country

5    to make an appointment at General Motors to look at something

6    on their computer for purposes of one of the, if not the

7    most, critical contested issue in the indirect purchaser

8    cases, it would be completely infeasible for us to do that.

9    And there is a distinction.

10          So there is the transactional, the data, those

11   types of things that go to the experts.  That's not what we,

12   the attorneys, need to see as much.  But these documents

13   which go to this contested issue, those are things the

14   attorneys need the opportunity to look at and study and

15   understand because this case could turn on those documents

16   and those facts, and doing that at General Motors' office is

17   just not going to be a feasible way for us to do this.

18          And as we have cited to the Court in our papers,

19   from this district, the Nucor case, that recognizes total

20   prohibitions on discovery like this are generally

21   inappropriate, they rarely happen.  And what you heard

22   referred to were source code cases.  This is not source code,

23   it is not.  It is not source code, it is not the recipe to

24   Coke, it is none of those things.

25          And further, those source code cases you have been

 1    referred to, as we pointed out in our papers, those were

 2    agreements by the parties.  Those were not decisions by

 3    courts on disputed motions.  The parties simply agreed to it

 4    in those cases.

 5            For many reasons, those are not analogous to the

 6    situation here.

 7            And I would add a few things.  One, this issue in

 8    indirect purchaser cases is central.  And the argument made

 9    in class certification motions, one of the predominate

10    arguments is your analysis, plaintiff, does not take into

11    account how retailers or how manufacturers adjust their

12    pricing in reaction to cost changes.  Cost changes, no

13    economist is going to dispute that cost changes have an

14    effect on prices, but the argument then is, well, how?  Is a

15    manufacturer going to reduce their price from 29.99 to 19.99

16    based upon a cost increase or not?  Is it going to look at

17    what its competitors are doing?  How is it going to make that

18    decision?  Plaintiffs, you have not shown that, in fact,

19    those cost changes had an impact on the prices they charged.

20    This is something that we are going to be called upon to show

21    to you, and this is evidence that is directly on that point.

22    There's certainly a substantial need --

23            THE COURT:  So you need it before class cert?

24            MR. WILLIAMS:  This is going to be certainly

25    critical for class certification.

1          THE COURT:  You need it before class cert?

2          MR. WILLIAMS:  I --

3          THE COURT:  I mean as we go through the parts?

4          MR. WILLIAMS:  Well, I guess we look at it two

5     ways.  We will need it for class certification in any case.

6     If a class is certified, we will need it then when we are

7     putting the case in at trial.  In terms of needing it before

8     class cert, I guess it is a timing issue.  We have been

9     working on this part of the case --

10         THE COURT:  You haven't needed it so far?

11         MR. WILLIAMS:  We have wanted it.  We haven't --

12         THE COURT:  I know you want it.

13         MR. WILLIAMS:  -- we haven't been able to get it.

14    Certainly this is one of the areas that the experts working

15    for us most want, are most waiting on.

16         And I'm thinking about the bridge that was on the

17    screen before and the part of the bridge that's missing for

18    us.  We have more or less completed discovery in several

19    cases on the upstream side.  What happens from the defendants

20    to the OEMs, right now we have that gap in the bridge between

21    what happens from the OEMs to the downstream side.  That's

22    the part of this case that after five years has not been

23    filled in for us.  That can only be answered with the OEM

24    discovery.

25         THE COURT:  What about this -- the discovery being

1    only to the experts and what about the economic versus

2    industry experts?

3              MR. WILLIAMS:  So I think our view on that, I put

4    it in two buckets.  The transactional, the data, for our

5    purposes, we don't -- the lawyers don't need to see that.

6    That's what the economists and econometricians works with.

7    They model and they do their analyses and they report to us

8    on what it shows.

9              These documents, as counsel mentioned, are more in

10   the form of PowerPoints, declarations, they are more

11   narrative.  I don't know how I would describe it best because

12   I haven't seen them, but these are not those types of

13   documents.

14             THE COURT:  They are not transactional?

15             MR. WILLIAMS:  They are not transactional, they are

16   not data.  And in that sense, I'm familiar with the principle

17   that has been stated, that in some cases a party gets or a

18   non-party gets notice of who the expert is that you want to

19   use.  We routinely prefer not to do that because it, one,

20   requires a pre-disclosure of an expert, and, two, it gives

21   someone else a veto power over something.  It -- these are

22   people who are not in the industry, they just -- they have

23   studied the industry.

24             Those are experts we use in cases like this, it's

25   true.  We routinely use an expert who, counsel said it

1    correctly, one does economics and econometrics.  One studies

2    the industry to explain why would a conspiracy be effective,

3    why was it possible in this industry, how it would affect the

4    actions of the actors in this industry, the auto dealers and

5    the auto makers.  So that is the type of expert we would want

6    to have.

7         And given the extraordinarily high level of

8    protections that Master Esshaki put in above what our

9    protective order already provides in this case, we think

10   those protections are ample.

11        And I think that one of the things that is critical

12   to this is the harm that has to be shown here.  As I read the

13   papers, what it really looks like to me is the harm they are

14   more concerned with isn't what's actually permitted; it's,

15   well, what if it gets to someone else, what if it gets to a

16   competitor?  Well, no competitors get this, period, none of

17   the competitors from General Motors get access to this

18   information.  But the parties would have access to it and the

19   parties in this case are essentially trying to prove this one

20   issue.  If there were cost increases from defendants to the

21   OEMs, did they make it to the indirect purchasers?

22        Special Master Esshaki granted this discovery

23   because he said this is an enormously important case that has

24   an economic impact potentially to millions of Americans and

25   this is the fundamental issue in the case, and I believe he

1    was correct in that regard.

2         The defendants certainly throughout this case have

3    turned over extraordinary amounts of information that is

4    incredibly confidential to them, proprietary to them, that

5    they would prefer not to turn over, they are protected by the

6    protective order.  The auto dealers have done the same.

7    General Motors would enjoy higher protections than the

8    parties.  I've never encountered this level of protection for

9    information in any case I have been in.

10         And I mentioned the other indirect purchaser cases

11   where the bases by which retailers and manufacturers make

12   decisions on prices are routinely at issue.  It is not

13   typically even disputed.  It's simply provided in discovery

14   because it is a central issue, as it is here.

15         I know I'm repeating myself, but it is really the

16   core issue for the indirect purchasers in this case is how

17   did price changes affect what the prices were to the

18   consumers.  And General Motors through the declarations it's

19   put in suggesting that it has no effect has made it very more

20   important for us to be able to rebut that because right now

21   that puts a thumb on the scales in favor of the defendants.

22   We don't have the ability to respond to it because -- or I

23   should say at this point we don't because if General Motors'

24   objection were to be sustained, that would be taken away from

25   us.

1           The most important, the most direct way to respond

2    to that assertion, which will be set forth to us time and

3    again, would be through discovery to understand that, to

4    analyze it, and to be able to interpret whether for some

5    reason General Motors, unlike every other manufacturer, is

6    immune to cost changes when it decides to sell its products

7    for.

8           THE COURT:  Okay.  Anything else?

9           MR. WILLIAMS:  No, Your Honor.  I'm sure there was,

10   but they are not coming to mind at this time.

11          I will note that the remaining -- or that the next

12   motion has some overlap to this one so some of these issues

13   will be addressed there in terms of access and scope.  But I

14   really wanted to focus on the need and why we think that

15   there is -- I would say there is an absolute need.  If that's

16   not the standard, there is certainly a substantial need for

17   this information here.

18          THE COURT:  By the way, what is the anticipated

19   volume of information?  Is there some burden of production in

20   terms of volume?

21          MR. WILLIAMS:  To my knowledge, and counsel will

22   correct me if I'm wrong, on what we are calling the -- I

23   should -- what General Motors has called the crown jewels,

24   and we have all used that terminology, I understand that's a

25   relatively small amount.  They certainly believe it is very

 1   sensitive but it is not an enormous amount of data.  Counsel

 2   will correct me if I'm wrong.

 3            THE COURT:  Okay.  Thank you.

 4            MR. WILLIAMS:  Thank you.

 5            MS. SMEDLEY:  Good afternoon, Your Honor.

 6   Angela Smedley, counsel for the Panasonic defendants.  I'm

 7   here today representing defendants.  We also signed on to the

 8   serving parties' opposition to GM's objection.

 9            And just a few things.  I wanted to touch on the

10   very critical issue of passthrough as both counsel before me

11   have, but just as plaintiffs need to demonstrate that the

12   alleged overcharges were passed through to them, we need to

13   have the opportunity to demonstrate that there is an absence

14   of that passthrough.  And while --

15            THE COURT:  You have an affidavit of --

16            MS. SMEDLEY:  While the recent statements by the

17   OEMs are certainly relevant to that and, you know, we are

18   happy that they have provided those, it is really the

19   underlying data that we need to be able to give our experts

20   so that we can provide it to you and show that there is

21   support for those statements that there is an absence of

22   passthrough from a contemporaneous source.  So the data and

23   the pricing methodology documents are very central to this

24   case.  Specifically, the qualitative documents that

25   Mr. Wolfson was talking about are important because we need

1   to know if -- from the numbers, if we can see an increase in

2   price just from the numbers, we don't know necessarily what

3   that is due to.  And if we are able to actually take a look

4   at the qualitative ways in which GM and the OEMs make those

5   decisions, you know, GM indicated that their methodology is

6   based on market factors and profitability considerations, so

7   if there is an increase, is it due to a profitability

8   consideration?  And the spreadsheets and the other

9   documentation of GM's methodology when they are pricing their

10  vehicles is what's going to enable us to make those -- make

11  arguments about those issues.  So in terms of defending our

12  clients in these cases, having access to this sort of

13  information is really critical for us.

14        In terms of Mr. Wolfson's suggestion that all of

15  these materials be located in one place at GM, that poses

16  some significant obstacles for defendants partly because

17  there are so many defendants who have been dragged into these

18  cases.  We are all over the country.  We would be facing

19  enormous burdens of time, travel, costs.

20        There are logistical issues that we would need to

21  address with GM on a constant basis I think.  When people

22  wanted to get access to the documents, we would need somebody

23  to physically be there to let us in and give us access to the

24  documents.  There is what seems maybe, you know, kind of a

25  silly thing to focus on, but if this -- if this information

1   is located in one standalone computer at GM, we are going to

2   be competing with each other.  And we are all in different

3   cases, we all represent different clients.  We will be

4   competing with plaintiffs to literally stand in front of this

5   computer and look at this information, which just doesn't

6   seem like a practical way to litigate.

7        We have obligations to our clients in terms of

8   obviously the briefs that we file with this Court, we have an

9   obligation to this Court to make sure the information in

10  those documents is accurate, and it just poses a very

11  significant impediment to all defendants' ability to do that

12  if we have to make these sorts of arrangements and, you know,

13  negotiate with each other in terms of who gets to walk up to

14  the computer next, how long are they going to stay there.

15  You know, at the last minute these documents change, and when

16  that happens, are we going to have to take last-minute

17  flights here, are we going to have to have someone stationed

18  here for two weeks while we are drafting the brief?  There's

19  just all sorts of logistical issues like that that defendants

20  would have to face.

21        THE COURT:  Well, part of what was brought up, and

22  GM brought this up too, we were doing this -- I mean some we

23  won't need because they settled so that would be the end, and

24  maybe as we go along it won't be needed because they have

25  settled.  But if we do this according to our class cert

 1   schedule, we are only doing a few class certs at a time, so

 2   that would limit the number of folks who have to look at the

 3   computer, as you say, at any one time.

 4        MS. SMEDLEY:  So that is something that I was

 5   planning to get into on our objection, but I'm happy to begin

 6   to address it now.

 7        THE COURT:  I know these two motions are

 8   overlapping, but go ahead.

 9        MS. SMEDLEY:  Yes.  So we also have significant

10   concerns about staggered discovery based on the class cert

11   schedules and largely because with respect to defendants, it

12   produces an inequitable result.  The downstream discovery

13   from the OEMs is not part specific, it will be produced --

14   it's data related to the total vehicle so it reflects

15   information about all parts in the, you know, total vehicle.

16   That's being produced at one time when it is ready, probably

17   shortly after these objections are resolved.

18        And because defendants are limited to accessing

19   that information only when the class cert schedule is set but

20   plaintiffs who are in every single case will have access to

21   it right away, it could be years before a later parts case

22   defendant is able to see this discovery, and meanwhile

23   plaintiffs have had it the whole time and are able to use it

24   to prepare, you know, to support their claims of passthrough.

25   Meanwhile the defendants who are in this case -- a later case

1    against the same plaintiffs, you know, are not permitted to

2    access that information until a class cert schedule was set,

3    and as we have seen so far in this litigation, sometimes that

4    takes a very long time, where basically plaintiffs will be

5    getting a head start in litigating this very critical issue

6    of passthrough against those later case defendants.

7         So I think that is our main concern about that, and

8    we would request -- that is one of the two restrictions that

9    we are asking Your Honor to eliminate by upholding our

10   objection.

11        THE COURT:  Okay.  Thank you.  Anything else?

12        MS. SMEDLEY:  Just a couple other things.  I think

13   the existing protective order has been effective.  As

14   Mr. Williams mentioned, the parties have produced very

15   sensitive information, and the protective -- the highly

16   confidential designation in the protective order has been

17   working just fine for that, we have not had problems.  The

18   Court sits here able to enforce that protective order if need

19   be.  And we have authority in our briefs both that it is not

20   proper for the producing party to assume that the existing

21   protective order is ineffective and also that outside counsel

22   is routinely provided with highly-sensitive information

23   because they are not considered to be the same as their

24   client.

25        There is one case I think that both parties

 1    referred to, it is Cherdak vs. FitClub.  And in that case the

 2    court ordered production of source code, which is highly

 3    sensitive, to a direct competitor -- outside counsel for a

 4    direct competitor of the producing party because the court

 5    did not accept that outside counsel should be excluded, this

 6    is the language from the case, since they, unlike the

 7    plaintiff, are not direct competitors of the opposing party.

 8         So I guess the point is that we have alternatives

 9    here.  We -- you know, there is a lot of precedent that

10    producing this information, highly sensitive though it is, to

11    outside counsel is an effective way of protecting that

12    information and allaying the concerns of the OEMs.

13         There are also several source code cases that we

14    have cited I believe where alternatives are presented in

15    those cases for source code where they are not necessarily

16    located in one place, where everybody has to travel in order

17    to use them.  There is one where that information is produced

18    to the other side and just required to be kept in a locked

19    room.  There is another where a source code was made

20    available on an electronic portal and login information was

21    provided by the producing party.  And there are a couple

22    other examples.

23         But, you know, the difference in those cases also

24    is that they were dealing with usually a single requesting

25    party, and, you know, so those accommodations were made even

 1   though they are just looking at the burden on this one

 2   requesting party.  And in our case we are encountering even

 3   greater difficulties because we have so many requesting

 4   parties who would need access to that information.

 5            THE COURT:  Okay.  Thank you.

 6            MS. SMEDLEY:  Thank you.

 7            MR. WOLFSON:  Your Honor --

 8            MR. WILLIAMS:  May I make one very brief point?

 9   What counsel just said reminded me I meant to say, and then I

10   will sit down again.

11            THE COURT:  All right.

12            MR. WILLIAMS:  I just wanted to make one point.

13   When counsel was talking about the staggering of this

14   production or the access of the information to align it with

15   the class certification schedules, at this time the parties

16   are spending significant efforts on resolution, and I'm sure

17   the Court is aware of this but I want to say this is

18   certainly a very critical issue to those decisions as well.

19   So for parties who would be staggered out down the road, this

20   type of information could be very influential in their

21   evaluation of whether and how to resolve one of the pending

22   cases.

23            THE COURT:  Thank you.  Mr. Wolfson.

24            MS. SMEDLEY:  Just one more point.

25            THE COURT:  We all don't get two shots, but go

1    ahead.

2              MS. SMEDLEY:  I will make this quick.  To follow up

3    on what Mr. Williams just said, we think this -- we are

4    engaged in mediation right now, some of the later case

5    defendants, and this is critical information that would

6    really help us be able to evaluate the claims, our defenses,

7    and hopefully move mediation along and further a speedy

8    resolution.

9              THE COURT:  Okay.  Now, Mr. Wolfson, you better

10   hurry up and get up there.

11             MR. WOLFSON:  I'm bookending the arguments here,

12   Your Honor.

13             I have specific responses to various points that

14   counsel made, but I'm curious whether Your Honor has specific

15   questions based -- to start.

16             THE COURT:  No.

17             MR. WOLFSON:  Okay.

18             THE COURT:  Go ahead.

19             MR. WOLFSON:  So, first, to address something that

20   Mr. Williams said, that GM is the only one who has made

21   statements about general approach to pricing, I believe

22   that's incorrect.  In the opposition to the original motion

23   to compel, the OEMs on the whole submitted a substantial

24   number of declarations regarding the business and why they

25   thought that the discovery was overbroad, why it was in some

 1    respects perhaps assuming too much about the process of how

 2    the OEMs sold cars, and those OEMs also provided some input,

 3    insight and input regarding how they actually go about

 4    pricing their automobiles.

 5         With respect to what the other of the first five or

 6    first six --

 7         THE COURT:  Six.

 8         MR. WOLFSON:  -- OEMs have provided, we are

 9    somewhat at a disadvantage there because we don't know what

10    they have.  We -- the Special Master Esshaki I think rightly

11    siloed out the conversations on specifics of the OEMs'

12    documents and data.  So when a representation was made to the

13    Court, well, the other five OEMs have provided this, I can't

14    substantively respond because I don't know what's there.

15    However, I can tell you that GM has provided deposition

16    testimony explaining exactly why this is so important to GM.

17         And frankly, the fact that the other OEMs' pricing

18    methodologies that may be different in certain material

19    respects is actually the whole reason that GM doesn't want to

20    have to produce this here.  It doesn't want it to get out

21    because these are competitive trade secrets.  Honda has its

22    own trade secrets, GM has its own, Ford, all of these

23    companies, they price their cars in their own proprietary

24    way, and that's something that --

25         THE COURT:  GM is the only one that has objected to

1    the Master's order?

2        MR. WOLFSON:  Yes, I believe we are the only one

3    that raised our own objection on this.  Portions of our

4    objections were joined by the other OEMs specifically with

5    respect to the protective order, and then I believe that

6    Honda also joined -- we note in our brief --

7        THE COURT:  Toyota?

8        MR. WOLFSON:  I don't have it right in front of me,

9    Your Honor, but there are footnotes explaining where other

10   OEMs join in our objection.

11       Now, the idea that the parties need to be able to

12   test on both sides what GM has said about its pricing

13   methodology, of course, but that's where the data comes in.

14   We are giving them our purchase data, including our contracts

15   and any pricing terms in those contracts that affect the

16   price.  Automobile manufacturers often have what is known as

17   an APR, an automatic price reduction, that occurs on an

18   annual or other some sort of periodic basis.  So what you

19   have is changes in the prices as they go into the cars, and

20   what they are also going to have on the end is the changes in

21   the price of those cars that incorporate those products.

22       With respect to the bills of materials,

23   Mr. Williams said, and he's right, that we have an aggregate

24   bill of materials.  That was a constraint of GM's system,

25   just what data is available.  I believe this is not revealing

1    anything confidential.  It is just more that if we had to go

2    back and put a part-by-part bill of materials, it would have

3    been terabytes of data for one quarter, so it is a

4    feasibility issue.  But again, the price indexes are not

5    going to change what the actual cost of the car was and they

6    are going to have the input cost and the input prices from

7    the contracts and the purchasing data that we are providing.

8         So to the extent there are incremental differences

9    in the price of the parts going into those cars, they are

10   going to have those prices, they are going to have the total

11   cost of the car and they are going to have the end price of

12   those cars for every month for the past 12 to 14 years.  So

13   we are giving them the MSRP data, and essentially they are

14   going to be able to reconstruct a lot of this from what data

15   we were able to reasonably get after significant discussions

16   and explanations and work with the Special Master.

17        The cases that Mr. Williams cites where producing

18   internal pricing methodology documents is -- to say that this

19   is routine, this is done all the time, we point this out in

20   our brief, but those are where the party is a party -- where

21   the -- you know, the producing party is actually typically in

22   the case.

23        We -- we continue to believe that they have

24   everything they need to test GM's statements and just in

25   general to assess passthrough, and this is on both sides.

1    The defendants are telling you they can't test it either, but

2    no one has called into question statements based on an

3    empirical study of the data yet, and that's an important

4    thing to remember because their burden is to show that they

5    need to go beyond what we are producing.  We are explaining

6    why what we are producing is enough, and they have said,

7    well, it might not be enough but they haven't actually shown

8    that it is not enough.

9         THE COURT:  Okay.  What standard of review should I

10   use to the magistrate judge's --

11        MR. WOLFSON:  We think, Your Honor --

12        THE COURT:  Not magistrate judge, to the Master's.

13        MR. WOLFSON:  Yes.  So in our brief we have argued

14   that it is de novo, but we understand that the other parties

15   have said that it is abuse of discretion.  From GM's view, it

16   doesn't really change the analysis in the end because the

17   problem is not that -- it is not an issue of the Court

18   needing to revisit the entire thing.  If we look at what the

19   parties have actually done, this failure to show, what do you

20   want to call it, absolute need, substantial need, what have

21   you, that's a critical point where they didn't, and when the

22   Special Master nevertheless ordered production, then that

23   would be in error.  And I mentioned it before, he said he was

24   on the -- you know, he was essentially on the knife's edge on

25   whether or not to order this at all, and we think he erred by

1    falling to the side of production.  So -- and our view

2    doesn't matter.

3             THE COURT:  Okay.  Mr. Williams, let's take the

4    next motion, or who's going to -- okay.  I'm sorry, Ms.

5    Smedley.

6             MS. SMEDLEY:  Okay.  So defendants' objection to

7    the order on vehicle pricing information.  So even though

8    defendants believe that the heightened restrictions that

9    Special Master Esshaki imposed are unnecessary, all of them,

10   and excessive, all of them, in an attempt to move through

11   this as quickly as possible, we have not objected to most of

12   them.

13            But there are two restrictions that we feel we

14   can't accept because they impose such undue burdens on

15   defendants, and the first one we did begin to talk about,

16   that's the staggered schedule.

17            I just wanted to provide the Court with an example

18   that this is not a theoretical concern.  In the bearings

19   case, which is dying down, the plaintiff counsel just last

20   week indicated to the OEMs that they were still seeking

21   downstream discovery in that case because it is the first

22   case in which the discovery would be available.  And so

23   plaintiffs will have the downstream discovery, which is not

24   part specific, as early as it is available from the OEMs, and

25   meanwhile no later case defendant will be permitted to even

1    try to access it until they have a class cert schedule in

2    that case.

3            Not only do we think it is inequitable for that

4    reason, we think it is inefficient.  There are large-scale

5    inefficiencies for all parties probably because the OEMs are

6    going to need to interact with each parts case as the class

7    cert schedule comes up to produce this information again and

8    again and make sure that the defendants are adhering to the

9    protective -- the heightened protective order restrictions.

10            We also think it is inconsistent with the point of

11    a multi-district litigation where we are supposed to be

12    coordinating and that this really prevents us from being able

13    to do that if there are common issues we could coordinate on

14    because the defendants who will have access to that critical

15    information will not be able to share it with the later case

16    defendants.

17            Also I will -- I don't know if you have the same

18    standard of review question for us but --

19            THE COURT:  I do.

20            MS. SMEDLEY:  Okay.  So we also think it is de novo

21    here because the Special Master made no finding that GM made

22    a showing of good cause, as is required under Sixth Circuit

23    precedent, in order to get these heightened protections, and

24    in the -- and under Rule 53, findings of fact and conclusions

25    of law would be reviewed by Your Honor de novo.

1          So there is also -- there is a balancing act that

2    takes place where the Special Master should balance the

3    injury or the harm that GM expects by disclosing their

4    vehicle pricing information under the protective order that

5    exists against our need for the information and the burdens

6    that the heightened restrictions will place on defendants.

7          So I believe with respect to the staggered

8    discovery issue, that covers most of our concerns.

9          THE COURT:  Okay.

10         MS. SMEDLEY:  And the other restriction we are

11   asking you to eliminate on this objection is that the order

12   requires defendants in each parts case to choose one defense

13   firm to keep the actual pricing information documents.  Those

14   are kept, you know, on -- in accordance with the other

15   restrictions that we have not challenged here, on a

16   standalone computer, you know, people will log in, it's not

17   networked.

18         And the problem is that similarly to the logistical

19   difficulties that we discussed, if the materials were just

20   located in one place at GM, defendants have the same problems

21   in terms of having to travel to a certain location in order

22   to use these documents in potentially time-sensitive

23   situations and with this one-custodian firm idea.

24         Additionally, the one -- the single-custodian firm

25   is then in a different situation than the other defendants in

```
 1    the same parts case because they have access to this

 2    information all the time, and meanwhile other defendants will

 3    have to make specific arrangements to come and use this --

 4    come and view this information whenever they need it.

 5         So there are different inequities here that we are

 6    hoping the Court will help us avoid so that we can adequately

 7    represent our clients.

 8         THE COURT:  Okay.  Anything else?

 9         MS. SMEDLEY:  The only other -- the one thing I

10    would like to say is that GM has to show good cause here for

11    the heightened protections, and they have to do that with a

12    particular and specific demonstration of fact, which we don't

13    believe they have done.  The concerns they have expressed

14    have not been specific, that they -- that somehow even though

15    this protective order is in place that has worked for the

16    rest of us, somehow their information is going to get out

17    there into the public I guess.

18         THE COURT:  Well, in this day and age you could

19    understand their concern.

20         MS. SMEDLEY:  I could if we hadn't had years --

21         THE COURT:  All you have to do is turn the

22    television on and you know why.

23         MS. SMEDLEY:  Yes.  But I think, you know, in the

24    context of this MDL, it is harder for me to accept that that

25    is, you know, imminent -- an imminent concern.
```

1      But additionally, you know, some of the concerns

2  that they have articulated is that the materials will get to

3  their competitors who, as Mr. Williams said, are not involved

4  in OEM discovery; those are the DPPs.  They were concerned

5  that the information would go to their suppliers, the

6  defendants, their customers, the IPPs.  And again, you know,

7  by producing the pricing information to outside counsel, we

8  really avoid those issues because counsel is not the same as

9  their clients, and we have to this point been very diligent

10  about making sure any information shared with our clients is

11  in accordance with the protective order and redacted if need

12  be.

13      So GM has not sufficiently identified specific harm

14  that might come to it if they produce pricing information

15  under the existing protective order, not to mention that we

16  have these additional protections that the Special Master

17  imposed and we are not challenging, one of which actually is

18  that any filing that contains or refers to this information

19  is supposed to be filed in camera with Your Honor, not

20  electronically at any time, and so we think that should

21  significantly reduce the concerns that GM has articulated.

22      THE COURT:  Uh-huh.

23      MS. SMEDLEY:  In which case there isn't good cause

24  for these restrictions, and we would ask that you strike down

25  those too.

1          THE COURT:  Okay.  Thank you.  Mr. Wolfson?

2          MR. WOLFSON:  Thank you, Your Honor.

3          So with respect to -- I would like to first address

4    possible GM's showing of good cause.  I mean, at this point

5    I'm not sure what else we could do.  We had our CFO under

6    oath explain just how sensitive these materials are.  That

7    they are limited to a few dozen people at a corporation of

8    tens of thousands because they are so sensitive.  That they

9    are kept under lock and key within GM because they are so

10   sensitive.  That they would be devastating to GM's business

11   because it would be -- if they got out to competitors,

12   suppliers, customers, any of the three groups of parties that

13   are at issue here.  We think that's good cause.

14         And if the fact that highly sensitive materials was

15   just going to outside counsel was enough to just put in a

16   typical protective order, then we would never have protective

17   orders that have the highest level of protection like for

18   things like source code or, say, the recipe for Coke.  We

19   believe that we have satisfied that burden.

20         We submit on the facts that we've submitted as part

21   of this briefing process that that is good cause, and that at

22   the December 9th hearing the Special Master, in fact, noted,

23   he acknowledged that they are trade secrets and he

24   acknowledged that there would be substantial harm to GM, a

25   third party, if they were obtained improperly by one of the

1    parties to the case or one of the third parties to the case.

2            To the extent that there is complaints that there

3    is one defense firm per case who is allowed access to this

4    information, as an initial matter, of course, we -- our

5    objection is it shouldn't have to be produced at all.

6    Assuming Your Honor disagrees and orders the production, this

7    is why it should be experts only because then there is not

8    the issue of having to have -- you know, well, which defense

9    firms gets access to these materials.  It is more the experts

10   have access to it, they are allowed to use it for economic or

11   econometric analyses, and that should be it.

12           The practicalities and logistics here of protecting

13   this information we also think are not as dire as the

14   defendants make them sound.  I mean, this, I believe, is a

15   subset of all of the attorneys that have appeared before you

16   today, and the parties routinely come to Detroit.  This is a

17   Detroit-focused case.  What we are proposing is that the

18   materials be made available at a GM-controlled location in

19   Detroit.  The parties are here, they come here often.

20           To the extent there is an argument that this would

21   create issues for, I think the quote was, potentially some

22   time-sensitive situations, this is an MDL with a long

23   schedule ahead of it, and the parties have ample lead time to

24   look at this information and decide whether they want to use

25   it for their analyses.

```
 1              So the idea that for the first time the parties are
 2      going to be coming in and looking at these materials in
 3      Detroit two weeks before an ultra-critical brief, we find
 4      that a little bit hard to believe, and we would say this is
 5      a -- it is -- we are all professionals, we can schedule out
 6      the time to go and check and look at evidence long before it
 7      becomes the last minute.
 8              THE COURT:  Now, also -- I'm sorry, just to go to
 9      another subject, plaintiff argued that they needed industry
10      experts to have access, and, of course, that's what you
11      oppose.  Could you address that?
12              MR. WOLFSON:  Sure.  The industry expert question,
13      at least -- let me look at my notes of what Mr. Williams
14      said -- that they would -- that they are often used, and I
15      acknowledge this, I have seen it in other cases, the experts
16      will describe why the industry is subject to collusion, why
17      increasing, you know, the amount of collusion and bids would
18      affect prices that then, you know, impact the OEMs.  All of
19      that sort of information is, from our perspective, readily
20      available through other sources.  You are going to have
21      discovery from the defendants about the RFP process, from GM
22      at least; you are going to have information about its
23      purchases through the RFP process; you are going to then have
24      the end prices; you have substantial discovery from, for
25      example, auto dealer plaintiffs who they are able to provide
```

1    discovery about how they deal with the OEMs when purchasing.

2         The structure of the industry is not necessarily

3    information that's going to require GM's secret sauce.  And

4    going back to that connecting piece of whether there were

5    passthroughs, our understanding is that would be more on the

6    econometric or economic expert side.  And that on the

7    industry side, to the extent there is anything that GM

8    produces that's relevant to the questions they are asked to

9    opine on, that, again, our deposition testimony and the data

10   and documents we have already agreed to produce would be more

11   than sufficient to provide that expert the data that they

12   need.

13        So that would be our response on the industry

14   expert side, Your Honor.  And, again, this is -- the idea

15   that we would have unfettered veto power by having the

16   ability to object to experts, I think again that might be a

17   bit overstated because this is not something where we are

18   saying we want to be able to exclude all experts.

19        Rather, this is the econometric experts, the

20   economic experts that are going to be providing damages or

21   class cert opinions.  We want to make -- we would to like to

22   know if there is a procedure that they would like where it

23   would be kept confidential from other parties just literally

24   for conflicts purposes or for particular reasons that we

25   articulate in a protective order for objecting, we would be

 1    willing to do that.  But the idea of being able to object to

 2    experts seeing this type of material, at least in cases I

 3    have litigated, it is not that uncommon, but it depends on it

 4    being this highest level of types of material.

 5         Those are the main points I wish to address.

 6         THE COURT:  Okay.  Thank you.  Anyone else?

 7         MS. SMEDLEY:  To address counsel's concern about

 8    the experts and our ability to keep the information

 9    confidential from our parties including other OEMs, I think

10    the fact that Mr. Wolfson couldn't tell the Court anything

11    about what the other OEMs have agreed to produce is a great

12    example of the fact that we are capable of doing that.  We

13    have -- the serving parties have taken great care to file all

14    of their briefs under seal and only serve them on the

15    appropriate OEMs.  Our clients have not seen that

16    information.  So, you know, it's already happening that that

17    information as sensitive is being protected under the

18    existing protective order and now we have these few

19    heightened restrictions that will help do that even more.

20         The extreme protective measures that GM is

21    advocating for today are really usually reserved for source

22    code and the recipe for Coke, the examples that counsel gave.

23    You know, to analogize it to GM itself, I would think this

24    would be more appropriate for an innovative technology that

25    they are working to develop that's going to set their cars

1    ahead of other cars.  They have -- I know they have a

2    vehicle-to-vehicle communication technology that has been,

3    you know, attributed to them as a significant advancement,

4    and that is really the sort of thing that these extreme

5    measures would be appropriate for as opposed to pricing

6    methodology which every business has.  So I also -- you know,

7    there is a concern here I think about the precedent this

8    sets.

9            Every party on the business side of things has a

10   pricing methodology, and are we at the point where they are

11   going to be able to come into court, point to an opinion from

12   this MDL and say, well, look, this is what is appropriate

13   because we have a pricing methodology that we think is unlike

14   other companies' pricing methodologies?

15           Oh, with respect to the experts, there's a

16   significant concern for defendants in terms of, I mean, one,

17   not being able to check this data because we have an

18   obligation under Rule 11 to ensure that our experts are

19   relying on accurate -- are accurately relying on facts.  So

20   this whole arrangement where experts only and GM gets a

21   chance to, I guess, review in detail how the information is

22   being used is of great concern to us.

23           I think lastly I will just say that the vast

24   majority of the pricing information that we are seeking is

25   not recent.  We have not asked for current information, we

```
 1    haven't asked for any from last year.  You know, this goes
 2    all the way back -- I believe the early part of our range was
 3    back in the -- it is back in the '90s.
 4            So, you know, when courts are assessing the harm
 5    that a producing party might suffer, that matters.  Is it
 6    current information that's going to undermine you today or is
 7    it from 20 years ago?  And, you know, presumably the way you
 8    priced cars back then is not -- who would necessarily
 9    conclude that it is exactly the same as you are doing it
10    today?
11            So I think that's something to take into
12    consideration is that we are asking for, you know -- even if
13    we -- if there is a specific time period GM is concerned
14    about, I mean, you know, maybe there's -- there's some
15    element to discuss here.  But the older documents and data we
16    feel like should not be subjected to additional restrictions,
17    and not even -- certainly not the ones -- the two that we are
18    asking you to eliminate today.
19            So I think that's it.
20            THE COURT:  Okay.  You hear if it is not broken,
21    don't fix it, so maybe that methodology has worked all of
22    these years, I don't know.
23            MR. WILLIAMS:  I have four quick points.  I know
24    Mr. Wolfson wanted to go as well.  Do you want to go first?
25            MR. WOLFSON:  Why don't you go.
```

1          MR. WILLIAMS:  Thank you.

2          MR. WOLFSON:  Yeah.

3          MR. WILLIAMS:  I will try to be very brief and

4    mindful of the time.  Steve Williams for end payors.

5          The first point, when counsel was arguing it and we

6    were talking about this issue of other cases, I had argued

7    initially that in other indirect purchaser antitrust cases,

8    this type of discovery about how pricing decisions are made

9    by retailers or manufacturers is routinely provided, and

10   counsel had -- in fact, I did say it is difficult to find

11   decisions on it because it is typically not even litigated

12   and objected to.

13         Counsel had responded by saying, well, those were

14   parties.  I just want to be clear, no, those were not

15   parties.  I'm talking about cases just like this where it is

16   indirect purchasers suing defendants alleged to have engaged

17   in a cartel who sold component parts to a manufacturer who

18   then sells, for example, TVs or computers.  Those are the

19   cases I'm talking about where we get that information from

20   Apple or Dell or Microsoft or Best Buy.

21         The second point was also -- I might have

22   misstated -- counsel had said that I had said no other OEM

23   had made the argument about costs not being passed through.

24   I hadn't meant to say that.  What I intended to say and I

25   believe is correct is no other OEM is objecting to producing

1    this information, only General Motors is objecting to

2    producing it.

3         The third point, I think in the last argument made

4    by GM they made the suggestion that all of the information

5    should be experts only, and I just want to make sure the

6    Court hears our position that the data, yes, end payors, we

7    are not arguing that the data has to go to the attorneys,

8    that's for the experts.  But this narrower set of documents

9    that are not data documents, we do not believe would be

10   appropriate to preclude counsel from looking at something

11   that's going to be to us critical to an important issue.

12        And then finally on the issue of having an

13   opportunity to veto --

14        THE COURT:  That's all this information, as I

15   understand it, that we with are talking about right now, the

16   quote/unquote crown jewels.

17        MR. WILLIAMS:  The data, experts only, what I

18   understand is the small, the very small volume of what GM --

19        THE COURT:  But the data has been given already

20   according to --

21        MR. WILLIAMS:  Is or will be, yeah.

22        But the crown jewel data, as GM refers to it,

23   that's the information that I think would be inappropriate to

24   only let experts see.  Attorneys need to see that, they need

25   to understand it, they need to be able to test it.

 1              Finally, it is a practical issue.  On the

 2      suggestion that GM have an opportunity to object to an expert

 3      who it is proposed be given information, I would note because

 4      of how long the case has gone on, most of the parties have

 5      their experts and have invested substantial time with those

 6      experts and substantial resources.  And the risk that would

 7      then create is someone who has already worked on this case

 8      for parties for many years would then be subject to an

 9      objection at this late date.  Thank you.

10              THE COURT:  Thank you.  Mr. Wolfson?

11              MR. WOLFSON:  Yes.  I will be very brief, Your

12      Honor, I promise.

13              I really just want to respond to the final points

14      that defense counsel made about every company has a pricing

15      method and that this is old versus new data.

16              With respect to the old data, I think Your Honor

17      hit it on the head: if it ain't broke, don't fix it.  And we

18      have submitted evidence that just because some materials are

19      a few years old doesn't necessarily mean that we would --

20      well, that it would mean if we have more recent data, it

21      doesn't matter and it wouldn't harm GM if it came out.  So we

22      have submitted materials on that with our brief and I would

23      just like to point that out.

24              With respect to the idea that this would create

25      some kind of unwelcome precedent for all future cases, that's

 1  why we have standards and burden shifting and that's why GM

 2  has come in.  We are a third party so we unquestionably have

 3  protections under Rule 45 and the case law, so that's the

 4  baseline.

 5          Second, we made our showing this is a trade secret.

 6  We made a showing also of substantial harm.  The question

 7  here is the serving parties' showing, and that this is just

 8  the typical approach.  If a third party makes a showing of

 9  trade secrets or highly confidential information, then we get

10  down to the showing of substantial need, absolute need that

11  the serving parties need to make, and our point is that they

12  have not made that.  So that is -- this is a case-specific,

13  fact-specific inquiry just applying old law.

14          THE COURT:  Okay.  Thank you.

15          MR. WOLFSON:  Thank you.

16          THE COURT:  All right.  The Court is going to issue

17  an opinion on this shortly.  I appreciate the arguments, and

18  we will see where it goes.  Thank you.

19          Is there anything else?

20          MR. WILLIAMS:  No, Your Honor.

21          THE COURT:  All right.  Have a good summer.

22          MR. WILLIAMS:  Thank you, Your Honor.

23          MR. WOLFSON:  Thank you, Your Honor.

24          THE LAW CLERK:  All rise.  Court is adjourned.

25          (Court recessed at 3:08 p.m.)

1                          —    —    —

2                        CERTIFICATION

3

4          I, Robert L. Smith, Official Court Reporter of

5    the United States District Court, Eastern District of

6    Michigan, appointed pursuant to the provisions of Title 28,

7    United States Code, Section 753, do hereby certify that the

8    foregoing pages comprise a full, true and correct transcript

9    taken in the matter of In Re: Automotive Parts Antitrust

10   Litigation, Case No. 12-02311, on Wednesday, June 7, 2017.

11

12

13                          *s/Robert L. Smith*
                            Robert L. Smith, RPR, CSR 5098
14                          Federal Official Court Reporter
                            United States District Court
15                          Eastern District of Michigan

16

17

18   Date:  06/22/2017

19   Detroit, Michigan

20

21

22

23

24

25