*In re Automotive Parts 2:12-md-02311*

FILED USDC - CLERK DET
2019 NOV 18 PM 1:14

## Objection to Proposed Plan of Allocation

I, Kevin L. Prins make the following Objection to the Proposed Plan of Allocation.

The Proposed Plan of Allocation includes a provision that each Claimant receive a minimum $100.00 payment from the fund. Although $100.00 when compared to the total fund of $1.2 Billion may seem insignificant, it does have a serious and significant impact on the distribution of funds to the class members.

If the Court proceeds with this Plan of Allocation, those claimants least impacted by the schemes alleged in the complaints and settlements paid will receive a disproportionate share of the fund at the expense of those claimants which purchased or leased vehicles impacted by multiple settlements – in some cases a vehicle is eligible to participate in 30 separate settlements. The claimants with one vehicle eligible to participate in one settlement will get the same $100.00 as the 30 settlement vehicle. This shifting of settlement benefits from those most impacted to those least impacted is neither fair nor equitable.

To magnify and compound this problem even further, it is possible that this $100.00 per Claimant minimum could exhaust the entire fund before the pro rata calculations even begin. This means that that same claimant with one vehicle eligible to participate in one settlement fund would get the same $100.00 as the small business owner with 25 vehicles, or the corporation with thousands of eligible vehicles. ALL would get the same $100.00. Again, this shifting of settlement benefits from those most impacted to those least impacted is neither fair nor equitable.

This claimant requests that the Court not order the $100.00 minimum per claimant as proposed in this Round 4 Plan of Allocation and in the alternative issue an order that distributes all monies on a pro rata share basis as the Court previously ordered in Rounds 1, 2 and 3.

Below is a brief discussion which addresses the basis of this objection.

## The Objecting Member of the Class

I am a member of the class as defined by the Court. I have registered three vehicles to date with the Claims Administrator. My claimant ID number is 10007163. Attached as Exhibit 1 is a copy of my claim registration verification and purchase contract associated with one of my three vehicles.

I am also a Principal in Ryan Fraud and Forensic Recovery, LLC. For over 30 years I have consulted in matters involving damages in business litigation. I have presented my findings as an expert witness on over 50 occasions in deposition, at arbitrations and at trial. Attached as Exhibit 2 is a copy of my current CV.

FILED
CLERK'S OFFICE

NOV 1 8 2019

U.S DISTRICT COURT
EASTERN MICHIGAN

1

**The Basis for the Proposed $100.00 Minimum Award Amount**

Per END-PAYOR PLAINTIFFS' SECOND AMENDED UNOPPOSED MOTION FOR AUTHORIZATION TO DISSEMINATE JULY 2019 NOTICE TO THE END-PAYOR PLAINTIFF SETTLEMENT CLASSES is the following quote from the motion at pages 8 & 9

> Based on the experience of Rounds 1-3, EPPs plan certain additional modifications of the previous Notice Programs in order to increase public awareness of the settlements, namely:
> - Additional outreach by email and targeted television and online advertising to class members of their potential claims and the claims deadline and to stimulate additional claims;
>
> - Additional outreach targeted at younger audiences, including by streaming video and sponsored social media posts;
>
> - Additional outreach of attorneys to media outlets; and
>
> - Informing potential class members of the minimum payment amount of $100.
>
> Based on Kinsella's past experience, this additional outreach, as well as the minimum payment amount and the claim submission deadline, will help to stimulate additional claims. Wheatman Decl. ¶¶ 37, 42, 43.

According to the moving papers the sole reason for the $100.00 per claimant minimum was to increase awareness and interest in the program.

Missing from motion and supporting declaration is any analysis or discussion of the economic impact such a proposal would have on the claimants who will receive monies from the settlement funds.

Although, well intentioned (i.e. increase interest and the filing of claims) such a proposal creates significant inequities between and among the class members. Put simply another way, a group of claimants which have very little in the way of impacted vehicles will benefit greatly at the expense of other members in the class which have more other more impacted vehicles. Below is an analytical analysis and discussion explaining the significant inequities created by this proposed Plan of Allocation.

**Information Reviewed and Analyzed**

As part of my review in this matter I have reviewed and analyzed the settlements, the Plans of Allocation in Rounds 1, 2 and 3 as well as the proposed Plan of Allocation in Round 4, the Claim Website and publicly available data re sales of vehicles. I have prepared a detail analysis to support the statements and analysis in the objection. Please note that one spreadsheet alone is approximately 50 columns wide and 10,000 rows deep. It would take thousands of pages to print. As a result, I will only submit to the Court in this Objection summaries as noted below.

2

**Vehicles Subject to the Various Settlements Analysis**

A review of the claim website lists almost 8,700 total vehicles combinations (Make, Model Year) subject to the 41 individual settlements approved by the Court. I have copied from the website all the vehicles and their associated parts listed from the claim website on or about November 4, 2019.

I have reviewed publicly available data regarding vehicle sales (the primary Source document is from Wards Intelligence, an industry recognized publication which tracks vehicle sales by Year, Make and Model). Per this information, I have determined the total vehicle sales associated with the vehicles listed on the claims website is almost 322,000,000 total units.

Given that only 30 states participate in the monetary portion of the settlements, I reduced the total vehicle sales by settlement by 50%. This represents the calculated population of total vehicles eligible to receive monies from each of the settlements – approximately 161,000,000 total vehicles.

Obviously not every vehicle sold is the subject of each of the 41 settlements approved by the Court. Therefore, I further took these total vehicle sales and identified which settlement was tied to each individual vehicle. (This is the primary spreadsheet which is approximately 50 columns x 10,000 rows). Attached as Exhibit 3 is a summary of the 41 settlements and the total vehicles sold in the US associated with that settlement.

**Impact of the Proposed Plan of Allocation re Individual Vehicles**

In addition to Total Vehicle Sales and a calculation of the pool of eligible vehicles per settlement, Exhibit 3 also calculates the amount a claimant may receive assuming certain participation rates (i.e. the number of claimed vehicles as a percent of the pool of eligible vehicles).

As seen in Exhibit 3, in many cases if the participation rate is as low as 10% of the eligible vehicles, the resulting payment would be a few dollars in many of the settlements. This is due to the fact in many cases the amount of the settlement (i.e. Auto Lamps) is relatively small and the number of vehicles associated with that settlement is large. In Auto Lamps, the settlement pool is $34 million and the number of total vehicles produced subject to the Auto Lamps settlement is over 135 million units. At a 10% participation rate the calculated award associated with Auto Lamps is approximately $5.00.

As seen on Exhibit 3, assuming a 10% participation rate, only 1 settlement would produce a recovery of $100.00. That settlement relates to Motor Generators and there were less than 3,000 total vehicles sold which qualify for Motor Generators. For all practical purposes there is no single settlement which would generate a $100.00 award. Therefore in order to get the $100.00 as defined in Rounds 1, 2 and three, a vehicle must be associated with multiple settlements.

3

In many cases a vehicle is eligible to be paid out of only one settlement fund. Keeping with the Auto Lamps example, A 2007 GMC Yukon XL is a vehicle which is only eligible to be paid from the Auto Lamps settlement. Under a straight pro rata methodology, as approved in Rounds 1, 2 and 3, this claimant would receive the approximate $5.00. Now under the proposed this Plan of Allocation this claimant will receive **20 times** than that of the original plans.

Exhibit 4 summarizes the number of settlements associated with the various vehicles and the number of units sold associated with those vehicles. As seen in Exhibit 4 there are 1,058 Make/Model/Year combinations which are eligible to participate in just one settlement. This represents almost 20% of the total eligible vehicle combinations in this program and their respective sales represents almost 15% of the total vehicle sales. Those Make/Model/Year combinations which are eligible to participate in three or less settlements equates to almost 44% of the total vehicle population.

A 2016 Ford Series Pick-up is eligible for 9 separate settlements. On a straight pro-rata allocation, as defined in Rounds 1, 2 & 3, and continuing to assume the 10% participation rate, that pick up is eligible for an award of approximately $100.00.

There are many vehicles which are eligible to participate in more than 20 settlements. One of the most impacted vehicles is a 2008 Honda Accord which is subject to 30 separate settlements. Under the straight pro-rata methodology, this vehicle would be eligible to receive almost $320.00. By allowing this windfall for those claimants who have a vehicle associated with one (or a few) settlement, the available funds for the remaining claimants is greatly diminished. This alone creates a significant inequity between and among the claimants.

If the goal of these settlement funds is to compensate those claimants which purchased or leased relative to their harm as defined by the number of impacted parts in a vehicle, then this proposed Plan of Allocation with the $100.00 minimum fails. This proposed Plan of Allocation greatly benefits those claimants with the least impacted vehicles at the expense of those claimants with the most impacted parts in their vehicles.

**Impact of the Proposed Plan of Allocation re Claimants with One Vehicle vs Multiple Vehicles**

Unfortunately, this is not the only inequity created by this proposed Plan of Allocation. The inequities of this Plan are greatly multiplied for those claimants which purchase or leased multiple vehicles vs those which purchase one vehicle.

Per the Plan of Allocation, the minimum payment will be $100.00 per Claimant and NOT per vehicle.

Assume for a moment that 10 Million claimants file valid claims. Based on the proposed Plan of Allocation, the funds will be effectively exhausted with the $100.00 payments. (10 million claimants x $100.00 = $1 Billion) This means that the claimant with the 2007 GMC Yukon XL as discussed above will receive the same amount of money as the claimant which purchased or

4

leased 10, 100 or 1,000 or more eligible vehicles. This proposed Plan of Allocation simply discriminates against those claimants which have multiple vehicles.

Assume that a small business owns 25 of the 2016 F-Series pick-up described above. Under the straight pro-rate share that claimant would be entitled to $2,500 (25 vehicles x $100 per vehicle). Now it its possible, under this Plan of Allocation that the business owner receives $100. That business owner is receiving 4% under this new plan as compared to the approved methodology in Plans 1, 2 and 3.

The 2007 GMC Yukon XL owner receives 20 times his award under this Plans vis a vis the plans approved in Rounds 1,2 and 3 and the small business owner receives 4%. That is not equitable or fair to the claimant which purchased more vehicles which were impacted by more parts subject to the settlements.

This problem is only magnified more for the corporation which owns fleets. If a fleet owner had 1,000 of the 2016 Ford F-Series Pickups, it would have been intitled to $100,000 under the plans of allocation in Rounds 1, 2 and 3. Under this proposed plan, it is possible that fleet owner might only receive $100 or 0.1% of the anticipated amount under the original plans of allocation.

Below is a summary of the potential impact of the $100.00 minimum regarding the specific vehicles discussed above if the fund is exhausted before the pro-rata share calculations can begin.

| | Payment Under Proposed Plan | Payment Using Only Pro-Rata Methodology | Realization Percentage |
|---|---|---|---|
| Owner of 1 GMC Yukon with 1 part eligible for a settlement | $100 | $ 5 | 2,000% |
| Owner of 1 F-Series Pick-up with 9 parts eligible for the settlements | $100 | $ 100 | 100% |
| Owner of 25 F-Series Pick-up with 9 parts eligible for the settlements | $100 | $ 2,500 | 4.00% |
| Owner of 1,000 F-Series Pick-up with 9 parts eligible for the settlements | $100 | $100,000 | 0.1% |

As is clearly seen the in this summary, as well as the discussion above, under the proposed Plan of Allocation those claimants most impacted by the schemes alleged in the complaints and the settlements paid receive the least benefit from the fund relative to those claimants with minimal claims.

As stated earlier, if the goal of these settlement funds is to compensate those claimants which purchased or leased relative to their harm as defined by the number of vehicles, then this proposed Plan of Allocation fails. This proposed Plan of Allocation greatly benefits those

claimants with the least impacted vehicles at the expense of those claimants with the most impacted vehicles. This simply is not fair or equitable.

**Conclusion**

As discussed above, an analytical review of the proposed Plan of Allocation shows that it is neither fair nor equitable to members of the class which purchased or leased multiple vehicles which are eligible for multiple settlements as compared to a claimant which purchased one vehicle subject to one (or few) settlements.

For that reason, it is requested that the Court reject the proposed $100.00 minimum per claimant and in the alternative approve a Plan of Allocation consistent with that of Rounds 1, 2 and 3.

Further, I respectfully request the opportunity to address the Court at the Fairness Hearing on December 19, 2019.

If Class Counsel or the Claims Administrator would like to discuss this matter further, I would be happy to make myself available.

Respectfully submitted,

Kevin L. Prins
6544 Egypt Ridge Rd NE
Rockford, MI 49341
(310) 467-7725
kevin.prins@ryan.com


cc:

Adam Zapala
Cotchett, Pitre, & McCarthy LLP

Hollis Salzman
Robins Kaplan LLP

Marc M. Seltzer
Susman Godfrey L.L.P

# EXHIBIT 1

# In Re: Automotive Parts Antitrust Litigation Website
# www.AutoPartsClass.com

## THANK YOU AND PRINT

Thank you for submitting your Auto Parts Class Claim Form. The details of your submission are below. **No documentation is required at this time but please hold on to any documents that you have. The Settlement Administrator will contact you if additional information is needed.**

**PLEASE PRINT** and save a copy of this page for your records. All information you provided will be kept private and used only for purposes of administering the Settlements reached in this litigation. Updates to your contact information can be made by contacting the Settlement Administrator at :

info@AutoPartsClass.com (mailto:info@AutoPartsClass.com)

Toll-Free: 1-877-940-5043

Auto Parts Settlements
P.O. Box 10163
Dublin, OH 43017-3163

---

### CLAIMANT CONTACT INFORMATION

| | |
|---|---|
| Claim Number : | 10007163 |
| Claimant Name : | Kevin Prins |
| Mailing Address : | 6544 Egypt Ridge Rd NE<br>Rockford<br>MI<br>49341<br>US |
| Phone Number : | (310) 467-7725 |
| Email : | kevin.prins@ryan.com |
| Filing a claim for business: | No |

### PURCHASE/LEASE CLAIMS SECTION

| | |
|---|---|
| Are you making a claim for the purchase or lease of a new vehicle? | Yes |
| For how many vehicles are you making a claim? | 3 |

**Vehicle(s) Claimed:**

| Vehicle Year | Vehicle Make | Vehicle Model | VIN (Vehicle Identification Number) | Place of Purchase | Estimated date of purchase or lease | Purchase or Lease? |
|---|---|---|---|---|---|---|
| 2015 | JEEP | RENEGADE | ZACCJBCT1FPC42035 | MI | 10/1/2015 | Purchase |
| 2003 | HONDA | PILOT | 2HKYF18703H507559 | CA | 6/15/2003 | Purchase |
| 2009 | HONDA | CIVIC HYBRID | JHMFA36299S016831 | CA | 9/1/2009 | Purchase |

## REPLACEMENT PART CLAIMS SECTION

Are you making a claim for the purchase of an eligible vehicle replacement part?　No

For how many replacement parts are you making a claim?　0

**Replacement Part(s) Claimed:**

# PURCHASE AGREEMENT

DEAL# 64428



VAN ANDEL FLIKKEMA

3844 Plainfield Ave. N.E Grand Rapids, MI 49525
(616) 363-4631  www.vfcars.com

CHRYSLER  JEEP

| DATE | SALES REPRESENTATIVE |
|------|---------------------|
| 11/02/2015 | SCHUITEMAN, KYLE J |

## TRADE-IN VEHICLE INFORMATION

| YEAR | MAKE | MODEL/SERIES | BODY STYLE |
|------|------|--------------|-----------|
| 2006 | MERCEDES | SLK350 | CV |

| COLOR | STOCK NO. | ENGINE | ODOMETER READING |
|-------|-----------|--------|------------------|
| | J55069A | | 95011 |

V.I.N. NO. | W | D | B | W | K | 5 | 6 | F | 5 | 6 | F | 1 | 3 | 0 | 2 | 9 | 2

BALANCE OWED TO:

ADDRESS:

## LIEN VERIFICATION

I/we the undersigned being dully sworn depose(s) and says that I/we am/are of legal age and competent to make this contract and am/are the true lawful owner(s) of the used vehicle described in this contract and am/are trading (or placing on sale) in accordance with the terms hereof, that there is no lien, mortgage, unpaid balance or any conditional sales agreement, or other encumbrances of any kind or character, including lien of and judgement or execution, except as follows:

$ _____ payable to _____ address _____ and due _____ (date); that this affidavit is made for the purpose of obtaining credit and to guarantee title to the above mentioned used vehicle and that all statements made here in are true and correct.

X _____  X _____

| BASE VEHICLE PRICE | $ | |
|--------------------|---|---|
| ACCESSORIES | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| CONTRACTUAL DISCLOSURE STATEMENT FOR USED VEHICLE ONLY | This order shall not become binding until dealer's authorized representative's signature appears here. |
|---|---|
| "The information you see on the window form for this vehicle is part of the contract. Information on the window form overrides any contrary provisions in the contract of sale." | MANAGER'S APPROVAL |
| | DATE |

---

BUYER'S NAME(S) KEVIN LEE PRINS

ADDRESS 6544 EGYPT RIDGE RD NE

CITY ROCKFORD          STATE MI          ZIP 49341

RES. PHONE (310)467-7725     BUS. PHONE _____

COUNTY OF RES KENT          DATE OF BIRTH _____

DRIVER'S LICENSE NO. _____

PLEASE ENTER MY ORDER FOR THE FOLLOWING: [✓] NEW  [ ] USED  [ ] DEMO

## VEHICLE TO BE PURCHASED INFORMATION

| YEAR | MAKE | MODEL/SERIES | BODY STYLE |
|------|------|--------------|-----------|
| 2015 | JEEP | RENEGADE | STA-WGN |

| COLOR | TRIM | TOP | STRIPE |
|-------|------|-----|--------|
| COLORADO R | | | |

| WEIGHT | STOCK NO. | ENGINE | ODOMETER READING |
|--------|-----------|--------|------------------|
| | 155069 | | 15 |

V.I.N. NO. | Z | A | C | C | J | B | C | T | 1 | F | P | C | B | 0 | 3

| | |
|---|---|
| TOTAL TAXABLE PRICE DOC FEE + CVR | 28921.00 |
| LICENSE (or Transfer Fee) | 8.00 |
| TITLE (or Transfer Fee) | 15.00 |
| SALES TAX | 1585.26 |
| NON-TAXABLE CHARGES | |
| TOTAL DELIVERED PRICE | 30529.26 |
| TRADE-IN ($ 8300.00 ) | |
| LESS LIEN - ($_____ ) | |
| NET ALLOWANCE TRACE-IN | 8300.00 |
| CASH DEPOSIT | |
| CASH DUE ON DELIVERY | |
| TOTAL DOWN PAYMENT | |
| BALANCE DUE | |
| EXTENDED SERVICE CONTRACT | |
| TOTAL AMOUNT DUE | 22229.26 |

| RECEIPT NO. | AMOUNT REC'D | DATE | IN BY | FINANCE SOURCE |
|-------------|--------------|------|-------|----------------|
| RECEIPT NO. | AMOUNT REC'D | DATE | IN BY | CITY |
| M E M O | AMOUNT | MONTHS | RATE | INS. |

---

1. Unless dealer furnishes buyer with a dealer's written warranty or service agreement or the used car sticker on the window of the vehicle indicates otherwise, all goods, services and vehicles sold hereunder are sold "AS IS". Warranties, if any, on dealer-installed accessories are provided by the manufacturer or supplier of such accessories and not dealer. Only the manufacturer or supplier of such accessories is responsible for performance under any such warranty. This limitation in no way affects the vehicle manufacturer's warranty, if any.
2. If this is a credit case and a financing disclosure statement has not been completely filled in, this order is not binding on either the Buyer or the Dealer, and either cancel it, in which event the Buyer will recover the deposit. However, this order shall become binding on the Buyer upon Buyer's receipt of a completely filled in financing disclosure statement.
3. THE SALESPERSON HAS NO AUTHORITY TO MAKE ANY PROMISES OR REPRESENTATIONS UNLESS THEY ARE WRITTEN ON THIS ORDER AND APPROVED BY DEALER'S AUTHORIZED REPRESENTATIVE.
4. THE ADDITIONAL TERMS AND CONDITIONS PRINTED ON REVERSE SIDE ARE PART OF THIS ORDER.
5. Unless otherwise noted, the buyer's name listed on line (a) below is the registered owner of the vehicle. If credit life insurance and/or accident and health insurance is selected, the registered owner of the vehicle is the Insured.

BUYER REPRESENTATIONS: Buyer certifies that no credit has been either extended to him by dealer or arranged for him by dealer or arranged for him by dealer for the cash down payment unless it appears in writing on the face of this order. The front and back of this Order comprise the entire agreement affecting this purchase and no other agreement or understanding of any nature concerning same has been made or entered into, or will be recognized. I have read the matter printed on the back hereof and agree to it as part of this order as if it were printed above my signature. I certify that I am 18 year of age or older, and hereby acknowledge receipt of a copy of this order.

| X _____ | 11/02/2015 | _____ | |
|---|---|---|---|
| PURCHASER'S SIGNATURE | DATE | CO-PURCHASER'S SIGNATURE | DATE |

# EXHIBIT 2

## KEVIN L. PRINS

### CONSULTING EXPERIENCE

Kevin L. Prins has over 30 years of experience in litigation consulting. He has testified in trials, in binding arbitrations, mediations, and before retired settlement judges. He has had his analyses accepted and affirmed by these tribunals as well as special masters appointed by the courts. In addition to his testimony roles he has also been retained as an independent arbitrator as well as a court appointed special master.

Highly skilled at financial analysis in the context of disputes, Mr. Prins demonstrates technical excellence and creativity with the application of financial concepts to the facts, and with the development of models to calculate the impact of specific actions and activities on the parties involved. His work has assisted counsel in obtaining many significant awards and recoveries for their clients.

Mr. Prins provides analyses relating to contract claims, cost overruns, delay and disruption, alleged fraudulent activities, lost profits and lost royalties, breach of contract, business interruption, business valuation, professional malpractice, personal injury, wrongful termination, and numerous other analyses to clients in industries such as defense, public contracts, entertainment, finance and banking, health care, real estate, utilities and a variety of manufacturing concerns.

Mr. Prins also assists counsel in settlement negotiations. His presentations to opposing counsel and experts of his models, methodologies, and conclusions have often aided in the resolution of the matter.

Mr. Prins specializes in damage computations, including government contract claims. He has prepared requests for equitable adjustment, analyzed the charging practices of various companies including those relating to direct cost and variable and fixed overhead cost, he has performed cost impact studies, and has investigated allegations of fraudulent business practices. Additionally, he reviews contractors' forward pricing practices and progress billing practices.

**EDUCATION:**    Master of Business Administration, Arizona State University

Bachelor of Business Administration, Grand Valley State College

Following is a brief description of some of the engagements on which Mr. Prins has provided assistance:

## BAD FAITH

- A client of Mr. Prins' had several buildings burned to the ground in the Los Angeles riots of 1992. One of these buildings housed his client's dental practice. The insurance company, which insured the doctor, failed to pay a substantial portion of the monies due under the building policies. On the other policies, including contents and business interruption, the insurance company paid, but over two years after the fires. Mr. Prins was retained to calculate the business interruption losses incurred by the dental practice which were a result of the insurance company's failure to pay on the policies as required in the insurance contract. Mr. Prins also assisted in preparing for the cross-examination of the opposing expert witnesses and performed an analysis of the insurance company for the punitive damages phase of the trial. After a three week trial, a jury found for Mr. Prins' client and awarded a multi-million dollar verdict, including punitive damages.

## BREACH OF CONTRACT

- Mr. Prins was retained by a County to analyze an allegation of over-charging by a contractor to the County. Upon review of the subcontractor's and prime contractor's activities, Mr. Prins prepared a claim on behalf of the County for recovery of sums claimed to be over paid to the contractor. During this process Mr. Prins provided testimony regarding an administrative bid protest. The matter was successfully negotiated in the County's favor.

- Mr. Prins was retained as a consultant to a State and its Governor to evaluate a claim of damage made by a plaintiff relating to an alleged breach by the State to construct a federally legislated facility. Mr. Prins reviewed and evaluated the Plaintiff's claimed out of pocket cost, its claimed lost opportunity cost and its claim for lost profits. Mr. Prins assisted in preparing the testifying experts for trial. A judge found in the State's favor and awarded nothing to the Plaintiff.

- Counsel to a home owners association which owns three golf courses retained Mr. Prins to calculate the association's lost profits resulting from a contractor's alleged improper construction of the greens on one of the courses. This alleged poor construction has given the golf course in question a poor reputation and has resulted in diminished play. In calculating damages Mr. Prins analyzed the profitability of the course in question, the profitability of the other two courses owned by the association and the level of play in the area.

- Mr. Prins was retained by the attorneys representing several primary care physicians accused of improperly leaving one Independent Physicians Association (IPA) for another. Mr. Prins analyzed the various doctor's practices including their patient growth and patient turnover rates. Mr. Prins analyzed the damage analysis prepared by the expert of their former IPA. He also performed an alternative calculation of the alleged lost profits suffered by their former IPA resulting from their departure.

2

- Mr. Prins was retained as a consultant to review and evaluate the information supplied by the owner of a selling apparel company to the buyer. Mr. Prins analyzed historic financial records, internal business plans which were never submitted to the buyer, business plans which were submitted to the buyer, financing records from various lending institutions, bank audit reports relating to the seller, investment banker's analysis of the selling company as well as numerous other financial records. The investigation's purpose was to determine if the seller hid relevant and critical information from the buyer. The matter was settled to the buyer satisfaction.

- Mr. Prins was retained to evaluate a loss of use/lost profits claim prepared by a hospital as part of its claim against a contractor. Mr. Prins analyzed the claimed projected future use of the hospital as well as the revenues expected to be generated and the expenses associated with those revenues. He also analyzed the actual historic use of the hospital, its revenues and expenses. Mr. Prins prepared an alternative analysis to the hospital claimed losses.

- Mr. Prins was retained by counsel to an Independent Physician Association (IPA) which was sued by one of its former OBGYNs who alleged that the IPA improperly terminated his contract. Mr. Prins reviewed the opposing expert's damage analysis and created an alternative analysis. Mr. Prins presented his findings to a jury which found for his client.

- Mr. Prins was retained by counsel to a toy company accused of failing to fully pay one of its Chinese vendor manufacturers. Mr. Prins reviewed the various contracts, purchase orders and shipping documentation in dispute. He reviewed the charge-backs and other return product documentation from the retailers. Mr. Prins also prepared a counter claim based on the allegation due to the poor quality of product sold to the toy company by the Chinese manufacturer returns from the retailers were significantly greater than expected and as a result the toy company realized much lower profit margins.

- Counsel for a golf course owner retained Mr. Prins to calculate the lost profits suffered by the golf course resulting its' leased golf carts routinely breaking down on the golf course. Following his deposition, the matter settled to the owner's satisfaction.

- Mr. Prins was retained by counsel to an insurance company to assist in drafting the Agreed Upon Procedures a Big 4 accounting firm would employ in reviewing the expenses associated with the international distribution of a slate of films.

- Mr. Prins was retained by counsel to a manufacturer of vitamins and supplements to calculate their damages resulting from a supplier mis-labeling a key ingredient which ended up being used in a production lot of vitamins. The matter was settled to the manufacture's satisfaction.

3

- A dispute arose between a utility and two municipalities relating to nuclear fuel contracts and the cities' obligation to participate in these contracts. Mr. Prins was retained by the utility to calculate the damages associated with the cities breach of the contracts. The matter was successfully negotiated in the utility's favor.

- Counsel retained Mr. Prins to calculate the damages associated with a buyer's breach of contracts to purchase two apartment complexes. After a thorough review of the contractual documents, the plans of the would-be buyer and the environmental factors, Mr. Prins determined that the would be sellers were not harmed in any way, but were, in fact, better off today by the breach.

- As part of the consideration in the buy-out of one stockholder from the other, the selling stockholder was to receive a percentage in the proceeds of a pending litigation subject to certain payments to senior lenders. Mr. Prins was retained by counsel to calculate the amount due under the agreement and determine when the funds were due to the selling shareholder. In addition, Mr. Prins was required to trace several transactions in which the purchasing stockholder and a senior lender funneled and diverted funds which should have been paid to reduce the lender's debt, thus allowing for timely payment to the selling shareholder. Mr. Prins assisted in all phases of discovery, was present during the entire trial and all phases of the post trial hearings and subsequent settlement discussions. A judge awarded a multi-million dollar judgment against the purchasing stockholder and the lender, which was found to be the joint venture partner of the purchasing stockholder.

- Counsel for the defense retained Mr. Prins to calculate the amounts due to the plaintiff under a lease and subsequent employment agreement. The plaintiffs were seeking damages in excess of $4.5 million. Mr. Prins testified at a binding arbitration that the amount due to the plaintiff was less than $700,000. Shortly after his testimony, the parties settled for an amount which approximated the amount to which Mr. Prins testified.

- Mr. Prins was retained to calculate the lost profits resulting from the failure of a prospective buyer to purchase a piece of real property due to his real estate agent purchasing the property in question. The property was to be used to expand an existing business. Mr. Prins testified at trial. A jury found for his client and awarded a judgment based upon Mr. Prins' testimony.

- Mr. Prins was retained to calculate damages suffered as a result of the failed sale of a golf club. Mr. Prins was required to analyze the golf courses historic profitability, the state of the golf industry at the time of the alleged sale and the prospects for future profitability.

## BUSINESS INTERRUPTION

- Mr. Prins was retained as part of a three person arbitration panel in a business interruption matter. Following presentations and arguments by the parties the panel unanimously rendered its decision.

4

- A collapsed roof required a franchisor to move its marketing facility to temporary quarters. Because of these temporary quarters, some prospective franchisees decided not to purchase a franchise. Mr. Prins was requested to quantify the lost profits associated with these lost sales of franchises. The matter was successfully negotiated to the franchisor's satisfaction.

- A real estate investor/general partner was claiming lost profits as a result of an insurance company's failure to pay a claim which then forced his apartment complex into foreclosure. Mr. Prins was retained by the counsel for the insurance company to calculate the damages, if any, associated with the foreclosure. Mr. Prins analyzed the cash flows associated with the apartment complex. He also reviewed the environmental factors, including the state of the real estate market in the mid-1980's. Mr. Prins determined that the complex would have been foreclosed upon in any event and, therefore, there were no damages resulting from the insurance company's failure to pay the claim. The matter was successfully negotiated to the benefit of the insurance company.

- Counsel for the defense retained Mr. Prins to evaluate a multi-million dollar business interruption claim prepared by one of the Big Three auto-makers regarding a 36 hour shut down of a production facility resulting from a severed power line in a construction accident. After an initial meeting with the auto-maker, further evaluation of the claim and a subsequent final meeting with the auto-maker, the matter was settled for less than one-half of the amount originally claimed by the manufacturer. The matter was settled within one week of the initial meeting with the auto-maker.

## CLASS ACTION CLAIMS

- Mr. Prins identifies settlement funds, or other recovery opportunities, which have been created, primarily as the result of litigation, and then matches those settlements/recovery opportunities with his Fortune 1000 type clients. Prins collects the required supporting data from its clients, prepares and files the claim forms, addresses any inquiries from the claims administrators and collects the funds on behalf of its clients. Prins has assisted in filing claims totaling tens of millions of dollars for his clients.

## COST ACCOUNTING STANDARDS

- Mr. Prins assisted a health care client in the drafting of a Cost Accounting Standards (CAS) disclosure statement/manual for a client which previously had not performed any CAS covered contracts for the Federal government. Mr. Prins and his team analyzed all aspects of the client's business to determine that they met the government's requirements as defined in the Cost Accounting Standards. Mr. Prins and his team assisted the client in drafting the actual CAS manual. They also assisted the client in the required audit by the Defense Contract Audit Agency (DCAA). The DCAA signed off on the CAS manual with only minor revisions to the originally submitted plan.

## FEE DISPUTES

- An insurance carrier requested that Mr. Prins review the billings submitted by another litigation support firm relating to a large engagement. Mr. Prins reviewed the billings to determine if the rates being charged were the rates quoted in the engagement letter. He analyzed time and expense reports to provide a level of comfort that the proper number of hours were being charged by each individual. The matter was concluded to the satisfaction of the carrier.

## ALLEGATIONS OF IMPROPER BUSINESS ACTIVITIES

- An investor in six single asset real estate LLCs sued his partner for mis-appropriation and fraud. Counsel to the investor retained Mr. Prins to analyze the transactions and trace the funds invested and spent. Mr. Prins determined that much of the investor's funds went to pay other investors and other obligations of his partner. Mr. Prins also determined that his partner was paid significant distributions contrary to the terms of their agreements.

- A national insurance brokerage firm made a voluntary disclosure to several of its school district clients that it had over billed and collected commissions and fees from the districts. Mr. Prins was retained, as an independent neutral consultant, to review the broker's disclosure, its supporting documentation and determine if the amount of the refund paid to the school districts was correct.

- Counsel to a composer retained Mr. Prins to determine the amount of loss suffered by the composer resulting from the alleged embezzlement over a four plus year period by his business manager. Mr. Prins reviewed in the amount of royalty income due the composer from his various sources, the amounts actually deposited into his accounts, the amounts transferred out of his accounts by the business manager and the location of where those funds were transferred. In addition Mr. Prins reviewed the various trusts the composer had established and how those trusts allegedly had been depleted by the business manager.

6

- A small defense contractor was facing an indictment due to allegations of overcharging of its overhead rates to the customer. Counsel requested Mr. Prins to investigate the matter. The investigation resulted in a determination that the charging practices of the contractor were questionable, but that no harm came to the customer because the overhead rates being charged were less than the actual rates incurred.

- Mr. Prins was retained by a hospital Board of Directors to review alleged improper activities of a various members of its management team. Mr. Prins and his team reviewed hospital policies and procedures, contracts entered into by the officers and out of pocket costs expended. The team assisted counsel in developing interview outlines for the individuals in question.

- The customer, as the result of a whistle-blower's testimony, made certain allegations of mis-charging of labor costs by a contractor. Mr. Prins analyzed the contracts in question, the labor charging practices of the contractor and the costs incurred on each of the contracts in question. Mr. Prins and his team determined that no mis-charging had taken place. After several meetings with the customer, the customer also agreed that no mis-charging had taken place.

## INTELLECTUAL PROPERTY

- Counsel for an Independent Physicians Association (IPA) accused of improperly recruiting primary care physicians from a competing IPA by using company confidential information retained Mr. Prins to analyze the alleged lost profits suffered by the competing IPA. Mr. Prins analyzed the competitor IPAs historic change in membership and its overall profitability. Mr. Prins also reviewed and analyzed the Corrective Action Plan documentation the competitor IPA filed with the State.

- Mr. Prins was retained to calculate the damages suffered by a designer of a copyrighted print as the result of another company copying the design and using it in various pieces of apparel. The matter settled to the designer's satisfaction.

- Mr. Prins was retained by counsel to a composer to determine the amount of royalties due to him for his work on a highly successful syndicated animated series. The analysis included a determination of the amount due the composer based upon the broadcasts of the series on a nationwide basis, the feature movies which used his music as well as an analysis of the video and DVD sales related to the series. Also included was analysis of the amount due the composer based upon the use of his music on the parent company's web site. The matter was settled to the composer's satisfaction.

## LOST PROFITS

- Counsel for the owner of several dental clinics retained Mr. Prins to calculate the lost profits sustained resulting from a delay in opening one of the clinics. Mr. Prins reviewed the actual operating results for the clinic in question once it did open as well as the operating results of the other clinics owned by his client.

7

- Counsel retained Mr. Prins to determine the damages associated with an ink manufacturers violation and eventual termination of an exclusive distribution agreement with its Southern California distributor.  In this matter Mr. Prins assisted in the coordination of discovery as well as the determination of damages.  With regard to document production, Mr. Prins assisted in which documents should be requested and' eventually which documents should be selected for copying, including a massive out-of-state production of documents. He also assisted in extensive depositions of both percipient and expert witnesses. Mr. Prins created the damage model which demonstrated the past and future losses to the distributor.  Mr. Prins attended all settlement conferences in this matter to present the plaintiff's case to the referee.  The matter was successfully settled prior to trial in the distributor's favor.

- Mr. Prins was retained by counsel to calculate the lost profits associated with a 4-8 week delay in the remodel of a grocery store.  Mr. Prins developed a model to quantify the lost profits by analyzing the sales history of the store, the cost structure of the store, the anticipated sales as well as the environmental factors impacting the grocery industry. The matter was matter successfully negotiated for Mr. Prins' client.

- Counsel retained Mr. Prins to calculate the income derived from a magazine advertisement which ran without the permission of the principle.  Mr. Prins analyzed the revenue and income derived from the target group of the advertisement prior to and after the publication date.  He also evaluated the state of the industry as well as other economic factors.  A jury found for his client.

## COST ALLOCATION

- Counsel to a County retained Mr. Prins to calculate the remediation costs which would be attributable to a group of waste haulers which transported Municipal Solid Waste to a facility in the 50s and 60s.  Mr. Prins reviewed the available documentation indicating the timing and amount of waste delivered to the site.  Mr. Prins developed an allocation model based on these facts and circumstances.

- Mr. Prins was retained by an international construction company to review its' process of charging indirect costs to public contracts.  Mr. Prins reviewed the company's bid and proposal process, the allocation methodologies employed and the process of billing these indirect costs to the customer.  A report of the finding was presented to senior management.

- Mr. Prins, with counsel, was requested to review the charging practices of a contractor's personnel to Independent Research and Development accounts.  This review resulted in a determination that there were questionable charging practices. Mr. Prins developed a model which quantified the impact to the customer.  The matter was successfully negotiated at the amount proposed by the contractor.

8

- Counsel retained Mr. Prins to investigate the allocation of home office expenses to three divisions of a Fortune 500 firm. Mr. Prins created a model which quantified the impact to the divisions and ultimately to the customer when the proper home office charges were allocated to the divisions.

## PARTNERSHIP DISPUTES

- Mr. Prins was appointed by the Court as an independent consultant to assist a Court Appointed Receiver in a long running dispute between a general partner and its limited partners to evaluate the transactions and day-to-day business activities of the partnership. Mr. Prins and his team analyzed over 14 years of data, which included several related party transactions. This analysis resulted in the proposed restatement of the financial statements of the partnership.

- Counsel for a partner claiming an ownership interest in over 20 single asset LLCs valued at over $100 million retained Mr. Prins to review the financial records of these LLCs. The analysis included a review a many inter-company type transactions which transferred funds between the various LLCs. The court found that Mr. Prins' client did have an ownership interest in the LLCs.

- Counsel for an award winning composer retained Mr. Prins to investigate his business partner's dealings with their various partnerships. This matter included a review and analysis of selected personal expenses charged the partnerships by the partner, a review and analysis of investments made in certain projects on behalf of the partnerships, a review and analysis of certain partnership assets removed from those partnerships and transferred to other of the business partner's entities. The matter was settled to the composer's satisfaction.

- Mr. Prins was retained by counsel to analyze a series partnership related transactions which included the sale and buyback of partnership interests relating to a mixed use project which included condominiums, apartments and retail.

- Mr. Prins was retained to calculate the lost profits suffered by a prospective partner in a mixed use project which included residential homes and a golf course. The matter settled to the satisfaction of the partner.

## PERSONAL INJURY

- Mr. Prins was retained by counsel of a child actor to calculate his lost wages resulting from an accident. Mr. Prins analyzed his past earnings history, the residuals earned, the pension plan of which he was a member as well as other industry related data. Mr. Prins calculated the actor's lost wages stemming from his accident.

- Counsel for a delivery company retained Mr. Prins to calculate the losses suffered by a real estate developer as a result of the company's driver causing an auto accident which involved the developer. Mr. Prins analyzed the developer's past projects as well as his proposed projects to calculate his alleged losses.

## PROFESSIONAL MALPRACTICE

- Mr. Prins was retained by Counsel to a Big 5 accounting firm which was accused of professional malpractice. The accounting firm's client was involved in many acquisitions as well as a transaction which the client sold itself to another entity. As part of his work, Mr. Prins and his team reviewed and analyzed various purchase transactions in question. The team also reviewed the accounting firm's client's documentation relating to how it recognized revenue relating to various sales and agreements and contracts with venders. Also as part of this engagement Mr. Prins reviewed and analyzed the events surrounding the sale.

- Mr. Prins was retained to calculate the lost profits suffered by an auto dealer as a result of an architect's failure to properly design a new dealership. The matter settled to the auto dealer's satisfaction.

- Counsel for a medical group practice retained Mr. Prins to calculate the damages associated with a computer system that was installed but failed to perform as advertised. Mr. Prins quantified the loss of revenues due to the disruption caused by the failure of the computer system. He also quantified all of the out-of-pocket costs incurred by the medical group in order to remedy the situation. The matter was successfully negotiated to the satisfaction of the medical group.

- Mr. Prins was retained by counsel for an elderly investor to evaluate if the investments which were purchased for her by her broker were appropriate for her needs given her net worth and income requirements. Mr. Prins reviewed and analyzed the needs of the investor, the investment requirements as stated by the investor on her profile sheet and the investments which were purchased. Mr. Prins determined that many of the investments were inappropriate investments given her needs. The matter was successfully negotiated in favor of the investor.

## REQUEST FOR EQUITABLE ADJUSTMENT

- Counsel for an international aircraft manufacturer retained Mr. Prins as its claims consultant to review and analyze the manufacturer's proposal, bid and contract for a next generation commercial aircraft program. Based on current pricing, the program was projected to experience a cost overrun of several billion dollars. Mr. Prins analyzed the areas of cost overruns and assisted the manufacturer to preparing settlement proposals to the prime contractor.

- Counsel for an international construction company retained Mr. Prins to review the project records of a mixed use project which had experienced significant cost overruns. Several subcontractors were also submitting claims due to their own cost overruns. Mr. Prins reviewed the project records, the subcontractor claims and assisted the contractor with settling these claims.

10

- Counsel for a contractor retained Mr. Prins to prepare a request for equitable adjustment relating to an aircraft modification project. For this assignment, Mr. Prins was required to develop a model which calculated the disruption associated with a myriad of changes passed down from the customer. The matter was successfully negotiated in favor of the contractor.

- Mr. Prins was retained by counsel to prepare a request for equitable adjustment for a defense contractor. On this engagement, Mr. Prins developed models which calculated a "should have been" baseline. The baseline included the original proposal submitted to the customer, plus any negotiated change orders, omissions made by the contractor at time of proposal and other items for which the contractor was responsible. This baseline was then compared to the actual and anticipated costs to complete to determine the amount of compensable costs due the contractor. Mr. Prins assisted in the presentations to and negotiations with the customer. The request for equitable adjustment was settled in a manner favorable to the contractor on all issues.

- Mr. Prins was requested by a contractor to review a request for equitable adjustment that the contractor's personnel had prepared. Mr. Prins reviewed all the direct and indirect cost inputs. He reviewed all the theory associated with the request. At the conclusion of his investigation, he made several presentations to the management team of the contractor. At this time he made a number of suggestions to improve and strengthen the request. These were incorporated and the matter reached a negotiated conclusion in the contractor's favor.

**WRONGFUL TERMINATION**

- Mr. Prins was retained by the counsel of a large software developer to calculate the damages resulting from the wrongful termination of an employee. Mr. Prins quantified the lost earnings including the value of stock options lost due to the termination. The matter was successfully negotiated to the satisfaction of the software developer.

# EXHIBIT 3

| Cases Vehicle Is Included In | | Access Mechanisms | Air Conditioning Systems | Air Flow Meters | Alternators | Anti-Vibration Rubber Parts |
|---|---|---|---|---|---|---|
| Round 1 | | | $ 28,486,133 | $ 5,047,920 | $ 6,216,420 | $ 10,283,916 |
| Round 2 | | $ 3,458,000 | $ 14,235,860 | | $ 67,579,207 | $ 70,063,309 |
| Round 3 | | | $ 7,600,000 | | | |
| Round 4 | | | | | | |
| TOTALS | 41 | $ 3,458,000 | $ 50,321,993 | $ 5,047,920 | $ 73,795,627 | $ 80,347,225 |
| IMPACT VEHICLE POOL | 321,901,989 | 33,135,192 | 136,594,524 | 8,933,302 | 74,755,870 | 91,072,037 |
| Number of Make, Model, Year | 8,678 | | | | | |
| Eligible State Adj | 50% | | | | | |
| Subtotal | 160,950,995 | 16,567,596 | 68,297,262 | 4,466,651 | 37,377,935 | 45,536,019 |
| Participation Rate Scenario 1 | 20% | 3,313,519 | 13,659,452 | 893,330 | 7,475,587 | 9,107,204 |
| Participation Rate Scenario 2 | 10% | 1,656,760 | 6,829,726 | 446,665 | 3,737,794 | 4,553,602 |
| Participation Rate Scenario 3 | 5% | 828,380 | 3,414,863 | 223,333 | 1,868,897 | 2,276,801 |
| Claim Vehicles | 41 | 1 | 1 | 1 | 1 | 1 |
| Claim Projection Scenario 1 | 20% | 1.04 | 3.68 | 5.65 | 9.87 | 8.82 |
| Claim Projection Scenario 2 | 10% | 2.09 | 7.37 | 11.30 | 19.74 | 17.64 |
| Claim Projection Scenario 3 | 5% | 4.17 | 14.74 | 22.60 | 39.49 | 35.29 |

| Cases Vehicle Is Included In | ATF Warmers | Automotive Bearings | Automotive Brake Hoses | Automotive Constant Velocity Joint Boot Products | Automotive Hoses | Automotive Lamps |
|---|---|---|---|---|---|---|
| Round 1 | $ 741,000 | | | | | |
| Round 2 | $ 1,662,943 | | | | | |
| Round 3 | $ 380,366 | $ 30,020,000 | $ 1,140,000 | $ 1,756,691 | $ 1,116,084 | |
| Round 4 | | $ 60,822,819 | $ 659,456 | $ 716,505 | $ 5,428,167 | $ 34,213,409 |
| TOTALS | $ 2,784,309 | $ 90,842,819 | $ 1,799,456 | $ 2,473,196 | $ 6,544,250 | $ 34,213,409 |
| IMPACT VEHICLE POOL Number of Make, Model, Year | 16,008,760 | 124,685,449 | 91,624,459 | 36,570,852 | 89,433,367 | 135,548,645 |
| Eligible State Adj | | | | | | |
| Subtotal | 8,004,380 | 62,342,725 | 45,812,230 | 18,285,426 | 44,716,684 | 67,774,323 |
| Participation Rate Scenario 1 | 1,600,876 | 12,468,545 | 9,162,446 | 3,657,085 | 8,943,337 | 13,554,865 |
| Participation Rate Scenario 2 | 800,438 | 6,234,273 | 4,581,223 | 1,828,543 | 4,471,668 | 6,777,432 |
| Participation Rate Scenario 3 | 400,219 | 3,117,136 | 2,290,612 | 914,271 | 2,235,834 | 3,388,716 |
| Claim Vehicles | 1 | 1 | 1 | 1 | 1 | 1 |
| Claim Projection Scenario 1 | 1.74 | 7.29 | 0.20 | 0.68 | 0.73 | 2.52 |
| Claim Projection Scenario 2 | 3.48 | 14.57 | 0.39 | 1.35 | 1.46 | 5.05 |
| Claim Projection Scenario 3 | 6.96 | 29.14 | 0.79 | 2.71 | 2.93 | 10.10 |

| Cases Vehicle Is Included In | Automotive Steel Tubes | Automotive Wire Harness | Body Sealings | Ceramic Substrates | Electric Powered Steering Assemblies | Electronic Throttle Bodies |
|---|---|---|---|---|---|---|
| Round 1 | | $ 119,496,220 | | | | $ 6,870,780 |
| Round 2 | | $ 65,585,264 | | $ 1,531,138 | $ 7,011,463 | |
| Round 3 | $ 5,320,000 | $ 1,915,200 | $ 37,620,000 | $ 12,160,000 | $ 6,606,494 | |
| Round 4 | $ 13,571,300 | | $ 28,098,653 | $ 26,600,000 | $ 4,133,735 | |
| TOTALS | $ 18,891,300 | $ 186,996,684 | $ 65,718,653 | $ 40,291,138 | $ 17,751,693 | $ 6,870,780 |
| MPACT VEHICLE POOL Number of Make, Model, Year | 65,654,769 | 71,919,192 | 130,185,578 | 75,933,657 | 89,586,045 | 9,386,734 |
| Eligible State Adj | | | | | | |
| Subtotal | 32,827,385 | 35,959,596 | 65,092,789 | 37,966,829 | 44,793,023 | 4,693,367 |
| Participation Rate Scenario 1 | 6,565,477 | 7,191,919 | 13,018,558 | 7,593,366 | 8,958,605 | 938,673 |
| Participation Rate Scenario 2 | 3,282,739 | 3,595,960 | 6,509,279 | 3,796,683 | 4,479,302 | 469,337 |
| Participation Rate Scenario 3 | 1,641,369 | 1,797,980 | 3,254,639 | 1,898,341 | 2,239,651 | 234,668 |
| Claim Vehicles | 1 | 1 | 1 | 1 | 1 | 1 |
| Claim Projection Scenario 1 | 2.88 | 26.00 | 5.05 | 5.31 | 1.98 | 7.32 |
| Claim Projection Scenario 2 | 5.75 | 52.00 | 10.10 | 10.61 | 3.96 | 14.64 |
| Claim Projection Scenario 3 | 11.51 | 104.00 | 20.19 | 21.22 | 7.93 | 29.28 |

| Cases Vehicle Is Included In | Exhaust Systems | Fan Motors | Fuel Injection Systems | Fuel Senders | Heater Control Panels | HID Ballasts |
|---|---|---|---|---|---|---|
| Round 1 | | | $ 8,693,640 | 58,000 | $ 2,182,780 | $ 5,510,596 |
| Round 2 | $ 20,330,000 | $ 142,120 | $ 22,604,113 | 187,823 | $ 14,676,679 | $ 4,636,266 |
| Round 3 | $ 760,000 | $ 3,664,422 | $ 8,831,253 | | $ 4,565,346 | $ 2,883,120 |
| Round 4 | | | $ 3,619,900 | | $ 1,366,578 | |
| TOTALS | $ 21,090,000 | $ 3,806,542 | $ 43,748,906 | $ 245,823 | $ 22,791,383 | $ 13,029,982 |
| IMPACT VEHICLE POOL Number of Make, Model, Year | 86,251,685 | 39,120,647 | 102,624,662 | 8,073,433 | 23,392,439 | 16,113,512 |
| Eligible State Adj | | | | | | |
| Subtotal | 43,125,843 | 19,560,324 | 51,312,331 | 4,036,717 | 11,696,220 | 8,056,756 |
| Participation Rate Scenario 1 | 8,625,169 | 3,912,065 | 10,262,466 | 807,343 | 2,339,244 | 1,611,351 |
| Participation Rate Scenario 2 | 4,312,584 | 1,956,032 | 5,131,233 | 403,672 | 1,169,622 | 805,676 |
| Participation Rate Scenario 3 | 2,156,292 | 978,016 | 2,565,617 | 201,836 | 584,811 | 402,838 |
| Claim Vehicles | 1 | 1 | 1 | 1 | 1 | 1 |
| Claim Projection Scenario 1 | 2.45 | 0.97 | 4.26 | 0.30 | 9.74 | 8.09 |
| Claim Projection Scenario 2 | 4.89 | 1.95 | 8.53 | 0.61 | 19.49 | 16.17 |
| Claim Projection Scenario 3 | 9.78 | 3.89 | 17.05 | 1.22 | 38.97 | 32.35 |

| Cases Vehicle Is Included In | Ignition Coils | Instrument Panel Clusters | Interior Trim Products | Inverters | Motor Generators | Occupant Safety Systems |
|---|---|---|---|---|---|---|
| Round 1 | $ 7,431,660 | $ 7,235,000 | | $ 2,337,000 | $ 2,337,000 | $ 24,446,350 |
| Round 2 | $ 31,314,022 | $ 7,525,762 | | $ 142,120 | $ 142,120 | |
| Round 3 | $ 5,396,000 | $ 3,800,000 | $ 2,470,000 | | | |
| Round 4 | $ 1,520,000 | | $ 5,089,494 | | | $ 34,543,172 |
| TOTALS | $ 45,661,682 | $ 18,560,762 | $ 7,559,494 | $ 2,479,120 | $ 2,479,120 | $ 58,989,522 |
| MPACT VEHICLE POOL Number of Make, Model, Year | 76,077,521 | 70,414,521 | 50,604,057 | 1,258,375 | 2,868 | 110,941,269 |
| Eligible State Adj | | | | | | |
| Subtotal | 38,038,761 | 35,207,261 | 25,302,029 | 629,188 | 1,434 | 55,470,635 |
| Participation Rate Scenario 1 | 7,607,752 | 7,041,452 | 5,060,406 | 125,838 | 287 | 11,094,127 |
| Participation Rate Scenario 2 | 3,803,876 | 3,520,726 | 2,530,203 | 62,919 | 143 | 5,547,064 |
| Participation Rate Scenario 3 | 1,901,938 | 1,760,363 | 1,265,101 | 31,459 | 72 | 2,773,532 |
| Claim Vehicles | 1 | 1 | 1 | 1 | 1 | 1 |
| Claim Projection Scenario 1 | 6.00 | 2.64 | 1.49 | 19.70 | 8,638.05 | 5.32 |
| Claim Projection Scenario 2 | 12.00 | 5.27 | 2.99 | 39.40 | 17,336.50 | 10.63 |
| Claim Projection Scenario 3 | 24.01 | 10.54 | 5.98 | 78.80 | 34,432.22 | 21.27 |

| Cases Vehicle Is Included In | Power Window Motors | Power Window Switches | Radiators | Shock Absorbers | Side Door Latches | Spark Plugs |
|---|---|---|---|---|---|---|
| Round 1 | | | $ 6,669,000 | | | |
| Round 2 | $ 142,120 | $ 3,040,000 | $ 15,760,989 | $ 13,300,000 | $ 2,280,000 | $ 9,760,366 |
| Round 3 | $ 19,180,770 | | $ 9,252,034 | $ 38,806,265 | $ 2,280,000 | $ 41,729,168 |
| Round 4 | | $ 4,408,000 | | | | |
| TOTALS | $ 19,322,890 | $ 7,448,000 | $ 31,682,023 | $ 52,106,265 | $ 4,560,000 | $ 51,489,534 |
| IMPACT VEHICLE POOL Number of Make, Model, Year | 88,016,951 | 20,831,369 | 72,511,884 | 90,866,408 | 48,402,328 | 232,652,224 |
| Eligible State Adj | | | | | | |
| Subtotal | 44,008,476 | 10,415,685 | 36,255,942 | 45,433,204 | 24,201,164 | 116,326,112 |
| Participation Rate Scenario 1 | 8,801,695 | 2,083,137 | 7,251,188 | 9,086,641 | 4,840,233 | 23,265,222 |
| Participation Rate Scenario 2 | 4,400,848 | 1,041,569 | 3,625,594 | 4,543,320 | 2,420,116 | 11,632,611 |
| Participation Rate Scenario 3 | 2,200,424 | 520,784 | 1,812,797 | 2,271,660 | 1,210,058 | 5,816,306 |
| Claim Vehicles | 1 | 1 | 1 | 1 | 1 | 1 |
| Claim Projection Scenario 1 | 2.20 | 3.58 | 4.37 | 5.73 | 0.94 | 2.21 |
| Claim Projection Scenario 2 | 4.39 | 7.15 | 8.74 | 11.47 | 1.88 | 4.43 |
| Claim Projection Scenario 3 | 8.78 | 14.30 | 17.48 | 22.94 | 3.77 | 8.85 |

| Cases Vehicle Is Included In | Starters | Steering Angle Sensors | Switches | Valve Timing Control Devices | Windshield Washer Systems | Windshield Wipers |
|---|---|---|---|---|---|---|
| Round 1 | $ 3,832,680 | $ 6,293,229 | $ 5,296,175 | $ 3,972,900 | | |
| Round 2 | $ 26,184,035 | | | $ 26,193,502 | $ 362,978 | $ 3,310,103 |
| Round 3 | $ 10,497,337 | | | | $ 1,548,006 | $ 33,403,430 |
| Round 4 | | $ 677,714 | $ 3,410,261 | $ 668,800 | | |
| TOTALS | $ 40,514,052 | $ 6,970,943 | $ 8,706,436 | $ 30,835,202 | $ 1,910,984 | $ 36,713,533 |
| MPACT VEHICLE POOL Number of Make, Model, Year | 85,201,274 | 4,684,426 | 33,576,723 | 18,845,402 | 71,802,630 | 114,419,786 |
| Eligible State Adj | | | | | | |
| Subtotal | 42,600,637 | 2,342,213 | 16,788,362 | 9,422,701 | 35,901,315 | 57,209,893 |
| Participation Rate Scenario 1 | 8,520,127 | 468,443 | 3,357,672 | 1,884,540 | 7,180,263 | 11,441,979 |
| Participation Rate Scenario 2 | 4,260,064 | 234,221 | 1,678,836 | 942,270 | 3,590,132 | 5,720,989 |
| Participation Rate Scenario 3 | 2,130,032 | 117,111 | 839,418 | 471,135 | 1,795,066 | 2,860,495 |
| Claim Vehicles | 1 | 1 | 1 | 1 | 1 | 1 |
| Claim Projection Scenario 1 | 4.76 | 14.88 | 2.59 | 16.36 | 0.27 | 3.21 |
| Claim Projection Scenario 2 | 9.51 | 29.76 | 5.19 | 32.72 | 0.53 | 6.42 |
| Claim Projection Scenario 3 | 19.02 | 59.52 | 10.37 | 65.45 | 1.06 | 12.83 |

# EXHIBIT 4

**Auto Parts Settlement**
**Summary of Vehicles Subject**
**to the Settleemnts**

| Number of Impacted Parts in the Vehicle | Number of Vehicle Types | Percent of Total | | Total Vehicle Sales | Percent of Total |
|---|---|---|---|---|---|
| 1 | 1,058 | 19.4% | | 47,154,731 | 14.6% |
| 2 | 761 | 14.0% | | 29,962,248 | 9.3% |
| 3 | 565 | 10.4% | | 27,762,919 | 8.6% |
| 4 | 393 | 7.2% | | 24,563,279 | 7.6% |
| 5 | 367 | 6.7% | | 21,879,589 | 6.8% |
| 6 | 362 | 6.6% | | 24,222,030 | 7.5% |
| 7 | 278 | 5.1% | | 17,291,245 | 5.4% |
| 8 | 195 | 3.6% | | 11,628,386 | 3.6% |
| 9 | 162 | 3.0% | | 9,981,750 | 3.1% |
| 10 | 132 | 2.4% | | 10,606,040 | 3.3% |
| 11-15 | 615 | 11.3% | | 35,700,753 | 11.1% |
| 16-20 | 359 | 6.6% | | 25,565,948 | 7.9% |
| 21-25 | 138 | 2.5% | | 19,779,090 | 6.1% |
| 26 - 30 | 61 | 1.1% | | 15,803,981 | 4.9% |
| Subtotal | 5,446 | | | 321,901,989 | |
| Vehicles with 0 Sales | 3,232 | | | | |
| Totals | 8,678 | | | | |